O  capIN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>Pacifica of the Valley Corporation,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 26-11060 (TMH) |

**MOTION OF THE DEBTOR FOR
(I) AUTHORIZATION TO (A) PAY EMPLOYEE OBLIGATIONS, (B) CONTINUE
EMPLOYEE BENEFIT PROGRAMS; AND (II) GRANTING RELATED RELIEF**

Pacifica Hospital of the Valley, as debtor and debtor in possession (the "Debtor") under chapter 11 of title 11 of the United States Code, §§ 101 *et seq.* (the "Bankruptcy Code")[2], in this chapter 11 case (425the "Chapter 11 Case"), by and through its undersigned counsel, hereby moves (the "Motion")[3] for entry of an interim order (substantially in the form attached hereto as **Exhibit A**, the "Interim Order") and a final order (substantially in the form attached hereto as **Exhibit B**, the "Final Order"): (i) authorizing, but not directing, the Debtor to (a) pay prepetition wages, salaries, other compensation, and reimbursable expenses, and (b) continue employee compensation and benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto (together, the "Employee Compensation & Benefits"); (ii) scheduling a final hearing (the "Final Hearing"); and (iii) granting related relief.  In further support of the Motion, the Debtor respectfully states as follows.

---

[1] The Debtor in this Chapter 11 Case, along with the last four digits of the Debtor's federal tax identification number, is 7312. The Debtor's mailing address is 9449 San Fernando Road, Sun Valley, CA 91352.

[2] All references to "section" or "§" herein are to sections of the Bankruptcy Code.  All references to "Bankruptcy Rules" are to provisions of the Federal Rules of Bankruptcy Procedure. All references to "Local Rules" are to provisions of the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Delaware.

[3] Capitalized terms used but not defined in this Motion have the meanings ascribed to them in the First Day Declaration (as defined below).

**PRELIMINARY STATEMENT**

1. The relief sought in this Motion is critical for the Debtor to continue to operate its business and retain the morale and services of its employees (the "Employees"). The Employees are vital to the operation of the Debtor's business and to the health, welfare, safety and security of the patients who seek medical care therein. Payment of, and otherwise honoring, Employee Compensation & Benefits is necessary to prevent Employees from terminating their employment with the Debtor and to maintain Employee morale pending resolution of the Chapter 11 Case. Any disruption to payment of Employee Compensation & Benefits would adversely affect the Debtor's goals in the Chapter 11 Case and may severely affect the Debtor's ability to preserve its assets and administer its estate. In support of this Motion, the Debtor relies upon and refers this Court to the *First Day Declaration of Precious Mayes* (the "First Day Declaration"). For these reasons, and as more fully explained below, the Debtor requests that this Court grant the relief requested herein.

## I.    JURISDICTION AND VENUE

2. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012. The Debtor confirms its consent, pursuant to Bankruptcy Rule 7008, to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3. Venue of the Chapter 11 Case and related proceedings is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The predicates for the relief requested herein are: §§ 105, 362, 363, 503, 507, and 541, Rules 6003 and 6004(h) of the Bankruptcy Rules and Local Rule 9013-1(m).

## II.   STATEMENT OF FACTS

### A.  General Background

5.      On the date hereof (the "Petition Date"), the Debtor commenced a voluntary case for relief under chapter 11 of the Bankruptcy Code. The Debtor is authorized to continue operating its business and managing its properties as debtor in possession pursuant to §§ 1107(a) and 1108.  No trustee, examiner, or statutory committee has been appointed in the Chapter 11 Case.

6.      Additional information regarding the Debtor, including its business and the events leading to the commencement of this Chapter 11 Case, is set forth in the First Day Declaration.

### B.  The Debtor's Employees

#### a.  Generally

7.      The Debtor's workforce consists of approximately 697 Employees.  These Employees include registered nurses, technicians, housekeepers, and food-service workers.  All of the Debtor's Employees are vital to patient care and to the Debtor's efforts to emerge from Chapter 11.

