**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>Pacifica of the Valley Corp.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 26-11060 (TMH) |

**DECLARATION OF PRECIOUS MAYES IN SUPPORT OF**
**EMERGENCY FIRST-DAY MOTIONS**

I, Precious Mayes, hereby state and declare as follows:

1.     I am the President and Chief Executive Officer of Pacifica of the Valley Corporation *d/b/a* Pacifica Hospital of the Valley (the "Debtor"), the debtor and debtor in possession in the above-captioned case (the "Chapter 11 Case"). I have served as the Debtor's President and Chief Executive Officer ("CEO") since 2018 and have over 35 years of healthcare leadership experience.

2.     Prior to my current role, I served as the Debtor's Chief Strategy Officer for four years, where I implemented specialized programs, including a patient experience program designed to coincide with developing healthcare reform, and financial management initiatives, developed new service lines, and established relationships with the California Department of Mental Health to expand different levels of services for the mental health patient population. As a result, the Debtor achieved unparalleled subacute unit growth—the Debtor's referral radius increased from thirty miles to over four hundred fifty miles over two years.

3.     I have occupied senior executive positions in healthcare, which includes extensive experience in Mergers and Acquisitions, Strategic Healthcare Transformation, and Leadership

---

[1] The Debtor in this Chapter 11 Case, along with the last four digits of the Debtor's federal tax identification number, is 7312. The Debtor's mailing address is 9449 San Fernando Road, Sun Valley, CA 91352.

Development.  My passion is providing innovative and highly needed medical and behavioral health services for the underserved communities.  The Debtor's mission is to promote preventative healthcare, recovery, and support sustainability of functional living in communities it serves.

4.     I have been recognized repeatedly by multiple federal and local organizations for my healthcare contributions, including by Congressman Antonio "Tony" Cardenas of the U.S. House of Representatives, Luz Rivas, Assemblymember of the 39th District, and multiple leadership and business development awards from the San Fernando Business Journal and the Los Angeles Business Journal.  I am currently a Board Member of the United Hospital Association and Hospital Association of Southern California.

5.     As the Debtor's President and CEO, I am knowledgeable and familiar with the Debtor's day-to-day operations, business and financial affairs, and books and records, as well as the circumstances leading to the commencement of this Chapter 11 Case.  I submit this declaration (this "Declaration") for the purpose of apprising the Court, the Debtor's creditors, and other parties in interest of the circumstances that compelled the commencement of this Chapter 11 Case and in support of the First-Day Motions (as defined below).

6.     I am over 18 and authorized to submit this Declaration on behalf of the Debtor. Except as otherwise indicated herein, this Declaration is based upon my personal knowledge, my review of relevant documents, information provided to me by employees of the Debtor in the ordinary course of their duties or the Debtor's legal and financial advisors, or my opinion based upon my experience, knowledge, and information concerning the Debtor's operations and the healthcare industry.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

7.      On July 4, 2026 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

8.      To enable the Debtor to minimize the adverse effects of the commencement of this Chapter 11 Case on its business, the Debtor has requested various types of relief in a number of applications and motions (each a "First-Day Motion," and, collectively, the "First-Day Motions"). The First-Day Motions seek relief intended to protect the health and wellbeing of the patients who are being treated by the Debtor; to maintain the Debtor's business operations; to ensure the dedicated doctors, nurses and other employees of the Debtor continue to be paid in the ordinary course of business; and to preserve value for the Debtor, its stakeholders, and parties in interest. Each First-Day Motion is crucial to the Debtor's reorganization efforts and to the health and wellbeing of the patients.  Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant First-Day Motion.

9.      To better familiarize the Court with the Debtor, its business, the circumstances leading up to the Chapter 11 Case and the relief that the Debtor is seeking in the First-Day Motions, this Declaration is organized into three sections.  Section I describes the Debtor's healthcare system.  Section II describes the circumstances that compelled the commencement of the Chapter 11 Case.  Section III provides a summary of the First-Day Motions and factual bases for the relief requested therein.

**I.      OVERVIEW OF THE DEBTOR'S HEALTHCARE SYSTEM**

**A.      Business Operations.**

**1.      *Patient Care.***

10.      The Debtor is an integrated healthcare system that has provided more than $3.3 billion of healthcare to its patients over the last 30 years.  The Debtor's stated mission centers on

its H.E.A.R.T. Care Values—Honesty, Excellence, Accountability, Respect, and Trust—which guide its patient-centered approach to delivering fast, effective, and affordable care.  The Los Angeles Business Journal has previously designated the Hospital as a Top Safety Net Provider.

