**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>Pacifica of the Valley Corporation,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 26-11060 (TMH) |

**DEBTOR'S <u>EMERGENCY</u> MOTION TO (I) SELL HQAF RECEIVABLES TO L.A. CARE PURSUANT TO SECTION 363, (II) STIPULATE TO THE VALIDITY AND NON-AVOIDABILITY OF PREPETITION SALES OF HQAF RECEIVABLES TO L.A. CARE (III) GRANT L.A. CARE A RELEASE OF ANY ESTATE CLAIMS (IV) GRANT ADMINISTRATIVE CLAIMS IN FAVOR OF L.A. CARE, (V) TO THE EXTENT NECESSARY <u>MODIFY THE AUTOMATIC STAY AND (VI) GRANT RELATED RELIEF</u>**

Pacifica of the Valley Corporation d/b/a Pacifica Hospital of the Valley, the debtor and debtor in possession ("<u>Debtor</u>") in the above-captioned chapter 11 case (the "<u>Chapter 11 Case</u>"), by and through its undersigned counsel, hereby submits this motion (the "<u>Motion</u>") for entry of an order (the "<u>Order</u>"), substantially in the form annexed hereto as **Exhibit A**, granting the Debtor authority to (i) sell HQAF receivables to the Local Initiative Health Authority for Los Angeles County, which operates as L.A. Care Health Plan ("<u>L.A. Care</u>", and the sale to L.A. Care being the "<u>Sale</u>"), (ii) stipulate to the validity and non-avoidability of prepetition sales of HQAF receivables to L.A. Care, (iii) grant L.A. Care a release of estate claims and causes of action, (iv) grant administrative claims in favor of L.A. Care, (v) to the extent necessary, modify the automatic stay, and (vi) grant related relief. In further support of the Motion, the Debtor submits the declaration of Peter Chadwick (the "<u>Chadwick Declaration</u>"), annexed hereto as **Exhibit B**, and states as follows:

---

[1] The Debtor in this Chapter 11 Case, along with the last four digits of the Debtor's federal tax identification number, is: Pacifica of the Valley Corporation d/b/a Pacifica Hospital of the Valley (7312). The Debtor's mailing address is 9449 San Fernando Road, Sun Valley, CA 91352.

**I.**

**<u>PRELIMINARY STATEMENT</u>**

1.      The Debtor—the operator of a safety-net hospital, a Subacute Skilled Nursing Facility, and Behavioral Health Urgent Care Clinic—requests authority to sell to L.A. Care $5 million in future receivables that it is owed under the Hospital Quality Assurance Fees program ("<u>HQAF</u>"), which will in turn provide the Debtor with immediate liquidity to maintain hospital operations, pay employees, and continue serving its patients and community.

2.      By way of background, LA Care – the nation's largest publicly operated health plan and the largest provider of Medi-Cal (California's version of Medicaid) to low-income residents – receives the managed care portion of the HQAF monies to be paid to the Debtor and then transmits these monies to the Debtor.  Prior to the Petition Date, in two other instances, LA Care purchased HQAF future receivables from the Debtor before actually receiving the HQAF monies to allow the Debtor earlier access to funds to support its operation. By way of this Motion, the Debtor requests authority to enter into another such transaction with LA Care.

3.      The relief requested in this Motion represents the Debtor's best—and only presently available—means of obtaining an immediate infusion of cash. Through the proposed sale, L.A. Care will provide the Debtor with $5 million of immediate liquidity on exceptionally favorable economic terms. Under the Post-Petition Purchase Agreement, L.A. Care will pay the Debtor $5 million in cash in exchange for L.A. Care's acquisition of the Debtor's right to receive an equivalent amount of future HQAF proceeds. The sale transaction imposes no interest, original issue discount, financing premium, or similar charge on the estate. Put simply, L.A. Care will pay $5 million today in exchange for the right to receive $5 million in the future. Given the Debtor's urgent need for liquidity, no third-party lender or purchaser could reasonably be expected to provide more favorable economic terms.

