**<u>EXHIBIT E</u>**

**(Post-Petition Purchase Agreement)**

**Purchase Agreement**

**regarding**

**Hospital Quality Assurance Fees**

**for Pacifica of the Valley Corporation**

This Purchase Agreement ("**Agreement**") is made and entered into by and between **Local Initiative Health Authority for Los Angeles County,** a local public agency operating and doing business as L.A. Care Health Plan ("**Health Plan**") and **Pacifica of the Valley Corporation** ("**Hospital**"), a Delaware corporation. doing business as **Pacifica Hospital of the Valley** having an address at 9449 San Fernando Rd., Sun Valley, CA 91352 and Federal Tax ID No. 33-0737312 ("**Hospital**" and, together with Health Plan, the "**Parties**" and each, a "**Party**"). The Agreement shall become effective on upon the last date executed by all parties and the satisfaction of all conditions to the effectiveness of this Agreement.

## BACKGROUND

A.      Health Plan is an independent public agency established by the Los Angeles County Board of Supervisors pursuant to Section 14087.96 of the California Welfare and Institutions Code, and a party to a certain Hospital Services Agreement(s) ("**HSA**") between Health Plan and Hospital, as amended. Under the HSA, health care services are provided to Health Plan members, and Health Plan pays for such services under the terms of the HSA.

B.      In addition to the rights and obligations of the Parties under the HSA, the Parties participate in securing funding under the Hospital Quality Assurance Fee ("**HQAF**") program implemented by the California Department of Health Care Services ("**DHCS**"). The HQAF programs provide supplemental funding to California hospitals that serve Medi-Cal and uninsured patients. Revenue to the Health Plan from the HQAF program is used to enhance federal financial participation for hospital services under the Medi-Cal program, to provide additional reimbursement and support to quality improvement efforts of hospitals, and to minimize uncompensated care provided by hospitals to uninsured patients, as well as to pay for the state's administrative costs and to provide funding for children's health coverage ("**HQAF Funds**").

C.      In order to receive HQAF payments, Hospital must be a general acute care hospital licensed under Section 1250(a) of the California Health and Safety Code, and provide

inpatient and outpatient services to Medi-Cal beneficiaries. Hospital submits appropriate documentation to the DHCS, which in turn processes the application for federal matching funds. Once the applications for HQAF Funds are approved by state and federal authorities, HQAF Funds are provided to Health Plan for distribution to Hospital in amounts determined by the model prepared in accordance with the enabling statutes.

D.    In connection with the HQAF Funds for the period spanning from **January 1, 2025 to December 31, 2025** (the "**HQAF Payment Period**"), Hospital expects approval by the United States Centers for Medicare and Medicaid Services and payment of the HQAF Funds to Health Plan **on or around April 1, 2026, but in no event later than September 30, 2026.** ("**Expected Fund Payment Date**"). Hospital further expects that such approval will lead to Health Plan's receipt of not less than **$15,00,000.00** for disbursement to Hospital according to applicable Law, but the exact amount is uncertain. In connection with the HQAF Funds, Hospital also expects Health Plan to receive certain HQAF Funds by the Expected Fund Payment Date.

E.    To assist Hospital's ability to continue to provide quality health care to Health Plan's members, Hospital has requested that Health Plan purchase from Hospital the amount of HQAF payments expected to be received for the HQAF Payment Period, in exchange for a true sale, transfer, assignment and conveyance to Health Plan of HQAF Funds received by Health Plan, and such further consideration as provided herein.

**NOW THEREFORE,** based on the foregoing facts and for good and valuable consideration, the parties agree as follows:

1.    **Definitions; Interpretation**:

(a)    Terms defined in the Recitals and elsewhere in this Agreement shall have the meanings ascribed to such terms in the applicable Recital or provision of this Agreement. In addition, the following terms, as used herein, shall have the following meanings:

(1)    "**Bankruptcy Code**" means title 11 of the United States Code (11 U.S.C. § 101, et seq.).

