**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Pacifica of the Valley Corporation,[1] | Case No. 26-11060 (TMH) |
| Debtor. | **Hearing Date: August 3, 2026, at 10:00 a.m. (ET)** **Objection Deadline: At Hearing** **Re: Docket No. 97** |

**AXIOS CAPITAL SOLUTIONS, LLC's LIMITED OBJECTION TO DEBTOR'S EMERGENCY MOTION TO (I) SELL HQAF RECEIVABLES TO L.A. CARE PURSUANT TO SECTION 363, (II) STIPULATE TO THE VALIDITY AND NON-AVOIDABILITY OF PREPETITION SALES OF HQAF RECEIVABLES TO L.A. CARE, (III) GRANT L.A. CARE A RELEASE OF ANY ESTATE CLAIMS, (IV) GRANT ADMINISTRATIVE CLAIMS IN FAVOR OF L.A. CARE, (V) TO THE EXTENT NECESSARY MODIFY THE AUTOMATIC STAY AND (VI) GRANT RELATED RELIEF**

Axios Capital Solutions, LLC ("**Axios**"), by and through its undersigned counsel, files this *Limited Objection* (this "**Objection**") to the above-captioned debtor's (the "**Debtor**" or "**Pacifica**") *Emergency Motion to (i) sell HQAF receivables to L.A. Care Pursuant to Section 363, (ii) stipulate to the validity and non-avoidability of prepetition sales of HQAF receivables to L.A. Care, (iii) grant L.A. Care a release of estate claims, (iv) grant administrative claims in favor of L.A. Care, (v) to the extent necessary, modify the automatic stay, and (vi) grant related relief* [D.I. 97] (the "**Motion**"). In support of this Objection, Axios respectfully states as follows:

**PRELIMINARY STATEMENT[2]**

1.      Axios does not dispute the Debtor's need for liquidity, and does not oppose the Debtor's access to funding. The Debtor operates a safety-net hospital, and Axios supports relief

---

[1] The Debtor in this Chapter 11 Case, along with the last four digits of the Debtor's federal tax identification number, is: Pacifica of the Valley Corporation d/b/a Pacifica Hospital of the Valley (7312). The Debtor's mailing address is 9449 San Fernando Road, Sun Valley, CA 91352.

[2] Capitalized terms used but not otherwise defined herein, have the meanings ascribed to such terms in the Motion.

that keeps its doors open, its employees paid, and its patients cared for.  If the Motion sought only authority to obtain necessary operating cash for the Debtor pursuant to the approved Budget, on appropriate terms, Axios would consent.  That is not what the Motion seeks.

2.       While the Debtor frames the funding as simply a purchase agreement pursuant to which L.A. Care will pay $5 million today in exchange for the right to receive $5 million in the future, it glosses over material strings attached to such funding and the negative impact the relief sought could have on the estate and its stakeholders.  The Motion seeks to have the Court bless the characterization of the transaction as a "sale" without qualification and without any potential for future challenge by any party.  The Agreements themselves say otherwise.  Full recourse to the Debtor's unrelated revenue stream, an escalating right of recoupment, and a broad indemnity are not features of a sale; they are features of a loan.  The Motion asks this Court to accept the label without examining the substance, and to authorize the payment of "buyer's" attorneys' fees and costs, on four days' notice, before any party has had the opportunity to investigate.

3.       The Motion bundles a genuine, narrow emergency -- **the immediate need for approximately $1.2 million in operating cash** -- with sweeping, permanent, non-emergency relief that has no connection to patient care:

    a.  a stipulation, binding on the Debtor, the Committee, any future trustee, and "all other parties in interest," that $7.5 million of prepetition transfers to L.A. Care are valid, non-avoidable "true sales" forever immune from challenge, which forecloses the rights of Axios (the Debtor's prepetition secured lender holding a first-priority lien on the same HQAF Receivables) and the estate, without adequate protection or compensation, and immediately barring any challenge period;

    b.  a right, mischaracterized in the Agreements as "recoupment," for L.A. Care to setoff any shortfall against revenue streams under the Debtor's separate HSA agreements that have nothing to do with the HQAF Receivables;

    c.  a request for $3.8 million more than the Debtor's own five-week Budget shows is needed, with no corresponding budget justifying the excess;

d.  an obligation for the Debtor to indemnify and hold L.A. Care harmless for losses, fees, and costs incurred in connection with the transaction;

e.  an obligation for the Debtor to pay L.A. Care's attorneys' fees and costs (uncapped and unliquidated) with administrative claim priority status;

f.  modification of the automatic stay to allow L.A. Care to retain up to $12.5 million of incoming HQAF proceeds;

g.  a blanket release of all estate claims against L.A. Care, known or unknown; and

h.  findings of good faith, arm's-length dealing, non-insider status, and "highest and best" value, entered without any marketing process and without a sufficient evidentiary record.

None of that relief is needed on an emergency basis to fund payroll or keep the lights on this week. All of it forecloses rights of the estate and its creditors permanently, on emergency notice, before any party has conducted any investigation. These provisions and extended relief are improper and should not be approved.

