# EXHIBIT A

MAIN STREET PRIORITY LOAN AGREEMENT

dated as of

December [/ɔ], 2020

among

PACIFICA OF THE VALLEY CORPORATION

and

FIRST WESTERN TRUST BANK

4826-5438-9459.2

LOAN AGREEMENT dated as of December [ ], 2020 (as it may be amended or modified from time to time, this "Agreement"), among PACIFICA OF THE VALLEY CORPORATION, as the Borrower, the other Loan Parties party hereto, and FIRST WESTERN TRUST BANK, as Lender.

The parties hereto agree as follows:

ARTICLE I

Definitions

SECTION 1.01. Defined Terms. As used in this Agreement, the following terms have the meanings specified below:

"Account" has the meaning assigned to such term in the Security Agreement.

"Acquisition" means any transaction, or any series of related transactions, consummated on or after the Closing Date, by which the Borrower or any of its Subsidiaries (a) acquires any going-concern business or all or substantially all of the assets of any firm, corporation, limited liability company or partnership, or division thereof, whether through purchase of assets, merger or otherwise or (b) directly or indirectly acquires (in one transaction or as the most recent transaction in a series of transactions) at least a majority (in number of votes) of the outstanding Equity Interests of a corporation that have ordinary voting power for the election of directors (other than Equity Interests having such power only by reason of the happening of a contingency) or a majority (by percentage or voting power) of the outstanding Equity Interests of a partnership or limited liability company.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the specified Person.

"Aggregate Principal Amount" is defined in Section 2.02(a).

"Anti-Corruption Laws" means all laws, rules, and regulations of any jurisdiction applicable to the Borrower or any of its Subsidiaries from time to time concerning or relating to bribery or corruption.

"Appendix" has the meaning assigned to such term in Section 5.01(a).

"Bankruptcy Event" means, with respect to any Person, when such Person becomes the subject of a voluntary or involuntary bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business appointed for it, or, in the good faith determination of the Lender, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment or has had any order for relief in such proceeding entered in respect thereof, provided that a Bankruptcy Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person by a Governmental Authority or instrumentality thereof, unless such ownership interest results in or provides such Person with immunity from the jurisdiction of courts within the U.S. or from the enforcement of judgments or writs of attachment on its assets or permits such Person (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

1

4826-5438-9459.2

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Borrower" means Pacifica of the Valley Corporation, a Delaware corporation.

"Borrower Certifications" means that certain Main Street Priority Loan Facility Form of Borrower Certifications and Covenants attached hereto as Exhibit C.

"Burdensome Restrictions" means any consensual encumbrance or restriction of the type described in clause (a) or (b) of Section 6.10.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in Denver are authorized or required by law to remain closed; provided that, when used in connection with a LIBOR Rate loan, the term "Business Day" shall also exclude any day on which banks are not open for general business in London.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases or financing leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Change in Control" means (a) Paul R. Tuft shall cease to own, free and clear of all Liens or other encumbrances, 100% of the outstanding voting Equity Interests of the Borrower on a fully diluted basis; or (b) the acquisition of direct or indirect Control of the Borrower by any Person or group other than Paul R. Tuft.

"Change in Law" means the occurrence after the date of this Agreement of any of the following: (a) the adoption of or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) compliance by the Lender (or, for purposes of Section 2.07(b), by any lending office of the Lender or by the Lender's holding company, if any) with any request, guideline, requirement or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; provided that, notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements or directives thereunder or issued in connection therewith or in the implementation thereof, and (y) all requests, rules, guidelines, requirements or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the U.S. or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted, issued or implemented.

"Charges" has the meaning assigned to such term in Section 8.16.

"Closing Date" means the date of this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means any and all property owned, leased or operated by a Person covered by the Collateral Documents and any and all other property of any Loan Party, now existing or hereafter acquired, that may at any time be, become or be intended to be, subject to a security interest or Lien in favor of the Lender to secure the Obligations.

2

4826-5438-9459.2

"Collateral Access Agreement" has the meaning assigned to such term in the Security Agreement.

"Collateral Documents" means, collectively, the Security Agreement, the Pledge Agreement and any other agreements, instruments and documents executed in connection with this Agreement that are intended to create, perfect or evidence Liens to secure the Obligations, including, without limitation, all other security agreements, pledge agreements, mortgages, deeds of trust, loan agreements, notes, guarantees, subordination agreements, pledges, powers of attorney, consents, assignments, contracts, fee letters, notices, leases, financing statements and all other written matter whether theretofore, now or hereafter executed by any Loan Party and delivered to the Lender.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Compliance Certificate" is defined in Section 5.01(e).

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Debt Service" means, for any period of determination, for the Borrower and its Subsidiaries on a consolidated basis, an amount equal to the sum of (a) interest expense paid in cash for such period plus (b) principal payments of all long-term debt paid for such period.

"Debt Service Coverage Ratio" means, for any period of determination, for the Borrower and its Subsidiaries on a consolidated basis, the ratio of (a)(i) EBITDA minus (ii) dividends, withdrawals, and other distributions, to (b) Debt Service for such period.

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Default Rate" is defined in Section 2.05(b).

"Denver" shall mean Denver, Colorado.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition (in one transaction or in a series of transactions) of any property by any Person (including any sale and leaseback transaction and any issuance of Equity Interests by a Subsidiary of such Person), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"Document" has the meaning assigned to such term in the Security Agreement.

"Dollars", "dollars" or "$" refers to lawful money of the U.S.

"EBITDA" means, for any period of determination, for the Borrower and its Subsidiaries on a consolidated basis the total of (without duplication), and as determined in accordance with GAAP consistently applied: (a) net income for such period, plus (b) in each case to the extent deducted in

3

calculating net income for such period, (i) interest expense, (ii) income taxes (including all distributions paid to the Borrower's equity holders for income tax liabilities attributable to their allocated share of the Borrower's taxable income for such period) and (iii) depreciation and amortization. For purposes of the computation of any financial covenant contained herein for any period during which a Permitted Acquisition is made, EBITDA shall be calculated on a pro forma basis as if such Permitted Acquisition had been consummated on the first day of such period in accordance with a schedule delivered the Lender by the Borrower setting forth the EBITDA for such Permitted Acquisition for a twelve-month period ending on the date of the Permitted Acquisition.

"Effective Date" means the date on which the conditions specified in Section 4.01 are satisfied (or waived in accordance with Section 8.02).

"Electronic Signature" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record.

"Electronic System" means any electronic system, including e-mail, e-fax, web portal access for the Borrower, and any other Internet or extranet-based site, whether such electronic system is owned, operated or hosted by the Lender and any of its respective Related Parties or any other Person, providing for access to data protected by passcodes or other security system.

"Eligible Cash" means, for any period of determination, for the Borrower and its Subsidiaries on a consolidated basis, (a) cash on the balance sheet from Priority Loan proceeds plus (b) Excess Cash Flow.

"Environmental Laws" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to the (i) environment, (ii) preservation or reclamation of natural resources, (iii) the management, Release or threatened Release of any Hazardous Material or (iv) health and safety matters.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Borrower or any Subsidiary directly or indirectly resulting from or based upon (a) any violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) any exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equipment" has the meaning assigned to such term in the Security Agreement.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any of the foregoing, but excluding any debt securities convertible into any of the foregoing.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with the Borrower, is treated as a single employer under Section 414(b) or (c) of the Code or Section 4001 (14)

4

of ERISA or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) the failure to satisfy the "minimum funding standard" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by the Borrower or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by the Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the incurrence by the Borrower or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal of the Borrower or any ERISA Affiliate from any Plan or Multiemployer Plan; or (g) the receipt by the Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from the Borrower or any ERISA Affiliate of any notice, concerning the imposition upon the Borrower or any ERISA Affiliate of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent, in critical status or in reorganization, within the meaning of Title IV of ERISA.

"Event of Default" has the meaning assigned to such term in Article VII.

"Excess Cash Flow" means, for any period of determination, for the Borrower and its Subsidiaries on a consolidated basis, the excess, if any, of (a) EBITDA minus (b) Debt Service.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to the Lender or required to be withheld or deducted from a payment to the Lender: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of the Lender being organized under the laws of, or having its principal office or its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) U.S. federal withholding Taxes imposed on amounts payable to or for the account of the Lender with respect to an applicable interest in the Priority Loan pursuant to a law in effect on the date on which (i) the Lender acquires such interest in the Priority Loan or (ii) the Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.07, amounts with respect to such Taxes were payable either to the Lender's assignor immediately before the Lender acquired the applicable interest in the Priority Loan, or to the Lender immediately before it changed its lending office, and (c) any withholding Taxes imposed under FATCA.

"FATCA" means Sections 1471 through 1474 of the Code as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"Federal Funds Effective Rate" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Lender from three Federal funds brokers of recognized standing selected by it.

5

4826-5438-9459.2

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Financial Officer" means the chief financial officer, principal accounting officer, treasurer or controller of the Borrower.

"Funded Indebtedness" means, as of any date of determination, all Indebtedness of the Borrower and its Subsidiaries on a consolidated basis as of such date (other than Indebtedness of the type described in clauses (d) and (f) of the definition of Indebtedness).

"Funding Account" has the meaning assigned to such term in Section 4.01(h).

"Funding Date" means the date that the Priority Loan is funded by Lender hereunder.

"GAAP" means generally accepted accounting principles in the U.S.

"Governmental Authority" means the government of the U.S., any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

"Guaranteed Obligations" has the meaning assigned to such term in Section 9.01.

"Guarantors" means all Loan Guarantors and all non-Loan Parties who have delivered an Obligation Guaranty, and the term "Guarantor" means each or any one of them individually.

"Hazardous Materials" means: (a) any substance, material, or waste that is included within the definitions of "hazardous substances," "hazardous materials," "hazardous waste," "toxic substances," "toxic materials," "toxic waste," or words of similar import in any Environmental Law; (b) those substances listed as hazardous substances by the United States Department of Transportation (or any successor agency) (49 C.F.R. 172.061 and amendments thereto) or by the Environmental Protection Agency (or any successor agency) (40 C.F.R. Part 302 and amendments thereto); and (c) any substance, material, or waste that is petroleum, petroleum-related, or a petroleum by-product, asbestos or asbestos-containing material, polychlorinated biphenyls, flammable, explosive, radioactive, freon gas, radon, or a pesticide, herbicide, or any other agricultural chemical.

6

"Healthcare Laws" means mean any and all applicable laws, actions, and orders relating to the regulation of the health care industry, including to the extent applicable any of the following: (a) Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395hhh (the Medicare statute); (b) any joint federal or state health care or health insurance program, including, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v (the Medicaid statute); (c) TRICARE, 10 U.S.C. § 1071 et seq.; (d) the Ethics in Patient Referrals Act or "STARK" law, as amended, 42 U.S.C. § 1395nn; (e) the Federal Health Care Program Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)); (f) the Federal False Claims Act (31 U.S.C. §§ 3729-3733); (g) the Federal Program Fraud Civil Remedies Act (31 U.S.C. §§ 3801-3812); (h) the Federal Anti-Kickback Act of 1986 (41 U.S.C. §§ 51-58); (i) the Federal Civil Monetary Penalties Law (42 U.S.C. §§ 1320a-7a and 1320a-7b); (j) the Exclusion Laws (42 U.S.C. § 1320a-7); (k) the Physician Payments Sunshine Act (42 U.S.C. § 1320a-7h) and any similar state laws and regulations; (l) HIPAA and similar applicable federal and state laws; (m) the Patient Protection and Affordable Care Act (Pub. L. 11-148), as amended by the Health Care and Education Reconciliation Act of 2010 (Pub. L. 11-152); (n) United States Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 et seq., and the applicable regulations promulgated thereunder; (o) the Federal Trade Commission Act, 15 U.S.C. § 41 et seq. and the rules, regulations and directives promulgated thereunder; (p) any other state or federal law, rule or regulation issued by any Governmental Authority which regulates kickbacks, fee-splitting, patient or program charges, claims submissions, reimbursement, recordkeeping, referrals, the hiring of employees or acquisition of services or supplies from those who have been excluded or debarred from government health care programs, quality, safety, privacy, security, licensure or any other aspect of providing health care; and (q) any state, local, international, or foreign equivalents to any of the foregoing.

"HIPAA" means the Health Insurance Portability and Accountability Act of 1996, the Health Information Technology for Economic and Clinical Health Act of the American Recovery and Reinvestment Act of 2009, and their implementing regulations.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (g) all Guarantees by such Person of Indebtedness of others, (h) all Capital Lease Obligations of such Person, (i) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances, (k) obligations under any earn-out (which for all purposes of this Agreement shall be valued at the maximum potential amount payable with respect to each such earn-out), and (l) obligations, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), under (i) any and all hedging transaction documents, and (ii) any and all cancellations, buy backs, reversals, terminations or assignments of any hedging transaction. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

7

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in the foregoing clause (a), Other Taxes.

"Indemnitee" has the meaning assigned to such term in Section 8.03(b).

"Information" has the meaning assigned to such term in Section 8.12.

"Inventory" has the meaning assigned to such term in the Security Agreement.

"Lender" means First Western Trust Bank, its successors and assigns.

"LIBOR Rate" means a fluctuating rate of interest as of and adjusted on each Business Day, that is equal, from time to time, to a rate per annum equal to the London interbank offered rate as administered by the ICE Benchmark Administration (or any other person or entity that takes over the administration of such rate) for deposits in U.S. dollars with a term equivalent to three months appearing on the applicable page or screen at Bloomberg.com (or, in the event such rate does not appear on a Bloomberg.com page or screen, on the appropriate page or screen of such other information service that publishes such rate as shall be selected by the Lender from time to time in its reasonable discretion) at approximately 11:00 a.m., London time on that day (or, if such day is not a Business Day, the immediately preceding Business Day). If the LIBOR Rate becomes unavailable during the term of this Priority Loan, Lender may designate a substitute interest rate index after notice to the Borrower in accordance with Section 2.06. Lender will tell the Borrower the current interest rate index upon the Borrower's request. The interest rate change will not occur more often than every three-month period.

"LIBO Screen Rate" means, for any day and time, the London interbank offered rate as administered by ICE Benchmark Administration (or any other Person that takes over the administration of such rate for Dollars) for a period equal in length to the applicable interest period as displayed on such day and time on pages LIBOR01 or LIBOR02 of the Reuters screen that displays such rate (or, in the event such rate does not appear on a Reuters page or screen, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate from time to time as selected by the Lender in its reasonable discretion).

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Loan Documents" means, collectively, this Agreement, each promissory note issued pursuant to this Agreement, each Collateral Document, the Borrower Certifications, the Loan Guaranty, any Obligation Guaranty, each compliance certificate or other certification delivered in connection with this Agreement, and each other agreement, instrument, document and certificate identified in Section 4.01 executed and delivered to, or in favor of, the Lender and including each other pledge, power of attorney, consent, assignment, contract, notice, letter of credit application and each other written matter whether heretofore, now or hereafter executed by or on behalf of any Loan Party, or any employee of any Loan Party, and delivered to the Lender in connection with this Agreement or the transactions contemplated hereby. Any reference in this Agreement or any other Loan Document to a Loan Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other

8

modifications thereto, and shall refer to this Agreement or such Loan Document as the same may be in effect at any and all times such reference becomes operative.

"Loan Guarantor" means any Person listed on the signature pages hereto as a "Loan Guarantor" and each Person who subsequently becomes a "Loan Guarantor" pursuant to Section 5.13(a).

"Loan Guaranty" means Article IX of this Agreement.

"Loan Parties" means, collectively, the Borrower and each Loan Guarantor and their respective successors and assigns, and the term "Loan Party" shall mean any one of them or all of them individually, as the context may require.

"Margin Stock" means margin stock within the meaning of Regulations T, U and X, as applicable.

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, operations, prospects or condition, financial or otherwise, of the Borrower and its Subsidiaries taken as a whole, (b) the ability of any Loan Party to perform any of its Obligations, (c) the Collateral, or the Lender's Liens on the Collateral or the priority of such Liens, or (d) the rights of or benefits available to the Lender under any of the Loan Documents.

"Material Indebtedness" means Indebtedness (other than Indebtedness to Lender or its Affiliates), of any one or more of the Loan Parties in an aggregate principal amount exceeding $50,000.00.

"Maximum Rate" has the meaning assigned to such term in Section 8.16.

"Moody's" means Moody's Investors Service, Inc.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Obligated Party" has the meaning assigned to such term in Section 9.02.

"Obligation Guaranty" means any Guarantee of all or any portion of the Obligations executed and delivered to the Lender by a guarantor who is not a Loan Party.

"Obligations" means all unpaid principal of and accrued and unpaid interest on the Priority Loan, all accrued and unpaid fees and all expenses, reimbursements, indemnities and other obligations and indebtedness (including interest and fees accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), obligations and liabilities of any of the Loan Parties to the Lender or any indemnified party, individually or collectively, existing on the Closing Date or arising thereafter, direct or indirect, joint or several, absolute or contingent, matured or unmatured, liquidated or unliquidated, secured or unsecured, arising by contract, operation of law or otherwise, arising or incurred under this Agreement or any of the other Loan Documents or in respect of the Priority Loan made or other instruments at any time evidencing any thereof.

"Other Connection Taxes" means, with respect to the Lender, Taxes imposed as a result of a present or former connection between the Lender and the jurisdiction imposing such Taxes (other than a connection arising from the Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in

9

any other transaction pursuant to, or enforced, any Loan Document), or sold or assigned an interest in the Priority Loan, or any Loan Document.

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"Paid in Full" or "Payment in Full" means, (i) the indefeasible payment in full in cash of the Priority Loan, together with accrued and unpaid interest thereon, (ii) the indefeasible payment in full in cash of the accrued and unpaid fees, and (iii) the indefeasible payment in full in cash of all reimbursable expenses and other Obligations (other than Unliquidated Obligations for which no claim has been made and other obligations expressly stated to survive such payment and termination of this Agreement), together with accrued and unpaid interest thereon.

"Participant" has the meaning assigned to such term in Section 8.04(c).

"Participant Register" has the meaning assigned to such term in Section 8.04(c).

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Permitted Acquisition" means any Acquisition made by the Borrower or any of its Subsidiaries as to which each of the following conditions has been satisfied:

> (a)     the Borrower has notified Lender not less than thirty (30) days (unless waived by Lender, in writing) prior to such Acquisition and have provided Lender with a copy of the term sheet or letter of intent for such Acquisition along with such notice;

> (b)     the Borrower has provided Lender with all material acquisition document drafts at least ten (10) days prior to the closing of such Acquisition, along with all material revisions thereto;

> (c)     the Borrower shall have provided Lender with such financial and other information reasonable requested by Lender in connection with the Acquisition promptly following Lender's request therefore;

> (d)     as of the date of the consummation of such Acquisition, no Default or Event of Default has occurred and is continuing or would result after giving effect to such Acquisition;

> (e)     such Acquisition is consummated on a non-hostile basis pursuant to a negotiated acquisition agreement that has been (if required by the governing documents of the seller or entity to be acquired) approved by the board of directors or other applicable governing body of the seller or entity to be acquired, and no material challenge to such Acquisition (excluding the exercise of appraisal rights) is pending or threatened by any shareholder or director of the seller or entity to be acquired;

> (f)     the business to be acquired in such Acquisition is in the same line of business as Borrower's business or a line of business incidental thereto;

10

(g)    as of the date of the consummation of such Acquisition, all material approvals required in connection therewith have been obtained;

(h)    the Borrower has furnished to the Lender a certificate demonstrating in reasonable detail pro forma compliance with the financial covenants in Section 6.12 for such period, in each case, calculated as if such Acquisition, including the consideration therefor, had been consummated on the first day of such period; and

(i)    the target to be acquired in such Acquisition shall have positive EBITDA for the twelve-month period most recently ended prior to the consummation of such Acquisition.

"Permitted Encumbrances" means:

(a) Liens imposed by law for Taxes that are not yet due or are being contested in compliance with Section 5.04;

(b) carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than thirty (30) days or are being contested in compliance with Section 5.04;

(c) pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

(d) deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business; and

(e) easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or interfere with the ordinary conduct of business of the Borrower or any Subsidiary;

provided that the term "Permitted Encumbrances" shall not include any Lien which has priority over Lender's Liens on the Collateral.

"Permitted Investments" means:

(a) direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the U.S. (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the U.S.), in each case maturing within one year from the date of acquisition thereof;

(b) investments in commercial paper maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's;

(c) investments in certificates of deposit, bankers' acceptances and time deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the U.S. or any state thereof which has a combined capital and surplus and undivided profits of not less than $500,000,000;

11

(d) fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above; and

(e) money market funds that (i) comply with the criteria set forth in Securities and Exchange Commission Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5,000,000,000.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Plan" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which the Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Plan Asset Regulations" means 29 CFR § 2510.3-101 et seq., as modified by Section 3(42) of ERISA, as amended from time to time.

"Pledge Agreement" means that certain Securities Pledge Agreement by Paul R. Tuft in favor of Lender, of even date herewith, as may be amended from time to time.

"Priority Loan" means a loan made pursuant to Section 2.01.

"Priority Loan Maturity Date" means the date that is five (5) years from the Closing Date.

"Regulation D" means Regulation D of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"Regulation T" means Regulation T of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"Regulation U" means Regulation U of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"Regulation X" means Regulation X of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder and thereof.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, partners, members, trustees, employees, agents, administrators, managers, representatives and advisors of such Person and such Person's Affiliates.

"Release" means any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, migrating, disposing, or dumping of any substance into the environment.

"Report" means reports prepared by the Lender or another Person showing the results of appraisals, field examinations or audits pertaining to the Borrower's assets from information furnished by or on behalf of the Borrower, after the Lender has exercised its rights of inspection pursuant to this Agreement.

4826-5438-9459.2

"Requirement of Law" means, with respect to any Person, (a) the charter, articles or certificate of organization or incorporation and bylaws or operating, management or partnership agreement, or other organizational or governing documents of such Person and (b) any statute, law (including common law), treaty, rule, regulation, code, ordinance, order, decree, writ, judgment, injunction or determination of any arbitrator or court or other Governmental Authority (including Environmental Laws), in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests of the Borrower or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests or any option, warrant or other right to acquire any such Equity Interests.

"S&P" means Standard & Poor's Ratings Services, a Standard & Poor's Financial Services LLC business.

"Sale and Leaseback Transaction" has the meaning assigned to such term in Section 6.06.

"Sanctioned Country" means, at any time, a country, region or territory which is the subject or target of any Sanctions (at the time of this Agreement, Crimea, Cuba, Iran, North Korea, and Syria).

