# EXHIBIT C

## Turnbull Declaration

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>Pacifica of the Valley Corp.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 26-11060 (TMH) |

**DECLARATION OF ANDREW R. TURNBULL IN SUPPORT OF DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO (A) OBTAIN POSTPETITION SECURED FINANCING AND (B) UTILIZE CASH COLLATERAL; (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (III) GRANTING ADEQUATE PROTECTION; (IV) MODIFYING THE AUTOMATIC STAY; (V) SCHEDULING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF**

I, Andrew R. Turnbull, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1. I am a Managing Director of Houlihan Lokey Capital, Inc. ("Houlihan Lokey"), the proposed investment banker to the above-captioned debtor and debtor in possession (the "Debtor") in the above-captioned chapter 11 case (the "Chapter 11 Case").

2. I am authorized to execute this declaration (the "Declaration") on behalf of the Debtor. Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein or I have acquired such knowledge through officers of the Debtor, the Debtor's other advisors or employees of Houlihan Lokey acting under my supervision in the ordinary course of business. If called upon to testify, I would testify competently to the facts set forth herein.

3. I submit this Declaration in support of the *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Obtain Postpetition Secured Financing and (B)*

[1] The Debtor in this Chapter 11 Case, along with the last four digits of the Debtor's federal tax identification number, is: Pacifica of the Valley Corporation d/b/a Pacifica Hospital of the Valley [7312]. The Debtor's mailing address is 9449 San Fernando Road, Sun Valley, CA 91352.

*Utilize Cash Collateral; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* (the "Motion"), whereby the Debtor seeks authority to enter into a senior secured, superpriority debtor-in-possession financing facility in an aggregate principal amount of up to $52,500,000 (the "DIP Facility"), consisting of $21,000,000 of new-money financing, a $2.1 million commitment fee and a roll-up of a portion of Axios's prepetition secured debt provided by Axios Capital Solutions, LLC ("Axios" or in its capacity as such, the "DIP Lender") pursuant to that certain Debtor-In-Possession Loan Term Sheet (the "DIP Term Sheet") and the documents related thereto (collectively, the "DIP Documents").[2]

## QUALIFICATIONS

4. I am a Managing Director in Houlihan Lokey's Financial Restructuring Group and have more than three decades of experience advising companies, lenders, creditors, and investors in financially distressed situations. My experience includes advising on capital raises and other financing transactions, acquisitions and divestitures involving financially distressed businesses and assets, and negotiations concerning the restructuring of private and public securities, both in chapter 11 cases and in out-of-court restructurings. I have worked across a range of industries, but for the last twenty years or so have been primarily focused on healthcare. In this regard, I have advised on many transactions involving the financing, restructuring and sale of healthcare businesses, including numerous hospitals. More broadly, Houlihan Lokey has substantial experience advising companies, creditors, and other constituencies in connection with complex restructurings, recapitalizations, distressed financings, mergers and acquisitions, and chapter 11 transactions.

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion.

5. In connection with its engagement by the Debtor, Houlihan Lokey has been advising the Debtor with respect to its capital structure, liquidity needs, financing alternatives, and strategic options. Among other things, Houlihan Lokey has worked closely with the Debtor and its other advisors to assess the Debtor's projected liquidity requirements, evaluate the amount and timing of financing necessary to support continued patient care and maintain operations, pay the Debtor's employees, conduct the chapter 11 process, identify and engage with potential sources of debtor-in-possession financing, and evaluate potential strategic transactions involving the Debtor or its assets.

**DIP FINANCING MARKETING PROCESS**

6. In connection with the Debtor's efforts to obtain postpetition financing, Houlihan Lokey contacted and engaged in discussions with numerous potential financing sources concerning their interest in providing debtor-in-possession financing to the Debtor. Those efforts were intended both to identify potential alternative sources of financing and to market-test the financing available from Axios, the holder of the Debtor's prepetition senior secured indebtedness.

7. Houlihan Lokey also has communicated with parties who have expressed interest in a potential acquisition, including with respect to their interest in debtor-in-possession financing in connection with a potential acquisition. This parallel process has allowed Houlihan Lokey and the Debtor to evaluate whether a potential strategic transaction could also provide an alternative source of financing and, more broadly, to assess the available DIP financing proposals in the context of the Debtor's sale process.

8. In that capacity, I and other members of the Houlihan Lokey team have devoted substantial time to the Debtor's financing and strategic processes. With respect to the DIP financing process, Houlihan Lokey has assisted in developing and preparing financial and other materials

for potential financing sources, evaluating the Debtor's projected cash needs and required financing capacity, identifying and contacting potential capital providers, responding to diligence requests, participating in discussions regarding proposed financing structures and terms, and analyzing proposals and other indications of interest received by the Debtor.

9. In evaluating the proposals received, Houlihan Lokey and the Debtor considered not only "headline" economics, but also the amount and timing of committed funding, conditions to funding, certainty of execution, the proposed collateral and priority structure, the implications of any required priming litigation, the ability for the Debtor to satisfy its administrative claims, and the Debtor's need to obtain liquidity promptly. These considerations are particularly important given the Debtor's liquidity position and the need to preserve continuity of patient care, support the Debtor's employees, and maintain uninterrupted hospital operations.

