**Exhibit A**

**DIP FINANCING**
**TERM SHEET**

This term sheet (the "DIP Term Sheet") summarizes the principal terms of a proposed debtor in possession financing and restructuring arrangement between Pacifica of the Valley Corporation ("Pacifica" or "Debtor") and Axios Capital Solutions, LLC ("Axios"). This DIP Term Sheet is binding and shall not become effective unless and until it is executed by both parties and approved by the Bankruptcy Court pursuant to the DIP Order in form and substance mutually acceptable to the Debtor and Axios.

**Proposed Terms**

| | |
|---|---|
| **Chapter 11 Case** | On July 4, 2026 ("Petition Date"), Pacifica commenced a voluntary chapter 11[1] proceeding in the U.S. Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The case is pending before Judge Thomas M. Horan, bearing Case No. 26-11060 (the "Chapter 11 Case"). |
| **DIP Lender** | Axios, or one or more of its designated affiliates, successors, or assigns ("Lender"). |
| **DIP Facility** | Lender shall provide Pacifica with a multi-draw senior secured, superpriority debtor in possession financing facility in the aggregate principal amount of $21,000,000 (the "DIP Facility").<br><br>Borrowings under the DIP Facility (the "DIP Loans") shall, subject to the borrowing conditions set forth herein, in the DIP Credit Agreement and in the applicable DIP Order, be incurred in multiple tranches as follows:<br><br>(a) an initial advance of $7 million (the "Initial Advance") payable upon the Bankruptcy Court's entry of an Order approving the DIP Facility on an interim basis (the "Interim DIP Order");<br><br>(b) a second advance of $4 million (the "Second Advance") payable upon the Bankruptcy Court's entry of an order approving the DIP Facility on a final basis (the "Final DIP Order" and together with the Interim DIP Order, the "DIP Order");<br><br>(c) a third advance of $3 million (the "Third Advance") payable upon the Debtor's filing of the Plan or Private Sale Motion, as applicable; and |

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, §§ 101 - 1532.

(d) a fourth advance of $7 million (the "<u>Fourth Advance</u>", and together with the Second Advance and the Third Advance, the "<u>Subsequent Advances</u>") payable upon the earlier to occur of (i) the Plan Confirmation Milestone (defined below) and (ii) the Sale Closing Milestone.

The DIP Facility shall be used to fund Pacifica's operations and the Chapter 11 Case through the effective date of the Plan, subject to the Approved Budget (defined below), agreed milestones, occurrence of no event of default, and entry of the DIP Order by the Bankruptcy Court.

The approved disbursements and timing of the draws under the DIP Facility shall be further set forth in an agreed 13-week cash-flow budget and funding schedule, approved by the Lender and attached hereto as Schedule 1 (the "<u>Approved Budget</u>").

**Certain Litigation**

*Landlord*. The Debtor, Axios, and Reliq Pacifica LLC and Beverly Gemini Investments, LLC (collectively, the "<u>Landlord</u>") have reached a non-binding agreement in principle (the "<u>Lease Principle Agreement</u>"), setting forth the parties' agreement in principle regarding lease terms in the event Axios acquires Pacifica Hospital of the Valley (the "<u>Hospital</u>") which is attached hereto as Schedule 2. If Landlord has repudiated or otherwise abandoned the agreement in principle reflected in the Lease Principle Agreement (or an agreement is not reached by October 21, 2026), then the Committee and Axios each shall be immediately deemed to have been granted standing to commence litigation against the Landlord to assert any and all claims and causes of action of the Debtor's estate against the Landlord, including, without limitation, seeking recharacterization of the Debtor's Master Lease with the Landlord and the restriction on use of DIP Facility proceeds to prosecute such litigation shall be deemed terminated. To the extent necessary, reference to Landlord shall include Taking the 5th LLC and Fifth/Arizona Investors, LLC for all purposes herein, including this grant of standing.

The Committee will discuss with Axios and the Debtor pursuing such litigation against Landlord and Axios may commence any such litigation and the Committee shall have 30 days after the commencement of such action to join or otherwise intervene, unless otherwise

agreed by Axios and the Committee. Upon the Plan Effective Date, if such dispute is not resolved, the litigation shall be handled by Newco (as defined in the Plan Term Sheet) or its designated counsel for the benefit of Newco. So long as the IMA is still in effect and Lender has not closed on its purchase of the Hospital, any settlement, compromise, or release of any such claims or causes of action against the Landlord (whether commenced by the Committee, the Debtor, or Axios) shall require the prior written consent of Axios. For the avoidance of doubt, neither the absence of an agreement with the Landlord nor the pendency of any such litigation shall be a condition to, or shall excuse or delay the consummation of, the sale of the Debtor's assets to Lender pursuant to the Plan or a Private Sale; in such event the Master Lease shall be assumed and assigned to Newco pursuant to section 365 solely to the extent it constitutes a true lease and expressly without prejudice to, or waiver, release, or ratification of, any claim or cause of action of the estate against the Landlord (including recharacterization), all of which shall be preserved pursuant to section 1123(b)(3)(B) (or sold to Axios under section 363) and vested in Newco.

**Use of Proceeds**

Proceeds of the DIP Facility may be used solely for the following purposes, in each case, in accordance with and subject to the Approved Budget then in effect, subject to the Permitted Variances:

- Working capital and other ordinary-course operating expenses;
- costs and expenses of administering the Chapter 11 Case;
- funding of an escrow pursuant to the Approved Budget for payment of documented, reasonable, and court-allowed estate professional fees and expenses;
- payment of amounts expressly authorized under the DIP documents or by the Bankruptcy Court;
- the payment of documented and reasonable fees and expenses of Lender's professionals in Axios's capacity as Lender, including negotiation and preparation of the DIP documents (for the avoidance of doubt, all other obligations under the DIP Facility shall be paid-

in-kind); and

- other purposes identified in the Approved Budget.

The DIP Facility shall be governed by the Approved Budget which shall be in form and substance acceptable to Pacifica and Axios.

**Budget**

Starting on the second Monday following entry of the Interim DIP Order, the Approved Budget shall be subject to customary variance testing for operating disbursements, with permitted variances of 15% in the aggregate and 20% for each line item (the "Permitted Variances"). Each variance shall be measured solely on a cumulative basis by comparing actual operating disbursements from the beginning of the applicable budget period through the relevant testing date against budgeted operating disbursements for the same cumulative period, and not on a standalone weekly basis.

