# **Exhibit 1**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>Pacifica of the Valley Corp.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 26-11060 (TMH) |

**DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO (A) OBTAIN POSTPETITION SECURED FINANCING AND (B) UTILIZE CASH COLLATERAL; (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (III) GRANTING ADEQUATE PROTECTION; (IV) MODIFYING THE AUTOMATIC STAY; (V) SCHEDULING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF**

Pacifica of the Valley Corporation d/b/a Pacifica Hospital of the Valley, the debtor and debtor in possession (the "Debtor") in the above-captioned chapter 11[2] case (the "Chapter 11 Case"), by and through its undersigned counsel, hereby moves (the "Motion"),[3] pursuant to §§ 105, 362, 363, and 364, Bankruptcy Rules 4001 and 6004, and Local Rule 4001-2, for entry of an interim order (substantially in the form attached hereto as **Exhibit A**, the "Interim Order") and a final order (the "Final Order" and together with the Interim Order, the "Orders"): (i) authorizing the Debtor to (a) obtain postpetition secured financing and (b) utilize Cash Collateral; (ii) granting, subject and subordinate to the Carve-Out and/or as otherwise set forth herein, senior liens and superpriority administrative expense status to the Debtor's existing

[1] The Debtor in this Chapter 11 Case, along with the last four digits of the Debtor's federal tax identification number, is: Pacifica of the Valley Corporation d/b/a Pacifica Hospital of the Valley [7312]. The Debtor's mailing address is 9449 San Fernando Road, Sun Valley, CA 91352.

[2] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532; all "Bankruptcy Rule" references are to the Federal Rules of Bankruptcy Procedure; and "Local Rule" references are to the Local Rules of the United States Bankruptcy Court for the District of Delaware.

[3] Capitalized terms used but not defined in this motion have the meanings ascribed to them in the First Day Declaration, Interim Order, or DIP Agreement (each as defined below).

prepetition secured creditor, Axios Capital Solutions, LLC ("Axios" or, in such capacity, the "DIP Lender") to secure the DIP Obligations; (iii) granting adequate protection; (iv) modifying the automatic stay imposed by § 362 and any other applicable stay (including Bankruptcy Rule 6004) to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents; (v) scheduling a final hearing (the "Final Hearing"); and (vi) granting related relief.

In support of this Motion, the Debtor submits the *Declaration of Peter Chadwick in Support of the Motion of the Debtor for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Obtain Postpetition Secured Financing and (B) Utilize Cash Collateral; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* (the "Chadwick Declaration"), attached hereto as **Exhibit B**, and the *Declaration of Andrew Turnbull in Support of the Motion of the Debtor for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Obtain Postpetition Secured Financing and (B) Utilize Cash Collateral; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* (the "Turnbull Declaration"), attached hereto as **Exhibit C**. In further support of the Motion, the Debtor incorporates by reference the *Declaration of Precious Mayes in Support of Chapter 11 Petition and First Day Pleadings* [Docket No. 16] (the "First Day Declaration") and respectfully states as follows:

## PRELIMINARY STATEMENT

1. The Debtor filed this Chapter 11 Case in severe financial distress amidst pending litigation to protect patient care and its employees; to preserve the Debtor's operations at its hospital (the "Hospital"), Subacute Skilled Nursing Facility, and Behavioral Health Urgent Care

Clinic, and other programs (collectively, the "Health Care System"); and to preserve the going-concern value of the Debtor's business for its stakeholders and parties in interest.

2. Since the Petition Date, the Debtor has continued to operate without the benefit of debtor in possession financing and with limited liquidity available to sustain operations and administer this Chapter 11 Case. However, absent immediate access to DIP financing and Cash Collateral use, the Debtor will suffer immediate and irreparable harm.

3. After months of extensive negotiations among numerous stakeholders, including Axios, the Committee, and the Debtor's landlord, the Debtor is pleased to report that it has reached a resolution in principle with Axios that provides the Debtor immediate and necessary financing and a clear path toward confirmation of a chapter 11 plan. The DIP Facility represents the best and only path forward for this Chapter 11 Case. It remains in discussions with the Committee and hopes to have their support in advance of the hearing on the Motion.

4. The relief requested in this Motion authorizes the Debtor to enter into a senior secured, superpriority debtor in possession financing facility that represents the only viable financing alternative available under the circumstances. The Debtor was unable to obtain financing on an unsecured, administrative-expense, or otherwise more favorable basis. Critically, the DIP Lender is the holder of the Debtor's prepetition secured debt and has agreed to provide the DIP Facility, which obviates the need for the Debtor to seek to prime an objecting secured creditor or engage in costly and protracted priming litigation.

5. The DIP Facility also requires the Debtor to proceed toward the formulation and filing of a chapter 11 plan consistent with the plan term sheet attached thereto (the "Plan Term Sheet"), which contemplates, among other things, (a) the sale of the Health Care System to Axios, (b) the establishment of a litigation trust funded with certain Excluded Assets, including

avoidance actions and other estate causes of action, for the benefit of general unsecured creditors and (c) the funding of the administrative expenses of the Chapter 11 Case.

6. The DIP Facility therefore provides the liquidity necessary to support the Debtor's ongoing operations and to fund a plan confirmation process, paving the way for a resolution of this Chapter 11 Case. Without the DIP Facility, the Debtor would lack a viable path to continue operations, preserve patient care and approximately 687 jobs, satisfy administrative claims or consummate a plan. Moreover, the value of the estate would rapidly erode to the detriment of all stakeholders. The proposed financing therefore satisfies the requirements of § 364 and reflects the Debtor's sound exercise of business judgment.

7. In short, the DIP Facility is the product of extensive, months long, good-faith and arm's-length negotiations, and contains market-standard terms and protections. The DIP Facility is necessary to maintain patient care, preserve value, avoid irreparable harm, and maximize recoveries for all parties in interest. Accordingly, the Debtor respectfully submits that the relief requested herein is fair, reasonable, and in the best interests of the Debtor, its estate, and all stakeholders, and should be approved on an interim and final basis.

## SUMMARY OF REQUESTED RELIEF STATEMENT

8. By this Motion, the Debtor requests entry of the Interim Order and the Final Order:

i. authorizing senior secured postpetition financing in an aggregate principal amount of up to $52,500,000 (the "DIP Facility," and the loans provided to the Debtor thereunder, the "DIP Loans"), consisting of (a) new money term loans, in an amount of $21,000,000, which new money term loans shall be made available to the Debtor in multiple tranches pursuant to the terms and subject to the conditions set forth in the DIP Term Sheet and the Orders (the "New Money Loan"); (b) a $2.1 million commitment fee (the "Commitment Fee"); and (c) a "roll up" of the principal amount of Prepetition Obligations, plus interest, fees, and other amounts due thereunder that will be deemed "rolled up" as loans under the DIP Facility on a 1.5x basis (i.e., 1.5 times the dollar amount of cash

actually advanced postpetition) pursuant to the terms and subject to the conditions set forth in the DIP Term Sheet and the Interim Order (the "Roll Up");

ii. Entry into (a) that certain Debtor In Possession Loan Term Sheet (the "DIP Term Sheet"), substantially in the form attached to the Interim Order as **Exhibit 1**, by and among the Debtor and the DIP Lender, and (b) the documents related to the DIP Term Sheet (together with the DIP Term Sheet, the "DIP Documents");

iii. Borrowing, on an interim basis, pursuant to the DIP Documents and this Interim Order, postpetition financing in an aggregate principal amount of up to (a) $7,000,000 of New Money Loans plus (b) the Roll Up (in an amount up to $10,500,000) for an aggregate principal amount on an interim basis of $17,500,000 (the "Interim DIP Facility");

iv. Borrowing, on a final basis, pursuant to the DIP Documents and the Final Order, postpetition financing in an aggregate principal amount of up to $52,500,000, consisting of $21,000,000 of New Money Loans and up to $31,500,000 of Roll Up, upon entry of the Final Order and certain other conditions precedent;

v. Executing and delivering the DIP Term Sheet and the other DIP Documents to the DIP Lender pursuant thereto;

vi. Granting to the DIP Lender the DIP Liens on all of the DIP Collateral to secure the DIP Facility and all obligations owing and outstanding thereunder and under the DIP Documents, as applicable, and the Orders, as applicable (collectively, and including all "Obligations" as defined in the DIP Term Sheet, the "DIP Obligations"), subject only to prior payment of the Carve-Out;

vii. Granting to the DIP Lender allowed superpriority administrative expense claims in this Chapter 11 Case for all DIP Obligations;

viii. Using the proceeds of the DIP Facility in accordance with the DIP Term Sheet, the DIP Documents, and the Interim Order, in all cases in accordance with the Budget, a copy of which is attached to the Interim Order as **Exhibit 2**, and as otherwise provided in the DIP Documents;

ix. Using any Prepetition Collateral, including the Cash Collateral, and provide adequate protection to those parties set forth herein that may

have an interest in such Prepetition Collateral, including Cash Collateral, for any possible Diminution;

x. Modifying the automatic stay imposed by § 362 solely to the extent necessary to implement and effectuate the terms of the DIP Documents and the Interim Order;

xi. Scheduling a Final Hearing to consider entry of the Final Order granting the relief requested in the Motion on a final basis and approving the form of notice with respect to the Final Hearing; and

xii. Waiving, to the extent applicable, any stay of the immediate effectiveness of an Interim Order imposed by the Bankruptcy Code or the Bankruptcy Rules, such that the Interim Order shall be immediately effective upon its entry on the Court's docket.

**JURISDICTION AND VENUE**

9. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution. Venue of the Chapter 11 Case and related proceedings is proper pursuant to 28 U.S.C. §§ 1408 and 1409. Pursuant to Bankruptcy Rule 7008 and Local Rule 9013-1(f), the Debtor consents to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

10. The statutory bases for the relief requested herein are §§ 105(a), 361, 362, 363, 364, 506(c), 507, and 552, Bankruptcy Rules 2002, 4001, 6003(b), 6004(a), 6004(h), 9013, and 9014, and Local Rules 2002-1, 4001-1, 4001-2, and 9013-1.

Case 26-11060-TMH Doc 231 Filed 09/25/26 Page 7 of 45

# BACKGROUND

## A. General Background

11. On July 4, 2026 (the "Petition Date"), the Debtor commenced the Chapter 11 Case by filing a voluntary petition for relief under chapter 11. The Debtor has continued in the possession of its property and continues to operate and manage its business as a debtor in possession pursuant to §§ 1107(a) and 1108.

12. The Debtor's Hospital is a safety net, 231-bed acute care hospital located in Sun Valley, California that offers a full range of inpatient and outpatient services, including 24-hour emergency care, and treats more than 50,000 emergency patients each year. The Debtor also operates a 98-bed, separately licensed subacute Skilled Nursing Unit, a Behavioral Health Urgent Care Clinic, and a Medical Surgical Program. Approximately 84% of the Debtor's patients live at or below the poverty line, and the Debtor is heavily dependent on Medi-Cal, which provides approximately 85% of the Debtor's total revenue. As of July 4, 2026, the Debtor had approximately 697 employees, including registered nurses, technicians, housekeepers, and food-service workers, all of whom are vital to patient care.

13. As set forth in the First Day Declaration, the Debtor faced significant financial challenges as a result of the COVID-19 pandemic, and also faced rising labor costs, state-mandated seismic retrofit requirements and delayed Hospital Quality Assurance Fees ("HQAF") and Disproportionate Share Hospital government reimbursement payments. These factors, among others, contributed to the Debtor's liquidity crisis and the commencement of this Chapter 11 Case.

14. The factual background regarding the Debtor, including its current and historical business operations and the events precipitating its chapter 11 filing, is set forth in detail in the First Day Declaration.

15. On July 20, 2026, the U.S. Trustee appointed a five-member Committee of Unsecured Creditors (the "Committee"). *See* Docket No. 78. No trustee or examiner has been appointed in the Chapter 11 Case.

**B. The Debtor's Prepetition Indebtedness**

**a. The Main Street Priority Loan**

16. On December 10, 2020, the Debtor entered into that certain Main Street Priority Loan Agreement (the "MSL" or "Prepetition Loan") with First Western Trust Bank ("First Western") and the Federal Reserve Bank of Boston (the "Federal Reserve"), pursuant to which First Western extended a senior secured loan to the Debtor in the principal amount of $35,000,000. In connection with the MSL, the Debtor executed a Pledge and Security Agreement granting First Western a security interest in all its personal property.

17. In November 2025, Axios purchased the MSL from First Western. As of the Petition Date, the outstanding balance under the Prepetition Loan is approximately $50,943,321.41, inclusive of all accrued and unpaid interest, fees, costs, and expenses (collectively, the "Prepetition Obligations"). The Prepetition Obligations are secured by liens on substantially all personal property assets of the Debtor (the "Prepetition Collateral" and the liens securing the Prepetition Obligations, the "Prepetition Liens").

18. In May 2025, First Western filed a breach of contract lawsuit (the "Colorado Litigation") styled *First Western Trust Bank v. Pacifica of the Valley Corporation and Paul R. Tuft*, Case No. 2025CV31732 (Division 209), in the District Court of Denver County, Colorado (the "Colorado Court"), over the Debtor's alleged failure to timely repay the MSL. *See* First Day Declaration ¶ 45; *see also* ¶ 12 [Docket No. 36]. In November 2025, after purchasing the MSL, Axios substituted into the Colorado Litigation. *See* ¶ 12 [Docket No. 36]. The Colorado

Court appointed a Special Monitor to investigate Pacifica's operations on May 15, 2026, *see id*. ¶ 13, and later denied Axios's motion for summary judgment on June 26, 2026, ruling that a jury must first resolve questions regarding whether common ownership made the MSL transfer invalid. *See* First Day Declaration ¶ 45 & Ex. B. The Debtor removed the Colorado Litigation to the United States District Court for the District of Colorado, and Axios has filed a motion to remand portions of the Colorado Litigation against defendants other than the Debtor, which is still pending.

**b. The Landlord**

19. The Debtor has operated its Hospital pursuant to a long-term Master Lease with Reliq Pacifica LLC, Beverly Gemini Investments, LLC, Taking the 5th, LLC and Fifth/Arizona Investors, LLC (together, the "Landlord"). As of the Petition Date, the Landlord asserts it is owed approximately $9.5 million on account of accrued and unpaid rent and other obligations under the Master Lease. The Landlord filed a UCC-1 financing statement in November 2022 seeking to perfect a lien in all personal property of the Debtor. That lien was subordinated to First Western's interest (now Axios's interest) pursuant to a Subordination Agreement. The Landlord asserts a security interest in all personal property of the Debtor.

**c. Security Interest in Favor of L.A. Care**

20. Prior to the Petition Date, the Debtor and the Local Initiative Health Authority for Los Angeles County, which operates as L.A. Care Health Plan ("L.A. Care") entered into two purchase agreements pursuant to which the Debtor sold to L.A. Care the right to receive designated future HQAF receivables in exchange for immediate cash consideration. These transactions were structured as true sales, transfers, assignments, and conveyances of the Debtor's right, title, and interest in the designated receivables ($7,500,000 in HQAF payments

expected to be received later this year) to L.A. Care. As a protective measure, the Debtor also granted L.A. Care a back-up security interest in the assigned receivables.

21. On August 3, 2026, the Court entered an order [Docket No. 115] (the "L.A. Care Sale Order") which, among other things, provided that the Debtor stipulated that such prepetition transactions were true sales subject only to a currently pending challenge period provided to the Committee and Axios.

## C. Summary of Terms of DIP Financing

22. In accordance with Bankruptcy Rule 4001 and Local Rule 4001-2, the below chart summarizes the significant terms of the proposed DIP Facility and DIP Documents.[4]

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| **Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | Pacifica of the Valley Corp. d/b/a Pacifica Hospital of the Valley | Interim Order, Preamble (ii); DIP Term Sheet |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | N/A. | N/A |
| **DIP Agent**<br>Bankruptcy Rule 4001(c)(1)(B) | N/A. | N/A |
| **DIP Lender**<br>Bankruptcy Rule 4001(c)(1)(B) | Axios Capital Solutions, LLC, or one or more of its designated affiliates | Interim Order, Preamble (ii); DIP Term Sheet |

[4] The following summary of the terms of the DIP Agreement is subject entirely to the express terms of the DIP Agreement or Interim Order, as applicable. If there are any inconsistencies between the summary below and the DIP Agreement, then the DIP Agreement shall control. If there are any inconsistencies between the summary below and the Interim Order, then the Interim Order shall control.

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| **DIP Facility**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(i)(A) and (B) | Senior secured super-priority term loan in an aggregate principal amount of $52,500,000, consisting of (i) the Roll Up, being 1.5 times the dollar amount of cash actually advanced postpetition under the DIP Facility, and (ii) New Money Term Loans of $21,000,000, such that, when combined with the Roll-Up, the total outstanding principal amount of the DIP Facility shall not exceed $52,500,000, which New Money Term Loans shall be made available to the Debtor in multiple tranches as follows: (a) an initial advance of $7,000,000 upon entry of the Interim Order; (b) a second advance of $4,000,000 upon entry of the Final Order; (c) a third advance of $3,000,000 payable upon the Debtor's filing of the Plan or Private Sale Motion, as applicable; and (d) a fourth advance of $7,000,000 payable upon the earlier to occur of the Plan Confirmation Milestone (as defined below) and the Sale Closing Milestone. | Interim Order, Preamble (i)-(ii); DIP Term Sheet |
| **Borrowing Limits**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(A), (a)(iii) | Up to (i) $21,000,000 of new money upon entry of the Final Order and satisfaction of all applicable conditions, and (ii) the aggregate principal amount of up to the $7,000,000 Initial Advance, upon entry of the Interim Order. | Interim Order, Preamble (i); DIP Term Sheet |
| **Budget**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(iii) | The DIP Facility shall be governed by the approved budget (the "Budget") which shall be in form and substance acceptable to the Debtor and the DIP Lender.<br><br>Starting on the second Monday following entry of the Interim Order, the Budget shall be subject to customary variance testing for operating disbursements, with permitted variances of 15% in the aggregate and 20% for each line item (the "Permitted Variances"). Each variance shall be measured solely on a cumulative basis by comparing actual operating disbursements from the beginning of the applicable budget period through the relevant testing date against budgeted operating disbursements for the same cumulative period, and not on a standalone weekly basis.<br><br>No proceeds of the DIP Facility (except as specifically set forth in the DIP Documents) shall be used to | Interim Order, Preamble (viii); DIP Term Sheet |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | investigate, challenge, object to, contest or raise any defense to, the validity, security, perfection, priority, extent or enforceability of any amount due under or the liens or claims granted under or in connection with the Prepetition Secured Debt, the Debtor's Master Lease with the Landlord or the prepetition sales of receivables to L.A. Care.<br><br>The Debtor shall be obligated to comply with the Budget, subject to the Permitted Variances. The Debtor's failure to comply with such requirement shall constitute an immediate Event of Default. | |
| **Interest Rate**<br>Bankruptcy Rule 4001(c)(1)(B) | <u>Base Interest Rate</u>: 12% per annum from the date of borrowing until repaid, which will be paid in kind (monthly, in arrears) on the then principal amount of the DIP Loan by increasing the principal amount of the DIP Loan.<br><br><u>Default Interest Rate</u>: 4% per annum plus the interest rate otherwise accruing or payable thereon.<br><br>All interest shall be computed on the basis of a three hundred sixty- (360)-day year for the actual number of days elapsed. | DIP Term Sheet |
| **Expenses and Fees**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(B), (M) | Proceeds of the DIP Facility may be used solely for the following purposes, in each case, in accordance with and subject to the Budget then in effect, subject to the Permitted Variances: (i) working capital and other ordinary-course operating expenses; (ii) costs and expenses of administering the Chapter 11 Case; (iii) funding of an escrow pursuant to the Budget for payment of documented, reasonable, and court-allowed estate professional fees and expenses; (iv) payment of amounts expressly authorized under the DIP documents or by the Court; (v) the payment of documented and reasonable fees and expenses of Lender's professionals in Axios' capacity as Lender, including negotiation and preparation of the DIP documents (for the avoidance of doubt, all other obligations under the DIP Facility shall be paid-in-kind); and (vi) other purposes identified in the Budget.<br><br>Commitment Fee: There shall also be a fee (a "<u>Commitment Fee</u>") of 10%, which shall be fully | DIP Term Sheet |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | earned and non-refundable upon entry of the Interim Order. | |
| **Maturity Date**<br>Bankruptcy Rule 4001(c)(1)(B), Local Rule 4001-2(a)(ii); Local Rule 4001-2(a)(i)(B), (M), (a)(ii) | All unfunded DIP commitments of the DIP Lender will terminate, and all DIP obligations of the Debtor will be immediately due and payable in full in cash on the earliest of: (a) December 4, 2026 (the "Maturity Date"); (b) the date upon which a Milestone is missed and not waived by the DIP Lender; (c) the date of consummation of any sale of all or substantially all of the assets of Pacifica pursuant to § 363; (d) the date of acceleration of the DIP Loans and the termination of the DIP commitments pursuant to the terms of the DIP Term Sheet or DIP Credit Agreement (e.g., occurrence of event of default); (e) the effective date of the Plan or any plan of reorganization in the Chapter 11 Case (the "Effective Date"); (f) appointment of a chapter 11 trustee in the Chapter 11 Case; and (g) conversion of the Chapter 11 Case to a case under Chapter 7 or dismissal of the Chapter 11 Case (such earliest date of (a)-(g), the "Termination Date"). | Interim Order, ¶ 14; DIP Term Sheet |
| **Collateral and Priority**<br>Bankruptcy Rule 4001(c)(1)(B)(i), 4001(c)(1)(B)(ii) | Subject to the Carve-Out and the Excluded Assets (as defined in the DIP Term Sheet), and to the extent of funds actually advanced under the DIP Facility, the DIP Lender will receive: (i) a superpriority administrative expense claim under § 364(c)(1); (ii) first-priority liens under § 364(c)(2) on unencumbered property of the estate including without limitations all proceeds of HQAF receivables, and avoidance and preference causes of actions (subject to the DIP Lender's agreement as set forth in the DIP Term Sheet with respect to Excluded Assets); (iii) junior liens under § 364(c)(3) junior to prior permitted senior liens under the Prepetition Loan Documents (as defined in the DIP Term Sheet); and (iv) priming liens under § 364(d) on all collateral securing the Prepetition Secured Debt except for prior permitted senior liens under the Prepetition Loan Documents. | Interim Order, ¶ 3(a); DIP Term Sheet |

