**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>Pacifica of the Valley Corporation.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 26-11060 (TMH)<br><br>Jointly Administered |

**PATIENT CARE OMBUDSMAN'S FIRST INTERIM REPORT**

**TO THE UNITED STATES TRUSTEE, THE DEBTOR, ALL PARTIES IN INTEREST AND THEIR RESPECTIVE COUNSEL OF RECORD:**

Jerry Seelig, the Patient Care Ombudsman ("PCO")[2] appointed under section 333 of title 11 of the United States Code ("Bankruptcy Code") in the above-captioned cases, files this First Interim Report (the "Report"). Pursuant to Bankruptcy Code section 333, the PCO is monitoring the quality of patient care for any significant decline or material compromise. The PCO has completed in-depth site visits of at the Debtor's main hospital and operating unit (together, the "Facilities"), conducted in-person interviews, and has worked in a cooperative manner with Debtor's key management to obtain necessary documents, materials, and financial reports. These

[1] The Debtors in this Chapter 11 Case, along with the last four digits of the Debtor's federal tax identification number, is 7312. The Debtor's mailing address is 9449 San Fernando Road, Sun Valley, CA 91352.

[2] As used herein and in all future filed Reports filed by the PCO, "PCO" collectively refers to Mr. Seelig, his firm Seelig + Cussigh HCO LLC ("S+C"), and the consultants retained by S+C. In conjunction with discharging his duties and preparing this report, the PCO has directed and supervised professionals from S+C. The resumes of Mr. Seelig and the retained consultants are attached to the *Application for Entry of Order Authorizing the Retention and Employment of Seelig + Cussigh HCO LLC Effective July 27, 2026* [Docket No. 159]. The PCO and the retained consultants possess extensive expertise in patient care, patient safety, healthcare quality and regulatory compliance. To ensure an efficient and non-duplicative review process, the PCO coordinated the consultants' monitoring and reporting efforts according to their respective areas of specialization. Specifically, Richard Cussigh focused on Medical Records, Health Insurance Portability and Accountability Act ("HIPAA") and related regulatory matters; Lisa Grod PhD, MSCPGTM, BCPA, NHA focused on Debtor's sub-acute and behavioral units; Maureen Archambault, RN, MBA, HRM, CPHRM, FASHRM focused patient care and operations across all hospital units; and John Baackes focused on funding and government relations.

visits and interviews have enabled the PCO to provide the Court with an accurate assessment of patient care at the Debtor's facilities.

The PCO will be present at the next scheduled hearing and available to answer any questions and to report in greater detail should the Court so desire.

This Report contains the following categories of information:

**I. Executive Summary**
**II. PCO's Monitoring Methodology and Scope**
**III. Review of the Debtor's Operations**
**IV. Hospital Systems Review**
**V. Next Steps for the PCO**

## I. EXECUTIVE SUMMARY

### A. Overview

Pacifica Hospital of the Valley ("PHOV" or the "Hospital") provides a comprehensive range of integrated healthcare, social welfare, and long-term care services. The Hospital operates from a 57,000-square-foot facility consisting of three interconnected buildings, joined through a seismic retrofit project, and includes three stories plus a basement.

For more than 30 years, the Hospital's two Care Units have served as its core service lines, providing specialized care and forming the foundation of its operations.

#### 1. The Subacute SNF Unit

The Hospital's separately licensed Subacute Skilled Nursing Facility Unit (the "Subacute Unit") serves a highly specialized patient population and receives referrals from more than 400 miles away, including from rural and underserved communities. The Subacute Unit currently maintains an average daily census of approximately 60 patients, with plans to expand capacity by an additional 30 to 34 beds in early 2027 upon completion of the Hospital's seismic retrofit program.

All patients in the Subacute Unit require a specialized level of care, including ongoing tracheostomy management and ventilator support, making the Unit a critical regional resource for individuals with complex medical needs.

**2. Behavioral Health Unit**

The Hospital's Behavioral Health Unit operates at or near full capacity, maintaining a census of approximately 39 patients on virtually all days. This secure, locked psychiatric care unit treats a broad range of acute mental health conditions, including major depressive disorder, bipolar disorder, and schizophrenia. Patient services include comprehensive psychiatric and psychological assessments, case management, medication management, individualized treatment planning, discharge and transition planning, and referrals to other mental health and acute care professionals.[3]

In addition, the Debtor operates a Behavioral Urgent Care Clinic pursuant to a contract with the Los Angeles County Department of Mental Health. The clinic, which serves both adolescents and adults, is located on the campus of the County of Los Angeles Olive View-UCLA Medical Center, approximately nine miles from the Hospital.[4]

Both the Subacute Unit and the Behavioral Health Unit provide highly specialized services that are in limited supply locally and regionally. As a result, each unit consistently operates at or near full census. Based on the information available and the PCO's professional experience, reimbursement rates for patients served in the Behavioral Health Unit and the Subacute Unit are

[3] Pacifica Hospital of the Valley, *Mental Health Unit*, https://pacificahospital.com/featured-inpatient-treatments/#gallery-details-mental-health

[4] Pacifica Hospital of the Valley, *Mental Health Urgent Care Clinic*, https://pacificahospital.com/pacific-hospital-of-the-valley-urgent-care-clinic/

believed to be significantly higher than reimbursement rates associated with more traditional inpatient and skilled nursing services due to the specialized nature and intensity of care provided.

**3. Medical Surgical Services Unit**

The Hospital maintains 50 Medical Surgical Services ("Med-Surg") beds and provides care for patients requiring hospitalization for a variety of chronic and acute care conditions and a limited number of minor surgical procedures.

The majority of the Medical Surgical beds are dedicated to treating patients with co-occurring medical and psychiatric conditions who have been recently released from incarceration. These "dual diagnosis" patients are directly referred from the California Department of Mental Health ("DMH") pursuant to a contractual arrangement with the Hospital.[5] Under that agreement, the Hospital is authorized to maintain up to 36 DMH-referred patients and, on most days, operates at or near that maximum capacity. Of these DMH-referred patients, their clinical need at admission determines what unit they are treated in. At the time of the filing of this Report, approximately 75% are treated in the Medical-Surgical Unit, 20% in the Behavioral Health Unit, and the remainder in the Intensive Care Unit ("ICU"). Based on the information available and the PCO's professional experience, reimbursement rates associated with these dual-diagnosis patients are believed to be materially higher than reimbursement rates for traditional hospital inpatient services due to the complexity and intensity of care required.

In support of its Medical-Surgical and Emergency Room services, the Hospital provides a broad continuum of clinical and rehabilitative care. These services include an intensive care unit, laboratory services staffed by board-certified pathologists, diagnostic imaging, and pulmonary medicine services. The Hospital also maintains a comprehensive rehabilitation department staffed

[5] *Declaration of Precious Mayes in Support of Emergency First Day Motions* (the "Mayes Declaration") [Docket No. 16] pp: 4-5.

by physical, occupational, and speech therapists who provide treatment for a wide range of conditions, including traumatic brain injuries, post-operative orthopedic impairments, neurological disorders, and cancer-related functional limitations. Together, these ancillary services support the Hospital's ability to deliver integrated and specialized care across its various treatment programs.

**4. 24-Hour Emergency Care**

The Hospital provides 24-hour emergency care through its Emergency Room ("ER"), treating approximately 14,000 emergency patients annually. The ER includes seven treatment rooms/bays and has the capacity to accommodate an additional seven patients in treatment chairs located in an adjacent hallway.