8.      In addition to full-time and part-time Employees, the Debtor employs per-diem Employees on an as-needed basis. Per diem employees are called in whenever the Debtor would not otherwise meet its core staffing requirements – for example, when core employees are sick or on vacation, or there is a spike in patient census.

#### b.  Employee Unions

9.      Approximately 538 of the Employees are represented by unions (the "Represented Employees").  The Represented Employees are represented by SEIU 121 RN and SEIU-UHW (collectively, the "Unions").[4]  The Debtor's contractual arrangements with the

---

[4] With respect to payment of any Employee Compensation & Benefits to Represented Employees, the Debtor reserves all of its rights to modify or reject such obligations and benefits under the CBAs pursuant to § 1113.  Any

Unions regarding the employment of the Represented Employees are reflected in collective bargaining agreements (each a "CBA," and collectively, the "CBAs").  For the avoidance of doubt, the Debtors do not seek to modify or amend the CBAs in this Motion.[5]

**C. Obligations on Account of Employee Wages and Other Compensation, Business Expenses, Deductions and Payroll Taxes**

a.  Payroll Schedules

10.     Traditionally, and with the limited exception noted below, Employees receive wages and salaries (the "Wages") according to two bi-weekly cycles: "Cycle 1" is for SEIU-121RN Employees and non-Represented Employees and "Cycle 2" is for SEIU-UHW Employees.  These cycles alternate so that the Debtor pays a payroll every week.

11.     Cycle 1 Employees have been paid through June 27, 2026.  Their next payroll is July 17, 2026, at which time they will be paid through July 11, 2026.  Cycle 2 Employees have been paid through June 20, 2026.  Their next payroll is July 10, 2026, at which time they will be paid through July 4, 2026.

12.     The Debtor does not pre-fund payrolls and pays Employees via checks, which are issued on the applicable payday.

b.  Outstanding Amounts to Employees and the Upcoming Payrolls

13.     The Debtor estimates that it owes its Employees an aggregate of approximately $1,490,000 on account of accrued Wages, including unpaid wages, salaries, paid leave, and other regular compensation earned before the Petition Date (collectively, the "Unpaid Employee Wages"); however, this amount may fluctuate.

---

request in this Motion to pay or honor such obligations and benefits to Represented Employees does not obligate or bind the Debtor to make any payments or provide any benefits to Represented Employees absent further order of this Court.

[5] The SEIU-121RN CBA is in the "printing stage," and is effective January 1, 2026, through December 31, 2029. The Debtor is party to a tentative agreement with SEIU-UHW, which is effective June 1, 2026, through May 31, 2029. These SEIU Employees are entitled to a two percent retroactive pay increase effective June 7, 2026, and pursuant to this Motion, the Debtor intends to honor these retroactive pay increases by including additional compensation for eligible employees in each of the next two postpetition pay periods.

14. Postpetition, the Debtor estimates its average gross payroll for its Employees will be approximately $2,331,534 per month ($1,459,342 for Cycle 1 and $2,331,534 for Cycle 2).

15. In the Debtor's upcoming payrolls, the Debtor would ordinarily pay Employees amounts that had been reconciled or adjusted as owed from any previous underpayment, including recently submitted expenses, uncalculated overtime, etc. (with these amounts referred to as the "Adjustments," which are included in the definition of Wages and Unpaid Employee Wages as applicable).

16. By this Motion, the Debtor seeks authority, but not direction, (i) to pay the Unpaid Employee Wages (which arose prepetition) in the ordinary course of business consistent with past practice, provided that no Employee shall be paid prepetition Wages exceeding $17,150, absent specific order from this Court and (ii) to pay postpetition Wages in the ordinary course.

c. Payroll Costs

17. The Debtor incurs certain obligations related to operating its payroll (the "Payroll Costs"). Services from vendors ADP and JB Developers are part of the Payroll Costs, and the Debtor owes prepetition amounts to these vendors for Payroll Costs (approximately $10,597 to ADP and approximate $8,428 to JB Developers). The Debtor seeks authority to honor prepetition amounts of Payroll Costs and to continue making payments on account of the Payroll Costs to ensure continued payroll services during the Chapter 11 Case.