11.    The Debtor delivers comprehensive, high-quality patient care through complete service lines including: 24/7 Emergency Care; Acute Care; Intensive Care Unit ("ICU"); Behavioral Health (locked); Distinct Part Subacute Skilled Nursing Facility ("SNF"); Outpatient Surgery and Rehabilitation; and In/Outpatient Ancillary Services.  More specifically:

- **The Hospital**:  The Debtor's hospital is a safety net, 231-bed acute care hospital, located at 9449 San Fernando Road in Sun Valley, California (the "Hospital"), which has a catchment area of 13 zip codes.  The Hospital offers a full range of inpatient and outpatient services, including 24-hour emergency care, and treats more than 50,000 emergency patients each year, including some of the most seriously ill and injured individuals in Los Angeles.  Additional outpatient services include elective surgery and imaging.

- **Subacute SNF Unit**:  The Debtor operates a 98-bed, separately licensed subacute Skilled Nursing Unit (the "SNF Unit") that draws patient referrals from more than 400 miles away, including from rural areas.  The SNF Unit currently averages 60 patients, all of whom require a specialized level of care including that they all require tracheostomy and ventilator support.

- **Behavioral Health Urgent Care Clinic**:  The Debtor operates a Behavioral Health Urgent Care located at 14228 Saranac Lane, Sylmar, California 91342. This Urgent Care Clinic treats people who are having a mental health crisis that can be stabilized in under 24 hours and individuals who do not rise to the level of medical necessity that would require them to be cared for on an inpatient basis. This Urgent Care Clinic is estimated to bring $2.5 million in annual revenue to the Debtor.

- **Medical Surgical Program:**  The Debtor has a Medical Surgical Program, which provides care for patients requiring minor surgical procedures.  The Medical Surgical Program initially comprised 10 beds and has since expanded to 30 beds dedicated to patients requiring medical release with psychiatric conditions that have been recently released from incarceration. These patients are directly referred from the California Department of Mental Health ("DMH").  The Medical Surgical Program and contractual arrangement with DMH has proven critical to the Debtor's financial stability and serves as a vital revenue stream enabling the Debtor to maintain operations.

4

- **Organic Farm Produce:** The Debtor has committed to the Centers for Clinical Standards and Quality initiative under Ref: QSSAM-26-03-Hospital/CAH, dated March 30, 2026. In response to the memorandum and directive issued by Secretary Kennedy and Dr. Oz, which encourages hospitals to adhere to the 2025-2030 Dietary Guidelines, the Debtor is working to transition certain processed foods to fresh produce where feasible. To support this initiative, the Debtor has converted three acres of open property adjacent to the Hospital into a working farm to cultivate fresh produce for its inpatients. The first corn harvest is anticipated in September 2026.

- **EmPATH Behavioral Health Urgent Care Clinic**: The Debtor is in the process of opening an EmPATH Behavioral Health Urgent Care Clinic adjacent to its emergency room that will provide Medi-Cal Certified crisis stabilization services. This clinic will be open 24 hours a day, 7 days a week, including holidays, and provides immediate psychiatric evaluation, crisis intervention, and stabilization services in a therapeutic space to treat acute psychiatric patients for up to 24 hours to avoid stressful emergency room settings. The Hospital was one of the six Acute Care Hospitals selected in the State of California to provide an EmPATH program.

12.    Additionally, the Debtor provides a broad continuum of clinical and rehabilitative care. Its service lines include an intensive care unit, laboratory services staffed by board-certified pathologists, diagnostic imaging, pulmonary medicine, and subacute programs offering individualized therapy. The Debtor's rehabilitation department employs skilled physical, occupational, and speech therapists who treat conditions ranging from traumatic brain injury and post-operative orthopedic procedures to neurological disorders and cancer-related impairments. Currently, the Debtor is also pursuing licensure for outpatient behavioral health services and intends to expand its outpatient and rehabilitation offerings once its application is approved.