4.      As a condition to providing this essential liquidity, L.A. Care requires finality concerning the two identical (except for provisions contemplating entry of a bankruptcy court order acceptable to L.A. Care in its sole discretion, substantially in the form attached as Exhibit C to the Post-Petition Purchase Agreement) prepetition transactions referenced above under which it previously purchased from the Debtor HQAF interests for an aggregate purchase price of $7.5 million. As with the proposed Post-Petition Purchase Agreement, those transactions imposed no interest, original issue discount, financing premium, or similar charges on the Debtor.

5.      Accordingly, the Debtor seeks authority to (i) stipulate that the Prepetition Purchase Agreements constitute valid, binding, enforceable, and non-avoidable true sales that are not subject to recharacterization as disguised financings and (ii) release L.A. Care from claims arising from or relating to those transactions. The Debtor is not aware of any viable claim or cause of action against L.A. Care, and the Prepetition Purchase Agreements were structured and documented as true sales in which L.A. Care paid dollar-for-dollar consideration for the purchased receivables. The proposed stipulation and release therefore do not relinquish any claim the Debtor presently believes has material value; instead, they provide the finality necessary to obtain the substantial and immediate benefits of the Post-Petition Purchase Agreement.

6.      The Debtor also seeks related relief necessary to implement the parties' agreement, including allowance of an administrative expense claim for L.A. Care's reasonable and documented fees and expenses incurred in connection with the Sale and negotiation of the Post-Petition Purchase Agreement and confirmation that L.A. Care may receive and retain the purchased HQAF proceeds when they are released by the California Department of Health Care Services ("DHCS") without violating the automatic stay.[2]

---

[2] In the ordinary course, the DHCS pays HQAF proceeds to L.A. Care for distribution to hospitals operating in Los Angeles County.

7.      The Debtor also respectfully submits that the Sale is in the best interests of the estate, was negotiated at arm's length and in good faith, provides indispensable liquidity without imposing financing or other debt-like costs on the estate, and preserves the Debtor's ability to continue operating for the benefit of its patients, employees, and stakeholders. Under these circumstances, the Sale and the related relief requested in this Motion constitute a sound exercise of the Debtor's business judgment and should be approved.

## II.

## JURISDICTION AND VENUE

8.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012. Venue of the Chapter 11 Case and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The statutory basis for the relief sought herein is §§ 105, 363, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code")[3] rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

10.     The Debtor confirms its consent, pursuant to Bankruptcy Rule 7008 and Local Rule 9013-1(f), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

---

[3] All references to 'section' or '§' herein are to sections of the Bankruptcy Code.

## III.

## RELIEF REQUESTED

11.     By this Motion, the Debtor requests entry of the Order: (a) authorizing the sale of HQAF receivables to L.A. Care pursuant to § 363; (b) approving the Debtor's stipulation as to the validity and non-avoidability of the prepetition sales of HQAF receivables to L.A. Care; (c) granting L.A. Care a release of estate claims and causes of action; (d) granting L.A. Care an administrative expense claim; (e) modifying the automatic stay to the extent necessary; and (f) granting related relief.

## IV.

## BACKGROUND

### A.     The Chapter 11 Case

12.     On July 4, 2026 (the "Petition Date"), the Debtor commenced the Chapter 11 Case. The Debtor is authorized to continue operating its business and managing its property as a debtor in possession pursuant to §§ 1107(a) and 1108.

13.     On July 20, 2026, the United States Trustee ("U.S. Trustee") appointed a committee of unsecured creditors (the "Committee"). *See* Docket No. 78.

14.     No trustee or examiner has been appointed in this Chapter 11 Case.

15.     Additional information regarding the Debtor, including its business and the events leading to the commencement of this Chapter 11 Case, is set forth in the *Declaration of Precious Mayes in Support of Chapter 11 Petition and First Day Pleadings* [Docket No. 16] (the "First Day Declaration").

### B.     The HQAF Program

16.     California's HQAF Program is a federally approved provider fee that allows the state to draw down federal Medicaid matching funds and deliver supplemental Medi-Cal payments

to hospitals serving some of California's most vulnerable patients. HQAF funding works as follows: the State of California develops and submits a proposal to obtain federal matching funds for the Private Hospital Directed Payment ("PHDP") program through a statewide model based on past utilization (inpatient and outpatient days) and statewide projected utilization growth rates to the Centers for Medicare & Medicaid Services ("CMS"). Once approved, the funds are then allocated by hospital based on actual utilization during the program period.