(2)    "**Debtor Relief Laws**" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

(3)　　"**Closing**" means the closing of the sale, transfer, assignment and conveyance of the Assigned HQAF Funds hereunder.

(4)　　"**Closing Date**" means the date on which the Closing occurs pursuant to Paragraph 4.

(5)　　"**Governmental Entity**" means any: (i) nation, principality, republic, state, commonwealth, province, territory, county, municipality, district or other jurisdiction of any nature; (ii) federal, state, local, municipal, foreign or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental division, subdivision, department, agency, bureau, branch, office, commission, council, board, instrumentality, officer, official, representative, organization, unit, body or other entity and any court, arbitrator or other tribunal); (iv) multi-national organization or body; or (v) individual, body or other entity exercising, or entitled to exercise, any executive, legislative, judicial, administrative, regulatory, police, military or taxing authority or power of any nature.

(6)　　"**Law**" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any federal, state, local or foreign government or political subdivision thereof, or any arbitrator, court or tribunal of competent jurisdiction.

(7)　　"**Lien**" means any mortgage, lien, pledge, participation interest, charge, adverse claim, security interest, encumbrance or restriction of any kind, including any restriction on use, transfer or exercise of any other attribute of ownership of any kind.

(8)　　"**Person**" means any individual, firm, corporation, company, partnership, limited liability company, trust, joint venture, association, estate, trust, Governmental Entity or other entity, enterprise, association or organization.

(9)　　"**Transfer**" means any sale, conveyance, assignment, lease, mortgage, pledge, hypothecation, encumbrance, lien, option, gift, or other disposition of, or agreement to dispose of, property or any interest in property, whether direct or indirect, voluntary or involuntary, absolute or conditional, and whether effected by operation of law or by any other means, including any method of parting with title, possession, control, or any right or interest in such property.

(10)　　"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of California; provided, that, if, with respect to any financing statement

or by reason of any provisions of applicable law, the perfection or the effect of perfection or non-perfection of the back-up security interest or any portion thereof granted pursuant to Paragraph 2(d) is governed by the Uniform Commercial Code as in effect in a jurisdiction of the United States other than the State of California, then "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions of this Agreement and any financing statement relating to such perfection or effect of perfection or non-perfection.

(b)      Except where expressly stated otherwise in this Agreement: (i) "include," "includes" and "including" are not limiting and shall be deemed to be followed by the words "without limitation"; (ii) "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase does not mean simply "if"; (iii) "hereof," "hereto," "herein" and "hereunder" and words of similar import when used in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement; (iv) references to a Person are also to its permitted successors and assigns; (v) except as expressly provided otherwise, definitions are applicable to the singular as well as the plural forms of such terms; and (vi) except as expressly provided otherwise, references to an "Paragraph," or "Exhibit" refer to a Paragraph of or an Exhibit to, this Agreement.

2.      **Purchase, Sale and Assignment**:

(a)      At the Closing and upon the terms and subject to the conditions of this Agreement, Hospital shall sell, transfer, assign and convey to Health Plan, and Health Plan shall purchase, acquire and accept from Hospital, all of its right, title and interest in and to the **HQAF** Funds in an amount equal to **$5,000,000.00** (the "**Assigned HQAF Funds**"), free and clear of all Liens.  Immediately upon the sale to Health Plan by Hospital of the Assigned HQAF Funds pursuant to this Paragraph 2(a), all of Hospital's right, title and interest in and to the Assigned HQAF Funds shall terminate, and all such right, title and interest shall vest in Health Plan.

(b)      At the Closing, and upon the terms and subject to the conditions of this Agreement, the purchase price to be paid as consideration to Hospital for the sale, transfer, assignment and conveyance of the Assigned HQAF Funds to Health Plan is **$5,000,000.00** in cash (the "**Purchase Price**").