4. Critically, the Motion's emergency relief does not affect only the Debtor and L.A. Care. It directly and negatively impacts the rights of Axios, the Debtor's prepetition secured lender, which holds a valid, perfected, first-priority security interest in substantially all of the Debtor's assets, including the Debtor's rights to payment under the HQAF program. Blessing $7.5 million in prepetition transfers as valid, non-avoidable "true sales," and authorizing a further $5 million transfer of the same collateral, on four days' notice and without any proposed adequate protection for Axios and satisfying applicable priming standards, is not justified. It also would put Axios's senior lien priority in the HQAF Receivables at risk before Axios (or the Committee) has had any opportunity to test the Agreements' characterization or validity.

5. The recoupment and indemnification provisions in each of the Agreements shift virtually all downside risk back to the Debtor -- the opposite of what a true buyer accepts when it purchases a receivable. As set forth below, controlling Third Circuit authority holds that recourse of this kind is a hallmark of a secured loan, not a sale. Moreover, the statements of the Debtor's

3

own declarant support finding that this transaction is not a sale – L.A. Care could be repaid by other assets of the Debtor before HQAF Funds are ever received by the Debtor and thus, never would be transferred to L.A. Care.  The Agreements obligate the Debtor to deliver the HQAF Funds by an "Expected Fund Payment Date" of September 30, 2026, failing which L.A. Care begins deducting 20% of the claims payments it otherwise owes the Debtor under the parties' unrelated HSA.  *See* Agreements §§ 4, 6.  Yet the Declaration of Peter Chadwick filed in support of the Motion states that HQAF funds "are expected to become available for distribution in early 2027." *Current Chadwick Decl.* ¶ 5.  The "purchased" receivable are not expected to pay L.A. Care by the contractual deadline and beginning in October 2026, L.A. Care will instead be repaid out of the hospital's operating revenue, at twenty cents of every claims dollar, months before any HQAF dollar arrives.  Separately, and regardless of the characterization of the transaction, Axios submits that the offset rights the Agreements label "recoupment" are, in substance, an improper setoff, as discussed further below.

6.    Nor can the requested relief be justified on the current record.  The current Budget reflects an immediate need for approximately $1.2 million (not $5 million) for the Budget period, excluding professional fees, and does not extend past August 8, 2026, the day after the Final Hearing on the Cash Collateral Motion.  There is no evidentiary basis in the record for the additional $3.8 million, no showing that any alternative source of funding was explored, and no investigation into the validity or characterization of the Prepetition Agreements.  Absent that showing, the Court and other stakeholders cannot determine that surrendering $12.5 million of the Debtor's expected $15 million in HQAF Funds (and permanently foreclosing any challenge to $7.5 million of prepetition transfers) is in the best interest of the estate.  Moreover, because the Agreements are, in substance, financings rather than sales for the reasons set forth below, section

364 of the Bankruptcy Code (not section 363) supplies the applicable standard, and the Debtor has not satisfied that standard either.

7.      Accordingly, at the emergency hearing, only funding up to $1.2 million should be approved, without prejudice to the Debtor seeking approval of additional amounts (supported by an appropriate record) at a later hearing (*e.g.*, at the Final Hearing on Cash Collateral scheduled for this Friday), and without any finding as to the characterization or validity of the Prepetition Agreements or any release of claims relating to them.  Unless the relief sought by the Motion is modified to address the deficiencies identified in this Objection, the Motion should not be approved.

**FACTUAL BACKGROUND**

**A.      Relevant Case History**

1.      On July 4, 2026, the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") commencing the above-captioned case (the "**Case**").

2.      On July 7, 2026, the Debtor filed the Cash Collateral Motion.  On July 8, 2026, Axios filed a limited objection to the Cash Collateral Motion reserving its rights to object at the final hearing [D.I. 36].  On July 8, 2026, the Court held a hearing on, among other motions, the Cash Collateral Motion, and on July 9, 2026, the Court entered the *Interim Order (I) Authorizing the Debtor to (A) Use Cash Collateral and (B) Grant Liens and Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief* [D.I. 57] (the "**Interim Cash Collateral Order**"), which, among other things, scheduled the final hearing on the Cash Collateral Motion for August 7, 2026 (the "**Final Hearing**").

3.    On July 22, 2026, the Debtor filed an amended 5-week cash flow forecast, through the week ending August 8, 2026 [D.I. 89-1] (the "**Budget**").

4.    On July 31, 2026, Axios filed an objection to the entry of the proposed final order on the Cash Collateral Motion (the "**Cash Collateral Objection**").

**B.    The Main Street Loan**

5.    Pursuant to the *Main Street Priority Loan Agreement* dated as of December 10, 2020 (the "**Main Street Loan**") among the Debtor and First Western Trust Bank ("**FWTB**"), as evidenced by the *Promissory Note* dated as of December 10, 2020, in the original amount of $35,000,000, the Debtor is indebted to Axios, as successor in interest to FWTB, in an amount of not less than $50,878,944,[3] exclusive of interest, fees, penalties and other amounts that have accrued and continue to accrue daily.  Axios holds the original Promissory Note and Allonge assigning all of FWTB's interests thereunder to Axios.