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, (b) any Person operating, organized or resident in a Sanctioned Country, or (c) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a) or (b) or (d) any Person otherwise the subject of any Sanctions.

"Sanctions" means all economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State.

"SEC" means the Securities and Exchange Commission of the U.S.

"Security Agreement" means that certain Pledge and Security Agreement (including any and all supplements thereto), dated as of the date hereof, between the Borrower and the Lender and any other pledge or security agreement entered into, after the date of this Agreement by any other Loan Party (as required by this Agreement or any other Loan Document) or any other Person for the benefit of the Lender, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Statements" has the meaning assigned to such term in Section 2.08(c).

"Subordinated Indebtedness" of a Person means any Indebtedness of such Person, the payment of which is subordinated to payment of the Obligations to the written satisfaction of the Lender.

"subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other

13

4826-5438-9459.2

ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent and/or by the parent and one or more subsidiaries of the parent.

"Subsidiary" means any direct or indirect subsidiary of the Borrower or a Loan Party, as applicable.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), value added taxes, or any other goods and services, use or sales taxes, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Transactions" means the execution, delivery and performance by the Borrower of this Agreement and the other Loan Documents, the borrowing of the Priority Loan and other credit extensions, the use of the proceeds thereof.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of Colorado or in any other state, the laws of which are required to be applied in connection with the issue of perfection of security interests.

"Unliquidated Obligations" means, at any time, any Obligations (or portion thereof) that are contingent in nature or unliquidated at such time, including any Obligation that is: (i) an obligation to reimburse a bank for drawings not yet made under a letter of credit issued by it; (ii) any other obligation (including any guarantee) that is contingent in nature at such time; or (iii) an obligation to provide collateral to secure any of the foregoing types of obligations.

"U.S." means the United States of America.

"USA PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

SECTION 1.02. Terms Generally. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "law" shall be construed as referring to all statutes, rules, regulations, codes and other laws (including official rulings and interpretations thereunder having the force of law or with which affected Persons customarily comply) and all judgments, orders and decrees of all Governmental Authorities. The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or modifications set forth herein), (b) any definition of or reference to any statute, rule or regulation shall be construed as referring thereto as from time to time amended, supplemented or otherwise modified (including by succession of comparable successor laws), (c) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject

14

4826-5438-9459.2

to any restrictions on assignments set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all functions thereof, (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (e) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (f) any reference in any definition to the phrase "at any time" or "for any period" shall refer to the same time or period for all calculations or determinations within such definition, and (g) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

SECTION 1.03.  Accounting Terms; GAAP.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided that, if the Borrower notifies the Lender that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if the Lender notifies the Borrower that the Lender requests an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

SECTION 1.04.  Interest Rates; LIBOR Notification .  The interest rate on LIBOR Rate loans is determined by reference to the LIBOR Rate, which is derived from the London interbank offered rate ("LIBOR").  LIBOR is intended to represent the rate at which contributing banks may obtain short-term revolving loans from each other in the London interbank market.  In July 2017, the U.K. Financial Conduct Authority announced that, after the end of 2021, it would no longer persuade or compel contributing banks to make rate submissions to the ICE Benchmark Administration (together with any successor to the ICE Benchmark Administrator, the "IBA") for purposes of the IBA setting LIBOR.  As a result, it is possible that commencing in 2022, LIBOR may no longer be available or may no longer be deemed an appropriate reference rate upon which to determine the interest rate on LIBOR Rate loans.  In light of this eventuality, public and private sector industry initiatives are currently underway to identify new or alternative reference rates to be used in place of LIBOR.  In the event LIBOR is no longer available (or in certain other circumstances), Section 2.06 of this Agreement provides a mechanism for determining an alternative rate of interest. The Lender will notify the Borrower, pursuant to Section 2.06, in advance of any change to the reference rate upon which the interest rate of LIBOR Rate loans is based. However, the Lender does not warrant or accept any responsibility for, and shall not have any liability with respect to, the administration, submission or any other matter related to LIBOR or other rates in the definition of "LIBOR Rate" or with respect to any alternative, successor rate thereto, or replacement rate thereof, including without limitation, whether the composition or characteristics of any such alternative, successor or replacement reference rate will be similar to, or produce the same value or economic equivalence of the LIBOR Rate or have the same volume or liquidity as did LIBOR prior to its discontinuance or unavailability.

ARTICLE II

The Credits

SECTION 2.01.  Priority Loan.  Subject to the terms and conditions set forth herein, the Lender agrees to make a loan in dollars to the Borrower, on the Funding Date, in a principal amount of

15

4826-5438-9459.2

$35,000,000.00 (the "Priority Loan"). Amounts prepaid or repaid in respect of the Priority Loan may not be reborrowed.

SECTION 2.02. Repayment and Amortization of Loan; Evidence of Debt.

(a) Interest on the Priority Loan will accrue on the Priority Loan, beginning on the Funding Date, at a floating per annum rate equal to the LIBOR Rate plus 3.0%. From the Closing Date through the date that is 12 months from the Closing Date (the "First Anniversary Date"), Borrower will not be required to make any payments of principal or interest on the Priority Loan. Interest on the Priority Loan during such period shall be capitalized and added to the outstanding principal balance of the Priority Loan on a quarterly basis, on each of the following dates:  March [/o], 2021, June [/o], 2021, September [/o ], 2021 and December [/o], 2021. Beginning one month following the First Anniversary Date, and on the same date of each month thereafter, Borrower will pay accrued interest on the Priority Loan.  Borrower will repay an aggregate of 15% of the original principal amount of the Priority Loan plus capitalized interest thereon (the "Aggregate Principal Amount") on the third anniversary of the Closing Date; an aggregate of 15% of the Aggregate Principal Amount of the Priority Loan on the fourth anniversary of the Closing Date, and the remaining outstanding principal balance and all accrued but unpaid interest thereon, on the Priority Loan Maturity Date. If any date set forth above is not a Business Day, then payment shall be due and payable on the Business Day immediately preceding such date.

(b)  The Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrower to the Lender resulting from the Priority Loan, including the amounts of principal and interest payable and paid to the Lender from time to time hereunder.

(c)  The Lender shall maintain accounts in which it shall record (i) the amount of the Priority Loan, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to the Lender hereunder and (iii) the amount of any sum received by the Lender hereunder.

(d)  The entries made in the accounts maintained pursuant to paragraph (b) and (c) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that the failure of the Lender to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Priority Loan in accordance with the terms of this Agreement.

(e)  The Lender may request that the Priority Loan made by it be evidenced by a promissory note.  In such event, the Borrower shall prepare, execute and deliver to the Lender a promissory note payable to the Lender (or, if requested by the Lender, to the Lender and its registered assigns) and in a form approved by the Lender.  Thereafter, the Priority Loan evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 8.04) be represented by one or more promissory notes in such form.

SECTION 2.03. Prepayment of Priority Loan; Mandatory Prepayments.

(a)  The Borrower shall have the right at any time and from time to time to prepay the Priority Loan in whole or in part, subject to prior notice in accordance with paragraph (b) of this Section 2.03.

(b)  The Borrower shall notify the Lender by telephone (confirmed by fax) or through Electronic System, if arrangements for doing so have been approved by the Lender, of any prepayment

16

4826-5438-9459.2

under this Section not later than 10:00 a.m., Denver time, on the date of prepayment. Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of the Priority Loan or portion thereof to be prepaid.

(c)   Notwithstanding anything to the contrary herein, if, on any date (such date, a "Trigger Date"), the Board of Governors of the Federal Reserve System or a designee thereof has, after consultation with the Lender, notified the Lender in writing that the Borrower has materially breached, made a material misrepresentation with respect to or otherwise failed to comply with certifications in Section 2 (CARES Act Borrower Eligibility Certifications and Covenants) or Section 3 (FRA and Regulation A Borrower Eligibility Certifications) of the Borrower Certifications in any material respect or that any such certification has failed to be true and correct in any material respect, then the Lender shall promptly so notify the Borrower and the Borrower shall, no later than two (2) Business Days after such Trigger Date, prepay the Priority Loan in full, along with any accrued and unpaid interest thereon.

SECTION 2.04.   Fees.

(a) The Borrower agree to pay to the Lender (i) a loan fee of $350,000.00, (ii) a closing fee of $350,000.00 and (iii) a commitment fee of $5,000.00, in each case, on the Funding Date.

(b)   Any principal or interest which is not paid within 15 days after its due date (whether as stated, by acceleration or otherwise) shall be subject to a late payment charge of five percent (5.0%) of the total payment due, in addition to the payment of interest. The Borrower agrees to pay and stipulates that five percent (5.0%) of the total payment due is a reasonable amount for a late payment charge. The Borrower shall pay the late payment charge upon demand by Lender or, if billed, within the time specified.

(c)   All fees payable hereunder shall be paid on the dates due, in immediately available funds, to the Lender.  Fees paid shall not be refundable under any circumstances.

SECTION 2.05.   Interest.

(a)  The Priority Loan shall bear interest as set forth in Section 2.02(a).

(b)   Upon the occurrence and during the continuance of an Event of Default, including the failure to pay all Obligations upon final maturity, Lender, at its option, may also, if permitted under applicable law, do one or both of the following: (i) increase the applicable interest rate for the Priority Loan to a rate equal to eight percent (8.0%) above the applicable interest rate for the Priority Loan (the "Default Rate"), and (ii) add any unpaid accrued interest to principal and such sum will bear interest therefrom until paid at the Default Rate.

(c)   All interest hereunder shall be computed on the basis of a year of 360 days, and shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The applicable interest rate for the Priority Loan shall be determined by the Lender, and such determination shall be conclusive absent manifest error.

SECTION 2.06.   Alternate Rate of Interest; Illegality.   If at any time the Lender determines (which determination shall be conclusive absent manifest error) that (i) that adequate and reasonable means do not exist for ascertaining the LIBOR Rate or (ii) the circumstances set forth in clause (i) have not arisen but either (w) the supervisor for the administrator of the LIBO Screen Rate has made a public statement that the administrator of the LIBO Screen Rate is insolvent (and there is no successor administrator that will continue publication of the LIBO Screen Rate), (x) the administrator of

the LIBO Screen Rate has made a public statement identifying a specific date after which the LIBO Screen Rate will permanently or indefinitely cease to be published by it (and there is no successor administrator that will continue publication of the LIBO Screen Rate), (y) the supervisor for the administrator of the LIBO Screen Rate has made a public statement identifying a specific date after which the LIBO Screen Rate will permanently or indefinitely cease to be published or (z) the supervisor for the administrator of the LIBO Screen Rate or a Governmental Authority having jurisdiction over the Lender has made a public statement identifying a specific date after which the LIBO Screen Rate may no longer be used for determining interest rates for loans, then the Lender and the Borrower shall endeavor to establish an alternate rate of interest to the LIBOR Rate that gives due consideration to then prevailing market convention for determining a rate of interest for bank loans in the United States at such time, and shall enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement as may be applicable (but, for the avoidance of doubt, such related changes shall not include a reduction of any floor or margin).

SECTION 2.07. Withholding of Taxes; Gross-Up.

(a) Payments Free of Taxes. Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by a withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 2.07), the Lender receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b) Payment of Other Taxes by Loan Parties. The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Lender, timely reimburse it for, Other Taxes.

(c) Evidence of Payment. As soon as practicable after any payment of Taxes by the Borrower to a Governmental Authority pursuant to this Section 2.07, the Borrower shall deliver to the Lender the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment, or other evidence of such payment reasonably satisfactory to the Lender.

(d) Indemnification by the Loan Parties. The Loan Parties shall jointly and severally indemnify the Lender, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by the Lender or required to be withheld or deducted from a payment to the Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by the Lender shall be conclusive absent manifest error.

(e) Treatment of Certain Refunds. If the Lender determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.07 (including by the payment of additional amounts pursuant to this Section 2.07), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of

18

indemnity payments made under this Section 2.07 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of the Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of the Lender, shall repay to the Lender the amount paid to the Lender (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event the Lender is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (e), in no event will the Lender be required to pay any amount to any indemnifying party pursuant to this paragraph (e), the payment of which would place the Lender in a less favorable net after-Tax position than the Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts giving rise to such refund had never been paid. This paragraph (e) shall not be construed to require the Lender to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(f) <u>Survival</u>. Each party's obligations under this Section 2.07 shall survive the resignation or replacement of the Lender or any assignment of rights by, or the replacement of, the Lender, and the repayment, satisfaction or discharge of all obligations under any Loan Document (including the Payment in Full of the Obligations).

(g) <u>Defined Terms</u>. For purposes of this Section 2.07, the term "applicable law" includes FATCA.

SECTION 2.08. <u>Payments Generally; Allocation of Proceeds</u>.

(a)      The Borrower shall make each payment required to be made by it hereunder prior to 5:00 p.m., Denver time, on the date when due, in immediately available funds, without set off or counterclaim. Any amounts received after such time on any date may, in the discretion of the Lender, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Lender at its offices at 1900 16th Street, Suite 1200, Denver, CO 80202, Attn: Loan Operations, except that payments pursuant to Section 8.03 shall be made directly to the Persons entitled thereto. The Lender shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments hereunder shall be made in dollars. To effectuate any payment due under the Loan Documents, the Borrower hereby authorizes the Lender to initiate debit entries to any deposit account of the Borrower maintained with the Lender and to debit the same to such account. This authorization to initiate debit entries shall remain in full force and effect until the Lender has received notification of its termination in such time and in such manner as to afford the Lender a reasonable opportunity to act on it. The Borrower acknowledges (1) that such debit entries may cause an overdraft of any such account which may result in the Lender's refusal to honor items drawn on any such account until adequate deposits are made to such account, (2) that the Lender is not under any duty or obligation to initiate any debit entry for any purpose, and (3) that if a debit is not made because any such account does not have a sufficient available balance, or otherwise, the payment may be late or past due.

(b)      All payments and any proceeds of Collateral received by the Lender (i) not constituting either a specific payment of principal, interest, fees or other sum payable under the Loan Documents (which shall be applied as specified by the Borrower) or (ii) after an Event of Default has occurred and is continuing and the Lender so elects, such funds shall be applied ratably <u>first</u>, to pay any fees, indemnities, or expense reimbursements then due to the Lender from the Borrower, <u>second</u>, to pay

19

interest then due and payable on the Priority Loan, third, to prepay principal on the Priority Loan, fourth, to the payment of any other Obligations due to the Lender from the Borrower.

(c)     The Lender may from time to time provide the Borrower with account statements or invoices with respect to any of the Obligations (the "Statements"). The Lender is under no duty or obligation to provide Statements, which, if provided, will be solely for the Borrower's convenience. Statements may contain estimates of the amounts owed during the relevant billing period, whether of principal, interest, fees or other Obligations. If the Borrower pay the full amount indicated on a Statement on or before the due date indicated on such Statement, the Borrower shall not be in default of payment with respect to the billing period indicated on such Statement; provided, that acceptance by the Lender of any payment that is less than the total amount actually due at that time (including but not limited to any past due amounts) shall not constitute a waiver of the Lender's right to receive payment in full at another time.

SECTION 2.09. Returned Payments. If after receipt of any payment which is applied to the payment of all or any part of the Obligations (including a payment effected through exercise of a right of setoff), the Lender is for any reason compelled to surrender such payment or proceeds to any Person because such payment or application of proceeds is invalidated, declared fraudulent, set aside, determined to be void or voidable as a preference, impermissible setoff, or a diversion of trust funds, or for any other reason (including pursuant to any settlement entered into by the Lender in its discretion), then the Obligations or part thereof intended to be satisfied shall be revived and continued and this Agreement shall continue in full force as if such payment or proceeds had not been received by the Lender. The provisions of this Section 2.09 shall be and remain effective notwithstanding any contrary action which may have been taken by the Lender in reliance upon such payment or application of proceeds. The provisions of this Section 2.09 shall survive the termination of this Agreement.

ARTICLE III

Representations and Warranties

Each Loan Party represents and warrants to the Lender that (and where applicable, agrees):

SECTION 3.01. Organization; Powers. Each Loan Party and each Subsidiary is duly organized or formed, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to carry on its business as now conducted and, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

SECTION 3.02. Authorization; Enforceability. The Transactions are within each Loan Party's corporate or other organizational powers and have been duly authorized by all necessary corporate or other organizational actions and, if required, actions by equity holders. Each Loan Document to which each Loan Party is a party has been duly executed and delivered by such Loan Party and constitutes a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

SECTION 3.03. Governmental Approvals; No Conflicts. The Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental

20

4826-5438-9459.2

Authority, except such as have been obtained or made and are in full force and effect and except for filings necessary to perfect Liens created pursuant to the Loan Documents, (b) will not violate any Requirement of Law applicable to any Loan Party or any Subsidiary, (c) will not violate or result in a default under any indenture, agreement or other instrument binding upon any Loan Party or any Subsidiary or the assets of any Loan Party or any Subsidiary, or give rise to a right thereunder to require any payment to be made by any Loan Party or any Subsidiary, and (d) will not result in the creation or imposition of, or other requirement to create, any Lien on any asset of any Loan Party or any Subsidiary, except Liens created pursuant to the Loan Documents.

SECTION 3.04. Financial Condition; No Material Adverse Change.

(a)   The Borrower has heretofore furnished to the Lender its consolidated balance sheet and statements of income, stockholders equity and cash flows (i) as of and for the fiscal year ended December 31, 2019, reported on by its independent public accountants, and (ii) as of and for the fiscal quarter and the portion of the fiscal year ended [September 30], 2020, certified by a Financial Officer. Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of the Borrower and its consolidated Subsidiaries as of such dates and for such periods in accordance with GAAP, subject to normal year-end audit adjustments all of which, when taken as a whole, would not be materially adverse and the absence of footnotes in the case of the statements referred to in clause (ii) above.

(b)   No event, change or condition has occurred that has had, or could reasonably be expected to have, a Material Adverse Effect, since December 31, 2019.

SECTION 3.05. Properties.

(a)   Each of each Loan Party's leases and subleases is valid and enforceable in accordance with its terms and is in full force and effect, and no default by any party to any such lease or sublease exists. Each of the Loan Parties and each Subsidiary has good and indefeasible title to, or valid leasehold interests in, all of its real and personal property, free of all Liens other than those permitted by Section 6.02.

(b)   Each Loan Party and each Subsidiary owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual property necessary to its business as currently conducted, and the use thereof by each Loan Party and each Subsidiary does not infringe in any material respect upon the rights of any other Person, and each Loan Party's and each Subsidiary's rights thereto are not subject to any licensing agreement or similar arrangement.

SECTION 3.06. Litigation and Environmental Matters.

(a)   There are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of any Loan Party, threatened against or affecting any Loan Party or any Subsidiary (i) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or (ii) that involve any Loan Document or the Transactions.

(b)   (i) No Loan Party or any Subsidiary has received notice of any claim with respect to any Environmental Liability or knows of any basis for any Environmental Liability and (ii) and except with respect to any other matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, no Loan Party or any Subsidiary (A) has failed to comply with any

21

Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law (B) has become subject to any Environmental Liability, (C) has received notice of any claim with respect to any Environmental Liability or (D) knows of any basis for any Environmental Liability.

SECTION 3.07.  Compliance with Laws and Agreements; No Default.  Except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, each Loan Party and each Subsidiary is in compliance with (i) each Requirement of Law applicable to it or its property (including, without limitation, all Healthcare Laws) and (ii) all indentures, agreements and other instruments binding upon it or its property.  No Default has occurred and is continuing.

SECTION 3.08.  Investment Company Status.  No Loan Party or any Subsidiary is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

SECTION 3.09.  Taxes.  Each Loan Party and each Subsidiary has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except Taxes that are being contested in good faith by appropriate proceedings and for which such Loan Party or such Subsidiary, as applicable, has set aside on its books adequate reserves.  No tax liens have been filed and no claims are being asserted with respect to any such taxes.

SECTION 3.10.  ERISA.  No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, could reasonably be expected to result in a Material Adverse Effect.

SECTION 3.11.  (a) Disclosure.  The Loan Parties have disclosed to the Lender all agreements, instruments and corporate or other restrictions to which any Loan Party or any Subsidiary is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  None of the reports, financial statements, certificates or other information furnished by or on behalf of any Loan Party or any Subsidiary to the Lender in connection with the negotiation of this Agreement or any other Loan Document (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time delivered and, if such projected financial information was delivered prior to the Closing Date, as of the Closing Date.

(b)  As of the Closing Date, to the best knowledge of each the Borrower, the information included in the Beneficial Ownership Certification provided on or prior to the Closing Date to the Lender in connection with this Agreement is true and correct in all respects.

SECTION 3.12.  Material Agreements.  No Loan Party or any Subsidiary is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in (i) any material agreement to which it is a party or (ii) any agreement or instrument evidencing or governing Indebtedness.

SECTION 3.13.  Solvency.  Immediately after the consummation of the Transactions to occur on the Funding Date, (i) the fair value of the assets of each Loan Party, at a fair valuation, will

22

exceed its debts and liabilities, subordinated, contingent or otherwise; (ii) the present fair saleable value of the property of each Loan Party will be greater than the amount that will be required to pay the probable liability of its debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured; (iii) each Loan Party will be able to pay its debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured; and (iv) no Loan Party will have unreasonably small capital with which to conduct the business in which it is engaged as such business is now conducted and is proposed to be conducted after the Funding Date.

SECTION 3.14. <u>Insurance</u>. As of the Closing Date, all premiums in respect of all insurance policies maintained by the Loan Parties have been paid. The Loan Parties believe that the insurance maintained by or on behalf of the Loan Parties and their Subsidiaries is adequate and is customary for companies engaged in the same or similar businesses operating in the same or similar locations.

SECTION 3.15. <u>Capitalization</u>. All of the issued and outstanding Equity Interests owned by any Loan Party have been (to the extent such concepts are relevant with respect to such ownership interests) duly authorized and issued and are fully paid and non-assessable.

SECTION 3.16. <u>Security Interest in Collateral</u>. The provisions of this Agreement and the other Loan Documents create legal and valid Liens on all the Collateral in favor of the Lender, and such Liens constitute perfected and continuing Liens on the Collateral, securing the Obligations, enforceable against the applicable Loan Party and all third parties, and having priority over all other Liens on the Collateral except in the case of (a) Permitted Encumbrances, to the extent any such Permitted Encumbrances would have priority over the Liens in favor of the Lender pursuant to any applicable law and (b) Liens perfected only by possession (including possession of any certificate of title), to the extent the Lender has not obtained or does not maintain possession of such Collateral.

SECTION 3.17. <u>Employment Matters</u>. The hours worked by and payments made to employees of the Loan Parties and their Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable federal, state, local or foreign law dealing with such matters. All payments due from any Loan Party or any Subsidiary, or for which any claim may be made against any Loan Party or any Subsidiary, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of such Loan Party or such Subsidiary.