10. To date, the financing process has yielded only one actionable proposal—the proposal from Axios embodied in the DIP Facility. Houlihan Lokey and the Debtor have received two other proposals relating to potential postpetition financing, but, in their current form these proposals are not actionable and require the Debtor to obtain nonconsensual priming liens of Axios's existing prepetition liens. Moreover, based on my review of those proposals and discussions with the Debtor and its advisors, even if the proposals could be made actionable, their terms, as presently proposed, are not sufficiently superior to the Axios proposal to justify the additional cost, execution risk, and uncertainty that would be associated with seeking to obtain financing that would require a nonconsensual priming of Axios's existing liens. Accordingly, as of the date hereof, the Axios proposal remains the only actionable DIP financing proposal presently available to the Debtor.

11. Houlihan Lokey and the Debtor also considered the practical consequences of pursuing an alternative financing proposal that required priming Axios without its consent. Such a financing would introduce additional uncertainty as to timing and execution and could require contested proceedings concerning priming and adequate protection. The Debtor presently has no other actionable source of postpetition financing that provides sufficient committed liquidity on terms superior, taken as a whole, to the DIP Facility. The proposed DIP Facility therefore provides the Debtor with the most certain presently available path to obtaining the liquidity necessary to maintain patient care, support its employees, continue hospital operations, and pursue a chapter 11 plan.

**THE AXIOS DIP FACILITY**

12. The terms of the DIP Facility are the product of extensive, good faith, arm's-length negotiations among the Debtor, its advisors, the Committee, and Axios that have taken place while the Debtor continued to run a marketing process in parallel.

13. In evaluating the DIP Facility, the Debtor and Houlihan Lokey considered its economic terms as a whole, rather than any individual term in isolation. Based on my experience with debtor-in-possession and other distressed financings, the overall economics of the DIP Facility—including the applicable interest rate, commitment fee, base interest and default interest rates, the amount of new-money funding being provided, and the roll-up contemplated by the facility—are within the range of terms that I would expect for a financing of this size and nature and under the circumstances presented here. Axios also was not willing to extend the DIP Facility without being provided priming liens.

14. The Axios DIP Facility includes a 1.5x roll-up of Axios's prepetition secured debt based on the amount of new money actually advanced. The Debtor considered the proposed roll-

up as part of its evaluation of the overall economics of the DIP Facility and in comparing the Axios proposal against the other financing alternatives received by the Debtor. Although the roll-up increases the amount of Axios's prepetition debt that will receive the benefits associated with the DIP Facility, it is a required component of Axios's proposal and is tied to the amount of new money actually advanced to the Debtor. In my experience, the Roll Up request is reasonable under the circumstances presented here. Taking the roll-up into account, together with the new-money commitment, pricing, certainty of funding, and other terms of the DIP Facility, the Axios proposal represents the best presently available actionable financing proposal for the Debtor.

15. As part of Houlihan Lokey's evaluation of the Axios proposal, per request, Axios provided information regarding its financial capacity to fund the commitments contemplated by the DIP Facility. I reviewed the information provided by Axios in response to that request and discussed that information with the Debtor and its other advisors. Based on that review, I believe the information provided by Axios is sufficient to support the Debtor's conclusion that Axios has the financial capacity to fund the amounts contemplated by the DIP Facility in accordance with its terms.

16. Accordingly, approval of the DIP Facility will provide the Debtor with necessary liquidity and funding certainty to maintain patient care, support its employees, and continue hospital operations, while allowing the Debtor and its advisors to pursue confirmation of a chapter 11 plan.

17. The DIP Facility is contingent on a transaction to transition the Hospital's ownership to the DIP Lender through a chapter 11 plan or private sale, in which the DIP Lender intends to acquire the Hospital as consideration for its DIP Claim. Based on the marketing process conducted to date, there may not be other viable parties positioned to provide an overbid under

these conditions. The Hospital has significant seismic remediation and other capital expenditure requirements, which will require a substantial capital commitment from a prospective acquirer. The transaction also involves meaningful turnaround execution risk and the continuation of considerable federal and state supplemental funding programs. Notwithstanding these challenges, the Debtor, Axios and the Debtor's landlord have been able to reach a non-binding term sheet to assist the DIP Lender in its reinvestment and turnaround efforts.

18. Based on the financing process conducted to date, my discussions with potential financing sources and interested acquirers, and my review of the proposals received, I respectfully submit that the Axios DIP Facility represents the best presently available actionable financing proposal for the Debtor and the only option that will provide immediate liquidity. No alternative proposal currently provides sufficient incremental value or other benefits to justify the additional cost, delay, uncertainty, and litigation risk associated with pursuing a nonconsensual priming transaction. Accordingly, the Debtor's decision to proceed with the Axios DIP Facility is reasonable and appropriate under the circumstances and will provide the Debtor with the liquidity and funding certainty necessary to maintain patient care, support its employees, continue hospital operations, and pursue confirmation of a chapter 11 plan.

[*Signature page to follow*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated: September 27, 2026

*/s/ Andrew R. Turnbull*
Andrew R. Turnbull
Managing Director
Houlihan Lokey