No proceeds of the DIP Facility (except as specifically set forth herein) shall be used to investigate, challenge, object to, contest or raise any defense to, the validity, security, perfection, priority, extent or enforceability of any amount due under or the liens or claims granted under or in connection with the Prepetition Secured Debt, the Debtor's Master Lease with the Landlord or the prepetition sales of receivables to L.A. Care.

Reporting to include weekly liquidity reports, budget-to-actual reporting, information concerning the Plan solicitation and confirmation process to be provided simultaneously to the Lender and the Committee.

The Debtor shall be obligated to comply with the Approved Budget, subject to the Permitted Variances. The Debtor's failure to comply with this requirement shall constitute an immediate Event of Default.

"Prepetition Secured Debt" means indebtedness or obligations arising in connection with the Main Street Priority Loan Agreement dated as of December 10, 2020 (the "Prepetition Loan Agreement") among the Debtor and Axios, as successor to First Western Trust Bank ("FWTB"), as also evidenced by the Promissory Note made and delivered by the Debtor to FWTB dated as of December 10, 2020, in the original amount of $35,000,000, and the Pledge and Security Agreement

| | |
|---|---|
| | dated as of December 10, 2020 (the "Prepetition Security Agreement" and together with the Prepetition Loan Agreement and all ancillary documents related thereto, the "Prepetition Loan Documents"), between the Debtor, as grantor, and Axios, as successor in interest to FWTB. |
| **Stipulations Concerning Axios's Prepetition Claims and Liens** | Subject to the Challenge Rights described below, Pacifica stipulates and agrees that:<br>• Axios holds valid and enforceable prepetition claims against Pacifica in the aggregate amount $50,943,321.41 as of the Petition Date (the "Allowed Prepetition Secured Debt Amount");<br>• Axios's prepetition claims are secured by valid, binding, enforceable, perfected, and non-avoidable liens on and security interests in the applicable prepetition collateral;<br>• the prepetition obligations and related liens are not subject to avoidance, recharacterization, subordination, disallowance, reduction, offset, recoupment, counterclaim, defense, or other challenge;<br>• Pacifica has no claims or causes of action against Axios arising from or relating to the Prepetition Loan Documents;<br>• The assignment of the Prepetition Loan Documents from FWTB to Axios is valid and enforceable and Axios has standing to seek to enforce the Prepetition Loan Documents;<br>• Neither Axios nor its principals are an affiliate of the Debtor as defined in the CARES Act or the Bankruptcy Code or an insider of the Debtor; and<br>• all payments made to or for the benefit of Axios before the Petition Date were valid and not avoidable.<br>These stipulations shall be binding immediately upon Pacifica and all other parties in interest upon entry of the Final DIP Order subject only to the Challenge Rights. |
| **Challenge Rights** | (i) The Committee's right to challenge the Stipulations and Releases set forth in this DIP Term Sheet and the Interim Order and (ii) the Committee's or Axios's right to file a Standing Motion (as defined in the L.A. Care |

Sale Order) seeking authority to challenge certain prepetition transactions between the Debtor and L.A. Care as and to the extent permitted by the L.A. Care Sale Order (collectively, the "Challenge Rights" and any assertion of such Challenge Rights, a "Challenge") shall be tolled through the first to occur of the (i) closing of a Private Sale and (ii) effective date of any chapter 11 plan filed and approved in this Chapter 11 Case (the "Challenge Expiry Date") and, upon the Challenge Expiry Date, shall be deemed waived and released in accordance with the terms and conditions of such plan or Private Sale consistent with the Plan Term Sheet; provided, however, that such tolling period shall expire in the event the Plan is not confirmed because the DIP Lender (i) fails to fund its obligations under the DIP Facility (it being understood that the Lender's declining to fund any advance as to which any condition precedent has not been satisfied, or following the occurrence of an Event of Default by the Debtor, shall not constitute a failure to fund), or (ii) fails to perform a material operational duty or material financial obligation under any Interim Management Agreement or similar agreement with the Debtor (the "IMA"), in each case consistent with the terms thereof, and such failure continues for three (3) business days after counsel for the Prepetition Senior Lender receives written notice thereof from the Debtor or the Committee, with a copy to L.A. Care, and results in a negative financial impact to the Hospital by an amount greater than $500,000, then the Committee (or Axios and Committee with respect to L.A. Care) shall have fourteen (14) days after counsel for the Prepetition Senior Lender, receives written notice from the Debtor or the Committee (which notice shall be delivered contemporaneously to counsel for L.A. Care by the Debtor or the Committee) of the Prepetition Senior Lender's continuing breach to commence and pursue any Challenge Rights; provided however, the Prepetition Senior Lender agrees to escrow any recoveries on account of its collateral in excess of the New Money Loans and the Commitment Fee pending resolution of such Challenge or further court order, and in the event of a successful Challenge (i) first, Axios's $15 million allowed claim against the Liquidating Trust shall be reduced, in an amount determined by the Bankruptcy Court not to exceed the amount actually

due and unfunded under the Approved Budget or the IMA, to offset such harm to the holders of allowed general unsecured claims, and (ii) if the damages exceed Axios's $15 million allowed claim against the Liquidating Trust, then the balance of the damages shall reduce any remaining Axios claim against the Debtor's estate. If such 14-day period expires as to either the DIP Lender or L.A. Care without a Challenge, the Committee's or Axios's right to challenge as to such party will be terminated. No extension of the Challenge Period shall be effective without the prior written consent of, as applicable, the DIP Lender, the Prepetition Senior Lender or L.A. Care.

**DIP Liens and Superpriority Claims**

Subject to the Carve-Out and the Excluded Assets (defined below), Axios shall receive, subject to Lender's agreement as set forth below with respect to Excluded Assets:

- a superpriority administrative expense claim under section 364(c)(1);
- first-priority liens under section 364(c)(2) on unencumbered property of the estate including without limitation all proceeds of HQAF receivables, and avoidance and preference causes of action;
- junior liens under section 364(c)(3) junior to prior permitted senior liens under the Prepetition Loan Documents; and
- priming liens under section 364(d) on all collateral securing the Prepetition Secured Debt except for prior permitted senior liens under the Prepetition Loan Documents.

Debtor agrees not to seek any alternative financing that would seek to prime the Lender or use cash collateral, without payment in full of the DIP obligations or Lender's consent.