Case 26-11060-TMH Doc 21-1 Filed 09/25/26 Page 14 of 45

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| **Covenants**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(H), (M) | The DIP Documents contain affirmative covenants as are usual and customary for debtor in possession financings, including: compliance with the Budget (subject to the Permitted Variances); weekly liquidity reports, budget-to-actual reporting, and information concerning the plan solicitation and confirmation process to be provided simultaneously to the DIP Lender and the Committee; that the Debtor shall not use funds of the DIP Facility to investigate, challenge, object to, contest, or raise defenses related to the Prepetition Obligations; and such other covenants as agreed to by the DIP Lender and the Borrower. | DIP Term Sheet |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(S) | Such events of default indicated in the DIP Term Sheet and as are customary and/or appropriate for transactions of this type, including: failure to comply with the Budget with Permitted Variances, failure to make timely payments, incurrence of any unauthorized debt, unauthorized sale of assets, breaches of representations or warranties, change of control, Documentation not in form reasonably satisfactory to the DIP Lender, failure to satisfy a Milestone, occurrence of a Termination Date. | DIP Term Sheet |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)(vi) | The Debtor shall achieve each of the following milestones (as may be extended with the consent of the DIP Lender):<br>(i) Initial Milestone: No later than September 29, 2026, the Bankruptcy Court shall have entered the Interim Order, in form acceptable to Lender.<br>(ii) Lease Extension Milestone: No later than October 5, 2026, the Debtor shall have filed a motion pursuant to § 365(d)(4)(B)(i) to extend the time within which the Debtor may assume or reject the Master Lease, and no later than October 30, 2026, the Court shall have entered an order extending such time through a date not earlier than January 29, 2027.<br>(iii) Sale Closing Milestone: If the DIP Lender elects to purchase the Debtor's | DIP Term Sheet |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | assets via Private Sale, such sale shall close on or before 30 days after such election.<br>(iv) Plan Confirmation Milestone: If the DIP Lender elects to purchase the Debtor's assets pursuant to the Plan, the Debtor shall have confirmed the Plan that is in all respects consistent with the Plan Term Sheet and otherwise in a form and substance reasonably agreeable to the DIP Lender on or before December 4, 2026. | |
| **Carve-Out**<br>Bankruptcy Rule 4001(b)(1)(B)(iii); Local Rule 4001-2(a)(i)(F), (M) | The DIP liens, replacement liens, superpriority claims, prepetition liens and other protections granted to Lender shall be subject to a "Carve-Out."<br>"Carve-Out" shall mean the sum of the following amounts as of the earlier of the day the Lender issues a Carve-Out Trigger Notice, or the Maturity Date: (i) fees payable to the Clerk of the Bankruptcy Court and the Office of the United States Trustee; (ii) statutory fees payable under 28 U.S.C. § 1930; (iii) allowed professional fees and expenses incurred by Pacifica and the Committee before delivery of a Carve-Out Trigger Notice to the extent consistent with the Approved Budget; and (iv) a post-trigger professional-fee reserve in the amount of $200,000 ("Wind-Down Carve Out").<br>The Carve-Out (including the Wind-Down Carve-Out) shall not include, apply to, or be available for any fees or expenses incurred by any party in connection with the investigation, initiation, or prosecution of any claims, causes of action, adversary proceedings, or other litigation against the Debtor, the Lender, L.A. Care, or the Landlord (except as provided herein) or any affiliates of any of the foregoing entities, or any of their respective officers, directors, employees, agents, advisors, and counsel, including but not limited to challenging the amount, validity, perfection, priority, or enforceability of or asserting any defense, counterclaim or offset to, the obligations and liens and security interests in favor of the Debtor or the Lender. | Interim Order, ¶ 9; DIP Term Sheet |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| **Prepayments** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(I) | Upon the Debtor's receipt of HQAF funds the Debtor shall be required to use such funds first to pay down the DIP Loan except to the extent such HQAF funds are HQAF Program 8 or 9 funds identified in the current Budget, in which event the Debtor may use such identified HQAF Program 8 or 9 funds in accordance with the Budget. | DIP Term Sheet |
| **Conditions to Closing of DIP Facility** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(E) | Conditions to the Initial Advance: (i) the Documentation shall be in form and substance reasonably satisfactory to the Lender; (ii) the Bankruptcy Court will have entered the Interim Order in form and substance acceptable to the DIP Lender, and such order has not been stayed or reversed; (iii) the DIP Lender shall have received and approved the Budget; (iv) no event of default shall have occurred; (v) the Interim Order, as approved, provides that the DIP Lender has at all times acted in good faith and is entitled to the protections of § 364(e); and (vi) upon entry of the Interim Order, the DIP Lender is granted the Super-Priority DIP claim and valid and perfected liens on the DIP Collateral. The DIP Lender may waive any of the conditions precedent at any time, such waiver being sufficient upon confirmation by electronic mail.<br><br>Conditions to Subsequent Advances: (i) the Final Order shall remain in effect; (ii) there shall exist no default (or event that would constitute a default with the giving of notice or lapse of time) under the DIP Facility, including satisfaction of applicable milestones, and all the representations and warranties contained in the DIP Facility shall be true and correct in all respects; (iii) all fees and expenses owing to the Lender in connection with the DIP Facility shall have been paid; (iv) there shall have occurred no material adverse change in the Debtor's (financial, environmental, or otherwise) operations, performance, or properties (other than, in each case, the commencement and continuation of the Chapter 11 Case), since the entry of the Interim Order, that in the reasonable judgment of the Lender, has or can reasonably be expected to have a material adverse effect on the rights and remedies of the Lender or the ability of the Debtor to perform its obligations to them | DIP Term Sheet |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | under the DIP Facility; and (v) the Landlord shall not, in Lender's reasonable judgment, have repudiated or otherwise abandoned the agreement in principle reflected in the Lease Term Sheet. | |
| **DIP Facility Super-Priority Claims** Bankruptcy Rule 4001(c)(1)(B)(i) | All DIP Obligations of the Debtor under the DIP Facility shall be secured by the DIP Liens granted in the DIP Documents and approved by the Court in the Interim Order and the Final Order. The DIP Obligations shall, pursuant to § 364(c)(1), be entitled to superpriority administrative expense claim status in the Chapter 11 Case, which Superpriority Claim shall have priority over any and all claims against the Borrower, including claims under §§ 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, and 1114, subject to the terms of the Orders. | Interim Order, ¶ 12(b); DIP Term Sheet |
| **Parties with an Interest in Cash Collateral** Bankruptcy Rule 4001(b)(1)(B)(i) | N/A. | Interim Order, D(i); DIP Term Sheet |
| **Liens, Cash Payments or Adequate Protection Provided for Use of Cash Collateral** Bankruptcy Rule 4001(b)(1)(B)(iv) | As adequate protection for diminution in value of its interests in prepetition collateral, Axios shall receive: (i) replacement liens on its prepetition collateral; (ii) reimbursement of actual and documented fees and expenses of Axios in its capacity as Lender in connection with the Chapter 11 Case (including in connection with negotiating this DIP Term Sheet, the Lease Term Sheet, the Credit Agreement and related documents); subject to customary review and payment procedures allowing UST and Committee review; and (iii) stipulations and releases. | DIP Term Sheet |
| **Determination Regarding Prepetition Claims** Bankruptcy Rule 4001(c)(1)(B)(iii) | Subject to the Challenge Rights, the Debtor stipulates and agrees that: (i) the DIP Lender holds valid and enforceable prepetition claims against the Debtor in the aggregate amount of $50,943,321.41 as of the Petition Date; (ii) the DIP Lender's prepetition claims are secured by valid, binding, enforceable, perfected, and non-avoidable liens on and security interests in the applicable prepetition collateral; (iii) the prepetition obligations and related liens are not subject to avoidance, recharacterization, subordination, disallowance, reduction, offset, recoupment, | Interim Order, ¶ D(ii), 21; DIP Term Sheet |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | counterclaim, defense, or other challenge; (iv) the Debtor has no claims or causes of action against the DIP Lender arising from or relating to the Prepetition Loan Document (as defined in the DIP Term Sheet); (v) the assignment of the MSL and any associated documents from First Western to the DIP Lender is valid and enforceable and the DIP Lender has standing to seek to enforce such documents; (vi) neither the DIP Lender nor its principals are an affiliate of the Debtor as defined in the CARES Act or the Bankruptcy Code or an insider of the Debtor; and (vii) all payments made to or for the benefit of the DIP Lender before the Petition Date were valid and not avoidable. | |
| **Liens on Avoidance Actions** Bankruptcy Rule 4001(c)(1)(B)(xi); Local Rule 4001-2(a)(i)(U) | N/A. | N/A |
| **Effect of Debtor's Stipulations on Third Parties** Bankruptcy Rule 4001(c)(1)(B)(iii), (vii), (viii) | The Debtor's stipulations shall be binding immediately upon the Debtor and all other parties in interest upon entry of the Final Order. | Interim Order, ¶ D(i); DIP Term Sheet |
| **Waiver or Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv); Local Rule 4001-2(a)(i)(S) | The automatic stay shall be modified to allow the DIP Lender the right to realize on all DIP Collateral, the right to exercise any remedy available under applicable law on 5 business days' notice, subject to obtaining relief from the Bankruptcy Court. | Interim Order, ¶ 6; DIP Term Sheet |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | Pursuant to the Interim Order and Final Order, the DIP Lender will be indemnified and held harmless by the Debtor regarding any claim or liability incurred in respect thereof or in any way related thereto, provided that no such party will be indemnified for any cost, expense, or liability to the extent determined in a final, non-appealable judgment of a court of competent | Interim Order, ¶ 20 |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | jurisdiction to have resulted primarily from such party's actual fraud, gross negligence, bad faith, or willful misconduct. | |
| **Section 506(c) Waiver and Section 552(b) Waiver**<br>Bankruptcy Rule 4001(c)(1)(B)(x) | Upon entry of the Final Order, the Debtor will waive its rights under § 552(b) and § 506(c). | Interim Order, ¶ 12(c); DIP Term Sheet |
| **Any Provision That Limits the Court's Power to Enter Future Orders**<br>Local Rule 4001-2(a)(i)(C) | N/A. | N/A |
| **Any Provision that Provides for the Funding of Non-Debtor Affiliates**<br>Local Rule 4001-2(a)(i)(D) | N/A. | N/A |
| **Any Provision that Provides for Postpetition Liens on Unencumbered Assets**<br>Local Rule 4001-2(a)(i)(G) | The DIP Term Sheet provides the DIP Lender first-priority liens under § 364(c)(2) on all unencumbered property of the estate. | DIP Term Sheet |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| **In Jointly Administered Cases, any Provision Governing Joint Liability of the Debtor**<br><br>Local Rule 4001-2(a)(i)(J) | N/A. | N/A |
| **Any Provision that Requires the Debtor to Pay an Agent or Lender's Expenses and Attorneys' Fees with no Notice or Review by the UST and Committee**<br><br>Local Rule 4001-2(a)(i)(K) | N/A. | N/A |
| **Any Provision that Prohibits the Use of Estate Funds to Investigate Liens and Claims of Prepetition Lenders**<br><br>Local Rule 4001-2(a)(i)(L) | The Committee's right to challenge (i) the Stipulations and Releases set forth in the DIP Term Sheet and (ii) with the consent of L.A. Care, any prepetition transactions between the Debtor and L.A. Care (collectively, the "Challenge Rights") shall be tolled through the Plan Effective Date and, upon the occurrence of the Plan Effective Date, shall be deemed waived and released in accordance with the terms and conditions of the Plan consistent with the Plan Term Sheet; *provided*, *however*, that if the Plan is not confirmed due exclusively to the DIP Lender's failure to fund its obligations under the DIP Facility (it being understood that the DIP Lender's declining to fund any advance as to which any condition precedent has not been satisfied, or following the occurrence of an Event of Default or the Termination Date, shall not constitute a failure to fund), the Committee shall have fourteen (14) days following such breach by Lender to commence and pursue any Challenge Rights. For the | Interim Order, ¶ 22; DIP Term Sheet |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | avoidance of doubt, the Challenge Rights shall be waived and released if the Plan is not confirmed for any reason other than the DIP Lender's failure to fund its obligations under the DIP Facility.. | |
| **Any Provisions granting Cross-Collateralization**<br>Local Rule 4001-2(a)(i)(N) | N/A. | N/A |
| **Any Provisions Deeming Prepetition Debt to be Postpetition Debt**<br>Local Rule 4001-2(a)(i)(O) | DIP Facility provides for a roll-up of the Prepetition Secured Debt in an amount equal to 1.5x of the dollar of cash actually advanced to the Debtor postpetition under the DIP Facility, with such corresponding amount of Prepetition Secured Debt to be automatically rolled up, refinanced, and converted into postpetition obligations under the DIP Facility as and when each such advance is funded. Such roll-up shall constitute a refinancing and continuation, and not a novation, satisfaction, or discharge, of the Prepetition Secured Debt, and the obligations so rolled up shall continue to constitute senior indebtedness for all purposes of any subordination, intercreditor, or similar agreement in favor of the holder of the Prepetition Secured Debt. | Interim Order, ¶¶ I, 4; DIP Term Sheet |
| **Any Provisions Priming Secured Liens Without Consent of Lienholder**<br>Local Rule 4001-2(a)(i)(P) | N/A. | N/A |
| **Any Provisions Binding the Estate to Validity, Perfection or Amount of Secured Debt** | Subject to the Challenger Rights (as defined in the DIP Term Sheet), Pacifica stipulates and agrees that:<br>• Axios holds valid and enforceable prepetition claims against Pacifica in the aggregate amount $50,943,321.41 as of the Petition Date;<br>• Axios's prepetition claims are secured by valid, | Interim Order, ¶ D(i); DIP Term Sheet |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| Local Rule 4001-2(a)(i)(Q) | binding, enforceable, perfected, and non-avoidable liens on and security interests in the applicable prepetition collateral;<br>• the prepetition obligations and related liens are not subject to avoidance, recharacterization, subordination, disallowance, reduction, offset, recoupment, counterclaim, defense, or other challenge;<br>• Debtor has no claims or causes of action against Axios arising from or relating to the Prepetition Loan, Security Agreement, the Prepetition Secured Debt or otherwise;<br>• The assignment of the Prepetition Loan from First Western to Axios is valid and enforceable and Axios has standing to seek to enforce the Prepetition Loan; and<br>• all payments made to or for the benefit of Axios before the Petition Date were valid and not avoidable. | |
| **Provisions that Immediately Approve All Terms and Conditions of the Underlying Loan Agreement**<br>Local Rule 4001-2(a)(i)(R) | N/A. | N/A |
| **Provisions Limiting What Parties-in-Interest May Raise at Emergency Hearings**<br>Local Rule 4001-2(a)(i)(T) | N/A. | N/A |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| **Provisions that Immediately Shield the Lender from the Equitable Doctrine of Marshalling**<br>Local Rule 4001-2(a)(i)(X) | Upon entry of the Final Order, the Debtor agreed to waive the Doctrine of Marshalling. | DIP Term Sheet |

**D. The Debtor's Need for Postpetition Financing**

23. A critical need exists for the Debtor to obtain access to the DIP Facility in order to, among other things, protect patient care and employees, ensure the continued operation of the Debtor's Health Care System, administer and preserve the value of the Debtor's estate, satisfy administrative expenses, including fees and expenses of retained professionals as well as those of the DIP Lender, and satisfy other ordinary course working capital and operational needs. As a safety net hospital serving a vulnerable patient population, the Debtor's continued operation is critical to the health and welfare of the communities it serves. Furthermore, over the next two weeks, the Debtor forecasts expenses will exceed receipts by $5.6 million because the Debtor must renew its medical malpractice insurance and pay certain monthly premiums, rent, physician compensation, and legally required scheduled capital expenditures (for which the Debtor is currently accruing $5,000 in penalties per day). Chadwick Decl., ¶ 12.

24. The DIP Facility will provide the Debtor with $21,000,000 in new money borrowing capacity to ensure the Debtor will have sufficient liquidity to fund operations and to file and confirm a chapter 11 plan. The DIP Facility will provide funding for continued patient care and Hospital operations, payroll and other ordinary course operating expenses, payments to essential vendors, paying the costs of administering this Chapter 11 Case, including professional fees, and the Debtor pursuing confirmation of a chapter 11 plan. Without access to

this liquidity, the Debtor may be required to curtail operations, halt new patient intakes, and begin transferring patients to other facilities. In the absence of the DIP Facility, the continued operation of the Debtor's business and the administration of this Chapter 11 Case through a plan process would not be possible. The access of the Debtor to sufficient capital and liquidity through the DIP Facility is therefore necessary to preserve the Debtor's operations and permit the Debtor to continue pursuing a value maximizing transaction.

**E. The Debtor's Efforts to Obtain Postpetition Financing**

25. The Debtor and its professionals have worked collaboratively to secure debtor in possession financing, culminating in the Debtor's prepetition secured lender, Axios, agreeing to provide the DIP Facility. In the months following the Petition Date, the Debtor's advisors contacted certain capital providers to assess their willingness to provide debtor in possession financing on more favorable terms. No party was willing to offer financing sufficient to support a restructuring of the Debtor's operations and business on terms more favorable than the DIP Facility. *See* Turnbull Declaration at ¶ 11. Furthermore, based on the facts and circumstances of this Chapter 11 Case, and the events leading thereto, it is highly unlikely that there exists any financing reasonably attainable by the Debtor on more favorable terms than provided through the DIP Facility, particularly where, as here, the Prepetition Lender must consent to priming or otherwise be primed over its objection. *Id.*

26. Furthermore, as set forth herein and in the declarations in support of the Motion, the Debtor's continued operations and the administration of this Chapter 11 Case would not be possible in the absence of the availability of the DIP Facility. The DIP Facility is contingent on a transaction to transition the Hospital's ownership to the DIP Lender through a chapter 11 plan or private sale, in which the DIP Lender intends to acquire the Hospital as consideration for its

DIP Claim. *Id.*, ¶ 17. Based on the marketing process conducted to date, there may not be other viable parties positioned to provide an overbid under these conditions. *Id.* The Hospital has significant seismic remediation and other capital expenditure requirements, which will require a substantial capital commitment from a prospective acquirer. *Id.* The transaction also involves meaningful turnaround execution risk and the continuation of considerable federal and state supplemental funding programs. *Id.* Notwithstanding these challenges, the Debtor, Axios and the Debtors' landlord have been able to reach a non-binding term sheet to assist the DIP Lender in its reinvestment and turnaround efforts. *Id.*

## BASIS FOR RELIEF

### A. The Debtor Should Be Authorized to Grant Superiority Claims

27. Section 364 distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business, and (c) obtaining credit with specialized priority or with security. *See* 11 U.S.C. § 364. If a debtor in possession cannot obtain postpetition credit on an unsecured basis, pursuant to § 364(b), a court may authorize a debtor to obtain credit or to incur debt, the repayment of which is entitled to superpriority administrative expense status, or is secured by a senior lien on unencumbered property, or a junior lien on encumbered property, or a combination of the foregoing. *See* 11 U.S.C. § 364. In addition, pursuant to § 364(d), a court may authorize a debtor to obtain postpetition credit secured by a lien that is equal or senior in priority to existing liens on encumbered property (i.e., a "priming" lien) when a debtor is unable to obtain credit on other terms and the interests of existing lienholders are adequately protected, or if the existing lienholders consent to such priming.

28. The Debtor proposes to grant the DIP Lender a priming first lien security interest on substantially all of the prepetition secured parties' assets (collectively, the "Priming Liens"). Therefore, the approval of the DIP Facility is governed by both §§ 364(c) and 364(d).

**a. The Debtor Satisfies the Conditions of Section 364(c) to Obtain Financing on a Senior Secured and Superpriority Basis.**

29. In the event that a debtor demonstrates that it is unable to obtain unsecured credit allowable as an administrative expense under § 503(b)(1), § 364(c) provides:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

30. Courts have articulated a three-part test to determine whether a debtor is entitled to enter into financing under § 364(c). Specifically, courts look to whether:

- the debtor is unable to obtain unsecured credit under § 364(b) (*i.e.*, by allowing an administrative claim);
- the credit transaction is necessary to preserve the assets of the estate; and
- the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011); *In re Aqua Assocs.*, 123 B.R. 192, 195–96 (Bankr. E.D. Pa. 1991); *In re Ames Dep't Stores*,115 B.R. 34, 37-40 (Bankr. S.D.N.Y. 1990);; *In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *In re Crouse Grp.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987)

31. To satisfy the requirements of § 364(c), a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative

expense basis. *In re Crouse Grp., Inc.*, 71 B.R. at 549 (finding that secured credit under § 364(c) is authorized, after notice and hearing, upon a showing that unsecured credit cannot be obtained). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (finding that superpriority administrative expenses should be authorized where debtor could not obtain credit as an administrative expense). When few lenders are likely to be willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988); *see also In re Snowshoe Co*., 789 F.2d at 1088 (finding that credit was unavailable absent a senior priming lien because the debtor had made unsuccessful contact with other financial institutions in the relevant geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (finding that the fact that two national banks refused to grant unsecured loans was sufficient to support the conclusion that the requirements of § 364 were met); *In re Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and finding that debtor made reasonable efforts to satisfy the requirements of § 364(c) by approaching four lending institutions, two of which refused to provide financing, and selecting the most favorable of the two offers it received).

32. In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under § 503(b)(1), § 364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in §§ 503(b) or 507(b); (2) secured by a lien on property of the

estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien." 11 U.S.C. § 364(c).

33. As set forth in the Turnbull Declaration, the Debtor believes, having consulted with its advisors, that the DIP Facility represents the best and only option available to address its immediate liquidity needs. Turnbull Declaration, ¶ 11. The Debtor only received one actionable proposal for postpetition financing—the proposal from the DIP Lender—and a second non-actionable proposal that, even if actionable, the Debtor determined in its business judgment would not be superior to the proposed DIP Financing. *Id.* In addition, the DIP Facility is the only proposal that provides adequate funding for the Debtor to confirm a chapter 11 plan and bring a resolution to this Chapter 11 Case. As a result, the Debtor submits that it could not have obtained financing on more favorable terms from sources other than the DIP Lender and is similarly unable to obtain adequate unsecured credit allowable under § 503(b)(1) as an administrative expense.

34. Further, § 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). Whether debtors were unable to obtain unsecured credit is determined by application of a good faith effort standard, and debtors must make a good faith effort to demonstrate that credit was not available without granting a security interest. *See In re YL W. 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing."). The required showing under § 364 that unsecured credit was not available is not

rigorous. *See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that § 364(d) imposes no duty to seek credit from every possible lender, particularly when "time is of the essence in an effort to preserve a vulnerable seasonal enterprise").

35. As set forth above, the Debtor is not aware of any available financing on equal or better terms than provided by the DIP Lender. Therefore, the Debtor submits that the requirement under § 364 that alternative financing on more favorable terms be unavailable has been satisfied.

**b. The Debtor Should be Authorized to Obtain Priming Liens Under § 364(d).**

36. Section 364(d) provides that debtors may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate and which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). The Debtor may incur "priming" liens under the DIP Facility if it is unable to obtain unsecured or junior secured credit and either (a) the affected secured lenders consent, or (b) adequate protection exists for such priming lien. *See Anchor Says. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, these [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

37. When determining whether to authorize a debtor to obtain credit secured by a "priming" lien as authorized by § 364(d), courts focus on whether the transaction will enhance the value of the debtor's assets. Courts consider a number of factors, including, without limitation:

a. whether alternative financing is available on any other basis (i.e., whether any better offers, bids or timely proposals are before the court);

b. whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtor's business;

c. whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtor and proposed lender(s);

d. whether the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors; and

e. whether the proposed financing agreement adequately protects prepetition secured creditors.

*See, e.g., Ames Dep't Stores*, 115 B.R. at 37-39; *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003); *see also* 3 Collier on Bankruptcy, ¶ 364.04[1] (15th ed. rev. 2008).

38. The Debtor submits that the priming of the Prepetition Liens by the DIP Liens should be approved by the Court. First, the Debtor was unable to find alternative financing that would sufficiently fund the Chapter 11 Case, and no potential financing party was willing to provide the Debtor with unsecured or junior secured financing. The Debtor has an extremely limited pool of unencumbered assets that was insufficient to attract potential financing counterparties. Additionally, in the face of a near-term potential shutdown of the Debtor's operations, no counterparty was willing to assume the risk of extending credit on an unsecured or junior secured basis. The DIP Lender was not willing to extend the $21 million in new capital absent being provided priming liens. Turnbull Declaration, ¶ 14.

39. Second, the DIP Facility is necessary to preserve the Debtor's estate and the Debtor's ability to provide continued care to its patients. Without the DIP Facility, the Debtor faces an imminent shutdown of its operations, requiring it to halt all new patient intakes and begin moving patients to other hospitals. Moving patients, particularly fragile and heavily

dependent patients such as those treated by the Debtor, will inevitably result in transfer trauma, also known as relocation stress syndrome. Studies have shown that transfer trauma can cause a drastic spike in depression, cognitive decline and premature mortality amongst frail individuals. *See, e.g.*, A. Montoya, et al., *Transfer Trauma Among Nursing Home Residents: Development of a Composite Measure*, The Gerontologist (2024), available at https://pubmed.ncbi.nlm.nih.gov/37392460/.

40. Courts have also authorized financing involving priming liens to avoid imminent liquidation. *See, e.g., In re True Religion Apparel, Inc.*, Case No. 20-10941 (Bankr. D. Del. 2020); *In re Erickson Inc.*, Case No. 16-34393 (HDH) (Bankr. N.D. Tex. Dec. 2, 2016); *In re Vitality Health Plan of California, Inc.*, Case No. 2:20-bk-21041-WB (Bankr. C.D. Cal. Oct. 21, 2021); *In re Advanced Living Techs., Inc.*, No. 13-10313-HCM, 2013 WL 1857803 (Bankr. W.D. Tex. Apr. 30, 2013).

41. Third, the terms of the DIP Facility are reasonable under the circumstances, and provide for financing on terms that are comparable to other DIP financings and generally consistent with market terms for companies facing similar circumstances as the Debtor.

42. Fourth, the DIP Facility was negotiated at arm's length and in good faith and is the result of a thorough parallel marketing process. Turnbull Declaration, ¶ 13. Entry into the DIP Facility with these terms thus reflects the sound exercise of the Debtor's business judgment.

43. Additionally, because the DIP Lender is the same entity as the Prepetition Lender, the adequate protection analysis is straightforward. The Prepetition Lender will receive the Adequate Protection Liens on all assets of the Debtor (subject and subordinate to the Carve-Out and the DIP Liens). Further, the Prepetition Lender will benefit from the Roll Up, which will convert a portion of its prepetition debt into DIP obligations, gaining the protections of a

superpriority administrative expense claim and enhanced collateral coverage. The agreed Roll Up is 1.5 times the dollar amount of cash actually advanced postpetition under the DIP Facility, automatically rolled up, refinanced, and converted into postpetition obligations as and when each such advance is funded. This structure is fair and reasonable, particularly where, as here, the Debtor has no other sources of funding and no other way to secure immediate liquidity. Turnbull Declaration, ¶ 11.

44. The DIP Facility will provide the Debtor with the funding necessary to provide essential patient care to vulnerable patients, pay the doctors, nurses and other essential employees who provide that medical care, to pay vendors, and continue the Hospital's operations. The preservation, maintenance, and enhancement of patient care, and thereby the going-concern value of the Debtor that will result from the DIP Financing will ultimately inure to the benefit of Axios as both the holder of the MSL and DIP Lender.

45. Because the DIP Lender is the same entity as the Prepetition Lender, no priming of a non-consenting secured creditor is required. Axios, as both the holder of the MSL and the DIP Lender, has consented to the terms of the DIP Facility, including the superpriority liens that will prime its prepetition security interest. Further, the Landlord is party to a prepetition subordination agreement pursuant to which it is required to consent to any debtor in possession financing approved by Axios.

46. To the extent the consent of L.A. Care is required, L.A. Care's interest is limited to the HQAF Receivables and does not extend to the Debtor's other assets. The Debtor has stipulated that $7.5 million of the HQAF Receivables were sold to L.A. Care prepetition, subject to the challenge period afforded to the Committee and Axios under the L.A. Care Order. Accordingly, to the extent any successful challenge results in L.A. Care being deemed a secured

creditor with a lien on the HQAF Receivables rather than the owner thereof, L.A. Care has consented to the DIP Facility. This consensual priming eliminates the need for the Debtor to undertake costly and protracted priming litigation and ensures that the DIP Facility can be approved promptly on the terms negotiated between the parties.

**c. Entry into the DIP Facility is an Exercise of the Debtor's Sound Business Judgment.**

47. Additionally, § 364 allows a debtor to obtain superpriority financing under a deferential standard. Courts grant debtors considerable deference in acting in accordance with their business judgment in obtaining postpetition credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See*, *e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. at 313 ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Barbara K. Enters., Inc.*, No. 08-11474 (MG), 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest"); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, among other things, an exercise of "sound and reasonable business judgment"); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 40 ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

48. Bankruptcy courts should not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *In re Curlew Valley Assoc.'s*, 14 B.R. 506, 513–14 (Bankr. D. Utah. Oct 8, 1981). To determine whether the business judgment standard is met, a court need only "examine whether a reasonable businessperson would make a similar decision under the circumstances." *In re Dura Auto. Sys. Inc.*, No. 06-11202 (KJC), 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007); *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006).