In early 2027, the Debtor expects to open an EmPATH (Emergency Psychiatric Assessment, Treatment, and Healing) Behavioral Health Urgent Care Clinic adjacent to the ER. As described in the Mayes Declaration:

> "The Debtor is in the process of opening an EmPATH Behavioral Health Urgent Care Clinic adjacent to its emergency room that will provide Medi-Cal Certified crisis stabilization services. This clinic will be open 24 hours a day, 7 days a week, including holidays, and provides immediate psychiatric evaluation, crisis intervention, and stabilization services in a therapeutic space to treat acute psychiatric patients for up to 24 hours to avoid stressful emergency room settings. The Hospital was one of the six Acute Care Hospitals selected in the State of California to provide an EmPATH program."[6]

The ER serves as a critical healthcare resource for the surrounding community, providing emergency care across a broad spectrum of medical needs. Moreover, for a substantial portion of the Hospital's patient population, the ER serves as the primary point of entry into the Hospital's continuum of care.

---

[6] *Id*. at pp. 5.

Based on the information available and the PCO's professional experience, although the ER has historically faced challenges associated with funding constraints and shortages of healthcare personnel, Hospital management has successfully maintained this essential community resource and continued to provide access to urgently needed emergency medical services.

**B. Pacifica is a Necessary Safety-Net Resource**

Pacifica Hospital of the Valley is a safety-net provider and, like all safety-net healthcare organizations, delivers medical services to vulnerable, low-income, and uninsured patients regardless of their ability to pay. Over its 76-year history, Pacifica has offered a broad range of acute care hospital services. Certain service lines, including inpatient pediatric care and labor and delivery services, have been reduced or discontinued over time due to financial constraints, physical plant limitations, and changes in patient demand.

Currently, the Hospital provides three services that are particularly critical to its role as a safety net provider:

1. Behavioral Health Services. The Hospital operates a 39-bed locked inpatient behavioral health unit for adults aged 18 and older who require psychiatric stabilization. Such beds are in short supply throughout Los Angeles County and, in particular, the San Fernando Valley. As a result, demand consistently exceeds available capacity, and there is effectively a continuous waiting list for admission.
2. Subacute Skilled Nursing Care. The Hospital also operates a licensed subacute/skilled nursing unit, with the number of operational beds varying from time to time. There is a significant shortage of subacute care beds throughout Los Angeles County and, indeed, nationwide. Subacute patients require a lower level of care than acute care hospital patients, but without adequate subacute capacity, such patients often remain in acute care hospital

beds longer than medically necessary. This not only increases healthcare costs but also limits the availability of acute care beds for patients requiring more intensive treatment. Based on current demand, if the Hospital were able to convert additional currently idle beds into subacute beds, those beds would likely be filled on a consistent basis.

3. Emergency Department Services. The Hospital's Emergency Department serves a critical safety net function for the surrounding community. Uninsured individuals and Medi-Cal beneficiaries frequently rely on safety-net emergency rooms as their primary, and often only, point of access to healthcare services.

The federal legislation commonly referred to as the "One Big Beautiful Bill Act" is expected to result in significant changes to the Medicaid program, including California's Medi-Cal program, beginning in 2027. These changes are likely to increase reliance on safety-net emergency departments as some individuals lose Medi-Cal eligibility or experience reductions in healthcare subsidies available through Affordable Care Act marketplaces.

Emergency department utilization may also increase beginning January 1, 2027, as California transitions as many as two million undocumented Medi-Cal beneficiaries from managed healthcare plans into the Medi-Cal fee-for-service system. Under managed care arrangements, beneficiaries generally have access to a network of participating physicians. By contrast, many providers do not accept fee-for-service Medi-Cal reimbursement rates, which may further limit access to outpatient care and increase reliance on hospital emergency departments as a source of treatment.

***The Hospital will continue to play a vital role in the San Fernando Valley healthcare system based on these three service lines alone. While additional services provided by the***

***Hospital are valuable to the community, none are more essential to the region's healthcare safety net than its behavioral health, subacute care, and emergency department services.***

## II. PCO'S MONITORING METHODOLOGY AND SCOPE

### A. Methodology

Following his appointment, the PCO implemented a cost-effective plan to visit and monitor the Debtor's patient care and safety at the Debtor's facilities. Among other things, the PCO:

1. Interviewed the Debtors' administrators and the key professionals involved in care and compliance.[7]

2. Reviewed internally prepared documentation of patient care and incidents ("incident reports") to identify patients harmed and then research specific patient charts and care components.

3. Reviewed liability-risk, staffing, and compliance documents at the facility and corporate level.

4. Took extensive notes documenting interviews and in-depth review of relevant documents, prepared and analyzed facility-specific reports, and distilled all that into the Report to the Court.

[7] The following officers and professionals were interviewed: Chief Executive Officer, Chief Responsible Officer, Chief Operating Officer, Chief Financial Officer, the Chief Nursing Officer (CNO);Vice President Human Resources; the Nursing Director of Critical Care Unit Units and the Emergency Room (ER); the Director of Nursing (DON) for the Sub-Acute unit; Nursing Director of Surgical Services; Behavioral Health Unit Director, Chief of Staff; Director and Coordinator of Medical Staff Services; staff physicians; Medical Director of the Emergency Department; key staff responsible for revenue cycle care documentation; staff nurses; other caregivers; Department Managers responsible for key care components including but not limited to Infection Control, Medical Records-Health Information Systems, Dietary, Case Management, Physical Plant-Facilities, Directors of Laboratory, Radiology, Physical Therapy; knowledgeable parties.

5. Conducted a comprehensive examination of reported state and federal quality measures, including each facility's Joint Commission Surveys[8] and any federal or state agency Statements of Deficiencies and Plans of Corrections for the past two-years.[9]

6. Reviewed the historical current system-wide efforts regarding peer review, incident reports, quality assurance, and performance improvement programs.[10]

## III. REVIEW OF THE DEBTOR'S OPERATIONS

The first building in what is now the Hospital's 57,000-square-foot, seismically retrofitted facility was completed in 1950, followed by additions constructed in 1960 and 1970. Through subsequent seismic retrofit projects, these structures were integrated into a single hospital facility

[8] All hospitals, nursing homes, and certain other health care providers that receive funds from Centers for Medicare and Medicaid Services ("**CMS**") are surveyed and the deficiencies and then the corrections are reported using Form 2567; definitions are found at: www.altsa.dshs.wa.gov/professional/nh/documents/Definitions.pdf In all states the JOINT COMMISSION, the State and the CMS share all survey and accrediting information. The JOINT COMMISSION conducts "surprise survey visits" no less than every three years to investigate all aspects of patient care and safety. At the conclusion of the survey, the JOINT COMMISSION provides the Hospital with a detailed report on deficiencies and demand for correction for each deficiency found. In all federal and state surveys, deficiencies are illustrated on a two-column form (CMS FORM 2567) with deficiencies cited on the left column and the right-hand column left blank for the respondent to provide within ten working days a plan of correction for each deficiency. All submitted forms "Post submission and acceptance of plans of corrections, both the JOINT COMMISSION survey documents and Statements of Deficiency and Plans of Correction" are public and will be provided to the Court if requested.

[9] On-Site Survey Process: a "Joint Commission Fact Sheet:" https://www.jointcommission.org/assets/1/18/Onsite_Survey_Process_8_13_18.pdf The JOINT COMMISSION ACCREDITATION CATEGORIES relevant to the Debtors is; "Accredited is awarded to a health care organization that is in compliance with all standards at the time of the on-site survey or has successfully addressed requirements for improvement in an Evidence of Standards Compliance within 60 days following the posting of the Accreditation Summary Findings Report and does not meet any other rules for other accreditation decisions. *Most importantly, the Hospital's next 3-year survey will take place over the next few months.*

[10] Pursuant to the Code of Federal Regulations, § 482.21: Condition of participation: Quality assessment and performance improvement program. The hospital must develop, implement, and maintain an effective, ongoing, hospital-wide, data-driven quality assessment and performance improvement program. The hospital's governing body must ensure that the program reflects the complexity of the hospital's organization and services; involves all hospital departments and services (including those services furnished under contract or arrangement); and focuses on indicators related to improved health outcomes and the prevention and reduction of medical errors. The hospital must maintain and demonstrate evidence of its QAPI program for review by CMS. https://www.ecfr.gov/current/title-42/chapter-IV/subchapter-G/part-482/subpart-C/section-482.21. *See also*, video summary: Governing Body and QAPI Requirements published by the JOINT COMMISSION is a layperson's introduction to this key hospital requirement. https://www.jointcommission.org/en-us/products-and-services/board-education/resource-center/governing-body-and-cms-qapi-requirements.

under one roof. Based on the information available, as well as the PCO's professional and management experience, including its role as PCO during the Debtor's prior bankruptcy case, the PCO believes that the Hospital's physical plant and infrastructure systems have historically suffered from chronic underinvestment and, at times, insufficient attention to necessary maintenance, repairs, and capital replacements. Notwithstanding these challenges, a skilled, dedicated, and often understaffed and underfunded facilities team has worked diligently to maintain operations under what were, at times, extremely difficult circumstances.