d. Supplemental Workforce

18. The Debtor utilizes independent contractors for services, including physician care. These independent contractors are paid by the Debtor as needed, and not based on any set payment schedule (these workers are the "Supplemental Workforce"). As of the Petition Date, the Debtor estimates that approximately $4,906,000 in prepetition amounts are owed to

the Supplemental Workforce. If the Debtor does not pay these amounts, the Supplemental Workforce may stop working for the Debtor. Accordingly, the Debtor requests authority to pay the Supplemental Workforce, as part of its ordinary course of business, whether the amounts are for services that arose pre or postpetition.

### e.  Business Expense Reimbursements

19.    The Debtor customarily reimburses Employees who incur business expenses in the ordinary course of performing their duties on behalf of the Debtor.  Such expenses typically include, but are not limited to, business-related travel expenses (including mileage), general corporate purchases, online payments and other items (the "Reimbursement Obligations"). Expense reports detailing the Reimbursement Obligations are submitted for reimbursement by the Employees and generally must be supported by copies of receipts.  Expenses are reimbursed with payroll.

20.    There is commonly a delay between when an Employee incurs an expense and submits the corresponding expense report for processing.  Therefore, it is difficult for the Debtor to determine the exact amount of Reimbursement Obligations that are currently due and owing.  Still, the Debtor is not aware of any outstanding Reimbursement Obligations, and the Debtor believes that few, if any, Employees have not received checks for obligations earned within 180 days of the Petition Date that would, with other amounts owed, require payment above the § 507(a)(4) cap.[6]  However, notwithstanding that caveat, the Debtor seeks authority to pay Employees in the ordinary course all amounts on account of Reimbursement Obligations, no matter when earned, and to continue to pay these amounts in the ordinary course of the Debtor's business.

---

[6] The Debtor reserves all rights and does not concede that any Reimbursement Obligation should count against the § 507(a)(4) cap.

f.   Deductions and Withholding

21.   Certain of these Employee Benefit Programs are funded by the Employees themselves through payroll deductions or a combination of payroll deductions and contributions from the Debtor (the "Deductions").  Deductions include Union dues (year to date, per pay period Deductions are approximately $6,426 for SEIU-121RN and $14,422 for SEIU-UHW), and the Debtor is also required by law to withhold from the Employees' wages amounts related to, among other things, national, regional, and local income tax (the "Employee Payroll Taxes") for remittance to the appropriate taxing authorities.  The Employee Payroll Taxes are generally processed and forwarded to the appropriate federal, state, or local taxing authority when the Employees' payroll checks are disbursed.

22.   The average amount of Deductions per pay period varies.  The Debtor seeks authority and discretion to continue deducting and remitting amounts to the appropriate third parties in a manner consistent with historical practice for any unpaid Deductions that relate to the period prior to the Petition Date and, postpetition, to continue the Deductions in the ordinary course of the Debtor's business.

**D.  The Debtor's Employee Benefit Programs**

23.   In addition to their wages, the Debtor's Employees also generally are entitled to receive other forms of compensation, including health benefits, paid time off, and reimbursement of certain business expenses (collectively, the "Employee Benefit Programs").  The Employee Benefit Programs include, but are not limited to: (i) paid time off; (ii) a retirement savings plan; (iii) a healthcare program, including dental and vision coverage; and (iv) other insurance coverage.

a.   PTO

24.   The Debtor provides eligible Employees with paid time off ("PTO").  Employees accrue PTO depending on factors like length of service and amount of shifts taken.

Eligible Employees accrue PTO and are entitled to receive a payout of accrued, but unused, PTO for their final paycheck if they are terminated. As of the Petition Date, the Debtor has approximately $1,800,000 in PTO on its books representing approximately 34,800 hours.

25. The Debtor believes that the continuation of the PTO policy in accordance with prior practice for its Employees is essential to maintaining Employee wellness and morale during the Chapter 11 Case. Further, the policies are broad-based programs upon which all Employees have come to depend. Moreover, disruptions or changes to these policies could have a direct impact on Employee commitment, morale, and retention, to the detriment of the Debtor.