13.    Approximately 84% of the Debtor's patients live at or below the poverty line. As a result, the Debtor is heavily dependent on Medi-Cal, which is California's Medicaid program—a joint federal and state public health insurance program. Medi-Cal provides approximately 85% of the Debtor's total revenue and patient volume, with approximately half of the Debtor's inpatient revenue coming directly from Medi-Cal, and another substantial portion arriving through Medi-

Cal Managed Care.  The Debtor's Hospital frequently ranks among the top hospitals nationwide for having the highest percentage of Medi-Cal patients, which currently stands at 81%.  Because of this payer distribution, the Hospital operates as a vital safety-net hospital in the Sun Valley area, providing care for vulnerable, uninsured, and low-income populations regardless of their ability to pay.

### 2.    *Employees.*

14.    As of July 2026, the Debtor has approximately 697 Employees.  The Employees include registered nurses ("RNs"), technicians, housekeepers, and food-service workers.  All of the Debtor's Employees are vital to patient care and to the Debtor's efforts to emerge from chapter 11.  In addition to full-time and part-time Employees, the Debtor employs per-diem Employees on an as-needed basis.  Approximately 597 of the Employees are represented by unions (the "Represented Employees").  The Represented Employees are represented by SEIU-121RN and SEIU-UHW (collectively, the "Unions").  The Debtor's contractual arrangements with the Unions regarding the employment of the Represented Employees are reflected in multiple collective bargaining agreements (each a "CBA," and collectively, the "CBAs").  Historically, the Debtor has worked collaboratively with the Unions to negotiate the CBAs and other employment terms for the Represented Employees.

### 3.    *Government Receivables.*

15.    The Debtor, similar to other hospitals serving similar communities, relies on Hospital Quality Assurance Fee ("HQAF") and the Disproportionate Share Hospital ("DSH") programs and other government support to help bridge the gap between what it is paid by Medicare and Medi-Cal and the cost of providing that care.  This is necessary because those programs only pay approximately 80% of the cost of providing care to the patients covered by those programs.

16.     The HQAF, established in 2010, provides funding for supplemental payments to California hospitals that serve Medi-Cal and uninsured patients.  The program has been very successful, providing billions of dollars in supplemental payments to California hospitals.  The Medicare and Medi-Cal programs also provide funding to hospitals that treat the most vulnerable patients through the DSH programs, under which facilities are able to receive at least partial compensation.  Under the Patient Protection and Affordable Care Act of 2010, federal DSH allotments were scheduled to be reduced to account for the decrease in uncompensated care anticipated under health insurance coverage expansion.  Nonetheless, Congress has consistently delayed the implementation of these harmful reductions since they were first scheduled in 2014, but significant cuts are still pending.  Unfortunately, both HQAF and DSH have proven difficult to rely on, as payments have been reduced and delayed, as set forth below.

17.     Under the HQAF Program 9 funding (which covered Calendar Year 2025), the Debtor received $7 million, and estimates that in the coming months it will receive approximately $16 million more (payments for the HQAF Program are typically made retroactively for the effective period in lump-sum quarterly intervals).  The Debtor also projects that it will receive $10 million from HQAF Program 10 (for Calendar Year 2026), but is unsure exactly when that money will be received.

**B.      Corporate Structure.**

18.     Pacifica of the Valley Corporation is incorporated in the State of Delaware and is licensed by the State of California to operate the Hospital in California.  A graphic depicting the Debtor's prepetition organizational structure is attached hereto as **Exhibit A**.

19.     As stated above, I am the President and CEO of the Debtor.  Paul Tuft is the Executive Chairman and owner of the Debtor's hospital.  The remainder of the senior management follows:

| Name | Position |
|------|----------|
| Fred Vitello | Chief Financial Officer |
| Michael Choo | Chief Operating Officer |
| Carol Poore, RN, DBA | Chief Administrative Officer / Hospital Administrator |
| Farough Kerendi, M.D. | Chief of Staff |
| Gregg Yost | Chief Human Resources Officer |
| Diane (Dede) Tsuruoka | Chief Communications Officer |
| Carmelo James | Chief Nursing Officer |
| Ken Kramer | Chief Information Officer |
| Deborah Martin | Financial Consultant |

## C.   Capital Structure.

### 1.   *Prepetition Indebtedness.*

20.     In July 2020, at the height of the COVID-19 pandemic, the Debtor applied for financing under the Main Street Loan Program established pursuant to the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act").  Similar to many hospitals across the country, the Debtor required additional liquidity to address unprecedented pandemic-related operating costs while continuing to provide essential healthcare services to its community, as set forth below.