17.    A particular hospital's "net benefit" from a HQAF Program cycle cannot be readily determined until it begins receiving the initial Program payments. This is because a hospital's share of the "pot" is not known until hospitals begin reporting actual utilization versus the modeled utilization for the Program period.

18.    In the ordinary course of business, HQAF proceeds are paid by DHCS, which administers Medi-Cal, California's version of Medicaid, to L.A. Care for subsequent distribution to eligible medical facilities located within Los Angeles County. L.A. Care serves as the intermediary through which those funds are received, allocated, and remitted to qualifying providers, including the Debtor, in accordance with the applicable HQAF program requirements and payment methodology.

19.    The Debtor anticipates receiving approximately $15 million in HQAF funding that has already been approved based on information received from DHCS officials, as well as official fee and payment schedules, notices, and models released by DHCS and the California Hospital Association. Crucially, however, the Debtor does not know precisely when it may receive such payments.

6

C. **The Purchase Agreements With L.A. Care**

      1. **L.A. Care**

20.     L.A. Care, located in Los Angeles, California, is an independent public agency and the nation's largest publicly operated health plan, serving more than two million members (approximately one quarter of the population of Los Angeles County). L.A. Care's mission is to provide access to quality health care for Los Angeles County's vulnerable and low-income communities and residents, as well as to support the safety net required to achieve that purpose. L.A. Care, which is the largest provider of Medi-Cal (California's version of Medicaid) to low-income residents of Los Angeles County, provides health services to its members under contracts with other health plans, hospitals, physicians, and other health care providers, including the Debtor.

      2. **The Prepetition Purchase Agreements**

21.     Prior to the Petition Date, the Debtor and L.A. Care entered into two purchase agreements pursuant to which the Debtor sold to L.A. Care the right to receive designated future HQAF receivables in exchange for immediate cash consideration (collectively, the "Prepetition Agreements"). *See* Chadwick Declaration, ¶ 4. These types of transactions have become increasingly common in the healthcare industry. *Id*.

22.     The first Prepetition Agreement, entered into on or about January 14, 2026 (the "January Purchase Agreement"), provided for the sale by the Debtor to L.A. Care of HQAF receivables expected to be received for the period spanning January 1, 2025 to December 31, 2025, in an amount equal to $6,000,000, in exchange for a cash payment of $6,000,000 from L.A. Care. The transaction was structured as a true sale, transfer, assignment, and conveyance of the Debtor's right, title, and interest in the designated HQAF receivables to L.A. Care, free and clear of all liens. As a protective measure, the Debtor also granted L.A. Care a back-up security interest in the assigned HQAF receivables in the event the transaction were ever recharacterized as a secured

financing rather than a true sale. A protective back-up UCC-1 financing statement was duly filed with the Delaware Secretary of State on January 27, 2026 under File Number 20260698957. The January Purchase Agreement is attached hereto as **Exhibit C**.

23.     The second Prepetition Agreement, entered into on or about May 12, 2026 (the "May Purchase Agreement", and together with the January Purchase Agreement, the "Prepetition Purchase Agreements"), was structured on the same operative terms as the January Purchase Agreement. Under this agreement, the Debtor sold to L.A. Care HQAF receivables for the same period—January 1, 2025 to December 31, 2025—in an amount equal to $1,500,000, in exchange for a cash payment of $1,500,000. As with the January Purchase Agreement, the transaction was structured as a true sale and included a back-up security interest in favor of L.A. Care, which was perfected through a UCC-1 financing statement filed with the Delaware Secretary of State on May 22, 2026 under File Number 20264120172. The May Purchase Agreement is attached hereto as **Exhibit D**.