(c)     The Parties intend that the sale, transfer, assignment and conveyance of the Assigned HQAF Funds contemplated by this Agreement be, and is, a true, complete, absolute and irrevocable sale, transfer, assignment and conveyance by Hospital to Health Plan of all of Hospital's right, title and interest in and to the Assigned HQAF Funds. Neither Hospital nor Health Plan intends the transactions contemplated by this Agreement to be, or for any purpose characterized as, a loan from Health Plan to Hospital or a pledge, a security interest, financing transaction or a borrowing. It is the intention of the parties hereto that the beneficial interest in and title to the Assigned HQAF Funds and any "proceeds" (as such term is defined in the UCC) thereof shall not be part of Hospital's estate in the event of the filing of a petition by or against Hospital under any Debtor Relief Laws. Hospital hereby waives, to the maximum extent permitted by applicable law, any right to contest or otherwise assert that this Agreement does not constitute a true, complete, absolute and irrevocable sale, transfer, assignment and conveyance by Hospital to Health Plan of all of Hospital's right, title and interest in and to the Assigned HQAF Funds under applicable Law, which waiver shall, to the maximum extent permitted by applicable Law, be enforceable against Hospital in any proceeding under any Debtor Relief Law relating to Hospital. Accordingly, Hospital shall treat the sale, transfer, assignment and conveyance of the Assigned HQAF Funds as a sale of "accounts" or "payment intangibles" (as appropriate) in accordance with the UCC, and Hospital hereby authorizes Health Plan to file financing statements (and continuation statements with respect to such financing statements when applicable) naming Hospital as the debtor and Health Plan as the secured party with respect to the Assigned HQAF Funds.

(d)     Not in derogation of the foregoing statement of the intent of the Parties, and for the purposes of providing additional assurance to Health Plan if, despite the intent of the Parties, the sale, transfer, assignment and conveyance of the Assigned HQAF Funds is hereafter held not to be a sale, Hospital hereby: (i) grants to Health Plan, as security for the payment of amounts to Health Plan equal to the Purchase Price, a security interest in and to all right, title and interest in, to and under the Assigned HQAF Funds, the "**Back-Up Security Interest**"); (ii) authorizes Health Plan to execute any such agreements, instruments or other documents in Hospital's name and to file such agreements, instruments or other documents in any appropriate filing office to perfect the Back-Up Security Interest; (iii) authorizes Health Plan to file such financing statements, and continuation statements or amendments with respect to such financing statements when applicable,

without the signature of Hospital, in such manner and such jurisdictions as are necessary or appropriate to perfect the Back-Up Security Interest; and (iv) ratifies the filing of any financing statement, and any continuation statement or amendment with respect thereto, filed without the signature of Hospital prior to the Closing Date.

(e)     If Hospital purports to reject this Agreement in any proceeding under any Debtor Relief Law, and if, despite the intent of the Parties, the sale, transfer, assignment and conveyance of the Assigned HQAF Funds is hereafter held not to be a sale, the Back-Up Security Interest created by Paragraph 2(d) shall survive rejection of this Agreement.

3.     **Further Assurances Clause**: Hospital shall take such action and execute, acknowledge and deliver, at its sole cost and expense, such agreements, instruments or other documents as Health Plan may reasonably require from time to time to carry out more effectively the purposes of this Agreement, including to prefect or protect the Back-Up Security Interest.

4.     **Closing**: Subject to the satisfaction of the conditions set forth in Paragraph 8, the Closing shall take place remotely via the exchange of documents and signatures on the date hereof, subject to the satisfaction or waiver of the conditions set forth in Paragraph 8 (other than those conditions that by their nature are to be satisfied at the Closing).

5.     **Disbursement of HQAF Funds**: It is expressly understood and agreed that upon Health Plan's receipt of such HQAF Funds, all such HQAF Funds in an amount equal to the Assigned HQAF Funds shall belong entirely to Health Plan, and Health Plan shall have no obligation to Hospital with respect to such funds. If and to the extent that the aggregate amount of HQAF Funds that are allocated to Hospital exceeds the amount of the Assigned HQAF Funds, Health Plan shall disburse the excess to Hospital in accordance with the program model guidelines, Health Plan's standard practices, and applicable law.