6.    Pursuant to the *Pledge and Security Agreement* dated as of December 10, 2020 (the "**Security Agreement**"), between the Debtor, as grantor, and Axios, as successor in interest to FWTB, Axios holds a valid, fully perfected first priority interest in and to substantially all assets of the Debtor, including the Debtor's rights to payment under the HQAF program, perfected by filing a UCC-1 financing statement with the Delaware Secretary of State, File No. 20254995547. Axios submits that there is no genuine basis to contest the validity, perfection, or enforceability of its lien.[4]

7.    Pursuant to the *Unconditional Guaranty* dated December 10, 2020 (the "**Tuft Guaranty**"), between Mr. Tuft, as guarantor, and Axios, as successor in interest to FWTB, the

---

[3] Calculated as of September 30, 2026, assuming no additional capitalization.
[4] Copies of the relevant documents are annexed to the *Declaration of Matthew P Milana*, being filed concurrently herewith.

Debtor's obligations under the Main Street Loan are personally, fully, and unconditionally guaranteed by Mr. Tuft, asserted by the Debtor to be the Executive Chairman and sole owner of the Debtor's hospital.  Mr. Tuft's obligations under the Tuft Guaranty are secured by the *Securities Pledge Agreement* dated December 10, 2020 (the "**Pledge Agreement**"), pursuant to which Mr. Tuft pledged, assigned and delivered to Axios, as successor in interest to FWTB, and granted to Axios, as successor in interest to FWTB, a security interest in all (100%) of his equity interests in the Debtor (the "**Tuft Stock**"), together with all proceeds and substitutions thereof, all cash, securities and other monies and property paid thereon, all rights to subscribe for securities declared or granted in connection therewith, and all other cash and non-cash proceeds of the foregoing (the "**Pledged Collateral**").[5]  Axios's security interest in the Tuft Stock and the Tuft Pledged Collateral is perfected by, among other things, Axios's possession of the stock certificate (Certificate No. 4) evidencing the Tuft Stock.

8.      Following an initial forbearance period after inception of the Main Street Loan, the Debtor defaulted under the Main Street Loan almost immediately when payments became due and has failed to make its monthly payments for years.  During that time, the Debtor amassed tens of millions of dollars in secured and unsecured debt owed to dozens of other creditors.

9.      Thus, as stated in numerous notices of default issued to the Debtor, in 2023, 2024, and 2025, the Debtor is and has been in default of its obligations under the Main Street Loan.  Such defaults have never been cured by the Debtor.

---

[5] The Pledged Collateral also includes any securities, instruments or distributions of any kind issuable, issued or received by Mr. Tuft upon conversion of, in respect of, or in exchange for any other Tuft Pledged Collateral, including, but not limited to those arising from a stock dividend, stock split, reclassification, reorganization, merger, consolidation, sale of assets or other exchange of securities or any dividends of other distributions of any kind upon or with respect to the Tuft Pledged Collateral.

10.    On May 13, 2025, FWTB commenced suit against the Debtor in the District Court of Denver County, Colorado (the "**Colorado Court**"), styled as *First Western Trust Bank v. Pacifica of the Valley Corporation and Paul R. Tuft*, Case No. 2025CV31732 (Division 209) (the "**Colorado Lawsuit**").  By Order of the Colorado Court dated November 5, 2025, granting *First Western Trust Bank's Verified Motion for Substitution of Plaintiff/Creditor Pursuant to C.R.C.P. 25(c)*, Axios was substituted as the plaintiff in the Colorado Lawsuit.  The Colorado Lawsuit was pending when the Debtor filed this chapter 11 case.[6]

**C.    The L.A. Care Agreements**

11.    Prior to the Petition Date, and after Axios's lien was perfected, the Debtor entered into two "purchase" agreements with L.A. Care:

    (A)  The first agreement, entered into on or about January 14, 2026 (the "**January Agreement**"), provided for the purported sale by the Debtor to L.A. Care of HQAF receivables expected to be received for the period spanning January 1, 2025 to December 31, 2025 (the "**HQAF Receivables**")[7], in the amount of $6,000,000, in exchange for a cash payment of $6,000,000 from L.A. Care; and

    (B)  The second agreement, entered into on or about May 12, 2026, shortly before the Petition Date (the "**May Agreement,**" and together with the January Agreement, the "**Prepetition Agreements**"), similarly provided for the purported sale by the Debtor to L.A. Care of the HQAF Receivables for the same period in the amount of $1,500,000, in exchange for a cash payment of $1,500,000 from L.A. Care.

*See* Motion ¶¶ 22-23; Exhibits C and D.

12.    Each Prepetition Agreement was structured as a purported true sale and included a back-up security interest in favor of L.A. Care, and gave L.A. Care the right to recoup any shortfall in its receipt of the HQAF Receivables.  The relevant HQAF Receivables are estimated to total approximately $15 million.  As of the Petition Date, the Debtor had purportedly transferred to L.A.