SECTION 3.18. <u>Margin Regulations</u>. No Loan Party is engaged and will not engage, principally or as one of its important activities, in the business of purchasing or carrying Margin Stock, or extending credit for the purpose of purchasing or carrying Margin Stock, and no part of the proceeds of the Priority Loan hereunder will be used to purchase or carry any Margin Stock.

SECTION 3.19. <u>Use of Proceeds</u>. The proceeds of the Priority Loan have been used and will be used, whether directly or indirectly as set forth in Section 5.08.

SECTION 3.20. <u>No Burdensome Restrictions</u>. No Loan Party is subject to any Burdensome Restrictions except Burdensome Restrictions permitted under Section 6.10.

SECTION 3.21. <u>Anti-Corruption Laws and Sanctions</u>. Each Loan Party has implemented and maintains in effect policies and procedures designed to ensure compliance by such Loan Party, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and such Loan Party, its Subsidiaries and their respective officers and directors and to the knowledge of such Loan Party its employees and agents, are in compliance with Anti-

23

Corruption Laws and applicable Sanctions in all material respects. None of (a) any Loan Party, any Subsidiary, any of their respective directors or officers or, to the knowledge of any such Loan Party or Subsidiary, employees, or (b) to the knowledge of any such Loan Party or Subsidiary, any agent of such Loan Party or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person. Neither the Priority Loan nor the use of proceeds, Transaction or other transaction contemplated by this Agreement or the other Loan Documents will violate Anti-Corruption Laws or applicable Sanctions.

SECTION 3.22. Plan Assets; Prohibited Transactions . None of the Loan Parties or any of their Subsidiaries is an entity deemed to hold "plan assets" (within the meaning of the Plan Asset Regulations), and neither the execution, delivery nor performance of the transactions contemplated under this Agreement, including the making of the Priority Loan, will give rise to a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code.

SECTION 3.23. Affiliate Transactions. Except as provided on Schedule 3.23, there are no existing or proposed agreements, arrangements, understandings or transactions between any Loan Party and any of the officers, members, managers, directors, stockholders, parents, holders of other Equity Interests, employees or Affiliates (other than Subsidiaries) of any Loan Party or any members of their respective immediate families, and none of the foregoing Persons are directly or indirectly indebted to or have any direct or indirect ownership, partnership, or voting interest in any Affiliate of any Loan Party or any Person with which any Loan Party has a business relationship or which competes with any Loan Party (except that any such Persons may own Equity Interests in (but not exceeding 2.0% of the outstanding Equity Interests of) any publicly traded company that may compete with a Loan Party).

SECTION 3.24. Borrower Certifications. All of the representations, warranties and certifications of the Borrower contained in the Borrower Certifications are true and correct in all material respects.

ARTICLE IV

Conditions

SECTION 4.01. Effective Date. The obligations of the Lender to make the Priority Loan shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 8.02):

(a) Loan Agreement and Loan Documents. The Lender (or its counsel) shall have received (i) from each party hereto either (A) a counterpart of this Agreement signed on behalf of such party or (B) written evidence satisfactory to the Lender (which may include fax or other electronic transmission of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement and (ii) duly executed copies of the Loan Documents and such other certificates, documents, instruments and agreements as the Lender shall reasonably request in connection with the transactions contemplated by this Agreement and the other Loan Documents.

(b) Closing Certificates; Certified Certificate of Incorporation; Good Standing Certificates. The Lender shall have received (i) a certificate of each Loan Party, dated the Closing Date and executed by its Secretary or Assistant Secretary, which shall (A) certify the resolutions of its board of directors, managers, members or other body authorizing the execution, delivery and performance of the Loan Documents to which it is a party, (B) identify by name and title and bear the signatures of the officers of such Loan Party authorized to sign the Loan

24

4826-5438-9459.2

Documents to which it is a party and, in the case of the Borrower, its Financial Officers, and (C) contain appropriate attachments, including the charter, articles or certificate of organization or incorporation of each Loan Party certified by the relevant authority of the jurisdiction of organization of such Loan Party and a true and correct copy of its bylaws or operating, management or partnership agreement, or other organizational or governing documents, and (ii) a long form good standing certificate for each Loan Party from its jurisdiction of organization.

(c) No Default Certificate. The Lender shall have received a certificate, signed by a Financial Officer of the Borrower, dated as of the Closing Date (i) stating that no Default has occurred and is continuing, (ii) stating that the representations and warranties contained in the Loan Documents are true and correct as of such date, and (iii) certifying as to any other factual matters as may be reasonably requested by the Lender.

(d) Fees. The Lender shall have received all fees required to be paid, and all expenses required to be reimbursed for which invoices have been presented (including the reasonable fees and expenses of legal counsel), on or before the Funding Date. All such amounts may be paid with proceeds of the Priority Loan made on the Funding Date and will be reflected in the funding instructions given by the Borrower to the Lender on or before the Funding Date.

(e) Lien Searches. The Lender shall have received the results of a recent lien search in the jurisdiction of organization of each Loan Party and each jurisdiction where assets of the Loan Parties are located, and such search shall reveal no Liens on any of the assets of the Loan Parties except for liens permitted by Section 6.02 or discharged on or prior to the Closing Date pursuant to a pay-off letter or other documentation satisfactory to the Lender.

(f) Pay-off Letter. The Lender shall have received satisfactory pay-off letters for all existing Indebtedness required to be repaid and which confirms that all Liens upon any of the property of the Loan Parties constituting Collateral will be terminated concurrently with such payment and all letters of credit issued or guaranteed as part of such Indebtedness shall have been cash collateralized.

(g) Funding Account. The Lender shall have received a notice setting forth the deposit account of the Borrower (the "Funding Account") to which the Lender is authorized by the Borrower to transfer the proceeds of the Priority Loan requested or authorized pursuant to this Agreement.

(h) Collateral Access. The Lender shall have received each of the Collateral Access Agreements required to be provided by Lender pursuant to the terms of the Security Agreement.

(i) Pledged Equity Interests; Stock Powers; Pledged Notes. The Lender shall have received (i) the certificates representing the Equity Interests pledged pursuant to the Security Agreement, together with an undated stock power for each such certificate executed in blank by a duly authorized officer of the pledgor thereof and (ii) each promissory note (if any) pledged to the Lender pursuant to the Security Agreement endorsed (without recourse) in blank (or accompanied by an executed transfer form in blank) by the pledgor thereof.

(j) Filings, Registrations and Recordings. Each document (including any Uniform Commercial Code financing statement) required by the Collateral Documents or under law or reasonably requested by the Lender to be filed, registered or recorded in order to create in favor of the Lender, a perfected Lien on the Collateral described therein, prior and superior in right to

25

4826-5438-9459.2

any other Person (other than with respect to Liens expressly permitted by Section 6.02), shall be in proper form for filing, registration or recordation.

(k) Insurance. The Lender shall have received evidence of insurance coverage in form, scope, and substance reasonably satisfactory to the Lender and otherwise in compliance with the terms of Section 5.10 of this Agreement.

(l) USA PATRIOT Act, Etc. (i) The Lender shall have received, (x) at least five (5) days prior to the Closing Date, all documentation and other information regarding the Borrower requested in connection with applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act, to the extent requested in writing of the Borrower at least ten (10) days prior to the Closing Date, and (y) a properly completed and signed IRS Form W-8 or W-9, as applicable, for each Loan Party, and (ii) the Lender shall have received, to the extent the Borrower qualify as a "legal entity customer" under the Beneficial Ownership Regulation, a Beneficial Ownership Certification in relation to the Borrower at least five (5) days prior to the Closing Date, to the extent requested in writing of the Borrower at least ten (10) days prior to the Closing Date.

(m) SPV Participation. The Lender shall have received a commitment letter from MS Facilities LLC that it will purchase a participation interest in $33,250,000.00 aggregate principal amount of the Priority Loan.

(n) Other Documents. The Lender shall have received such other documents as the Lender or its counsel may have reasonably requested.

The Lender shall notify the Borrower of the Effective Date, and such notice shall be conclusive and binding.

ARTICLE V

Affirmative Covenants

Until all of the Obligations shall have been Paid in Full, each Loan Party executing this Agreement covenants and agrees, jointly and severally with all of the other Loan Parties, with the Lender that:

SECTION 5.01.  Financial Statements; Borrowing Base and Other Information.  The Borrower will furnish to the Lender:

(a) without duplication of any other items set forth in this Section 5.01, (i) annually, no later than 120 days after the end of each fiscal year of Borrower, all of the items set forth in "Table I" of "Appendix C: Required Financial Reporting" attached hereto as Exhibit D (the "Appendix"); and (ii) quarterly, no later than 30 days after the end of each fiscal quarter of the Borrower, the items listed as "Yes" under the column entitled "MSPLF" in "Table II" of the Appendix.

(b) within 120 days after the end of each fiscal year of the Borrower, its audited consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such year, setting forth in each case in comparative form the figures for the previous fiscal year, all reported on by independent public accountants of recognized national or regional standing (without a "going concern" or like qualification, commentary or

26

4826-5438-9459.2

exception, and without any qualification or exception as to the scope of such audit) to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied;

(c) within 30 days after the end of each fiscal quarter of the Borrower (beginning with the fiscal quarter ending March 31, 2021), (i) its consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such fiscal quarter and then elapsed portion of such fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, and (ii) its consolidated balance sheet and related statements of operations, and cash flows reported on a trailing twelve-month basis, in each case all certified by a Financial Officer of the Borrower as presenting fairly in all material respects the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

(d)    within 45 days after the end of each fiscal year of the Borrower, a company-prepared consolidated balance sheet and related statements of operations, and cash flows as of the end of and for such year, setting forth in each case in comparative form the figures for the previous fiscal year;

(e)    concurrently with any delivery of financial statements under clause (a) or (b) above, a certificate of a Financial Officer of the Borrower in substantially the form of Exhibit A (each, a "Compliance Certificate") (i) certifying, in the case of the financial statements delivered under clause (b) above, as presenting fairly in all material respects the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes, (ii) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (iii) setting forth reasonably detailed calculations demonstrating compliance with Section 6.12 and (iv) stating whether any change in GAAP or in the application thereof has occurred since the date of the audited financial statements referred to in Section 3.04 and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such certificate;

(f) as soon as possible and in any event within 30 days of filing or any extension or modification thereof, copies of all tax returns filed by any Loan Party with the U.S. Internal Revenue Service; provided that if any Loan Party receives an extension for any tax returns then such filed tax returns shall be due no later than October 15;

(g)    as soon as possible and in any event within ten (10) days after the end of each calendar month, a detailed listing of all intercompany loans made by the Borrower to any Affiliate during such calendar month;

(h) promptly following any request therefor, (x) such other information regarding the operations, changes in ownership of Equity Interests, business affairs and financial condition of any Loan Party or any Subsidiary, or compliance with the terms of this Agreement, as the Lender may reasonably request and (y) information and documentation reasonably requested by the Lender for purposes of compliance with applicable "know your customer" and anti-money

27

4826-5438-9459.2

laundering rules and regulations, including the USA PATRIOT Act and the Beneficial Ownership Regulation; and

(i) promptly after any request therefor by the Lender, copies of (i) any documents described in Section 101(k)(1) of ERISA that the Borrower or any ERISA Affiliate may request with respect to any Multiemployer Plan and (ii) any notices described in Section 101(l)(1) of ERISA that the Borrower or any ERISA Affiliate may request with respect to any Multiemployer Plan; provided that if the Borrower or any ERISA Affiliate has not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plan, the Borrower or the applicable ERISA Affiliate shall promptly make a request for such documents and notices from such administrator or sponsor and shall provide copies of such documents and notices promptly after receipt thereof.

SECTION 5.02. Notices of Material Events. The Borrower will furnish to the Lender prompt (but in any event within any time period that may be specified below) written notice of the following:

(a) the occurrence of any Default;

(b) receipt of any notice of any investigation by a Governmental Authority or any litigation or proceeding commenced or threatened against any Loan Party or any Subsidiary that (i) seeks damages in excess of $50,000, (ii) seeks injunctive relief, (iii) is asserted or instituted against any Plan, its fiduciaries or its assets, (iv) alleges criminal misconduct by any Loan Party or any Subsidiary, (v) alleges the violation of, or seeks to impose remedies under, any Environmental Law or related Requirement of Law, or seeks to impose Environmental Liability, (vi) asserts liability on the part of any Loan Party or any Subsidiary in excess of $50,000 in respect of any tax, fee, assessment, or other governmental charge, or (vii) involves any product recall;

(c) any material change in accounting or financial reporting practices by the Borrower or any Subsidiary;

(d) the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in liability of the Loan Parties and their Subsidiaries in an aggregate amount exceeding $25,000;

(e) any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect; and

(f) any change in the information provided in the Beneficial Ownership Certification delivered to such Lender that would result in a change to the list of beneficial owners identified in such certification.

Each notice delivered under this Section shall be accompanied by a statement of a Financial Officer or other executive officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

SECTION 5.03. Existence; Conduct of Business. Each Loan Party will, and will cause each Subsidiary to, (a) do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, qualifications, licenses, permits, franchises, governmental authorizations, intellectual property rights, licenses and permits material to the conduct of

28

its business, and maintain all requisite authority to conduct its business in each jurisdiction in which its business is conducted; provided that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 6.03 and (b) carry on and conduct its business in substantially the same manner and in substantially the same fields of enterprise as it is presently conducted.

SECTION 5.04.  Payment of Obligations.  Each Loan Party will, and will cause each Subsidiary to, pay or discharge all Material Indebtedness and all Indebtedness to Lender and its Affiliates, and all other material liabilities and obligations, including Taxes, before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) such Loan Party or Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (c) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect; provided, however, that each Loan Party will, and will cause each Subsidiary to, remit withholding taxes and other payroll taxes to appropriate Governmental Authorities as and when claimed to be due, notwithstanding the foregoing exceptions.

SECTION 5.05.  Maintenance of Properties.  Each Loan Party will, and will cause each Subsidiary to, keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted.

SECTION 5.06.  Books and Records; Inspection Rights.  Each Loan Party will, and will cause each Subsidiary to, (a) keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities and (b) permit any representatives designated by the Lender (including employees of the Lender or any consultants, accountants, lawyers, agents and appraisers retained by the Lender), upon reasonable prior notice, to visit and inspect its properties, conduct at the Loan Party's premises field examinations of the Loan Party's assets, liabilities, books and records, including examining and making extracts from its books and records, environmental assessment reports and Phase I or Phase II studies, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested.  The Loan Parties acknowledge that the Lender, after exercising its rights of inspection, may prepare certain Reports pertaining to the Loan Parties' assets for internal use by the Lender.

SECTION 5.07.  Compliance with Laws and Material Contractual Obligations.  (a) Each Loan Party will, and will cause each Subsidiary to, (i) comply with each Requirement of Law applicable to it or its property (including, without limitation, Environmental Laws and Healthcare Laws) and (ii) perform in all material respects its obligations under material agreements to which it is a party, except, in each case, where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  Each Loan Party will maintain in effect and enforce policies and procedures designed to ensure compliance by such Loan Party, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

(b)  the Borrower shall not use, occupy, or permit the use or occupancy of any real property by the Borrower or any lessee, tenant, licensee, permittee, agent, or any other person in any manner that would be a violation of any applicable federal, state or local law or regulation, regardless of whether such use or occupancy is lawful under any conflicting law, including without limitation any law relating to the use, sale, possession, cultivation, manufacture, distribution or marketing of any controlled substances or other contraband (whether for commercial, medical, or personal purposes), or any law relating to the medicinal use or distribution of marijuana (collectively, "Prohibited Activities").  Any lease, license, sublease or other agreement for use, occupancy or possession of any real property

4826-5438-9459.2

(collectively a "lease") with any third person ("lessee") shall expressly prohibit the lessee from engaging or permitting others to engage in any Prohibited Activities. the Borrower shall upon demand provide Lender with a written statement setting forth its compliance with this section and stating whether any Prohibited Activities are or may be occurring in, on or around the real property. If the Borrower becomes aware that any lessee is likely engaged in any Prohibited Activities, the Borrower shall, in compliance with applicable law, terminate the applicable lease and take all actions permitted by law to discontinue such activities. the Borrower shall keep Lender fully advised of its actions and plans to comply with this section and to prevent Prohibited Activities. This paragraph is a material consideration and inducement upon which Lender relies in extending credit and other financial accommodations to the Borrower. Failure by the Borrower to comply with this section shall constitute a material non-curable Event of Default. Notwithstanding anything in this Agreement or the other Loan Documents regarding rights to cure Events of Default, Lender is entitled upon breach of this paragraph to immediately exercise any and all remedies under the Loan Documents, and by law.

In addition and not by way of limitation, the Borrower shall indemnify, defend and hold Lender harmless from and against any loss, claim, damage, liability, fine, penalty, cost or expense (including reasonable attorneys' fees and expenses) arising from, out of or related to any Prohibited Activities at or on the real property, Prohibited Activities by the Borrower or any lessee of the real property, or the Borrower's breach, violation, or failure to enforce or comply with any of the covenants set forth in this section. This indemnity includes, without limitation any claim by any governmental entity or agency, any lessee, or any third person, including any governmental action for seizure or forfeiture of any real property (with or without compensation to Lender, and whether or not the real property is taken free of or subject any lien or security interest of Lender).

SECTION 5.08. Use of Proceeds.

(a)     The proceeds of the Priority Loan will be used for general corporate purposes, including Permitted Acquisitions, and to pay fees and expenses related to the Priority Loan and such Permitted Acquisitions. No part of the proceeds of the Priority Loan will be used, whether directly or indirectly, (i) for any purpose that entails a violation of any of the regulations of the Federal Reserve Board, including Regulations T, U and X, (ii) to refinance any existing Indebtedness to Lender, or (iii) for the benefit of any of Borrower's non-U.S. Affiliates (including any parent company), if any.

(b)     The Borrower shall not use, and the Borrower shall procure that its Subsidiaries and its or their respective directors, officers, employees and agents shall not use, the proceeds of the Priority Loan (a) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (b) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, except to the extent permitted for a Person required to comply with Sanctions, or (c) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

SECTION 5.09. Accuracy of Information. The Loan Parties will ensure that any information, including financial statements or other documents, furnished to the Lender in connection with this Agreement or any other Loan Document or any amendment or modification hereof or thereof or waiver hereunder or thereunder contains no material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, and the furnishing of such information shall be deemed to be a representation and warranty by the Loan Parties on the date thereof as to the matters specified in this Section 5.09.

30

4826-5438-9459.2

SECTION 5.10. <u>Insurance</u>. Each Loan Party will, and will cause each Subsidiary to, maintain with financially sound and reputable carriers having a financial strength rating of at least A- by A.M. Best Company (a) insurance in such amounts (with no greater risk retention) and against such risks (including loss or damage by fire and loss in transit; theft, burglary, pilferage, larceny, embezzlement, and other criminal activities; business interruption; and general liability) and such other hazards, as is customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations and (b) all insurance required pursuant to the Collateral Documents. The Borrower will furnish to the Lender information in reasonable detail as to the insurance so maintained.

SECTION 5.11. <u>Casualty and Condemnation</u>. The Borrower will furnish to the Lender prompt written notice of any casualty or other insured damage to any material portion of the Collateral or the commencement of any action or proceeding for the taking of any material portion of the Collateral or interest therein under power of eminent domain or by condemnation or similar proceeding.

SECTION 5.12. <u>Depository Banks</u>. Each Loan Party will maintain the Lender as its principal depository bank, including for the maintenance of operating, administrative, cash management, collection activity, and other deposit accounts for the conduct of its business.

SECTION 5.13. <u>Additional Collateral; Further Assurances</u>.

(a) Subject to any applicable Requirement of Law, and if requested by the Lender, each Loan Party will cause each of its Subsidiaries formed or acquired after the date of this Agreement or any limited liability companies formed pursuant to any division to become a Loan Party by executing a Joinder Agreement in the form of <u>Exhibit B</u>. In connection therewith, the Lender shall have received all documentation and other information regarding such newly formed or acquired Subsidiaries as may be required to comply with the applicable "know your customer" rules and regulations, including the USA Patriot Act. Upon execution and delivery thereof, each such Person (i) shall automatically become a Loan Guarantor hereunder and thereupon shall have all of the rights, benefits, duties, and obligations in such capacity under the Loan Documents and (ii) will grant Liens to the Lender in any property of such Loan Party which constitutes Collateral, including any parcel of real property located in the U.S. owned by any Loan Party.

(b) Each Loan Party will cause 100% of the issued and outstanding Equity Interests of the Borrower and each of its Subsidiaries (including any Subsidiaries hereafter acquired pursuant to a Permitted Acquisition) to be subject at all times to a first priority, perfected Lien in favor of the Lender pursuant to the terms and conditions of the Loan Documents or other security documents as the Lender shall reasonably request.

(c) Without limiting the foregoing, each Loan Party will, and will cause each Subsidiary to, execute and deliver, or cause to be executed and delivered, to the Lender such documents, agreements and instruments, and will take or cause to be taken such further actions (including the filing and recording of financing statements, fixture filings, mortgages, deeds of trust and other documents and such other actions or deliveries of the type required by Section 4.01, as applicable), which may be required by any Requirement of Law or which the Lender may, from time to time, reasonably request to carry out the terms and conditions of this Agreement and the other Loan Documents and to ensure perfection and priority of the Liens created or intended to be created by the Collateral Documents, all in form and substance reasonably satisfactory to the Lender and all at the expense of the Loan Parties.

(d) If any material assets (including any real property or improvements thereto or any interest therein) are acquired by any Loan Party after the Closing Date (including any material assets

31

4826-5438-9459.2

acquired in connection with a Permitted Acquisition) (other than assets constituting Collateral under the Security Agreement that become subject to the Lien under the Security Agreement upon acquisition thereof), the Borrower will (i) notify the Lender and, if requested by the Lender, cause such assets to be subjected to a Lien securing the Obligations and (ii) take, and cause each applicable Loan Party to take, such actions as shall be necessary or reasonably requested by the Lender to grant and perfect such Liens, including actions described in paragraph (c) of this Section, all at the expense of the Loan Parties.