**Excluded Assets**

The following assets (collectively, with the proceeds thereof, the "Excluded Assets"), upon entry of the Final DIP Order, shall be excluded from the liens, security interests, claims, encumbrances, or other interests of Axios arising under or in connection with any prepetition or postpetition financing or indebtedness (including any adequate protection liens and claims) for the

benefit of holders of allowed general unsecured claims upon the entry of the Final DIP Order:

i. The Debtor's interests in or related to Pacific Gardens Medical Center;

ii. Chapter 5 causes of action; provided that to the extent a consensual resolution with the Landlord is not reached, all claims and causes of action of the Estate against the Landlord (including recharacterization of the Master Lease, any claim affecting title to or the characterization of the Site, and chapter 5 claims against the Landlord) shall be specifically retained under section 1123(b)(3)(B) and post-Effective Date prosecuted by Newco (at its option), as the Estate's representative, with any net cash recovery on chapter 5 claims against the Landlord contributed to the Liquidating Trust waterfall and all other relief inuring to Newco;

iii. Other litigation causes of action, including claims against directors, officers and other affiliated or related parties of the Debtor (subject to treatment of claims against the Landlord as noted in (ii) above);

iv. Director & Officer Insurance rights and claims;

v. Any excess QAF revenue generated by the Debtor from successfully reducing asserted setoffs or recoupment amounts in excess of the amount of QAF budgeted in the Approved Budget (the "QAF Delta"), provided that any such additional amounts will not negatively impact future QAF receipts (i.e., QAF 9, 10, 11 etc. other than the QAF identified in the Approved Budget); and

vi. The Debtor's cash on hand as of the earlier of the IMA transition date and the Effective Date under ordinary course of business (e.g., no discounts to accelerate payments) and excluding cash from any QAF funds that are not identified in the Approved Budget or from (v) hereof (collectively, (i)-(vi), the "Excluded Assets").

For the avoidance of doubt, the Excluded Assets shall not be included in any sale of the Debtor's assets pursuant to the Plan or otherwise.

Upon the occurrence of the Plan Effective Date, the Excluded Assets shall be contributed to the Liquidating Trust in accordance with the Plan Term Sheet. The DIP Order shall expressly provide for the foregoing carve-out and gifting, and shall provide that, upon the Plan Effective Date, the Excluded Assets shall be contributed to the Liquidating Trust free and clear of all liens, claims, interests and encumbrances.

**Roll-Up**

The DIP Facility shall provide for a roll-up of the Prepetition Secured Debt in an amount equal to 1.5x of cash actually advanced to the Debtor postpetition under the DIP Facility, with such corresponding amount of Prepetition Secured Debt to be automatically rolled up, refinanced, and converted into postpetition obligations under the DIP Facility as and when each such advance is funded, subject to a successful Challenge. Such roll-up shall constitute a refinancing and continuation, and not a novation, satisfaction, or discharge, of the Prepetition Secured Debt, and the obligations so rolled up shall continue to constitute senior indebtedness for all purposes of any subordination, intercreditor, or similar agreement in favor of the holder of the Prepetition Secured Debt.

**Adequate Protection**

As adequate protection for diminution in value of its interests in prepetition collateral, Axios shall receive:

- Replacement liens on its prepetition collateral;
- Reimbursement of actual and documented fees and expenses of Axios in its capacity as Lender in connection with the Chapter 11 Case (including in connection with negotiating this DIP Term Sheet, the Lease Principle Agreement, the Credit Agreement and related documents); subject to customary review and payment procedures allowing UST and Committee review; and
- Stipulations and releases (detailed below).

**Surcharge; Equities of the Case; Marshalling**

Upon entry of the Final DIP Order, waiver of:

- Section 552(b) Equities-of-the-Case;

- Section 506(c) Surcharge; and
- Marshalling.

The DIP liens, replacement liens, superpriority claims, prepetition liens and other protections granted to Lender shall be subject to a "Carve-Out" as described herein.

**Carve Out**

"Carve-Out" shall mean the sum of the following amounts as of the earlier of (i) the day the Lender issues a Carve-Out Trigger Notice (defined in the applicable DIP Order), or (ii) the Maturity Date ("Carve-Out Effective Date"):

- fees payable to the Clerk of the Bankruptcy Court and the Office of the United States Trustee;
- statutory fees payable under 28 U.S.C. § 1930;
- allowed professional fees and expenses incurred by the Debtor and the Committee before delivery of a Carve-Out trigger notice to the extent consistent with the Approved Budget; and
- a post-trigger professional-fee reserve in the amount of $200,000 (the "Wind-Down Carve-Out"). For avoidance of doubt, this shall not result in any additional funding obligation by the Lender.

Notwithstanding any other provision herein, the Carve-Out (including the Wind-Down Carve-Out) shall not include, apply to, or be available for any fees or expenses incurred by any party in connection with the investigation, initiation, or prosecution of any claims, causes of action, adversary proceedings, or other litigation against the Debtor, the Lender, L.A. Care, or the Landlord (except as provided herein and only to the extent of $50,000 of the proceeds of the DIP Facility) or any affiliates of any of the foregoing entities, or any of their respective officers, directors, managers, members, employees, agents, representatives, advisors, attorneys, accountants, and counsel, including but not limited to challenging the amount, validity, perfection, priority, or enforceability of or asserting any defense, counterclaim or offset to, the obligations and liens and security interests in favor of the Debtor or the Lender.

**Milestones**

The following milestones ("Milestones") shall apply, subject to agreed extensions by Lender and appropriate

Bankruptcy Court relief:

- Initial Milestone: No later than September 29, 2026, the Bankruptcy Court shall have entered the Interim DIP Order, in form acceptable to Lender.

- Lease Extension Milestone: No later than October 5, 2026, the Debtor shall have filed a motion pursuant to section 365(d)(4)(B)(i) to extend the time within which the Debtor may assume or reject the Master Lease, and no later than October 30, 2026, the Bankruptcy Court shall have entered an order extending such time through a date not earlier than January 29, 2027.

- Sale Closing Milestone: If Axios elects to purchase the Debtor's assets via Private Sale, such sale shall have an initial transition date on or before 30 days after such election and the Debtor and Axios will enter into an IMA while Axios obtains regulatory approvals, and the Debtor and Axios shall close thereafter.