49. In determining whether the Debtor has exercised sound business judgment in entering into the DIP Facility, the Court should consider the economic terms of the financing under the totality of circumstances. *See In re Lyondell Chem. Co.*, No. 09-10023 (REG), Hr'g Tr. at 733:8-734:25, 735:1-10 (Bankr. S.D.N.Y. Feb. 27, 2009) (considering, in determining whether DIP financing reflected sound and reasonable business judgment, whether "the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor/borrower and the proposed lender," the debtors' efforts "to negotiate the best terms they could," and "the present state of the financial markets"); *In re Elingsen McLean Oil Co., Inc.*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing that a debtor may have to enter into "hard" bargains to acquire funds for its reorganization). Moreover, the Court may appropriately take into consideration noneconomic benefits to the Debtor offered under the proposed postpetition facility. *See In re ION Media Networks, Inc.*, No. 09-13125 (JMP), 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (holding that "a business decision to obtain credit from a particular lender is almost never based purely on economic terms. . . . [r]elevant features of the financing must be evaluated, including non-economic elements such as the

timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.”).

50. The Debtor’s decision to enter into the DIP Facility is an exercise of its sound business judgment. The Debtor has a critical need for liquidity to continue its operations, including essential medical care, during the Chapter 11 Case. Chadwick Declaration, ¶ 12. Without the DIP Facility, the Debtor may be unable to continue to provide patient care, satisfy administrative expenses, and satisfy other ordinary course working capital and operational needs. *Id.* The DIP Facility and its $21 million in New Money Loans thus provides the only viable path forward to continuity of medical care.

51. Additionally, as further discussed in the Turnbull Declaration, the DIP Facility was a product of good faith arm’s length negotiation among the Debtor and the DIP Lender, which was the best (and only) available source of postpetition financing under present circumstances. Turnbull Declaration, ¶¶ 10, 13. The Debtor has satisfied the legal requirements to incur the obligations under the DIP Facility on the terms and conditions set forth in the DIP Documents.

52. Even if the Court were to conclude that the Debtor’s entry into the DIP Facility is subject to a heightened standard of review, including an entire-fairness standard, rather than the business judgment rule, the DIP Facility readily satisfies that standard. The terms of the DIP Facility are the product of extensive, good-faith, arm’s-length negotiations between sophisticated parties whose interests have historically been adverse—including through years of litigation between the Debtor and the DIP Lender and its predecessors—and thus were not dictated by or for the benefit of the DIP Lender. Moreover, while those negotiations were ongoing, the Debtor, with the assistance of its investment banker, conducted a parallel

marketing process to identify potential alternative sources of postpetition financing and thereby market-test the terms offered by the DIP Lender. That process produced no superior or actionable alternative financing proposal. Against that backdrop, both the process by which the DIP Facility was negotiated and the economic terms ultimately obtained are fair to the Debtor and its estate. Accordingly, even under a heightened standard of review, the DIP Facility is entirely fair, reasonable, and appropriate and should be approved.

53. Section 363(b) permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval. It is well settled in the Third Circuit that such transactions should be approved when they are supported by a sound business purpose. *See In re Abbots Dairies, Inc.*, 788 F.2d 143 (3d Cir. 1986). The business judgment rule shields such business decisions from judicial second-guessing. *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

**B. The Roll Up is Appropriate and Should Be Approved.**

54. The repayment of prepetition funded indebtedness with postpetition financing (often referred to as a "roll-up") is a common feature in debtor in possession financing arrangements. Courts in this jurisdiction and other jurisdictions have approved similar DIP financing features, including on an interim basis. *See, e.g., In re Del Monte Foods Corp. II, Inc.*, No. 25-16984 (MBK) (Bankr. D. N.J. Aug. 12, 2025) (approving $165 million, multi-draw, DIP financing with a $247.5 million roll up); *In re Meyer Burger (Holding) Corp.*, No. 25-11217 (CTG) (Bankr. D. Del. July 17, 2025) (authorizing an approximately $9.2 million delayed-draw DIP financing that included an interim roll up and, ultimately, a dollar-for-dollar roll up for actually-advanced funds); *In re Blackhawk Mining LLC*, No. 19-11595 (LSS) (Bankr. D. Del.

July 23, 2019) (authorizing an approximately $240 million DIP financing that included a roll-up of $70 million in prepetition term loans debt and up to $82 million of prepetition ABL debt pursuant to interim order).

55. Here, the DIP Facility includes a negotiated roll-up feature: upon entry of the Interim Order, a portion of the Prepetition Obligations shall be rolled up into DIP Obligations on a 1.5x basis relative to the cash amount actually advanced postpetition under the DIP Facility, automatically rolled up, refinanced, and converted into postpetition obligations under the DIP Facility as and when each such advance is funded. Upon incurrence of the Roll Up, the corresponding portion of the Prepetition Obligations shall be automatically and irrevocably deemed satisfied in full.

56. The Roll Up is a required and integral component of the DIP Facility. Axios was unwilling to provide new money financing without the Roll Up, and no alternative financing is available on better terms. Turnbull Declaration, ¶ 14. The Roll Up appropriately harmonizes the prepetition and postpetition financing into a single, integrated transaction and provides the Debtor with access to new money necessary to fund operations and this Chapter 11 Case.

57. Accordingly, the Roll Up is reasonable and should be approved.

**C. The Carve-Out is Appropriate**

58. The liens and superiority claims granted to the DIP Lender and the Prepetition Lender pursuant to the Proposed Orders, are subject and subordinate to the Carve-Out. The Carve-Out contains similar terms to others that the Court has found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel. Without the Carve-Out, the Debtor's estate may be deprived of possible rights and powers if the services for which professionals may be compensated is restricted. *See In re Ames Dep't Stores*, 115 B.R. at 38 (observing that courts insist on carve outs for professionals

representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). Additionally, the Carve-Out protects against administrative insolvency during the course of this Chapter 11 Case by ensuring that assets remain for the payment of fees to the U.S. Trustee and professional fees. Accordingly, the Carve-Out is appropriate and should be approved.

**D. The Rates and Fees of the DIP Facility Are Reasonable**

59. The DIP Facility bears interest at a base rate of 12% per annum from the date of borrowing until repaid, which will be paid in kind (monthly, in arrears) on the then principal amount of the DIP Loan by increasing the principal amount of the DIP Loan. Default interest is 4% per annum plus the interest rate otherwise accruing. The commitment fee is 10% of the principal of the DIP Facility, which shall be fully earned and non-refundable upon entry of the Interim Order. As set forth in the Turnbull Declaration, the interest rate and commitment fee are consistent with prevailing market terms for debtor in possession financing under circumstances comparable to those presented here. *See* Turnbull Declaration, ¶ 13. Thus, the economics of the DIP Facility are straightforward and favorable to the Debtor, particularly in light of the Debtor's immediate liquidity needs and the absence of any superior actionable financing alternative.

60. The Debtor respectfully submits that the interest rate, commitment fee and other economic terms of the DIP Facility are fair and reasonable and should be approved.

**E. The Milestones, Conditions Precedent and Events of Default Imposed by the DIP Facility are Reasonable**

61. As set forth in the chart above, the DIP Term Sheet also contemplates, as a condition to providing the DIP Facility, certain (i) conditions precedent; (ii) milestones

(the "Milestones") in connection with this Chapter 11 Case; and (iii) events of default, all of which are customary for postpetition financing in chapter 11.

62. The DIP Facility is a critical component of the Debtor's chapter 11 efforts because it provides the Debtor with the stability and certainty needed to continue patient care and fund its case. The continued operation of the Debtor's Health Care business during this case would not be possible absent access to the DIP Facility. The DIP Facility will prevent interruptions to the Debtor's Health Care System's operations, preserve and promote patient health and safety, preserve the Debtor's ability to maintain ordinary course relationships with key vendors and counterparties, and satisfy working capital needs in the ordinary course during the Chapter 11 Case.

63. Moreover, the Milestones, conditions precedent, and events of default are reasonable and appropriately tailored to protect the DIP Lender, maintain the status quo of the business and ensure transparency, accountability, and progress in the chapter 11 process, without unduly constraining the Debtor's ability to operate its Health Care System or administer the Chapter 11 Case. The provisions of the DIP Term Sheet are not designed to create technical defaults or render the Debtor disproportionately susceptible to a breach. The Milestones, in particular, reflect a realistic and achievable timeline developed in constructive cooperation with the DIP Lender and are intended to facilitate, rather than impede, a successful restructuring pursuant to the Restructuring Agreement.

64. The Milestones and the related conditions precedent and events of default are fair, reasonable, and should be approved.

**F. The DIP Lender Should Be Deemed a Good Faith Lender under Section 364(e)**

65. Section 364(e) protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to

obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

66. Here, the DIP Facility is the result of: (i) the Debtor's reasonable business judgment that the DIP Lender providing the best (and only) reasonable postpetition financing alternative available under the circumstances; and (b) extended arm's length, good-faith negotiations between the Debtor and the DIP Lender. *See* Turnbull Declaration at ¶¶ 12, 13. Under the circumstances, the terms and conditions of the DIP Documents are fair and reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code, in accordance with the Orders and the DIP Documents, and in accordance with the Budget (subject to the Permitted Variances). Further, no consideration is being provided to any party other than as described herein, in the DIP Documents, the Turnbull Declaration, and the Chadwick Declaration.

67. Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the meaning of § 364(e) and that the DIP Lender thus is entitled to all of the protections afforded therein.

**G. Modification of the Automatic Stay is Warranted**

68. The relief requested herein contemplates a modification of the automatic stay to permit, among other things: (i) the Debtor to grant the security interests, liens, and superpriority

claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (ii) upon the occurrence of an Event of Default (as defined in the DIP Documents), subject to the notice periods set forth in the DIP Term Sheet, the DIP Lender to exercise any available remedies under the DIP Documents and applicable law; and (iii) the Debtor to implement the terms of the Orders, including payment of all amounts provided under the DIP Documents.

69. Stay modifications of this kind are ordinary and standard features of postpetition financing facilities and, in the Debtor's business judgment, are appropriate under the present circumstances. Accordingly, the Debtor requests that the Court modify the automatic stay solely to the extent contemplated by the DIP Documents and the Orders.

70. Section 363(c)(2) provides that a debtor may not use, sell, or lease cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).

**H. The Debtor Should be Authorized to Use Cash Collateral**

71. The Debtor has an urgent need for the immediate use of Cash Collateral and seeks to use all Cash Collateral pursuant to the terms of the DIP Documents. The Debtor needs the Cash Collateral to pay operating expenses, including essential vendors, to ensure continued services essential to the Debtor's healthcare business, as well as fund this Chapter 11 Case.

72. The Debtor believes that the terms and conditions of its use of Cash Collateral (including the provision of adequate protection described above) are appropriate and reasonable and that such adequate protection is sufficient to secure any adequate protection obligations under the circumstances. Furthermore, Axios has consented to the Debtor's use of the Cash

Collateral subject to the terms and conditions of the DIP Documents and the proposed Interim Order.

73. The Debtor was unable to confer with the Landlord and L.A. Care regarding the use of Cash Collateral before filing this Motion, but intends to do so before the hearing. In any event, no further consent should be required. The Landlord is party to a prepetition subordination agreement with Axios that prohibits it from contesting the Debtor's use of Cash Collateral to the extent approved by Axios. And, subject to the challenge period under the L.A. Care Order, the Debtor has stipulated that L.A. Care validly purchased $7.5 million of HQAF receivables before the Petition Date, which necessarily means that L.A. Care holds no interest in such receivables as Cash Collateral. Accordingly, although the Debtor will confer with both parties before the hearing, it respectfully submits that no additional consent is necessary and that the Debtor should be authorized to use Cash Collateral on the terms set forth in the DIP Documents.

## I. Interim Approval Should Be Granted

74. Bankruptcy Rule 4001(c)(2) provides that, with respect to motions for authority to obtain credit:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 14-day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(c)(2).

75. Similarly, to the extent the Debtor is seeking authority to use, sell, or otherwise incur an obligation regarding property of its estate, Bankruptcy Rule 6003(b) provides that the Court may only grant immediate relief to the extent it is necessary to avoid immediate and irreparable harm.

76. Generally, courts find "immediate and irreparable harm" exists where loss of the business threatens a debtor's ability to reorganize. *See In re Ames*, 115 B.R. at 36, n.2. Granting the relief requested on an interim basis is left to the Court's discretion as informed by the facts of the case. In examining requests for interim relief, courts apply the same business judgment standard applicable to other business decisions, and a debtor should be entitled to borrow those amounts that it believes prudent in the operation of its business. *See In re Trans World Airlines, Inc.*, 163 B.R. at 974; *In re Ames*, 115 B.R. at 40. After the 14-day period, the request for financing is not limited to those amounts necessary to prevent the destruction of the debtor's business, and the debtor is entitled to borrow those amounts that it believes are prudent to the operation of its business. *In re Ames*, 115 B.R. at 36.

77. The Debtor seeks approval of the relief requested for the Interim DIP Facility, in light of the immediate and irreparable harm that the Debtor's estate will incur unless the Debtor obtains the financing necessary to sustain its business. Absent sufficient funds, the Debtor's business and assets will quickly erode to the detriment of the Debtor's estate and stakeholders. For the reasons set forth herein, the Debtor submits that immediate access to the DIP Facility is necessary to preserve the value of the Debtor's estate for the benefit of all parties-in-interest.

## **REQUEST FOR FINAL HEARING**

78. Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtor requests that the Court set a date for consideration of entry of the Final Order (the "Final Hearing") that is as soon as practicable, in accordance with the Milestones, and fix the time and date prior to the Final Hearing for parties in interest to file objections to this Motion.

79. The Debtor requests that it be authorized to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, by first class mail upon

the notice parties listed below. The Debtor further requests that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001(c)(2).

**WAIVER OF BANKRUPTCY RULES 6004(a) AND (h)**

80. The Debtor respectfully requests that the Court waive any stay of the effectiveness of the Orders. Pursuant to Bankruptcy Rule 6004(h), "[u]nless the court orders otherwise, an order authorizing the use, sale, or lease of property (other than Cash Collateral) is stayed for 14 days after the order is entered." Fed. R. Bankr. P. 6004(h). The Debtor submits that granting this Motion such that it is effective immediately is essential to prevent irreparable damage to the Debtor and its estate.

81. Accordingly, the Debtor respectfully submits that the relief requested herein is appropriate under the circumstances and under Bankruptcy Rules 6003 and 6004(h).

82. Finally, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) because the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtor's estate, is narrowly tailored to the exigencies of this Chapter 11 Case, and any delay resulting from compliance with the notice requirements would materially prejudice the Debtor, its estate, and stakeholders by jeopardizing the Debtor's access to critical financing and its ability to continue operations in the ordinary course.

**NOTICE**

Notice of this Motion shall be given to the following parties: (i) the U.S. Trustee; (ii) the Debtor's thirty (30) largest unsecured creditors (excluding insiders); (iii) counsel to Axios; (iv) all known holders of liens upon the Debtor's assets; (v) the attorneys general in the states in which the Debtor conducts its business; (vi) the Internal Revenue Service; (vii) the United States Securities and Exchange Commission; and (viii) all parties that have filed notices of appearance pursuant to Bankruptcy Rule 2002, in each case by facsimile transmission, email,

overnight courier and/or hand delivery. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

**CONCLUSION**

WHEREFORE, the Debtor respectfully requests entry of the Orders: (i) granting the relief requested herein; and (ii) granting the Debtor such other and further relief as the Court deems just and proper.

Dated: September 27, 2026

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
919 North Market Street, 17th Floor
Wilmington, DE 19899
Tel: (302) 652-4100
Email: ljones@pszjlaw.com

-and-

**DENTONS US LLP**

Tania M. Moyron (admitted *pro hac vice*)
Samuel R. Maizel (admitted *pro hac vice*)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Tel: (213) 623-9300
Email: tania.moyron@dentons.com
samuel.maizel@dentons.com

John D. Beck (admitted *pro hac vice*)
Geoffrey M. Miller (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020
Tel: (212) 768-6700
Email: john.beck@dentons.com
geoffrey.miller@dentons.com

*Counsel for Debtor and Debtor in Possession*

Case 26-11060-TMH Doc 23-1 Filed 09/27/26 Page 1 of 2

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>PACIFICA OF THE VALLEY CORPORATION,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 26-11060 (TMH) |

**Hearing Date: September 29, 2026 at 11:00 a.m. (ET)**
**Objection Deadline: At The Hearing**

## NOTICE OF INTERIM HEARING ON DIP FINANCING MOTION

**PLEASE TAKE NOTICE** that on September 27, 2026, the above-captioned debtor and debtor in possession (the "Debtor") filed the *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Obtain Postpetition Secured Financing tnd (B) Utilize Cash Collateral; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* (the "DIP Motion").

**PLEASE TAKE FURTHER NOTICE** that the Debtors intend to seek interim approval of the DIP Motion and entry of an interim order at the hearing scheduled for **September 29, 2026 at 11:00 a.m. (prevailing Eastern Time)** (the "Hearing") before the Honorable Thomas M. Horan, United States Bankruptcy Judge for the District of Delaware, 824 North Market Street, Third Floor, Courtroom #7, Wilmington, Delaware 19801.

**PLEASE TAKE FURTHER NOTICE** that objections or responses to the interim relief sought may be brought at or before the Hearing.

---

[1] The Debtor in this chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is 7312. The Debtor's mailing address is 9449 San Fernando Road, Sun Valley, CA 91352.

Case 26-11060-TMH Doc 23-1 Filed 09/28/26 Page 2 of 3

**PLEASE TAKE FURTHER NOTICE** that after the Hearing, the Debtors will serve upon you a complete copy of: (a) the DIP Motion; (b) any interim order entered by the Court at the Hearing; and (c) notice of the final hearing on the DIP Motion.

**PLEASE TAKE FURTHER NOTICE** that the Debtors reserve the right to modify, if necessary, the proposed interim order at or before the Hearing.

Dated: September 27, 2026

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
Wilmington, DE 19801
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
tcairns@pszjlaw.com

-and-

**DENTONS US LLP**
Tania M. Moyron (admitted *pro hac vice*)
Samuel R. Maizel (admitted *pro hac vice*)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone: (213) 623-9300
Facsimile: (213) 623-9924
Email: tania.moyron@dentons.com
samuel.maizel@dentons.com

John D. Beck (admitted *pro hac vice*)
Geoffrey Miller (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone: (212) 768-6700
Facsimile: (212) 768-6800
Email: john.beck@dentons.com
geoffrey.miller@dentons.com

*Counsel to the Debtor and Debtor in Possession*

# EXHIBIT A

## Proposed Form of Interim Order

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>Pacifica of the Valley Corp.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 26-11060 (TMH)<br><br>**Ref. Docket No. ____** |

**INTERIM ORDER (I) AUTHORIZING THE DEBTOR TO OBTAIN POSTPETITION SECURED FINANCING; (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION; (IV) MODIFYING THE AUTOMATIC STAY; (V) AUTHORIZING THE DEBTOR'S USE OF CASH COLLATERAL; AND (VI) SCHEDULING A FINAL HEARING**

Upon the motion (the "Motion")[2] of Pacifica of the Valley Corporation d/b/a Pacifica Hospital of the Valley, the above-captioned debtor and debtor in possession (the "Debtor") in the above-captioned chapter 11 case (the "Chapter 11 Case"), pursuant to §§ 105, 361, 362, 363, 364, 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the corresponding local rules of this District (the "Local Rules"), requesting entry of an interim order (this "Interim Order") and Final Order authorizing the Debtor to, among other things:

i. Obtain senior secured postpetition financing in an aggregate principal amount not to exceed $52,500,000.00 (the "DIP Credit Facility," and the loans provided to the Debtor thereunder, the "DIP Loans"), consisting of (a) new money term loans, in an aggregate principal amount which shall not exceed $21,000,000.00, which new money term loans shall be made available to the Debtor from time to time pursuant to the terms and subject to the conditions set forth in the DIP Term Sheet and the Orders (the "New Money Term Loan") and (b) a contemporaneous "roll-up" of the Prepetition Senior Loan Obligations in an amount equal to one and half times (1.5x) the amount of cash advanced under the New Money Term Loan (up to $31,500,000.00) (the "Roll Up"), plus interest, fees, and other amounts due

[1] The Debtor in this Chapter 11 Case, along with the last four digits of the Debtor's federal tax identification number, is 7312. The Debtor's mailing address is 9449 San Fernando Road, Sun Valley, CA 91352.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

thereunder pursuant to the terms and conditions of the DIP Documents and this Interim Order;

ii. Enter into (a) that certain DIP Term Sheet (the "DIP Term Sheet") attached as **Exhibit 1** hereto, by and among the Debtor and Axios Capital Solutions, LLC (in such capacity, the "DIP Lender") as lender and (b) the documents related to the DIP Term Sheet (together with the DIP Term Sheet, the "DIP Documents");

iii. Borrow, on an interim basis, pursuant to the DIP Documents and this Interim Order, postpetition financing in an aggregate principal amount of up to (a) $[7,000,000.00] in New Money Term Loans and (b) [$10,500,000] of the Roll Up (the "Interim DIP Credit Facility");

iv. Borrow, on a final basis, pursuant to the DIP Documents and the Final Order, postpetition financing in an aggregate principal amount of up to $52,500,000.00, upon entry of a Final Order;

v. DIP Lender shall also be entitled to a DIP Facility Fee of 10%, up to $2,100,000.

vi. Execute and deliver the DIP Term Sheet and the other DIP Documents to the DIP Lender pursuant thereto;

vii. Grant to the DIP Lender the DIP Liens on all of the DIP Collateral to secure the DIP Credit Facility and all obligations owing and outstanding thereunder and under the DIP Documents, as applicable, and the Interim Order and the Final Order, as applicable (collectively, and including all "Obligations" as defined in the DIP Term Sheet, the "DIP Obligations"), subject only to prior payment of the Carve-Out;

viii. Grant to the DIP Lender allowed superpriority administrative expense claims in the Chapter 11 Case for all DIP Obligations;

ix. Use the proceeds of the DIP Credit Facility in accordance with the DIP Term Sheet, the DIP Documents and this Interim Order, in all cases in accordance with the Budget, and as otherwise provided in the DIP Documents;

x. Use any Prepetition Collateral, including the Cash Collateral, and provide adequate protection to those parties set forth herein that may have an interest in such Prepetition Collateral, including Cash Collateral, for any possible Diminution;

xi. Vacate and modify the automatic stay imposed by § 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms of the DIP Documents and this Interim Order;

xii. Schedule a final hearing (the "Final Hearing") to consider entry of an order (the "Final Order") granting the relief requested in the Motion on a final basis and approving the form of notice with respect to the Final Hearing; and

xiii. Waive, to the extent applicable, any stay of the immediate effectiveness of this Interim Order imposed by the Bankruptcy Code or the Bankruptcy Rules, such that this Interim Order shall be immediately effective upon its entry on the Court's docket.

The Court having considered the Motion, the Chadwick Declaration, the Turnbull Declaration, the DIP Term Sheet, and the evidence submitted or adduced and the arguments of counsel made at the hearing on this Interim Order (the "Interim Hearing"); and notice of the Motion and the Interim Hearing having been given in accordance with Bankruptcy Rules 4001 and 9014; and the Interim Hearing having been held and concluded; and it appearing that granting the relief requested in the Motion on an interim basis is an appropriate exercise of the Debtor's business judgment, necessary to avoid immediate and irreparable harm to the Debtor pending the Final Hearing, and is otherwise fair and reasonable and in the best interests of the Debtor, its estate and its creditors, and is essential for the preservation of the value of the Debtor's property; and all objections, if any, to the entry of this Interim Order having been withdrawn, resolved or overruled by the Court; and after due deliberation and consideration, and good and sufficient cause appearing therefor:

**IT IS FOUND AND DETERMINED THAT:**

A. Petition Date. On July 4, 2026 (the "Petition Date"), the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code with this Court.

B. Jurisdiction and Venue. This Court has jurisdiction over these proceedings, pursuant to 28 U.S.C. §§ 157(b) and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, and over the persons and property affected hereby. Venue for the Chapter 11 Case and the proceedings on the Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409. Consideration of the Motion constitutes a

core proceeding under 28 U.S.C. § 157(b)(2). This Court may enter a final order consistent with Article III of the United States Constitution.

C. Notice. Notice of the Interim Hearing and notice of the Motion has been given by the Debtor to (i) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"); (ii) the Debtor's thirty (30) largest unsecured creditors; (iii) counsel to the DIP Lender and to the Prepetition Secured Parties; (iv) all known holders of liens upon the Debtor's assets; (v) the attorneys general in the states in which the Debtor conducts its business; (vi) the Internal Revenue Service; (vii) the United States Securities and Exchange Commission; and (viii) all parties that have filed notices of appearance pursuant to Bankruptcy Rule 2002; in each case by email, overnight courier and/or hand delivery. Under the circumstances, such notice of the Interim Hearing and Motion and the relief provided for in this Interim Order complies with § 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001, and the Local Rules and no further notice of the Interim Hearing is required.