Today, the historical lack of investment in maintenance and repairs, coupled with delays in completing the seismic retrofit project, continues to affect the Hospital's operations, most notably by limiting its available census capacity. At the same time, however, the retrofit and repurposing of certain areas, including areas formerly devoted to discontinued service lines, has created and will continue to create opportunities for the Hospital to develop new, needed, and well-reimbursed programs that build upon its longstanding core competencies.

### C. Seismic Issues[11]

Following major California earthquakes in 1971 and 1994, which collectively resulted in more than 50 deaths and widespread damage to numerous hospitals, the California Legislature required that general acute care hospitals not only remain standing after a major seismic event but also remain operational. As a result, California hospitals, including the Debtor, have spent more than three decades conducting seismic evaluations and undertaking retrofit and remediation projects to comply with evolving state-mandated seismic safety standards.[12]

[11] 2025 California Code: Health and Safety Code – HSC DIVISION 107 - HEALTH CARE ACCESS AND INFORMATION; PART 7 - FACILITIES DESIGN REVIEW AND CONSTRUCTION; CHAPTER 1 - Health Facilities; ARTICLE 8 - New State Responsibilities For Seismic Safety in Hospitals Section 130002. https://law.justia.com/codes/california/code-hsc/division-107/part-7/chapter-1/article-8/section-130002/

[12] CALIFORNIA LEGISLATURE: *A Primer on Hospital Seismic Safety Requirements* https://shea.senate.ca.gov/sites/shea.senate.ca.gov/files/final_seismic_background_paper_aa_edits.pdf

The PCO served as a monitor in the Debtor's 2009 bankruptcy case and observed the Debtor's initial, but limited, efforts to address these seismic requirements. For many years thereafter, the Debtor either lacked, or elected not to commit, the financial resources necessary to achieve compliance with applicable seismic standards.

More recent developments are described in the Mayes Declaration, which explains that the COVID-19 pandemic caused significant delays to the ongoing seismic retrofit project. As a result, despite spending more than $15 million on seismic compliance efforts through 2024, the Debtor continued to miss mandated deadlines. Ms. Mayes states:

> "Since the Debtor had missed the seismic deadlines, the Debtor engaged with state legislators to seek relief. Pursuant to Assembly Bill 2404, which was approved by the Governor of California on September 27, 2022, the Debtor obtained an 18-month extension to complete the seismic work."[13]

That extension has since expired. The Debtor is currently working with state legislators to obtain additional relief through legislation that would extend its compliance deadline to April 20, 2028, and provide abatement of accrued daily fines.

Notwithstanding these challenges, the seismic retrofit project remains active and funded. The Debtor currently cannot utilize 38 SNF beds as a result of the state-mandated construction, which management estimates has reduced annual revenue by approximately $20 million. According to the Debtor, those 38 beds are expected to return to service in January 2027 upon completion of the retrofit project.

Based on the information available and the PCO's professional experience, the PCO believes the seismic retrofit project is progressing toward completion and is likely to meet the current January 2027 target date for returning the affected SNF beds to operation.

[13] *Id*. at pp. 6.

**D. Summary of the Physical Plant Monitoring**

Mr. Seelig and Dr. Grod each conducted multiple inspections of the Facility, both interior and exterior, accompanied by knowledgeable members of the Hospital's staff. Based on those inspections, the PCO makes the following observations:

a. Due to its age and prolonged exposure to sun, wind, and other environmental conditions, portions of the roof have experienced leakage and require resurfacing. However, based on the information reviewed by the PCO, the roof does not require full replacement at this time. The PCO has reviewed the proposed remediation plan and the associated contractor bid.

b. The Chiller System component of the Hospital's HVAC system was cited by state regulators as an Immediate Jeopardy ("IJ") because the hospital had not obtained approval from the California Department of Health Care Access and Information (HCAI) for the installation of a needed and currently operating temporary unit. The remediation plan presently focuses on obtaining final regulatory approval for continued use of the temporary unit. Installation of a permanent replacement chiller has been delayed pending approval of an additional extension of the Hospital's seismic compliance deadline.

c. The fire alarm system subpanel requires replacement of its backup batteries to restore the system to full operating condition. Once the batteries are replaced, the system should be tested to confirm that all components are functioning properly.

d. The annunciator panel located on the first floor currently displays a trouble indicator light that remains illuminated and requires further evaluation. The Facility is also equipped with two natural gas generators and one diesel generator, which collectively provide

approximately ninety-six hours of backup power. Additional fuel is maintained on-site in separate storage to support extended generator operation in the event of a power outage.

## IV. HOSPITAL OPERATIONS & SYSTEMS' REVIEW

The Hospital's System Review, which included its key operating unit's effort, was led by Maureen Archambault, RN, MBA, HRM, CPHRM, FASHRM, ("Maureen"). Maureen has over 30 years of healthcare operations, risk financing, claims management, patient safety, and enterprise risk management experience across all segments in healthcare. She is a highly skilled health care administrator nationally recognized as a founder of and leader in clinical risk assessment and quality improvement efforts. For some units and services. Dr. Grod contributed to the monitoring and reporting.

Upon appointment, the PCO requested and received key documents from the Hospital's Leadership. After reviewing the documents, the PCO conducted initial zoom interviews with the Hospital's leadership team with the purpose of reviewing key indicators to determine if there is any significant decline in the quality of care. The participants were provided a preliminary agenda from which to prepare and provide initial responses that were reviewed during the meeting.

In Summary, the PCO Employed the following Methodology Employed in their Review of the Hospital and its Operating Unit:

a. Prior to being on-site, the PCO reviewed various documents including budget statements, policies and procedures, various regulatory reports and associated plans of correction.

b. Hospital leadership conducted a campus tour that included all patient care areas as well as many areas needed to support patient care. These appeared to be clean, free from

debris, hallways clear, ceiling tiles were clean and fire extinguishers that were randomly checked were tagged appropriately.

c. While rounding in the various hospital departments, the PCO randomly reviewed medical and patient care equipment for current biomedical checks and appropriate tags. Those reviewed were found to be compliant.

d. The PCO randomly reviewed patient care supplies and medications for expiration dates and those reviewed were found to be compliant.

**A. The Acute Care Hospital's Key Operating Units Systems Review**

Based on its on-site inspections, together with its review of documents and other materials both on-site and off-site, the PCO offers the following summary assessment of the Hospital's principal departments, service lines, and operating units.

**1. Dietary**

An independent review of the Dietary Department and the Food storage areas was completed by Lisa Grod, PhD, LNHA. An interview with the Director of the Dietary department was held to discuss, menus (monthly & disaster), as well as food preparation for patients with specialized needs such as puree, minced or chopped foods and with food preferences or allergies, storage of perishable (frozen and fresh) foods, temperature logs, emergency supplies and review of policies and procedures. Logs were reviewed for kitchen hood maintenance and sanitation procedures and schedules. The director of Dietary has thermometers that monitor the temperature of the refrigerator and freezers that are relayed hourly to his phone to ensure that all foods remain at their respective temperature ranges. All foods need to be dated when stored in the refrigerators and freezers, fresh alternative food items that were pre-prepared were dated to ensure timely consumption. Non-perishable food staples were properly stored and maintained in a separate area.