26. The Debtor therefore seeks authority to honor its existing PTO policies to the extent they would permit continuing Employees to use their prepetition accrued leave in the ordinary course of business and going forward. Further, the Debtor is often required under applicable law to fully pay out PTO upon termination of an Employee. The Debtor seeks authority to fully pay out PTO in these circumstances, regardless of whether the amount exceeds the statutory cap(s) of § 507(a).

b. Health Plans

27. The Debtor offers eligible Employees and their eligible dependents the option of medical, dental and vision insurance. For medical insurance (including prescription drug coverage), the Debtor offers self-insured coverage utilizing Allied Benefit Services (respectively, the "Medical Plan" and the "Health Provider"). The coverage offered by the Medical Plan differs depending on the level of coverage Employees elect to receive.

28. As the Debtor self-insures for the Medical Plan, it is ultimately responsible for qualifying amounts of Employee health claims. This year, Employee claims have averaged $145,436 per week. In order to maintain the Medical Plan, the Debtor also pays (i) medical premiums ($102,687.58 in latest invoice), and (ii) fees, including administrative fee to the

Health Provider (with the last invoice for $11,273.60 in administrative fees), broker fees ($11,648.00 in latest invoice), PPO fees ($7,862.40 in latest invoice), ACS fees ($832.22 in latest invoice) and Teledoc fees ($1,464.32 in latest invoice).  The Debtor owes the Health Provider a total of approximately $1,700,000 (approximately $1,875,000 for Employee health claims and $425,000 for premiums).

29.     For dental insurance and vision insurance the Debtor also offers fully-insured coverage through Avesis Premier Access (respectively, the "Dental Plan" and the "Vision Plan, and, together with the Medical Plan and Dental Plan, defined as the "Health Plans").  The monthly premiums for the Dental and Vision Plan are approximately $42,000 per month in the aggregate.

30.     The Debtor makes payroll Deductions depending on the level of coverage the Employee elects to receive for all Health Plans.

31.     Medical premiums are due on the 15th day of the month of coverage.  Premiums for the Vision Plan and Dental Plan are due on the first day of the month of coverage, with a 30-day grace period.  The Debtor made payment for the Dental Plan on May 31, 2026, and is now in arrears for the June payment.

32.     The Debtor seeks authority to maintain and administer the Health Plans and to make payments due or that will be due relating to the Health Plans, including, without limitation, paying claims, paying premiums, paying Reimbursement Obligations relating to the Health Plans, and paying the providers of the Health Plans.  For the avoidance of doubt, the Debtor seeks authority to continue to pay, in its discretion and in the ordinary course of its business, the premiums for the Health Plans incurred postpetition and to maintain its Health Plans.

33.     Furthermore, and for similar reasons, the Debtor seeks to continue to perform any obligations under § 4980B of the Internal Revenue Code to administer Continuation Health

Coverage ("COBRA") (*see* 26 U.S.C. § 4980B) with respect to eligible former Employees.  All COBRA costs are included in the Medical Plan, and COBRA benefits are administered by Allied Benefit Services.  In order to maintain employee morale and ensure the orderly administration of the estate, the Debtor requests authority to pay, in its discretion such prepetition costs and amounts discussed in this section and continue to pay post-petition amounts in the ordinary course.

c.   Employee Life and AD&D Insurance and Voluntary Plans

34.   The Debtor offers eligible Employees life insurance and accidental death and dismemberment ("Life and AD&D Insurance") through Colonial Life.  The maximum benefit under the Life & AD&D Insurance is 1x base salary, up to a maximum of $150,000 (and Employees may also obtain supplemental insurance for their spouses and children).  The amount of monthly costs for Life and AD&D Insurance totals approximately $4,500 per month, less voluntary employee deductions.  The next payment due date is July 13, 2026.