21.     On December 10, 2020, the Debtor entered into that certain Main Street Priority Loan Agreement (the "MSL") with First Western Trust Bank ("First Western") and the Federal Reserve Bank of Boston (the "Federal Reserve"), pursuant to which First Western extended a senior secured loan to the Debtor in the principal amount of $35,000,000.  In connection with the MSL, the Debtor executed a Pledge and Security Agreement granting First Western a security interest in personal property.  In addition, Paul R. Tuft, the Debtor's sole shareholder, executed an

unconditional personal guaranty in favor of First Western and pledged one hundred percent (100%) of his equity interests in the Debtor as additional security for the MSL.

### 2.    *Financials and Cash on Hand.*

22.    The Debtor's 2024 audited financial statements reflect revenue of approximately $100 million for 2024 and $107 million for 2023.  The Debtor does not have audited financial statements for 2025.  As of July 4, 2026, the Debtor has approximately $240,797 in its unrestricted bank accounts.  Additionally, as described above, the Debtor anticipates receiving additional HQAF funds later this month and other governmental receivables thereafter, although the timing of government receivables are difficult to predict.  Historically, to address cash flow shortfalls pending receipt of these government receivables, individuals on the Debtor's executive team have personally lent funds to the Debtor to ensure it could satisfy its most immediate obligations.

23.    The Hospital previously went through chapter 11 cases, including the last of which closed in 2017 after plan confirmation.

### 3.    *The Landlord Entities.*

24.    Since 2013, the Debtor has operated the Hospital pursuant to a long-term Master Lease with Reliq Pacifica LLC, Beverly Gemini Investments, LLC, Taking the 5th, LLC, and Fifth/Arizona Investors, LLC (collectively, the "Landlord Entities").  The Hospital is the Debtor's principal operating facility and is indispensable to its ability to provide acute care services to the surrounding community.  During the COVID-19 pandemic, the Debtor became unable to timely satisfy certain obligations owing to the Landlord Entities under the Master Lease.  As of the Petition Date, the Debtor estimates that it owes the Landlord Entities approximately $9.5 million on account of accrued and unpaid rent and other obligations under the Master Lease.

9

25.     The Landlord Entities filed a UCC-1 financing statement in November 2022 seeking to perfect a lien in all personal property of the Debtor.  That lien was subordinated to First Western's interest (and now Axios's claimed interest) pursuant to a Subordination Agreement. The Debtor's investigation of these security interests is ongoing.

**4.     *LA County.***

26.     The Local Initiative Health Authority for Los Angeles County, which operates as L.A. Care Health Plan ("L.A. Care"), a publicly operated health plan, filed UCC-1 statements in January 2026 and May 2026 asserting an interest in future proceeds of certain HQAF funds.  These security interests arise from agreements entered into between the Debtor and L.A. Care whereby L.A. Care purchased the Debtor's right to future receipt of HQAF payments.  The applicable purchase agreements provide that if the sale of the Debtor's right to receive future HQAF payments is subsequently held not to be a true sale, the Debtor also granted L.A. Care a "Back-Up Security Interest" (as defined in the purchase agreements) in the Debtor's HQAF receivables.  As of the Petition Date, the Debtor estimates that it owes L.A. Care approximately $7.5 million on account of these agreements.  The Debtor has not determined the validity of the security interests of L.A. Care.

**5.     *Grant Funding.***

27.     In December 2023, the Debtor received a $2.9 million grant from the Mental Health Services Oversight and Accountability Commission ("MHSOAC") to establish and operate an Emergency Psychiatric Assessment, Treatment, and Healing ("EmPATH") Behavior Health Unit at the Hospital.  The MHSOAC approved the expenditure of funds to establish and operate EmPATH Units under a competitive procurement process.  The Debtor was selected as one of the

highest scoring applicants in this competitive process.  The grant term is approximately three years, with funding distributed across three annual payments.

28.    Under the grant, the Debtor is required to use the EmPATH model of service delivery for its crisis stabilization care.  The Debtor's innovative EmPATH Unit will operate as a 24-hour crisis stabilization facility, providing patients with immediate access to a psychiatrist for evaluation and monitoring.  Patients will receive support from a compassionate multidisciplinary team trained in de-escalation and stabilization techniques.  This model allows patients to receive rapid assessment and treatment in a less restrictive environment than traditional inpatient psychiatric hospitalization, often enabling them to return to the community with appropriate outpatient support rather than requiring admission.  The EmPATH grant represents a significant investment by the State of California in the Debtor's behavioral health capabilities and reflects the Debtor's demonstrated commitment to serving the mental health needs of its community.