### 3.  The Post-Petition Purchase Agreement

24.     The Debtor now seeks authority to enter into the same agreement (except for provisions contemplating entry of a bankruptcy court order acceptable to L.A. Care in its sole discretion, substantially in the form attached as Exhibit C to the Post-Petition Purchase Agreement) (the "Post-Petition Purchase Agreement") and sell to L.A. Care HQAF receivables expected to be received for the period spanning January 1, 2025 to December 31, 2025, in an amount equal to $5,000,000, in exchange for a cash payment of $5,000,000 from L.A. Care. *Id.*, ¶ 5. The Post-Petition Purchase Agreement is attached hereto as **Exhibit E**.

25.     The Post-Petition Purchase Agreement imposes no interest, original issue discount, fees, or other costs on the estate except that, as conditions to entering into the Post-Petition Purchase Agreement, L.A. Care and the Debtor have agreed (i) L.A. Care shall be granted an

administrative expense claim for its reasonable and documented fees and expenses incurred in connection with the Sale and negotiation of the Post-Petition Purchase Agreement and (ii) the Debtor shall stipulate, without any right of subsequent challenge by any other party, including the Committee, that the Prepetition Purchase Agreements are valid, non-avoidable true-sale transactions. *Id.*, ¶ 6.

V.

<u>**ARGUMENT**</u>

**A.      The Sale Should Be Approved.**

**1.   The Sale Represents a Sound Exercise of the Debtor's Business Judgment.**

26.      The Debtor submits that application of the § 363(b) standard for sales outside of the ordinary course of a debtor's business is met here. Section 363(b) provides, in relevant part: "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. §363(b)(1). This Court's power under § 363 is supplemented by § 105(a), which provides in relevant part: "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." *Id.* § 105(a). As set forth below, the Debtor submits it has satisfied the requirements of §§ 105 and 363 as those sections have been construed by courts in the Third Circuit and that the Debtor has sound business justifications for selling the HQAF receivables at this time.

27.      Furthermore, "[i]t is a well-established principle of bankruptcy law that the … [Debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate." *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992). Courts in the Third Circuit have used the "sound business purpose" standard for approving sales pursuant to § 363. *See In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986); *see also, e.g., In re ICL Holding Co. Inc.*, 802

9

F.3d 547, 551 (3d Cir. 2015); *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (approving a sale pursuant to § 363 where there was a "legitimate business justification").

28.     "Under Delaware law, the business-judgment rule operates as a presumption 'that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest.'" *Continuing Creditors' Comm. of Star Telecomms., Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 462 (D. Del. 2004) (quoting *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988)); *accord Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F. Supp. 2d 538, 555 n.111 (D. Del. 2008). Thus, this Court should grant the relief requested in this Motion if the Debtor demonstrates a sound business justification therefor. *See In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 179 (D. Del. 1991).

29.     The Debtor has a clear and compelling business justification for the Sale. As described above, the Debtor is a safety-net hospital facing severe liquidity constraints and an urgent need for cash. The Sale will provide the Debtor's estate with $5,000,000 in immediate proceeds, enabling the Debtor to maintain operations, pay its employees, and continue providing critical healthcare services to the community. Absent those proceeds, the Debtor's liquidity crisis will deepen which will have significant impact on operations.

30.     The Sale was negotiated at arm's length and in good faith between the Debtor and L.A. Care. Its terms are consistent with the Prepetition Purchase Agreements and are the most favorable terms reasonably available to the Debtor. In substance, L.A. Care is paying the Debtor $5,000,000 today in exchange for the right to receive an equivalent amount of HQAF funds expected to be released by DHCS later this year. No third-party lender or purchaser could reasonably be expected to offer more favorable economic terms.

10

31.     Under these circumstances, the Sale is a sound exercise of the Debtor's business judgment, is in the best interests of the estate and its stakeholders, and should be approved.

**2. The Sale Satisfies the Requirements of § 363(f) for a Sale Free and Clear of Encumbrances.**

32.     Section 363(f) provides: "[t]he Trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—(1) applicable non-bankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; . . . (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." 11 U.S.C. § 363(f).

33.     As § 363(f) is stated in the disjunctive, when proceeding pursuant to § 363(b), it is only necessary to meet one of the five conditions of § 363(f).  The Debtor submits that one or more of the conditions set forth in § 363(f) will be satisfied with respect to the Sale.