6.     **Health Plan's Recoupment of Shortfall**. If Health Plan has not received HQAF Funds as described in Paragraph 4 by the Expected Fund Payment Date, Health Plan shall be entitled to recoup the difference between the Purchase Price and the amount of HQAF Funds received for the HQAF Payment Period (the "**Shortfall**") from any claims payment amounts it

would otherwise owe to Hospital under the HSA, beginning on the first day of the month following the Expected Payment Date.  Specifically, Health Plan will be entitled to deduct from such claims payment amounts otherwise due to Hospital an amount equal to 20% of such claims payment amounts. Such deductions shall continue until the full amount of the Shortfall has been recouped. The Parties acknowledge and agree that Hospital's right to receive claim payment amounts from Health Plan under the HSA and Health Plan's right to receive the Assigned HQAF Funds pursuant to this Agreement form part of an integrated agreement and \arise out of the same transaction or circumstance.

7.    **Representations and Warranties**. Hospital represents and warrants to Health Plan as of the date of execution of this Agreement and as of the Closing that:

(a)    Hospital owns all right, title and interest in and to the Assigned HQAF Funds, and has not Transferred all or any part of its right, title or interest in and to the Assigned HQAF Funds.

(b)    Hospital has all requisite power and authority to execute, deliver and perform its obligations under this Agreement. The execution, delivery and performance of this Agreement, and the consummation of the transactions contemplated hereby, have been duly authorized by all necessary corporate action on the part of Hospital.

(c)    This Agreement has been duly executed and delivered by an authorized representative of Hospital and constitutes the valid and binding obligation of Hospital, enforceable against Hospital in accordance with its terms, except as may be limited by applicable Debtor Relief Laws or by general principles of equity (whether considered in a proceeding in equity or at law).

(d)    The execution, delivery and performance by Hospital of this Agreement and the consummation of the transactions contemplated hereby do not and will not (i) contravene or conflict with the certificate of incorporation, charter, bylaws or other organizational documents of Hospital, (ii) contravene or conflict with or constitute a default under any Law binding upon or applicable to Hospital or the Assigned HQAF Funds or (iii) contravene or conflict with or constitute a default under any agreement or judgment binding upon or applicable to Hospital or the Assigned HQAF Funds.

(e)     Hospital has fully and timely completed all steps to be eligible to receive HQAF Funds for the HQAF Payment Period, that Hospital's eligibility for such funds meets the legal requirements for receipt of HQAF Funds under those programs.

(f)     No consent, approval, license, order, authorization, registration, declaration or filing with or of any Governmental Entity or other Person is required to be done or obtained by Hospital in connection with (i) the execution and delivery by Hospital of this Agreement, (ii) the performance by Hospital of its obligations under this Agreement or (iii) the consummation by Hospital of any of the transactions contemplated by this Agreement.

(g)     Hospital has no reason to believe, after due diligence and careful inquiry that the aggregate amount of HQAF Funds that it will receive will be lower than the Purchase Price.

(h)     The information set forth on the accompanying informational certificate, the form of which is attached as **Exhibit B** (the "**Informational Certificate**") is true and correct.

**8.**     **Conditions to Closing**: Health Plan's obligation to consummate the transactions contemplated hereunder on the Closing Date are subject to the satisfaction or waiver, at, or prior to the Closing Date, of each of the following conditions precedent:

(a)     Hospital shall have performed and complied with all agreements, covenants, obligations and conditions required to be performed and complied with by it under this Agreement at or prior to the Closing Date.

(b)     The representations and warranties of Hospital contained in Paragraph (e) shall have been true and correct as of the date hereof and shall be true and correct as of the Closing Date as though made at and as of the date hereof and as of the Closing Date.