---

[6] Additional information concerning the Colorado Lawsuit is set forth in Axios's Limited Objection to the Motion, on an interim basis, filed on July 8, 2026 [D.I. 36], and is incorporated herein by reference to the extent applicable.
[7] Payments of the HQAF Receivables are referred to herein as the "**HQAF Funds**".

Care the right to receive $7.5 million of the expected $15 million in HQAF Receivables, $1.5 million of which was transferred during the preference period.

13.     On July 29, 2026, the Debtor filed the Motion seeking expedited relief and authority to enter into a substantially identical agreement for the Debtor to sell to L.A. Care the HQAF Receivables relating to the same period (*i.e.*, the estimated $15 million in HQAF Receivables relating to the period of January 1, 2025 to December 31, 2025), in the amount of $5,000,000, in exchange for a cash payment of $5,000,000 from L.A. Care (the "**Post-Petition Agreement**" and collectively with the Prepetition Agreements, the "**Agreements**").  *See* Motion ¶ 24; Exhibit E.

14.     By order dated, July 30, 2026, the Court scheduled a hearing on the Motion for August 3, 2026 [D.I. 99].

## OBJECTIONS

A.  **The Motion Improperly Bundles a Narrow, Undisputed Emergency With Sweeping, Permanent Relief That Cannot Be Evaluated, Let Alone Approved, on Four Days' Notice**

15.     Section 363(b) permits a sale outside the ordinary course of business where the debtor demonstrates a sound business purpose. *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986).  But the Motion does not seek approval of a simple sale of future receivables on undisputed terms -- it seeks a bundle of final, preclusive determinations (true-sale status of $7.5 million in prepetition transfers, a release of all estate claims, the priming of Axios's rights and liens, and findings of good faith and highest-and-best value) that no party, including Axios, has had any opportunity to test through discovery or an evidentiary hearing.  In fact, it immediately bars any challenge period; contrary to the practice under the Local Bankruptcy Rule 4001-2.  The urgency of the Debtor's cash position does not create urgency for those separate, permanent determinations, and the Debtor has not shown otherwise.

9

16.     The Debtor's request effectively asks the Court to roll up the $7.5 million transferred under the Prepetition Agreements into a valid, unavoidable "sale," in exchange for $5 million of new funding, resulting in L.A. Care obtaining the sole right to receive an aggregate of $12.5 million of the Debtor's expected $15 million in HQAF Receivables.  That roll-up, and the binding determination that the Agreements are true-sale transactions, is not appropriate relief for an emergency motion.

17.     Accordingly, and because Axios recognizes that patient lives are at issue, Axios does not object to $1.2 million being funded to enable the Debtor to operate through the next week and get past the Final Hearing on the Cash Collateral Motion.[8]  However, all rights to challenge the Prepetition Agreements, including their validity and characterization, should be preserved.

B. **The Agreements Are, in Substance, Secured Financings (Not Sales) Under Controlling Third Circuit Authority, So Section 364 (Not Section 363) Governs**

18.     The Debtor's entry into the two Prepetition Agreements with L.A. Care was in contravention of the Debtor's loan agreement with Axios,[9] and occurred after Axios perfected its lien on the Debtor's receivables, including HQAF payments.  Any rights to the HQAF Receivables that L.A. Care obtained under the Prepetition Agreements were subject to Axios's preceding liens, rights and interests.

19.     The Third Circuit has squarely addressed "when a sale is not a sale, but rather a secured loan." *Major's Furniture Mart, Inc. v. Castle Credit Corp.*, 602 F.2d 538, 543–45 (3d Cir. 1979).  Under Major's Furniture Mart, courts look past the label the parties give a transaction to

---

[8] To the extent an extended mutually agreeable budget is provided, Axios is agreeable to increasing the amount, as appropriate.

[9] Article VI of the Main Street Loan Agreement prohibits the Debtor from any disposition of, or incurring any lien on, any of its assets, with certain express exceptions not applicable to the Agreements. Main Street Loan Agreement, §§ 6.02 and 6.05.

its economic substance, and full recourse to the seller, an obligation to make the buyer whole for uncollected receivables, and retention of the risk of loss by the seller are each hallmarks of a secured loan rather than a true sale. *Id*.  Despite the Agreements' use of "sale" nomenclature, the Agreements all have the hallmarks of a loan.  Under each of the Agreements, the risk of loss remains with the Debtor; it is not transferred to L.A. Care.

20.     Section 6 of the proposed Post-Petition Purchase Agreement provides that if L.A. Care does not receive the HQAF Funds by the Expected Fund Payment Date, L.A. Care is entitled to recoup the shortfall from other funds payable to the Debtor (*i.e.*, payments under the unrelated HSA):

> **[L.A. Care] Recoupment of Shortfall**. If Health Plan [L.A. Care] has not received HQAF Funds as described in Paragraph 4 by the **Expected Fund Payment Date**, Health Plan shall be entitled to recoup the difference between the Purchase Price and the amount of HQAF Funds received for the HQAF Payment Period (the "**Shortfall**") from any claims payment amounts it would otherwise owe to Hospital under the HSA, beginning on the first day of the month following the Expected Payment Date. Specifically, Health Plan will be entitled to deduct from such claims payment amounts otherwise due to Hospital an amount equal to **20%** of such claims payment amounts. **Such deductions shall continue until the full amount of the Shortfall has been recouped.** The Parties acknowledge and agree that Hospital's right to receive claim payment amounts from Health Plan under the HSA and Health Plan's right to receive the Assigned HQAF Funds pursuant to this Agreement form part of an integrated agreement and \ [sic] arise out of the same transaction or circumstance.