## ARTICLE VI

### Negative Covenants

Until all of the Obligations shall have been Paid in Full, each Loan Party executing this Agreement covenants and agrees, jointly and severally with all of the other Loan Parties, with the Lender that:

SECTION 6.01. Indebtedness. No Loan Party will, nor will it permit any Subsidiary to create, incur, assume or suffer to exist any Indebtedness, except:

(a) the Obligations;

(b) Indebtedness (i) of the Borrower existing on the date hereof and set forth in Schedule 6.01 and (ii) which represents an extension, renewal, refinancing or replacement of such Indebtedness permitted under clause (i); provided that such extension, renewal, refinancing or replacement does not (A) increase the then-outstanding principal amount of such Indebtedness or (B) result in any Lien on any property of the Borrower other than the real property securing the Indebtedness permitted under clause (i) of this clause (b);

(c) Indebtedness of the Borrower to any Subsidiary and of any Subsidiary to the Borrower or any other Subsidiary, provided that (i) Indebtedness of any Subsidiary that is not a Loan Party to the Borrower or any other Loan Party shall be subject to Section 6.04 and (ii) Indebtedness of any Loan Party to any Subsidiary that is not a Loan Party shall be subordinated to the Obligations on terms reasonably satisfactory to the Lender; and

(d) Guarantees by the Borrower of Indebtedness of any Subsidiary and by any Subsidiary of Indebtedness of the Borrower or any other Subsidiary, provided that (i) the Indebtedness so Guaranteed is permitted by this Section 6.01, (ii) Guarantees by the Borrower or any other Loan Party of Indebtedness of any Subsidiary that is not a Loan Party shall be subject to Section 6.04 and (iii) Guarantees permitted under this clause (d) shall be subordinated to the Obligations on the same terms as the Indebtedness so Guaranteed is subordinated to the Obligations.

Borrower may not prepay any Indebtedness other than the Obligations.

SECTION 6.02. Liens. No Loan Party will, nor will it permit any Subsidiary to, create, incur, assume or permit to exist any Lien on any of its property, assets or revenues, whether now owned or hereafter acquired, securing any debt for borrowed money or any obligations evidenced by a bond, debenture, note, loan agreement or other similar instrument, or any guarantee of the foregoing, other than the following:

(a) Liens created pursuant to any Loan Document;

(b) Permitted Encumbrances;

32

4826-5438-9459.2

(c) any Lien on any real property of such Loan Party existing on the date hereof and set forth in Schedule 6.02; provided that (i) such Lien shall not apply to any other property or asset of the Borrower or Subsidiary or any other the Borrower or Subsidiary and (ii) such Lien shall secure only those obligations which it secures on the date hereof or an extension, renewal, refinancing or replacement of such obligations permitted under Section 6.01(b); and

(d) Liens granted by a Subsidiary that is not a Loan Party in favor of the Borrower or another Loan Party in respect of Indebtedness owed by such Subsidiary.

SECTION 6.03. Fundamental Changes.

(a) No Loan Party will merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or otherwise Dispose of all or substantially all of its assets, or all or substantially all of the stock of any of its Subsidiaries (in each case, whether now owned or hereafter acquired), or liquidate, divide or dissolve, except that, if at the time thereof and immediately after giving effect thereto no Event of Default shall have occurred and be continuing, (i) any Subsidiary of the Borrower may merge into the Borrower in a transaction in which the Borrower is the surviving entity, (ii) any Loan Party (other than the Borrower) may merge into any other Loan Party in a transaction in which the surviving entity is a Loan Party and (iii) any Subsidiary that is not a Loan Party may liquidate, divide or dissolve if the Borrower determine in good faith that such liquidation, division or dissolution is in the best interests of the Borrower and is not materially disadvantageous to the Lender; provided that any such merger involving a Person that is not a wholly owned Subsidiary immediately prior to such merger shall not be permitted unless also permitted by Section 6.04.

(b) No Loan Party will, nor will it permit any Subsidiary to, engage in any business other than businesses of the type conducted by the Borrower and their Subsidiaries on the date hereof and businesses reasonably related thereto.

SECTION 6.04. Investments, Loans, Advances, Guarantees and Acquisitions. No Loan Party will form any subsidiary after the Closing Date, or purchase, hold or acquire (including pursuant to any merger with any Person that was not a Loan Party and a wholly owned Subsidiary prior to such merger) any Equity Interests, evidences of indebtedness or other securities (including any option, warrant or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, Guarantee any obligations of, or make or permit to exist any investment or any other interest in, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person constituting a business unit (whether through purchase of assets, merger or otherwise), except:

(a) Permitted Investments, subject to control agreements in favor of the Lender or otherwise subject to a perfected security interest in favor of the Lender;

(b) investments by the Borrower and the Subsidiaries in Equity Interests in their respective Subsidiaries, provided that (i) any such Equity Interests held by a Loan Party shall be pledged pursuant to the Security Agreement and (ii) the aggregate amount of investments by Loan Parties in Subsidiaries that are not Loan Parties (together with outstanding intercompany loans permitted under Section 6.04(c)) shall not exceed $50,000 at any time outstanding (in each case determined without regard to any write-downs or write-offs);

(c) loans or advances made by any Loan Party to any Subsidiary and made by any Subsidiary to a Loan Party or any other Subsidiary, provided that (i) any such loans and advances

33

4826-5438-9459.2

made by a Loan Party shall be evidenced by a promissory note pledged pursuant to the Security Agreement and (ii) the amount of such loans and advances made by Loan Parties to Subsidiaries that are not Loan Parties (together with outstanding investments permitted under Section 6.04(b)) shall not exceed $50,000 at any time outstanding (in each case determined without regard to any write-downs or write-offs);

(d) loans or advances made by a Loan Party to its employees on an arms-length basis in the ordinary course of business consistent with past practices for travel and entertainment expenses, relocation costs and similar purposes;

(e) investments existing on the date hereof and set forth in <u>Schedule 6.04</u>; and

(f) Permitted Acquisitions.

SECTION 6.05. <u>Asset Sales</u>. No Loan Party will, nor will it permit any Subsidiary to, Dispose of any asset, including any Equity Interest owned by it, nor will the Borrower permit any Subsidiary to issue any additional Equity Interest in such Subsidiary (other than to another the Borrower or another Subsidiary in compliance with Section 6.04), except:

(a) Dispositions of (i) Inventory in the ordinary course of business and (ii) used, obsolete, worn out or surplus Equipment or property in the ordinary course of business;

(b) Dispositions of assets to the Borrower or any Subsidiary, <u>provided</u> that any such Dispositions involving a Subsidiary that is not a Loan Party shall be made in compliance with Section 6.09; and

(c) Dispositions resulting from any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of the Borrower or any Subsidiary.

SECTION 6.06. <u>Sale and Leaseback Transactions</u>. No Loan Party will, nor will it permit any Subsidiary to, enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred (a "<u>Sale and Leaseback Transaction</u>").

SECTION 6.07. <u>Borrower Certifications</u>. Borrower will not fail to comply with all covenants set forth in the Borrower Certifications.

SECTION 6.08. <u>Restricted Payments; Certain Payments of Indebtedness</u>.

(a) No Loan Party will, nor will it permit any Subsidiary to, declare or make, or agree to declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except (i) the Borrower may declare and pay dividends with respect to its Equity Interests payable solely in additional Equity Interests, and (ii) Subsidiaries may declare and pay dividends ratably with respect to their Equity Interests.

(b) No Loan Party will, nor will it permit any Subsidiary to, make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of principal of or interest on any Indebtedness, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit,

34

on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Indebtedness, except:

(i)   payment of Indebtedness created under the Loan Documents;

(ii)   payment of regularly scheduled interest and principal payments as and when due in respect of any Indebtedness permitted under Section 6.01, other than payments in respect of the Subordinated Indebtedness prohibited by the subordination provisions thereof;

(iii)   refinancings of Indebtedness to the extent permitted by Section 6.01; and

(iv)   payment of secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness to the extent such sale or transfer is permitted by the terms of Section 6.05.

SECTION 6.09.   Transactions with Affiliates.   No Loan Party will, nor will it permit any Subsidiary to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (a) transactions that (i) are in the ordinary course of business and (ii) are at prices and on terms and conditions not less favorable to such Loan Party or such Subsidiary than could be obtained on an arm's-length basis from unrelated third parties, (b) transactions between or among the Loan Parties not involving any other Affiliate, (c) any investment permitted by Sections 6.04(b), 6.04(c) or 6.04(e), (d) any Indebtedness permitted under Section 6.01(c), (e) any Restricted Payment permitted by Section 6.08, (f) loans or advances to employees permitted under Section 6.04(d), (g) the payment of reasonable fees to directors of the Borrower or any Subsidiary who are not employees of the Borrower or any Subsidiary, and compensation and employee benefit arrangements paid to, and indemnities provided for the benefit of, directors, officers or employees of the Borrower or its Subsidiaries in the ordinary course of business, and (h) any issuances of securities or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment agreements, stock options and stock ownership plans approved by the Borrower's board of directors.

SECTION 6.10.   Restrictive Agreements.   No Loan Party will, nor will it permit any Subsidiary to, directly or indirectly enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of such Loan Party or any Subsidiary to create, incur or permit to exist any Lien upon any of its property or assets, or (b) the ability of any Subsidiary to pay dividends or other distributions with respect to any Equity Interests or to make or repay loans or advances to the Borrower or any other Subsidiary or to Guarantee Indebtedness of the Borrower or any other Subsidiary; provided that (i) the foregoing shall not apply to restrictions and conditions imposed by any Requirement of Law or by any Loan Document, (ii) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary pending such sale, provided such restrictions and conditions apply only to the Subsidiary that is to be sold and such sale is permitted hereunder, (iii) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness and (iv) clause (a) of the foregoing shall not apply to customary provisions in leases and other contracts restricting the assignment thereof.

SECTION 6.11.   Amendment of Material Documents.   No Loan Party will amend, modify or waive any of its rights under (a) any agreement relating to any Subordinated Indebtedness, or (b) its charter, articles or certificate of organization or incorporation and bylaws or operating, management or

35

4826-5438-9459.2

partnership agreement, or other organizational or governing documents, to the extent any such amendment, modification or waiver would be adverse to the Lender.

SECTION 6.12. Financial Covenants.

(a)    The Borrower will not permit the Debt Service Coverage Ratio, calculated on a trailing twelve-month basis, as of the last day of any fiscal quarter, beginning with the fiscal quarter ending June 30, 2021, to be less than 1.30 to 1.00.

(b)    The Borrower will not permit the ratio of (i) Funded Indebtedness less Eligible Cash to (ii) EBITDA, calculated on a trailing twelve-month basis, as of the last day of any fiscal quarter, beginning with the fiscal quarter ending June 30, 2021, to be greater than 2.50 to 1.00.

ARTICLE VII

Events of Default

If any of the following events ("Events of Default") shall occur:

(a) the Borrower shall fail to pay any principal of the Priority Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b) the Borrower shall fail to pay any interest on the Priority Loan or any fee or any other amount (other than an amount referred to in clause (a) of this Article) payable under this Agreement or any other Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three (3) Business Days;

(c) any representation or warranty made or deemed made by or on behalf of any Loan Party or any Subsidiary in, or in connection with, this Agreement or any other Loan Document, including, without limitation, the Borrower Certification, or any amendment or modification hereof or thereof or waiver hereunder or thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or any other Loan Document or any amendment or modification hereof or thereof or waiver hereunder or thereunder, shall prove to have been incorrect in any material respect when made or deemed made;

(d) any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in Section 5.02(a), 5.03 (with respect to a Loan Party's existence) or 5.08 or in Article VI;

(e) any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in this Agreement (other than those specified in clause (a), (b) or (d)), and such failure shall continue unremedied for a period of (i) 5 days after the earlier of any Loan Party's knowledge of such breach or notice thereof from the Lender if such breach relates to terms or provisions of Section 5.01, 5.02 (other than Section 5.02(a)), 5.03 through 5.07, 5.10, 5.11 or 5.13 of this Agreement or (ii) 15 days after the earlier of any Loan Party's knowledge of such breach or notice thereof from the Lender if such breach relates to terms or provisions of any other Section of this Agreement;

36

(f) any Loan Party or any Subsidiary shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable;

(g) any event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; provided that this clause (g) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness to the extent such sale or transfer is permitted by the terms of Section 6.05;

(h) an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of a Loan Party or any Subsidiary or its debts, or of a substantial part of its assets, under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Loan Party or any Subsidiary or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for sixty (60) days or an order or decree approving or ordering any of the foregoing shall be entered;

(i) any Loan Party or any Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (h) of this Article, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for such Loan Party or Subsidiary of any Loan Party or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing;

(j) any Loan Party or any Subsidiary shall become unable, admit in writing its inability, or publicly declare its intention not to, or fail generally, to pay its debts as they become due;

(k) one or more judgments for the payment of money in an aggregate amount in excess of $50,000.00, not covered by insurance, shall be rendered against any Loan Party, any Subsidiary or any combination thereof and the same shall remain undischarged for a period of thirty (30) consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of any Loan Party or any Subsidiary to enforce any such judgment or any Loan Party or any Subsidiary shall fail within thirty (30) days to discharge one or more non-monetary judgments or orders which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, which judgments or orders, in any such case, are not stayed on appeal or otherwise being appropriately contested in good faith by proper proceedings diligently pursued;

(l) an ERISA Event shall have occurred that, in the opinion of the Lender, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in a Material Adverse Effect;

4826-5438-9459.2

(m) a Change in Control shall occur;

(n) the occurrence of any "default", as defined in any Loan Document (other than this Agreement), or the breach of any of the terms or provisions of any Loan Document (other than this Agreement), which default or breach continues beyond any period of grace therein provided;

(o) the Loan Guaranty or any Obligation Guaranty shall fail to remain in full force or effect or any action shall be taken to discontinue or to assert the invalidity or unenforceability of the Loan Guaranty or any Obligation Guaranty, or any individual Guarantor dies or a guardian or conservator is appointed for any individual Guarantor or all or any portion of their property, or any Guarantor shall fail to comply with any of the terms or provisions of the Loan Guaranty or any Obligation Guaranty to which it is a party, or any Guarantor shall deny that it has any further liability under the Loan Guaranty or any Obligation Guaranty to which it is a party, or shall give notice to such effect, including, but not limited to notice of termination delivered pursuant to Section 9.08 or any notice of termination delivered pursuant to the terms of any Obligation Guaranty;

(p) except as permitted by the terms of any Collateral Document, (i) any Collateral Document shall for any reason fail to create a valid security interest in any Collateral purported to be covered thereby, or (ii) any Lien securing any Obligation shall cease to be a perfected, first priority Lien;

(q) any Collateral Document shall fail to remain in full force or effect or any action shall be taken to discontinue or to assert the invalidity or unenforceability of any Collateral Document;

(r) any material provision of any Loan Document for any reason ceases to be valid, binding and enforceable in accordance with its terms (or any Loan Party shall challenge the enforceability of any Loan Document or shall assert in writing, or engage in any action or inaction that evidences its assertion, that any provision of any of the Loan Documents has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms); or

(s)    (i) any Loan Party or any Subsidiary shall fail to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness (other than Indebtedness under the Loan Documents) owing to the Lender or any commonly controlled Affiliate of the Lender, in each case beyond the applicable grace period with respect thereto, if any; or (ii) any Loan Party or any Subsidiary shall fail to observe or perform any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which failure to make a payment, default or other event described in cause (i) or (ii) is to cause such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; provided that clause (ii) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness and such Indebtedness is repaid when required under the documents providing for such Indebtedness;

then, and in every such event (other than an event with respect to the Borrower described in clause (h) or (i) of this Article), and at any time thereafter during the continuance of such event, the Lender may, by notice to the Borrower, take either or both of the following actions, at the same or different times: (i) declare the Priority Loan to be due and payable, whereupon the

38

principal of the Priority Loan so declared to be due and payable, together with accrued interest thereon and all fees (including, for the avoidance of doubt, any break funding payment) and other obligations of the Borrower accrued hereunder and under any other Loan Document, shall become due and payable immediately, in each case without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; and in the case of any event with respect to the Borrower described in clause (h) or (i) of this Article, the principal of the Priority Loan then outstanding, together with accrued interest thereon and all fees (including, for the avoidance of doubt, any break funding payments) and other obligations of the Borrower accrued hereunder and under any other Loan Documents, shall automatically become due and payable, in each case without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower.    Upon the occurrence and during the continuance of an Event of Default, the Lender may increase the rate of interest applicable to the Priority Loan and other Obligations as set forth in this Agreement and exercise any rights and remedies provided to the Lender under the Loan Documents or at law or equity, including all remedies provided under the UCC. Lender may also report information about the Borrower's accounts to credit bureaus. Late payments, missed payments, or other Events of Default may be reflected in the Borrower's credit report.

ARTICLE VIII

Miscellaneous

SECTION 8.01. Notices.

(a) Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax, as follows:

(i)      if to any Loan Party, to it in care of the Borrower at:[1]

Pacifica of the Valley Corporation
9449 San Fernando Road
Sun Valley, CA 91352
Attention: Paul R. Tuft
E-mail: _PTuft@southwestcs.com_
Fax No:  _None_

(ii)     if to First Western Trust Bank at:

First Western Trust Bank
7025 N. Scottsdale Road, Suite 100
Scottsdale, AZ 85253
Attention: Derren Thompson, Senior Vice President
E-mail: derren.thompson@myfw.com
Fax No: (480) 596-~~1853~~ 1810

All such notices and other communications (i) sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received, (ii) sent by fax shall be

---

[1] Borrower to provide.

39

4826-5438-9459.2

deemed to have been given when sent, provided that if not given during normal business hours for the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day of the recipient, or (iii) delivered through Electronic Systems to the extent provided in paragraph (b) below shall be effective as provided in such paragraph.

(b)  Notices and other communications to the Lender hereunder may be delivered or furnished by using Electronic Systems pursuant to procedures approved by the Lender; provided that the foregoing shall not apply to notices pursuant to Article II unless otherwise stated or agreed by the Lender. Each of the Lender and the Borrower (on behalf of the Loan Parties) may, in its discretion, agree to accept notices and other communications to it hereunder by using Electronic Systems pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.  All such notices and other communications (i) sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if not given during the normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day for the recipient, and (ii) posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (i), of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (i) and (ii) above, if such notice, e-mail or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day of the recipient.

(c)  Any party hereto may change its address, facsimile number or e-mail address for notices and other communications hereunder by notice to the other parties hereto.

SECTION 8.02.  Waivers; Amendments.

(a)  No failure or delay by the Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Lender hereunder and under any other Loan Document are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of the Priority Loan shall not be construed as a waiver of any Default, regardless of whether the Lender may have had notice or knowledge of such Default at the time.

(b)     Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except (i) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrower and the Lender or (ii) in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Lender and the Loan Party or Loan Parties that are parties thereto.

SECTION 8.03.  Expenses; Indemnity; Damage Waiver.

(a)  The Loan Parties, jointly and severally, shall pay all (i) reasonable out-of-pocket expenses incurred by the Lender and its Affiliates, including the reasonable fees, charges and disbursements of counsel for the Lender (whether outside counsel or the allocated costs of its internal

40

4826-5438-9459.2

legal department), in connection with the credit facilities provided for herein, the preparation and administration of the Loan Documents and any amendments, modifications or waivers of the provisions of the Loan Documents (whether or not the transactions contemplated hereby or thereby shall be consummated), and (ii) out-of-pocket expenses incurred by the Lender, including the fees, charges and disbursements of any counsel for the Lender, in connection with the enforcement, collection or protection of its rights in connection with the Loan Documents, including its rights under this Section, or in connection with the Priority Loan, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Priority Loan.  Expenses being reimbursed by the Loan Parties under this Section include, without limiting the generality of the foregoing, fees, costs and expenses incurred in connection with:

        (A)     appraisals and insurance reviews;

        (B)     field examinations and the preparation of Reports based on the fees charged by a third party retained by the Lender or the internally allocated fees for each Person employed by the Lender with respect to each field examination;

        (C)     background checks regarding senior management and/or key investors, as deemed necessary or appropriate in the sole discretion of the Lender;

        (D)     Taxes, fees and other charges for (i) lien searches and (ii) recording the financing statements and continuations, and other actions to perfect, protect, and continue the Lender's Liens;

        (E)     sums paid or incurred to take any action required of any Loan Party under the Loan Documents that such Loan Party fails to pay or take; and

        (F)     forwarding loan proceeds, collecting checks and other items of payment, and establishing and maintaining the accounts and lock boxes, and costs and expenses of preserving and protecting the Collateral.

        (b) The Loan Parties, jointly and severally, shall indemnify the Lender, and each Related Party of the Lender (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, penalties, incremental taxes, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of the Loan Documents or any agreement or instrument contemplated thereby, the performance by the parties hereto of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated hereby, (ii) the Priority Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Materials on or from any property owned or operated by a Loan Party or a Subsidiary, or any Environmental Liability related in any way to a Loan Party or Subsidiary, (iv) the failure of a Loan Party to deliver to the Lender the required receipts or other required documentary evidence with respect to a payment made by such Loan Party for Taxes pursuant to Section 2.07, or (v) any actual or prospective claim, litigation, investigation, arbitration or proceeding relating to any of the foregoing, whether or not such claim, litigation, investigation, arbitration or proceeding is brought by any Loan Party or their respective equity holders, Affiliates, creditors or any other third Person and whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, penalties, liabilities or related expenses are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross

41

4826-5438-9459.2

negligence or willful misconduct of such Indemnitee. This Section 8.03(b) shall not apply with respect to Taxes other than any Taxes that represent losses or damages arising from any non-Tax claim.

(c) To the extent permitted by applicable law, no Loan Party shall assert, and each Loan Party hereby waives, any claim against any Indemnitee, (i) for any damages arising from the use by others of information or other materials obtained through telecommunications, electronic or other information transmission systems (including the Internet), or (ii) on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document, or any agreement or instrument contemplated hereby or thereby, the Transactions, the Priority Loan or the use of the proceeds thereof; provided that, nothing in this paragraph (c) shall relieve any Loan Party of any obligation it may have to indemnify an Indemnitee against special, indirect, consequential or punitive damages asserted against such Indemnitee by a third party.

(d) All amounts due under this Section shall be payable promptly after written demand therefor.

SECTION 8.04. Successors and Assigns.

(a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section) and, to the extent expressly contemplated hereby, the Related Parties of the Lender) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b) The Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of the Priority Loan at the time owing to it) to one or more purchasers whether or not related to the Lender.

(c) The Lender may, without the consent of, or notice to, the Borrower, sell participations to one or more banks or other entities, including, without limitation, MS Facilities LLC, a Delaware limited liability company (a "Participant") in all or a portion of the Lender's rights and/or obligations under this Agreement (including all or a portion of the Priority Loan owing to it); provided that (i) the Lender's obligations under this Agreement shall remain unchanged; (ii) the Lender shall remain solely responsible to the other parties hereto for the performance of such obligations; and (iii) the Borrower shall continue to deal solely and directly with the Lender in connection with the Lender's rights and obligations under this Agreement. Each the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.07 (subject to the requirements and limitations therein) to the same extent as if it were the Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; provided that such Participant shall not be entitled to receive any greater payment under Section 2.07, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.