- Plan Confirmation Milestone: If Axios elects to purchase the Debtor's assets pursuant to the Plan, the Debtor shall have confirmed the Plan that is in all respects consistent with the Plan Term Sheet and otherwise in a form and substance reasonably agreeable to Axios on or before December 8, 2026.

Failure to satisfy a Milestone shall constitute an event of default unless waived or extended in writing by Lender.

The Debtor shall not assume, reject, or seek to extend, amend, or modify the Master Lease, and shall not stipulate to or agree upon any cure amount or adequate assurance of future performance with respect to the Master Lease, in each case without the prior written consent of Lender.

**Interest & Fees**

Base Interest Rate: 12% per annum from the date of borrowing until repaid, which will be paid in kind (monthly, in arrears) on the then principal amount of the DIP Loan by increasing the principal amount of the

| | |
|---|---|
| | DIP Loan.<br><br>Default Interest Rate: 4% per annum plus the interest rate otherwise accruing or payable thereon.<br><br>All interest shall be computed on the basis of a three hundred sixty- (360)-day year for the actual number of days elapsed.<br><br>Commitment Fee: 10% of the amount of the DIP Facility shall be fully earned and non-refundable upon entry of the Interim DIP Order. |
| **Maturity** | All unfunded DIP commitments of Lender will terminate, and all DIP obligations of the Debtor will be immediately due and payable in full in cash on the earliest of: (a) December 8, 2026 (the "Maturity Date"); (b) the date upon which a Milestone is missed and not waived by Lender; (c) the date of consummation of any sale of all or substantially all of the assets of Pacifica pursuant to section 363; (d) the date of acceleration of the DIP Loans and the termination of the DIP commitments pursuant to the terms of this DIP Term Sheet or DIP Credit Agreement (e.g., occurrence of event of default); (e) the effective date of the Plan or any plan of reorganization in the Chapter 11 Case (the "Effective Date"); (f) appointment of a chapter 11 trustee in the Chapter 11 Case; and (g) conversion of the Chapter 11 Case to a case under Chapter 7 or dismissal of the Chapter 11 Case (such earliest date of (a)-(g), the "Termination Date"). |
| **Mandatory Prepayment** | Upon Debtor's receipt of HQAF funds (excluding QAF Delta which is an Excluded Asset) Debtor shall be required to use such funds first to pay down the DIP Loan except to the extent such HQAF funds are HQAF Program 8 or 9 funds identified in the current Approved Budget, in which event the Debtor may use such identified HQAF Program 8 or 9 funds in accordance with the Approved Budget. |
| **Conditions Precedent to Initial Advance** | The obligation of the Lender to fund the Initial Advance shall be subject to the condition precedent that on the date of such release, the following statements shall be true:<br><br>(i) The Documentation shall be in form and substance reasonably satisfactory to the Lender;<br><br>(ii) The Bankruptcy Court has entered the Interim |

DIP Order in form and substance acceptable to the Lender, authorizing the Debtor to enter the DIP Facility, and such Interim DIP Order has not been otherwise stayed or reversed;

(iii) The Lender shall have received and shall have approved the Budget;

(iv) No event of default shall have occurred;

(v) The Interim DIP Order provides that the Lender has at all times acted in good faith and is entitled to the protections of section 364(e); and

(vi) Upon the entry of the Interim DIP Order, the Lender shall have as collateral for the Initial Advance, the Super-Priority DIP claim and valid and perfected liens on the DIP collateral as set forth in this DIP Term Sheet and in the Documentation.

Subject to the foregoing conditions being satisfied, the Lender shall release funds to the Debtor under the terms set forth herein. For the avoidance of doubt, the Lender may waive any of the conditions precedent at any time, such waiver being sufficient upon confirmation by electronic mail.

**Conditions to Subsequent Advances**

The obligation of the Lender to fund any Subsequent Advance shall be subject to the condition precedent that on the date of such release, the following statements shall be true:

i. The Final DIP Order shall remain in effect and be a final non-appealable order of the Bankruptcy Court.

ii. There shall exist no default (or event that would constitute a default with the giving of notice or lapse of time) under the DIP Facility, including satisfaction of applicable milestones, and all the representations and warranties contained in the DIP Facility shall be true and correct in all respects.

iii. All fees and expenses owing to the Lender in connection with the DIP Facility shall have been paid.

iv. There shall have occurred no material adverse change in the Debtor's (financial, environmental, or otherwise) operations, performance, or properties (other than, in each case, the commencement and continuation of the Chapter 11

| | |
|---|---|
| | Case), since the entry of the Interim DIP Order, that in the reasonable judgment of the Lender, has or can reasonably be expected to have a material adverse effect on the rights and remedies of the Lender or the ability of the Debtor to perform its obligations to them under the DIP Facility.<br>v. The Landlord shall not, in Lender's reasonable judgment, have repudiated or otherwise abandoned the Lease Principle Agreement. |
| **Sale/Plan Election Process and Credit Bid** | Lender may elect to purchase the Debtor's assets either pursuant to the Plan or a motion to sell ("Private Sale Motion") substantially all its assets pursuant to a private sale under section 363 (a "Private Sale").<br><br>If Lender elects to purchase the assets via a Private Sale, such sale shall close by the Sale Closing Milestone and Lender shall be responsible for all operating costs of the Hospital from and after the closing of such sale.<br><br>If Lender elects to purchase the assets pursuant to the Plan, the Plan shall be confirmed on or before the Plan Confirmation Milestone.<br><br>Regardless whether Lender has elected to purchase the assets via a Private Sale or a Plan, Lender and Debtor shall enter into a mutually acceptable IMA, in form and substance acceptable to Lender, on or before November 10, 2026 (or such later date as Lender and Debtor may agree), pursuant to which, for the period commencing upon the entry into such agreement and ending upon the closing of Private Sale or the sale contemplated by the Plan, Lender shall retain all net operating profits of the Hospital and shall fund operating shortfalls of the Hospital (a) during the period covered by the Approved Budget, solely to the extent set forth therein, by means of advances under the DIP Facility, and (b) thereafter through such closing, by additional advances that shall constitute DIP Obligations for all purposes hereunder (the "Operating Advances"); provided that Lender shall not assume, and nothing herein shall be construed to impose on Lender, any liability of the Debtor arising or accruing prior to entry into such IMA for |

any professional liability, regulatory, seismic, tax, or similar liability of the Debtor or the Hospital, other than ordinary course payables that become due after the period covered by the Approved Budget and prior to such closing.