D. Debtor's Stipulations. In requesting the financing from the DIP Lender and in exchange for and as a material inducement to the DIP Lender to agree to provide the financing in accordance with the DIP Credit Facility, the Debtor acknowledges, represents, stipulates and agrees, for itself and its estate, subject to the Challenge rights set forth in Paragraph 21 of this Interim Order (solely with respect to the Prepetition Senior Lender) and without prejudice to the rights of interested parties other than the Debtor, as follows (the "Stipulations"):

i. As of the Petition Date, the Debtor has senior secured indebtedness in an aggregate outstanding amount of approximately $50,943,321.41, inclusive of all accrued and unpaid interest, but exclusive of fees, costs, and expenses (collectively, the "Prepetition Senior Loan Obligations"), owed pursuant to that certain Main Street Priority Loan Agreement, dated as

of December 10, 2020 (the "Prepetition Senior Loan Agreement" and all documents related thereto, the "Prepetition Senior Loan Documents"), by and among the Debtor and First Western Trust Bank ("First Western") and the Federal Reserve Bank of Boston (the "Federal Reserve"), pursuant to which First Western extended a senior secured loan to the Debtor in the principal amount of $35,000,000. In November 2025, Axios Capital Solutions, LLC ("Axios") purchased the Prepetition Loan Agreement from First Western (Axios, in such capacity, the "Prepetition Senior Lender"). The Prepetition Senior Loan Obligations are secured by liens on substantially all assets of the Debtor (the "Prepetition Senior Loan Collateral" and the liens securing the Prepetition Senior Loan Obligations, the "Prepetition Senior Liens"). The Prepetition Senior Lender and the Debtor's landlord, Reliq Pacifica LLC and Beverly Gemini Investments, LLC ("Landlord"), are referred to herein collectively as the "Prepetition Secured Parties," the obligations owed to each of the Prepetition Secured Parties are referred to herein collectively as the "Prepetition Secured Obligations", the liens securing the Prepetition Secured Obligations are referred to herein collectively as the "Prepetition Liens," and the Debtor's assets subject to the Prepetition Liens are referred to herein collectively as the "Prepetition Collateral." Landlord's liens are subordinated to the liens of Prepetition Senior Lender pursuant to, and to the extent set forth in, that certain Lien Subordination Agreement, dated December 17, 2020 between those parties (the "Subordination Agreement").

ii. As of the Petition Date: (a) the Prepetition Senior Loan Obligations constitute legal, valid, and binding obligations of the Debtor, enforceable in accordance with their terms (other than in respect of the stay of enforcement arising from § 362 of the Bankruptcy Code to the extent applicable); (b) no recoupments, offsets, defenses, or counterclaims exist to the Prepetition Senior Loan Obligations; and (c) no portion of the Prepetition Senior Loan Obligations

or any payments or other transfers made to the Prepetition Senior Lender or applied to the Prepetition Senior Loan Obligations prior to the Petition Date is subject to avoidance, subordination, recharacterization, recovery, attack, recoupment, offset, counterclaim, crossclaim, defense, or claim (as defined in § 101(5) of the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law;

iii. The Prepetition Senior Liens constitute valid, binding, enforceable (other than with respect to the stay of an enforcement arising from § 362 of the Bankruptcy Code) and perfected liens with priority over any and all other liens in the Prepetition Senior Loan Collateral (except as otherwise provided in the Prepetition Senior Loan Documents), and are not subject to any challenge or defense, including without limitation, avoidance, subordination, recharacterization, recovery, reduction, set-off, offset, attack, counterclaim, crossclaim, or claim (as defined in § 101(5) of the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law;

iv. The Debtor has waived, discharged, and released any right it may have to challenge the Prepetition Senior Loan Obligations and the Prepetition Senior Liens on the Prepetition Senior Loan Collateral and to assert any recoupments, offsets, defenses, claims, objections, challenges, causes of action and/or causes of action against the Prepetition Senior Lender with respect to the Prepetition Senior Loan Documents, the Prepetition Senior Obligations, the Prepetition Senior Liens, or the Prepetition Senior Loan Collateral;

v. Any payments made on account of the Prepetition Senior Loan Obligations before the Petition Date were payments made (a) out of the Prepetition Senior Loan Collateral, and/or (b) in the ordinary course of business and in exchange for reasonably equivalent value and did not diminish any property otherwise available for distribution to unsecured creditors;

vi. All of the Debtor's cash, including the cash in its deposit accounts and other accounts, wherever located, whether as original collateral or proceeds of other Prepetition Senior Collateral, constitutes Cash Collateral;

vii. Neither the DIP Lender nor any of the Prepetition Secured Parties is a control person or insider (as defined in § 101(31) of the Bankruptcy Code) of the Debtor;

viii. Until such time as all DIP Obligations are indefeasibly paid in full in cash, the Debtor shall not in any way prime (or otherwise cause to be subordinated in any way) or seek to prime (unless such proposal, if approved, would satisfy the DIP Obligations in full in cash), (a) the liens provided to the DIP Lender, or (b) the Prepetition Senior Liens securing the Prepetition Senior Loan Collateral, in each case by granting a subsequent lender, or any party-in-interest, a superior or pari passu lien or claim with respect to the DIP Collateral or the Prepetition Senior Loan Collateral, as applicable, pursuant to § 364(d) of the Bankruptcy Code or otherwise, except with respect to the Carve-Out;

ix. Until such time as all DIP Obligations are indefeasibly paid in full in cash, the Debtor shall not in any way or at any time seek (unless such proposal, if approved, would satisfy the DIP Obligations in full in cash) allowance of any administrative expense claim against the Debtor of any kind or nature whatsoever, including, without limitation, claims for any administrative expenses of the kind specified in, or arising or ordered under §§ 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 552(b), 726, 1113 and 1114 of the Bankruptcy Code that is superior to or pari passu with the DIP Superpriority Claim and the Adequate Protection Liens provided herein, except with respect to the Carve-Out;

x. The Prepetition Secured Parties are entitled, pursuant to §§ 361, 363(e), and 364(d)(1) of the Bankruptcy Code, to adequate protection of their respective interests in the

Prepetition Collateral, including the Cash Collateral, to the extent of any diminution in the value of the Prepetition Collateral occurring from and after the Petition Date (the "Diminution"), that may be caused by or arising as a result of (a) the incurrence and payment of the DIP Obligations, (b) the use of Prepetition Collateral (including Cash Collateral), (c) the granting of the DIP Liens and the DIP Superpriority Claim, (d) the subordination of the Prepetition Secured Obligations to the DIP Obligations and the Carve-Out, (e) the subordination of the Prepetition Secured Obligations to the Carve-Out, and (f) imposition of the automatic stay pursuant to § 362 of the Bankruptcy Code.

E. Cash Collateral. For the purposes of this Interim Order, the term "Cash Collateral" shall mean and include all "cash collateral," as defined in § 363 of the Bankruptcy Code, in or on which the DIP Lender or the Prepetition Secured Parties have a lien, security interest, or any other interest (including, without limitation, any Adequate Protection Liens or security interests), whether existing on the Petition Date, arising pursuant to this Interim Order or otherwise, and shall include, without limitation: (i) all cash proceeds arising from the collection, sale, lease or other disposition, use or conversion of any real or personal property, in or on which the DIP Lender or the Prepetition Secured Parties have a lien or a replacement lien, whether as part of the DIP Collateral or the Prepetition Collateral, or pursuant to an order of the Court or applicable law or otherwise, and whether such property has been converted to cash, existed as of the commencement of the Chapter 11 Case, or arose or was generated thereafter; (ii) all of the respective deposits, refund claims, and rights in retainers of the Debtor on which the DIP Lender or the Prepetition Secured Parties hold a lien or replacement lien, whether as part of the DIP Collateral or Prepetition Collateral or pursuant to an order of the Court or applicable law or otherwise; (iii) all cash and cash equivalents held in any depository or other accounts maintained by the Debtor, whether such

cash and cash equivalents existed as of the commencement of the Chapter 11 Case, or arose or was generated thereafter; and (iv) the proceeds of any sale, transfer or other disposition of DIP Collateral or Prepetition Collateral. For the avoidance of doubt, and subject to the Interim Order and Final Order, the Debtor's authorization to use Cash Collateral shall automatically terminate, without further order of the Court, upon the earliest of: (a) the Maturity Date; (b) entry of any order by the Bankruptcy Court denying or terminating the Debtor's authority to use Cash Collateral; or (c) upon the occurrence or continuation of an Event of Default.

F. Findings Regarding the DIP Credit Facility.

a. *Need for the DIP Credit Facility and to Use Cash Collateral*. An immediate need exists for the Debtor to obtain funds pursuant to borrowings under the Interim DIP Credit Facility and to use Cash Collateral in order to continue operations, fund payroll, and operating expenses, and administer and preserve the value of its estate pending the Final Hearing. The ability of the Debtor to finance its operations through the Interim DIP Credit Facility and use of Cash Collateral is vital to the preservation and maintenance of the going concern value of the Debtor's estate, to maximize the value of the Debtor's assets for the benefit of its creditors, and to avoid immediate and irreparable harm to the Debtor, its estate and its creditors.

b. *Priming of Any Prepetition Liens*. Upon the entry of this Interim Order, the priming of any of the Primed Liens, is a condition to the Debtor's borrowings under the DIP Credit Facility, which borrowing is necessary for the Debtor to be able to continue to operate its business and administer the Chapter 11 Case for the benefit of its estate and creditors. The Prepetition Senior Lender has consented to the priming of its Prepetition Senior Liens and the Landlord is bound by the Subordination Agreement not to object to any financing, including a priming facility, supported by the Prepetition Senior Lender, and thus is deemed to have consented to such treatment. The terms of the adequate protection arrangements provided for herein are fair and reasonable and otherwise sufficient under the circumstances to adequately protect the Prepetition Secured Parties against any Diminution with respect to the Prepetition Collateral as provided for herein.

c. *No Credit Available on More Favorable Terms*. The Debtor has been unable to obtain (a) unsecured credit allowable under Bankruptcy Code § 503(b)(1) as an administrative expense, or (b) credit for money borrowed secured by a lien on property of the estate on more favorable terms and conditions than those provided in the DIP Term Sheet and this Interim Order. The Debtor is unable to obtain credit for borrowed money without granting to the DIP Lender the DIP Protections.

d. *Sections 506(c) and 552(b) Waivers*. In light of (i) the DIP Lender's agreement to subordinate its liens and superpriority claims to the Carve-Out, and in exchange for and as a material inducement to the DIP Lender to agree to provide the DIP Credit Facility and (ii) the Prepetition Senior Lender's agreement to subordinate its liens, and the Landlord's deemed consent under the Subordination Agreement to subordinate its liens, to the DIP Obligations, the Carve-Out, and the DIP Liens, and to permit the use of the Prepetition Collateral (including Cash Collateral for payments made in accordance with the Budget and the terms of this Interim Order), each of the DIP Lender and, subject to entry of the Final Order, the Prepetition Secured Parties are entitled to a waiver of the provisions of § 506(c), and, subject to entry of the Final Order, the Prepetition Secured Parties are entitled to a waiver of the exceptions provided in §§ 552(b)(1) and (2) of the Bankruptcy Code, in each case as provided for herein.

e. *Use of Proceeds of the DIP Credit Facility*. Proceeds of the DIP Credit Facility (net of any amounts used to pay fees, costs, and expenses under the DIP Documents) shall be used in a manner consistent with the terms and conditions of the DIP Term Sheet and this Interim Order and in accordance with the Budget.

G. Application of Proceeds of DIP Collateral. Subject solely to the Challenge rights reserved in ¶ 21 of this Interim Order, all net proceeds of any sale or other disposition of the DIP Collateral, if any, shall, subject to the Carve-Out, be applied first to repay the DIP Obligations in full.

H. Effect of Reversal; Good Faith. The DIP Lender has indicated a willingness to provide financing to the Debtor solely in accordance with the DIP Term Sheet and this Interim Order, provided that the DIP Obligations, DIP Liens and other protections granted by this Interim Order and the DIP Documents will not be affected by any subsequent reversal or modification of this Interim Order to the extent provided in § 364(e) of the Bankruptcy Code. The DIP Lender has acted in good faith in agreeing to provide the DIP Credit Facility approved by this Interim Order.

I. Roll Up. Subject to the provisions of Paragraph 21 of this Interim Order and subject to the Carve-Out, as and when each draw of the New Money Term Loan is funded, one and half times (1.5x) of such amount funded of the outstanding Prepetition Loan Obligations, up to a principal amount of $10,500,000.00 on an interim basis and up to a total of $31,500,000.00 on a

final basis, shall be rolled up and converted into DIP Obligations (the "Roll Up"). The Prepetition Senior Lender, who is also the DIP Lender, would not have consented to extend DIP Loans or other financial accommodations to the Debtor without the inclusion of the Roll Up in the DIP Obligations. Thus, the Roll Up is consideration for, and solely on account of, the agreement of the DIP Lender to extend the DIP Loans and not on account of the Prepetition Loan Obligations.

J. Business Judgment and Good Faith Pursuant to Section 364(e). (i) The terms and conditions of the DIP Credit Facility and the DIP Documents as set forth in this Interim Order or the Motion, and the terms and conditions thereunder are fair, reasonable, and the best reasonably available under the circumstances, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and consideration; (ii) the DIP Documents and use of Cash Collateral were negotiated in good faith and at arms' length between the Debtor and the DIP Lender and the Prepetition Secured Parties; and (iii) the DIP Credit Facility loan proceeds to be funded to the Debtor pursuant to the DIP Documents will be advanced in good faith, and for valid business purposes and uses, as a consequence of which the DIP Lender is entitled to the protection and benefits of § 364(e) of the Bankruptcy Code.

K. Immediate Entry of Interim Order. The Debtor has requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2) and Local Rule 4001-2(b). The permission granted herein to enter into the DIP Documents, to obtain funds thereunder and to use the Prepetition Collateral (including the Cash Collateral) pursuant to this Interim Order is necessary to avoid immediate and irreparable harm to the Debtor and its estate. This Court concludes that entry of this Interim Order is in the best interests of the Debtor's estate and creditors as its implementation will, among other things, allow for access to the financing necessary to

administer the Chapter 11 Case, to sustain the operation of the Debtor's existing business and to further enhance the Debtor's prospects for a successful reorganization.

**NOW, THEREFORE**, based upon the foregoing findings, and upon consideration of the Motion and the record made before this Court with respect to the Motion, including the record created during the Interim Hearing, all papers filed on the docket, and with the consent of the Debtor, the DIP Lender, and the Prepetition Secured Parties to the form and entry of this Interim Order, and good and sufficient cause appearing therefor, and the Court being otherwise fully advised in the premises;

**IT IS HEREBY ORDERED AND ADJUDGED THAT:**

1. **Motion Granted**. The Motion is **GRANTED** in accordance with the terms and conditions set forth in this Interim Order. Any objections to the Motion with respect to entry of this Interim Order to the extent not withdrawn, waived, or otherwise resolved, and all reservations of rights included therein, are hereby denied and overruled on the merits.

2. **The DIP Documents**.

a) *Approval of Entry into the DIP Documents*. The Debtor is authorized to execute, deliver and perform in accordance with the DIP Documents and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Documents, and to execute and deliver all instruments and documents which may be required or necessary for the performance by the Debtor under the DIP Documents and the creation and perfection of the DIP Liens described in and provided for by this Interim Order and the DIP Documents. Upon entry of this Interim Order, and subject to the provisions of Paragraph 21 hereof and the Carve-Out, as and when New Money Term Loans are advanced under the DIP Facility, one and half times (1.5x) of such amount funded of outstanding Prepetition Senior Loan

Obligations shall be deemed rolled up and converted into DIP Obligations, up to an aggregate principal amount of $10,500,000.00 under this Interim Order (the "Roll-Up"). The Debtor is authorized to take such acts as shall be necessary or desirable to effect the Roll-up and conversion of the Prepetition Senior Loan Obligations to DIP Obligations. The Debtor is hereby authorized to use Cash Collateral subject to the terms of this Interim Order. The Debtor is hereby authorized to do and perform all acts, pay the principal, interest, fees, expenses, and other amounts described in the DIP Term Sheet and all other DIP Documents as such become due.

b) *Authorization for DIP Financing*. To enable the Debtor to continue to preserve the value of its estate during the period prior to entry of the Final Order (the "Interim Period") and subject to the terms and conditions of this Interim Order, the Budget (a copy of which is attached hereto as **Exhibit 2**), and the DIP Documents, upon the execution of the DIP Term Sheet, the Debtor is hereby authorized to borrow, pursuant to the Interim DIP Credit Facility, the aggregate principal amount of up to (a) $7,000,000.00 in New Money Term Loans, plus (b) $10,500,000 of Roll Up.

c) *Conditions Precedent*. The DIP Lender shall have no obligation to make any loans under the DIP Term Sheet during the Interim Period unless the conditions precedent to making such loans under the DIP Term Sheet have been satisfied in full or waived by the DIP Lender in its sole discretion.

d) *Enforceable Obligations*. The DIP Documents shall constitute and evidence the valid and binding obligations of the Debtor, which obligations shall be enforceable against the Debtor, its estate and any successors thereto, and its creditors or representatives thereof, in accordance with their terms.

e) *Protection of the DIP Lender and Other Rights*. From and after the Petition Date, the Debtor shall use the proceeds of the DIP Credit Facility only for the purposes specifically set forth in the DIP Term Sheet, this Interim Order, and, notwithstanding any other order of this Court authorizing disbursements by the Debtor, in strict compliance with the Budget (subject only to any variances thereto that may be permitted by the DIP Term Sheet or the Budget).

3. **The DIP Lien Priority**.

a) To secure the DIP Obligations, the DIP Lender is hereby granted pursuant to, and in accordance with, §§ 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, valid, enforceable and fully perfected liens (the "DIP Liens") in and on all of the DIP Collateral, including, without limitation, all of the Debtor's now owned or hereafter acquired right, title, and interest in and to all cash, accounts, accounts receivable, goods, inventory, property, plant and equipment, commercial tort claims, intellectual property, contract rights, tax refunds, prepaid expenses, deposits, general intangibles, real estate, leaseholds, all intercompany claims, all claims, and causes of action of the Debtor or its estate (including, without limitation, all commercial tort claims of every kind and description, whether described in specificity in the DIP Documents or not) and any and all proceeds and property recovered therefrom, any and all proceeds arising from insurance policies, all intellectual property, which for the avoidance of doubt, shall include, without limiting the generality of the foregoing, all assets of the Debtor that constitute Prepetition Collateral, and all other property and assets including, without limitation, Cash Collateral, all cash and non-cash proceeds, rents, products, substitutions, accessions, offspring and profits of any of the collateral described above, and subject to entry of the Final Order, any and all proceeds or property recovered in connection with any and all claims, causes of action, rights, or remedies of the Debtor or its estate arising under chapter 5 of the Bankruptcy Code (including, without

limitation, §§ 544, 545, 547, 548, 549, 550, and 553 thereof), and any similar or related claims, causes of action, or rights arising under applicable state or other non-bankruptcy law ("Avoidance Actions"), but, for the avoidance of doubt, excluding the Avoidance Actions themselves, (collectively, the "DIP Collateral"), subject only to prior payment of the Carve-Out and any Prior Permitted Liens;

b) The DIP Liens shall be effective immediately upon the entry of this Interim Order other than the DIP Liens on the proceeds of Avoidance Actions, which shall be effective upon entry of the Final Order, and the DIP Liens shall not at any time be made subject or subordinated to, or made pari passu with, any other lien, security interest or claim existing as of the Petition Date or created thereafter, including under §§ 363 or 364(d) of the Bankruptcy Code or otherwise, other than prior payment of the Carve-Out and the Prior Permitted Liens;

c) The DIP Liens shall be, and hereby are deemed, fully perfected liens and security interests, effective and perfected upon the date of this Interim Order, without the necessity of execution by the Debtor of mortgages, security agreements, pledge agreements, financing agreements, financing statements, account control agreements or any other agreements, filings or instruments, such that no action whatsoever need be taken by the DIP Lender, the Debtor, or any other party (including, without limitation, any depository bank or securities intermediary) to perfect such interests.

d) For the avoidance of doubt, until indefeasible payment in full in cash of the DIP Obligations, and subject in all cases to the Carve-Out and the terms of the Interim Order and Final Order, the DIP Lender shall have the following priority claims and liens: (i) pursuant to § 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims against the Debtor and its estate with priority over any and all administrative expenses and other claims

of the kind specified in §§ 503(b) or 507(b) of the Bankruptcy Code, subject to, solely with respect to the Roll Up, the Challenge rights reserved in Paragraph 21 of this Interim Order; (ii) pursuant to § 364(c)(2) of the Bankruptcy Code, perfected first priority, senior liens on and security interests in all DIP Collateral that, as of the Petition Date, was not subject to any valid, perfected, and unavoidable lien, or was subject only to invalid, unperfected, or avoidable liens; (iii) pursuant to § 364(c)(3) of the Bankruptcy Code, perfected junior liens on, and security interests in, all DIP Collateral that, as of the Petition Date, was subject to a valid, perfected, and unavoidable lien in existence at the commencement of the Chapter 11 Case, other than the Primed Liens (such third-party senior liens, "Prior Permitted Liens"); and (iv) pursuant to § 364(d)(1) of the Bankruptcy Code, and except with respect to any property subject to Prior Permitted Liens, perfected, first-priority senior priming liens on, and security interests, in all DIP Collateral that is subject to the existing liens in favor of the Prepetition Secured Parties (the "Primed Liens"), which Primed Liens shall be primed by and made subject and subordinate to the perfected first-priority senior priming DIP Liens granted to the DIP Lender hereunder; such priming DIP Liens shall also prime any liens granted after the Petition Date as adequate protection of any Primed Liens, all as provided in the Interim Order and Final Order; *provided* that notwithstanding the foregoing, upon the effectiveness of the Roll Up as provided herein, any prepetition liens and security interests securing the Prepetition Senior Loan Obligations are hereby deemed replaced by the DIP Liens securing the DIP Obligations (including the Roll Up), as provided in this Interim Order and the Final Order, subject to the Challenge rights reserved in Paragraph 21 of this Interim Order.

4. **Superpriority Administrative Claim**. The DIP Lender is hereby granted an allowed superpriority administrative expense claim (the "DIP Superpriority Claim," together with the DIP Liens, the "DIP Protections") pursuant to § 364(c)(1) of the Bankruptcy Code in the

Chapter 11 Case and in any Successor Case(s) for all DIP Obligations, including the Roll Up (subject to the Challenge rights reserved in Paragraph 21 of this Interim Order), having priority over any and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kinds specified in or arising or ordered under §§ 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c) (with respect to the Roll Up, subject to entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 and any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed DIP Superpriority Claim shall be payable from all pre- and post-petition property of the Debtor and all proceeds thereof, including, without limitation, and after entry of a Final Order, proceeds or property recovered in connection with the pursuit of Avoidance Actions (but excluding the Avoidance Actions themselves). The DIP Superpriority Claim shall be subject and subordinate in priority of payment only to prior payment of the Carve-Out. The DIP Superpriority Claim shall be senior in all respects to any superpriority claims granted in the Chapter 11 Case.

5. **Authorization to Use Proceeds of the DIP Credit Facility and Cash Collateral**. Pursuant to the terms and conditions of this Interim Order, the DIP Term Sheet and the other DIP Documents, and in accordance with the Budget and any variances thereto that may be permitted pursuant thereto or pursuant to the DIP Term Sheet, the Debtor is authorized to use the borrowings pursuant to the DIP Term Sheet and to use Cash Collateral during the Interim Period until the earliest to occur of the (a) the Maturity Date; (b) entry of any order by the Bankruptcy Court denying or terminating the Debtor's use of Cash Collateral; or (c) upon the occurrence or continuation of an Event of Default. Subject to the terms of the DIP Term Sheet, the Debtor and the DIP Lender may agree in writing to modify the Budget in the DIP Lender's sole discretion at

any time that the DIP Credit Facility remains outstanding. Silence, inaction, course of dealing, or funding of any advance shall not constitute approval of any Budget modification or variance.

6. **Relief from the Automatic Stay**.

a. Upon the occurrence and during the continuance of an Event of Default, the DIP Lender shall have no obligation to make further advances or consent to further use of Cash Collateral. Upon five (5) Business Days' prior written notice to the Debtor (the "Remedies Notice Period"), counsel to the Official Committee of Unsecured Creditors (the "Committee"), the Prepetition Secured Parties, and the U.S. Trustee, the DIP Lender is hereby granted relief from any stay of proceeding (including, without limitation, the automatic stay applicable under § 362 of the Bankruptcy Code to the holder or holders of any security interest) to permit the DIP Lender, upon the occurrence of and continuance of an Event of Default, to exercise any rights and remedies provided to the DIP Lender under the DIP Documents or at law or equity, including all remedies provided under the Bankruptcy Code. Furthermore, the DIP Lender is hereby granted immediate relief from the automatic stay to take steps to perfect the DIP Liens, as described below. The automatic stay of § 362(a) of the Bankruptcy Code, to the extent applicable, shall be deemed terminated without the necessity of any further action by the Court in the event that the Debtor, the Committee, the Prepetition Secured Parties, and/or the U.S. Trustee have not obtained an order providing otherwise (a "Stay Enforcement Order") from this Court prior to the expiration of the Remedies Notice Period; *provided* that the hearing on whether the automatic stay shall be terminated may be sought on an expedited basis.

b. Upon an Event of Default and subject to the expiration of the Remedies Notice Period without entry of a Stay Enforcement Order, and notwithstanding § 362, the Prepetition Senior Lender, solely in its capacity as party to any deposit account control agreement(s)

or similar control agreements in effect as of the Petition Date with respect to any Debtor's deposit, securities, or other bank accounts (collectively, "DACAs"), shall be granted limited relief from the automatic stay to deliver any "notice of exclusive control," "activation notice," or similar instruction required under the DACAs to acknowledge and implement that the Prepetition Senior Lender has exclusive control over the applicable account(s) for the benefit of itself and the DIP Lender pursuant to this Interim Order. Any bank, financial institution, depository, or securities intermediary subject to a DACA (each, a "Depository Institution") is authorized to comply with any such notice or instruction without further order of the Court, and shall have the protections of § 364(e) and any other applicable protections afforded by this Interim Order for taking such actions in good faith. For the avoidance of doubt, any such exercise shall be limited to effectuating the Prepetition Senior Lender's and the DIP Lender's exclusive control consistent with the DIP Documents and this Interim Order. Nothing in this paragraph requires the Prepetition Senior Lender or any Depository Institution to sweep, transfer, or apply funds in any account before the expiration of the Remedies Notice Period. All parties' rights with respect to cash management relief and orders remain reserved, and this Paragraph is intended to complement, and not conflict with, any cash management order entered in the Chapter 11 Case.