Temperature logs are maintained to ensure that the food is cooked at the proper temperature and that once they are placed in an insulated cart to be delivered to patient rooms.

The kitchen hoods are serviced every 6 months, and the service logs are maintained with the Dietary Supervisor. According to the Dietary Director they have three meal cycles and to accommodate special meal preferences based on patient preferences. Disaster menus were available for review; Water is stored in Central Supply (Materials Management) (enough for 300 staff members and 120 patients based on current census and will last approximately 14 days. A Registered Dietician is on staff and covers the hospital units and Sub Acute residents.

**2. Materials Management**

An independent review of the Purchasing/Central Supply area was completed with a knowledgeable employee. Disaster preparedness supplies (food stores and water) were on the shelves with abundant supplies for 14 days to meet the specific needs of the residents within the hospital, the Sub Acute units and staff in the event of a disaster.

Personal Protective Equipment (PPE's) – gowns, gloves, masks, shields, etc. are available and replaced on a routine basis to ensure that the staff have what they need when assisting with patients & residents. General supplies to maintain the hospital are purchased on M-W-F schedules. Supplies are being purchased and replenished as they are being used by the Hospital at this time. According to the Director, this department follows a first in - first out ("FIFO") and rotation method to be sure that stock does not expire and that expired supplies/materials are checked regularly.

**3. Nursing**

The financial constraints of the Debtor pre and postpetition have created numerous challenges for the Nursing Department. Most new hires are new graduates as it is difficult to attract

experienced staff. To recruit nurses, the Hospital has developed several educational programs in collaboration with local colleges. Significant recruitment challenges remain with onboarding and offer of employment perceived to be too long through the Human Resources process.

Most importantly, staff turnover rate is well above 30%. Therefore, a Nurse Educator is greatly needed to work with the number of new graduates and as part of their recommendations; the PCO has urged the hospital to accelerate its efforts to recruit and hire for this position. The Hospital also needs to strengthen its preceptor program, which is a key resource for training and supporting staff who are working with new hires.

Patient safety has also been a challenge, and the Hospital is working to obtain a **Wander Guard system** for behavioral health patients to alarm staff when a patient elopes from the unit. In addition, the patient call light system is not working, and they require a new system. Patient experience data has not been shared with nursing staff or leadership, so staff is unaware of improvement opportunities or general patient satisfaction, and the PCO has requested that a Culture of Safety or Employee Engagement survey be conducted.

Event reports (that is “incident reporting” described in Chapters below) are on paper and submitted to the Manager for review and investigation. There are currently deficiencies in the Hospital’s efforts at tracking or trending systems. This has led to limited reporting on patient events or safety committees and across the organization. Every staff member interviewed requested electronic event report system.

Staff are required to manage aggressive patients and the application of restraints without the assistance of the Security team. All staff receive training in the Management of Aggressive Behavior (MAB) program. The PCO has initiated an investigation into the Hospital’s workplace violence program and will appropriately offer suggestion for corrections in this program.

Central lines and peripherally inserted central catheter (PICC) lines are placed by an external company. They are called in when a line is required and are very responsive. However, they are not fully compliant in reporting needed to assess hospital acquired infection risks.

**4. Medical/Surgical Unit**

The PCO both "gowned in" – observed two procedures and investigated the Surgical Program as to cleanliness, staffing, and medical record documentation.

**5. Pharmacy/IV Admixture Room**

The PCO met with the pharmacist on duty at the time of the visit. Medications and supplies are ordered via McKesson under the direction of the pharmacy department. Pharmacy Director reports that PHOV maintains adequate supplies of meds on site and can acquire additional meds as needed from suppliers.

The pharmacy is not open 24 hours per day. All orders are faxed into Pharmacy from the various Nursing units; yet there is not a computer order physician entry (CPOE) option currently available in the electronic medical record. Pharmacists validate the order and release the medications to the nursing unit. In addition, they add any medication to intravenous solutions. There is not a Pyxis or Omnicell digital order and bedside fulfillment, therefore the pharmacy must assess utilization and match orders manually each day. Schedule 2 medications narcotics are minimally prescribed by the physicians on staff and are kept in a secure location inside the pharmacy.

Controlled substances are kept in a locked cupboard in the Intensive Care Unit, Surgery, and in the Emergency Department. Charge nurses and Pharmacy maintain the keys to these cupboards, with reconciliation of controlled substances occurring at the end of each shift. Bar scanning is also not available to assure the right patient is receiving the correct medication.

Pharmacy has conducted audits on occasion to ascertain the practice of nursing to verify proper medication administration. While there is an antibiotic stewardship program in place, the organization has not been reporting the results to the National Healthcare Safety Network ("NHSN") as required.

**6. Laboratory**

The PCO conducted an independent review of the Laboratory in conjunction with the Laboratory Director. During the review, the Laboratory's policies and procedures were examined, and the facility was observed to be clean, organized, and well maintained.

According to the Laboratory Director, all surgical tissue specimens collected by the Hospital are sent to outside providers for analysis. In addition, laboratory testing performed for Hospital employees, including employee blood draws and related services, is handled confidentially and is likewise referred to external laboratories for analysis.

**7. Radiology**

The PCO reviewed the radiology department with the working manager. Apart from a new Ultrasound, all equipment in the department is exceptionally old and outdated. Consulting Radiologists and attending physicians had frequent complaints about the quality of imaging from both the CT scan and the MRI. The CT scan was replaced in August with portable CT scan.

The Nuclear Medicine[14] equipment has been inoperable for over one year due to the need for a new computer costing approximately $30,000. Therefore, they rely on an external service to conduct any of these studies at $2,000 per study.

There are only two portable X-ray machines available in the department (no stationary machines) that provide very poor-quality results. Fluoroscopy has been inoperable for over 10

[14] Nuclear medicine is a specialized area of radiology. It uses very small amounts of a radioactive substance (radionuclide or radio-tracer) for health research, diagnosis, and treatment of various conditions, including cancer.

years. Radiology safety studies have been outsourced to an external company, Therapy Physics, who has due to prepetition nonpayment have not released a timely study/evaluation of the system. The PCO had appropriately requested that the Debtor cure this deficiency.

Effective August 26, 2026, the Debtor entered into an agreement with a new radiology group, resolving prior concerns regarding the availability and utilization of consulting radiologists. The new group currently provides services through a teleradiology model and maintains an on-site presence twice each month. Feedback from Hospital staff has been very favorable, particularly with respect to the group’s timeliness and responsiveness.

**8. Surgery and Sterile Processing**

As stated above, as part of her monitoring effort, the PCO “gowned in” – observed two procedures in the Operating Room,  consists of three operating suites. Surgery typically schedules procedures one to two days per week, with approximately four to six cases performed per operating day. The Department maintains 24/7 on-call coverage, although the majority of procedures are performed on an outpatient basis. In 2024, approximately 30 surgical procedures were completed.

Due to reimbursement challenges and limited financial resources, the Hospital currently has only one anesthesiologist available to provide anesthesia services. As a result, surgical scheduling is largely dependent upon that physician's availability. Most procedures are gastrointestinal in nature, including esophagogastroduodenoscopies (EGDs), colonoscopies, and percutaneous endoscopic gastrostomy (PEG) tube placements.

Staffing constraints also affect nursing coverage within the Operating Room. At present, only one circulating nurse is available, as several surgical staff members have departed the organization. Given the limited surgical volume, recruitment and retention of experienced perioperative personnel has proven challenging.

There are no autoclaves (on site sterilization equipment or “flash sterilization”) available for sterile processing. New autoclaves were purchased, yet the installation permits have expired. With no flash sterilization equipment available; Sterile processing is therefore outsourced, and the Hospital’s Sterile Processing Technician conducting random tray audits to assess cleanliness, pitting, staining, or engraving. The GI scopes are processed in the Surgery area and there are appropriate closets for their storage.