35.   The Debtor offers voluntary plans to eligible employees (Accident, Hospital Indemnity, Cancer and Critical Illness).  Premiums are paid by employees directly to the carrier (Colonial Life).   The Debtor does not offer employee deductions (pass through) for these voluntary plans.

36.   The Debtor's Employees and their families depend on insurance provided by the Debtor as a fundamental aspect of compensation.  Any disruption or perceived disruption regarding insurance benefits or coverage would damage morale and may cause Employees to seek employment elsewhere.

37.   The Debtor seeks authority, in its discretion, to maintain these programs, to pay any accrued and unpaid prepetition premiums and related charges and to continue the above benefits postpetition and to deliver the Employees' portion of any accrued and unpaid

prepetition premiums for the AD&D Insurance and Life Insurance to the corresponding administrators in connection with the payment of the Wages and withholding obligations.

        d.  Retirement Plan

38.     The Debtor offers eligible Employees the opportunity to participate in a Pooled Employer Plan through Transamerica (the "Retirement Plan").  Employees participating in this program may contribute up to the federal statutory caps per year, and the Debtor deducts the employee deferrals from Employee paychecks for each pay cycle.  The Debtor transitioned to the Retirement Plan effective May 1, 2026, from a 401(k) plan (the "401(k) Plan").  The Debtor estimates it owes "blackout" amounts concerning this transition from the 401(k) Plan of approximately $374,225 (the "Black-Out Payments").

39.     Maintaining and honoring the Retirement Plan, including making the Black-Out Payments, as part of the Employee Benefit Programs is critical to maintaining employee morale. The Debtor requests authority to deliver and to pay in its discretion all Retirement Plan amounts to maintain employee morale and ensure the orderly administration of the estate.

**E.  Bonuses**

40.     The Debtor pays bonuses (the "Bonuses") in the ordinary course of the Debtor's business to eligible nurses who obtain their bachelor's degree while working for the Debtor. The Debtor is not aware of any outstanding Bonuses at this time.  Still, the Debtor seeks permission to pay, in the Debtor's discretion, the Bonuses, whether earned prepetition or postpetition, and, for the avoidance of doubt, the Debtor does not seek permission by this Motion to pay Bonuses to any insiders.  Further, the Debtor will not make any payment of Bonuses that exceeds the $17,150 statutory cap for an Employee on an interim basis.

### III.    RELIEF REQUESTED

41.     By this Motion, the Debtor requests the Court enter the Interim Order and authorize, but not direct, the Debtor to pay the Employee Compensation & Benefits on an

interim basis, to schedule the Final Hearing and to enter the Final Order to authorize, but not direct, the Debtor to pay the Employee Compensation & Benefits on a final basis. Pursuant to Local Rule 9013-1(m)(ii), the Debtor seeks relief to pay a maximum amount of $12,322,000 on account of prepetition amounts, unless otherwise required by applicable law, including, without limitation, any PTO amounts due to an Employee upon termination or any amounts ordered by the Court via separate order.

42. The relief sought in this Motion is critical for the Debtor's successful emergence from Chapter 11 by assuring the retention of services and morale of the Debtor's Employees. Any failure to pay Employee Compensation & Benefits could lead to the loss of key Employees at this critical time, hampering the Debtor's operations, harming its estate and the value of the Debtor's assets, and, most importantly, likely negatively impacting patient care. Moreover, the requested relief is warranted whether the amounts are prepetition or postpetition. All prepetition amounts fall within the requirements of §§ 507(a)(4) and (5), or are otherwise necessitated by the facts of the case; all postpetition amounts are allowable administrative expenses payable under §§ 503(b)(1) or 503(c) and 507(a)(2). Moreover, none of the requested payments implicate a prohibition under § 503(c), because the payments are made in the ordinary course of business and the Debtor does not seek to pay any bonuses to insiders by this Motion.