## II.    THE NEED FOR CHAPTER 11 RELIEF AND THE EVENTS LEADING TO THE COMMENCEMENT OF THIS CHAPTER 11 CASE

29.    The Debtor filed this Chapter 11 Case to protect patient care and employees; to maintain the Debtor's business operations; and to preserve the going-concern value of the Debtor's business for its stakeholders and parties in interest.

30.    The Debtor's liquidity crisis, legacy liability, and ongoing operational challenges, compounded by the Colorado Action (as defined below), precipitated the filing of this Chapter 11 Case on an emergency basis.  Shortly prior to the Petition Date, the Debtor appointed a Chief Restructuring Officer (the "CRO"), Peter Chadwick of Berkeley Research Group, to support its efforts in evaluating strategic options, developing and implementing a turnaround plan, and instituting treasury management procedures and control.

A.    *COVID-19* **Pandemic.**

31.    The COVID-19 pandemic significantly disrupted the Debtor's normal operations and caused the Debtor to incur a significant amount of debt serving as a surge center without any reimbursement.  Since the start of the COVID-19 pandemic in early 2020, the Debtor responded immediately by establishing a mitigation plan in preparation for the potential surge of patients and to sustain compliance with environmental, staffing, training, infection control, personal protective equipment and specialized equipment.  One critical component was the Debtor's expansion of beds as per the California Department of Public Health All Facilities Letter (AFL 20-23 eff. 3/20/20), which required hospitals to use unoccupied space for additional ICU and telemetry beds to service COVID-19 patients.  The Debtor responded to this statewide call to action and increased bed capacity inside and outside of the Hospital to service COVID-19 patients, including adding beds in hallways, closed units, outside areas, and increasing ICU beds from 7 to 66.

32.    In early December 2020, during the second wave of COVID-19, Secretary Dr. Mark Ghaly from the California Emergency Medical Services Authority ("EMSA") toured the Hospital and thereafter requested that the Hospital utilize any other unused space to provide service to COVID-19 patients.  Efforts taken to expand surge capacity at EMSA's request resulted in the Debtor incurring additional expenses.

33.    Throughout this period, the Debtor faced severe staffing shortages, and consequently, the Debtor hired traveling nurses at significantly elevated rates, which placed substantial additional financial strain on the Debtor as it struggled to maintain adequate staffing levels to care for the influx of COVID-19 patients.

34.    To address the adverse consequences of COVID-19, the Debtor requested support from the State of California and, through persistence, secured three National Guard strike teams

12

in December 2020 to help stabilize the crisis.  The National Guard brought additional healthcare workers and remained at the Debtor for approximately three weeks until operations were stabilized.

35.    Thereafter, in response to EMSA's request, the Debtor also became responsible for reopening a closed hospital in Los Angeles to serve as a designated satellite surge hospital.

36.    The Debtor never fully recovered from the adverse impact of the pandemic. Although the Debtor had substantially addressed staff shortages by January 2021, the Debtor still experienced a shortage in billing personnel, and consequently, there was a pause in billing. Further, the Debtor only received nominal reimbursements for costs associated with becoming a surge center.  Further, the emergency rate occupancy drop of approximately 60% reduced future QAF funds.  As a result, the Debtor shouldered unprecedented expenses to care for COVID-19 patients.

**B.    Seismic Issues.**

37.    Current California law requires general acute care hospitals to conduct seismic evaluations and retrofit and repair their facilities to meet certain seismic performance standards.

38.    During the COVID-19 pandemic, the Debtor's role as a surge center severely impacted its ability to complete the required seismic improvements.  Contractors were unable to come on-site, causing the Debtor to miss critical construction and seismic milestones and incur fines.  As a consequence, the Hospital could not use thirty-eight of its SNF beds because of the state-mandated seismic retrofit, which caused the Debtor to lose $20 million in revenue annually. Those 38 beds are due to come back into operation in January 2027.  The restoration of these beds will be critical to the financial viability of the Debtor in the future.