34.     Recognizing the severe need for liquidity in these cases, Reliq Pacifica LLC and Beverly Gemini Investments, LLC (collectively, "Reliq"), the Debtor's Landlord who was also purportedly granted a lien for outstanding obligations owed to it, have consented to the Sale. Moreover, the Debtor believes that any other parties that do object on the basis that they hold liens or claims against the HQAF receivables will either (a) be holders of liens or claims that are subject to a bona fide dispute or (b) would be compelled to accept cash in satisfaction of their interests. 11 U.S.C. §§ 363(f)(4) & 363(f)(5). Therefore, pursuant to § 363, the Debtor may sell the HQAF receivables free and clear of all liens, claims, and encumbrances.

35.     Additionally, the Debtor also submits that it is appropriate to sell the HQAF receivables free and clear of successor liability relating to the Debtor's business. Courts have

consistently held that a buyer of a debtor's assets pursuant to a § 363 sale takes free and clear from successor liability relating to the debtor's business. *See, e.g., In re Trans World Airlines, Inc.*, 322 F.3d 283, 288–93 (3d Cir. 2003) (sale of assets pursuant to § 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program); *United Mine Workers of Am. 1992 Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.)*, 99 F.3d 573, 585–87 (4th Cir. 1996) (affirming the sale of debtors' assets free and clear of certain taxes); *Amphenol Corp. v. Shandler (In re Insilco Techs., Inc.)*, 351 B.R. 313, 322 (Bankr. D. Del. 2006) (stating that a 363 sale permits a buyer to take ownership of property without concern that a creditor will file suit based on a successor liability theory); *see also In re Gen. Motors Corp.*, 407 B.R. 463, 505–06 (Bankr. S.D.N.Y. 2009) (holding that "[t]he law in this Circuit and District is clear; the Court will permit GM's assets to pass to the purchaser free and clear of successor liability claims, and in that connection, will issue the requested findings and associated injunction."); *In re Chrysler LLC*, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) ("[I]n personam claims, including any potential state successor or transferee liability claims against New Chrysler, as well as in rem interests, are encompassed by section 363(f) and are therefore extinguished by the Sale."). The Sale should be consummated free and clear of encumbrances so that any order approving the Sale cannot be frustrated if claimants could thereafter use the Sale as a basis to assert claims against L.A. Care, to the extent any exist.

### 3. L.A. Care Should Be Entitled To the Protections of § 363(m).

36.    Section 363(m) provides in relevant part that the reversal or modification on appeal of an authorization under § 363(b) of a sale or lease of property does not affect the validity of a sale or lease under such authorization to a buyer who bought or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal. *See* 11 U.S.C. § 363(m). Pursuant to § 363(m), a good

faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. *See Mark Bell Furniture Warehouse, Inc. v. D.M. Reid Assocs., Ltd. (In re Mark Bell Furniture Warehouse, Inc.)*, 992 F.2d 7, 8 (1st Cir. 1993); *Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985); *In re Congoleum Corp.*, Case No. 03-51524, 2007 WL 1428477, at *2 (Bankr. D. N.J. May 11, 2007); *In re Abbotts Dairies of Pa.*, 788 F.2d at 147 ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.").

37.     The Debtor and L.A. Care have not engaged in any conduct that would cause or permit the Sale to be avoided under § 363(n). The Sale has been negotiated at arm's length and in good faith, and L.A. Care is not an insider of the Debtor. Accordingly, the Debtor submits that L.A. Care is a "good faith" purchaser within the meaning of § 363(m) and should be entitled to the protections afforded thereunder.