(c)     Health Plan shall have received a copy of the Informational Certificate, duly executed and delivered by an authorized officer of Hospital.

(d)     Health Plan shall have received a certificate of the Secretary or an Assistant Secretary of Hospital, dated the Closing Date, certifying as to (i) the incumbency of each officer of Hospital executing this Agreement and (ii) the attached thereto copies of (A) Hospital's certificate of incorporation (or similar organizational documents), (B) bylaws (or similar organizational documents), and (C) resolutions adopted by Hospital's governing body authorizing

the execution and delivery by Hospital of this Agreement and the consummation by Hospital of the transactions contemplated hereby.

(e)    Health Plan shall have filed a financing statement to perfect the Back-Up Security Interest.

(f)    The United States Bankruptcy Court for the District of Delaware shall have entered an order, in the form attached hereto as Exhibit C, or otherwise in form and substance satisfactory to Health Plan in its sole discretion, approving Hospital's entry into this Agreement and the consummation of the transactions contemplated by this Agreement.

**9.    Covenants**: Hospital covenants to Health Plan that it:

(a)    will not Transfer any of its right, title and interest in and to all or any portion of the Assigned HQAF Funds;

(b)    shall take all such further and additional actions as Health Plan may require to ensure that the Assigned HQAF Funds are actually paid to Health Plan; and

(c)    shall keep Health Plan reasonably informed of the progress and timing on its submission of documentation and payment for the HQAF Funds for the HQAF Payment Period, and shall provide a complete and accurate written response to any inquiry from Health Plan about this subject within five (5) days after Hospital's receipt of Health Plan's written request for same. Further, upon receiving information that other eligible hospitals have taken significant required steps to participate in the HQAF program, Health Plan may request assurances and supporting documentation from Hospital evidencing Hospital's compliance with its obligations under this Agreement. Failure to timely provide appropriate documentation shall be grounds for Health Plan to elect recoupment as provided herein.

**10.    Election to Recoup After Notice**. If (a) Health Plan, at any time, determines that Hospital has not taken reasonable or timely action to ensure payment of the HQAF Funds to Health Plan pursuant to Paragraph 4, or (b) Hospital has breached any of its representations, warranties, covenants or other obligations under this Agreement, Health Plan may elect to commence recoupment of the Purchase Price from claims payments it would otherwise owe to Hospital under the HSA. To make this election, Health Plan shall give at least 10 days written notice to Hospital

of this election, and may begin recoupment of not more than 30% of the Purchase Price per month, beginning on the first day of the month after expiration of the notice.

      **11.**      **Indemnification**.

      (a)      Irrespective of any obligation contained in this Agreement, Hospital shall indemnify and hold Health Plan harmless against any losses, claims, demands, liabilities, court costs, judgments and expenses, imposed by a court or otherwise incurred by Health Plan after the date of this Agreement as a result of Health Plan's receipt of Health Plan's and/or Hospital's portion of HQAF Funds or payment to Hospital of the Purchase Price, including the following:

      (i)      IF DHCS, the Department of Health and Human Services or any other federal or state agency recoups, offsets, or otherwise withholds any monies from or fails to provide any monies to Health Plan, or Health Plan is denied any monies to which it otherwise would have been entitled, for any reason relating to the Medi-Cal managed care capitation rate increases arising from the HQAF Funds (as it relates to the anticipated payment) as such increases flow to Health Plan from the State and this Agreement, including:

      (A)      DHCS's use of HQAF Funds to supplant or replace other amounts owed to Health Plan;

      (B)      The failure of the HQAF programs to qualify in whole or part for federal financial participation; or

      (C)      Overpayment of HQAF Funds to Health Plan by DHCS, Health Plan shall have a right to immediately recoup, offset or withhold any and all such amounts from payments otherwise due to Hospital. Recovery by Health Plan under this section includes, reduction in future payments paid to Hospital pursuant to Paragraph 6, or any other agreement between the parties;