L.A. Care Agreements § 6 (emphasis added).

21.     That is recourse to the Debtor's general revenue stream under the HSA – a contract with no connection to the HQAF Receivables themselves.  The Debtor is effectively guaranteeing repayment to L.A. Care out of the hospital's other cash flows.  The Agreements' recitation that the HQAF Receivables and the HSA claims stream form an "integrated agreement" "arising out of the same transaction or circumstances", does not make it so; under *Major's Furniture Mart*, the label the parties choose is not controlling.

11

22.     Greater recoupment rights for L.A. Care are set forth in Section 10 of the Agreements, allowing for recoupment of up to 30% of the Purchase Price per month from sources other than the HQAF Receivables:

> **Election to Recoup After Notice**. If (a) Health Plan, at any time, determines that Hospital has not taken reasonable or timely action to ensure payment of the HQAF Funds to Health Plan pursuant to Paragraph 4, or (b) Hospital has breached any of its representations, warranties, covenants or other obligations under this Agreement, Health Plan may elect to commence recoupment of the Purchase Price from claims payments it would otherwise owe to Hospital under the HSA. To make this election, Health Plan shall give at least 10 days written notice to Hospital of this election, and may begin recoupment of not more than **30%** of the Purchase Price per month, beginning on the first day of the month after expiration of the notice.

L.A. Care Agreements § 10 (emphasis added).

23.     And, under Section 11, the Debtor must indemnify L.A. Care for essentially every scenario in which the HQAF Funds fail to materialize as expected, including DHCS recoupment, failure to qualify for federal match, and overpayment clawback, and must pay L.A. Care's attorney's fees and costs related to any challenge to DHCS's withholding of payment.  *See* Agreements ¶11(a) - (b).

24.     Dollar-for-dollar pricing with no discount, full recourse, an express contractual "Back-Up Security Interest" that springs into effect precisely if a court looks past the label, and a broad indemnity are, together, the fact pattern Major's Furniture Mart recharacterized as a loan. Granting the relief requested in the Motion would validate the mischaracterization of these transactions and impose additional, open-ended financial risk on the Debtor by allowing L.A. Care recourse to, and indemnification from, revenue of the Debtor entirely unconnected to the "purchased" HQAF Receivables; and obligate the Debtor to pay the uncapped attorneys' fees and costs of L.A. Care, the purported "buyer".  Treating the Agreements as true-sale Agreements and allowing the HQAF Receivables to be sold free and clear of all liens, would also improperly confer

on L.A. Care a permanent priority (ownership) senior to Axios's pre-existing perfected lien, to which L.A. Care is not entitled.

25.  Moreover, the Debtor states that the HQAF Funds are not expected to become available for distribution until early 2027 – well after the September 30, 2026 Expected Fund Payment Date set forth in the Agreements. *See Current Chadwick Decl*. ¶ 5.  As a result, no later than October 1, 2026, L.A. Care will be able to begin deducting 20% of the claims payments it otherwise owes the Debtor under the parties' unrelated HSA to "recoup" the funding L.A. Care is providing. *See* Agreements §§ 4, 6.  This arrangement is another telling example that the transaction is not a sale, because presumably L.A. Care will not be entitled to receive the HQAF Funds it purportedly is "purchasing" if L.A. Care has already paid itself back from the Debtor's other assets.

26.  Because the Agreements are, in substance, financings, the Debtor's request should be tested against Section 364, not Section 363 of the Bankruptcy Code.  Section 364(c) permits superpriority claims or liens on unencumbered property after notice and a hearing; § 364(d) permits a lien senior to an existing lien only where the debtor cannot obtain credit otherwise and the existing lienholder's interest is adequately protected. 11 U.S.C. § 364(c), (d).  The provisions of Local Bankruptcy Rule 4001-2 respecting financing orders also should be, but have not been, complied with.  Because L.A. Care's asserted rights under the Agreements reach the same HQAF Receivables in which Axios holds a prior perfected lien, *see* ¶ 6, *supra*, the practical effect of the relief requested is to prime Axios without any of the showings § 364(d) requires (*i.e.*, no showing that credit was unavailable on other terms, and no adequate protection for Axios's interest).  As discussed herein and further in Axios's Cash Collateral Objection, Axios is not adequately

13

protected.[10]  The Motion should not be granted on a lesser standard than the Bankruptcy Code requires simply because the transaction is styled as a sale.