To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 8.08 as though it were the Lender. If the Lender shall sell a participation, it shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each

42

Case 26-11060-TMH Doc 109-1 Filed 08/03/26 Page 45 of 83

Participant and the principal amounts (and stated interest) of each Participant's interest in the Priority Loan or other obligations under this Agreement or any other Loan Document (the "Participant Register"); provided that the Lender shall have no obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any the Priority Loan or its other obligations under this Agreement or any other Loan Document) to any Person except to the extent that such disclosure is necessary to establish that the Priority Loan, or other obligation is in registered form under Section 5f.103-1(c) of the U.S. Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and the Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(d) The Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of the Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release the Lender from any of its obligations hereunder or substitute any such pledgee or assignee for the Lender as a party hereto.

SECTION 8.05. Survival. All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of the Priority Loan, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on the Priority Loan or any fee or any other amount payable under this Agreement is outstanding. The provisions of Sections 2.07, 2.07 and Section 8.03 shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Priority Loan, or the termination of this Agreement or any other Loan Document or any provision hereof or thereof.

SECTION 8.06. Counterparts; Integration; Effectiveness; Electronic Execution.

(a) This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Lender constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Lender and when the Lender shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

(b) Delivery of an executed counterpart of a signature page of this Agreement by fax, emailed pdf. or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to any document to be signed in connection with this Agreement and the transactions contemplated hereby or thereby shall be deemed to include Electronic Signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature,

43

physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Actor any similar state laws based on the Uniform Electronic Transactions Act.

SECTION 8.07. <u>Severability</u>.  Any provision of any Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 8.08. <u>Right of Setoff</u>.  If an Event of Default shall have occurred and be continuing, the Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by the Lender or any Affiliate to or for the credit or the account of any Loan Party against any and all of the Obligations, irrespective of whether or not the Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Loan Parties may be contingent or unmatured or are owed to a branch office or Affiliate of the Lender different from the branch office or Affiliate holding such deposit or obligated on such indebtedness. The rights of the Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which the Lender may have.

SECTION 8.09. <u>Governing Law; Jurisdiction; Consent to Service of Process; Waiver of Special Damages</u>.

(a)  The Loan Documents (other than those containing a contrary express choice of law provision, including, without limitation, the Borrower Certifications) shall be governed by and construed in accordance with the internal laws of the State of Colorado, but giving effect to federal laws applicable to national banks.

(b)  Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of any U.S. federal or Colorado State court sitting in Denver, Colorado, and any appellate court from any thereof, in any action or proceeding arising out of or relating to any Loan Documents, the transactions relating hereto or thereto, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may (and any such claims, cross-claims or third party claims brought against the Lender or any of its Related Parties may only) be heard and determined in such state court or, to the extent permitted by law, in such federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement or any other Loan Document shall affect any right that the Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against any Loan Party or its properties in the courts of any jurisdiction.

(c)  Each Loan Party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

44

4826-5438-9459.2

(d) Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 8.01. Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

(e)     BORROWER WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY APPLICABLE LAW, ANY RIGHT BORROWER MAY HAVE TO CLAIM OR RECOVER FROM LENDER IN ANY LEGAL ACTION OR PROCEEDING, ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES.

SECTION 8.10.  WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 8.11.  Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 8.12.  Confidentiality.  The Lender agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any Governmental Authority (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by any Requirement of Law or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (x) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (y) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Loan Parties and their obligations, (g) with the consent of the Borrower, (h) to holders of Equity Interests in the Borrower, (i) to any Person providing a Guarantee of all or any portion of the Obligations, or (j) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to the Lender on a non-confidential basis from a source other than the Borrower.  For the purposes of this Section, "Information" means all information received from the Borrower relating to the Borrower or its business, other than any such information that is available to the Lender on a non-confidential basis prior to disclosure by the Borrower; provided that, in the case of information received from the Borrower after the date hereof, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

45

4826-5438-9459.2

SECTION 8.13.  Nonreliance; Violation of Law.  The Lender hereby represents that it is not relying on or looking to any margin stock (as defined in Regulation U) for the repayment of the Priority Loan provided for herein.  Anything contained in this Agreement to the contrary notwithstanding, the Lender shall not be obligated to extend credit to the Borrower in violation of any Requirement of Law.

SECTION 8.14.  USA PATRIOT Act.  The Lender is subject to the requirements of the USA PATRIOT Act and hereby notifies each Loan Party that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies such Loan Party, which information includes the name and address of such Loan Party and other information that will allow the Lender to identify such Loan Party in accordance with the USA PATRIOT Act.

SECTION 8.15.  Disclosure.  Each Loan Party hereby acknowledges and agrees that the Lender and/or its Affiliates from time to time may hold investments in, make other loans to or have other relationships with, any of the Loan Parties and their respective Affiliates.

SECTION 8.16.  Interest Rate Limitation.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to the Priority Loan, together with all fees, charges and other amounts which are treated as interest on the Priority Loan under applicable law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by the Lender holding the Priority Loan in accordance with applicable law, the rate of interest payable in respect of the Priority Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of the Priority Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to the Lender in respect of other loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by the Lender.

SECTION 8.17.  No Fiduciary Duty, etc.  (a) Each the Borrower acknowledges and agrees, and acknowledges its Subsidiaries' understanding, that the Lender will not have any obligations except those obligations expressly set forth herein and in the other Loan Documents and the Lender is acting solely in the capacity of an arm's length contractual counterparty to the Borrower with respect to the Loan Documents and the transactions contemplated herein and therein and not as a financial advisor or a fiduciary to, or an agent of, the Borrower or any other Person.  Each the Borrower agrees that it will not assert any claim against the Lender based on an alleged breach of fiduciary duty by the Lender in connection with this Agreement and the transactions contemplated hereby.  Additionally, each the Borrower acknowledges and agrees that the Lender is not advising the Borrower as to any legal, tax, investment, accounting, regulatory or any other matters in any jurisdiction.  The Borrower shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the transactions contemplated herein or in the other Loan Documents, and the Lender shall have no responsibility or liability to the Borrower with respect thereto.

(b) Each the Borrower further acknowledges and agrees, and acknowledges its Subsidiaries' understanding, that the Lender, together with its Affiliates, is a full service securities or banking firm engaged in securities trading and brokerage activities as well as providing investment banking and other financial services.  In the ordinary course of business, the Lender may provide investment banking and other financial services to, and/or acquire, hold or sell, for its own accounts and the accounts of customers, equity, debt and other securities and financial instruments (including bank loans and other obligations) of, the Borrower and other companies with which the Borrower may have commercial or other relationships.  With respect to any securities and/or financial instruments so held by the Lender or

4826-5438-9459.2

any of its customers, all rights in respect of such securities and financial instruments, including any voting rights, will be exercised by the holder of the rights, in its sole discretion.

(c) In addition, each the Borrower acknowledges and agrees, and acknowledges its Subsidiaries' understanding, that the Lender and its Affiliates may be providing debt financing, equity capital or other services (including financial advisory services) to other companies in respect of which the Borrower may have conflicting interests regarding the transactions described herein and otherwise. The Lender will not use confidential information obtained from the Borrower by virtue of the transactions contemplated by the Loan Documents or its other relationships with the Borrower in connection with the performance by the Lender of services for other companies, and the Lender will not furnish any such information to other companies. Each the Borrower also acknowledges that the Lender has no obligation to use in connection with the transactions contemplated by the Loan Documents, or to furnish to the Borrower, confidential information obtained from other companies.

SECTION 8.18.  Correction of Loan Documents; Document Imaging .  Lender may correct patent errors and fill in any blanks in the Loan Documents consistent with the agreement of the parties. Lender shall be entitled, in its sole discretion, to image all or any selection of the Loan Documents, and items and records governing, arising from or relating to any of the Borrower's loans, and may destroy or archive the paper originals. The parties hereto waive any right to insist Lender produce paper originals, agree that such images shall be accorded the same force and effect as the paper originals, and further agree that Lender is entitled to use such images in lieu of destroyed or archived originals for any purpose, including as admissible evidence in any demand, presentment or proceedings.

ARTICLE IX

Loan Guaranty

SECTION 9.01.  Guaranty.  Each Loan Guarantor (other than those that have delivered a separate Guarantee) hereby agrees that it is jointly and severally liable for, and, as a primary obligor and not merely as surety, absolutely and unconditionally and irrevocably guarantees to the Lender, the prompt payment when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter, of the Obligations and all costs and expenses including, without limitation, all court costs and reasonable attorneys' and paralegals' fees (including allocated costs of in-house counsel and paralegals) and expenses paid or incurred by the Lender in endeavoring to collect all or any part of the Obligations from, or in prosecuting any action against, the Borrower, any Loan Guarantor or any other guarantor of all or any part of the Obligations (such costs and expenses, together with the Obligations, collectively the "Guaranteed Obligations"). Each Loan Guarantor further agrees that the Guaranteed Obligations may be extended or renewed in whole or in part without notice to or further assent from it, and that it remains bound upon its guarantee notwithstanding any such extension or renewal. All terms of this Loan Guaranty apply to and may be enforced by or on behalf of any domestic or foreign branch or Affiliate of the Lender that extended any portion of the Guaranteed Obligations.

SECTION 9.02.  Guaranty of Payment.  This Loan Guaranty is a guaranty of payment and not of collection. Each Loan Guarantor waives any right to require the Lender to sue the Borrower, any Loan Guarantor, any other guarantor of, or any other Person obligated for all or any part of the Guaranteed Obligations (each, an "Obligated Party"), or otherwise to enforce its payment against any collateral securing all or any part of the Guaranteed Obligations.

SECTION 9.03. No Discharge or Diminishment of Loan Guaranty.

47

4826-5438-9459.2

(a) Except as otherwise provided for herein, the obligations of each Loan Guarantor hereunder are unconditional and absolute and not subject to any reduction, limitation, impairment or termination for any reason (other than the Payment in Full of the Guaranteed Obligations), including: (i) any claim of waiver, release, extension, renewal, settlement, surrender, alteration, or compromise of any of the Guaranteed Obligations, by operation of law or otherwise; (ii) any change in the corporate existence, structure or ownership of the Borrower or any other Obligated Party liable for any of the Guaranteed Obligations; (iii) any insolvency, bankruptcy, reorganization or other similar proceeding affecting any Obligated Party, or their assets, or any resulting release or discharge of any obligation of any Obligated Party; or (iv) the existence of any claim, setoff or other rights which any Loan Guarantor may have at any time against any Obligated Party, the Lender or any other Person, whether in connection herewith or in any unrelated transactions.

(b) The obligations of each Loan Guarantor hereunder are not subject to any defense or setoff, counterclaim, recoupment, or termination whatsoever by reason of the invalidity, illegality, or unenforceability of any of the Guaranteed Obligations or otherwise, or any provision of applicable law or regulation purporting to prohibit payment by any Obligated Party, of the Guaranteed Obligations or any part thereof.

(c) Further, the obligations of any Loan Guarantor hereunder are not discharged or impaired or otherwise affected by: (i) the failure of the Lender to assert any claim or demand or to enforce any remedy with respect to all or any part of the Guaranteed Obligations; (ii) any waiver or modification of or supplement to any provision of any agreement relating to the Guaranteed Obligations; (iii) any release, non-perfection, or invalidity of any indirect or direct security for the obligations of the Borrower for all or any part of the Guaranteed Obligations or any obligations of any other Obligated Party liable for any of the Guaranteed Obligations; (iv) any action or failure to act by the Lender with respect to any collateral securing any part of the Guaranteed Obligations; or (v) any default, failure or delay, willful or otherwise, in the payment or performance of any of the Guaranteed Obligations, or any other circumstance, act, omission or delay that might in any manner or to any extent vary the risk of such Loan Guarantor or that would otherwise operate as a discharge of any Loan Guarantor as a matter of law or equity (other than the Payment in Full of the Guaranteed Obligations).

SECTION 9.04. <u>Defenses Waived</u>. To the fullest extent permitted by applicable law, each Loan Guarantor hereby waives any defense based on or arising out of any defense of the Borrower or any Loan Guarantor or the unenforceability of all or any part of the Guaranteed Obligations from any cause, or the cessation from any cause of the liability of the Borrower, any Loan Guarantor or any other Obligated Party, other than the Payment in Full of the Guaranteed Obligations. Without limiting the generality of the foregoing, each Loan Guarantor irrevocably waives acceptance hereof, presentment, demand, protest and, to the fullest extent permitted by law, any notice not provided for herein, as well as any requirement that at any time any action be taken by any Person against any Obligated Party, or any other Person. Each Loan Guarantor confirms that it is not a surety under any state law and shall not raise any such law as a defense to its obligations hereunder. The Lender may, at its election, foreclose on any Collateral held by it by one or more judicial or nonjudicial sales, accept an assignment of any such Collateral in lieu of foreclosure or otherwise act or fail to act with respect to any collateral securing all or a part of the Guaranteed Obligations, compromise or adjust any part of the Guaranteed Obligations, make any other accommodation with any Obligated Party or exercise any other right or remedy available to it against any Obligated Party, without affecting or impairing in any way the liability of such Loan Guarantor under this Loan Guaranty, except to the extent the Guaranteed Obligations have been Paid in Full. To the fullest extent permitted by applicable law, each Loan Guarantor waives any defense arising out of any such election even though that election may operate, pursuant to applicable law, to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Loan Guarantor against any Obligated Party or any security.

48

SECTION 9.05. Rights of Subrogation. No Loan Guarantor will assert any right, claim or cause of action, including, without limitation, a claim of subrogation, contribution or indemnification that it has against any Obligated Party, or any collateral, until the Loan Parties and the Loan Guarantors have fully performed all their obligations to the Lender.

SECTION 9.06. Reinstatement; Stay of Acceleration. If at any time any payment of any portion of the Guaranteed Obligations (including a payment effected through exercise of a right of setoff) is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, or reorganization of the Borrower or otherwise (including pursuant to any settlement entered into by Lender in its discretion), each Loan Guarantor's obligations under this Loan Guaranty with respect to that payment shall be reinstated at such time as though the payment had not been made and whether or not the Lender is in possession of this Loan Guaranty. If acceleration of the time for payment of any of the Guaranteed Obligations is stayed upon the insolvency, bankruptcy or reorganization of the Borrower, all such amounts otherwise subject to acceleration under the terms of any agreement relating to the Guaranteed Obligations shall nonetheless be payable by the Loan Guarantors forthwith on demand by the Lender.

SECTION 9.07. Information. Each Loan Guarantor assumes all responsibility for being and keeping itself informed of the Borrower's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks that each Loan Guarantor assumes and incurs under this Loan Guaranty, and agrees that the Lender shall not have any duty to advise any Loan Guarantor of information known to it regarding those circumstances or risks.

SECTION 9.08. Termination. The Lender may continue to make loans or extend credit to the Borrower based on this Loan Guaranty until five (5) days after it receives written notice of termination from any Loan Guarantor. Notwithstanding receipt of any such notice, each Loan Guarantor will continue to be liable to the Lender for any Guaranteed Obligations created, assumed or committed to prior to the fifth day after receipt of the notice, and all subsequent renewals, extensions, modifications and amendments with respect to, or substitutions for, all or any part of such Guaranteed Obligations. Nothing in this Section 9.08 shall be deemed to constitute a waiver of, or eliminate, limit, reduce or otherwise impair any rights or remedies the Lender may have in respect of, any Default or Event of Default that shall exist under clause (o) of Article VII hereof as a result of any such notice of termination.

SECTION 9.09. Taxes. Each payment of the Guaranteed Obligations will be made by each Loan Guarantor without withholding for any Taxes, unless such withholding is required by law. If any Loan Guarantor determines, in its sole discretion exercised in good faith, that it is so required to withhold Taxes, then such Loan Guarantor may so withhold and shall timely pay the full amount of withheld Taxes to the relevant Governmental Authority in accordance with applicable law. If such Taxes are Indemnified Taxes, then the amount payable by such Loan Guarantor shall be increased as necessary so that, net of such withholding (including such withholding applicable to additional amounts payable under this Section), the Lender receives the amount it would have received had no such withholding been made.

SECTION 9.10. Maximum Liability. Notwithstanding any other provision of this Loan Guaranty, the amount guaranteed by each Loan Guarantor hereunder shall be limited to the extent, if any, required so that its obligations hereunder shall not be subject to avoidance under Section 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act or similar statute or common law. In determining the limitations, if any, on the amount of any Loan Guarantor's obligations hereunder pursuant to the preceding sentence, it is the intention of the parties hereto that any rights of subrogation, indemnification or contribution

49

which such Loan Guarantor may have under this Loan Guaranty, any other agreement or applicable law shall be taken into account.

SECTION 9.11. Contribution.

(a)    To the extent that any Loan Guarantor shall make a payment under this Loan Guaranty (a "Guarantor Payment") which, taking into account all other Guarantor Payments then previously or concurrently made by any other Loan Guarantor, exceeds the amount which otherwise would have been paid by or attributable to such Loan Guarantor if each Loan Guarantor had paid the aggregate Guaranteed Obligations satisfied by such Guarantor Payment in the same proportion as such Loan Guarantor's "Allocable Amount" (as defined below) (as determined immediately prior to such Guarantor Payment) bore to the aggregate Allocable Amounts of each of the Loan Guarantors as determined immediately prior to the making of such Guarantor Payment, then, following indefeasible payment in full in cash of the Guarantor Payment, the Payment in Full of the Guaranteed Obligations and the termination of this Agreement, such Loan Guarantor shall be entitled to receive contribution and indemnification payments from, and be reimbursed by, each other Loan Guarantor for the amount of such excess, pro rata based upon their respective Allocable Amounts in effect immediately prior to such Guarantor Payment.

(b)    As of any date of determination, the "Allocable Amount" of any Loan Guarantor shall be equal to the excess of the fair saleable value of the property of such Loan Guarantor over the total liabilities of such Loan Guarantor (including the maximum amount reasonably expected to become due in respect of contingent liabilities, calculated, without duplication, assuming each other Loan Guarantor that is also liable for such contingent liability pays its ratable share thereof), giving effect to all payments made by other Loan Guarantors as of such date in a manner to maximize the amount of such contributions.

(c)    This Section 9.11 is intended only to define the relative rights of the Loan Guarantors, and nothing set forth in this Section 9.11 is intended to or shall impair the obligations of the Loan Guarantors, jointly and severally, to pay any amounts as and when the same shall become due and payable in accordance with the terms of this Loan Guaranty.

(d)    The parties hereto acknowledge that the rights of contribution and indemnification hereunder shall constitute assets of the Loan Guarantor or Loan Guarantors to which such contribution and indemnification is owing.

(e)    The rights of the indemnifying Loan Guarantors against other Loan Guarantors under this Section 9.11 shall be exercisable upon the Payment in Full of the Guaranteed Obligations and the termination of this Agreement.

SECTION 9.12.    Liability Cumulative.    The liability of each Loan Party as a Loan Guarantor under this Article IX is in addition to and shall be cumulative with all liabilities of each Loan Party to the Lender under this Agreement and the other Loan Documents to which such Loan Party is a party or in respect of any obligations or liabilities of the other Loan Parties, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

[Signature Page Follows]

50

4826-5438-9459.2

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

PACIFICA OF THE VALLEY CORPORATION

By: *Paul Tuft*
Name: PAUL TUFT
Title: Executive Chairman

FIRST WESTERN TRUST BANK

By: _____
Name: Derren Thompson
Title: Senior Vice President

## SCHEDULE 3.23

### Affiliate Transactions

1. [Loan from the Borrower, as lender, to Paul R. Tuft, as borrower, in an outstanding principal amount of $[1,233.140 ], pursuant to that certain Amended and Restated Promissory Note dated as of December 1, 2020, and maturing on December 31, 2020.][2]

## SCHEDULE 6.01[3]

### Existing Indebtedness

1. Indebtedness in an outstanding principal amount of $[ 30,922,783 ],[4] pursuant to that certain Master Lease Agreement dated August 30, 2013, by and among the Borrower, as tenant, and Reliq Pacifica LLC, Beverly Gemini Investments, LLC, Taking the 5th, LLC and Fifth/Arizona Investors, LLC, collectively, as landlord.

2. Capital lease obligations in an outstanding principal amount of $[ 85,704] pursuant to [       ].[5]

## SCHEDULE 6.02

### Existing Liens

Tax Liens:
- CA Department of Tax & Fee Administration $47,194
- CA Employment Development Department $167,910
- Tax Collector $242,541

## SCHEDULE 6.04

### Existing Investments

---

[2] Borrower to confirm.
[3] Borrower to complete schedules.
[4] Borrower to confirm.
[5] Borrower to confirm.

4826-5438-9459.2

1.  [Loan from the Borrower, as lender, to Paul R. Tuft, as borrower, in an outstanding principal amount of $[ 1,233,140], pursuant to that certain Amended and Restated Promissory Note dated as of December 1, 2020, and maturing on December 31, 2020.][6]

---

[6] Borrower to confirm.

4826-5438-9459.2

**EXHIBIT A**

COMPLIANCE CERTIFICATE

**TO:   First Western Trust Bank ("Lender")**                    **Date:** _____

**FROM:  Pacifica of the Valley Corporation ("Borrower")**

The undersigned officer of the Borrower, in his or her capacity as an officer of the Borrower and not in an individual capacity, certifies that under the terms and conditions of the Priority Loan Agreement among the Loan Parties and the Lender (the "Agreement"), on behalf of Borrower and the other Loan Parties (1) each Loan Party is in complete compliance for the period ending _____, 20___ with all required covenants except as noted below, (2) there are no Events of Default that are continuing past any applicable grace period set forth in the Agreement, (3) all representations and warranties in the Agreement are true and correct in all material respects on this date except as noted below and except for such charges thereto resulting from matters not prohibited by the Agreement and the other Loan Documents; provided, however, that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof; and provided, further that those representations and warranties expressly referring to a specific date shall be true, accurate and complete in all material respects as of such date, (4) each Loan Party and each of the Subsidiaries, has timely filed all required tax returns and reports, and Borrower has timely paid all foreign, federal, state and local taxes, assessments, deposits and contributions owed by such Person except as otherwise permitted pursuant to the terms of the Agreement, and (5) no Liens have been levied or claims made against any Loan Party or any Subsidiaries relating to unpaid employee payroll or benefits of which such Person has not previously provided written notification to Lender.  Attached are the required financial statements supporting the certification.  The undersigned certifies that these are prepared in accordance with GAAP consistently applied from one period to the next except as explained in an accompanying letter or footnotes. Capitalized terms used but not otherwise defined herein shall have the meanings given them in the Agreement.