In connection with any such sale, whether consummated pursuant to the Plan or a Private Sale Motion, the Lender shall credit bid not less than $40 million of the obligations outstanding under the DIP Facility, including the Commitment Fee, Roll-Up and Operating Advances. Any amount of the DIP Facility not credit bid and any portion of the Prepetition Secured Debt not rolled up into the DIP Facility and not credit bid, shall not be waived, released, satisfied, or discharged by the credit bid, the sale, or the Plan; provided that (i) Axios shall not assert against the Debtor's estate or for purposes of sharing in the proceeds of the Excluded Assets, more than $15 million (with any remaining obligations under the DIP Facility to be satisfied first) and (ii) any aggregate allowed claim amounts above $15 million shall be assumed by Newco as senior secured indebtedness (the "Assumed Axios Debt"), in each case on the terms set forth in the Plan Term Sheet. For the avoidance of doubt, following the consummation of a sale either through a Plan or a Private Sale, Axios shall not recover or claw back any amounts paid during the Chapter 11 Case, or recover from the Debtor's estate or Liquidating Trust more than $15 million in the aggregate.

For the avoidance of doubt, and notwithstanding anything to the contrary, in any scenario, whether or not a Plan or a Private Sale is consummated, Axios shall not recover or receive by any means from the Debtor's estate or Liquidating Trust (as applicable) more than $15 million in the aggregate from the Excluded Assets as provided in the Plan Term sheet waterfall set forth below:

1. The first $1 million of net proceeds shall be retained by the Liquidating Trust / estate for distribution to holders of allowed general unsecured claims and/or payment

of expenses.

2. Subsequent net recoveries will be split 50/50 between the Liquidating Trust / estate and Axios, until a total of $8 million of net proceeds is realized (i.e., until the Liquidating Trust / estate and Axios each realize a recovery of $4 million from net proceeds).
3. After $8 million in net proceeds is realized, 75% of subsequent net proceeds shall be retained by the Liquidating Trust / estate and 25% shall be transferred to Axios, until Axios's allowed claim is paid in full.

For the avoidance of doubt, Axios's election to pursue a sale pursuant to a Private Sale Motion shall not preclude, restrict, or otherwise prevent the Debtor from concurrently pursuing, filing, or prosecuting a plan of liquidation consistent with the Plan Term Sheet.

The Debtor shall prepare, file, solicit, prosecute, and seek confirmation of a combined disclosure statement and chapter 11 plan (the "Plan") that is consistent in all material respects with the plan term sheet attached hereto as **Exhibit A** (the "Plan Term Sheet"), together with all other documents necessary or appropriate to effectuate such plan (collectively, the "Plan Documents").

The Debtor shall use commercially reasonable efforts to obtain entry of an order confirming such plan as soon as reasonably practicable and, in any event, on or before December 8, 2026.

The Plan and Plan Documents shall be in form and substance reasonably satisfactory to the Lender and the Committee (if the Committee has executed the Plan Term Sheet). The Debtor shall not file, support, consent to, or seek confirmation of any plan, or agree to any amendment, modification, or supplement to any Plan Document, that is inconsistent in any material respect with the Plan Term Sheet without the prior written consent of the Lender and the Committee (if it is a signatory to the Plan Term Sheet).

**Lender Support of Plan**

Subject to the Plan and the Plan Documents being consistent in all material respects with the Plan Term Sheet, the Lender shall support the Plan and the

| | |
|---|---|
| | transactions contemplated thereby and shall use commercially reasonable efforts to facilitate the confirmation and consummation of the Plan.<br><br>Without limiting the foregoing, the Lender shall: (i) timely vote all claims held or controlled by it (in any capacity) that are entitled to vote on the Plan to accept the Plan and shall not change or withdraw such vote; (ii) not object to, delay, impede, or take any action inconsistent with or that would reasonably be expected to interfere with the solicitation, confirmation, or consummation of the Plan or the transactions contemplated by the Plan Term Sheet; (iii) support, and not object to, the approval and implementation of the Plan Documents and the transactions contemplated thereby; (iv) not propose, support, solicit, encourage, or vote in favor of any alternative chapter 11 plan, restructuring, sale, recapitalization, liquidation, or other transaction that is inconsistent with the Plan Term Sheet; and (v) take such actions as are reasonably necessary or appropriate to support and effectuate the Plan and the transactions contemplated by the Plan Term Sheet.<br><br>For the avoidance of doubt, the Lender's support obligations shall include support for the establishment and funding of the Liquidating Trust and the contribution of the Excluded Assets thereto free and clear of all liens, claims, security interests, superpriority claims, adequate protection claims, and other interests of the Lender as set forth in the Plan Term Sheet. |
| **Litigation** | Within five (5) business days after entry of the Interim DIP Order, Pacifica agrees to the remand of the Colorado Litigation to the Colorado District Court and to not object to Axios's pursuit of a judgment and recovery from Tuft, including the continuation of the Colorado proceeding (including collection) against Tuft.<br><br>Axios agrees (a) upon the proceeding's return to the Colorado District Court, to dismiss the Colorado complaint against Pacifica without prejudice, including, without limitation, with respect to any Challenge, and (b) to not seek recovery on the Prepetition Secured Debt of an amount greater than the Allowed Prepetition Secured Debt Amount, together with interest, fees, costs, and expenses accruing after the Petition Date under the applicable guaranty, from Tuft. Any actual recovery on the Prepetition Secured Debt by Axios from Tuft |