7. **Postpetition DIP Lien Perfection**.

a) This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect the DIP Liens or to entitle the DIP Liens to the priorities granted herein. Notwithstanding

the foregoing, the DIP Lender may, at its sole discretion, file financing statements, without notice to the Debtor, with all appropriate jurisdictions to perfect or protect the DIP Lender's interest or rights hereunder, including a notice that any disposition of the DIP Collateral, by the Debtor or any other Person, shall be deemed to violate the rights of the DIP Lender under the Uniform Commercial Code. Such financing statements may indicate the DIP Collateral as "all assets of the Borrower" or words of similar effect, or as being of an equal or lesser scope, or with greater detail, all in the DIP Lender's discretion, and is hereby granted relief from the automatic stay of § 362 of the Bankruptcy Code in order to do so, and any and all of such financing statements, mortgages, notices of lien and other documents shall be deemed to have been filed or recorded at the time and on the date of the commencement of the Chapter 11 Case.

b) The Debtor shall from time to time execute and deliver to the DIP Lender, at the written request of the DIP Lender, all negotiable collateral, all financing statements and other documents that the DIP Lender may reasonably request, in form satisfactory to the DIP Lender, to perfect and continue the perfection of the DIP Lender's security interests in the DIP Collateral and in order to fully consummate all of the transactions contemplated under the DIP Documents.

8. **Authorization and Direction for Payment of DIP Lender and Prepetition Secured Parties' Fees and Expenses**. The Debtor shall pay all reasonable and documented prepetition and postpetition out of pocket costs and expenses of DIP Lender in connection with the Chapter 11 Case and any Successor Case(s), including, without limitation, in connection with (a) the preparation, negotiation, execution and delivery of the DIP Documents, this Interim Order, and any Final Order, and the funding of all DIP Loans under the DIP Credit Facility, (b) the administration of the DIP Credit Facility and any amendment or waiver of any provision of the DIP Documents, this Interim Order, and any Final Order, (c) the administration of the Chapter 11

Case and any Successor Case(s), (d) the enforcement or protection of the DIP Lender's rights and remedies under the DIP Documents, this Interim Order, and any Final Order, and (e) as provided in Paragraph 12(d). Notwithstanding anything to the contrary herein, the payment of all such reasonable and documented fees, costs and expenses of the DIP Lender, whether incurred before or after the Petition Date, including, without limitation, all reasonable and documented fees referred to in the DIP Documents, all fees referred to in Paragraph 12(d) and all attorneys' fees and expenses, shall (i) be subject to Paragraph 21 of this Interim Order, be deemed non-refundable and irrevocable, and (ii) not be subject to the Budget. None of DIP Lender's or the Prepetition Secured Parties' attorneys' fees or disbursements shall be subject to the approval (whether prior to payment or after) of this Court or the guidelines of the Office of the U.S. Trustee, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court. Any such fees, costs and expenses shall be paid by the Debtor within fourteen (14) days after delivery of a summary invoice to the Debtor and without the need for application to or order of the Court. Such summary invoice may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any work product doctrine, privilege or protection, common interest doctrine privilege or protection, any other evidentiary privilege or protection recognized under applicable law, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege, work product doctrine, privilege or protection, common interest doctrine privilege or protection, or any other evidentiary privilege or protection recognized under applicable law. [A copy of such summary invoice shall be provided by DIP Lender or the Prepetition Secured Parties, as applicable to the U.S. Trustee contemporaneously with the Debtor's receipt of such summary invoice]. Notwithstanding the foregoing, if (x) the Debtor or the U.S. Trustee objects to the

reasonableness of a summary invoice submitted by the DIP Lender and (y) the parties cannot resolve such objection, in each case within the fourteen (14) day period following receipt of such summary invoice, the Debtor or the U.S. Trustee, as the case may be, shall file with the Court and serve on the DIP Lender submitting the fee request a fee objection (a "Fee Objection"), which Fee Objection shall be limited to the issue of the reasonableness of such fees and expenses.

9. **Carve-Out; Professional Fee Escrow**.

a) "Carve-Out" means (a) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the U.S. Trustee under 28 U.S.C. § 1930(a) (without regard to the notice set forth in (c) below) (the "U.S. Trustee Fees"); (b) to the extent allowed at any time, whether by interim order, procedural order, or otherwise by the Court, solely to the extent provided for in the Budget, all unpaid fees (including, without limitation, transaction fees paid upon the closing of the respective transaction but excluding success fees) and expenses (collectively, the "Professional Fees") accrued or incurred by persons or firms retained by the Debtor pursuant to §§ 327, 328, or 363 of the Bankruptcy Code (the "Professionals") and professionals employed by the Committee (the "Committee Professionals" and, together with the Professionals, the "Professional Persons") at any time on or prior to delivery by or on behalf of the DIP Lender of a Carve-Out Trigger Notice, whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice; and (c) the Professional Fees in an aggregate amount not to exceed $200,000.00 for amounts incurred after the date of delivery of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise by the Court (the amounts set forth in this clause (c) being the "Post-Carve-Out Trigger Notice Cap"). "Carve-Out Trigger Notice" means a written notice delivered by email (or other electronic means) to the Debtor and its counsel, the U.S. Trustee, and counsel to the Committee, and the Prepetition Secured

Parties, which notice may be delivered following the occurrence and during the continuation of an Event of Default under the DIP Documents, stating (x) that the Post-Carve-Out Trigger Notice Cap has been invoked, (y) the DIP Loans have been accelerated, and (z) the DIP Lender does not intend to fund further advances under the DIP Loans or consent to further use of Cash Collateral. Except as otherwise provided herein, no portion of the Carve-Out or proceeds of the DIP Credit Facility may be used for the payment of the fees and expenses of any person incurred in challenging, or in relation to the Challenge of, (a) the liens and/or claims of the DIP Lender or the Prepetition Secured Parties, or the initiation or prosecution of any claim or action against the DIP Lender or the Prepetition Secured Parties, including, without limitation, any Avoidance Actions, and any other federal, state or foreign law, in respect of the DIP Documents or (b) any claims or causes of actions against the DIP Lender or the Prepetition Secured Parties, their advisors, professionals, agents and sub-agents, including formal discovery proceedings in anticipation thereof.

b) The Debtor shall wire transfer funds, on a weekly basis, to an escrow account establish by Verita, its claims agent, in an amount equal to, but not to exceed, the amounts set forth in the professional fee line items under the "Restructuring Disbursements" subheading in the Budget for each such week (the "Professional Fee Escrow"). The Debtor shall use funds held in the Professional Fee Escrow exclusively to pay Professional Fees as they become allowed and payable pursuant to the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, in accordance with any interim or final orders of the Court; *provided, however*, that the Debtor's obligations to pay such allowed Professional Fees shall not be limited or be deemed limited to funds held in the Professional Fee Escrow. Upon delivery of a Carve-Out Trigger Notice, the Debtor may also fund the Professional Fee Escrow with the amount of the Post-Carve-Out Trigger

Notice Cap. Except as provided in this Interim Order, no funds of the Debtor shall be transferred or otherwise deposited into the Professional Fee Escrow. The amount transferred to the Professional Fee Escrow in any week shall not exceed the amount expressly scheduled for that week in the Approved Budget (other than an initial catch up escrow to amounts accrued prior to the Initial Advance), and the aggregate pre-Trigger Notice amount shall not exceed the aggregate amount scheduled in the Approved Budget. No transfer to the Professional Fee Escrow may be made after delivery of a Carve-Out Trigger Notice other than the fixed Post-Carve-Out Trigger Notice Cap. The Professional Fee Escrow shall not be subject to the control of the DIP Lender, and the funds transferred to the Professional Fee Escrow shall not be subject to the DIP Liens, the Adequate Protection Liens or any other liens, nor constitute DIP Collateral, Prepetition Collateral or collateral for any other obligation; *provided, however*, that the DIP Liens shall automatically attach to any residual interest in the Professional Fee Escrow (which liens shall be deemed automatically perfected liens as of entry of this Interim Order), and upon satisfaction of all amounts payable from the Professional Fee Escrow, any excess proceeds shall revert to the DIP Lender until the DIP Obligations have been satisfied in full and thereafter to the Debtor (including as reorganized pursuant to a chapter 11 plan).

c) The Debtor shall not sell, assign, factor, advance against, compromise, settle, transfer, or otherwise dispose of any HQAF receivable or any related proceeds without the DIP Lender’s prior written consent in its sole discretion and, if required by applicable law, further order of this Court. Notwithstanding the foregoing or any anything else herein to the contrary, in the event there is a Carve Out Trigger Notice, the DIP Lender and Prepetition Senior Lender hereby consent to the Debtor entering into one or more agreements for the advancement or sale of HQAF receivables with such amounts to be used for reasonable, necessary and documented costs

(excluding legal fees) to safely close the Hospital, to be determined in consultation with the DIP Lender, with any excess amounts to be turned over to the DIP Lender.

10. For the avoidance of doubt, notwithstanding any (i) occurrence of any Event of Default, (ii) delivery of a Carve-Out Trigger Notice, or (iii) termination of the DIP Documents, the Debtor shall be permitted to fund and make payments from the Professional Fee Escrow in accordance with the Budget and this Interim Order; *provided, that*, for the further avoidance of doubt, nothing in this subparagraph is intended or shall be deemed to obligate the DIP Lender to make any further DIP Loans or advance any further funds under the DIP Facility upon the occurrence of any of the events identified at (i), (ii), and (iii) in this subparagraph.

11. **Payment of Compensation**. Nothing herein shall (i) limit or cap the amount of U.S. Trustee Fees or any professional fees of the Debtor or Committee that may ultimately be allowed or paid from sources other than the DIP Collateral or Prepetition Collateral, or (ii) be construed as consent to the allowance of any professional fees or expenses of the Debtor or Committee or affect the right of any party in interest to object to the allowance and payment of such fees and expenses.

12. **Adequate Protection for Prepetition Secured Parties**. As adequate protection in respect of, and as consideration for any Diminution resulting from any of the incurrence and payment of the DIP Obligations, the use of Cash Collateral, the use of other Prepetition Collateral, the granting of the DIP Liens and the DIP Superpriority Claim, the subordination of the Prepetition Secured Obligations to the DIP Obligations and the Carve-Out and the imposition of the automatic stay pursuant to § 362 of the Bankruptcy Code, the Prepetition Secured Parties are hereby granted (in each case subject only to the DIP Liens, the DIP Superpriority Claim, and prior payment of the Carve-Out) the following adequate protection:

a) *Adequate Protection Liens*. The Prepetition Secured Parties are hereby granted (effective and perfected by operation of law immediately upon entry of this Interim Order and without the necessity of execution by the Debtor of mortgages, security agreements, pledge agreements, financing statements, account control agreements and other agreements, filings or instruments) valid, perfected, postpetition security interests and liens (the "Adequate Protection Liens") in and on all of the DIP Collateral, with a priority subject and subordinate only to (i) the DIP Liens, (ii) prior payment of the Carve-Out and (iii) any liens senior by operation of law or otherwise permitted under the Prepetition Loan Documents (solely to the extent that any such permitted liens were valid, properly perfected, non-avoidable and senior in priority to the Prepetition Liens as of the Petition Date, or valid, non-avoidable senior priority liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by § 546(b) of the Bankruptcy Code).

b) *Superpriority Claims*. Administrative superpriority expense claims in the Chapter 11 Case (the "Adequate Protection Superpriority Claims"), junior and subordinate only to the DIP Obligations and the Carve-Out, pursuant to section 507(b) having priority over any and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kinds specified in or arising or ordered under §§ 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of a Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 and any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed Adequate Protection Superpriority Claim shall be payable from and have recourse to all pre- and post-petition property of the Debtor and all proceeds thereof including, without limitation, and after

entry of a Final Order, any proceeds or property recovered in connection with the pursuit of Avoidance Actions. The DIP Superpriority Claim shall be subject and subordinate in priority of payment only to prior payment of the Carve-Out. For the avoidance of doubt, the Adequate Protection Superpriority Claims are junior and subordinate in all respects to (i) the Carve-Out and (ii) the DIP Superpriority Claim and all other DIP Obligations.

c) *506(c) and 552(b) Waivers*. Upon the entry of the Final Order, the Prepetition Secured Parties' consent to use of Cash Collateral and Prepetition Collateral under this Interim Order and the Final Order and the Debtor's right to use Cash Collateral and Prepetition Collateral: (i) is in lieu of any § 506(c) claim, payment or priority for the costs or expenses of the administration of the Chapter 11 Case; and (ii) is granted as consideration for (among other things) the waiver of the exceptions provided in §§ 552(b)(1) and (2) of the Bankruptcy Code.

d) *Fees and Expenses*. The Debtor shall pay all postpetition reasonable and documented fees and expenses incurred by the DIP Lender, including, without limitation, the reasonable and documented fees and expenses of counsel to the Prepetition Senior Lender; including fees and expenses incurred in connection with negotiations in connection with the DIP Term Sheet and Plan Term Sheet and related documents; provided, however, that the DIP Lender shall not be entitled to reimbursement for any fees or expenses incurred in connection with (i) the acquisition of the Hospital or the transfer of operations at the Hospital (including in connection with regulatory approval, interim management agreement or similar arrangement, or negotiation of a lease with the Landlord), or (ii) the negotiation, preparation, or documentation of any asset purchase agreement, or (iii) any other activities undertaken in furtherance of the DIP Lender's acquisition of the Debtor's assets. No provision of this Interim Order shall impair the DIP Lender's right to reimbursement for reasonable expenses incurred to preserve, monitor, enforce, protect, or

realize upon its rights and collateral, including in connection with a court-approved sale process or credit bid as DIP Lender.

13. **Credit Bid Rights**. In connection with any sale or disposition of all or any portion of the DIP Collateral, including in each case pursuant to §§ 9-610 or 9-620 of the Uniform Commercial Code, at any sale thereof conducted under the provisions of the Bankruptcy Code, including § 363 of the Bankruptcy Code or as part of restructuring plan subject to confirmation under § 1129 of the Bankruptcy Code, or at any sale or foreclosure conducted by the DIP Lender, by a chapter 7 trustee under § 725 of the Bankruptcy Code, or otherwise, in each case in accordance with applicable law and, with respect to any credit bid, § 363(k) of the Bankruptcy Code, the DIP Lender shall have the power and right to "credit bid" the full amount (or any portion) of all DIP Obligations (inclusive of the Roll Up, subject to the Challenge rights in Paragraph 21 of this Interim Order) in order to purchase (either directly or through one or more acquisition vehicles) all or any portion of the DIP Collateral and (b) subject to the terms of Paragraph 21 herein, the Prepetition Senior Lender shall have the right to credit bid the full amount (or any portion) of the Prepetition Senior Loan Obligations, in order to purchase (either directly or through one or more acquisition vehicles) all or any portion of the Prepetition Collateral. The Debtor, on behalf of itself and the estate, further hereby agrees not to challenge the rights granted to the DIP Lender and the Prepetition Senior Lender in this paragraph. The DIP Lender and each of its affiliates, designees, and acquisition vehicles may credit bid all or any portion of the full amount of the DIP Obligations, including principal, accrued interest, fees, expenses, protective advances, and other obligations under the DIP Documents, in any sale or disposition of DIP Collateral. No Challenge shall limit such credit-bid right absent a final, non-appealable order expressly determining the specific amount of DIP Obligations that may not be credit bid.

14. **Maturity Date**. All unfunded DIP commitments of the DIP Lender will terminate, and all DIP Obligations of the Debtor will be immediately due and payable in full in cash on the earliest of: (a) December 11, 2026, unless a Confirmation Order is entered, in form and substance reasonably acceptable to DIP Lender, approving the Plan, Disclosure Statement and related sale of the Debtor's assets to the DIP Lender (or its designee), in which case such date shall be extended to the occurrence of the effective date of the Plan and closing of such sale (the "Maturity Date"); (b) the date upon which a Milestone is missed and not waived by the DIP Lender; (c) the date of consummation of any sale of all or substantially all of the assets of the Debtor pursuant to § 363 of the Bankruptcy Code; (d) the date of acceleration of the DIP Loans and the termination of the DIP commitments pursuant to the terms of the DIP Documents (e.g., occurrence of an Event of Default); (e) the effective date of a plan of reorganization in the Chapter 11 Case; (f) appointment of a chapter 11 trustee in the Chapter 11 Case; or (g) conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code or dismissal of the Chapter 11 Case.

15. **Events of Default**. The occurrence of an "Event of Default" by the Debtor pursuant to the DIP Term Sheet shall constitute an event of default under this Interim Order, unless expressly waived by the DIP Lender in its sole discretion in writing in accordance with the DIP Documents (each, an "Event of Default"). The Debtor shall provide the DIP Lender immediate written notice of any Event of Default or event that, with notice, passage of time, or both, would become an Event of Default.

16. **Rights and Remedies Upon Event of Default**. Upon the occurrence and during the continuance of an Event of Default, the DIP Lender shall have the rights to which it is entitled under the DIP Term Sheet and this Interim Order, subject to the rights and defenses of the Debtor under this Interim Order.

17. **Proofs of Claim**. Neither the DIP Lender nor the Prepetition Secured Parties shall be required to file proofs of claim in the Chapter 11 Case or Successor Cases for any claim allowed herein.

18. **Other Rights and Obligations**.

a) *Good Faith Under Section 364(e) of the Bankruptcy Code*. The DIP Lender and the Prepetition Secured Parties have acted in good faith in connection with (i) negotiating the DIP Documents and the loans to be made pursuant thereto, (ii) consenting to the Debtor's use of Cash Collateral, and (iii) their reliance on this Interim Order. Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with § 364(e) of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (c), in the event any or all of the provisions of this Interim Order are hereafter reversed or modified by a subsequent order of this or any other Court, the DIP Lender and the Prepetition Secured Parties are entitled to all of the benefits and protections to the extent provided in § 364(e) of the Bankruptcy Code.

b) *Binding Effect*. The DIP Liens, DIP Superpriority Claim, and the Adequate Protection Liens and other rights and remedies granted under this Interim Order to the DIP Lender and the Prepetition Secured Parties, as applicable, shall continue in the Chapter 11 Case and any Successor Case(s), and shall be valid and enforceable against any trustee appointed in the Debtor's Chapter 11 Case and upon the dismissal of the Debtor's Chapter 11 Case, or in any Successor Case(s), and such liens and security interests shall maintain their priority as provided in this Interim Order until all the DIP Obligations or the Prepetition Obligations, as applicable, have been indefeasibly paid in full in accordance with the DIP Documents, the Prepetition Documents or this Interim Order, as applicable; *provided*, for the avoidance of doubt, that the DIP Liens (to the extent of the Roll Up), DIP Superpriority Claim (to the extent of the Roll Up), and the Adequate

Protection Liens shall be subject to the Challenge rights reserved in Paragraph 21 of this Interim Order.

c) *DIP Lender's Liability for DIP Collateral*. So long as the DIP Lender complies with reasonable commercial lending practices, the DIP Lender shall not in any way or manner be liable or responsible for: (i) the safekeeping of the DIP Collateral; (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause; (iii) any diminution in the value thereof; or (iv) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other person whomsoever, provided that this paragraph shall not apply to CERCLA liability. All risk of loss, damage or destruction of the DIP Collateral shall be borne by the Debtor.

d) *Demand; Protest*. The Debtor waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, notice of any default, nonpayment at maturity, release, compromise, settlement, extension, or renewal of accounts, documents, instruments, chattel paper, and guarantees at any time held by the DIP Lender on which the Debtor may in any way be liable.

e) *No Other Financing.* Except as provided in the DIP Term Sheet, the Debtor shall not seek, solicit, entertain, negotiate, or support any alternative financing (including not entering into any future sale or financing transactions with L.A. Care, or any other person, regarding HQAF receivables or otherwise, and not using or pledging cash collateral other than as set forth in the Approved Budget) or priming proposal without the DIP Lender's prior written consent unless such financing would indefeasibly repay all DIP Obligations in full in cash at or prior to consummation.

19. **Releases**. The release, discharge, waivers, settlements, compromises, and agreements set forth in this Paragraph 19 (the "Releases") and the Stipulations set forth in

Paragraph D of this Interim Order shall be deemed effective upon entry of this Interim Order, subject only to the rights set forth in Paragraph 21 below. The Debtor forever and irrevocably releases, discharges, and acquits (i) the DIP Lender, solely in its capacity as DIP Lender, under the DIP Documents; (ii) the DIP Lender's affiliates and predecessors in interest; and (iii) the DIP Lender's former, current or future officers, employees, directors, agents, representatives, owners, members, partners, advisors, legal advisors, shareholders, managers, consultants, accountants, and attorneys, solely in their capacity as such (collectively, the "DIP Lender Releasees"), of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every type at any time arising prior to the Petition Date, including without limitation, all Avoidance Actions, provided that no such parties will be released, discharged, and acquitted for any claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted from such parties' actual fraud, gross negligence, bad faith, self-dealing or willful misconduct. For the avoidance of doubt, nothing contained herein shall relieve the DIP Lender from fulfilling any of its commitments under this Interim Order or the DIP Documents. Subject to (i) entry of the Final Order and (ii) the Challenge rights set forth in Paragraph 21 of this Interim Order and without prejudice to the rights of interested parties under Paragraph 21 of this Interim Order, the Debtor forever and irrevocably releases, discharges, and acquits the Prepetition Senior Lender, solely in its capacity as such, under the Prepetition Senior Loan Documents, and their affiliates and predecessors in interest, and their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, advisors, legal advisors, shareholders, managers, consultants, accountants, and attorneys, solely in their capacity as such (collectively, the "Prepetition Secured Party Releasees"),

of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every type at any time arising prior to the Petition Date, including without limitation, all Avoidance Actions, provided that no such parties will be released, discharged, and acquitted for any claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted from such parties' actual fraud, gross negligence, bad faith, self-dealing or willful misconduct. For the avoidance of doubt, the foregoing release applies only to conduct, acts and omissions that occurred on or prior to the entry of the Final Order, and the release does not apply to future conduct, acts or omissions or ongoing obligations of the Prepetition Senior Lender to the Debtor under the Prepetition Senior Loan Documents.

20. **Indemnification**. The DIP Lender has acted in good faith, and without negligence or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining the requisite approvals of the DIP Loans, including in respect of the granting of the DIP Liens, any challenges or objections to the DIP Credit Facility, and all documents related to any and all transactions contemplated by the foregoing. Accordingly, the DIP Lender shall be and hereby is indemnified and held harmless by the Debtor in respect of any claim or liability incurred in respect thereof or in any way related thereto, provided that no such party will be indemnified for any cost, expense, or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted from such party's actual fraud, gross negligence, bad faith, or willful misconduct; *provided, further*, that, notwithstanding anything to the contrary herein or in the DIP Term Sheet or any other related document, no Debtor shall have any obligation to indemnify,

contribute to, or reimburse the DIP Lender or any of its affiliates, agents, or representatives for any losses, claims, damages, liabilities, or expenses to the extent arising from or relating to a successful Challenge (as defined in Paragraph 21 of this Interim Order).

21. **Reservation of Certain Third-Party Rights and Bar of Challenges and Claims**. The Releases set forth in Paragraph 19 above and the Stipulations set forth in Paragraph D of this Interim Order shall be binding upon the Debtor and any of its respective successors and assigns in all circumstances and for all purposes, and the Debtor is deemed to have irrevocably waived and relinquished all Challenges as of the Petition Date. In addition, the Committee's right to challenge (i) the Stipulations and Releases set forth herein and (ii) with the consent of L.A. Care, any prepetition transactions between the Debtor and L.A. Care (collectively, the "Challenge Rights") shall be tolled through the effective date of any chapter 11 plan filed and approved in this Chapter 11 Case and, upon the occurrence of the effective date of such plan, shall be deemed waived and released in accordance with the terms and conditions of such plan consistent with the Plan Term Sheet; provided, however, that such tolling period shall expire in the event the Plan is not confirmed due to the DIP Lender's failure to fund its obligations under the DIP Facility, at which time the Committee will have 14-days to pursue a challenge. If such 14-day period expires without a challenge, the Committee's right to challenge will be terminated. No extension of the Challenge Period shall be effective without the prior written consent of the DIP Lender and the Prepetition Senior Lender. The Committee shall have derivative standing to bring a challenge against the Prepetition Senior Lender or the Prepetition Senior Liens provided it satisfies the requirements set forth in, and consistent with, this paragraph. A timely Challenge must be commenced by a properly filed adversary complaint or contested matter that identifies with particularity each challenged lien, obligation, payment, or transaction and the specific legal and factual basis for relief. A request for

Rule 2004 examination, discovery request, motion to extend, objection, reservation of rights, or other preliminary proceeding shall not constitute a Challenge. Pending a final, non-appealable order sustaining a timely and properly commenced Challenge solely as to a specifically identified portion of the Roll-Up, the Roll-Up shall remain a valid and enforceable DIP Obligation entitled to all DIP Protections. No Challenge, investigation, discovery request, grant of standing, reservation of rights, or other proceeding shall affect the New Money Term Loans or their associated DIP Protections.