The overhead surgical lighting in each operating room is significantly outdated, requiring the use of portable lights to illuminate the surgical field. Staff have reported that the portable lighting equipment may create a potential trip hazard within the operating room environment. In addition, the operating room walls are finished with porcelain tile and grout. Replacement of these surfaces should be considered, as grout can harbor pathogens, including mold and bacteria, if not properly maintained.

Temperature and humidity levels within the Operating Room are measured manually each morning between 6:00 a.m. and 7:00 a.m. If the temperature exceeds 73 degrees Fahrenheit, the surgeon and anesthesiologist are notified so that an appropriate determination can be made regarding whether scheduled procedures should proceed.

**9. Infection Prevention**

The Hospital's acute care Infection Prevention ("IP") Manager has more than 30 years of experience in infection prevention and control. However, the position is currently on-site only on Fridays and certain weekends. The Hospital does not utilize an infection prevention software platform; accordingly, surveillance activities, data collection, and chart reviews are performed manually.

The Infection Control Committee meets monthly, during which infection control data, policies, procedures, and quality improvement initiatives are reviewed and discussed. The Hospital has achieved a notable infection prevention milestone, having gone more than one year without a Central Line-Associated Bloodstream Infection ("CLABSI"), due in large part to focused efforts to reduce unnecessary central line utilization.

The Facility does not currently have any negative-pressure isolation rooms available for patients requiring airborne infection isolation. In addition, the Infection Prevention Department continues to face challenges coordinating with the Engineering and Facilities Departments on repairs, renovation projects, and other activities requiring completion of an Infection Control Risk Assessment ("ICRA").

The PCO has encouraged the Hospital to address these operational deficiencies, including hiring an on-site assistant IP manager.

**10. Medical Staff**

The PHOV medical staff has a very small number of active physicians. Of the approximate 90 members, there are only about 25 active physicians. The Chief of Staff is on his fourth term although per the bylaws there are only two terms allowed. The Chief of Staff is also serving in an advisory role as the Chief Medical Officer ("CMO") and thereby performs credentials, peer review, and utilization review activities.

It has been difficult to recruit physicians to the facility due to the financial constraints, age of the equipment and building, and the associated reputation There is no neurologist nor orthopedic specialist due the Hospital's prepetition inability to pay their stipends. PHOV is currently recruiting for these positions.

The peer review committee was discontinued during the Covid pandemic in 2019. At the time of the filing of the Report, the Hospital is reestablishing that Committee. In addition, there is a lack of clinical indicators or criteria for each of the specialty committees which are needed to trigger chart review and referrals to peer review.

These deficiencies are created by the absence of a quality coordinator and supporting data abstracter responsible for chart review and preparation of cases for peer review. The Ongoing Professional Practice Evaluation (OPPE) of the medical staff is just recently being updated. Currently quality assessment and incident reporting data is gathered from Information Technology; yet this data in not collected or organized in a manner that facilitates meaningful tracking, procedural analysis, or performance initiatives. Continuous monitoring for medical staff credentials (OIG, Medical Board) is a manual process being completed on the 11th of each month.

The utilization review Committee reconvened in June 2026, the committee reformed and robust data is being shared with Hospital leadership. Of continuing concern is the number of incomplete medical records which delays the ability to code and bill for services rendered. Additionally, there are cases noted every month that have been denied for inappropriate admission.

**11. Case Management**

Case Management interacts with patients, families, insurance companies and physicians in order to assist with the coordination of care and discharge planning. They facilitate insurance authorizations and are alerted when there are denials of care. They partner with physicians to address documentation issues to enable patient care or payment.

On the day of the visit to Case Management, there was only one Case Manager available for the Medical Surgical and Intensive Care Units as staff had called in sick or were out on long-term leave of absence. The Behavioral Health Unit has dedicated case Managers/Social Services to

focus on the special needs of that population and to navigate the legal system as most of the patients are in a conservatorship or legal hold.

**12. Human Resources**

In a detailed discussion with the Vice President of Human Resources ("HR VP"), the following matters were identified:

a. The Hospital has several union contracts which absorb much of the Vice President's time and focus. He was recently able to renegotiate one of the contracts for another three years, which will allow him to focus on operational issues.

b. The Hospital utilizes a Learning Management System (LMS), HealthStream for a few required educational programs specifically for compliance topics. They have not expanded the utilization for additional required continuing education topics due to time and money. Additionally, the program requires that each employee have a hospital email address which does not yet exist due to financial constraints. Therefore, the Managers of each of the units have been manually developing many of the required educational programs themselves and keeping documentation on paper files, sending to Human Resources for the employee file. The HR VP recognizes that they are behind in education resources for the organization. There are recent discussions about moving education, or at least a nurse educator, to better meet the needs of staff.

c. Human Resources uses the JB Dev program for time keeping and for the tracking of required licensure renewals. When a license is coming due for renewal, there is communication to the employee about the required renewal timing. If they do not receive the license, the employee is barred from clocking into their shift.

d. Human Resources completes all onboarding and background checks. They believe it is a timely process and suggest that the new managers need to complete referrals and job offers

timelier. He recognizes that there are new leaders in the organization that require more mentoring and education to support them in their roles. This is left to the individual Vice Presidents or supervisor to conduct.

e. Security reports to Human Resources. This service was recently brought back into the organization, which had been previously outsourced. He believes that the staff need additional training in workplace violence, particularly with de-escalation techniques and have less reliance on Security. There is a workplace violence plan, but we have not yet had access to the plan. There has not been any meeting of a workplace violence committee or task force. No debriefs have been conducted after a violent, "code gray" event. The Human Resources Vice President acknowledged that they are very behind in providing required education on compliance topics and in updating necessary policies and procedures.

Based on the PCO's interviews and review of documents/materials; the PCO has determined that there are deficiencies in the aforementioned program, which are for the most part systemic and dating to prior to Bankruptcy, yet currently limit the effectiveness of the Debtor's Human Resources operations.

**B. The Subacute-SNF Unit Review**

The Subacute-SNF assessment effort was led by Lisa Grod Ph.D. a licensed nursing home administrator with twenty plus years of extensive experience in subacute skilled nursing operation, as well as all other long term care programs/facilities.

After reviewing the documents, the PCO conducted initial zoom interviews with the leadership team of the SNF operations with the purpose of reviewing key indicators to determine if there is any significant decline in the quality of care.

On Site Interviews and Expert Observations follows:

**1. Resident and Subacute Unit Rounds**

Resident rounds were completed on Subacute units 2 and 3 with the Director of Nursing and the Director of Staff Development within the Subacute unit on several random visits to the Hospital, that included resident rooms and resident positioning. The PCO noted that Interdisciplinary Team Meetings (IDT) are held weekly and provide reports and updates on every resident residing on both floors, activities were being held in the activity room.

a) The PCO observed Resident Care that Subacute units were free of odors, and the residents were observed to be in activities, up in their wheelchairs (in and out of rooms), or resting in bed depending on their medical conditions or the time of day.

b) Meetings were held with Director of Nursing ("DON"), the ("DSD"), and staff as needed. Meetings included discussions of the CMS required Minimum Data Set (MDS[15] and documentation, Quality Measure Reports, Weight Variance Meetings, Skin Assessments, and Pressure Ulcer Reports,

c) A discussion was helping to review the new guidelines from the state regulatory body the California Department of Public Health ("CDPH") on Informed Consent regarding the use and documentation of Antipsychotics, Antidepressants, and Antianxiety/Hypnotics. Other areas discussed were Medication Errors, Incident reports - Falls, grievance and theft and loss, NHPPD,[16] QAPI, Care Plans,

---

[15] A minimum data set (MDS) nurse monitors, assesses, and documents patients' health at a residential or long-term care facility. This data is used to create state and federal government-mandated reports on patient health at the facility. The Minimum Data Set is a state and federally mandated process used to clinically assess patients at admission and discharge; ***What is a MDS Nurse?*** at: https://nurse.org/resources/mds-nurse/