## IV. BASIS FOR RELIEF

43. The relief requested is permitted under §§ 105, 363, and 507(a)(4) to the extent such payments are prepetition in nature, and under §§ 105 and 503 to the extent they are postpetition administrative expenses. Sections 105(a) and 363(b)(1) and (c)(1) and the "necessity of payment" doctrine provide statutory support for the requested relief. Further, payments of the majority of the amounts of Employee Compensation & Benefits will be

required either (i) to confirm a plan (requiring payment of all administrative expenses) or (ii) to comply with applicable nonbankruptcy law in the operation of the Debtor's business.

### A. Unpaid Prepetition Employee Compensation & Benefits Are Entitled to Priority Treatment

44.     Qualifying prepetition amounts are entitled to priority treatment under §§ 507(a)(4) and 507(a)(5), and qualifying postpetition amounts are entitled to priority treatment under §§ 507(a)(2) and 503(b)(1)(A)(i).  The Debtor is required to pay these priority claims in full to confirm a chapter 11 plan.  *See* 11 U.S.C. § 1129(a)(9)(B) (requiring payment of certain allowed unsecured claims for (a) wages, salaries, or commissions, including sick leave pay earned by an individual, and (b) contributions to an employee benefit plan); 11 U.S.C. § 1129(a)(9)(A).  Thus, granting the relief sought herein should only affect the timing of certain payments to the Employees, and should not materially affect recoveries for general unsecured creditors.  Indeed, payment of the Employee Compensation & Benefits at this time enhances value for the benefit of all interested parties.

45.     The majority of Employee Compensation & Benefits and related taxes that the Debtor requests authority to pay and/or honor are amounts entitled to priority in payment under §§ 507(a)(4), (5) and (8)(D).  If the aggregate prepetition Wages, Employee Benefits and PTO that accrued within the 180 days prior to the Petition Date exceed the sum of $17,150 allowable as a priority claim under §§ 507(a)(4) and (5) for any individual Employee, the Debtor is not requesting authority by this Motion, on an interim basis, to pay any such excess amounts, unless required to do so by other applicable law (such as PTO upon termination).

### B. Payment of Certain Employee Compensation & Benefits Is Required by Law

46.     The Debtor seeks authority to pay the applicable Deductions to the appropriate third parties.  These amounts principally represent wages that governments, Employees, or judicial authorities have designated for deduction from the Employees' paychecks.  Indeed, certain Deductions are not property of the Debtor's estate, because the Debtor has withheld

such amounts from the Employees' paychecks on another party's behalf. *See* 11 U.S.C. § 541(b)(1), (d); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes). Because the Deductions may not be property of the Debtor's estate, the Debtor requests authorization to transmit the full amount of the Deductions on account of the Employees to the proper parties in the ordinary course of business. Failure to remit such Deductions could subject the Debtor to disputes or collection efforts from governmental authorities or third parties that may not respect the automatic stay.

**C. Payment of the Employee Compensation & Benefits Is Proper Pursuant to Section 363(b) and the "Doctrine of Necessity"**

a. Section 363 and the Debtor's Ordinary Course of Business

47.    Section 363(c)(1) expressly grants the Debtor the authority to "enter into transactions . . . in the ordinary course of business" and "use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). Therefore, the Debtor believes it is permitted to pay all postpetition amounts due pursuant to the Employee Compensation & Benefits, as such actions are in the ordinary course of the Debtor's business. *See, e.g., In re Nellson Nutraceutical, Inc.*, 369 B.R. 787 (Bankr. D. Del. 2007) (concluding that the ordinary course employee bonus compensation program is in the ordinary course of the debtor's business). For the avoidance of doubt, the Debtor does not require Court approval to pay any payroll accruals following the Petition Date.

48.    In addition, the Court may grant authority to pay amounts arising prepetition pursuant to §§ 363(b) and 105(a). Section 363 provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business,

property of the estate."  11 U.S.C. § 363(b)(1).  Under § 363(b), courts require only that the debtor "show that a sound business purpose justifies such actions."  *See, e.g., In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (requiring that the debtor show a "sound business purpose" to justify its actions under § 363) (internal citations omitted); *see also In re Phx. Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987).  Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task").