13

39.     Since the Debtor had missed the seismic deadlines, the Debtor engaged with state legislators to seek relief.  Pursuant to Assembly Bill 2404, which was approved by the Governor of California on September 27, 2022, the Debtor obtained an 18-month extension to complete the seismic work.  The extension, however, did not fully resolve the Debtor's challenges.  Construction costs following the pandemic significantly exceeded pre-COVID estimates, creating substantial financial hardship for the Debtor.  The resulting cost overruns led to litigation that further delayed the seismic work.  The Debtor's extension to complete the seismic retrofit expired on January 1, 2025, resulting in fines of $15,000, per day.  Fines through June 2026 total approximately $9 million.  The Debtor intends to submit another draft assembly bill to extend its deadline for compliance with seismic safety standards to April 20, 2028 and to abate the daily fines.

40.     As to costs associated with seismic retrofits, as of December 31, 2023 and 2024, the Debtor spent $7.8 million and $7.9 million, respectively.

41.     In April 2026, the Debtor obtained new quotes for seismic retrofits to the Hospital totaling approximately $6.5 million from a contractor, and approximately $650,000 from an architectural firm.

**C.     Rising Labor Costs.**

42.     Similar to other hospitals across the country, the Debtor faced increased labor costs and other labor-related financial pressures driven by statewide and facility-specific factors.

**D.     Working Capital Shortages.**

43.     As discussed above, the Debtor relies on HQAF, DSH, and other government support to help bridge the gap between Medicare and Medi-Cal reimbursement and the actual cost of care.  HQAF and DSH payments have been frequently reduced and/or delayed, which is a major driver of the financial challenges facing the Hospital.

14

**E.     Cybersecurity Attack.**

44.     In February 2024, Change Healthcare, a subsidiary of UnitedHealth Group, was compromised by a cyberattack that compromised its IT systems and sensitive data and operations of the Debtor and other hospitals across the country.  This cyberattack impacted healthcare operations on a national scale, and resulted in the disruption of operations and cash collections, data loss, and reputational damage to the Debtor.

**F.     Colorado Litigation.**

### 1.  *Colorado Action.*

45.     On May 13, 2025, First Western filed a lawsuit against the Debtor in Colorado state court (currently captioned *Axios Capital Solutions v. Pacifica of the Valley Corporation, et al.*, Case No. 2025CV31732 (Dist. Ct. County of Denver, Co., Div. 209) (the "Colorado Action")) for breach of contract for the Debtor's failure to timely meet its repayment obligations.  In November 2025, Axios Capital Solutions, LLC ("Axios"), claimed to have purchased the Debtor's MSL, and stepped into First Western's shoes as the plaintiff in the Colorado Action.  On June 26, 2026, the Colorado court denied Axios's motion for summary judgment, concluding that genuine issues of material fact exist regarding whether Axios validly acquired the MSL.  A true and correct copy of the Colorado court's ruling is attached hereto as **Exhibit B**.

### 2.  *Special Monitor.*

46.     On May 15, 2026, pursuant to a joint motion of Axios, the Debtor, and Mr. Tuft, the Colorado court appointed Westwood Healthcare Partners, LLC, as Special Monitor (the "Special Monitor") to the Debtor.  On June 12, 2026, Axios and the Special Monitor filed an *ex parte* motion to expand the Special Monitor's role to a receivership (the "Receivership Motion").  On June 24, 2026, the Debtor and Mr. Tuft filed a joint response in opposition to the Receivership

Motion.   On July 1, 2026, Axios and the Special Monitor filed a reply in support of the Receivership Motion.  A hearing on the Receivership Motion was scheduled for July 8, 2026.

### III.    FIRST-DAY MOTIONS

47.    The Debtor requests that the relief described below in the First-Day Motion[2] be granted, as each request constitutes a critical element in achieving the successful restructuring of the Debtor for the benefit of its patients, creditors and the communities it serves.

A.    **Administrative Motions.**

> 1. ***Motion of the Debtor for an Order (I) Extending the Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs, and (II) Granting Related Relief (the "Schedules and SOFA Motion").***

48.    By the Schedules and SOFA Motion, the Debtor requests entry of an order granting additional time to file its schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs.  As a consequence of the size and complexity of the Debtor's business operations, the number of creditors likely to be involved in this Chapter 11 Case, the numerous critical operational matters that the Debtor's management and employees must address, a 30-day extension (without prejudice to further extensions) is necessary and appropriate.