**B.      The Debtor Should Be Authorized to Stipulate to the Validity and Non-Avoidability of the Prepetition Purchase Agreements and to Release Claims Against L.A. Care.**

38.     The Court should approve the Debtor's stipulation that the Prepetition Purchase Agreements constitute valid, binding, enforceable, and non-avoidable true-sale transactions, together with the Debtor's release of any claims or causes of action against L.A. Care arising from or relating to the Prepetition Purchase Agreements, the purchased HQAF proceeds, or the transactions contemplated thereby. The requested stipulation and release are not gratuitous. Rather, they are material and indispensable components of the consideration required by L.A. Care in exchange for entering into the Post-Petition Purchase Agreement and providing the Debtor with $5,000,000 in urgently needed liquidity. L.A. Care has made clear that it will not enter into the Post-Petition Purchase Agreement unless its rights under the Prepetition Purchase Agreements are

established with finality and are not subject to a subsequent challenge by the Debtor, the Committee, or any other party acting on behalf of the estate.[4]

39.     Approval of the stipulation and release is a sound exercise of the Debtor's business judgment. Before the Petition Date, L.A. Care paid the Debtor an aggregate of $7.5 million in immediate cash consideration under the Prepetition Purchase Agreements to acquire the Debtor's right to receive an equivalent amount of designated future HQAF proceeds. Each transaction was expressly structured as a true sale, transfer, assignment, and conveyance of the Debtor's right, title, and interest in the purchased HQAF proceeds. The inclusion of a protective backup security interest in each Prepetition Purchase Agreement, in each case perfected through properly filed UCC-1 financing statements, does not alter the parties' stated intent that the transactions constitute true sales; rather, it provides alternative protection to L.A. Care only in the event of a subsequent recharacterization.

40.     The economic terms of the Prepetition Purchase Agreements further support the requested relief. L.A. Care paid the Debtor dollar-for-dollar consideration for the purchased HQAF proceeds: $6 million under the January Purchase Agreement and $1.5 million under the May Purchase Agreement. The Prepetition Purchase Agreements did not impose interest, an original issue discount, or another financing premium that would suggest they were disguised loans. Instead, the Debtor transferred specifically identified payment rights in exchange for immediate cash consideration equal to the amount of the purchased receivables. Accordingly, both the form

---

[4] Section 2(d) of each Purchase Agreement grants L.A. Care a "Back-Up Security Interest" in the event the applicable transaction is recharacterized as something other than a true sale. Because each Purchase Agreement and the corresponding Sale constitute an integrated transaction, and the Debtor seeks entry of an Order approving that transaction as a true sale, such security interests should be unnecessary. L.A. Care has informed the Debtor, however, that it reserves all rights to amend the transaction to provide for such security interests if the terms of the Order are modified in a manner that affects the integrated nature or true-sale treatment of the transaction.

and economic substance of the Prepetition Purchase Agreements support their treatment as true sales rather than secured financings.

41.     The Debtor is not presently aware of any claims or causes of action against L.A. Care arising from or relating to the Prepetition Purchase Agreements, the purchased HQAF proceeds, or L.A. Care's conduct in connection with those transactions. The Debtor has no knowledge of any fraud, misconduct, breach, avoidable transfer, or other basis upon which the estate could assert a viable claim against L.A. Care. Thus, the proposed release does not relinquish any claim that the Debtor presently believes has material value. Instead, it provides L.A. Care, a not-for-profit governmental agency which is using taxpayer dollars to purchase the receivables, with the finality it requires to enter into the Post-Petition Purchase Agreement and prevents the estate from incurring the cost and uncertainty associated with investigating or litigating speculative claims that the Debtor does not believe exist. Indeed, mitigation of this uncertainty furthers the mission of L.A. Care – to provide support for social safety net hospitals in Los Angeles County and the patients that use them in a fiscally responsible way – which, in turn, benefits the Debtor and hospitals like the Debtor. Absent these protections, L.A. Care has made clear to the Debtor it is unwilling to enter into the Sale.

42.     The stipulation and release provide substantial value to the estate. In exchange for finality concerning the Prepetition Purchase Agreements and related claims, L.A. Care will enter into the Post-Petition Purchase Agreement and provide the Debtor with $5 million in immediate liquidity on exceptionally favorable terms—namely, $5 million today in exchange for the right to receive $5 million in future HQAF proceeds. The transaction imposes no economic cost on the estate outside of payment of L.A. Care's reasonable fees and expenses (discussed below). These proceeds are essential to the Debtor's ability to maintain hospital operations, pay employees, and

15

continue providing critical healthcare services. The certain and immediate benefit of obtaining this liquidity materially outweighs the speculative value, if any, of preserving claims that the Debtor has not identified and does not presently believe exist.