      (ii)      (ii)      Hospital acknowledges that Health Plan may pursue an appeal, a lawsuit, or any other available legal action to challenge any recoupment, offset or otherwise withholding of amounts by DHCS, the Department of Health and Human Services, or any other federal or state agency, in each case, in connection with Health Plan's receipt of Hospital's portion

of HQAF Funds or payment to Hospital of the Purchase Price (such appeal, lawsuit or challenge shall be referred to as an "**Appeal**");

(iii)   At Health Plan's discretion, solely in connection with an Appeal, Hospital shall either provide or arrange for legal representation on Health Plan's behalf or Health Plan shall arrange for its own representation and be entitled to reasonable attorney's fees and costs from Hospital for such representation, in addition to any and all other relief to which Health Plan may be entitled under applicable law, including the following:

(A)   If any action at law, suit in equity, arbitration, or administrative action is brought against Health Plan by DHCS, the Department of Health and Human Services, any other federal or state agency or other individual or organization, as a result of an Appeal, to: (1) enforce or interpret the HQAF programs or payments; or (2) recoup, offset, or otherwise withhold any monies from Health Plan relating to the HQAF programs; or

(B)   If Health Plan brings any appeal, action at law, suit in equity, arbitration or administrative action against the DHCS, the Department of Health and Human Services or any other federal or state agency, as a result of an Appeal, to (1) enforce or interpret the HQAF programs or right to payments thereunder; or (2) in response to an action described above;

(b)   If Health Plan prevails in any appeal, action at law, suit in equity, arbitration, or administrative action against Hospital to enforce or interpret its right to HQAF Funds or to recoup, offset, or otherwise withhold any monies relating to the HQAF payments, Health Plan shall be entitled to reasonable attorney's fees and costs from Hospitals that arise in connection with this Agreement; and

(c)   If Health Plan believes that it is subject to any losses, claims, demands, liabilities, court costs, judgments or obligations to third parties which arise before the execution of this Agreement as a direct result of the parties' intention to enter into this agreement or the terms of this agreement, Health Plan shall promptly notify Hospital in writing of such belief.

12.     **HSA.** Except as specifically stated herein, nothing in this Agreement shall be deemed to amend the HSA or any other agreement between the Parties, and the HSA shall remain in full force and effect.

13.     **Binding Agreement.** This Agreement, and all the terms and provisions hereof, shall be binding on the Parties and their respective legal representatives, successors and assigns, administrators, heirs, and trustees, and shall inure to the benefit of the Parties and their respective legal representatives, successors and assigns, administrators, heirs, and trustees.

14.     **Notices.** Any notice, request, demand, or other communication required or permitted under this Agreement shall be deemed to be properly given when both: (a) transmitted via email to the email address listed below; and (b) delivered to the physical address listed below by United States mail, postage prepaid, or deposited for overnight delivery, charges prepaid, with an established overnight courier that provides a tracking number showing confirmation of receipt.

Notice shall be provided to:

| **Health Plan** | **Hospital** |
|---|---|
| *Hard copy to*:<br>L.A. Care Health Plan<br>Attn: Martha Santana-Chin, CEO<br>    Augustavia J. Haydel,<br>    General Counsel<br>1200 West 7th Street<br>Los Angeles, CA 90017 | *Hard copy to*:<br>Precious Mayes<br>9449 San Fernando Rd<br>Sun Valley, CA 91352 |
| *Email to*:<br>MSantana-Chin@lacare.org<br>AHaydel@lacare.org | *Email to*:<br>pmayes@pacificahospital.com<br>dmartin@pacificahospital.com |

15.     **Controlling Law.** This Agreement and any disputes arising out of this Agreement shall be governed by California law, and any action concerning or arising out of this Agreement shall be venued in the County of Los Angeles.