27.    The relief requested here directly and negatively impacts Axios's rights as the Debtor's prepetition senior secured lender holding a valid, perfected, first-priority security interest in substantially all of the Debtor's assets, including the Debtor's rights to payment under the HQAF program, including the HQAF Receivables that are the subject of the Agreements.  *See* ¶ 6, *supra*. Any rights L.A. Care obtained under the Prepetition Agreements were, and remain, subject and subordinate to Axios's preceding, senior lien.  Therefore, any lien on HQAF Receivables granted to L.A. Care remains subordinate to Axios's lien, and any purported sale of the HQAF Receivables to L.A. Care was transferred subject to Axios's liens.  The Motion nonetheless asks the Court to bless that transfer, and to authorize a further $5 million transfer of the same collateral, as final and non-avoidable, on four days' notice, without providing adequate protection for Axios's interest. Axios's rights as the Debtor's senior secured lender are implicated regardless of which Bankruptcy Code provision properly governs the Agreements, and the Motion should not be approved without express preservation of those rights.

28.    This case should not be funded to the detriment of Axios and other creditors.  The Debtor has not demonstrated that Axios (or any other secured lender) is adequately protected. Axios reserves all rights to raise such issues in connection with the hearing on the Debtor's Cash Collateral Motion, scheduled for August 7th.  The proposed order for the L.A. Care Motion should be clear that all such rights are reserved.

---

[10] Replacement liens provide no protection where the underlying collateral, including cash that is being spent on operations reflecting Net Operating Cash Flow losses in multiple weeks of the Budget, is itself declining in value. *See* Cash Collateral Objection ¶20.

29.     The proposed Order's provision that liens on the sold HQAF Receivables "attach to the Sale proceeds with the same validity, priority, and extent as they attached to the HQAF Receivables immediately before the closing" is illusory protection under these circumstances. Maintaining the prepetition priority would subordinate L.A. Care's right to HQAF Receivables to Axios's liens and rights.  The Motion simultaneously asks the Court to validate the Debtor's prepetition transfers to L.A. Care as true sales, and the proceeds of the proposed new funding will be spent within a matter of weeks -- leaving Axios, if its lien priority is ultimately vindicated, with no meaningful recourse.

### C.  L.A. Care's Offset Rights Are, in Substance, an Impermissible Setoff, Not Recoupment

30.     Separately, Axios seeks confirmation that the Agreements' characterization of L.A. Care's offset rights as "recoupment" is inaccurate, and that those rights, properly analyzed, constitute an impermissible setoff.  Recoupment is a narrow, equitable doctrine that permits a creditor to reduce its liability on a claim by asserting a claim against the debtor arising from the *same transaction*; a setoff, by contrast, permits a creditor to net mutual but independent debts, and is subject to section 553 of the Bankruptcy Code and the automatic stay.  *See In re University Medical Center*, 973 F.2d 1065 (3d Cir. 1992) (holding prepetition overpayments by Department of Health and Human Services (HHS) to debtor hospital for Medicare services were not part of same transaction as debtor's postpetition claims for reimbursement for Medicare services and therefore recoupment did not apply and HHS's setoff was violation of stay).  Under the label of "recoupment," the Agreements, however, purport to permit L.A. Care to recover any shortfall in the HQAF Receivables (payments under the HQAF program) by withholding amounts otherwise payable to the Debtor under the HSA, a separate program governed by a separate agreement with its own, independent basis for payment.  *See* L.A. Care Agreements §§ 6, 10.

15

31.    The Agreements' recitation that the HQAF Receivables and the HSA claims stream "form part of an integrated agreement" and "arise out of the same transaction or circumstance" does not make it so.  See *Gardens Regional Hospital and Medical Center*, 975 F.3d 926 (9th Cir. 2020) (holding that withholding from ordinary fee-for-service Medi-Cal payments was not recoupment but an impermissible setoff to recover unpaid HQAF assessments in violation of the automatic stay).  Because the HQAF program and the HSA are separate programs with separate payment streams and no common origin beyond the Debtor's status as a counterparty to both, L.A. Care's right to withhold HSA payments to recover an HQAF shortfall is setoff, not recoupment. Axios requests that the Court confirm that L.A. Care's offset rights under the Agreements are properly characterized as setoff and decline to approve any order suggesting otherwise.  At minimum, any order approving the Motion should preserve all parties' rights to challenge the nature of the setoff terms on the Prepetition Agreements and the exercise of those rights under section 553 of the Bankruptcy Code and the automatic stay.

D. **The Requested Stipulation, Release, and Non-Challenge Provisions Improperly Foreclose Estate Claims Without Investigation or an Evidentiary Record**

32.    As of the Petition Date, the Debtor itself had "not determined the validity of the security interests of L.A. Care." *See Declaration of Precious Mayes in Support of Emergency First-Day Motions* [D.I. 16] ("**Mayes Decl**.") ¶ 26.  Nothing has changed that would allow the Debtor, the Committee, or the estate to make an informed judgment about the Prepetition Agreements' characterization in the four days between the Motion's filing and the scheduled hearing.  Yet without an investigation into the proper characterization of, and validity of the security interests under, the Agreements, the Motion asks the Court to stipulate, with finality, that those Agreements are valid, non-avoidable true sales, and to release L.A. Care from all estate claims, known or unknown, and the proposed Order goes further still, purporting to bind "any subsequently

16

appointed trustee or estate representative" and providing that "no such person or entity shall have standing or authority to commence, prosecute, or otherwise assert any claim." Proposed Order ¶ 8.