**Please indicate compliance status by circling Yes/No under "Complies" column.**

| Reporting Covenant | Required | Complies |
|---|---|---|
| Quarterly company prepared financial statements; Appendix reporting + Compliance Certificate | FQE within 30 days | Yes  No |
| Annual company prepared financial statements; Appendix Reporting + Compliance Certificate | FYE within 120 days | Yes  No |

| Financial Covenants | Required | Actual | Complies |
|---|---|---|---|
| | | | |
| Maintain on a Quarterly Basis: | | | |
| Debt Service Coverage Ratio of not less than: | 1.30:1.00 | ____:1.00 | Yes  No |
| Funded Debt less Eligible Cash to EBITDA of not more than: | 2.50:1.00 | ____:1.00 | Yes  No |

The following are the exceptions with respect to the certification above:  (If no exceptions exist, state "No exceptions to note.")

4826-5438-9459.2

_____
_____
_____
_____

        PACIFICA OF THE VALLEY CORPORATION, a
        Delaware corporation

        By:_____
        Name:_____
        Title:_____

4826-5438-9459.2

**EXHIBIT B**

JOINDER AGREEMENT

THIS JOINDER AGREEMENT (this "Agreement"), dated as of [    ], is entered into between _____, a _____ (the "New Subsidiary") and FIRST WESTERN TRUST BANK (the "Lender") under that certain Loan Agreement dated as of December [    ], 2020 (as the same may be amended, modified, extended or restated from time to time, the "Loan Agreement") among Pacifica of the Valley Corporation (the "Borrower"), the other Loan Parties party thereto, and the Lender. All capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Loan Agreement.

The New Subsidiary and the Lender, hereby agree as follows:

1.    The New Subsidiary hereby acknowledges, agrees and confirms that, by its execution of this Agreement, the New Subsidiary will be deemed to be a Loan Party under the Loan Agreement and a "Loan Guarantor" for all purposes of the Loan Agreement and shall have all of the obligations of a Loan Party and a Loan Guarantor thereunder as if it had executed the Loan Agreement. The New Subsidiary hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Loan Agreement, including without limitation (a) all of the representations and warranties of the Loan Parties set forth in Article III of the Loan Agreement, *[and]* (b) all of the covenants set forth in Articles V and VI of the Loan Agreement *[and (c) all of the guaranty obligations set forth in Article IX of the Loan Agreement. Without limiting the generality of the foregoing terms of this paragraph 1, the New Subsidiary, subject to the limitations set forth in Section 9.10 and 9.13 of the Loan Agreement, hereby guarantees, jointly and severally with the other Loan Guarantors, to the Lender, as provided in Article IX of the Loan Agreement, the prompt payment and performance of the Guaranteed Obligations in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration or otherwise) strictly in accordance with the terms thereof and agrees that if any of the Guaranteed Obligations are not paid or performed in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration or otherwise), the New Subsidiary will, jointly and severally together with the other Loan Guarantors, promptly pay and perform the same, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, as a mandatory prepayment, by acceleration or otherwise) in accordance with the terms of such extension or renewal.]* *[The New Subsidiary has delivered to the Lender an executed Obligation Guaranty.]*

2.    If required, the New Subsidiary is, simultaneously with the execution of this Agreement, executing and delivering such Collateral Documents (and such other documents and instruments) as requested by the Lender in accordance with the Loan Agreement.

3.    The address of the New Subsidiary for purposes of Section 8.01 of the Loan Agreement is as follows:

_____
_____
_____

4.    The New Subsidiary hereby waives acceptance by the Lender of the guaranty by the New Subsidiary upon the execution of this Agreement by the New Subsidiary.

1

5.      This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which together shall constitute one and the same instrument.

6.      THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF COLORADO.

IN WITNESS WHEREOF, the New Subsidiary has caused this Agreement to be duly executed by its authorized officer, and the Lender, has caused the same to be accepted by its authorized officer, as of the day and year first above written.

[NEW SUBSIDIARY]

By:_____

Name:_____

Title:_____

Acknowledged and accepted:

FIRST WESTERN TRUST BANK

By:_____

Name:_____

Title:_____

2

4826-5438-9459.2

## EXHIBIT C

BORROWER CERTIFICATIONS

[Attached]

4826-5438-9459.2

*Issued on June 11, 2020*

## MAIN STREET PRIORITY LOAN FACILITY
## BORROWER CERTIFICATIONS AND COVENANTS
## INSTRUCTIONS AND GUIDANCE

Reference is made to the Main Street Priority Loan Facility (the "Facility"), which has been authorized under section 13(3) of the Federal Reserve Act (the "FRA"). Under the Facility, the Federal Reserve Bank of Boston (the "Reserve Bank"), acting under the direction of the Board of Governors of the Federal Reserve System (the "Board" and, together with the twelve Federal Reserve Banks, the "Federal Reserve"), has committed to lend to a special purpose vehicle, MS Facilities LLC, a Delaware limited liability company (the "SPV"), on a recourse basis. The SPV will purchase 95 percent participations in certain eligible loans made by eligible lenders to eligible borrowers. Eligible lenders will retain 5 percent of each such eligible loan. The Secretary of the Treasury ("Secretary") has committed funds appropriated to the Exchange Stabilization Fund under section 4027 of the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") to the SPV in connection with the Facility, the Main Street New Loan Facility, and the Main Street Expanded Loan Facility (each, a "Main Street Facility").

**INSTRUCTIONS**: To participate in the Main Street Priority Loan Facility, the borrower (the "Borrower") must provide the following certifications and covenants (the "Borrower Certifications and Covenants") in a writing executed, on behalf of the Borrower, by its principal executive officer *and* principal financial officer (or individuals performing similar functions)[1] in connection with the loan (the "Eligible Loan") to be made by the eligible lender (the "Eligible Lender") to the Borrower under the Facility. For purposes of these certifications and covenants, the Federal Reserve's current Frequently Asked Questions ("FAQs") on the Main Street Facilities, as posted on the website of the Board or the Reserve Bank as of the date hereof, are incorporated by reference. The Borrower may rely on the clarifications and interpretations provided in the FAQs, to the extent applicable.

1. **Facility Borrower Eligibility Certifications and Covenants**.

    **1.A.** *Borrower Is a Business*. The Borrower must certify that it is a Business. For purposes of the Borrower Certifications and Covenants, "Business" means an entity that is organized for profit as a partnership; a limited liability company; a corporation; an association; a trust; a cooperative; a joint venture with no more than 49 percent participation by foreign business entities; a tribal business concern that is (i) wholly owned by one or more Indian tribal governments, or by a corporation that is wholly owned by one or more Indian tribal governments, or (ii) owned in part by one or more Indian tribal governments, or by a corporation that is wholly owned by one or more Indian tribal governments, if all other owners are either U.S. citizens or Businesses; or any other form of organization that has been publicly designated by the Federal Reserve as a "Business."[2]

    **1.B.** *Date of Establishment*. The Borrower must certify that it was established prior to March 13, 2020. For purposes of this certification, "established" means the date of formation, incorporation, or organization for any registered entity under the laws of the United States, one of the several states of the United States, the District of Columbia, any of the territories and possessions of the United States, or an Indian tribal government.

    **1.C.** *Not an Ineligible Business*. The Borrower must certify that, after reasonable, good faith diligence, it has no reason to believe it is an Ineligible Business.

---

[1] If the principal executive officer and principal financial officer of a Borrower are the same individual, the second signatory should be the next-in-line officer or employee of the Borrower that works in a financial or accounting capacity.

[2] Any such designations will be published in FAQs posted to the website of the Board or the Reserve Bank.

- For purposes of the Borrower Certifications and Covenants, an "Ineligible Business" means a business of any of the types listed in 13 CFR 120.110(b)-(j), (m)-(s), as modified and clarified by Small Business Administration ("SBA") regulations for purposes of the Paycheck Protection Program ("PPP") on or before April 24, 2020. Such modifications and clarifications include the SBA's recent interim final rules available at 85 Fed. Reg. 20811, 85 Fed. Reg. 21747, and 85 Fed. Reg. 23450. The Federal Reserve may further modify the application of these restrictions to Main Street.[3]

- *Reasonable, Good Faith Diligence.* For purposes of this certification, Eligible Borrowers are expected to review the list of Ineligible Businesses in 13 CFR 120.110(b)-(j), (m)-(s), and make a reasonable, good faith effort to determine if the Borrower's activities or ownership would cause it to be classified within one of the listed ineligible categories. If representatives of the Borrower have reason to believe that the Borrower may be an Ineligible Business under the categories listed in that regulation, Borrowers are expected to conduct further inquiry into the SBA's interpretations of such categories, including in the interim final rules, and to reference the FAQs.

**1.D.   *Maximum Size*.** The Borrower must certify that it meets at least one of the following two conditions: (i) the Borrower has 15,000 employees or fewer, or (ii) the Borrower had 2019 annual revenues of $5 billion or less. The Borrower must meet at least one of these conditions, but is not required to meet both.

- *Number of Employees.* To determine the number of its employees, the Borrower should follow the framework set out in the Small Business Administration's regulation at 13 CFR 121.106. As set out in that regulation, the Borrower should count as employees all full-time, part-time, seasonal, or otherwise employed persons, excluding volunteers and independent contractors. The Borrower should count its own employees and those employed by its affiliates. In order to determine the applicable number of employees, the Borrower should use the average of the total number of persons employed by the Borrower and its affiliates for each pay period over the 12 months prior to the origination of the Eligible Loan.

- *Amount of Revenues.* To determine its 2019 annual revenues, the Borrower must aggregate its revenues with those of its affiliates. The Borrower may use either of the following methods to calculate 2019 annual revenues for purposes of determining eligibility: (1) the Borrower may use its (and its affiliates') annual "revenue" as reflected on its fiscal year 2019 audited financial statements prepared in accordance with U.S. Generally Accepted Accounting Principles ("U.S. GAAP"); or (2) the Borrower may use its (and its affiliates') annual receipts for the fiscal year 2019, as reported to the Internal Revenue Service. For purposes of the Facility, the term "receipts" has the same meaning used by the Small Business Administration in 13 CFR 121.104(a). If the Borrower (or its affiliate) does not yet have 2019 audited financial statements prepared in accordance with U.S. GAAP or annual receipts for 2019, the Borrower (or its affiliate) should use its most recent audited financial statements or annual receipts.

- *Identifying Affiliates.* For purposes of the Borrower Certifications and Covenants, the Borrower should identify its affiliates in accordance with the affiliation principles set forth in 13 CFR 121.301(f) (1/1/2019 ed.).

---

[3] Any such modifications will be published in the FAQs posted to the website of the Board or the Reserve Bank.

*Issued on June 11, 2020*

**1.E.** ***Other Similar Credit Programs.*** The Borrower must certify that it has not also participated in, and commit that it will not seek to participate simultaneously in, the Main Street New Loan Facility, the Main Street Expanded Loan Facility, or the Primary Market Corporate Credit Facility (a facility established by the Federal Reserve under section 13(3) of the FRA, using equity committed by the Secretary, to support bond and loan issuances). For the avoidance of doubt, a Borrower that has received a PPP loan is permitted to borrow under the Facility, provided that it meets the other Facility eligibility criteria.

2. **CARES Act Borrower Eligibility Certifications and Covenants.**

**2.A.** ***Specific Support under CARES Act.*** Consistent with the definition of an "eligible business" under section 4002(4) of the CARES Act, the Borrower must certify that it has not received specific support pursuant to the Coronavirus Economic Stabilization Act of 2020 (Subtitle A of Title IV of the CARES Act). For purposes of this certification, a Borrower is ineligible only if it has received support pursuant to section 4003(b)(1)-(3) of the CARES Act.

**2.B.** ***U.S. Business Requirement.*** The Borrower must certify that it is a business that is created or organized in the United States or under the laws of the United States and that has significant operations in and a majority of its employees based in the United States, consistent with section 4003(c)(3)(C) of the CARES Act.

- *Created or Organized.* A business is created or organized in the United States if it is created or organized under the laws of the United States, one of the several states of the United States, the District of Columbia, any of the territories and possessions of the United States, or an Indian tribal government.

- *Significant Operations.* To determine if it has "significant operations" in the United States, the Borrower's operations should be evaluated on a consolidated basis together with its subsidiaries, but not its parent companies or sister affiliates. For example, the Borrower has significant operations in the United States if, when consolidated with its subsidiaries, greater than 50 percent of the Borrower's (i) assets are located in the United States; (ii) annual net income is generated in the United States; (iii) annual net operating revenues are generated in the United States; or (iv) annual consolidated operating expenses (excluding interest expense and any other expenses associated with debt service) are generated in the United States. This is a non-exhaustive list of examples that reflects the principles that should be applied by the Borrower when evaluating its eligibility under this criterion.

- *Majority of Employees.* To determine if it has "a majority of its employees" in the United States, the Borrower's operations should be evaluated on a consolidated basis together with its subsidiaries, but not its parent companies or sister affiliates. As set out in 13 CFR 121.106, the Borrower should count as employees all full-time, part-time, seasonal, or otherwise employed persons, excluding volunteers and independent contractors. In order to determine the applicable number of employees, the Borrower should use the average of the total number of persons employed by the Borrower and its subsidiaries for each pay period over the 12 months prior to the origination of the Eligible Loan under the Facility.

**2.C.** ***Eligible under Conflicts of Interest Prohibition.*** Section 4019(c) of the CARES Act requires the principal executive officer and principal financial officer (or individuals performing similar functions) of a Borrower to certify to the Secretary and the Board that the Borrower is not a Covered Entity.

- For purposes of the Borrower Certifications and Covenants, "Covered Entity" means an entity in which a Covered Individual directly or indirectly holds a Controlling Interest.

3

*Issued on June 11, 2020*

- For purposes of the Borrower Certifications and Covenants, "Covered Individual" means the President, the Vice President, the head of an Executive department as defined in 5 U.S.C. § 101, or a member of Congress (each a "Government Official" and collectively "Government Officials"), and the spouse, child, son-in-law, or daughter-in-law, as determined under applicable common law, of the Government Official (each a "Family Member" and any group of which are "Family Members"). The term "child" includes a step-child, but the term "spouse" does not include an ex-spouse. To determine a Covered Individual's equity interest in an entity, the Government Official's and Family Members' equity interests shall be aggregated.

- For purposes of the Borrower Certifications and Covenants, a "Controlling Interest" means owning, controlling, or holding not less than 20 percent, by vote or value, of the outstanding amount of any class of equity interest in an entity. An "equity interest" means (a) shares, (b) capital or profit interest in a limited liability company or partnership, or (c) a warrant or right (other than a right to convert) to purchase, sell, or subscribe to any such equity interest. The determination of whether a Covered Individual directly or indirectly holds a Controlling Interest in an entity must take into account a Covered Individual's direct interest in the entity as well as a Covered Individual's interest in any entity that directly or indirectly has an interest in such entity (*e.g.*, the entity's parent companies).

  o *Direct Interests*. If a Covered Individual directly owns, controls, or holds 20 percent or more, by vote or value, of the outstanding amount of any class of equity interest in an entity that is seeking to enter into a transaction with the Facility, that entity is a Covered Entity.

  o *Indirect Interests*. For the purpose of determining the amount of an equity interest indirectly owned or held by a Covered Individual in an entity:

    - A Covered Individual's indirect equity interest by value (*i.e.*, economic interest that may or may not include voting rights) shall be calculated on a proportional basis, taking into account any partial ownership of the relevant entity's parents.

      - For example, if a Government Official owns 25 percent of the economic interest in Company A, and Company A owns 40 percent of the outstanding amount of a class of voting securities of Company B, the Government Official is deemed to own 10 percent of the class of voting securities of Company B.

    - For the purpose of determining the amount of an equity interest indirectly controlled by a Covered Individual in an entity:

      - A Covered Individual shall be deemed to indirectly control an equity interest in an entity if he or she controls, directly or indirectly, the entity that owns or holds the equity interest.

      - An individual or entity shall be deemed to control another entity only when the individual or entity owns or holds a majority of the voting interest in such entity, or is, or holds a majority of the voting interest in, the general partner of such entity.

4

- For example, if a Government Official owns a 51 percent voting interest in Company A, which owns a 51 percent voting interest in Company B, which owns 20 percent of the equity interests of Company C, the Government Official shall be deemed to control 20 percent of the equity interests of Company C.

  o *Shares.* A share is considered an ownership interest without regard to whether the share is transferrable or classified as stock or anything similar and without regard to whether the share is a voting security. For example, a nonvoting preferred share would be considered a share.

  o *Warrants or Rights.* If the Covered Individual has warrants or other rights (other than a right to convert), calculate the Covered Individual's interest in the underlying equity interest on a fully diluted basis assuming that both the individual and other holders of such warrants or rights have exercised such interests. Warrants, options, and similar rights must be counted even if they are unexercised or "out of the money." For example, when calculating an individual's percentage in an equity interest, use the following formula:

$$\frac{\text{(Individual's shares in a class)} + \text{(Individual's options and warrants in that class)}}{\text{(Total outstanding shares in that class, assuming all warrants or rights are exercised)}}$$

- *Basis for Certification: Reasonable Diligence.* In light of limited public information on ownership interests of Government Officials, and that the identities of Government Officials' Family Members are not disclosed or reported in any routine or comprehensive manner, it is necessary to prescribe the level of diligence required to make a conflict of interest certification in good faith. To determine whether any Covered Individual holds a Controlling Interest in an entity, it is necessary and sufficient for the entity to undertake the following reasonable diligence:

  o Entities must take into account the ownership, control, and holding of any equity interest of any size if the entity has actual knowledge that a Covered Individual, directly or indirectly, owns, controls, or holds the interest.

  o Entities must determine the beneficial owner of any 5 percent or greater equity interest of the entity and determine whether such beneficial owner is a Covered Individual (i) by checking the name of each such beneficial owner against a list of all Government Officials (link here) and (ii) if the entity has not otherwise been able to confirm whether such beneficial owner is a Family Member, by asking each such beneficial owner whether the owner is a Family Member. If the aggregate amount of equity interests owned by the identified beneficial owners, together with the aggregate percentage ownership determined from actual knowledge in (i) above, is less than 20 percent, an entity need not determine if the identified beneficial owners are Family Members.

  o To determine the identity of beneficial owners of publicly traded securities, Borrowers may rely on information disclosed by such persons in reporting under sections 13(d) and 13(g) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78m(d), 78m(g)).

**2.D. *Direct Loan Restrictions.*** The Borrower must commit to comply with the compensation, stock repurchase, and capital distribution restrictions that apply to direct loan programs under section 4003(c)(3)(A)(ii) of the CARES Act, except that an S corporation or other tax pass-through entity that is

5

a Borrower may make distributions to the extent reasonably required to cover its owners' tax obligations in respect of the Borrower's earnings.

- *Limits on Compensation.* The following restrictions apply to compensation of officers and employees of Borrowers that exceeds $425,000 and, where applicable, $3,000,000, in calendar year 2019 or the Subsequent Reference Period (as defined below).

  o *Officer or employee:* "Officer or employee" means an individual who performs compensated services for the Borrower and either:

    (i) for whom, in connection with those services, the Borrower would be responsible for reporting the compensation on Form W-2 and withholding federal income taxes under IRS rules applicable to U.S. citizen employees in a state or the District of Columbia (regardless of whether the compensation paid to the individual is actually subject to federal income tax withholding, and whether or not tax is withheld); or

    (ii) is a partner in a partnership, a member of a limited liability company, or other similar structure.  Officer or employee does not include an independent director or an independent contractor.

    - *Total Compensation:* "Total Compensation" includes salary, bonuses, awards of stock, and other financial benefits provided by the Borrower and its affiliates to an officer or employee of the Borrower.[4]

  o *Restrictions on compensation for employees or officers with total compensation of between $425,000 and $3,000,000.* No employee or officer whose total compensation exceeded $425,000, but was less than or equal to $3,000,000, in calendar year 2019 or the Subsequent Reference Period will, until 12 months after the date on which the Eligible Loan is no longer outstanding:

    - receive from the Borrower total compensation which exceeds, during any 12 consecutive month period, the total compensation received by the officer or employee from the Borrower in calendar year 2019 or the Subsequent Reference Period; or

    - receive from the Borrower severance pay or other benefits upon termination of employment with the Borrower, which exceeds twice the maximum total compensation received by the officer or employee from the Borrower in calendar year 2019 or the Subsequent Reference Period.

    - Exception.  These restrictions do not apply to an employee whose compensation is determined through an existing collective bargaining agreement entered into prior to March 1, 2020.  For purposes of this exception, the term "employee" has the same meaning given the term in section 2 of the National Labor Relations Act (29 U.S.C. § 152); and includes any individual employed by an employer subject to the Railway Labor Act (45 U.S.C. § 151 *et seq.*).

---

[4] Borrowers should consult the FAQs for additional guidance on "Total Compensation" before signing the Borrower Certifications and Covenants.

6

o *Restrictions on compensation for employees or officers with total compensation exceeding $3,000,000.* No employee or officer whose total compensation exceeded $3,000,000 in calendar year 2019 or the Subsequent Reference Period will, until 12 months after the date on which the Eligible Loan is no longer outstanding:

- receive, during any 12 consecutive month period, total compensation in excess of the sum of (1) $3,000,000; and (2) 50 percent of the excess over $3,000,000 of the total compensation received by the officer or employee from the Borrower in calendar year 2019 or the Subsequent Reference Period; and

- except for an employee whose compensation is determined through an existing collective bargaining agreement entered into prior to March 1, 2020, receive from the Borrower severance pay or other benefits upon termination of employment with the Borrower, which exceeds twice the maximum total compensation received by the officer or employee from the Borrower in calendar year 2019 or the Subsequent Reference Period. For purposes of this exception, the term "employee" has the same meaning given the term in section 2 of the National Labor Relations Act (29 U.S.C. § 152); and includes any individual employed by an employer subject to the Railway Labor Act (45 U.S.C. § 151 *et seq.*).

o *Restrictions applicable to new hires and existing officers or employees who become highly compensated.* For an officer or employee whose employment with a Borrower started during 2019 or later, the "Subsequent Reference Period" is the 12-month period starting from the end of the month in which the officer or employee commenced employment, if such officer's or employee's total compensation exceeds $425,000 (or $3,000,000) during such period. For an officer or employee whose total compensation first exceeds $425,000 during a 12-month period ending after 2019, the "Subsequent Reference Period" is the 12-month period starting from the end of the month in which the officer or employee's total compensation first exceeded $425,000 (or $3,000,000).