| | |
|---|---|
| | (excluding judgment interest, fees, costs and expenses, and similar recoveries) shall be credited against Axios' recovery from the Debtor's estate or the Liquidating Trust, as applicable. For the avoidance of doubt, only the actual recoveries by Axios from the Liquidating Trust shall reduce the liabilities of Tuft to Axios under the Prepetition Secured Debt. |
| **Hospital Closure** | In the event the Plan is not confirmed and the alternative private sale as contemplated in the Plan Term Sheet does not occur, and the Debtor determines to proceed to an orderly closing of Pacifica Hospital, Lender agrees to consent to the Debtor entering into an agreement with L.A. Care or other party to reasonably fund the wind-down in exchange for HQAF funds, similar to the recent transaction the Debtor entered into with L.A. Care with such amounts to be used for reasonable, necessary and documented costs (excluding legal fees) to safely close the Hospital, with any excess amounts to be turned over to Lender. |
| **Proof of Funds** | Axios shall provide proof of funds by September 28, 2026, consisting of evidence reasonably satisfactory to the Debtor and the Committee (to be provided on a confidential, professionals'-eyes-only basis to professionals for the Debtor and the Committee) of immediately available, unrestricted funds of not less than $26,000,000 (or a binding funding commitment from a creditworthy affiliate of Axios). Delivery of such proof of funds shall be a condition to the Debtor's execution of this DIP Term Sheet and to entry of the Interim DIP Order. |
| **Documentation** | The Initial Advance shall be funded upon entry of an Interim DIP Order and this DIP Term Sheet, in each case in form and substance satisfactory to the Lender. The Lender shall have no obligation to provide further funding without an agreed upon DIP Credit Agreement. This DIP Term Sheet, the DIP Credit Agreement, the DIP Order, and any other document(s) and/or instrument(s) required to be executed by the Lender shall constitute the definitive DIP documents (the "Documentation").<br><br>The Documentation shall contain customary (a) representations and warranties, (b) events of default (including, but not limited to, failure to comply with the Approved Budget with Permitted Variances, failure to make timely payments, incurrence of any unauthorized |

| | |
|---|---|
| | debt, unauthorized sale of assets, breaches of representations or warranties, change of control, Documentation not in form reasonably satisfactory to Lender, failure to satisfy a Milestone, occurrence of a Termination Date), (c) remedies (including, without limitation, modification of automatic stay (after default notice provided), the right to realize on all DIP Collateral, the right to exercise any remedy available under applicable law on 5 business days' notice, without necessity of obtaining further relief or order from the Bankruptcy Court), (d) § 506(c) and § 510 waivers, and (e) § 552(b)(1) entitlement, and be in form and substance reasonably satisfactory to the Lender. The Documentation shall conform to this DIP Term Sheet and otherwise shall be in form and substance reasonably acceptable to the Lender. In the event of any inconsistency between the Documentation and the DIP Order, the DIP Order shall control (subject only to the requirement that it be in a form reasonably acceptable to the Lender). |
| **Governing Law** | This DIP Term Sheet and the definitive DIP documents shall be governed by the laws of the State of New York, except to the extent governed by the Bankruptcy Code or other applicable federal law. |

**If the foregoing is acceptable to you, please so indicate by signing a copy of this proposal in the space provided below and return an executed copy at your earliest convenience.**

PACIFICA OF THE VALLEY CORPORATION

By: ________________________________
Name:
Title:
Date:

AXIOS CAPITAL SOLUTIONS, LLC

By: ________________________________
Name:
Title:
Date:

**Exhibit A**

# PLAN TERM SHEET

On July 4, 2026 ("Petition Date"), Pacifica of the Valley Corporation ("Pacifica" or "Debtor") commenced a voluntary chapter 11[1] proceeding in the U.S. Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The case is pending before Judge Thomas M. Horan, bearing Case No. 26-11060 (the "Case").

This term sheet ("Term Sheet") between Pacifica and Axios Capital Solutions, LLC ("Axios") describes the principal terms of a proposed plan of reorganization for the Debtor ("Plan") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Plan is subject to, inter alia, definitive documentation satisfactory to the Debtor and Axios, and to compliance with statutory confirmation requirements and the occurrence of the effective date of the Plan (the "Effective Date") in accordance with the provisions of chapter 11 of the Bankruptcy Code.

This Term Sheet is not a solicitation of acceptances or rejections with respect to any chapter 11 plan. Any such solicitation will comply with the provisions of the Bankruptcy Code. However, the terms set forth herein are binding in connection with the parties obligations under the DIP Facility (defined below).

The distributions under, and other benefits provided in, the Plan constitute a resolution, compromise and settlement of claims and causes of action between the Parties, including addressing the Debtor's funding needs for the Case.

| | |
|---|---|
| **Plan Sponsor** | Axios, or one or more of its designated affiliates, successors, or assigns ("Sponsor"). |
| **Restructuring Summary** | The Plan will provide for the sale of all the Debtor's assets to Sponsor free and clear of all liens, claims and encumbrances, except for certain assets expressly excluded that will be transferred to a liquidating trust. To provide critical funding for the Case, and in conjunction with the restructuring, the Sponsor has agreed to provide a debtor-in-possession financing facility up to $21 million plus a 1.5X roll up of the Axios Prepetition Claim (defined below) for an aggregate principal amount of $52.5 million (such facility as more fully described in the DIP Term Sheet, the "DIP Facility"), which shall be credit bid under the Plan in an amount not less than $40 million.<br><br>Any and all estate claims against Axios shall be released and there shall be no challenge to the Axios Prepetition Claim and related liens except that solely the Committee will retain a right to a 14-day period to challenge the Axios Prepetition Claim and related liens as and to the extent set forth in the DIP Term Sheet, which is incorporated herein. |

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, §§ 101 - 1532.

| | |
|---|---|
| **Key Plan Terms** | The Plan shall contain the following key terms:<br><br>i. Axios's prepetition secured claim is allowed in full as a secured claim with full credit bid rights as set forth in the DIP Term Sheet ("Axios Prepetition Claim");<br><br>ii. Sponsor or its designee ("Newco") shall acquire all the assets of the Debtor, including, assuming the lease, as amended (or entering into an amended or new lease, in each case without novation of the 2013 Master Lease and without prejudice to the estate's claims against the Landlord as set forth in the DIP Term Sheet) pursuant to that Lease Principle Agreement (as defined in the DIP Term Sheet) between the Debtor, Axios, and the Landlord (as defined in the DIP Term Sheet), which set forth the parties' agreement in principle regarding lease terms in the event Axios acquires Pacifica Hospital of the Valley (the "Hospital")) except for the Excluded Assets (defined below) which shall not be assets acquired by Sponsor under the applicable sale documents;<br><br>iii. A liquidating trust ("Liquidating Trust") shall be established, and the Excluded Assets will be transferred to the Liquidating Trust free and clear of all liens, claims and encumbrances and subject to the distribution waterfall set forth herein;<br><br>iv. Funding for the Plan shall be proceeds from the DIP Facility, excess cash from the Approved Budget as of the earliest of the IMA transition date and the Plan Effective Date (except any cash resulting from an extraordinary receipt not reflected in the Approved Budget) and the Excluded Assets in the Liquidating Trust; and<br><br>v. The claims treatment provided below. |
| **Claims Treatment** | The Plan shall provide for the following claim treatment:<br><br>i. Each holder of an allowed administrative claim, including claims of the type described in section 503(b)(9) (to the extent not already paid during the chapter 11 case), shall receive payment in full (in cash) of the unpaid portion of its allowed administrative claim on the Effective Date or as soon thereafter as practicable (or, if payment is not then due, shall be paid |