22. **Restriction on Use of Funds**. Subject to the final sentence of this paragraph 22, but notwithstanding any other provision in this Interim Order or the DIP Documents to the contrary, without the express written consent of the DIP Lender, no proceeds of the DIP Credit Facility, any DIP Collateral or Prepetition Collateral (including, without limitation, Cash Collateral) or any portion of the Carve-Out may be used to pay any claims for services rendered by any professionals retained by the Debtor, any creditor or party in interest, the Committee, any trustee appointed under the Chapter 11 Case or any Successor Case(s), or any other party to (a) request authorization to obtain postpetition loans or other financial accommodations pursuant to § 364 of the Bankruptcy Code or otherwise, other than from the DIP Lender, unless the proceeds of such loans or accommodations are or will be sufficient, and will be first used, to indefeasibly pay in full in cash all DIP Obligations; (b) investigate (except as set forth in this paragraph below), assert, join, commence, support or prosecute any Challenge or other action or claim, counter-claim, proceeding, application, motion, objection, defense, or other adversary proceeding or contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of the DIP Lender or any other DIP Lender Releasee or the Prepetition Senior Lender with respect to any transaction, occurrence, omission, or action including, without limitation, (i)

any Avoidance Actions, (ii) any action relating to any act, omission or aspect of the relationship between or among any of the DIP Lender Releasees or the Prepetition Senior Lender Releases, on the one hand, and any of the Debtor, on the other, (iii) any action with respect to the validity and extent of the DIP Obligations, the Prepetition Senior Secured Obligations, or the validity, extent, and priority of the DIP Liens, the Prepetition Senior Liens or the Adequate Protection Liens, (iv) any action seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the DIP Obligations, the DIP Liens, the Prepetition Senior Secured Obligations, the Prepetition Senior Liens, or the Adequate Protection Liens, or (v) any action that has the effect of preventing, hindering or delaying (whether directly or indirectly) DIP Lender in respect of the enforcement of the DIP Liens; (c) subject to authority provided to the Debtor pursuant to the DIP Documents, pay any claim (as defined in the Bankruptcy Code) of a prepetition creditor (as defined in the Bankruptcy Code) if the Debtor has received a written objection to such payment from the DIP Lender; and/or (d) use or seek to use Cash Collateral or sell or otherwise dispose of DIP Collateral, unless otherwise permitted hereby or by the DIP Documents, without the express written consent of the DIP Lender. Notwithstanding the foregoing, up to $25,000 (the "Challenge Budget") in the aggregate of the DIP Credit Facility, DIP Collateral, Cash Collateral and Carve-Out may be used by the Committee to investigate Challenges against the Prepetition Secured Party Releasees and the legality, validity, priority, perfection, enforceability and extent of the Prepetition Senior Liens. The Challenge Budget is a hard aggregate cap and may be used solely for an initial investigation by Committee Professionals. It may not be used to seek or litigate an extension of the Challenge Period, prosecute an appeal, conduct discovery beyond that reasonably necessary for the investigation, challenge New Money Term Loans or related DIP Protections, or pursue claims against any person other than the Prepetition Senior Secured Party Releasees. No unused portion

of the Challenge Budget may be reallocated for any other purpose without the DIP Lender's prior written consent.

23. **Limitation on Surcharge**. Without limiting the terms of the Carve-Out (and subject to the entry of the Final Order solely with respect to (i) the Prepetition Secured Parties and (ii) the Roll Up), no costs or expenses of administration which have been or may be incurred in the Chapter 11 Case or any Successor Case(s) at any time shall be surcharged against, and no person may seek to surcharge any costs or expenses of administration against the DIP Lender, the Prepetition Secured Parties, the Carve-Out (other than the Professional Persons that are the beneficiaries of the Carve-Out as provided for in the Budget), the DIP Collateral or the Prepetition Collateral, pursuant to §§ 105 or 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Lender and the Prepetition Secured Parties (and the Professional Persons that are the beneficiaries of the Carve-Out as provided for in the Budget in the case of an asserted surcharge against the Carve-Out); *provided* that nothing herein shall alter the Challenge Budget. No action, inaction or acquiescence by the DIP Lender or the Prepetition Secured Parties shall be deemed to be or shall be considered evidence of any alleged consent to a surcharge against either DIP Lender, the DIP Collateral, the Prepetition Secured Parties or the Prepetition Collateral.

24. **No Marshaling**. Subject to entry of the Final Order, the Prepetition Secured Parties and the DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral. Without limiting the generality of the immediately preceding sentence, and subject to entry of the Final Order, no party (other than the Prepetition Secured Parties and the DIP Lender) shall be entitled, directly or indirectly, to direct the exercise of remedies or seek (whether by order of this Court or

otherwise) to marshal or otherwise control the disposition of the DIP Collateral or the Prepetition Collateral (as applicable) after an Event of Default under the DIP Documents.

25. **Allocation of Proceeds of Excluded Assets**. Notwithstanding anything to the contrary in this Interim Order, the Final Order, the DIP Documents, or the Prepetition Loan Documents, the DIP Lender and the Prepetition Senior Lender agree that any credit bid of the DIP Lender or its affiliates shall not include the Excluded Assets (as defined in the DIP Term Sheet and Plan Term Sheet), including Avoidance Actions, and the proceeds thereof, after payment of all reasonable and documented costs and expenses incurred in prosecuting, settling, or otherwise realizing upon such Excluded Assets, shall be distributed as follows: (a) the first $1 million shall be retained by the Debtor's estate (or applicable litigation trust) for distribution to holders of allowed General Unsecured Claims and/or payment of expenses for payment; (b) then, a 50%/50% sharing between the Prepetition Senior Lender and the holders of allowed General Unsecured Claims, until the Prepetition Senior Lender has received $4 million from net proceeds; and (c) then, 75% of subsequent net proceeds shall be distributed to holders of allowed General Unsecured Claims and 25% shall be distributed to the Prepetition Senior Lender, until the Prepetition Senior Lender is paid up a total of $20 million (i.e., $4 million ((iii) above) + $16 million), at which time all subsequent net proceeds shall be distributed to holders of allowed General Unsecured Claims. No Excluded Asset may be compromised, settled, released, abandoned, or otherwise disposed of in a manner reasonably expected to impair the DIP Lender's rights under this paragraph without prior written notice to, and consent of, the DIP Lender. Notwithstanding the foregoing, in the event the DIP Lender consents to a form of plan of reorganization ("Plan") that contains an alternative distribution waterfall, then such waterfall under the Plan shall govern.

26. **Survival of Interim Order**. The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (a) confirming any Plan in the Chapter 11 Case, (b) converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code or a Successor Case, (c) to the extent authorized by applicable law, dismissing the Chapter 11 Case, (d) withdrawing the reference of the Chapter 11 Case from this Court, or (e) providing for abstention from handling or retaining of jurisdiction of the Chapter 11 Case in this Court and this Interim Order. The terms and provisions of this Interim Order shall be binding upon the Debtor, the DIP Lender, the Prepetition Secured Parties and each of their respective successors and assigns, and shall inure to the benefit of the Debtor and the DIP Lender, the Prepetition Secured Parties and each of their respective successors and assigns including, without limitation, any trustee, examiner with expanded powers, responsible officer, estate administrator or representative, or similar person appointed or elected in a case for the Debtor under any chapter of the Bankruptcy Code, including any Successor Case.

27. **Survival of L.A. Care Sale Order**. For the avoidance of doubt, nothing in this Interim Order shall alter, modify, impair, or limit any rights, obligations, releases, stipulations, or other provisions by or in favor of the Debtor, L.A. Care, or any other party under the *Order Granting Debtor's Emergency Motion to (I) Sell HQAF Receivables to L.A. Care Pursuant to Section 363, (II) Stipulate to the Validity and Non-Avoidability of Prepetition Sales of HQAF Receivables to L.A. Care (III) Grant L.A. Care a Release of Any Estate Claims (IV) Grant Administrative Claims in Favor of L.A. Care, (V) to the Extent Necessary, Modify the Automatic Stay and (VI) Grant Related Relief* [Docket No. 115] (the "L.A. Care Sale Order"); *provided*, *however*, that, to the extent L.A. Care is ultimately determined to hold a valid prepetition security interest in any assets of the Debtor, L.A. Care shall receive adequate protection for any diminution

in value of such security interest as a Prepetition Secured Party under this Interim Order in exchange for L.A. Care being subordinated to (i) the Carve-out (ii) the priming of such security interest by the DIP Liens and (iii) the Adequate Protection Superpriority Claims, in each case to the extent and on the terms provided in this Interim Order.

28. **Lender Information, Reporting, And Collateral-Preservation Covenants**. Beginning on the second Monday after entry of this Interim Order, the Debtor shall deliver to the DIP Lender: (i) weekly thirteen-week Budget-to-actual reports, including explanations for all variances; (ii) weekly accounts receivable aging, reimbursement, payor, denial, recoupment, setoff, and HQAF reports; (iii) weekly reports regarding payroll, vendor obligations, patient census, licensure, provider agreements, and material regulatory matters; and (iv) immediate notice of any Event of Default, material litigation, material regulatory notice or proceeding, casualty, loss of material provider status, or threatened impairment of material reimbursement rights. The Debtor shall preserve all material licensure, provider agreements, reimbursement rights, and governmental-program participation, and shall not settle, compromise, sell, assign, factor, advance against, or otherwise dispose of any material receivable or reimbursement right without the DIP Lender's prior written consent.

29. **Final Hearing; Objection Deadlines**. The Final Hearing to consider entry of the proposed Final Order and final approval of the DIP Credit Facility is scheduled for __________, 2026 at __________ [a.m./p.m.] prevailing Eastern Time at the United States Bankruptcy Court for the District of Delaware. Any objections or responses to entry of the proposed Final Order shall be filed on or before 4:00 p.m. (prevailing Eastern Time) on ____________, 2026, and served on the following parties: (i) counsel to the Debtor, (ii) counsel to the Committee, (iii) counsel to the DIP Lender and the Prepetition Secured Parties, and (iv) the Office of the U.S. Trustee for the

District of Delaware, 844 N. King Street, Room 2207, Lockbox 35, Wilmington, Delaware 19801. If no objections to the entry of the proposed Final Order are filed and served in accordance with this Interim Order, no Final Hearing may be held, and the proposed Final Order may be presented by the Debtor under certification of counsel and entered by this Court.

30. **Notice of Entry and Service**. Within two (2) business days following entry of this Interim Order, the Debtor shall serve notice of the entry of this Interim Order and of the Final Hearing, together with copies of this Interim Order and the Motion, on: (i) the parties having been given notice of the Interim Hearing; and (ii) any party which has filed prior to such date a request for notices with this Court.

31. **Inconsistency**. In the event of any inconsistency between the terms and conditions of the DIP Documents and of this Interim Order, the provisions of this Interim Order shall govern and control. To the extent any inconsistency between this Interim Order and the L.A. Care Sale Order shall exist, the terms and conditions of this Interim Order shall govern and control.

**32.** **Enforceability**. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable effective as of the Petition Date immediately upon entry of this Interim Order. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, 9024, or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order. The rights of all parties in interest to object to the terms of the Final Order, including the DIP Documents at the Final Hearing are expressly reserved.

33. **Retention of Jurisdiction**. This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Interim Order, the DIP Documents, and all rights and remedies of the DIP Lender hereunder.

# <u>Exhibit 1</u>

## DIP Term Sheet

# DIP FINANCING
# TERM SHEET

This term sheet (the "DIP Term Sheet") summarizes the principal terms of a proposed debtor in possession financing and restructuring arrangement between Pacifica of the Valley Corporation ("Pacifica" or "Debtor") and Axios Capital Solutions, LLC ("Axios"). This DIP Term Sheet is binding[1] and shall not become effective unless and until it is executed by both parties and approved by the Bankruptcy Court pursuant to the DIP Order in form and substance mutually acceptable to the Debtor and Axios.

**Proposed Terms**

**Chapter 11 Case**

On July 4, 2026 ("Petition Date"), Pacifica commenced a voluntary chapter 11[2] proceeding in the U.S. Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The case is pending before Judge Thomas M. Horan, bearing Case No. 26-11060 (the "Chapter 11 Case").

**DIP Lender**

Axios, or one or more of its designated affiliates, successors, or assigns ("Lender").

**DIP Facility**

Lender shall provide Pacifica with a multi-draw senior secured, superpriority debtor in possession financing facility in the aggregate principal amount of $21,000,000 (the "DIP Facility").

Borrowings under the DIP Facility (the "DIP Loans") shall, subject to the borrowing conditions set forth herein, in the DIP Credit Agreement and in the applicable DIP Order, be incurred in multiple tranches as follows:

(a) an initial advance of $7 million (the "Initial Advance") payable upon the Bankruptcy Court's entry of an Order approving the DIP Facility on an interim basis (the "Interim DIP Order");

(b) a second advance of $4 million (the "Second Advance") payable upon the Bankruptcy Court's entry of an order approving the DIP Facility on a final basis (the "Final DIP Order" and together with the Interim DIP Order, the "DIP Order");

(c) a third advance of $3 million (the "Third

---

[1] At the time of filing, this term sheet is not executed by the parties and remains subject to client approval.

[2] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, §§ 101 - 1532.

Advance") payable upon the Debtor's filing of the Plan or Private Sale Motion, as applicable; and

(d) a fourth advance of $7 million (the "Fourth Advance", and together with the Second Advance and the Third Advance, the "Subsequent Advances") payable upon the earlier to occur of (i) the Plan Confirmation Milestone (defined below) and (ii) the Sale Closing Milestone.

The DIP Facility shall be used to fund Pacifica's operations and the Chapter 11 Case through the effective date of the Plan, subject to the Approved Budget (defined below), agreed milestones, occurrence of no event of default, and entry of the DIP Order by the Bankruptcy Court.

The approved disbursements and timing of the draws under the DIP Facility shall be further set forth in an agreed 13-week cash-flow budget and funding schedule, approved by the Lender and attached hereto as Schedule 1 (the "Approved Budget").

**Certain Litigation**

*Landlord*. The Debtor, Axios, and Reliq Pacifica LLC, Beverly Gemini Investments, LLC, Taking the 5th, LLC and Fifth/Arizona Investors, LLC (collectively, the "Landlord") have entered into a non-binding Term Sheet, dated September 15, 2026 (the "Lease Term Sheet"), setting forth the parties' agreement in principle regarding lease terms in the event Axios acquires Pacifica Hospital of the Valley (the "Hospital") which is attached hereto as Schedule 2. If Landlord has repudiated or otherwise abandoned the agreement in principle reflected in the Lease Term Sheet (or an agreement is not reached by October 21, 2026), then the Committee and Axios each shall be immediately deemed to have been granted standing to commence litigation against the Landlord to assert any and all claims and causes of action of the Debtor's estate against the Landlord, including, without limitation, seeking recharacterization of the Debtor's Master Lease with the Landlord and the restriction on use of DIP proceeds to prosecute such litigation shall be deemed terminated. The Committee will discuss with Axios and the Debtor pursuing such litigation against Landlord, and shall commence any such litigation within five (5) business days of such repudiation or abandonment by Landlord (or after October 21, 2026) unless the Committee reasonably determines such claim lacks

merit; after which time, Axios may commence any such litigation. Upon the Plan Effective Date, if such dispute is not resolved, the litigation shall be handled by Newco (as defined in the Plan Term Sheet) or its designated counsel for the benefit of Newco. Any settlement, compromise, or release of any such claims or causes of action against the Landlord (whether commenced by the Committee, the Debtor, or Axios) shall require the prior written consent of Axios. For the avoidance of doubt, neither the absence of an agreement with the Landlord nor the pendency of any such litigation shall be a condition to, or shall excuse or delay the consummation of, the sale of the Debtor's assets to Lender pursuant to the Plan or a Private Sale; in such event the Master Lease shall be assumed and assigned to Newco pursuant to section 365 solely to the extent it constitutes a true lease and expressly without prejudice to, or waiver, release, or ratification of, any claim or cause of action of the estate against the Landlord (including recharacterization), all of which shall be preserved pursuant to section 1123(b)(3)(B) (or sold to Axios under section 363) and vested in Newco.

**Use of Proceeds**

Proceeds of the DIP Facility may be used solely for the following purposes, in each case, in accordance with and subject to the Approved Budget then in effect, subject to the Permitted Variance:

- Working capital and other ordinary-course operating expenses;
- costs and expenses of administering the Chapter 11 Case;
- funding of an escrow pursuant to the Approved Budget for payment of documented, reasonable, and court-allowed estate professional fees and expenses;
- payment of amounts expressly authorized under the DIP documents or by the Bankruptcy Court;
- the payment of documented and reasonable fees and expenses of Lender's professionals in Axios' capacity as Lender, including negotiation and preparation of the DIP documents (for the avoidance of doubt, all other obligations under the DIP Facility shall be paid-in-kind); and

- other purposes identified in the Approved Budget.

The DIP Facility shall be governed by the Approved Budget which shall be in form and substance acceptable to Pacifica and Axios.

Starting on the second Monday following entry of the Interim DIP Order, the Approved Budget shall be subject to customary variance testing for operating disbursements, with permitted variances of 15% in the aggregate and 20% for each line item (the "Permitted Variances"). Each variance shall be measured solely on a cumulative basis by comparing actual operating disbursements from the beginning of the applicable budget period through the relevant testing date against budgeted operating disbursements for the same cumulative period, and not on a standalone weekly basis.

No proceeds of the DIP Facility (except as specifically set forth herein) shall be used to investigate, challenge, object to, contest or raise any defense to, the validity, security, perfection, priority, extent or enforceability of any amount due under or the liens or claims granted under or in connection with the Prepetition Secured Debt, the Debtor's Master Lease with the Landlord or the prepetition sales of receivables to L.A. Care.

**Budget**

Reporting to include weekly liquidity reports, budget-to-actual reporting, information concerning the Plan solicitation and confirmation process to be provided simultaneously to the Lender and the Committee.

The Debtor shall be obligated to comply with the Approved Budget, subject to the Permitted Variances. The Debtor's failure to comply with this requirement shall constitute an immediate Event of Default.

"Prepetition Secured Debt" means indebtedness or obligations arising in connection with the Main Street Priority Loan Agreement dated as of December 10, 2020 (the "Prepetition Loan Agreement") among the Debtor and Axios, as successor to First Western Trust Bank ("FWTB"), as also evidenced by the Promissory Note made and delivered by the Debtor to FWTB dated as of December 10, 2020, in the original amount of $35,000,000, and the Pledge and Security Agreement dated as of December 10, 2020 (the "Prepetition

Security Agreement" and together with the Prepetition Loan Agreement and all ancillary documents related thereto, the "Prepetition Loan Documents"), between the Debtor, as grantor, and Axios, as successor in interest to FWTB.

**Stipulations Concerning Axios's Prepetition Claims and Liens**

Subject to the Challenge Rights described below, Pacifica stipulates and agrees that:

- Axios holds valid and enforceable prepetition claims against Pacifica in the aggregate amount $50,943,321.41 as of the Petition Date (the "Allowed Prepetition Secured Debt Amount");
- Axios's prepetition claims are secured by valid, binding, enforceable, perfected, and non-avoidable liens on and security interests in the applicable prepetition collateral;
- the prepetition obligations and related liens are not subject to avoidance, recharacterization, subordination, disallowance, reduction, offset, recoupment, counterclaim, defense, or other challenge;
- Pacifica has no claims or causes of action against Axios arising from or relating to the Prepetition Loan Documents;
- The assignment of the Prepetition Loan Documents from FWTB to Axios is valid and enforceable and Axios has standing to seek to enforce the Prepetition Loan Documents;
- Neither Axios nor its principals are an affiliate of the Debtor as defined in the CARES Act or the Bankruptcy Code or an insider of the Debtor; and
- all payments made to or for the benefit of Axios before the Petition Date were valid and not avoidable.

These stipulations shall be binding immediately upon Pacifica and all other parties in interest upon entry of the Final DIP Order subject only to the Challenge Rights.

**Challenge Rights**

The Committee's right to challenge (i) the Stipulations and Releases set forth in this DIP Term Sheet and (ii) with the consent of L.A. Care, any prepetition transactions between the Debtor and L.A. Care (collectively, the "Challenge Rights") shall be tolled

through the Plan Effective Date and, upon the occurrence of the Plan Effective Date, shall be deemed waived and released in accordance with the terms and conditions of the Plan consistent with the Plan Term Sheet; provided, however, that if the Plan is not confirmed due exclusively to the Lender's failure to fund its obligations under the DIP Facility (it being understood that Lender's declining to fund any advance as to which any condition precedent has not been satisfied, or following the occurrence of an Event of Default or the Termination Date, shall not constitute a failure to fund), the Committee shall have fourteen (14) days following such breach by Lender to commence and pursue any Challenge Rights. For the avoidance of doubt, the Challenge Rights shall be waived and released if the Plan is not confirmed for any reason other than the Lender's failure to fund its obligations under the DIP Facility.

**DIP Liens and Superpriority Claims**

Subject to the Carve-Out and the Excluded Assets (defined below), and to the extent of funds actually advanced under the DIP Facility, Axios shall receive:

- a superpriority administrative expense claim under section 364(c)(1);
- first-priority liens under section 364(c)(2) on unencumbered property of the estate including without limitation all proceeds of HQAF receivables, and avoidance and preference causes of action (subject to Lender's agreement as set forth below with respect to Excluded Assets);
- junior liens under section 364(c)(3) junior to prior permitted senior liens under the Prepetition Loan Documents; and
- priming liens under section 364(d) on all collateral securing the Prepetition Secured Debt except for prior permitted senior liens under the Prepetition Loan Documents.

Debtor agrees not to seek any alternative financing that would seek to prime the Lender or use cash collateral, without payment in full of the DIP obligations or Lender's consent.

**Excluded Assets**

Notwithstanding anything to the contrary herein, all assets designated to be contributed to the Liquidating

| | |
|---|---|
| | Trust in the Plan Term Sheet, including, without limitation, (i) the QAF Delta (as defined in the Plan Term Sheet), (ii) any estate interest in or related to Pacific Gardens Medical Center, and (iii) all causes of action, claims, and rights of recovery to be contributed to the Liquidating Trust, including chapter 5 causes of action, D&O claims, and any other litigation claims (collectively, the "<u>Excluded Assets</u>"), shall be included and subject to, the liens, security interests, claims, encumbrances, or other interests of Axios arising under or in connection with any prepetition or postpetition financing or indebtedness; however, Lender has agreed to gift the proceeds of Excluded Assets purchased through a Private Sale or a Plan as set forth in the Plan Term Sheet.<br><br>Upon the occurrence of the Plan Effective Date and the contribution of the Excluded Assets to the Liquidating Trust in accordance with the Plan Term Sheet, the Excluded Assets shall be released from and shall not be subject to any DIP Liens, adequate protection liens, replacement liens, superpriority claims, or claims arising under section 507(b) of the Bankruptcy Code granted to or for the benefit of Axios. The DIP Order shall expressly provide for the foregoing carve-out and shall provide that, upon the Plan Effective Date, the Excluded Assets shall be contributed to the Liquidating Trust free and clear of all such liens, claims, and interests of Axios. |
| **Roll-Up** | The DIP Facility shall provide for a roll-up of the Prepetition Secured Debt in an amount equal to 1.5x of cash actually advanced to the Debtor postpetition under the DIP Facility, with such corresponding amount of Prepetition Secured Debt to be automatically rolled up, refinanced, and converted into postpetition obligations under the DIP Facility as and when each such advance is funded. Such roll-up shall constitute a refinancing and continuation, and not a novation, satisfaction, or discharge, of the Prepetition Secured Debt, and the obligations so rolled up shall continue to constitute senior indebtedness for all purposes of any subordination, intercreditor, or similar agreement in favor of the holder of the Prepetition Secured Debt. |
| **Adequate Protection** | As adequate protection for diminution in value of its interests in prepetition collateral, Axios shall receive:<br><br>• Replacement liens on its prepetition collateral; |

- Reimbursement of actual and documented fees and expenses of Axios in its capacity as Lender in connection with the Chapter 11 Case (including in connection with negotiating this DIP Term Sheet, the Lease Term Sheet, the Credit Agreement and related documents); subject to customary review and payment procedures allowing UST and Committee review; and
- Stipulations and releases (detailed below).

**Surcharge; Equities of the Case; Marshalling**

Upon entry of the Final DIP Order, waiver of:

- Section 552(b) Equities-of-the-Case;
- Section 506(c) Surcharge; and
- Marshalling.

**Carve Out**

The DIP liens, replacement liens, superpriority claims, prepetition liens and other protections granted to Lender shall be subject to a "Carve-Out" as described herein.

"Carve-Out" shall mean the sum of the following amounts as of the earlier of (i) the day the Lender issues a Carve-Out Trigger Notice (defined in the applicable DIP Order), or (ii) the Maturity Date ("Carve-Out Effective Date"):

- fees payable to the Clerk of the Bankruptcy Court and the Office of the United States Trustee;
- statutory fees payable under 28 U.S.C. § 1930;
- allowed professional fees and expenses incurred by the Debtor and the Committee before delivery of a Carve-Out trigger notice to the extent consistent with the Approved Budget; and
- a post-trigger professional-fee reserve in the amount of $200,000 (the "Wind-Down Carve-Out") For avoidance of doubt, this shall not result in any additional funding obligation by the Lender.

Notwithstanding any other provision herein, the Carve-Out (including the Wind-Down Carve-Out) shall not include, apply to, or be available for any fees or expenses incurred by any party in connection with the investigation, initiation, or prosecution of any claims,

Case 26-10600-TMH Doc 237-1 Filed 10/02/26 Page 103 of 126

causes of action, adversary proceedings, or other litigation against the Debtor, the Lender, L.A. Care, or the Landlord (except as provided herein) or any affiliates of any of the foregoing entities, or any of their respective officers, directors, employees, agents, advisors, and counsel, including but not limited to challenging the amount, validity, perfection, priority, or enforceability of or asserting any defense, counterclaim or offset to, the obligations and liens and security interests in favor of the Debtor or the Lender.

**Milestones**

The following milestones ("Milestones") shall apply, subject to agreed extensions by Lender and appropriate Bankruptcy Court relief:

- Initial Milestone: No later than September 29, 2026, the Bankruptcy Court shall have entered the Interim DIP Order, in form acceptable to Lender.

- Lease Extension Milestone: No later than October 5, 2026, the Debtor shall have filed a motion pursuant to section 365(d)(4)(B)(i) to extend the time within which the Debtor may assume or reject the Master Lease, and no later than October 30, 2026, the Bankruptcy Court shall have entered an order extending such time through a date not earlier than January 29, 2027.

- Sale Closing Milestone: If Axios elects to purchase the Debtor's assets via Private Sale, such sale shall have an initial close on or before 30 days after such election and the Debtor and Axios will enter into an interim management agreement or similar agreement while Axios obtains regulatory approvals, and the Debtor and Axios shall close thereafter.

- Plan Confirmation Milestone: If Axios elects to purchase the Debtor's assets pursuant to the Plan, the Debtor shall have confirmed the Plan that is in all respects consistent with the Plan Term Sheet and otherwise in a form and substance reasonably agreeable to Axios on or before December 8, 2026.