[16] CALIFORNIA DEPARTMENT OF PUBLIC HEALTH; GUIDELINES, "NHPPD" means the actual nursing hours performed by direct caregivers per patient day. (o) NHPPD Calculation is the calculation of the NHPPD by dividing the actual nursing hours performed by direct caregivers per patient day by the Average Census" at https://www.cdph.ca.gov/Programs/CHCQ/LCP/Pages/AFL-11-19.aspx#:~:text=(n)%20NHPPD%20means%20the%20actual,day%20by%20the%20Average%20Census

d) While the QAPI program has not been officially in use hospital wide, this DON has been identifying areas that would benefit from QAPI planning and is currently working with Health Services Advisory Group ("HSAG").[17]

e) Triple check review with team: Triple Check review with team: billing, nursing respiratory, rehab, DSD, Coder, MDS, Finance, CNO, Social services, and Health Information. The team uses their electronic medical record Point Click Care ("PCC") to review each individual's status with the team members present. Recommendations were provided to each department on presentation of changes identified as they occur throughout the month so that MDS can be informed and make modifications for declines and gains as necessary. It is equally important to verify and validate with the "UB04", which is the standardized claim form used by institutional providers to bill Medicare, Medicaid, and commercial insurance payers. The triple check process documents that all information is correct on the face sheet, the coding (the diagnoses), rehab minutes/goals have been met, and ancillary services are provided and have been documented (labs, x-rays, etc.) and that insurance is correct for the documentation to be submitted timely for reimbursement.

f) Policies on theft and loss, grievances, and incidents were provided to the PCO. No Internet Quality Improvement & Evaluation System ("iQIES").[18] Reports on Quality

[17] For more than 40 years, HSAG has worked to improve the quality of healthcare services for Medicare patients to achieve the best possible patient outcomes through our work as part of the Medicare Quality Improvement Organization (QIO) Program. The QIO Program is a national healthcare initiative whose primary focus is to improve the healthcare that Medicare patients receive. At: https://hsag.com/en/medicare-providers/

[18] Beginning in May 2021, State Survey Agencies (SAs) and CMS locations began a phased transition to the Internet Quality Improvement and Evaluation System (iQIES), which is an internet-based system that includes survey and certification functions. iQIES consolidated and replaced functionality from the prior surveying/assessment systems: QIES, CASPER, and ASPEN; at https://www.cms.gov/medicare/health-safety-standards/quality-safety-oversight-general-information/iqies

Measures for the Subacute unit were provided. No CASPER[19] report was generated at this time either to review domains of care against the national averages.

g) Electronic Medical Record: Point Click Care (PCC) is utilized by Subacute to document Resident care and create reports related to resident care. Incident reports were able to be uploaded into the system for the Subacute staff, Care Plans, MDS, medication management, treatment, dietary plans, and monitor quality measures affecting the residents. One issue remains that there is no interoperability between systems and not all of the necessary information is communicated as determined by which system the information is entered into and in what detail.

h) Rehabilitation: A meeting with the Director of Cal Rehab & PT Specialist took place in the Physical Therapy Clinic to discuss the number of patients/residents being seen by them daily. A discussion took place on the RNA program and the frequency for updating the treatment plan.

i) Staffing: The Subacute program model utilizes RN/s and LVN's to provide care to the residents which provides them with a higher level of care and higher NHPPD per day.

j) QAPI: The PCO received a document for a prior QAPI meeting in the SNF that addresses the monthly required committee meetings quarterly: QAPI, Infection Control & Antimicrobial Stewardship Program, and the Pharmaceutical Service Committee. No Annual meeting to review Patient Care Policies and Procedures.

k) Infection Prevention and Disaster Preparedness: The PCO met with the Director to discuss the IP program and training of the newly hired IP LVN for the Subacute Units. The

[19] "CASPER" (Certification and Survey Provider Enhanced Reporting) is the centralized CMS tool that consolidates critical compliance, quality, and staffing data for long-term care and home health providers, enabling efficient reporting, validation, and quality improvement across multiple CMS programs.

PCO met with the SNF IP (infection Preventionist) and reviewed the IP binder and in-services, as well as the Antibiotic Stewardship Program (ASP). The IP works 40 hours a week and in coordination with the Hospital IP Director to ensure that Inservice training and the data collection documentation is gathered in a timely manner and reported as appropriate to the DON, QAPI, and CNO.

l) The Emergency Disaster Program is being updated and is a work in progress. A discussion was held regarding 'shelter-in-place' in place versus transfer to outlier facilities. There are current agreements for transfers if Unable to review transfer agreements at this time, however there were transfer agreements for transportation in place.[20]

## C. THE BEHAVIORAL UNIT REVIEW

An independent review and tour of the Behavioral Health Unit (BHU) was completed by Lisa Grod, PhD, LNHA. The Chief Nursing Office Carmello James and the BHU's Director Johvannes were present to discuss BHU clinical operations, the admission process, the length of stay, and the post stay discharge planning process. In summary:

a. The Hospital operated Urgent Care Clinic ("UCC") at Olive View Hospital is a source of dual/triple diagnoses programs referral for the BHU program which is run by the Hospital.

b. A meeting with the CNO and Director of Nursing for the BHU covering rates for caring for the BHU by the Department of Mental Health which makes this a valuable program for the community and environs.

[20] At the time of this report, the PCO was unable to contact the Medical Director and the Pharmacy Consultant.

c. The BHU works closely with the state regarding LPS conservatorships and through the County and the DMH they have developed relationships for safe discharges back into the community.

d. The Hospital is working to complete the on-site EmPATH program facility, adjacent to the ER, which will enable the Hospital to provide emergency psychiatric assessment and treatment programs to improve mental health outcomes during a mental health crisis.

## D. INTEROPERABILITY, DOCUMENTATION, AND HIPAA COMPLIANCE

1. **Interoperability**: The Appropriate & Safe Sharing of Patient Information

The Debtor must share, as do all complex health and long-term care providers, patient information in a safe and accessible form. HealthIT.gov, which is the official website for the federal Office of the National Coordinator for Health Information Technology ("ONC") states that as a complex health system, the Debtor "requires diverse electronic health record (EHR) products. One size does not fit all. To realize their full potential, EHR products must be able to share information seamlessly."[21] "Interoperability" is the term used for linking systems within each of the Debtor's facilities, between the Debtor's facilities, and between the Debtor and other care and financial parties.[22]

At the Debtor, interoperability is demanded of their Electronic Medical Record Systems as well as special applications and reporting systems. In summary, the Hospital employs the "**Meditech**" EMR; the Clinics employ the "**EClinicalWorks**" EMR; and the Subacute Unit

---

[21] HealthIT.gov – FAQ's at: https://www.healthit.gov/faq/what-ehr-interoperability-and-why-it-important

[22] The PCO highly recommends "Interoperability Challenges Have Real-World Effects on Patients", which is posted on the secure exchange of health information accreditation and training organization DIRECT TRUST's *Blog*: https://directtrust.org/blog/interoperability-challenges-have-real-world-effects-on-patients/%E2%80%8BDirectTrust

employ the "**PointClickCare**" EMR. All three must be interoperable with the other EMR and the multiple other laboratory, radiology, and data reporting integration systems.

The PCO has assessed and will continue to assess and report on the Debtor's interoperability issues.

The PCO has extensive experience with both Meditech and Point Click and Care systems, including a recent acquisition of a Hospital emerging from Bankruptcy that employs Meditech. Prepetition, the Debtor failed to purchase demanded system and interface upgrades. **Meditech**, like all EMR providers, has over the past three years demanded that their clients make the costly conversion from server to cloud operating system, and thereby offering limited support to Debtor's EMR system. Although the Debtor's Information technology team is most skilled and committed, they have for the most part only been able to maintain yet not employ fully this EMR system.