49.     Notably, the reasonable use of incentives and bonuses is considered the proper exercise of a debtor's business judgment.  *See In re Global Home Prods., LLC*, 369 B.R. 778, 784 (Bankr. D. Del. 2007) (citing In re U.S. Airways, Inc., 329 B.R. 793, 795 (Bankr. E.D. Va. 2005)).  Here, the Debtor has determined in its business judgment that it must pay and incentivize its Employees to perform and remain through the Employee Compensation & Benefits.  Therefore, the Court may approve such payments under § 363.

b.   Section 105(a) and the Necessity of Payment Doctrine

50.     The Court may also authorize payment of prepetition claims in appropriate circumstances under § 105(a), which codifies the inherent equitable powers of a bankruptcy court and empowers bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Specifically, the Court may use its power under § 105(a) to authorize the payment and continuation of the Employee Compensation & Benefits under the "necessity of payment" rule (also referred to as the "doctrine of necessity").

51.     Courts have recognized the "necessity of payment" doctrine. *See, e.g., In re Lehigh & New England Ry. Co.*, 657 F.2d 570 (3d Cir. 1981).  In that case, the Third Circuit held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor. *Id.* at 581 (stating a court may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment").  Moreover, in 2017, the U.S. Supreme Court, in *Czyzewski v. Jevic Holding Corp.*, recognized that courts "approve[] interim distributions that violate ordinary priority rules," generally when there are "significant Code-related objectives that the priority-violating distributions serve," including "payment of employees' prepetition wages."  137 S. Ct. 973, 985 (2017) (emphasis added).

52.     This is because the necessity of payment doctrine is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy and goal of chapter 11." *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); *see also In re Just for Feet, Inc.*, 242 B.R. 821, 826 (D. Del. 1999) (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); *In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of toolmakers as "necessary to avert a serious threat to the Chapter 11 process").

c.  The Need for Approval of Payment of the Employee Compensation & Benefits

53.  The majority of the Employees rely exclusively on the Employee Compensation & Benefits to satisfy their daily living expenses and to provide security and assurance for themselves and their families as they react to and plan for major life events.  Consequently, the Employees will be exposed to financial difficulties if the Debtor is not permitted to honor obligations for unpaid Employee Compensation & Benefits.  Additionally, continuing ordinary course compensation and benefits will help maintain Employee morale, avoid Employee flight that could cripple the Debtor's bankruptcy efforts and endanger creditor recoveries.

54.  Moreover, the Employees provide the Debtor with services necessary to conduct the Debtor's remaining business and wind-down, and the Debtor believes that, absent the payment of the Employee Compensation & Benefits, the Debtor may experience turnover and instability at this critical time in its efforts to exit Chapter 11.  The Employees remain employed with the Debtor because they are vital, and the Debtor will face extreme difficulty in replacing them, let alone timely replacing them.

55.  Enterprise/going-concern value may be materially impaired to the detriment of all stakeholders in such a scenario.  The Debtor therefore believes that payment and honoring of its Employee Compensation & Benefits is a necessary and critical element of the Debtor's efforts to preserve value during this case.  Retention and motivation of the Employees is essential for the Debtor to preserve the value of its assets and keep the company stable during this case.

56.  Courts have approved payment to employees under comparable circumstances. *See In re Lucira Health, Inc.*, Case No. 23-10242-MFW, Docket No. 139 (Bankr. D. Del. Mar. 21, 2023); *In re FTX Trading Ltd.*, Case No. 22-11068-JTD, Docket No. 426 (Bankr. D. Del. Jan. 1, 2023); *In re First Guaranty Mortgage Corp.*, Case No. 22-10584-CTG, Docket No. 64 (Bankr. D. Del. Jul. 1, 2022).