> 2. ***Motion of Debtor for Order (I) Authorizing the Debtor to Redact Commercially Sensitive or Personally Identifiable Information; and (II) Granting Related Relief ("Redaction Motion")***

49.    By the Redaction Motion, the Debtor seeks entry of an order authorizing the Debtor to redact sensitive or personally identifiable information.  The Debtor's reporting requirements would otherwise cause the names, home addresses, and email addresses of certain of the Debtor's current and former employees, debtholders, and individual equityholders to be publicly filed.  The

---

[2] All undefined terms below have the definition ascribed to them in their respective motion.

Debtor requests authority to redact such information to spare these individuals from the risks associated with publicly filing their personally identifiable information. I understand that similar relief has been granted in similar chapter 11 cases in this and other districts.

      **3.** ***Debtor's Motion for Entry of an Order Authorizing Certain Procedures to Maintain Confidentiality of Patient Information as Required by Applicable Privacy Rules (the "Patient Confidentiality Motion").***

50. By the Patient Confidentiality Motion, the Debtor seeks entry of an order authorizing certain procedures to maintain the confidentiality of patient information as required by applicable privacy rules. As a health care provider, the Debtor is required, by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), to maintain the confidentiality of patient information. Breaches of HIPAA obligations carry steep monetary penalties. The Bankruptcy Code, however, requires that debtors make certain mandatory public disclosures, some of which conflict with the provisions of HIPAA. The Debtor has proposed certain privacy procedures in the Patient Confidentiality Motion to ensure that the Debtor is able to both maintain patient confidentiality as required by HIPAA while also complying with the reporting requirements of the Bankruptcy Code. I understand such procedures are routinely approved in similar bankruptcy cases of healthcare providers and would request the Court approve the Patient Confidentiality Motion.

**B.**     **Operational Motions Requesting Immediate Relief.**

51. The Debtor intends to ask for immediate relief with respect to the following First-Day Motions and, therefore, will present these motions at the First-Day Hearing.

1. ***Motion of the Debtor for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Continue Operating its Existing Cash Management System, Including Maintaining Existing Bank Accounts, Checks, and Business Forms, and (B) Continue its Existing Deposit Practices, (II) Waiving Certain U.S. Trustee Guidelines, (III) Modifying Requirements of Section 345(b) of the Bankruptcy Code, and (IV) Granting Related Relief (the "Cash Management Motion").***

52.    By the Cash Management Motion, the Debtor requests interim and final authority (i) authorizing the Debtor to (a) continue to use its cash management system, including maintaining its existing bank accounts, checks, and business forms, (b) implement changes to its cash management system in the ordinary course of business, including opening new bank accounts or closing existing bank accounts; (ii) waive certain bank account and related guidelines of the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee Guidelines"), to the extent inconsistent with the Debtor's practices under its existing cash management system or other actions described herein; (iii) modifying the requirements of § 345(b); and (iv) granting related relief.

53.    The Debtor further requests, by the Cash Management Motion, that the Court authorize the financial institutions at which the Debtor maintains various bank accounts to (a) continue to maintain, service and administer the Debtor's bank accounts, and (b) debit the bank accounts in the ordinary course of business on account of (i) wire transfers or checks drawn on the bank accounts, or (ii) undisputed service charges owed to the banks for maintenance of the Debtor's cash management system, if any.

54.    The Cash Management System consists of thirteen (13) bank accounts maintained at California Federal Credit Union and Columbia Bank. Deposits at the California Federal Credit Union are federally insured up to at least $250,000 per account holder by the National Credit Union Administration. Also, deposits at Columbia Bank are federally insured up to at least $250,000 per account holder by the Federal Deposit Insurance Corporation.

55.     Maintaining the Debtors' Cash Management System in its current state is crucial to the Debtor's continued operations. Requiring the Debtor to close its existing Bank Accounts would have disastrous, potentially fatal, consequences for the Debtor because it will significantly interrupt the Debtor's government receivables, which is the majority of its revenue. Without this revenue, the Debtor would likely be forced to immediately cease operations and would be unable to provide patients with critical healthcare.

56.     In addition, the Debtor lacks any meaningful cash reserves and requires immediate access to its cash receipts. Any delay in collection of those receipts that are available could jeopardize the Debtor's ability to conduct its business, which, in turn, could ultimately provide irreparable harm to the Debtor's patients. Such delays would threaten the Debtor's reorganization and could cause it to immediately cease operations.