43.     Accordingly, the Court should authorize the Debtor to stipulate that the Prepetition Purchase Agreements and the transactions contemplated thereby are valid, binding, enforceable, and non-avoidable true sales of the applicable HQAF proceeds to L.A. Care. The Court should also approve the Debtor's release of L.A. Care from any and all claims and causes of action belonging to the Debtor or its estate, whether known or unknown, arising from or relating to the Prepetition Purchase Agreements, the purchased HQAF proceeds, or the transactions contemplated thereby, and provide that neither the Debtor, the Committee, nor any other party acting or purporting to act on behalf of the Debtor or its estate may subsequently challenge those agreements, transactions, or released matters.

**C.     The Debtor Should Be Authorized to Grant An Administrative Expense Claim to L.A. Care.**

44.     Section 503(b)(1)(A) provides for the allowance of administrative expenses for "the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A). A claim qualifies for administrative-expense priority where it arises from a postpetition transaction with the debtor in possession and the consideration supporting the claim provides an actual and necessary benefit to the estate. *See In re Valley Media, Inc.*, 279 B.R. 105, 140 (Bankr. D. Del. 2002); *Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.)*, 181 F.3d 527, 532–33 (3d Cir.1999). Although administrative-expense claims are construed narrowly to preserve estate assets, they are appropriate where the claimant's postpetition performance directly facilitates the debtor's continued operations or otherwise preserves the value of the estate. *Pennsylvania Department of Environmental Resources v. Tri–State Clinical*

16

*Laboratories, Inc.*, 178 F.3d 685, 689 (3d Cir. 1999) (writing that administrative expenses must, among other things, preserve the estate).

45. That standard is satisfied here. The Post-Petition Purchase Agreement is a transaction entered into directly with the Debtor after the Petition Date and provides an immediate and substantial benefit to the estate. Specifically, L.A. Care has agreed to advance $5,000,000 in immediate cash proceeds to the Debtor in exchange for the right to receive an equivalent amount of future HQAF proceeds. Those funds are necessary to address the Debtor's severe liquidity constraints, maintain hospital operations, pay employees, and permit the Debtor to continue providing critical healthcare services to its patients and the surrounding community. The Post-Petition Purchase Agreement therefore provides a direct, concrete, and substantial benefit to the estate and is integral to the Debtor's ability to continue operating during the Chapter 11 Case.

46. As a condition to entering into the Post-Petition Purchase Agreement and providing this essential liquidity, L.A. Care requires administrative expense status for its reasonable and documented fees and expenses incurred in connection with the Post-Petition Purchase Agreement and transactions contemplated thereby. Such fees and expenses arise from L.A. Care's postpetition dealings with the Debtor and are necessary to implement, document, obtain approval of, and protect the benefits of the Post-Petition Purchase Agreement. Without L.A. Care's agreement to enter into that transaction, the estate would not receive the $5,000,000 in immediate liquidity that the Debtor requires to continue operating. Accordingly, the reimbursement obligation is an actual and necessary cost of obtaining and preserving a substantial benefit for the estate.

47. The proposed administrative-expense treatment is also appropriately limited. L.A. Care would be entitled only to reimbursement of fees and expenses that are reasonable, documented, and incurred in connection with the Sale and negotiation of the Post-Petition

17

Purchase Agreement. The requested relief therefore does not confer an unlimited or unreviewable right to payment. Rather, it recognizes the administrative priority of qualifying postpetition costs incurred by L.A. Care in providing the Debtor with urgently needed liquidity and preserving the Debtor's operations for the benefit of the estate and its stakeholders.

48.    Under these circumstances, the fees and expenses covered by the Post-Petition Purchase Agreement satisfy the requirements of section 503(b)(1)(A). The Court should therefore authorize the Debtor to grant L.A. Care an administrative-expense claim for its reasonable and documented fees and expenses incurred in connection with the Sale and negotiation of the Post-Petition Purchase Agreement and to pay those amounts as and when invoiced by L.A. Care.