**16.**     **Construction.** The Parties agree that they have been represented by counsel and have cooperated in the drafting and preparation of this Agreement. In any construction to be made of this Agreement, this Agreement shall not be construed for or against any particular Party, but rather the Agreement is to be construed to implement the mutual intent of the Parties.

**17.**     **Counterparts.** This Agreement may be executed in multiple counterparts, each of which shall be an original but all of which shall constitute one Agreement. This Agreement may be executed via DocuSign.  The signature of a party transmitted by PDF or electronically shall have the same force and effect as the original signature of the party.

[Signature page follows]

**IN WITNESS WHEREOF,** the parties hereto, by their duly authorized representatives, have affixed their hands as of the date set forth above.

| **HEALTH PLAN** | **HOSPITAL** |
|---|---|
| L.A. Care Health Plan | PACIFICA OF THE VALLEY CORPORATION |
| **By:** | **By:** |
| **Title:** | **Title:** |
| **Date:** | **Date:** |

## EXHIBIT A
## PAYMENT WIRE INSTRUCTIONS

| | |
|---|---|
| Routing Transit Number: | |
| Bank Name: | |
| Bank Address: | |
| Account Number: | |
| Beneficiary Account Name: | |
| Swift Code (International Wires Only): | |

**Exhibit A to HQAF Purchase Agreement**

\\4127-4906-2755  v6

## EXHIBIT B

## INFORMATION CERTIFICATE

Reference is hereby made to that certain **Purchase Agreement regarding Private Hospital Directed Payments** (the "**Agreement**"), dated as of _____, **2026**, made by and among **Pacifica of the Valley Corporation** ("**Hospital**"), a Delaware corporation, doing business as **Pacifica Hospital of the Valley** ("**Hospital**") and **Local Initiative Health Authority for Los Angeles County,** a local public agency operating and doing business as L.A. Care Health Plan ("**Health Plan**"). Capitalized terms used but not defined herein have the meanings assigned to them in the Agreement.

Hospital hereby certifies to Health Plan:

1.      Name.

(a)     The exact legal name of Hospital, as such name appears in its respective certificate of incorporation or any other formation or organizational document, is as follows:

**Hospital: Pacifica of the Valley Corporation**

(b)     The following are any other legal names that Hospital has had in the past four months, together with the date of the relevant change:

**N/A**

(c)     The following are any other names (including trade names) used by Hospital, or any other business or organization to which Hospital became the successor by merger, consolidation, acquisition, change in form, nature, or jurisdiction of organization, or otherwise, now or at any time during the past four months:

**N/A**

2.      Other Identifying Factors.

(a)     Hospital is the type of entity described next to its name below:

**Hospital: Corporation**

(b)     Hospital is a registered organization[./, except to the extent disclosed below:

**N/A**

(c)     The jurisdiction of organization or formation of Hospital Guarantor is as follows:

**Exhibit B to HQAF Purchase Agreement**

Hospital: Delaware

(d)      Hospital has not changed its jurisdiction of organization or formation at any time during the past four months./, except as set out below:

**N/A**

(e)      The organizational identification number, if any, of Hospital appears next to its name below:

**Hospital: N/A**

(f)      The federal taxpayer identification number of Hospital appears next to its name below:

**Hospital: 33-0737312**

3.      Current Location.

The chief executive office of the Hospital is located at the following address:

**Hospital: 9449 San Fernando Road, Sun Valley, CA 91352**


[SIGNATURE PAGE FOLLOWS]


**Exhibit B to HQAF Purchase Agreement**

IN WITNESS WHEREOF, [each of the undersigned/the undersigned] has executed this certificate effective as of _____, 2026.

PACIFICA OF THE VALLEY
CORPORATION

By _____

Name:

Title:


L.A. Care Health Plan

By _____

Name:

Title:

**Exhibit B to HQAF Purchase Agreement**

\\4127-4906-2755  v6

**<u>Exhibit C</u>**

**<u>Form of Sale Order</u>**

**Exhibit C to HQAF Purchase Agreement**

\\4127-4906-2755  v6