33.     The May Agreement, moreover, was executed on May 12, 2026 -- fifty-three days before the Petition Date.  The stipulation sought by the Motion would therefore extinguish, without investigation and without any disclosed consideration, a potential avoidance claim under section 547 of the Bankruptcy Code respecting $1.5 million of transfers (and the associated back-up security interest), together with the estate's attendant rights under section 502(d).  The Motion does not demonstrate that the estate receives value in exchange for surrendering those claims.

34.     That relief does not merely settle a dispute between the Debtor and L.A. Care.  It forecloses Axios's rights, as discussed above, and also the Committee's ability to investigate, and if warranted seek standing to pursue, an estate cause of action that could benefit all creditors, before the Committee has had any opportunity to do so.  The stipulation and release sought here presents substantial concerns:  permanent, non-emergency relief affecting estate causes of action and third-party rights, sought through an emergency sale motion rather than an adversary proceeding or under section 364, without demonstrating sufficient value to the estate to support such relief.

35.     All of Axios's rights with respect to the Prepetition Agreements must be preserved, including all rights regarding whether the Debtor's entry into the Prepetition Agreements complied with its obligations to Axios under the Main Street Loan documents (and liability of the Debtor and/or L.A. Care in connection therewith), and Axios's rights in and priority to the collateral that

is the subject of the Prepetition Agreements.[11]  The Debtor has not demonstrated that Axios's rights should be extinguished by the release and stipulation the Motion seeks.

### E. The Amount and Timing of the Requested Funding Are Not Supported by the Record

36.    The Debtor's business relies on the receipt of HQAF payments.[12]   Since the inception of this case, the Debtor has represented that it expects to receive approximately $15 million in HQAF Receivables.  The current Budget, however, reflects an immediate need of approximately $1.2 million for the Budget period (excluding professional fees)[13] and does not extend past August 8, 2026 — the day after the Final Hearing on the Cash Collateral Motion.  The record contains no evidentiary basis for the additional $3.8 million sought, and no budget reflecting how it would be used.  To the extent a new Budget is filed with the Court, Axios reserves all right to review such Budget and supplement this Objection.

37.    Nor has the Debtor demonstrated that the estimated $15 million in HQAF Receivables is net of any accrued and unpaid QAF assessment obligations owed to DHCS.  Where assessments go unpaid, DHCS's withholding rights can reduce the very stream being sold.  *See Gardens Regional*, 975 F.3d at 929-31.  Each budget filed in this Case reflects $0 in QAF fee payments.  Before the Court permits the sale of $12.5 million of a $15 million stream, the record should establish that the $15 million QAF Receivables exist.

---

[11] Axios reserves all rights regarding whether the Debtor's entry into the Prepetition Agreements complied with its obligations to Axios under the Main Street Loan documents, and does not concede the point here.

[12] *See Mayes Decl.* ¶ 15.

[13] The Debtor's Motion to establish procedures for interim compensation for professionals [D.I. 76] requests procedures that would allow professionals to be paid 80% of their monthly fees after a certificate of no objection is filed, which would be at least 14 days after the professionals' monthly fee statement is filed.  To date, no monthly fee statements have been filed, and the Court is scheduled to hear that motion on August 7th.  Therefore, no payments need to be made to professionals at this time.

18

38.     The timing represented to this Court has also shifted. At the outset of the case, the Debtor represented that HQAF Funds would be received "later this month" [July]. *See Mayes Decl.* ¶ 22; *Declaration of Peter Chadwick In Support of Debtor's Cash Collateral Motion* [D.I. 14], ¶ 10.  The Agreements themselves state that the Debtor expects to receive the HQAF Funds "on or around April 1, 2026, but in no event later than September 30, 2026." *See* Agreements, at D.  But the *Declaration of Peter Chadwick* filed in support of this Motion [D.I. 97-2] ("**Current Chadwick Decl**.") now states that "HQAF funds are expected to become available for distribution in early 2027." *Current Chadwick Decl.*, ¶ 5.  On the Debtor's own current representation, the HQAF Funds will not be received by the September 30, 2026 Expected Fund Payment Date set forth in the Agreements -- meaning L.A. Care's right to recoup from the Debtor's other revenue will be triggered no later than sixty days from now.

39.     No evidence has been presented that the Debtor sought funding from any other source.  Under the terms proposed, L.A. Care obtains a guaranteed repayment path with no risk of loss, a final and binding determination that the Prepetition Agreements are valid, non-avoidable true sales (currently disputed by Axios), the right to acquire $12.5 million of the Debtor's expected $15 million in HQAF Funds, and an administrative expense claim for its fees and expenses. L.A. Care is not simply paying $5 million today for $5 million later; it is obtaining materially more than that, on terms that have not been tested.  The Debtor has not yet filed its Schedule of Assets and Liabilities or its Statement of Financial Affairs, or provided any valuation of the Debtor's business or its assets, and the current Budget before the Court expires on August 8th.