- *Limits on repurchases of equity securities.* The following restrictions on repurchases apply to Borrowers that have, or have a parent company that has, equity securities that are listed on a national securities exchange. The term equity security has the same meaning as in section 3(a) of the Securities Exchange Act of 1934. The term national securities exchange means an exchange registered as a national securities exchange under section 6 of the Securities Exchange Act of 1934. For purposes of these restrictions, the term repurchase includes a redemption of an equity security.

o Restrictions applicable to the Borrower's repurchases of its own shares. Until 12 months after the date on which the Eligible Loan is no longer outstanding, a Borrower must commit not to repurchase an equity security that is issued by the Borrower and listed on a national securities exchange.

o Restrictions applicable to the Borrower's repurchases of shares of its parent company. While the Eligible Loan is outstanding, the Borrower also must commit to not repurchase an equity security issued by any of its parent companies that is listed on a national securities exchange. A parent company means any company that consolidates the Borrower for purposes of financial reporting, such as under rules of consolidation established by the Securities Exchange Commission or U.S. GAAP.

7

*Issued on June 11, 2020*

- o  Exception. Restrictions on repurchases of equity securities by the Borrower or a parent company do not apply to any repurchases required under a contractual obligation that was in effect as of March 27, 2020.

- *Limits on distributions.* Until 12 months after the date on which the Eligible Loan is no longer outstanding, the Borrower must agree not to pay dividends or make other capital distributions with respect to the common stock equivalents of the Borrower, except as provided below. For purposes of these restrictions, the term "common stock equivalents" includes common stock in a corporation and equivalent interests in a partnership, limited liability company, a business organized as a trust or other legal entity. Dividends and other capital distributions means any payment made with respect to the Borrower's common stock equivalents, including a discretionary dividend payment. In addition, preferred stock or any other equity interest in a Borrower that provides for mandatory or preferential payment of dividends or other distributions shall be subject to these restrictions unless both the equity interest and the obligation to pay dividends or distributions existed as of March 27, 2020. Dividends and other capital distributions do not include repurchases or redemptions.

  - o  *S Corporations and other tax pass-through entities.* A Borrower that is an S corporation or other tax pass-through entity may make distributions in respect of its common stock equivalents to the extent reasonably required to cover its owners' tax obligations in respect of the entity's earnings. Such distributions shall be subject to an annual reconciliation, with any surplus or deficiency to be deducted from or added to distributions, as applicable, in the following year.

## 3.  FRA and Regulation A Borrower Eligibility Certifications.

**3.A.  *Unavailability of Credit.*** Consistent with 12 CFR 201.4(d)(8), the Borrower must certify that it is unable to secure adequate credit accommodations from other banking institutions. This does not necessarily mean that no other credit is available for the Borrower's purposes. Rather, the Borrower can certify that it is unable to secure "adequate credit accommodations" because the amount, price, or terms of credit available from other sources are inadequate for the Borrower's needs during the current unusual and exigent circumstances.

**3.B.  *Solvency.*** Under section 13(3) of the FRA, the Borrower must certify that it is not Insolvent as that term is used in 12 CFR 201.4(d)(5)(iii). For purposes of this certification, a Borrower is "Insolvent" if it is in bankruptcy, resolution under Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act, or any other Federal or State insolvency proceeding (as defined in paragraph B(ii) of section 13(3) of the Federal Reserve Act), or if it was "generally failing to pay undisputed debts as they become due" during the 90 days preceding the date of borrowing. For purposes of this certification, a Borrower has been "generally failing to pay undisputed debts as they become due" during the 90 days preceding the date hereof to the extent it is behind on its debts for reasons other than disruptions to its business resulting from the Coronavirus Disease 2019 ("COVID-19") pandemic. For the avoidance of doubt, a person or entity would not be Insolvent or "generally failing to pay its undisputed debts as they become due" if it is behind on its debts because of reduced business activity resulting from stay-at-home, shelter-in-place, social distancing, or other similar orders or recommendations by federal, state, or local government authorities related to the COVID-19 pandemic. Additionally, a person or entity would not be Insolvent if expected and routine sources of funding were unexpectedly unavailable due to market conditions resulting from the COVID-19 pandemic. If, however, a person or entity is failing to pay its undisputed debts as they become due for reasons unrelated to the COVID-19 pandemic, then it is Insolvent. For

8

*Issued on June 11, 2020*

example, a person or entity is Insolvent if it was generally failing to pay its undisputed debts in the 90 days preceding the later of March 1, 2020, or the date on which changes in its business activity related to the COVID-19 pandemic commenced.

4.    **Eligible Loan Certifications**.

4.A.    *Financial Records*. The Borrower must certify that (i) it has provided financial records to the Eligible Lender and a calculation of the Borrower's (and, if relevant, the Borrower's affiliates' and/or Selected Subsidiaries') adjusted 2019 earnings before interest, taxes, depreciation, and amortization ("EBITDA"), reflecting only those adjustments permitted pursuant to the methodology that the Borrower agreed upon with the Eligible Lender, and (ii) such financial records fairly present, in all material respects, the financial condition of such entities for the period covered thereby in accordance with U.S. GAAP (if applicable), consistently applied, and that such adjusted EBITDA calculations are true and correct in all material respects.

- Borrowers are expected to submit statements to the Lender as follows:[5]

    o    *U.S. GAAP Compliance:*  Borrowers that are subject to U.S. GAAP reporting requirements or that already prepare their financials in accordance with U.S. GAAP must submit U.S. GAAP-compliant financial records in connection with this certification.  Borrowers that do not have to comply with U.S. GAAP and that do not typically prepare their financials in accordance with U.S. GAAP are not required to submit U.S. GAAP compliant financials.

    o    *Financial Statements:*  Borrowers that typically prepare audited financial statements must submit audited financial statements.  Otherwise Borrowers should submit reviewed financial statements or financial statements prepared for the purpose of filing taxes.  If a Borrower does not yet have audited or reviewed financial statements for 2019, the Borrower should use its most recent audited or reviewed financial statements.

    o    *Consolidation:*  Borrowers that typically prepare financial statements that consolidate the Borrower with its subsidiaries (but not its parent companies or sister affiliates) must submit such consolidated financial statements.  If a Borrower does not typically prepare consolidated financial statements, it is not required to do so, unless so required by the Lender.

- For purposes of the Borrower Certifications and Covenants, "Selected Subsidiaries" means one or more operating subsidiaries selected by the Borrower to provide a guarantee for the Eligible Loan on a joint and several basis, provided that (i) a Borrower is only required to designate Selected Subsidiaries if it is a holding company, all or substantially all of the assets of which comprise equity interests in other entities; (ii) each Selected Subsidiary must itself be eligible to borrow under the Facility's eligibility criteria; (iii) the aggregate adjusted 2019 EBITDA of the Selected Subsidiaries must be used to calculate the Borrower's maximum loan size under the Facility (in addition to the other tests, as applicable); and (iv) if the Eligible Loan is secured, then the Selected Subsidiaries' guarantees are also secured.

4.B.    *Unsecured Eligible Loans – Pari Passu*.  The Borrower must certify that, if the Eligible Loan is unsecured, then the Borrower's other Loans or Debt Instruments (other than Mortgage Debt) are

---

[5] The same framework should be applied to the Borrower's affiliates or Selected Subsidiaries, where applicable.

9

unsecured at the time of origination of the Eligible Loan, as well. For purposes of this certification, the "Borrower's other Loans or Debt Instruments" shall be read to include the Loans or Debt Instruments of the Selected Subsidiaries, if any, on an aggregate basis.

- For purposes of the Borrower Certifications and Covenants:

  o "<u>Loans or Debt Instruments</u>" means debt for borrowed money and all obligations evidenced by bonds, debentures, notes, loan agreements or other similar instruments, and all guarantees of the foregoing.

  o "<u>Mortgage Debt</u>" means (i) debt secured by real property at the time of the Eligible Loan's origination; and (ii) limited recourse equipment financings (including equipment capital or finance leasing and purchase money equipment loans) secured only by the acquired equipment.

**4.C.** ***Secured Eligible Loans – Valuations and Calculations.*** The Borrower must certify that, if the Eligible Loan is secured, then the Borrower has provided the Eligible Lender with (i) good faith valuations of any collateral security for the Eligible Loan (including security for the Selected Subsidiaries' guarantees, if applicable) at the time of origination of the Eligible Loan, (ii) good faith valuations of any collateral security for each of the Borrower's other Loans or Debt Instruments (other than Mortgage Debt) at the time of origination of the Eligible Loan, (iii) good faith calculation of the outstanding aggregate principal amount of each of the Borrower's other Loans or Debt Instruments (other than Mortgage Debt) at the time of origination of the Eligible Loan, and (iv) confirmation as to whether any collateral security for the Eligible Loan (including security for the Selected Subsidiaries' guarantees, if applicable) is Shared Collateral (all of the foregoing, "<u>Lien and Collateral Valuation Reporting</u>"). For purposes of this certification, the "Borrower's other Loans or Debt Instruments" shall be read to include the Loans or Debt Instruments of the Selected Subsidiaries, if any, on an aggregate basis.

- For purposes of the Borrower Certifications and Covenants, "<u>Shared Collateral</u>" means any collateral security for the Eligible Loan (including security for the Selected Subsidiaries' guarantees, if applicable) that is also collateral security for any of the Borrower's other Loans or Debt Instruments (other than Mortgage Debt).

**4.D.** ***Secured Eligible Loans – Shared Collateral.*** The Borrower must certify that, if the Eligible Loan is secured, then the Borrower has no knowledge or reason to believe that the lien of the Eligible Lender in any Shared Collateral is not senior to or *pari passu* with the lien on such Shared Collateral that secures any of the Borrower's other Loans or Debt Instruments (other than Mortgage Debt). For purposes of this certification, the "Borrower's other Loans or Debt Instruments" shall be read to include the Loans or Debt Instruments of the Selected Subsidiaries, if any, on an aggregate basis.

**5. Additional Borrower Certifications and Covenants.**

**5.A.** ***Prohibition on Early Repayment of Other Debt.*** The Borrower must commit that it will not repay the principal balance of, or pay any interest on, any debt, unless the principal or interest payment is mandatory and due, until (i) the Eligible Loan is repaid in full or (ii) neither the SPV nor a Governmental Assignee holds an interest in the Eligible Loan in any capacity. This restriction shall apply only to other debt for borrowed money of the Borrower. The Borrower may, however, at the time of origination of the Eligible Loan, use the proceeds of the Eligible Loan to refinance existing debt owed by the Borrower to a lender that is not the Eligible Lender or an affiliate of the Eligible Lender.

- For purposes of the Borrower Certifications and Covenants, "<u>Governmental Assignee</u>" means any of the following entities, if the SPV's interest in the Eligible Loan is transferred or assigned

10

*Issued on June 11, 2020*

to such entity: any Federal Reserve Bank, any vehicle authorized to be established by the Board or any Federal Reserve Bank, any entity created by an act of the United States Congress, or any vehicle established or acquired by the Department of the Treasury or any other department or agency of the Federal government of the United States.

- *Mandatory and Due.* With respect to debt that predates the Eligible Loan, principal and interest payments are "mandatory and due" on the future date upon which they were scheduled to be paid as of the date of origination of the Eligible Loan, or upon the occurrence of an event that automatically triggers mandatory prepayments under a contract for indebtedness that the Borrower executed prior to the date of origination of the Eligible Loan, except that any such prepayments triggered by the incurrence of new debt can only be paid at the time of origination or if such prepayments are *de minimis*. For the avoidance of doubt, the Borrower may continue to pay, and the Lender may request that the Borrower pay, interest or principal payments on outstanding debt on (or after) the payment due date, provided that the payment due date was scheduled prior to the date of origination of the Eligible Loan. The Borrower may not pay, and the Lender may not request that the Borrower pay, interest or principal payments on such debt ahead of schedule during the life of the Eligible Loan, unless required by a mandatory prepayment clause as specifically permitted above. For future debt incurred by the Borrower in compliance with the terms and conditions of the Eligible Loan, principal and interest payments are "mandatory and due" on their scheduled dates or upon the occurrence of an event that automatically triggers mandatory prepayments.

- *Safe Harbor.* The foregoing Prohibition on Early Repayment of Other Debt would not prohibit the Borrower from undertaking any of the following actions during the term of the Eligible Loan:

  o repaying a line of credit (including a credit card) in accordance with the Borrower's normal course of business usage for such line of credit;

  o taking on and paying additional debt obligations required in the normal course of business and on standard terms, including inventory and equipment financing, provided that such debt is secured only by the newly acquired property (*e.g.*, inventory or equipment), and, apart from such security, is of equal or lower priority than the Eligible Loan; or

  o refinancing debt that is maturing no later than 90 days from the date of such refinancing.

**5.B.** ***Prohibition on Early Cancellation or Reduction of Other Existing Credit Lines.*** The Borrower must commit that it will not seek to cancel or reduce any of its committed lines of credit with the Eligible Lender or any other lender until (i) the Eligible Loan is repaid in full or (ii) neither the SPV nor a Governmental Assignee holds an interest in the Eligible Loan in any capacity.

- *Safe Harbor.* The safe harbor to the Prohibition on Early Repayment of Other Debt is also a safe harbor to the Prohibition on Early Cancellation or Reduction of Other Existing Credit Lines.

**5.C.** ***Ability to Meet Financial Obligations for 90 Days.*** The Borrower must certify that it has a reasonable basis to believe that, as of the date of origination of the Eligible Loan and after giving effect to the Eligible Loan, the Borrower has the ability to meet its financial obligations for at least the next 90 days and does not expect to file for bankruptcy during that time period. In order to make this certification,

11

the Borrower must determine that, in addition to the foregoing, after receiving the Eligible Loan, it expects to be able to pay its undisputed debts that (i) are due as of the date hereof and (ii) become due during the 90 days following the date hereof.

**5.D.** ***Use of Proceeds.*** If the Borrower is a subsidiary of a foreign company, the Borrower must commit that it will use the proceeds of the Eligible Loan only for the benefit of the Borrower, its consolidated U.S. subsidiaries, and other affiliates of the Borrower that are U.S. businesses. The proceeds of the Eligible Loan may not be used for the benefit of the Borrower's foreign parents, affiliates, or subsidiaries.

**5.E.** ***Previous Use of the Facility by the Borrower.*** The Borrower must certify that it has informed the Eligible Lender if it has previously received, or has a pending application to receive, funds in connection with any Main Street Facility, as well as the value of such funding. The Borrower is subject to the maximum loan size limitations of the Facility on an entity-basis, rather than on a loan basis. That is, if the Borrower receives more than one loan under the Facility, the sum of those loans cannot exceed the permissible maximum loan size of the Facility.

**5.F.** ***Previous Use of Other Credit Programs by Affiliates.*** The Borrower must certify that, to its knowledge after reasonable diligence, none of its affiliates has accessed the Main Street New Loan Facility, the Main Street Expanded Loan Facility, or the Primary Market Corporate Credit Facility. It must also certify that it has informed the Eligible Lender if, after reasonable diligence, it has determined that any of its affiliates has previously received, or has a pending application to receive, funds in connection with any Main Street Facility, as well as the value of such funding. An affiliated group of companies can participate in only one Main Street Facility and may not participate in both a Main Street Facility and the Primary Market Corporate Credit Facility. In no case can an affiliated group's total participation in the Facility exceed the maximum loan size that the affiliated group is eligible to receive on a consolidated basis. As result, the Borrower's maximum loan size is limited by its own leverage level, the leverage level of the affiliated group on a consolidated basis, and the size of any loan extended to other affiliates in the group.

**5.G.** ***Use of the Facility by Borrower That Is a Holding Company.*** If (and only if) the Borrower is a company, all or substantially all of the assets of which comprise equity interests in other entities, then the Borrower must certify that (i) the Eligible Loan is fully guaranteed on a joint and several basis by its Selected Subsidiaries and (ii) if the Eligible Loan is secured, then the Selected Subsidiaries' guarantees are also secured.

6. **Indemnity.** The certifications and covenants shall also include an indemnification by the Borrower of the beneficiaries of such certifications and covenants for any liability, claim, cost, loss, judgment, damage or expense that a beneficiary incurs or suffers as a result of or arising out of a material breach of any of the Borrower's certifications or covenants contained in such document.

**FORM CERTIFICATIONS AND COVENANTS:** The form certifications and covenants are provided on the next page.

*Issued on June 11, 2020*

## MAIN STREET PRIORITY LOAN FACILITY
## FORM OF BORROWER CERTIFICATIONS AND COVENANTS

Reference is made to the Main Street Priority Loan Facility (the "Facility"), which has been authorized under section 13(3) of the Federal Reserve Act (the "FRA"). Under the Facility, the Federal Reserve Bank of Boston (the "Reserve Bank"), acting under the direction of the Board of Governors of the Federal Reserve System (the "Board" and, together with the twelve Federal Reserve Banks, the "Federal Reserve"), has committed to lend to a special purpose vehicle, MS Facilities LLC, a Delaware limited liability company (the "SPV"), on a recourse basis. The SPV will purchase 95 percent participations in certain eligible loans made by eligible lenders to eligible borrowers. Eligible lenders will retain 5 percent of each such eligible loan. The Secretary of the Treasury ("Secretary") has committed funds appropriated to the Exchange Stabilization Fund under section 4027 of the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") to the SPV in connection with the Facility, the Main Street New Loan Facility, and the Main Street Expanded Loan Facility (each, a "Main Street Facility").

Reference is further made to the Main Street Priority Loan Facility Borrower Certifications and Covenants Instructions and Guidance (the "Instructions") immediately preceding these Main Street Priority Loan Facility Borrower Certifications and Covenants.

I, the undersigned principal executive officer or principal financial officer, or other authorized officer performing similar functions of the borrower named below (the "Borrower"), in such capacity, make these certifications and covenants (these "Borrower Certifications and Covenants") to the SPV, the lender named below as the eligible lender (the "Eligible Lender") with respect to the eligible loan to be made to the Borrower under the Facility (the "Eligible Loan"), the Reserve Bank, the Board, and the Secretary (each, a "Beneficiary" and, collectively, the "Beneficiaries") in connection with Borrower's participation in the Facility.

I hereby confirm that I have the full power and authority to make the following certifications and covenants on behalf of the Borrower and that the Borrower has the full power and authority to enter into, deliver, and perform the following covenants, agreements, and undertakings, and that such covenants, agreements, and undertakings (i) have been duly and validly authorized, executed, and delivered by the Borrower and (ii) are the legal, valid, and binding obligations of the Borrower, enforceable against the Borrower in accordance with their respective terms, except that such enforceability against the Borrower may be limited by bankruptcy, insolvency, or other similar laws of general applicability affecting the enforcement of creditors' rights generally and by a court's discretion in relation to equitable remedies. I also hereby confirm that I have consulted with such other officers, employees, and advisors of the Borrower as I have deemed appropriate, and made such other investigations and inquiries as I have deemed appropriate, in order to make the following certifications, covenants, and agreements.

1.    **Facility Borrower Eligibility Certifications and Covenants**. In connection with Borrower's proposed participation in the Facility, I hereby:

  **1.A.**    certify that, as of the date hereof, the Borrower is a Business (as defined in the Instructions);

  **1.B.**    certify that the Borrower was established (as defined in the Instructions) prior to March 13, 2020;

  **1.C.**    certify that, as of the date hereof, after reasonable, good faith diligence (as explained in the Instructions), the Borrower has no reason to believe that it is an Ineligible Business (as defined in the Instructions);

  **1.D.**    certify that, as of the date hereof, the Borrower (when aggregated with its affiliates in accordance with the Instructions) meets at least one of the following two conditions: (i) has 15,000 employees or fewer, or (ii) had 2019 annual revenues of $5 billion or less; and

13

**1.E.**   certify that, as of the date hereof, the Borrower has not also participated in, and covenant and agree that the Borrower will not seek to participate simultaneously in, the Main Street New Loan Facility, the Main Street Expanded Loan Facility, or the Primary Market Corporate Credit Facility.

2.   **CARES Act Borrower Eligibility Certifications and Covenants.** In connection with Borrower's proposed participation in the Facility, I hereby:

**2.A.**   certify that, as of the date hereof, the Borrower has not received specific support pursuant to the Coronavirus Economic Stabilization Act of 2020 (Subtitle A of Title IV of the CARES Act);

**2.B.**   certify that, as of the date hereof, the Borrower is created or organized in the United States or under the laws of the United States with significant operations in and a majority of its employees based in the United States, consistent with section 4003(c)(3)(C) of the CARES Act;

**2.C.**   certify that, as of the date hereof, to the best of my knowledge and based on reasonable diligence (as explained in the Instructions), the Borrower is not a Covered Entity (as defined in the Instructions); and

**2.D.**   covenant and agree that the Borrower will comply with the compensation, stock repurchase, and capital distribution restrictions that apply to direct loan programs under section 4003(c)(3)(A)(ii) of the CARES Act, except that an S corporation or other tax pass-through entity that is a Borrower may make distributions to the extent reasonably required to cover its owners' tax obligations in respect of the Borrower's earnings.

3.   **FRA and Regulation A Borrower Eligibility Certifications.** In connection with Borrower's proposed participation in the Facility, I hereby certify, as of the date hereof, that the Borrower:

**3.A.**   is unable to secure adequate credit accommodations from other banking institutions, consistent with 12 CFR 201.4(d)(8); and

**3.B.**   is not Insolvent (as defined in the Instructions), consistent with 12 CFR 201.4(d)(5).

4.   **Eligible Loan Certifications.** In connection with the Borrower's proposed participation in the Facility, I hereby certify that:

**4.A.**   (i) the Borrower has provided financial records to the Eligible Lender and a calculation of the Borrower's (and, if relevant, the Borrower's affiliates' and Selected Subsidiaries' (as defined in the Instructions)) adjusted 2019 earnings before interest, taxes, depreciation, and amortization ("EBITDA"), reflecting only those adjustments permitted pursuant to the methodology agreed upon with the Eligible Lender, and (ii) such financial records fairly present, in all material respects, the financial condition of such entities for the period covered thereby in accordance with U.S. Generally Accepted Accounting Principles (if applicable), consistently applied, and that such adjusted EBITDA calculations are true and correct in all material respects;

**4.B.**   if the Eligible Loan is unsecured, the Borrower's other Loans or Debt Instruments (as defined in the Instructions), other than Mortgage Debt (as defined in the Instructions), are unsecured at the time of origination of the Eligible Loan;

**4.C.**   if the Eligible Loan is secured, the Borrower has provided the Eligible Lender with (i) good faith valuations of any collateral security for the Eligible Loan (including security for the Selected Subsidiaries' guarantees, if applicable) at the time of origination of the Eligible Loan, (ii) good faith valuations of any collateral security for each of the Borrower's other Loans or Debt Instruments (other than Mortgage Debt) at the time of origination of the Eligible Loan, (iii) good faith calculation of the outstanding aggregate principal amount of each of the Borrower's other Loans or Debt Instruments (other than Mortgage Debt) at the time of origination of the Eligible Loan and (iv) confirmation as to whether

14

any collateral security for the Eligible Loan (including security for the Selected Subsidiaries' guarantees, if applicable) is Shared Collateral (as defined in the Instructions); and

**4.D.** if the Eligible Loan is secured, I have no knowledge or reason to believe that the lien of the Eligible Lender in any Shared Collateral is not senior to or *pari passu* with the lien on such Shared Collateral securing any of the Borrower's other Loans or Debt Instruments, other than Mortgage Debt.