in accordance with its terms) or pursuant to such other terms as may be agreed to by the holder of such claim and the Debtor;

ii. Holders of priority tax claims shall be treated in accordance with section 1129(a)(9)(C) or pursuant to such other terms as may be agreed to by the holder of such claim and the Debtor;

iii. Holders of a secured claim (other than Axios or the Landlord) shall receive the following treatment, at the option of the Debtor: (a) payment in full (in cash) on the Effective Date or as soon thereafter as practicable to the extent secured; (b) delivery of collateral securing any such claim and payment of any interest required under section 506(b); or (c) other treatment rendering such claim unimpaired. The Subordination Agreement between Axios and the Landlord shall be enforced.

iv. Axios shall have a secured claim in the aggregate amount of any remaining DIP Obligations and Axios Prepetition Claim after its credit bid; provided that it shall not assert against the Debtor's estate or for purposes of sharing in the proceeds of the Excluded Assets, more than $15 million (with any remaining obligations under the DIP Facility to be satisfied first) and shall receive an interest in the proceeds of the Liquidating Trust subject to the sharing percentages as set forth below. Newco will assume any remaining debt in excess of $15 million, including under the DIP Facility or the Axios Prepetition Claim (which is secured). Unless otherwise agreed, any indebtedness so assumed by Newco shall continue to constitute Senior Debt under the Subordination Agreement and shall not be deemed waived, released, satisfied or discharged by the credit bid, the sale or the Plan.

v. For the avoidance of doubt, and notwithstanding anything to the contrary, in any scenario, whether or not a Plan or a Private Sale is consummated, Axios shall not recover or receive by any means from the Liquidating Trust more than $15 million in the aggregate from Excluded Assets as provided in the waterfall set forth below:

(1) Holders of General Unsecured Claims shall receive their *pro rata* share of the interest in the

| | |
|---|---|
| | Liquidating Trust with the right to proceeds thereof subject to the sharing with Axios as set forth below.<br><br>(2) Equity holder(s) shall receive no recoveries under the Plan. The Plan shall not provide any release, exculpation, injunction or indemnity in favor of Paul R. Tuft or any of his affiliates, and the Colorado Litigation shall be treated as set forth in the DIP Term Sheet. |
| **Sale Toggle** | In the event confirmation of the Plan does not or cannot occur, the Debtor shall promptly execute a private sale to Sponsor maintaining the same economic terms for Axios and the Excluded Assets waterfall as if the sale occurred under the Plan.<br><br>Under either sale process, Axios shall receive the assets free and clear of all liens, claims and encumbrances and assets shall be purchased in accordance with the DIP Term Sheet. The DIP Term Sheet contains terms relating to the Plan and Sale Toggle process and deadlines that are incorporated herein. |
| **Excluded Assets** | The following assets (collectively, with the proceeds thereof, the "Excluded Assets") shall not be acquired by Newco and shall vest in the Liquidating Trust:<br><br>i. The Debtor's interests in or related to Pacific Gardens Medical Center;<br><br>ii. Chapter 5 causes of action; provided that to the extent a consensual resolution with the Landlord is not reached, all claims and causes of action of the Estate against the Landlord (including recharacterization of the Master Lease, any claim affecting title to or the characterization of the Site, and chapter 5 claims against the Landlord) shall be specifically retained under section 1123(b)(3)(B) and post-Effective Date prosecuted by Newco (at its option) as the Estate's representative, with any net cash recovery on chapter 5 claims against the Landlord contributed to the Liquidating Trust waterfall and all other relief inuring to Newco;<br><br>iii. Other litigation causes of action, including claims against directors, officers and other affiliated or related parties of the Debtor (subject to treatment of claims against the Landlord as noted in (ii) above); |

iv. Director & Officer Insurance rights and claims;

v. Any excess QAF revenue generated by the Debtor from successfully reducing asserted setoffs or recoupment amounts in excess of the amount of QAF budgeted in the Approved Budget (the "QAF Delta"), provided that any such additional amounts will not negatively impact future QAF receipts (*i.e.*, QAF 9, 10, 11 etc. other than the QAF identified in the Approved Budget); and

vi. The Debtor's cash on hand as of the earlier of the IMA transition date and the Effective Date under ordinary course of business (*e.g.*, no discounts to accelerate payments) and excluding cash from any QAF funds that are not identified in the Approved Budget or from (v) hereof (collectively, (i)-(vi), the "Excluded Assets").

**Liquidating Trust**

The Liquidating Trust shall have a three-member oversight committee, with 2 members selected by the Committee and 1 member selected by Axios. The Liquidating Trustee will be selected by the Committee, in consultation with the Debtor and Axios.

Net recoveries (*i.e.*, after all costs and expenses of the Liquidating Trust) from the assets in the Liquidating Trust shall be distributed as follows:

i. The first $1 million shall be retained by the Liquidating Trust for distribution to holders of allowed General Unsecured Claims and/or payment of expenses for payment;

ii. Then, a 50%/50% sharing between Axios and the Liquidating Trust, until Axios has received $4 million from net proceeds; and

iii. Then, 75% of subsequent net proceeds shall be retained by the Liquidating Trust and 25% shall be distributed to Axios, until Axios' allowed claim of $15 million is paid in full, at which time all subsequent net proceeds shall be retained by the Liquidating Trust.