Failure to satisfy a Milestone shall constitute an event

| | |
|---|---|
| | of default unless waived or extended in writing by Lender.<br><br>The Debtor shall not assume, reject, or seek to extend, amend, or modify the Master Lease, and shall not stipulate to or agree upon any cure amount or adequate assurance of future performance with respect to the Master Lease, in each case without the prior written consent of Lender. |
| **Interest & Fees** | <u>Base Interest Rate</u>: 12% per annum from the date of borrowing until repaid, which will be paid in kind (monthly, in arrears) on the then principal amount of the DIP Loan by increasing the principal amount of the DIP Loan.<br><br><u>Default Interest Rate</u>: 4% per annum plus the interest rate otherwise accruing or payable thereon.<br><br>All interest shall be computed on the basis of a three hundred sixty- (360)-day year for the actual number of days elapsed.<br><br><u>Commitment Fee</u>: 10% of the amount of the DIP Facility shall be fully earned and non-refundable upon entry of the Interim DIP Order. |
| **Maturity** | All unfunded DIP commitments of Lender will terminate, and all DIP obligations of the Debtor will be immediately due and payable in full in cash on the earliest of: (a) December 8, 2026 (the "<u>Maturity Date</u>"); (b) the date upon which a Milestone is missed and not waived by Lender; (c) the date of consummation of any sale of all or substantially all of the assets of Pacifica pursuant to section 363; (d) the date of acceleration of the DIP Loans and the termination of the DIP commitments pursuant to the terms of this DIP Term Sheet or DIP Credit Agreement (e.g., occurrence of event of default); (e) the effective date of the Plan or any plan of reorganization in the Chapter 11 Case (the "<u>Effective Date</u>"); (f) appointment of a chapter 11 trustee in the Chapter 11 Case; and (g) conversion of the Chapter 11 Case to a case under Chapter 7 or dismissal of the Chapter 11 Case (such earliest date of (a)-(g), the "<u>Termination Date</u>"). |
| **Mandatory Prepayment** | Upon Debtor's receipt of HQAF funds Debtor shall be required to use such funds first to pay down the DIP Loan except to the extent such HQAF funds are HQAF Program 8 or 9 funds identified in the current Approved |

Budget (excluding QAF Delta), in which event the Debtor may use such identified HQAF Program 8 or 9 funds in accordance with the Approved Budget (excluding QAF Delta).

**Conditions Precedent to Initial Advance**

The obligation of the Lender to fund the Initial Advance shall be subject to the condition precedent that on the date of such release, the following statements shall be true:

(i) The Documentation shall be in form and substance reasonably satisfactory to the Lender;

(ii) The Bankruptcy Court has entered the Interim DIP Order in form and substance acceptable to the Lender, authorizing the Debtor to enter the DIP Facility, and such Interim DIP Order has not been otherwise stayed or reversed;

(iii) The Lender shall have received and shall have approved the Budget;

(iv) No event of default shall have occurred;

(v) The Interim DIP Order provides that the Lender has at all times acted in good faith and is entitled to the protections of section 364(e); and

(vi) Upon the entry of the Interim DIP Order, the Lender shall have as collateral for the Initial Advance, the Super-Priority DIP claim and valid and perfected liens on the DIP collateral as set forth in this DIP Term Sheet and in the Documentation.

Subject to the foregoing conditions being satisfied, the Lender shall release funds to the Debtor under the terms set forth herein. For the avoidance of doubt, the Lender may waive any of the conditions precedent at any time, such waiver being sufficient upon confirmation by electronic mail.

**Conditions to Subsequent Advances**

The obligation of the Lender to fund any Subsequent Advance shall be subject to the condition precedent that on the date of such release, the following statements shall be true:

i. The Final DIP Order shall remain in effect and be a final non-appealable order of the Bankruptcy Court.

ii. There shall exist no default (or event that would constitute a default with the giving of notice or lapse of time) under the DIP Facility, including

satisfaction of applicable milestones, and all the representations and warranties contained in the DIP Facility shall be true and correct in all respects.

iii. All fees and expenses owing to the Lender in connection with the DIP Facility shall have been paid.

v. There shall have occurred no material adverse change in the Debtor's (financial, environmental, or otherwise) operations, performance, or properties (other than, in each case, the commencement and continuation of the Chapter 11 Case), since the entry of the Interim DIP Order, that in the reasonable judgment of the Lender, has or can reasonably be expected to have a material adverse effect on the rights and remedies of the Lender or the ability of the Debtor to perform its obligations to them under the DIP Facility.

vi. The Landlord shall not, in Lender's reasonable judgment, have repudiated or otherwise abandoned the agreement in principle reflected in the Lease Term Sheet.

**Sale/Plan Election Process and Credit Bid**

Lender may elect to purchase the Debtor's assets either pursuant to the Plan or a motion to sell ("Private Sale Motion") substantially all its assets pursuant to a private sale under section 363 (a "Private Sale").

If Lender elects to purchase the assets via a Private Sale, such sale shall close by the Sale Closing Milestone and Lender shall be responsible for all operating costs of the Hospital from and after the closing of such sale.

If Lender elects to purchase the assets pursuant to the Plan, the Plan shall be confirmed on or before the Plan Confirmation Milestone.

Regardless whether Lender has elected to purchase the assets via a Private Sale or a Plan, Lender and Debtor shall enter into a mutually acceptable interim management agreement or other similar arrangement, in form and substance acceptable to Lender, on or before [a date to be determined], pursuant to which, for the period commencing upon the entry into such agreement and ending

upon the closing of Private Sale or the sale contemplated by the Plan, Lender shall retain all net operating profits of the Hospital and shall fund operating shortfalls of the Hospital (a) during the period covered by the Approved Budget, solely to the extent set forth therein, by means of advances under the DIP Facility, and (b) thereafter through such closing, by additional advances that shall constitute DIP Obligations for all purposes hereunder (the "Operating Advances"); provided that Lender shall not assume, and nothing herein shall be construed to impose on Lender, any liability of the Debtor arising or accruing prior to entry into such interim management agreement for any professional liability, regulatory, seismic, tax, or similar liability of the Debtor or the Hospital, other than ordinary course payables that become due after the period covered by the Approved Budget and prior to such closing.

In connection with any such sale, whether consummated pursuant to the Plan or a Private Sale Motion, the Lender shall credit bid not less than $40 million of the obligations outstanding under the DIP Facility, including the Commitment Fee, Roll-Up and Operating Advances. Any amount of the DIP Facility not credit bid and any portion of the Prepetition Secured Debt not rolled up into the DIP Facility and not credit bid, shall not be waived, released, satisfied, or discharged by the credit bid, the sale, or the Plan; provided that (i) Axios shall not assert against the Debtor's estate or for purposes of sharing in the proceeds of the Excluded Assets, more than $20 million (with any remaining obligations under the DIP Facility to be satisfied first) and (ii) any aggregate allowed claim amounts above $20 million shall be assumed by Newco as senior secured indebtedness (the "Assumed Axios Debt"), in each case on the terms set forth in the Plan Term Sheet. For the avoidance of doubt, following the consummation of a sale either through a Plan or a Private Sale, Axios shall not recover or claw back any amounts paid during the Chapter 11 Case, or recover from the Debtor's estate or Liquidating Trust more than $20 million in the aggregate.

For the avoidance of doubt, the Debtor's election to pursue a sale pursuant to a Private Sale Motion shall not preclude, restrict, or otherwise prevent the Debtor from concurrently pursuing, filing, or prosecuting a plan of liquidation consistent with the Plan Term Sheet.

The Debtor shall prepare, file, solicit, prosecute, and seek confirmation of a combined disclosure statement and chapter 11 plan (the "<u>Plan</u>") that is consistent in all material respects with the plan term sheet attached hereto as **<u>Exhibit A</u>** (the "<u>Plan Term Sheet</u>"), together with all other documents necessary or appropriate to effectuate such plan (collectively, the "<u>Plan Documents</u>").

The Debtor shall use commercially reasonable efforts to obtain entry of an order confirming such plan as soon as reasonably practicable and, in any event, on or before December 8, 2026.

The Plan and Plan Documents shall be in form and substance reasonably satisfactory to the Lender. The Debtor shall not file, support, consent to, or seek confirmation of any plan, or agree to any amendment, modification, or supplement to any Plan Document, that is inconsistent in any material respect with the Plan Term Sheet without the prior written consent of the Lender.

**Lender Support of Plan**

Subject to the Plan and the Plan Documents being consistent in all material respects with the Plan Term Sheet, the Lender shall support the Plan and the transactions contemplated thereby and shall use commercially reasonable efforts to facilitate the confirmation and consummation of the Plan.

Without limiting the foregoing, the Lender shall: (i) timely vote all claims held or controlled by it (in any capacity) that are entitled to vote on the Plan to accept the Plan and shall not change or withdraw such vote; (ii) not object to, delay, impede, or take any action inconsistent with or that would reasonably be expected to interfere with the solicitation, confirmation, or consummation of the Plan or the transactions contemplated by the Plan Term Sheet; (iii) support, and not object to, the approval and implementation of the Plan Documents and the transactions contemplated

| | |
|---|---|
| | thereby; (iv) not propose, support, solicit, encourage, or vote in favor of any alternative chapter 11 plan, restructuring, sale, recapitalization, liquidation, or other transaction that is inconsistent with the Plan Term Sheet; and (v) take such actions as are reasonably necessary or appropriate to support and effectuate the Plan and the transactions contemplated by the Plan Term Sheet.<br><br>For the avoidance of doubt, the Lender's support obligations shall include support for the establishment and funding of the Liquidating Trust and the contribution of the Excluded Assets thereto free and clear of all liens, claims, security interests, superpriority claims, adequate protection claims, and other interests of the Lender as set forth in the Plan Term Sheet. |
| **Litigation** | Within five (5) business days after entry of the Interim DIP Order, Pacifica agrees to the remand of the Colorado Litigation to the Colorado District Court and to not object to Axios's pursuit of a judgment and recovery from Tuft, including the continuation of the Colorado proceeding (including collection) against Tuft.<br><br>Axios agrees (a) upon the proceedings return to the Colorado District Court, to dismiss the Colorado complaint against Pacifica without prejudice, and (b) to not seek recovery of an amount greater than the Allowed Prepetition Secured Debt Amount, together with interest, fees, costs, and expenses accruing after the Petition Date under the applicable guaranty, from Tuft. |
| **Hospital Closure** | In the event the Plan is not confirmed and the alternative private sale as contemplated in the Plan Term Sheet does not occur, and the Debtor determines to proceed to an orderly closing of Pacifica Hospital, Lender agrees to consent to the Debtor entering into an agreement with L.A. Care or other party to reasonably fund the wind-down in exchange for HQAF funds, similar to the recent transaction the Debtor entered into with L.A. Care with such amounts to be used for reasonable, necessary and documented costs (excluding legal fees) to safely close the Hospital, with any excess amounts to be turned over to Lender. |
| **Proof of Funds** | Axios shall provide proof of funds by September 28, 2026, consisting of evidence reasonably satisfactory to the Debtor and the Committee (to be provided on a confidential, professionals'-eyes-only basis to counsel |

for the Debtor and the Committee) of immediately available, unrestricted funds of not less than $26,000,000 (or a binding funding commitment from a creditworthy affiliate of Axios). Delivery of such proof of funds shall be a condition to the Debtor's execution of this DIP Term Sheet and to entry of the Interim DIP Order.

The Initial Advance shall be funded upon entry of an Interim DIP Order and this DIP Term Sheet, in each case in form and substance satisfactory to the Lender. The Lender shall have no obligation to provide further funding without an agreed upon DIP Credit Agreement. This DIP Term Sheet, the DIP Credit Agreement, the DIP Order, and any other document(s) and/or instrument(s) required to be executed by the Lender shall constitute the definitive DIP documents (the "Documentation").

**Documentation**

The Documentation shall contain customary (a) representations and warranties, (b) events of default (including, but not limited to, failure to comply with the Approved Budget with Permitted Variances, failure to make timely payments, incurrence of any unauthorized debt, unauthorized sale of assets, breaches of representations or warranties, change of control, Documentation not in form reasonably satisfactory to Lender, failure to satisfy a Milestone, occurrence of a Termination Date), (c) remedies (including, without limitation, modification of automatic stay (after default notice provided), the right to realize on all DIP Collateral, the right to exercise any remedy available under applicable law on 5 business days' notice, without the necessity of obtaining further relief or order from the Bankruptcy Court), (d) § 506(c) and § 510 waivers, and (e) § 552(b)(1) entitlement, and be in form and substance reasonable satisfactory to the Lender. The Documentation shall conform to this DIP Term Sheet and otherwise shall be in form and substance reasonably acceptable to the Lender. In the event of any inconsistency between the Documentation and the DIP Order, the DIP Order shall control (subject only to the requirement that it be in a form acceptable to the Lender).

**Governing Law**

This DIP Term Sheet and the definitive DIP documents shall be governed by the laws of the State of New York, except to the extent governed by the Bankruptcy Code

or other applicable federal law.

**If the foregoing is acceptable to you, please so indicate by signing a copy of this proposal in the space provided below and return an executed copy at your earliest convenience.**

PACIFICA OF THE VALLEY CORPORATION

By: ________________________________
Name:
Title:
Date:

AXIOS CAPITAL SOLUTIONS, LLC

By: ________________________________
Name:
Title:
Date:

**Exhibit A**

## PLAN TERM SHEET

On July 4, 2026 ("Petition Date"), Pacifica of the Valley Corporation ("Pacifica" or "Debtor") commenced a voluntary chapter 11[1] proceeding in the U.S. Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The case is pending before Judge Thomas M. Horan, bearing Case No. 26-11060 (the "Case").

This term sheet ("Term Sheet") between Pacifica and Axios Capital Solutions, LLC ("Axios") describes the principal terms of a proposed plan of reorganization for the Debtor ("Plan") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Plan is subject to, inter alia, definitive documentation satisfactory to the Debtor and Axios, and to compliance with statutory confirmation requirements and the occurrence of the effective date of the Plan (the "Effective Date") in accordance with the provisions of chapter 11 of the Bankruptcy Code.

This Term Sheet is not a solicitation of acceptances or rejections with respect to any chapter 11 plan. Any such solicitation will comply with the provisions of the Bankruptcy Code. However, the terms set forth herein are binding in connection with the parties obligations under the DIP Facility (defined below).

The distributions under, and other benefits provided in, the Plan constitute a resolution, compromise and settlement of claims and causes of action between the Parties, including addressing the Debtor's funding needs for the Case.

| | |
|---|---|
| **Plan Sponsor** | Axios, or one or more of its designated affiliates, successors, or assigns ("Sponsor"). |
| **Restructuring Summary** | The Plan will provide for the sale of all the Debtor's assets to Sponsor free and clear of all liens, claims and encumbrances, except for certain assets expressly excluded that will be transferred to a liquidating trust. To provide critical funding for the Case, and in conjunction with the restructuring, the Sponsor has agreed to provide a debtor-in-possession financing facility up to \$21 million plus a 1.5X roll up of the Axios Prepetition Claim (defined below) for an aggregate principal amount of \$52.5 million (such facility as more fully described in the DIP Term Sheet, the "DIP Facility"), which shall be credit bid under the Plan in an amount not less than \$40 million.<br><br>Any and all estate claims against Axios shall be released and there shall be no challenge to the Axios Prepetition Claim and related liens except that solely the Committee will retain a right to a 14-day period to challenge the Axios Prepetition Claim and related liens, which will not be pursued and such period shall be tolled until the occurrence of the Effective Date of the Plan (or the closing of the alternative private sale, as set forth in the |

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, §§ 101 - 1532.

Plan), at which time the Committee's challenge right shall be terminated; however, such tolling period shall terminate in the event the Plan is not confirmed due to the DIP Lender's failure to fund its obligations under the DIP Facility at which time the Committee will have 14-days to pursue a challenge (as set forth in the DIP Term Sheet). If such 14-day period expires without a challenge, the Committee's right to challenge will be terminated.

**Key Plan Terms**

The Plan shall contain the following key terms:

i. Axios's prepetition secured claim is allowed in full as a secured claim with full credit bid rights ("Axios Prepetition Claim");

ii. Sponsor or its designee ("Newco") shall acquire all the assets of the Debtor, including, assuming the lease, as amended (or entering into a new lease) pursuant to that non-binding Term Sheet, dated September 15, 2026 (the "Lease Term Sheet"), between the Debtor, Axios, and Reliq Pacifica LLC and Beverly Gemini Investments, LLC (together, the "Landlord"), which set forth the parties' agreement in principle regarding lease terms in the event Axios acquires Pacifica Hospital of the Valley (the "Hospital")) except for the Excluded Assets (defined below) which shall not be assets acquired by Sponsor under the applicable sale documents;

iii. A liquidating trust ("Liquidating Trust") shall be established, and the Excluded Assets will be transferred to the Liquidating Trust subject to all liens, claims and encumbrances of Axios and to the distribution waterfall set forth herein;

iv. Funding for the Plan shall be proceeds from the DIP Facility and the Excluded Assets in the Liquidating Trust; and

v. The claim treatment provided below.

**Claim Treatment**

The Plan shall provide for the following claim treatment:

i. Each holder of an allowed administrative claim, including claims of the type described in section 503(b)(9) (to the extent not already paid during the chapter 11 case), shall receive payment in full (in cash) of the unpaid portion of its allowed administrative claim

on the Effective Date or as soon thereafter as practicable (or, if payment is not then due, shall be paid in accordance with its terms) or pursuant to such other terms as may be agreed to by the holder of such claim and the Debtor;

ii. Holders of priority tax claims shall be treated in accordance with section 1129(a)(9)(C), and will be unimpaired;

iii. Holders of a secured claim (other than Axios) shall receive the following treatment, at the option of the Debtor: (a) payment in full (in cash) on the Effective Date or as soon thereafter as practicable to the extent secured; (b) delivery of collateral securing any such claim and payment of any interest required under section 506(b); or (c) other treatment rendering such claim unimpaired. The Subordination Agreement between Axios and the Landlord shall be enforced.

iv. Axios shall have a secured claim in the aggregate amount of any remaining DIP Obligations and Axios Prepetition Claim after its credit bid; provided that it shall not assert against the Debtor's estate or for purposes of sharing in the proceeds of the Excluded Assets, more than $20 million (with any remaining obligations under the DIP Facility to be satisfied first) and shall receive an interest in the proceeds of the Liquidating Trust subject to the sharing percentages as set forth below. Newco will assume any remaining debt in excess of $20 million, including under the DIP Facility or the Axios Prepetition Claim (which is secured). For the avoidance of doubt, following the consummation of a sale either through a Plan or a Private Sale, Axios shall not recover or claw back any amounts paid during the Chapter 11 Case, or recover from the Debtor's estate or Liquidating Trust more than $20 million in the aggregate.

v. Holders of General Unsecured Claims shall receive their *pro rata* share of the interest in the Liquidating Trust with the right to proceeds thereof subject to the sharing percentages as set forth below.

vi. Equity holder(s) shall receive no recoveries under the Plan.

**Sale Toggle**

In the event confirmation of the Plan does not or cannot occur, the Debtor shall promptly execute a private sale to Sponsor maintaining the same economic terms for Axios and the Excluded Assets waterfall as if the sale occurred under the Plan.

Under either sale process, Axios shall receive the assets free and clear of all liens, claims and encumbrances and assets shall be purchased in accordance with the DIP Term Sheet. The DIP Term Sheet contains terms relating to the Plan and Sale Toggle process and deadlines that are incorporated herein.

**Excluded Assets**

The following assets (collectively, the "Excluded Assets") shall not be acquired by Newco and shall vest in the Liquidating Trust:

i. The Debtor's interests in or related to Pacific Gardens Medical Center;

ii. Chapter 5 causes of action;

iii. Other litigation causes of action;

iv. Director & Officer Insurance claims;

v. Any excess QAF revenue generated by the Debtor from successfully reducing asserted setoffs or recoupment amounts in excess of the Approved Budgeted QAF (the "QAF Delta"), provided that any such additional amounts will not negatively impact future QAF receipts (*i.e.*, QAF 9, 10, 11 etc. other than the QAF identified in the Approved Budget); and

vi. The Debtor's cash on hand as of the Effective Date under ordinary course of business (*e.g.*, no discounts to accelerate payments) and excluding cash from any QAF funds that are not identified in the Approved Budget or from (v) hereof (collectively, (i)-(vi), the "Excluded Assets").

**Liquidating Trust**

The Liquidating Trust shall have a three-member oversight committee, with 2 members selected by the Committee and 1 member selected by Axios. The Liquidating Trustee will be selected by the Committee, in consultation with the Debtor and Axios.

Net recoveries (*i.e.*, after all costs and expenses of the Liquidating Trust) from the assets in the Liquidating Trust shall

be distributed as follows:

i. The first $1 million shall be retained by the Liquidating Trust for distribution to holders of allowed General Unsecured Claims and/or payment of expenses for payment;

ii. Then, a 50%/50% sharing between Axios and the holders of allowed General Unsecured Claims, until Axios has received $4 million from net proceeds; and

iii. Then, 75% of subsequent net proceeds shall be distributed to holders of allowed General Unsecured Claims and 25% shall be distributed to Axios, until Axios is paid up a total of $20 million (*i.e*., $4 million ((iii) above) + $16 million), at which time all subsequent net proceeds shall be distributed to holders of allowed General Unsecured Claims.

| | |
|---|---|
| **Other Litigation** | *L.A. Care*. Neither Axios, the Committee, nor the Liquidating Trust will pursue a challenge against L.A. Care in respect of the $7.5 million in QAF receivables that are the subject of the 2026 prepetition agreements with L.A. Care.<br><br>*Landlord*. The lease relating to Landlord (as defined in the DIP Term Sheet) will be handled as set forth in the DIP Term Sheet, which is incorporated herein. |
| **Conditions Precedent to Plan Confirmation** | (i) The agreement in principle reflected in this Term Sheet shall not have been repudiated or otherwise abandoned, and no Plan with terms contrary to this Term Sheet shall have been proposed; (ii) the Disclosure Statement shall have been approved; (iii) an asset purchase agreement shall have been agreed upon in form and substance reasonably satisfactory to the Debtor and Sponsor; (iv) the Plan, including any amendments, modifications or supplements thereto, and all documentation contemplated by this Term Sheet or the Plan, shall be in form and substance reasonably satisfactory to the Sponsor; (v) there shall not have occurred a force majeure event (to be defined as a significant global disruption in the financial markets caused by outbreak of war, terrorism, or other incidents, but not adverse changes in the financial, banking or capital markets generally); and (vi) the Bankruptcy Court shall have entered an order approving the Disclosure Statement and confirming the Plan ("Confirmation Order"), which order shall be in form and substance reasonably satisfactory to the Debtor |

| | |
|---|---|
| | and Sponsor. |
| **Conditions Precedent to Plan Consummation** | (i) Contemporaneous effectiveness of the Sale (and related documents such as an interim management agreement or management operations transfer agreement ("MOTA")); and (ii) No modification or stay of the Confirmation Order or entry of other court order prohibiting Plan transactions from being consummated. |
| **Documentation** | The agreed upon funding by Sponsor shall be pursuant to this Term Sheet, the Plan, the Confirmation Order, the "Asset Purchase Agreement," the MOTA, and any other document(s) and/or instrument(s) required to be executed by the Sponsor or Newco shall constitute the definitive Plan documents (the "Documentation"). The Documentation shall contain customary provisions, such as, among other things, representations and warranties, events of default, Documentation not in form reasonably satisfactory to Sponsor or Newco, etc. The Documentation shall conform to this Term Sheet and otherwise shall be in form and substance reasonably acceptable to the Sponsor. In the event of any inconsistency between the Documentation and the Confirmation Order, the Confirmation Order shall control (subject only to the requirement that it be in a form acceptable to the Sponsor). |
| **Regulatory Cooperation** | The Debtor shall (i) within [TBD] business days after Lender's written request, execute and deliver all notices, applications, consents and other documents required of the current licensee, provider, enrollee, registrant or contracting party in connection with the transfer to Lender or its designee of the Hospital's licenses, permits, registrations, certificates, designations, accreditations, provider agreements, program participations and other governmental and accreditation authorizations, including without limitation the notice required by 22 C.C.R. § 70125, the licensee's portions of the CDPH change-of-ownership application, Form CMS-855A, DHCS Medi-Cal and Hospital Quality Assurance Fee program filings, HCAI notices and pending seismic compliance filings, LA County DMH (LPS designation) and EMS Agency designations, DEA, CLIA, pharmacy and radiologic health registrations, accreditation-body notifications, and the assignment of managed care, payor and graduate medical education participating-site agreements; (ii) promptly furnish all information and documents reasonably required for such filings; (iii) cooperate with Lender and its regulatory counsel in all communications with the foregoing agencies and bodies; (iv) maintain all such authorizations in good standing and not |

take or omit any action that would impair them; (v) timely file all Medicare and Medi-Cal cost reports, including any terminating cost report, in a form reasonably acceptable to Lender; and (vi) execute and file, subject to any required approvals, the notices and applications associated with any interim arrangement contemplated hereby.

**Preservation of Rights**

This Term Sheet is part of a proposed settlement among the Parties with respect to their Claims. Nothing herein shall be deemed to be an admission of any kind. To the extent provided by Federal Rule of Evidence 408 and any applicable state rules of evidence, this Term Sheet and all negotiations relating thereto shall not be admissible into evidence in any proceeding. Except as expressly provided in this Term Sheet, nothing herein is intended to, and shall not be deemed to in any manner waive, limit, impair, or restrict the ability of Axios to protect and preserve its rights, remedies, and interests, including its Claims against the Debtor or any other person, any liens or security interests it may have in any assets of the Debtor, or its full participation in the Chapter 11 Case, including with respect to any matters covered by this Term Sheet. Without limiting the previous sentence in any way, if the transactions contemplated by this Term Sheet or otherwise set forth in the Term Sheet are not consummated as provided herein, or if this Term Sheet is repudiated or abandoned for any reason, the Parties each fully reserve any and all of their respective rights, remedies, and interests.

**Governing Law**

The definitive Plan Documents would be governed by the laws of the State of New York, except to the extent governed by the Bankruptcy Code or other applicable federal law.

**If the foregoing is acceptable to you, please so indicate by signing a copy of this proposal in the space provided below and return an executed copy at your earliest convenience.**

**PACIFICA OF THE VALLEY CORPORATION**

By: ______________________________
Name:
Title:

**AXIOS CAPITAL SOLUTIONS, LLC**

By: ______________________________
Name:
Title:

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

By: ______________________________
Name:
Title:

# <u>Exhibit 2</u>

## Budget

Pacifica of the Valley Corporation
13-Week Cash Flow Forecast

| Week # | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 13 Week |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | 10/3/26 | 10/10/26 | 10/17/26 | 10/24/26 | 10/31/26 | 11/7/26 | 11/14/26 | 11/21/26 | 11/28/26 | 12/5/26 | 12/12/26 | 12/19/26 | 12/26/26 | Total |
| Actual / Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| **I. Receipts** | | | | | | | | | | | | | | |
| 1.) Government | $ 451,828 | $ 451,828 | $ 451,828 | $ 451,828 | $ 451,828 | $ 451,828 | $ 451,828 | $ 951,828 | $ 951,828 | $ 951,828 | $ 451,828 | $ 451,828 | $ 451,828 | $ 7,373,765 |
| 2.) Non-Government | 130,544 | 130,544 | 130,544 | 130,544 | 130,544 | 130,544 | 130,544 | 130,544 | 130,544 | 130,544 | 130,544 | 130,544 | 130,544 | 1,697,073 |
| 3.) QAF | - | - | - | - | 2,121,620 | - | 547,147 | 1,998,647 | - | 547,147 | - | - | - | 5,214,561 |
| 4.) Sale to LA Care of QAF | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 5.) DSH | - | - | - | 850,000 | - | - | - | - | - | - | - | 850,000 | - | 1,700,000 |
| 6.) LACare | 221,215 | 221,215 | 221,215 | 221,215 | 221,215 | 221,215 | 221,215 | 221,215 | 221,215 | 221,215 | 221,215 | 221,215 | 221,215 | 2,875,795 |
| 7.) Other | 613,402 | 435,781 | 689,781 | 89,781 | 439,781 | 189,781 | 89,781 | 89,781 | 89,781 | 539,781 | 89,781 | 89,781 | 89,781 | 3,536,779 |
| 8.) **Total Receipts** | **$ 1,416,989** | **$ 1,239,369** | **$ 1,493,369** | **$ 1,743,369** | **$ 3,364,989** | **$ 993,369** | **$ 1,440,516** | **$ 3,392,016** | **$ 1,393,369** | **$ 2,390,516** | **$ 893,369** | **$ 1,743,369** | **$ 893,369** | **$ 22,397,973** |
| **II. Operating Disbursements** | | | | | | | | | | | | | | |
| 9.) Payroll | $ 833,850 | $ 740,831 | $ 851,474 | $ 700,681 | $ 851,474 | $ 700,681 | $ 851,474 | $ 700,681 | $ 851,474 | $ 700,681 | $ 851,474 | $ 700,681 | $ 851,474 | $ 10,186,932 |
| 10.) Payroll Taxes | 411,890 | 240,311 | 411,890 | 240,311 | 411,890 | 240,311 | 411,890 | 240,311 | 411,890 | 240,311 | 411,890 | 240,311 | 411,890 | 4,325,099 |
| 11.) Benefits | 417,279 | 576,269 | 415,842 | 340,430 | 501,261 | 310,857 | 308,580 | 339,273 | 290,111 | 1,254,720 | 190,826 | 209,253 | 190,826 | 5,345,527 |
| 12.) Rent | - | 646,240 | - | 646,240 | - | - | - | - | 646,240 | - | - | - | 1,195,704 | 3,134,424 |
| 13.) Supplies | 211,559 | 117,150 | 110,500 | 114,770 | 106,200 | 103,300 | 101,000 | 107,770 | 94,200 | 117,800 | 101,000 | 89,750 | 113,320 | 1,488,319 |
| 14.) Pharmaceuticals | 18,000 | 10,000 | 10,000 | 11,500 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 11,500 | 141,000 |
| 15.) Purchased Services | 312,411 | 191,940 | 97,954 | 105,263 | 173,902 | 129,411 | 64,732 | 80,600 | 81,910 | 252,808 | 63,800 | 66,532 | 86,910 | 1,708,173 |
| 16.) Repairs and Maintenance | 4,090 | 15,228 | 15,228 | 15,228 | 15,228 | 15,228 | 15,228 | 15,228 | 15,228 | 15,228 | 15,228 | 15,228 | 15,228 | 186,826 |
| 17.) Utilities | 8,000 | 86,400 | 1,175 | 13,000 | - | 93,950 | 5,000 | 1,175 | 8,000 | 85,950 | 13,000 | 1,175 | 8,000 | 324,826 |
| 18.) Insurance | 252,752 | 308,441 | - | - | 326,840 | 4,286 | - | 2,576 | 41,156 | 331,126 | - | - | 23,322 | 1,290,500 |
| 19.) QAF Fees | - | 140,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 250,000 |
| 20.) Medical Professional Fees | 120,000 | 263,685 | - | - | - | 368,685 | - | - | - | 368,685 | - | - | - | 1,121,055 |
| 21.) Other | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 650,000 |
| 22.) CapEx - Seismic and Opening Beds | - | 243,112 | 21,600 | - | - | 48,677 | 172,384 | - | 350,000 | 640,554 | - | - | - | 1,476,327 |
| 23.) **Total Operating Disbursements** | **$ 2,639,832** | **$ 3,629,606** | **$ 1,995,663** | **$ 2,247,424** | **$ 2,456,796** | **$ 2,085,387** | **$ 2,000,288** | **$ 1,557,616** | **$ 2,860,209** | **$ 4,077,864** | **$ 1,717,218** | **$ 1,392,931** | **$ 2,968,174** | **$ 31,629,008** |
| 24.) **Net Operating Cash Flow** | **$ (1,222,843)** | **$ (2,390,238)** | **$ (502,295)** | **$ (504,055)** | **$ 908,193** | **$ (1,092,018)** | **$ (559,773)** | **$ 1,834,400** | **$ (1,466,840)** | **$ (1,687,348)** | **$ (823,850)** | **$ 350,438** | **$ (2,074,806)** | **$ (9,231,035)** |
| **III. Bankruptcy Related Disbursements** | | | | | | | | | | | | | | |
| 25.) Professional Fees | $ - | $ 2,595,000 | $ 1,951,000 | $ 1,951,000 | $ 1,976,000 | $ 1,308,500 | $ 89,000 | $ - | $ - | $ 3,101,500 | $ 670,000 | $ 581,000 | $ 581,000 | $ 14,804,000 |
| 26.) UST Fees | - | - | - | 250,000 | - | - | - | - | - | - | - | - | - | 250,000 |
| 27.) Other Non-Recurring | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 28.) **Total Non-Operating Disbursements** | **$ -** | **$ 2,595,000** | **$ 1,951,000** | **$ 2,201,000** | **$ 1,976,000** | **$ 1,308,500** | **$ 89,000** | **$ -** | **$ -** | **$ 3,101,500** | **$ 670,000** | **$ 581,000** | **$ 581,000** | **$ 15,054,000** |
| 29.) **Net Cash Flow** | **$ (1,222,843)** | **$ (4,985,238)** | **$ (2,453,295)** | **$ (2,705,055)** | **$ (1,067,807)** | **$ (2,400,518)** | **$ (648,773)** | **$ 1,834,400** | **$ (1,466,840)** | **$ (4,788,848)** | **$ (1,493,850)** | **$ (230,562)** | **$ (2,655,806)** | **$ (24,285,035)** |
| **VI. Liquidity Summary** | | | | | | | | | | | | | | |
| 30.) Beginning Cash Balance | $ 1,551,056 | $ 7,328,212 | $ 2,342,975 | $ 3,889,680 | $ 4,184,625 | $ 3,116,818 | $ 716,299 | $ 67,527 | $ 1,901,927 | $ 435,086 | $ 2,646,238 | $ 1,152,388 | $ 921,826 | $ 1,551,056 |
| 31.) Net Cash Flow | (1,222,843) | (4,985,238) | (2,453,295) | (2,705,055) | (1,067,807) | (2,400,518) | (648,773) | 1,834,400 | (1,466,840) | (4,788,848) | (1,493,850) | (230,562) | (2,655,806) | (24,285,035) |
| 32.) DIP Draws | 7,000,000 | - | 4,000,000 | 3,000,000 | - | - | - | - | - | 7,000,000 | - | - | - | 21,000,000 |
| 33.) **Ending Cash Balance** | **$ 7,328,212** | **$ 2,342,975** | **$ 3,889,680** | **$ 4,184,625** | **$ 3,116,818** | **$ 716,299** | **$ 67,527** | **$ 1,901,927** | **$ 435,086** | **$ 2,646,238** | **$ 1,152,388** | **$ 921,826** | **$ (1,733,980)** | **$ (1,733,980)** |

**Footnotes:**
- *Forecast has not yet been agreed to by the DIP Lender.*
- *Forecast assumes ordinary course operations throughout the 13-weeks and does not contemplate any of the potential transactions identified in the Term Sheet.*
- *Does not include DIP Lender contributions to operating losses after 11/7/2026 which are being discussed.*
- *The Fourth Advance ($7mm) during the week ending 12/5/2026 is intended to support costs associated with Plan Confirmation.*
- *The three weeks ending 11/28/2026 show professional fee escrow payments being deferred.*

**<u>EXHIBIT B</u>**

**Chadwick Declaration**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>Pacifica of the Valley Corp.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 26-11060 (TMH) |

**DECLARATION OF PETER C. CHADWICK IN SUPPORT OF DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO (A) OBTAIN POSTPETITION SECURED FINANCING AND (B) UTILIZE CASH COLLATERAL; (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (III) GRANTING ADEQUATE PROTECTION; (IV) MODIFYING THE AUTOMATIC STAY; (V) SCHEDULING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF**

I, Peter C. Chadwick, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1. I am the Chief Restructuring Officer of Pacifica of the Valley Corporation d/b/a Pacifica Hospital of the Valley, in the chapter 11 case (the "Chapter 11 Case") of the above-captioned debtor and debtor in possession (the "Debtor").

2. I have been a Managing Director with Berkeley Research Group, LLC ("BRG") since 2015. I specialize in corporate restructuring, interim management, financial advisory, and distressed business operations, with over three decades of experience advising hospitals and healthcare systems in financial distress, including serving as chief restructuring officer, interim executive, and financial advisor in complex operational and chapter 11 restructurings. My work has focused on stabilizing healthcare operations, implementing cash-management controls,

[1] The Debtor in this Chapter 11 Case, along with the last four digits of the Debtor's federal tax identification number, is: Pacifica of the Valley Corporation d/b/a Pacifica Hospital of the Valley [7312]. The Debtor's mailing address is 9449 San Fernando Road, Sun Valley, CA 91352.

Case 26-10606-TMH Doc 23-3 Filed 01/05/26 Page 2 of 7

preserving continuity of patient care, and developing operational budgets that allow hospitals to continue serving their communities while pursuing restructuring alternatives.

3. I am authorized to execute this declaration (the "Declaration") on behalf of the Debtor. Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein or I have acquired such knowledge through officers of the Debtor or employees of BRG acting under my supervision in the ordinary course of business. If called upon to testify, I would testify competently to the facts set forth herein.

4. I submit this Declaration in support of the *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Obtain Postpetition Secured Financing and (B) Utilize Cash Collateral; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* (the "Motion"), whereby the Debtor seeks authority to enter into a senior secured, superpriority debtor-in-possession financing facility in an aggregate principal amount of up to $52,000,000 (the "DIP Facility"), consisting of $21,000,000 of new-money financing and a roll-up of a portion of Axios's prepetition secured debt provided by Axios Capital Solutions, LLC ("Axios" or in its capacity as such, the "DIP Lender") pursuant to that certain Debtor-In-Possession Loan Term Sheet (the "DIP Term Sheet") and the documents related thereto (collectively, the "DIP Documents").[2]

5. For the reasons set forth below, the relief requested in the Motion is critical to avoid closure of the hospital, which would result in the cessation of operations, and serious disruption to patient care and the Debtor's workforce, all of which, among other things, would materially undermine the Debtor's ability to achieve its objectives in the Chapter 11 Case.

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion.

**BACKGROUND**

6. On the Petition Date, the Debtor commenced the Chapter 11 Case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor has continued in the possession of its property and continues to operate and manage its business as a debtor in possession pursuant to §§ 1107(a) and 1108. No trustee or examiner has been appointed in the Chapter 11 Case.

7. On December 10, 2020, the Debtor entered into the MSL with First Western and the Federal Reserve pursuant to which First Western extended a senior secured loan to the Debtor in the principal amount of $35,000,000. In connection with the MSL, the Debtor executed a Pledge and Security Agreement granting First Western a security interest in substantially all of its personal property.

8. In November 2025, Axios purchased the MSL from First Western. As of the Petition Date, the Prepetition Obligations are approximately $50,943,321.41, inclusive of all accrued and unpaid interest, fees, costs, and expenses. The prepetition obligations owed to Axios are secured by senior secured liens on substantially all of the Debtor's assets.

**NEED FOR POST-PETITION FINANCING**

9. For nearly three months since the Petition Date, the Debtor has operated with extremely limited liquidity and without the benefit of incremental debtor-in-possession financing. As of the date of the Motion, the Debtor has approximately $1,600,000 cash on hand and requires DIP financing to continue to operate the Hospital.

10. Unlike commercial enterprises, hospitals cannot delay essential expenditures without creating risks to patient care. The Debtor must meet payroll to retain clinical staff, purchase necessary pharmaceuticals and medical supplies, maintain utilities and critical medical systems,

and ensure vendors continue supporting operations. Without immediate funding, the Hospital may be unable to continue caring safely for its patients and may need to begin an orderly cessation of operations, including the safe transfer or discharge of patients over an appropriate period of time.

11. Accordingly, the Debtor requires an immediate and dependable source of additional liquidity.

**THE DIP FACILITY PROVIDES NECESSARY LIQUIDITY**

12. To address its immediate liquidity crisis, the Debtor has negotiated the DIP Facility with the DIP Lender, the holder of the Debtor's prepetition senior secured debt. The DIP Facility provides for a senior secured, superpriority facility in an aggregate principal amount of up to $52.5 million, including $21 million of new-money financing and a roll-up of a portion of the Debtor's prepetition obligations in accordance with the DIP Documents. Based on the Debtor's current liquidity position and the financing efforts undertaken to date, I am not aware of any actionable alternative source of funding that is presently available on similar or superior terms.

13. Without immediate access to the DIP Facility, the Debtor does not have sufficient liquidity to continue operating the Hospital, maintain continuity of patient care, and pursue a plan confirmation process. Over the next two weeks, the Debtor forecasts expenses will exceed receipts by $5.6 million. Among other things, the Debtor must renew its medical malpractice insurance and pay certain monthly premiums, rent, physician compensation, and legally required scheduled capital expenditures (for which the Debtor is currently accruing $5,000 in penalties per day).

14. The DIP Facility includes a 13-week Budget that has been approved by the DIP Lender and is designed to, among other things, fund a chapter 11 plan process culminating in December 2026. Use of proceeds must comply with the Budget, subject to agreed variances. I have supervised the preparation and review of the Budget governing the Debtor's use of proceeds of the

DIP Facility and Cash Collateral. Based on my experience with the Debtor's operations and liquidity requirements, the Budget reflects reasonable estimates of the Debtor's anticipated receipts and expenditures and provides sufficient funding for continued patient care, the Debtor's employees, essential vendors, hospital operations, U.S. Trustee fees, administrative fees, and completion of the contemplated chapter 11 plan confirmation process.

**NEED FOR INTERIM RELIEF**

15. Immediate access to the DIP Facility and Cash Collateral is necessary to avoid immediate and irreparable harm to the Debtor. Without interim approval of the DIP Facility, the Debtor will lack sufficient cash to meet payroll, purchase essential medical supplies, and maintain operations necessary to care for patients currently in the Hospital. Accordingly, immediate access to the DIP Facility and Cash Collateral is necessary and appropriate.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated: September 27, 2026

*/s/ Peter C. Chadwick*
Peter C. Chadwick
Chief Restructuring Officer
Pacifica of the Valley Corporation

# EXHIBIT C

## Turnbull Declaration

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>Pacifica of the Valley Corp.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 26-11060 (TMH) |

**DECLARATION OF ANDREW R. TURNBULL IN SUPPORT OF DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO (A) OBTAIN POSTPETITION SECURED FINANCING AND (B) UTILIZE CASH COLLATERAL; (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (III) GRANTING ADEQUATE PROTECTION; (IV) MODIFYING THE AUTOMATIC STAY; (V) SCHEDULING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF**

I, Andrew R. Turnbull, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1. I am a Managing Director of Houlihan Lokey Capital, Inc. ("Houlihan Lokey"), the proposed investment banker to the above-captioned debtor and debtor in possession (the "Debtor") in the above-captioned chapter 11 case (the "Chapter 11 Case").

2. I am authorized to execute this declaration (the "Declaration") on behalf of the Debtor. Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein or I have acquired such knowledge through officers of the Debtor, the Debtor's other advisors or employees of Houlihan Lokey acting under my supervision in the ordinary course of business. If called upon to testify, I would testify competently to the facts set forth herein.

3. I submit this Declaration in support of the *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Obtain Postpetition Secured Financing and (B)*

[1] The Debtor in this Chapter 11 Case, along with the last four digits of the Debtor's federal tax identification number, is: Pacifica of the Valley Corporation d/b/a Pacifica Hospital of the Valley [7312]. The Debtor's mailing address is 9449 San Fernando Road, Sun Valley, CA 91352.

*Utilize Cash Collateral; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* (the "Motion"), whereby the Debtor seeks authority to enter into a senior secured, superpriority debtor-in-possession financing facility in an aggregate principal amount of up to $52,500,000 (the "DIP Facility"), consisting of $21,000,000 of new-money financing, a $2.1 million commitment fee and a roll-up of a portion of Axios's prepetition secured debt provided by Axios Capital Solutions, LLC ("Axios" or in its capacity as such, the "DIP Lender") pursuant to that certain Debtor-In-Possession Loan Term Sheet (the "DIP Term Sheet") and the documents related thereto (collectively, the "DIP Documents").[2]

## QUALIFICATIONS

4. I am a Managing Director in Houlihan Lokey's Financial Restructuring Group and have more than three decades of experience advising companies, lenders, creditors, and investors in financially distressed situations. My experience includes advising on capital raises and other financing transactions, acquisitions and divestitures involving financially distressed businesses and assets, and negotiations concerning the restructuring of private and public securities, both in chapter 11 cases and in out-of-court restructurings. I have worked across a range of industries, but for the last twenty years or so have been primarily focused on healthcare. In this regard, I have advised on many transactions involving the financing, restructuring and sale of healthcare businesses, including numerous hospitals. More broadly, Houlihan Lokey has substantial experience advising companies, creditors, and other constituencies in connection with complex restructurings, recapitalizations, distressed financings, mergers and acquisitions, and chapter 11 transactions.

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion.

5. In connection with its engagement by the Debtor, Houlihan Lokey has been advising the Debtor with respect to its capital structure, liquidity needs, financing alternatives, and strategic options. Among other things, Houlihan Lokey has worked closely with the Debtor and its other advisors to assess the Debtor's projected liquidity requirements, evaluate the amount and timing of financing necessary to support continued patient care and maintain operations, pay the Debtor's employees, conduct the chapter 11 process, identify and engage with potential sources of debtor-in-possession financing, and evaluate potential strategic transactions involving the Debtor or its assets.

**DIP FINANCING MARKETING PROCESS**

6. In connection with the Debtor's efforts to obtain postpetition financing, Houlihan Lokey contacted and engaged in discussions with numerous potential financing sources concerning their interest in providing debtor-in-possession financing to the Debtor. Those efforts were intended both to identify potential alternative sources of financing and to market-test the financing available from Axios, the holder of the Debtor's prepetition senior secured indebtedness.

7. Houlihan Lokey also has communicated with parties who have expressed interest in a potential acquisition, including with respect to their interest in debtor-in-possession financing in connection with a potential acquisition. This parallel process has allowed Houlihan Lokey and the Debtor to evaluate whether a potential strategic transaction could also provide an alternative source of financing and, more broadly, to assess the available DIP financing proposals in the context of the Debtor's sale process.

8. In that capacity, I and other members of the Houlihan Lokey team have devoted substantial time to the Debtor's financing and strategic processes. With respect to the DIP financing process, Houlihan Lokey has assisted in developing and preparing financial and other materials

for potential financing sources, evaluating the Debtor's projected cash needs and required financing capacity, identifying and contacting potential capital providers, responding to diligence requests, participating in discussions regarding proposed financing structures and terms, and analyzing proposals and other indications of interest received by the Debtor.

9. In evaluating the proposals received, Houlihan Lokey and the Debtor considered not only "headline" economics, but also the amount and timing of committed funding, conditions to funding, certainty of execution, the proposed collateral and priority structure, the implications of any required priming litigation, the ability for the Debtor to satisfy its administrative claims, and the Debtor's need to obtain liquidity promptly. These considerations are particularly important given the Debtor's liquidity position and the need to preserve continuity of patient care, support the Debtor's employees, and maintain uninterrupted hospital operations.

10. To date, the financing process has yielded only one actionable proposal—the proposal from Axios embodied in the DIP Facility. Houlihan Lokey and the Debtor have received two other proposals relating to potential postpetition financing, but, in their current form these proposals are not actionable and require the Debtor to obtain nonconsensual priming liens of Axios's existing prepetition liens. Moreover, based on my review of those proposals and discussions with the Debtor and its advisors, even if the proposals could be made actionable, their terms, as presently proposed, are not sufficiently superior to the Axios proposal to justify the additional cost, execution risk, and uncertainty that would be associated with seeking to obtain financing that would require a nonconsensual priming of Axios's existing liens. Accordingly, as of the date hereof, the Axios proposal remains the only actionable DIP financing proposal presently available to the Debtor.

11. Houlihan Lokey and the Debtor also considered the practical consequences of pursuing an alternative financing proposal that required priming Axios without its consent. Such a financing would introduce additional uncertainty as to timing and execution and could require contested proceedings concerning priming and adequate protection. The Debtor presently has no other actionable source of postpetition financing that provides sufficient committed liquidity on terms superior, taken as a whole, to the DIP Facility. The proposed DIP Facility therefore provides the Debtor with the most certain presently available path to obtaining the liquidity necessary to maintain patient care, support its employees, continue hospital operations, and pursue a chapter 11 plan.

## THE AXIOS DIP FACILITY

12. The terms of the DIP Facility are the product of extensive, good faith, arm's-length negotiations among the Debtor, its advisors, the Committee, and Axios that have taken place while the Debtor continued to run a marketing process in parallel.

13. In evaluating the DIP Facility, the Debtor and Houlihan Lokey considered its economic terms as a whole, rather than any individual term in isolation. Based on my experience with debtor-in-possession and other distressed financings, the overall economics of the DIP Facility—including the applicable interest rate, commitment fee, base interest and default interest rates, the amount of new-money funding being provided, and the roll-up contemplated by the facility—are within the range of terms that I would expect for a financing of this size and nature and under the circumstances presented here. Axios also was not willing to extend the DIP Facility without being provided priming liens.

14. The Axios DIP Facility includes a 1.5x roll-up of Axios's prepetition secured debt based on the amount of new money actually advanced. The Debtor considered the proposed roll-

up as part of its evaluation of the overall economics of the DIP Facility and in comparing the Axios proposal against the other financing alternatives received by the Debtor. Although the roll-up increases the amount of Axios's prepetition debt that will receive the benefits associated with the DIP Facility, it is a required component of Axios's proposal and is tied to the amount of new money actually advanced to the Debtor. In my experience, the Roll Up request is reasonable under the circumstances presented here. Taking the roll-up into account, together with the new-money commitment, pricing, certainty of funding, and other terms of the DIP Facility, the Axios proposal represents the best presently available actionable financing proposal for the Debtor.

15. As part of Houlihan Lokey's evaluation of the Axios proposal, per request, Axios provided information regarding its financial capacity to fund the commitments contemplated by the DIP Facility. I reviewed the information provided by Axios in response to that request and discussed that information with the Debtor and its other advisors. Based on that review, I believe the information provided by Axios is sufficient to support the Debtor's conclusion that Axios has the financial capacity to fund the amounts contemplated by the DIP Facility in accordance with its terms.

16. Accordingly, approval of the DIP Facility will provide the Debtor with necessary liquidity and funding certainty to maintain patient care, support its employees, and continue hospital operations, while allowing the Debtor and its advisors to pursue confirmation of a chapter 11 plan.

17. The DIP Facility is contingent on a transaction to transition the Hospital's ownership to the DIP Lender through a chapter 11 plan or private sale, in which the DIP Lender intends to acquire the Hospital as consideration for its DIP Claim. Based on the marketing process conducted to date, there may not be other viable parties positioned to provide an overbid under

these conditions. The Hospital has significant seismic remediation and other capital expenditure requirements, which will require a substantial capital commitment from a prospective acquirer. The transaction also involves meaningful turnaround execution risk and the continuation of considerable federal and state supplemental funding programs. Notwithstanding these challenges, the Debtor, Axios and the Debtor's landlord have been able to reach a non-binding term sheet to assist the DIP Lender in its reinvestment and turnaround efforts.

18. Based on the financing process conducted to date, my discussions with potential financing sources and interested acquirers, and my review of the proposals received, I respectfully submit that the Axios DIP Facility represents the best presently available actionable financing proposal for the Debtor and the only option that will provide immediate liquidity. No alternative proposal currently provides sufficient incremental value or other benefits to justify the additional cost, delay, uncertainty, and litigation risk associated with pursuing a nonconsensual priming transaction. Accordingly, the Debtor's decision to proceed with the Axios DIP Facility is reasonable and appropriate under the circumstances and will provide the Debtor with the liquidity and funding certainty necessary to maintain patient care, support its employees, continue hospital operations, and pursue confirmation of a chapter 11 plan.

[*Signature page to follow*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated: September 27, 2026

*<u>/s/ Andrew R. Turnbull</u>*
Andrew R. Turnbull
Managing Director
Houlihan Lokey