Based on the information available and their professional experience, the PCO believes that:

- There is a great potential for compromise to care due to the difficulty of documenting and retrieving patient encounter information into the Meditech-EClinical Works EMR hybrid system.
- The Debtor's ability to achieve full charge capture in its billing and collecting effort is slowed and at times harmed due to the flawed EMR system.

The PCO will continue to Monitor and Report to the Court on this most important issue.

### 2. Medical Records' Content Sampling

The patient's medical record is a means of communication between providers as to health status, preventive health services, treatment, planning, and delivery of care and are an indicator of the ongoing quality of care. Patient medical records were sampled to test the existence and timeliness of required medical records, forms, and statements. The purpose of this review was to determine whether patient record documentation was maintained at the time of our review to

support quality and continuity of care. These tests included a review of the Debtors' internal medical record policies, and those internal requirements were used to structure elements included in our test samples.

Medical records were selected from the Debtor's Behavioral Health and Subacute Units. A contemporaneous review was conducted to test the current maintenance of the medical record requirements at each of these operations. Our medical record review sampled 23 medical records out 141 admissions for patients admitted between August 20, and August 25, 2026. This test occurred on August 26, 2026. All History and Physical ("H&P") and Progress Notes were found for these patients, except for one patient, where Progress Notes were missing since August 16, 2026. Follow-up inquiries through August 31 indicated that these records remained outstanding.

#### 3. Documentation Failures

Based on the information available and their professional experience, the PCO believes that for patients cared for in the Medical Surgical and ER units, the Physician leading Medical Staff Leadership has in multiple instances been unable to enforce medical record documentation requirements' rules or take necessary disciplinary action (suspension) for failure to document care. As a result, some of the Hospitalists are not incentivized to complete their medical records, contributing to financial and patient safety concerns. ***The PCO will continue to Monitor and Report to the Court on this most important issue.***

### E. GOVERNANCE AND QUALITY ASSESSMENT PERFORMANCE IMPROVEMENT CAPABILITIES

Quality Management System (Quality Assurance and Performance Improvement – QAPI) is a process whereby information is gathered, tracked, analyzed and reported to the governing board and leadership to develop performance improvement projects. Quality Assurance and Performance Improvement is a key tool for each person involved in care, to find, assess, and fix

deficiencies in patient care and safety. As part of the PCO's review of the care delivery processes, an important component is implementation and operation of all components of the Debtor's QAPI program.[23]

The PCO quotes from The National Institutes of Health ("NIH") to respectfully remind the Court that "the healthcare system is made up of individual players, but its ultimate goals of patient care and safety are accomplished through teamwork. Likewise, when medical errors occur, though they may result from an individual's actions, the appropriate next steps fall on the institution to identify, learn from, and improve on the prevention of such events."[24] Therefore, at each Debtor's facility and system-wide there must be viable and vital on-going quality assurance and performance improvement programs.

The key components needed to support an effective QAPI program are the following:

a. Both Federal and State Rule and Regulations demand regularly scheduled meetings be held by nursing, medical staff, QAPI, infection control, facilities (to include disaster preparedness and other emergency situations). The Hospital are Joint Commission accredited and the SNF is state licensed separately and have its own rules and regulations as well as mandates to provide services to and coordinate with the Hospital.

---

[23] "The core functions of an incident reporting system are twofold. One is to use incidents to identify and prioritize which aspects of a healthcare system and its underlying risks need to be examined more closely (citation omitted). The other is to organize broader investigation and improvement activities to understand and address those risks. These active processes of investigation, inquiry and improvement underpin learning." Macrae, C. "The problem with incident reporting," *BMJ Qual Saf*, 25: 74 (2016).

[24] Joel McGowan; Amanda Wojahn; Joseph R. Nicolini "Risk Management Event Evaluation and Responsibilities"; HIH: National Library of Medicine: https://www.ncbi.nlm.nih.gov/books/NBK559326/#:~:text=Risk%20management%20in%20healthcare%20is,and%20prevent%20risks%20to%20patients

b. All Facilities and their Directors must maintain and update policies and procedures for their departments/services and all must participate with the Debtor's leadership in developing, implementing, training for, and assessing protocols that facilitate their specific contribution to patient care and services. In addition to all the above efforts at compliance with rules and regulations and licensing, all the Debtor's operating units are a Medicare certified facility with accreditations by The Joint Commission, the College of American Pathologists, the California Department of Public Health Licensing and Certification Division, and other department or service-specific accrediting bodies.

c. The demand for specific senior managers/directors to comply with the required rules, regulations, and protocols, and the need to comply with patient care/services reimbursement rules and procedures means that the PCO monitors both the Debtors corporate operations as well as each Hospital. The Debtor's constant compliance efforts within and across the Hospitals offers the PCO a road map of the quality of patient care and safety. Thereby through interviews, observation, and review of documentation the PCO accurately assess the quality of patient care and safety and any decline or compromise in that care.

Based on the PCO's interviews and review of documents/materials; the PCO has determined that there are deficiencies in the aforementioned program, which are for the most part systemic and dating to prior to Bankruptcy, yet currently limit the effectiveness of the Debtor's QAPI program. ***Multiple meetings between the Debtor's leadership and the PCO were held to document the steps the Debtor is taking to improve the Debtor's QAPI program.***

**1. Incident Reporting**

As stated above, be it a hospital, or SNF, quality patient care is achieved through documenting every care component. Maintaining, and improving patient care and safety demands that the provider and their organization closely examine "adverse events" (e.g., a medical error, patient injury, or equipment failure) that harms or has the potential to harm a patient, caregiver, or visitor. The collecting and documenting of these adverse events data is "***Incident Reporting or Occurrence***." "Done well, it (the incident report) both identifies safety hazards and guides. Incident reports help staff identify and change the individual or system-level factors contributing to medical errors."[25]

**2. Risk Management**

The NIH defines risk management in healthcare as "a complex set of clinical and administrative systems, processes, procedures, and reporting structures designed to detect, monitor, assess, mitigate, and prevent risks to patients."[26] As a key component of QAPI, Risk Management works closely with the Quality Department. The Risk Management Department:

a. Coordinates with a Patient Safety Organizations ("PSOs"), which are mandated provider organizations that collect and analyze data as part of the QAPI effort.

b. Collects and disseminates information related to patient safety, while maintaining a patient safety database.

c. Works to educate and involve health care providers, patients, and other interested parties on the providers' patient safety efforts.

---

[25] "Why is incident reporting important for healthcare organizations?" THE Patient Safety Company-Topics: https://www.patientsafety.com/en/blog/why-incident-reporting

[26] Joel McGowan; Amanda Wojahn; Joseph R. Nicolini "Risk Management Event Evaluation and Responsibilities"; HIH: National Library of Medicine: https://www.ncbi.nlm.nih.gov/books/NBK559326/#:~:text=Risk%20management%20in%20healthcare%20is,and%20prevent%20risks%20to%20patients.

d. The Risk Management department increases patient safety by encouraging confidential and voluntary reporting of adverse events, which can lead to the prevention and recurrence of medical errors.[27]

Based on the PCO's interviews and review of documents/materials; the PCO has determined that there are deficiencies in the Risk Management Department, which are for the most part systemic and dating to prior to the Bankruptcy, yet currently limit the effectiveness of the Debtor's Risk Management Department and therein the QAPI program. A most recent meeting between the Debtor's leadership and the PCO responded to the PCO's questions and documented for the PCO the steps the Debtor is taking to improve the Debtor's Risk Management Department and the QAPI program.

**3. Compliance-Ethics Program[28]**

As mandated by the 2010 Affordable Care Act ("ACA") as a recipient of Medicare, Medicaid, and Children's Health Insurance Program ("CHIP") funds, the Debtor's Hospital and SNF must establish a compliance-ethics program. Although we refer in this Report as to this key mandated program as "Compliance," most providers now refer to this as the "Compliance-Ethics program or department. Best practice has the Compliance-Ethics department and its director separate from the QAPI program. Most importantly, the Compliance program interacts with and supports the Debtor quality assurance, training, and performance improvement effort. In summary, a Compliance-Ethics program:

a. Establishes policies, procedures, and controls for all your providers and support staff.

---

[27] Paine LA, Baker DR, Rosenstein B, Pronovost PJ. The Johns Hopkins Hospital: identifying and addressing risks and safety issues. Jt Comm J Qual Saf. 2004 Oct. 30(10):543-50. [PubMed]: https://www.ncbi.nlm.nih.gov/books/NBK559326/#

[28] "Why Compliance and Ethics Programs in Healthcare Are Mandatory for Quality Care" *The Compliance & Ethics Blog:* https://www.complianceandethics.org/compliance-ethics-programs-healthcare-mandatory-quality-care/#:~:text=What%20is%20key%20is%20that,is%20driven%20by%20the%20government

b. Exercises effective compliance and ethics oversight at both the highest levels (compliance and ethics officer, CEO, CFO and Board)

c. Trains and continuously communicates in an effective manner with all employees, board members and vendors on compliance and ethics rules, regulations, and standards.

d. Transparent, viable and vital monitoring and enforcement of all components of the compliance and ethics program

e. Respond appropriately to detected offenses and develop corrective action to prevent future offenses.

Based on the PCO's interviews and review of documents/materials, the PCO has determined that there are deficiencies in the Debtor's Compliance Ethics Department, which are for the most part systemic and dating to prior to the Bankruptcy, yet currently limit the effectiveness of the Debtor's Compliance Ethics Department and therein the QAPI program. A most recent meeting between the Debtor's leadership and the PCO responded to the PCO's questions and documented for the PCO the steps the Debtor is taking to improve the Debtor's Compliance Ethics Department and the QAPI program.

## V. THE PCO'S ASSESSMENT AS TO ACTUAL AND THE POTENTIAL FOR, COMPROMISE TO CARE

Early on in their monitoring, the Patient Care Ombudsman reported to the CRO and Management, multiple compromises to and deficiencies in care. Leadership of the hospital and unit leaders concurred with our assessment, and with our assistance initiated a process of remediation.

With the consent of Counsel for the U.S. Trustee, the PCO delayed the filing of the this mandated 60-day report. Reporting of significant compromises to care can be appropriately delayed if there is a fully committed and funded plan of remediation. The delay was justified and

necessary, because the Debtor was engaged in a remediation effort, which would be partially funded by an anticipated, yet at the time, not funded DIP loan. The PCO was delayed to the time of the filing of this Report due to their need to reconfirm the Debtor's commitment to the remediation effort.

*At the time of the filing of this report*, based on the PCO's on and off-site interviews, and post-visit requests documents/materials, prior and on-going review of documents/material; the PCO assessment is that**:**

a. The Hospital is providing, (yet can be improved in many instances), quality patient care and safety within the Emergency Room, all components of the Behavioral Unit, the Subacute, Laboratory Services, and the Pharmacy.

b. With the post petition stabilization in consulting radiologists and the most recent addition of a portable CAT Scan unit, we believe based on the minimal monitoring time and data available, there has been an increase in the quality and availability of radiology services for all units.

c. The Surgical program, although doing few surgical procedures both in and outpatient, must pursue and an immediate program of quality assessment and performance improvement for its surgical settings, staffing, equipment and physicians available to perform procedures. Most importantly, the Medical Surgical Unit must take all necessary steps to a) implement better documentation and b) be supported by a QAPI program, which will also benefit greatly the coordination of care between ER and the Medical Surgical Unit.

## A. Commitment to Ensure Quality Assurance and Improving Performance

The Debtor must meet its commitment to a Remediation effort, which will include the retention of expert consultants and filling open positions in all departments. This effort will be driven by a Strategic Plan that is well-communicated across the organization and will build on core competencies: Behavioral Health and Sub-Acute.

The PCO believes that Hospital Leadership and managers understand and are ready to act on systemic deficiencies identified as to specific clinical practice and procedures, data collection and sharing, QAPI system issues, as well as other potential for compromise to care that need remediation.

Medical Surgical unit as part of the strategic planning/improvement effort will determine then act on a program to:

1. Improve documentation and Charge Capture;
2. Determine which specialist and hospitalist/intensivist are needed;
3. What ancillary programs/equipment is needed in support (Labs, IMAGING, rehab, etc.).

In Summary, system-wide improvements for the quality of care include:

1. Development of a robust QAPI plan to include data and committee structure, which must include a. Addition of Quality and Risk Management Leadership; b. the Addition of Compliance program Leadership.
2. Development of Governance/Board to oversee quality and financial performance.
3. Update and enhance the Meditech Electronic Medical Record and when the other components in the electronic medical records reporting system.
4. Implementation of an electronic event reporting system.

5. Enhanced staffing for Infection Prevention.
6. Assessment and investment into surgical services.
7. Assessment and investment into radiology services.
8. Acquire and employ a Pyxis or Omnicell pharmacy digital order and bedside fulfillment system.
9. Recruitment of a Nurse Educator and development of robust competency program.
10. Recruitment of new medical staff leadership, which must include rebuilding the peer review process.
11. Address concerns pertaining to medical record documentation.

*This effort will be closely monitored by the PCO and reported to the Court in a timely manner.*

## VI. THE PCO'S NEXT STEPS

The PCO has identified the need to continue monitoring the quality of patient care and evaluating whether the Debtor's financial and operational challenges are having any adverse impact on patient outcomes. Consistent with its obligations under section 333 of the Bankruptcy Code, the PCO and his team will continue conducting interviews with management, caregivers, and patients, and will maintain an active monitoring role with particular focus on the following areas:

1. The Debtor's Progress toward building and implementing a QAPI, Incident Reporting, Risk, and Compliance Departments and monitor the Debtor's effort to remediate any deficiencies in those programs.

2. As to Medical Records and the security and availability to authorized persons of patient medical records and information. Continued sampling of medical records to determine

if the charts capture all required documents and consent forms. Continued review of and reporting on the Debtor's Data collection/use and Interoperability.

3. As to Documentation, a continued intensive review of the Hospital's efforts at remediating deficiencies in Documentation, which are currently impacting quality of care and charge capture.

4. Discharge planning and the incidence of readmissions at the Hospital and SNFs.

5. At all facilities and units, the key indicators of Patient Life and Safety Measures, including but not limited to infection rates and infection control, Life Safety and Facilities management efforts, availability of drugs and supplies, and other demanded interviews and document/materials review.

6. Continued review of physical plant and equipment issues including reporting to the court on the Seismic Retrofit effort.

7. Specific practice areas and procedures identified above that pose a potential risk to patient care and safety.

The PCO will report to the Court and parties in interest anything else as warranted.

Dated: October 8, 2026 By: /s/ *Jerry Seelig*

JERRY SEELIG
*In his capacity as the Patient Care Ombudsman*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>Pacifica of the Valley Corporation.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 26-11060 (TMH)<br><br>Jointly Administered |

**AFFIDAVIT OF BRYA M. KEILSON**

STATE OF DELAWARE :
: SS
NEW CASTLE COUNTY :

I, Brya M. Keilson, certify that I am, and at all times during the service, have been a partner at Robinson & Cole LLP, not less than 18 years of age and not a party to the matter concerning which service was made. I certify further that on October 8, 2026, I caused to be served:

**PATIENT CARE OMBUDSMAN'S FIRST INTERIM REPORT**

Service was completed upon the parties on the attached list via electronic mail.

Dated: October 8, 2026

*/s/ Brya M. Keilson*
Brya M. Keilson

[1] The Debtors in this Chapter 11 Case, along with the last four digits of the Debtor's federal tax identification number, is 7312. The Debtor's mailing address is 9449 San Fernando Road, Sun Valley, CA 91352.