## V.    COMPLIANCE WITH BANKRUPTCY RULE 6003 AND WAIVER OF BANKRUPTCY RULES 6004(a) AND (h)

57.    The Debtor requests that the Court determine that the relief requested in this Motion complies with Bankruptcy Rule 6003 and that waiver of Bankruptcy Rules 6004(a) and (h) is appropriate.  Bankruptcy Rule 6003 provides, in relevant part:

> Unless relief is needed to avoid immediate and irreparable harm, the court must not, within 21 days after the petition is filed, grant an application or motion to: . . . (2) use, sell, or lease, property of the estate, including a motion to pay all or a part of a claim that arose before the petition was filed; [or] (3) incur any other obligation regarding the property of the estate.

Fed. R. Bankr. P. 6003(a)(2), (a)(3).

58.    The Third Circuit Court of Appeals has interpreted language similar to that used in Bankruptcy Rule 6003 in the context of preliminary injunctions.  In that context, irreparable harm has been interpreted as a continuing harm that cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.  *See, e.g., Norfolk S. Ry. Co. v. City of Pittsburgh*, 235 F. App'x. 907, 910 (3d Cir. 2007) (citing *Glasco v. Hills*, 558 F.2d 179, 181 (3d Cir. 1977)).  Further, the harm must be shown to be actual and imminent, not speculative or unsubstantiated.  *See, e.g., Acierno v. New Castle County*, 40 F.3d 645, 653-55 (3d Cir. 1994).

59.    As described in the Motion and supported by the First Day Declaration, the Debtor needs to retain and incentivize its Employees, and immediately paying these Employees their compensation and benefits in the ordinary course is essential to accomplish this goal.  As a result, the Debtor respectfully submits that it has satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003.

60.    The Debtor further seeks a waiver of any stay of the effectiveness of the Order. Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  As set forth above, the Debtor submits that granting this Motion

such that it is effective immediately is essential to prevent irreparable damage to the Debtor and its estate.

61.    Accordingly, the Debtor respectfully submits that the relief requested herein is appropriate under the circumstances and under Bankruptcy Rules 6003 and 6004(h).

62.    Finally, should the Court be inclined to grant the Motion, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a).

## VI.    RESERVATION OF RIGHTS

63.    Nothing contained in this Motion or any order granting the relief requested in this Motion, and no action taken pursuant to the relief requested or granted (including any payment made in accordance with any such order), is intended as or shall be construed or deemed to be: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtor under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtor's or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to § 365; (f) an admission as to the validity, priority, enforceability or perfection of any lien on, security interest in, or other encumbrance on property of the Debtor's estate; or (g) a waiver or limitation of any claims, causes of action or other rights of the Debtor or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law.

## VII.    NO PRIOR REQUEST

64.    No prior request for the relief sought in this Motion has been made to this or any other court.

## VIII.   NOTICE

65.   The Debtor will provide notice of this Motion to:  (a) the Office of the United States Trustee; (b) counsel for the Debtor's secured lenders; (c) the Debtor's thirty largest unsecured creditors and (d) any party that has requested notice pursuant to Bankruptcy Rule 2002.  As this Motion is seeking "first day" relief, the Debtor will serve copies of this Motion and any order entered in respect to this Motion as required by Local Rule 9013-1(m).  The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

## IX.   CONCLUSION

WHEREFORE, the Debtor respectfully requests entry of an order (i) granting the relief requested herein; and (ii) granting the Debtor such other and further relief as the Court deems just and proper.

Dated: July 6, 2026

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
Timothy Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
Wilmington, DE 19899
Tel:     (302) 652-4100
Email: ljones@pszjlaw.com
debertenthal@pszjlaw.com
tcairns@pszjlaw.com

-and -

**DENTONS US LLP**
Tania M. Moyron ([*pro hac vice* forthcoming])
Samuel R. Maizel ([*pro hac vice* forthcoming])
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone:  (213) 623-9300
Facsimile:  (213) 623-9924
Email:  tania.moyron@dentons.com
          samuel.maizel@dentons.com

John D. Beck (*pro hac vice* forthcoming)
Geoffrey Miller (*pro hac vice* forthcoming)
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone:  (212) 768-6700
Facsimile:  (212) 768-6800
Email:  john.beck@dentons.com
          geoffrey.miller@dentons.com

*Proposed Counsel to Debtor and Debtor in Possession*