57.     The Debtor also relies upon its Bank Account and Cash Management System for other important business functions, including payment of payroll, applicable state and federal payroll taxes, and payment of vendors needed to operate the Debtor's business. Any disruption in the Debtor's ability to make these types of disbursements when and as required in the ordinary course could cause employees and patients to lose confidence in the Debtor's ability to function as a going concern.

58.     I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtor's estate, its creditors, patients, and all other parties in interest, and will enable the Debtor to continue to operate its business in this Chapter 11 Case with minimal disruption, thereby benefiting all parties in interest. Accordingly, for the reasons set forth herein and in the Cash Management Motion, on behalf of the Debtor, I respectfully submit that the relief requested in the Cash Management Motion should be granted.

19

**2.** ***Motion of the Debtor for (I) Authorization to (A) Pay Employee Obligations, (B) Continue Employee Benefit Programs; and (II) Granting Related Relief (the "<u>Wage Motion</u>").***

59.   By the Wage Motion, the Debtor seeks entry of interim and final orders granting them the authority, in their discretion, to (a) pay prepetition wages, salaries, other compensation, and reimbursable expenses, and (b) continue employee compensation and benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto (collectively, and as defined in the Wage Motion, the "<u>Employee Compensation & Benefits</u>").

60.   The Employees (and the Supplemental Workforce) are vital to the operation of the Debtor's business and to the health, welfare, safety and security of the patients who seek medical care therein.  Allowing the Debtor the discretion to pay, maintain, and otherwise honor, Employee Compensation & Benefits is necessary to prevent Employees from terminating their employment with the Debtor and to maintain Employee morale pending resolution of the Chapter 11 Case.  Any disruption to payment of Employee Compensation & Benefits would adversely affect the Debtor's goals in this Chapter 11 Case and may severely affect the Debtor's ability to care for patients and to administer its estate.

61.   Accordingly, for the reasons set forth herein and expanded on in the Wage Motion, on behalf of the Debtor, I respectfully submit that the relief requested in the Wage Motion is in the best interests of the Debtor's estate, its patients, its creditors, and all other parties in interest, and will enable the Debtor to continue to operate during Chapter 11 Case, to maintain the Debtor's high level of patient care, and to maximize value for the estate.

   **3.  *Motion of the Debtor Pursuant to 11 U.S.C. §§ 105(a) and 366 and Fed. R. Bankr. P. 6003 and 6004 for Entry of Interim and Final Orders (I) Approving Debtor's Proposed Form of Adequate Assurance of Payment to Utility Companies, (II) Establishing Procedures for Resolving Objections by Utility Companies, (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service; and (IV) Granting Related Relief (the "Utilities Motion").***

62.     By the Utilities Motion, the Debtor seeks entry of interim and final orders: (i) approving the Debtor's proposed form of adequate assurance of payment to the Utility Companies (as defined below); (ii) establishing procedures for resolving objections by Utility Companies relating to the adequacy of the proposed adequate assurance provided by the Debtor; (iii) prohibiting the Utility Companies from altering, refusing, or discontinuing service to, or discriminating against, the Debtor on the basis of the commencement of this Chapter 11 Case and/or any outstanding prepetition debts; and (iv) granting related relief, all as more fully set forth in the Motion.

63.     In the ordinary course of business, the Debtor obtains various essential utility services (collectively, the "Utility Services"), including electricity, water, sewer, natural gas, phone/telecommunications, trash and internet, from a number of utility companies (collectively, the "Utility Companies").  The Debtor relies on the Utility Companies to provide Utility Services to provide necessary support to their patients, employees, and vendors.  Accordingly, I believe preserving the Utility Services on an uninterrupted basis is essential to the Debtor's ongoing operations, and even a brief alteration or discontinuation of service would likely cause severe disruption to the Debtor's ability to provide vital healthcare services to its patients and compromise the Debtor's business.

64.     The Debtor has proposed to provide Utility Companies with Adequate Assurance of payment for Utility Services and customary procedures for resolving any disputes.  I understand

21

such procedures are routinely approved in this district and would request the Court approve the Utilities Motion to ensure the Debtor maintains uninterrupted Utility Services.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed July 7, 2026, at Los Angeles, California.

/s/ Precious Mayes
Precious Mayes
President and Chief Executive Officer
Pacifica of the Valley Corporation