**D.    To the Extent Necessary, the Stay Should be Modified to Permit L.A. Care to Retain HQAF Receivables when Received Without Further Order of the Court.**

49.    Absent the Purchase Agreements, the portion of the HQAF proceeds attributable to the Debtor would ordinarily be distributed by L.A. Care to the Debtor upon receipt. The Purchase Agreements allow the Debtor immediate access to an equivalent amount of funding on an interest and fee free basis.

50.    The automatic stay imposed by § 362 should not prohibit L.A. Care from receiving and retaining the HQAF proceeds purchased under the Prepetition Purchase Agreements and the Post-Petition Purchase Agreement. The Debtor is stipulating that the Prepetition Purchase Agreements constituted valid, binding, and non-avoidable true-sale transactions, and the Debtor seeks Court approval of the Post-Petition Purchase Agreement as a sale pursuant to § 363. Accordingly, the HQAF proceeds subject to those Purchase Agreements are not property of the Debtor's estate and, upon receipt by L.A. Care, may be retained and applied in accordance with the applicable Purchase Agreement without violating the automatic stay. *See In re Wheeling-*

18

*Pittsburgh Steel Corp.*, 59 B.R. 129 (Bankr. W.D. Pa. 1986) (debtor's prepetition sale of property meant that such property was not property of the estate upon commencement of bankruptcy case).

51.     Nevertheless, to eliminate any uncertainty and out of an abundance of caution, the Debtor requests that the Court expressly provide that the automatic stay does not apply to, or alternatively modify the automatic stay to permit, L.A. Care's receipt and retention of HQAF proceeds that otherwise would have been distributed to the Debtor, up to an aggregate amount of $12.5 million, representing the total aggregate purchase price under the Purchase Agreements. Such relief is necessary to give effect to the Purchase Agreements and the transactions contemplated thereby and to ensure that L.A. Care may exercise its contractual rights without the risk of violating § 362 or seeking further order of this Court.

**VI.**

**WAIVER OF BANKRUPTCY RULE 6004(h)**

52.     The Debtor seeks a waiver of any stay of the effectiveness of the Order. Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." For the reasons detailed herein, the Debtor submits that granting this Motion is essential to prevent irreparable damage to the Debtor and its estate. Accordingly, the Debtor respectfully submits that the relief requested herein is appropriate under the circumstances and under Bankruptcy Rule 6004(h).

**VII.**

**NOTICE**

53.     The Debtor will provide notice of this Motion to: (a) the U.S. Trustee; (b) Axios; (c) Reliq; (d) Counsel to the Committee; (e) the holders of the thirty (30) largest unsecured claims against the Debtor; (f) the office of the attorney general for each of the states in which the Debtor

19

operates; and (g) the United States Attorney's Office for the District of Delaware. The Debtor submits that, under the circumstances, no other or further notice is required.

## VIII.

## <u>NO PRIOR REQUEST</u>

54.     No prior request for the relief sought herein has been made to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

## IX.

## CONCLUSION

55.     The Debtor respectfully requests that the Court enter an order (i) authorizing the sale of the HQAF receivables to L.A. Care pursuant to § 363; (ii) approving the Debtor's stipulation as to the validity and non-avoidability of the prepetition sales of HQAF receivables to L.A. Care; (iii) granting L.A. Care a release; (iv) granting L.A. Care administrative expense claims; (v) modifying the automatic stay to the extent necessary; and (vi) granting related relief.

Dated: July 29, 2026

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
919 North Market Street, 17th Floor
Wilmington, DE 19899
Telephone: (302) 652-4100
Email: ljones@pszjlaw.com

-and-

**DENTONS US LLP**

Tania M. Moyron (admitted *pro hac vice*)
Samuel R. Maizel (admitted *pro hac vice*)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone:  (213) 623-9300
Facsimile:  (213) 623-9924
Email:  tania.moyron@dentons.com
           samuel.maizel@dentons.com

John D. Beck (admitted *pro hac vice*)
Geoffrey Miller (*pro hac vice* forthcoming)
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone:  (212) 768-6700
Facsimile:  (212) 768-6800
Email:  john.beck@dentons.com
           geoffrey.miller@dentons.com

*Proposed Counsel to Debtor and Debtor in Possession*

21