40.     The Debtor has not demonstrated that (a) it is not simply gambling with Axios's collateral, to the detriment of Axios and the estate's other creditors, (b) this funding will be

sufficient to allow the Debtor to pursue its strategy in this case, or (c) the Debtor can operate going forward with only $2.5 million of HQAF Funds (after it sells $12.5 million to L.A. Care).

41.     Until the Debtor has a demonstrated plan for this Case, it cannot show that surrendering $12.5 million of its expected $15 million in HQAF funding (and permanently foreclosing challenge to $7.5 million of prepetition transfers) is in the best interest of the estate and its creditors.  Currently, it appears the Debtor is gambling with Axios's collateral without adequately protecting Axios.  The Debtor has not shown that this funding will carry it through a plan process, that no other receipts are expected to bridge the gap, or that the proceeds would not be better preserved for a sale process.  The Debtor should not be allowed to continue to finance ongoing operating losses through the L.A. Care advance, to the detriment of the estate, Axios and other stakeholders.  Absent that showing, this arrangement risks becoming the next step toward an insurmountable payable to L.A. Care, funded by the surrender of the estate's most readily available asset.

### F.   The Uncapped Fee, Expense, and Indemnification Provisions Impose Unbounded Risk on a Liquidity-Constrained Estate

42.     The Motion also seeks approval of an administrative expense claim for L.A. Care's reasonable and documented fees and expenses incurred in connection with the Sale. Motion ¶ 25. Apart from being an atypical feature of a "sale," this provision creates real financial exposure: this case has tight liquidity, and the Agreements' indemnification provisions combined with administrative-claim status for L.A. Care's uncapped attorneys' fees and costs create the potential for a material, unbudgeted drain on the estate at the very time the Debtor represents it needs every available dollar for patient care and payroll.  This is not a simple sale motion; this could have a real impact on the outcome of this case.

43.    This exposure reinforces why, at the emergency hearing, the Court should approve only the funding actually needed to bridge the Debtor to the Final Hearing on the Cash Collateral Motion, *see supra* Part A, without the accompanying fee, indemnity, stipulation, and release provisions that are not necessary to address that narrow emergency.

44.    Axios does not ask the Court to deny the Debtor funding.  Axios asks the Court to approve the emergency and continue everything else: authorize funding of up to $1.2 million today and continue all remaining relief (*e.g.*, the larger funding amount, the true-sale findings, the stipulations respecting the Prepetition Agreements, the releases, the no-standing provision, the recoupment characterization, and the fee and indemnity provisions) to the Final Hearing on August 7, 2026, where they may be evaluated on a proper record.  Specifically, the Proposed Order should be modified to:

    a.    decline to find that the Prepetition Agreements are true sales, and preserve all parties' rights, including Axios's, to contest their validity, priority, and characterization;

    b.    decline to characterize L.A. Care's offset rights under the Agreements as "recoupment," or preserve all parties' rights, including Axios's, to challenge that characterization and the exercise of those rights under section 553 of the Bankruptcy Code and the automatic stay

    c.    limit funding under the Post-Petition Agreement to $1.2 million at this time, without prejudice to the Debtor seeking approval of additional amounts on a fuller record

    d.    decline to approve the release of estate claims against L.A. Care, or any provision purporting to bind the Committee or any future trustee from investigating or asserting such claims; and

    e.    provide expressly that nothing in any order on the Motion prejudices the rights of any party, including Axios, to contest priority, adequate protection, or characterization issues in connection with the pending Cash Collateral Motion.

Axios remains available to discuss these matters with the Debtor to reach an appropriate funding arrangement in order to continue to protect patients and the Debtor's operations.

## RESERVATION OF RIGHTS

45.    For the foregoing reasons, Axios objects to the Motion unless the relief sought is modified as set forth herein.  Axios expressly reserves the right to (a) amend or supplement this Objection and otherwise take any additional or further action with respect to the subject matter hereof, (b) be heard before this Court to raise additional arguments or issues in connection herewith, and (c) take discovery concerning the Motion.  Nothing herein is intended to nor shall be construed as a waiver or limitation of any of Axios's rights or remedies, all of which are fully reserved.

**RAINES FELDMAN LITTRELL LLP**

Dated: August 3, 2026
    Wilmington, Delaware

*/s/ Matthew P. Milana*
Thomas J. Francella, Jr. (No. 3835)
Matthew P. Milana (No.  6681)
824 North Market Street, Suite 805
Wilmington, DE 19801
Telephone: (302) 772-5803
Email: tfrancella@raineslaw.com
       mmilana@raineslaw.com
and

Hamid R. Rafatjoo, Esquire (*pro hac vice*)
Raines Feldman Littrell LLP
4675 MacArthur Ct., Suite 1550
Newport Beach, CA 92660
Email:  HRafatjoo@raineslaw.com

and

Carollynn H.G. Callari, Esquire (*pro hac vice*)
Raines Feldman Littrell LLP
1350 Avenue of the Americas, 22nd Floor
New York, NY 10019
Email:  ccallari@raineslaw.com

**Counsel to Axios Capital Solutions, LLC**