5. **Additional Borrower Certifications and Covenants.** In connection with the Borrower's proposed participation in the Facility, I hereby:

**5.A.** covenant and agree that the Borrower will not repay the principal balance of, or pay any interest on, any debt unless the principal or interest payment is mandatory and due, until (i) the Eligible Loan is repaid in full or (ii) neither the SPV nor a Governmental Assignee (as defined in the Instructions) holds an interest in the Eligible Loan in any capacity, provided that the Borrower may, at the time of origination of the Eligible Loan, refinance existing debt owed by the Borrower to a lender that is not the Eligible Lender;

**5.B.** covenant and agree that the Borrower will not seek to cancel or reduce any of its committed lines of credit with the Eligible Lender or any other lender until (i) the Eligible Loan is repaid in full or (ii) neither the SPV nor a Governmental Assignee holds an interest in the Eligible Loan in any capacity;

**5.C.** certify that, as of the date hereof, I have a reasonable basis to believe that, after giving effect to the Eligible Loan, the Borrower has the ability to meet its financial obligations for at least the next 90 days and does not expect to file for bankruptcy during that time period;

**5.D.** covenant and agree that, if the Borrower is a subsidiary of a foreign company, the Borrower will use the proceeds of the Eligible Loan only for the benefit of the Borrower, its consolidated U.S. subsidiaries, and other affiliates of the Borrower that are U.S. businesses, and not for the benefit of the Borrower's foreign parents, affiliates, or subsidiaries;

**5.E.** certify that I have informed the Eligible Lender if, as of the date hereof, the Borrower has previously received, or has a pending application to receive, funds in connection with any Main Street Facility, as well as the value of such funding;

**5.F.** certify that, to my knowledge after reasonable diligence, none of the Borrower's affiliates has accessed the Main Street New Loan Facility, the Main Street Expanded Loan Facility, or the Primary Market Corporate Credit Facility as of the date hereof, and the Borrower has informed the Eligible Lender if, after reasonable diligence, it has determined that any of its affiliates has previously received, or has a pending application to receive, funds in connection with the Facility, as well as the value of such funding; and

**5.G.** certify that, if (and only if) the Borrower is, as of the date hereof, a company, all or substantially all of the assets of which comprise equity interests in other entities, then (i) the Eligible Loan is fully guaranteed on a joint and several basis by its Selected Subsidiaries and (ii) if the Eligible Loan is secured, then the Selected Subsidiaries' guarantees are also secured.

6. **Indemnification.** The Borrower shall indemnify, defend, and hold each Beneficiary and its officers, directors, agents, partners, members, controlling entities, and employees (collectively, "Indemnitees") harmless from and against any liability, claim, cost, loss, judgment, damage, or expense (including reasonable attorneys' fees and expenses) that any Indemnitee incurs or suffers as a result of or arising out of a material

15

*Issued on June 11, 2020*

breach of any of Borrower's representations, warranties, covenants, or agreements in these Borrower Certifications and Covenants.

7. **Miscellaneous.**

**7.A.** I further covenant and agree that the Borrower will promptly notify the Eligible Lender of any material misrepresentation with respect to any certification hereunder and any material breach of any covenant made hereunder during the time in which the Eligible Loan is outstanding and the SPV, or any Governmental Assignee, holds an interest in the Eligible Loan, and for one year after the Eligible Loan is no longer owned in any capacity by the SPV or any other Governmental Assignee.

**7.B.** I acknowledge that, if this certification includes a knowing material misrepresentation, in addition to all remedies available at law, in equity or otherwise, the SPV, the Reserve Bank, the Board, or the Secretary may refer the matter to the relevant law enforcement authorities for investigation and possible action in accordance with applicable criminal and civil law. *See, e.g.*, 18 U.S.C. § 1001; 31 U.S.C. § 3729.

**7.C.** I further acknowledge that, the Eligible Loan and any other financial assistance provided to the Borrower through the Facility would promptly become due and payable upon discovery of a material misrepresentation or material breach of covenant related to Section 2 (CARES Act Borrower Eligibility Certifications and Covenants) or Section 3 (FRA and Regulation A Borrower Eligibility Certifications) of these Borrower Certifications and Covenants.

**7.D.** I further acknowledge that the Reserve Bank, the Board, the Department of the Treasury, and any Governmental Assignee or agency of the Federal government associated with such Governmental Assignee may make public and nonpublic disclosures with respect to the Facility including, without limitation, those required under applicable law. These disclosures may include the identity of the Borrower; the date and amount of the loan provided to the Borrower through the Main Street Facilities; the form in which the loan was provided to the Borrower; material terms of such loan; and other information. In addition, the SPV or the managing member of the SPV may make disclosures of information that it receives from and about the Borrower in connection with the Facility to the Reserve Bank, the Board, the Department of the Treasury, and any Governmental Assignee or agency of the Federal government associated with such Governmental Assignee. On behalf of the Borrower, I consent to such disclosures.

**7.E.** I covenant and agree that the Borrower will retain records (the "File") containing the basis for the certifications in Section 2 (CARES Act Borrower Eligibility Certifications and Covenants) and compliance with the covenant therein, and will make such information available to the Reserve Bank as promptly as practicable upon request of the Reserve Bank, either as (i) a copy of the File for the Reserve Bank's own inspection or review or (ii) an attestation by an external auditor that the auditor has examined the File and has found it sufficient to support the certification and compliance with the related covenant. If the Borrower submits an attestation by an external auditor, the Reserve Bank reserves the right to request a copy of the File for its own inspection or review. The Borrower will retain the File for a period of 10 years following the termination of all of the Main Street Facilities, or for the period of time required by the Borrower's document retention policies, whichever is longer.

The illegality, invalidity or unenforceability of any provision of these Borrower Certifications and Covenants under the law of any jurisdiction shall not affect its legality, validity, or enforceability under the law of any other jurisdiction or the legality, validity, or enforceability of any other provision.

THESE BORROWER CERTIFICATIONS AND COVENANTS, THE RIGHTS AND OBLIGATIONS OF THE BORROWER AND BENEFICIARIES UNDER THESE BORROWER CERTIFICATIONS AND COVENANTS

16

AND ANY CLAIM OR CONTROVERSY DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THESE BORROWER CERTIFICATIONS AND COVENANTS OR THE TRANSACTION (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, SHALL IN ALL RESPECTS BE GOVERNED BY AND INTERPRETED, CONSTRUED AND DETERMINED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISION THEREOF THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION).

The Borrower irrevocably and unconditionally submits to and accepts the non-exclusive jurisdiction of the United States District Court for the District of Massachusetts located in the City of Boston or the courts of the Commonwealth of Massachusetts located in the County of Suffolk for any action, suit, or proceeding arising out of or based upon these Borrower Certifications and Covenants or any matter relating to them and waives any objection that it may have to the laying of venue in any such court or that any such court is an inconvenient forum or does not have personal jurisdiction over it.

These Borrower Certifications and Covenants may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. These Borrower Certifications and Covenants shall become effective when it shall have been duly executed and delivered by the undersigned officers of the Borrower. The words "executed," signed," "signature," and words of like import as used above and elsewhere in these Borrower Certifications and Covenants may include, in addition to manually executed signatures, images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf", "tif", or "jpg") and other electronic signatures (including, without limitation, any electronic sound, symbol, or process, attached to or logically associated with a contract or other record and executed or adopted by a person with the intent to sign the record). The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

Name of the Borrower: Pacifica of the Valley Corporation

Name of the Lender: First Western Trust Bank

*On behalf of the Borrower:*

By: *Paul Tuft*                                By: _____

Name: PAUL TUFT                         Name: PRECIOUS MAYES

Title: Executive Chairman          Title: PRESIDENT /CEO

Date: 12/10/20                              Date: 12/10/20

17

# EXHIBIT D

APPENDIX

[Attached]

4826-5438-9459.2

*Effective: October 30, 2020*

# Appendix C:  Required Financial Reporting

Each Main Street loan should contain a financial reporting covenant requiring the regular delivery of certain financial information and calculations.  The items listed in Table I below must be provided by each Main Street borrower to their Eligible Lender at least annually.  The items listed in Table II must be provided by each Main Street borrower to their Eligible Lender at least quarterly; the quarterly requirements vary based on the Main Street facility in which the borrower is participating.  Eligible Lenders will specify the required reporting standards and forms for each Eligible Borrower.[37]

| Table I: Data Required Annually from All Main Street Borrowers | |
|---|---|
| **Required Data** | **Definition** |
| Total Assets | The sum of current assets, fixed assets, and other non-current assets (including, but not limited to, intangible assets, deferred items, investments, and advances). |
| Current Assets | Cash, accounts receivable, inventory, and other short-term assets that are likely to be converted into cash, used, sold, exchanged, or otherwise expensed in the normal course of business within one year. |
| Cash & Marketable Securities | Cash, depository accounts, and marketable securities that can be easily sold and readily converted into cash. |
| Tangible Assets | Assets having a physical existence, measured as total assets less intangible assets. Tangible assets are distinguished from intangible assets, such as trademarks, copyrights, and goodwill. |
| Total Liabilities | The total amount of all outstanding obligations, both current and noncurrent. |
| Current Liabilities | Short term debt, accounts payable, and other current liabilities that are due within one year. |
| Total Debt (Incl. Undrawn Available Lines of Credit) | Existing outstanding and committed debt (including any undrawn available amounts). |
| Total Equity | Measured as total assets minus total liabilities. |
| Total Revenue | Total income generated by the sale of goods or services from ongoing operations. Total Revenue excludes any non-recurring sales or gains. |
| Net Income | The income (or loss) after expenses and losses have been subtracted from all revenues and gains for the fiscal period, including discontinued operations. |
| Unadjusted EBITDA | Earnings before interest expense, income tax expense, depreciation expense, and amortization expense.  The starting point is net income. |
| Adjusted EBITDA | Unadjusted EBITDA adjusted for any non-recurring, one-time, or irregular items.  The Adjusted EBITDA measurement should align with the relevant facility's term sheet. |

---

[37] Under the Servicing Agreement, in the case of multi-borrower loans, this information must be entered into the Portal "on a consolidated basis" (otherwise referred to in this document as on an "aggregated basis").  Eligible Lenders may elect to require reporting from the co-borrowers on an aggregated basis, or may aggregate such information after requiring individual co-borrower financial statements.  If an Eligible Lender permits co-borrowers to submit aggregated financial statements, the Eligible Lender should instruct the co-borrowers to use the Eligible Lender's typical practices to aggregate such information in a manner that accounts for transactions between the co-borrowers and accurately reflects the financial position of the co-borrowers and their ability to repay the loan (e.g., in a manner that avoids double counting of revenues, assets, or liabilities).

*Effective:  October 30, 2020*

| Table I: Data Required Annually from All Main Street Borrowers | |
| --- | --- |
| **Required Data** | **Definition** |
| Depreciation Expense | Non-cash expense measured based on the use of fixed assets, recognized over the useful life of the fixed assets. |
| Amortization Expense | Non-cash expense measured based on the use of intangible assets, recognized over the life of the intangible asset. |
| Interest Expense | The periodic finance expense of short term and long term debt. |
| Tax Expense | Federal, state and local income tax expenses. |
| Rent Expense | The contractual costs of occupying leased real estate. |
| Dividends / Equity Distributions | Distributions to equity owners. |
| Accounts Receivable (net of allowances) | Amounts owed to the borrower resulting from providing goods and/or services. Accounts receivable will be net of any allowances for uncollectible amounts. |
| Inventory (net of reserves) | Value of the raw materials, work in process, supplies used in operations, finished goods, and merchandise bought which are intended to be sold in the ordinary course of business.  Inventory should be net of reserves. |
| Fixed Assets, Gross | Tangible property used in the business and not for resale, including buildings, furniture, fixtures, equipment, and land. Report fixed assets gross of depreciation. |
| Accumulated Depreciation | Cumulative depreciation of all fixed assets up to the Date of Financial Information. |
| Accounts Payable (A/P) | The obligations owed to the borrower's creditors arising from the entity's ongoing operations, including the purchase of goods, materials, supplies, and services. Accounts payable excludes short term and long term debt. |
| Short Term Debt | Debt obligations of the borrower due with a term of less than one year, including the current portion of any Long Term Debt. |
| Long Term Debt | Debt obligations of the borrower that are due in one year or more, excluding the current portion that is otherwise captured in Short Term Debt. |
| Description of EBITDA Adjustments | Description of items that are added to Unadjusted EBITDA to determine Adjusted EBITDA. |
| Total Expenses | All money spent and costs incurred, both recurring and non-recurring, to generate revenue.  Expenses exclude items capital in nature (i.e., expenses that are allowed to be capitalized and included in the cost basis of a fixed asset). |
| Operating Expenses | Money spent and costs incurred related to normal business operations including selling, general & administrative expenses, depreciation, and amortization (i.e., total expenses less non-recurring expenses).  Exclude capital expenditures. |
| Operating Income | Profit (or loss) realized from continuing operations (i.e., revenue less operating expenses). |
| Fixed Charges | Expenses that recur on a regular basis, regardless of the volume of business (i.e., lease payments, rental payments, loan interest payments, or insurance payments). |
| Capitalized Expenditures | Non-operating expenditures capitalized to fixed assets. |
| Guarantor Net Assets | Total assets less total liabilities of the guarantor (also referred to as net worth). |
| Sr. Debt Balance | Debt amount ranking senior to the Main Street loan. |
| Additional Pari Passu Debt Balance | Debt amount ranking pari passu to the Main Street loan. |
| Collateral Type (Non-Real Estate) | If the loan is secured by collateral that is not predominantly real estate, including if the collateral provided is different types, report the predominant type of collateral (e.g., inventory, receivables, securities, etc.) by aggregate value. |

95

Case 26-11060-TMH   Doc 109-1   Filed 08/03/26   Page 81 of 83

*Effective: October 30, 2020*

| Table I: Data Required Annually from All Main Street Borrowers | |
|---|---|
| **Required Data** | **Definition** |
| Collateral Type (Real Estate) | If the loan is secured by real estate collateral, indicate the property type (e.g., hotel, multifamily, residential, industrial, etc.). If the loan is secured by multiple real estate property types, report the predominant property type by aggregate value. |
| Collateral Value Reporting | For loans that require ongoing or periodic valuation of the collateral, report the market value of the collateral as of the reporting date. |
| Collateral Value Date | Define the as-of date that corresponds with the Collateral Value Reporting field. |
| Covenant Status (Pass / Fail) | Yes/no, indicating if the facility has satisfied covenant tests. |
| Date of Covenant Default | If applicable, report the date when borrower defaulted covenants. |
| Nature of Covenant Default | If applicable, describe the covenant default (i.e., missing financial statements, ratio trigger). |
| Date of Covenant Cure | If applicable, report the date when borrower cured previous defaults. |

| Table II: Data Required Quarterly from Main Street Borrowers by Main Street Facility | | | | |
|---|---|---|---|---|
| **Required Data** | **MSELF** | **MSNLF** | **MSPLF** | **Definition** |
| Total Assets | Yes | Yes | Yes | The sum of current assets, fixed assets, and other non-current assets (including, but not limited to, intangible assets, deferred items, investments, and advances). |
| Current Assets | Yes | Yes | Yes | Cash, accounts receivable, inventory, and other short term assets that are likely to be converted into cash, used, sold, exchanged, or otherwise expensed in the normal course of business within one year. |
| Cash & Marketable Securities | Yes | Yes | Yes | Cash, depository accounts, and marketable securities that can be easily sold and readily converted into cash. |
| Tangible Assets | Yes | No | No | Assets having a physical existence measured as total assets less intangible assets. Tangible assets are distinguished from intangible assets, such as trademarks, copyrights, and goodwill. |
| Total Liabilities | Yes | Yes | Yes | The total amount of all outstanding obligations, both current and noncurrent. |
| Current Liabilities | Yes | Yes | Yes | Short term debt, accounts payable, and other current liabilities that are due within one year. |
| Total Debt (Incl. Undrawn Available Lines of Credit) | Yes | Yes | Yes | Existing outstanding and committed debt (including any undrawn available amounts). |
| Total Equity | Yes | Yes | Yes | Measured as total assets minus total liabilities. |
| Total Revenue | Yes | Yes | Yes | Total income generated by the sale of goods or services from ongoing operations. Total Revenue excludes any non-recurring sales or gains. |
| Net Income | Yes | Yes | Yes | The income (or loss) after expenses and losses have been subtracted from all revenues and gains for the fiscal period, including discontinued operations. |
| Unadjusted EBITDA | Yes | Yes | Yes | Earnings before interest expense, income tax expense, depreciation expense and amortization expense. The starting point is net income. |

96

*Effective: October 30, 2020*

| Table II: Data Required Quarterly from Main Street Borrowers by Main Street Facility | | | | |
|---|---|---|---|---|
| **Required Data** | **MSELF** | **MSNLF** | **MSPLF** | **Definition** |
| Adjusted EBITDA | Yes | Yes | Yes | Unadjusted EBITDA adjusted for any non-recurring, one-time or irregular items. The Adjusted EBITDA measurement should align with the relevant facility's term sheet. |
| Depreciation Expense | Yes | No | No | Non-cash expense measured based on the use of fixed assets, recognized over the useful life of the fixed assets. |
| Amortization Expense | Yes | No | No | Non-cash expense measured based on the use of intangible assets, recognized over the life of the intangible asset. |
| Interest Expense | Yes | Yes | Yes | The periodic finance expense of short term and long term debt. |
| Tax Expense | Yes | No | No | Federal, state and local income tax expenses. |
| Rent Expense | Yes | No | No | The contractual costs of occupying leased real estate. |
| Dividends / Equity Distributions | Yes | Yes | Yes | Distributions to equity owners. |
| Accounts Receivable (net of allowances) | Yes | No | No | Amounts owed to the borrower resulting from providing goods and/or services. Accounts receivable will be net of any allowances for uncollectible amounts. |
| Inventory (net of reserves) | Yes | No | No | Value of the raw materials, work in process, supplies used in operations, finished goods, and merchandise bought which are intended to be sold in the ordinary course of business. Inventory should be net of reserves. |
| Fixed Assets, Gross | Yes | No | No | Tangible property used in the business and not for resale, including buildings, furniture, fixtures, equipment, and land. Report fixed assets gross of depreciation. |
| Accumulated Depreciation | Yes | No | No | Cumulative depreciation of all fixed assets up to the Date of Financial Information. |
| Accounts Payable (A/P) | Yes | No | No | The obligations owed to the borrower's creditors arising from the entity's ongoing operations, including the purchase of goods, materials, supplies, and services. Accounts payable excludes short term and long term debt. |
| Short Term Debt | Yes | No | No | Debt obligations of the borrower due with a term of less than one year, including the current portion of any Long Term Debt. |
| Long Term Debt | Yes | No | No | Debt obligations of the borrower that are due in one year or more, excluding the current portion that is otherwise captured in Short Term Debt. |
| Description of EBITDA Adjustments | Yes | No | No | Description of items that are added to Unadjusted EBITDA to determine Adjusted EBITDA. |
| Total Expenses | Yes | No | No | All money spent and costs incurred, both recurring and non-recurring, to generate revenue. Expenses exclude items capital in nature (i.e., expenses that are allowed to be capitalized and included in the cost basis of a fixed asset). |
| Operating Expenses | Yes | Yes | Yes | Money spent and costs incurred related to normal business operations, including selling, general & administrative expenses, depreciation, and amortization (i.e. total expenses less non-recurring expenses). Exclude capital expenditures. |

*Effective: October 30, 2020*

| Table II: Data Required Quarterly from Main Street Borrowers by Main Street Facility | | | | |
|---|---|---|---|---|
| **Required Data** | **MSELF** | **MSNLF** | **MSPLF** | **Definition** |
| Operating Income | Yes | Yes | Yes | Profit (or loss) realized from continuing operations (i.e., revenue less operating expenses). |
| Fixed Charges | Yes | No | No | Expenses that recur on a regular basis, regardless of the volume of business (i.e., lease payments, rental payments, loan interest payments, or insurance payments). |
| Capitalized Expenditures | Yes | Yes | Yes | Non-operating expenditures capitalized to fixed assets. |
| Guarantor Net Assets | Yes | No | No | Total assets less total liabilities of the guarantor (also referred to as net worth). |
| Sr. Debt Balance | Yes | Yes | Yes | Debt amount ranking senior to the Main Street loan. |
| Additional Pari Passu Debt Balance | Yes | Yes | Yes | Debt amount ranking pari passu to the Main Street loan. |
| Collateral Type (Non-Real Estate) | Yes | No | No | If the loan is secured by collateral that is not predominantly real estate, including if the collateral provided is different types, report the predominant type of collateral (e.g., inventory, receivables, securities, etc.) by aggregate value. |
| Collateral Type (Real Estate) | Yes | No | No | If the loan is secured by real estate collateral, indicate the property type (e.g., hotel, multifamily, residential, industrial, etc.). If the loan is secured by multiple real estate property types, report the predominant property type by aggregate value. |
| Collateral Value Reporting | Yes | No | No | For loans that require ongoing or periodic valuation of the collateral, report the market value of the collateral as of the reporting date. |
| Collateral Value Date | Yes | No | No | Define the as-of date that corresponds with the Collateral Value Reporting field. |
| Covenant Status (Pass / Fail) | Yes | Yes | Yes | Yes/no, indicating if the facility has satisfied covenant tests. |
| Date of Covenant Default | Yes | Yes | Yes | If applicable, report the date when borrower defaulted covenants. |
| Nature of Covenant Default | Yes | Yes | Yes | If applicable, describe the covenant default (i.e., missing financial statements, ratio trigger). |
| Date of Covenant Cure | Yes | Yes | Yes | If applicable, report the date when borrower cured previous defaults. |