**Other Litigation**

*L.A. Care*. Except as set forth in the DIP Term Sheet, neither Axios, the Committee, nor the Liquidating Trust will pursue a challenge against L.A. Care in respect of the $7.5 million in QAF receivables that are the subject of the 2026 prepetition

| | |
|---|---|
| | agreements with L.A. Care. L.A. Care shall be a released party under the Plan and a Private Sale, and the release in favor of L.A. Care shall become effective on the first to occur of the effective date of a chapter 11 plan and the closing of a Private Sale.<br><br>*Landlord*. The lease relating to Landlord (as defined in the DIP Term Sheet) will be handled as set forth in the DIP Term Sheet. Without limiting the foregoing, the Plan shall, except as otherwise agreed with the Landlord, specifically retain and vest in Newco, pursuant to section 1123(b)(3)(B), all claims and causes of action of the estate against the Landlord, including recharacterization of the Master Lease, avoidance claims against the Landlord, and claims under the Subordination Agreement, and the attorney-client privilege and work product of the Debtor relating to the Landlord and the Master Lease shall pass to Newco on the Effective Date. Any net cash recovery on chapter 5 claims against the Landlord shall be contributed to the Liquidating Trust waterfall. |
| **Conditions Precedent to Plan Confirmation** | (i) The agreement in principle reflected in this Term Sheet shall not have been repudiated or otherwise abandoned, and no Plan with terms contrary to this Term Sheet shall have been proposed; (ii) the Disclosure Statement shall have been approved; (iii) an asset purchase agreement shall have been agreed upon in form and substance reasonably satisfactory to the Debtor and Sponsor; (iv) the Plan, including any amendments, modifications or supplements thereto, and all documentation contemplated by this Term Sheet or the Plan, shall be in form and substance reasonably satisfactory to the Debtor, the Committee (if a signatory hereto) and Sponsor; (v) there shall not have occurred a force majeure event (to be defined as a significant global disruption in the financial markets caused by outbreak of war, terrorism, or other incidents, but not adverse changes in the financial, banking or capital markets generally); and (vi) the Bankruptcy Court shall have entered an order approving the Disclosure Statement and confirming the Plan ("Confirmation Order"), which order shall be in form and substance reasonably satisfactory to the Debtor, the Committee (if a signatory hereto) and Sponsor. |
| **Conditions Precedent to Plan Consummation** | (i) Contemporaneous effectiveness of the Sale (and related documents such as an interim management agreement or management operations transfer agreement ("MOTA")); (ii) issuance to Newco of the general acute care hospital license for the Hospital by the California Department of Public Health, or the effectiveness of an interim arrangement, reasonably |

| | |
|---|---|
| | satisfactory to Sponsor, that permits Newco to operate the Hospital pending such issuance, which condition may be waived by Sponsor in its sole discretion; and (iii) No modification or stay of the Confirmation Order or entry of other court order prohibiting Plan transactions from being consummated. |
| **Documentation** | The agreed upon funding by Sponsor shall be pursuant to this Term Sheet, the Plan, the Confirmation Order, the "Asset Purchase Agreement," the MOTA, and any other document(s) and/or instrument(s) required to be executed by the Sponsor or Newco shall constitute the definitive Plan documents (the "Documentation"). The Asset Purchase Agreement shall provide, among other things, that all payments received by the Debtor on account of services rendered after entering into the MOTA, including Medicare, Medi-Cal and payor receipts paid to the Debtor's provider numbers or accounts pending completion of change-of-ownership processing, shall be remitted to Newco promptly upon receipt. The Documentation shall contain customary provisions, such as, among other things, representations and warranties, events of default, Documentation not in form reasonably satisfactory to Sponsor or Newco, etc. The Documentation shall conform to this Term Sheet and otherwise shall be in form and substance reasonably acceptable to the Sponsor. In the event of any inconsistency between the Documentation and the Confirmation Order, the Confirmation Order shall control (subject only to the requirement that it be in a form reasonably acceptable to the Debtor, the Committee (only if a signatory hereto) and Sponsor). |
| **Regulatory Cooperation** | The Debtor shall reasonably cooperate and reasonably promptly respond to Lender and its regulatory counsel in the transition process, including (i) after October 5, 2026, within five (5) business days after Lender's written request, execute and deliver all notices, applications, consents and other documents required of the current licensee, provider, enrollee, registrant or contracting party in connection with the transfer to Lender or its designee of the Hospital's licenses, permits, registrations, certificates, designations, accreditations, provider agreements, program participations and other governmental and accreditation authorizations, including without limitation the notice required by 22 C.C.R. § 70125, the licensee's portions of the CDPH change-of-ownership application, Form CMS-855A, DHCS Medi-Cal and Hospital Quality Assurance Fee program filings, HCAI notices and pending seismic compliance filings, LA County DMH (LPS |

designation) and EMS Agency designations, DEA, CLIA, pharmacy and radiologic health registrations, accreditation-body notifications, and the assignment of managed care, payor and graduate medical education participating-site agreements; (ii) promptly furnish all information and documents reasonably required for such filings; (iii) cooperate with Lender and its regulatory counsel in all communications with the foregoing agencies and bodies; (iv) maintain all such authorizations in good standing and not take or omit any action that would impair them; (v) timely file all Medicare and Medi-Cal cost reports, including any terminating cost report, in a form reasonably acceptable to Lender; and (vi) execute and file, subject to any required approvals, the notices and applications associated with any interim arrangement contemplated hereby.

| | |
|---|---|
| **Preservation of Rights** | This Term Sheet is part of a proposed settlement among the Parties with respect to their Claims. Nothing herein shall be deemed to be an admission of any kind. To the extent provided by Federal Rule of Evidence 408 and any applicable state rules of evidence, this Term Sheet and all negotiations relating thereto shall not be admissible into evidence in any proceeding. Except as expressly provided in this Term Sheet, nothing herein is intended to, and shall not be deemed to in any manner waive, limit, impair, or restrict the ability of any Party to protect and preserve its rights, remedies, and interests, including Axios' Claims against the Debtor or any other person, any liens or security interests it may have in any assets of the Debtor, or its full participation in the Chapter 11 Case, including with respect to any matters covered by this Term Sheet. Without limiting the previous sentence in any way, if the transactions contemplated by this Term Sheet or otherwise set forth in the Term Sheet are not consummated as provided herein, or if this Term Sheet is repudiated or abandoned for any reason, the Parties each fully reserve any and all of their respective rights, remedies, and interests. |
| **Governing Law** | The definitive Plan Documents would be governed by the laws of the State of New York, except to the extent governed by the Bankruptcy Code or other applicable federal law. |

**If the foregoing is acceptable to you, please so indicate by signing a copy of this proposal in the space provided below and return an executed copy at your earliest convenience.**

**PACIFICA OF THE VALLEY CORPORATION**

By: ______________________________
Name:
Title:

**AXIOS CAPITAL SOLUTIONS, LLC**

By: ______________________________
Name:
Title:

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

By: ______________________________
Name:
Title: