# <u>Exhibit A</u>

## Credit Agreement

# SENIOR SECURED SUPERPRIORITY

# DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT

Dated as of October 15, 2026,

between

PACIFICA OF THE VALLEY CORPORATION,
as Borrower,

and

AXIOS CAPITAL SOLUTIONS, LLC,
as the Lender

# TABLE OF CONTENTS

**ARTICLE I DEFINITIONS AND OTHER TERMS .... 2**
1.01 Defined Terms .... 2
1.02 Other Interpretive Provisions. .... 20
1.03 Accounting Terms. .... 21
1.04 Times of Day. .... 21

**ARTICLE II THE LOANS .... 21**
2.01 The Loans. .... 21
2.02 Borrowing of the Loans. .... 22
2.03 Prepayments. .... 22
2.04 Repayment of Loans. .... 24
2.05 Interest. .... 24
2.06 Evidence of Debt. .... 25
2.07 Lender’s Expenses. .... 25
2.08 Payments Generally. .... 26
2.09 Commitment Fee. .... 26
2.10 Asset Purchase Transaction. .... 26

**ARTICLE III TAXES, YIELD PROTECTION AND ILLEGALITY .... 26**
3.01 Taxes. .... 26
3.02 Increased Costs. .... 27
3.03 Survival. .... 27

**ARTICLE IV CONDITIONS PRECEDENT .... 28**
4.01 Conditions to Funding of the Interim New Money DIP Loan. .... 28
4.02 Conditions to Funding Additional New Money DIP Loans. .... 29

**ARTICLE V REPRESENTATIONS AND WARRANTIES .... 30**
5.01 Existence, Qualification and Power. .... 30
5.02 Authorization; No Contravention. .... 30
5.03 Governmental Authorization; Other Consents. .... 31
5.04 Binding Effect. .... 31
5.05 No Material Adverse Effect. .... 31
5.06 Litigation. .... 31
5.07 Subsidiaries. .... 32
5.08 Environmental Compliance. .... 32
5.09 Insurance. .... 32
5.10 Taxes. .... 33
5.11 Disclosure. .... 33
5.12 Compliance with Laws and Agreements. .... 33
5.13 Creation and Perfection of Security Interests in the DIP Collateral. .... 33
5.14 Labor Matters. .... 33
5.15 Permits. .... 34
5.16 Reorganization Matters. .... 34



#138873886v6<US_ACTIVE> - Axios - Pacifica Senior Secured Superpriority DIP Credit Agreement

**ARTICLE VI AFFIRMATIVE COVENANTS ........ 35**
6.01 Certificates; Other Information. ........ 35
6.02 Notices. ........ 35
6.03 Payment of Taxes and Other Obligations. ........ 36
6.04 Preservation of Existence. ........ 37
6.05 Maintenance of Properties and Leases. ........ 37
6.06 Maintenance of Insurance. ........ 37
6.07 Compliance with Laws. ........ 38
6.08 Books and Records. ........ 39
6.09 Inspection Rights. ........ 39
6.10 Use of Proceeds. ........ 39
6.11 ERISA Compliance. ........ 40
6.12 Environmental Compliance. ........ 40
6.13 Replacement/Substitution of Existing Workers' Compensation Insurance Policies. ........ 41
6.14 Pledged Assets. ........ 41
6.15 Casualty and Condemnation. ........ 41
6.16 Further Assurances. ........ 41
6.17 Milestones. ........ 41
6.18 Budget. ........ 43

**ARTICLE VII NEGATIVE COVENANTS ........ 43**
7.01 Liens. ........ 43
7.02 Investments. ........ 44
7.03 Indebtedness. ........ 44
7.04 Fundamental Changes. ........ 45
7.05 Dispositions. ........ 45
7.06 Restricted Payments. ........ 45
7.07 Transactions with Affiliates and Insiders. ........ 45
7.08 Burdensome Agreements. ........ 45
7.09 Amendments to Indebtedness; Material Contracts. ........ 46
7.10 Amendments to Material Documents; Fiscal Year; Legal Name. ........ 46
7.11 Ownership of Subsidiaries. ........ 46
7.12 Sale and Leaseback Transactions. ........ 47
7.13 Speculative Transactions. ........ 47
7.14 Formation of Subsidiaries. ........ 47
7.15 Prepayment of Indebtedness. ........ 47
7.16 Sanctions. ........ 47
7.17 Anti-Corruption Laws. ........ 47
7.18 Capital Expenditures. ........ 47
7.19 Compensation. ........ 48
7.20 Chapter 11 Claims. ........ 48
7.21 Amendments to the DIP Order. ........ 48
7.22 Bankruptcy Notices. ........ 48
7.23 Budget Covenant. ........ 49

**ARTICLE VIII EVENTS OF DEFAULT AND REMEDIES ........ 49**

8.01 Events of Default. 49
8.02 Remedies Upon Event of Default. 52
8.03 Carve Out Reserve Funding. 52
8.04 Application of Funds. 53

**ARTICLE IX COLLATERAL 53**
9.01 Grant of Security Interest. 53
9.02 Perfection of Security Interest. 55
9.03 Right to Cure. 55
9.04 The Lender's Rights, Duties, and Liabilities. 55
9.05 Remedies. 56
9.06 Concerning the DIP Collateral. 57

**ARTICLE X MISCELLANEOUS 59**
10.01 Amendments. 59
10.02 Notices and Other Communications; Facsimile Copies. 59
10.03 No Waiver; Cumulative Remedies. 61
10.04 Expenses; Indemnity; Damage Waiver. 61
10.05 Payments Set Aside. 62
10.06 Successors and Assigns. 62
10.07 Set-off. 64
10.08 Interest Rate Limitation. 64
10.09 Credit Bid Limitation 64
10.10 Counterparts; Integration; Effectiveness. 65
10.11 Survival of Representations and Warranties. 65
10.12 Severability. 65
10.13 GOVERNING LAW; JURISDICTION. 66
10.14 WAIVER OF RIGHT TO TRIAL BY JURY. 67
10.15 USA Patriot Act Notice. 67
10.16 No Advisory or Fiduciary Relationship. 67
10.17 Conflict. 68
10.18 Release. 68

**SCHEDULE 5.10 - TAX PAYMENTS 70**

**SCHEDULE 5.14 - LABOR MATTERS 71**

**SCHEDULE 7.01 - EXISTING LIENS 72**

**SCHEDULE 7.02 - EXISTING INVESTMENTS 74**

**SCHEDULE 7.03 - EXISTING INDEBTEDNESS 74**

**EXHIBIT A - FORM OF BORROWING REQUEST 75**

**EXHIBIT B - BUDGET 76**

**EXHIBIT C - ASSET PURCHASE TRANSACTION TERMS 77**

**EXHIBIT D - PLAN TERM SHEET** ........................................................................................ **79**

# SENIOR SECURED SUPERPRIORITY
# DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT

This SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT is entered into as of [__________], 2026 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "**Agreement**"), between PACIFICA OF THE VALLEY CORPORATION, a Delaware corporation (the "**Borrower**" or "**Debtor**"), as borrower, and AXIOS CAPITAL SOLUTIONS, LLC, a Delaware limited liability company, as lender (together with any successors or assigns, the "**Lender**").

## RECITALS

WHEREAS, on July 4, 2026 (the "**Petition Date**"), the Debtor commenced a case under chapter 11 of title 11 to the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), Case No. 26-11060 (TMH) (the "**Chapter 11 Case**") and has retained possession of its properties and is authorized under the Bankruptcy Code to continue the operation of its businesses as a debtor in possession;

WHEREAS, prior to the Petition Date, on December 10, 2020, the Debtor entered into that certain Main Street Priority Loan Agreement (as amended, restated, amended and restated, supplemented or otherwise modified through the Petition Date, the "**Prepetition Credit Agreement**") with First Western Trust Bank ("**First Western**") and the Federal Reserve Bank of Boston (the "**Federal Reserve**"), pursuant to which First Western extended a senior secured loan to the Debtor in the principal amount of $35,000,000 (the "**Prepetition Loan**"). In connection with the Prepetition Credit Agreement, the Debtor executed a Pledge and Security Agreement granting First Western a security interest in all its personal property. Pursuant to that certain Sale and Assignment Agreement dated as of September 29, 2025, the Lender purchased the Prepetition Loan from First Western;

WHEREAS, pursuant to the Prepetition Credit Agreement, the Lender is owed at least $50,943,321.41 from the Borrower as of the Petition Date;

WHEREAS, the Debtor has requested that the Lender make post-petition loans and advances and provide other financial or credit accommodations to the Debtor, and the Lender has agreed, subject to the conditions set forth herein and in the DIP Order (as defined below), to extend a senior secured, multiple-draw, superpriority DIP credit facility to the Debtor in the aggregate amount of *up to* $**52,500,000**, comprised of (x) New Money DIP Loans in the aggregate principal amount of *up to* $**21,000,000**, including (i) an initial Interim New Money DIP Loan in the aggregate principal amount of **$7,000,000**, which was previously advanced by the Lender, and (ii) Additional New Money Loans in the aggregate principal amount of *up to* **$14,000,000** and (y) Roll Up DIP Loans in an aggregate principal amount of *up to* **$31,500,000**, in each case subject to the Budget and all as otherwise provided in this Agreement; and

WHEREAS, the Lender is only willing to make the Loans provided for by this Agreement (and the Debtor acknowledges and agrees that the Lender is only willing to make the Loans provided for by this Agreement) on all of the terms and conditions and provisions of this

Agreement and the other DIP Loan Documents, based on the truth and accuracy of these Recitals and all of the other representations and warranties made by the Debtor in this Agreement and the other DIP Loan Documents, as applicable, and on the terms and subject to the conditions of this Agreement and the other DIP Loan Documents, as applicable.

## AGREEMENT

NOW, THEREFORE, in consideration of the representations and mutual covenants and agreements contained herein and in the other DIP Loan Documents, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in contemplation of the statements set forth in Recitals above, the truth and accuracy of which statements (and reliance thereon by the Lender) are specifically acknowledged by the Borrower, the parties hereby covenant and agree as follows:

## ARTICLE I
## DEFINITIONS AND OTHER TERMS

1.01 Defined Terms.

As used in this Agreement, the following terms shall have the meanings set forth below:

"**Acquisition**" means, by any Person, the acquisition by such Person, in a single transaction or in a series of related transactions, of all or substantially all of the property of another Person or more than a majority of the Voting Stock of another Person, in each case whether or not involving a merger or consolidation with such other Person and whether for cash, property, services, assumption of Indebtedness, securities or otherwise.

"**Additional New Money DIP Commitment**" means the Lender's commitment to make Additional New Money DIP Loans in an aggregate principal amount of *up to* $14,000,000.

"**Additional New Money DIP Loans**" has the meaning set forth in Section 2.01(b).

"**Affiliate**" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. Subject only to the Challenge Rights provided in the DIP Order, in no event shall the Lender be deemed to be an Affiliate of the Borrower.

"**Agreement**" has the meaning set forth in the introductory paragraph hereto.

"**Anti-Corruption Laws**" means all Laws of any jurisdiction applicable to the Borrower from time to time concerning or relating to bribery or corruption, including the Foreign Corrupt Practices Act of 1977, 15 U.S.C. §§ 78dd-1 et seq.

"**Anti-Money Laundering Laws**" means all Laws of any jurisdiction applicable to the Borrower from time to time concerning or relating to money laundering, including the Patriot Act.

"**Anti-Terrorism Laws**" means all Laws of any jurisdiction applicable to the Borrower from time to time concerning or relating to terrorism or money laundering, including Title III of

the Patriot Act, the Trading with the Enemy Act, and each of the foreign assets control regulations of the United States Treasury Department (31 C.F.R. Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto.

"**Asset Purchase Transaction**" means the purchase or acquisition by the Lender (or its designee), in one transaction or a series of related transactions, of substantially all of the assets of the Borrower.

"**Assignment and Assumption**" means an assignment and assumption entered into by the Lender and the assignee or assignees designated therein.

"**Attributable Indebtedness**" means, on any date, (a) in respect of any Capital Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP and (b) in respect of any Synthetic Lease of any Person, the capitalized amount of the remaining lease payments under the relevant lease that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease were accounted for as a Capital Lease.

"**Bankruptcy Code**" has the meaning set forth in the Recitals hereto.

"**Base Interest Rate**" has the meaning specified in Section 2.05(a).

"**Board of Directors**" means, with respect to any Person, the board of directors of such Person (or the equivalent board of advisors, managers or members or body performing similar functions for such Person) or any committee of the board of directors of such Person authorized, with respect to any particular matter, to exercise the power of the board of directors (or board of advisors, managers or members or body performing similar functions) of such Person.

"**Borrower**" has the meaning set forth in the introductory paragraph hereto.

"**Borrowing**" means a borrowing or deemed borrowing of a Loan on a given date.

"**Borrowing Request**" means an irrevocable, written request for a Borrowing of Loans, which must be substantially in the form of **Exhibit A** and must specify (i) the requested date of the borrowing (which shall be a Business Day), (ii) the principal amount of New Money DIP Loans to be borrowed, and (iii) wire instructions for the account(s) to which funds are to be disbursed.

"**Budget**" means the thirteen (13)-week cash flow forecast attached as **Exhibit B**, approved by the Lender in its sole discretion, and approved by the Bankruptcy Court pursuant to the DIP Order, as such budget may be amended or modified in accordance with this Agreement and the DIP Order.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the State of New York.

"**Businesses**" means, at any time, a collective reference to the businesses operated by the Borrower.

"**Capital Expenditures**" means, with respect to any Person for any period, any expenditure in respect of the purchase or other acquisition of any fixed or capital assets which are classified as capital expenditures in accordance with GAAP (excluding normal replacements and maintenance which are properly charged to current operations).

"**Capital Lease**" means, as applied to any Person, any lease of any property by that Person as lessee which, in accordance with GAAP, is required to be accounted for as a capital lease on the balance sheet of that Person.

"**Carve-Out**" means collectively, (a) all statutory and other fees required to be paid to the Clerk of the Bankruptcy Court and to the UST pursuant to 28 U.S.C. §1930(a) plus interest at the statutory rate, if any, pursuant to 31 U.S.C. § 3717 (without regard to the Carve-Out Trigger Notice (as defined below)), (b) reasonable fees and expenses incurred by a trustee and payable under section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed $25,000 (without regard to the Carve-Out Trigger Notice), (c) to the extent allowed at any time, all unpaid fees and expenses of the professionals retained by the Debtor and, subject to amounts expressly set forth in the Budget, any Committee appointed in the Chapter 11 Case that (i) are incurred on or prior to the date of delivery of the Carve-Out Trigger Notice, or (ii) are incurred after the date of delivery of a Carve-Out Trigger Notice, subject to an aggregate cap of $200,000 for the Debtor's and Committee's professionals (the "**Post-Carve-Out Trigger Notice Cap**"). For avoidance of doubt, this shall not result in any additional funding obligation by the Lender. Notwithstanding any other provision herein, the Carve-Out (including the Post-Carve-Out Trigger Notice Cap) shall not include, apply to, or be available for any fees or expenses incurred by any party in connection with the investigation, initiation, or prosecution of any claims, causes of action, adversary proceedings, or other litigation against the Debtor, the Lender, L.A. Care, or the Landlord (except as provided herein and only to the extent of $50,000 of the proceeds of the DIP Facility) or any of their respective Affiliates, Related Parties and officers, directors, managers, members, employees, agents, representatives, advisors, attorneys, accountants and counsel, including challenging the amount, validity, perfection, priority, or enforceability of or asserting any defense, counterclaim or offset to, the obligations and liens and security interests in favor of the Debtor or the Lender. For avoidance of doubt, nothing herein shall preclude any litigation against the Debtor's director and shareholder Paul Tuft.

"**Carve-Out Trigger Notice**" shall mean a written notice delivered by the Lender to the Debtor's lead counsel, the UST, and lead counsel to the Committee, which notice may only be delivered following the occurrence and during the continuation of an Event of Default under this Agreement.

"**Change in Law**" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation, administration or application thereof, after the date of this Agreement or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority, central bank or comparable agency made or issued after the date of this Agreement.

"**Chapter 11 Case**" has the meaning set forth in the Recitals hereto.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Commitment Fee**" has the meaning set forth in Section 2.09.

"**Committee**" means the official committee of unsecured creditors appointed in the Chapter 11 Case.

"**Contractual Obligation**" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto. Without limiting the generality of the foregoing, a Person shall be deemed to be Controlled by another Person if such other Person possesses, directly or indirectly, power to vote 10% or more of the securities having ordinary voting power for the election of directors, managing general partners or the equivalent. In no event shall the Lender be deemed to Control the Borrower.

"**Debt Issuance**" means the issuance by the Borrower of any Indebtedness.

"**Debtor**" has the meaning set forth in the Recitals.

"**Debtor Relief Laws**" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Default**" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"**Default Rate**" means an interest rate equal to the Base Interest Rate plus **4%** per annum, to the fullest extent permitted by applicable Laws.

"**DIP Collateral**" has the meaning set forth in Section 9.01.

"**DIP Loan Documents**" means this Agreement, the DIP Order, and each other agreement, instrument, or document executed or delivered by or on behalf of the Borrower to the Lender at any time pursuant to or related to this Agreement and/or the DIP Order. Any reference in this Agreement or any other DIP Loan Document to a DIP Loan Document shall include all appendices, exhibits or schedules thereto.

"**DIP Obligations**" means all advances to, and debts, principal, interest, premiums, fees, liabilities, obligations, covenants and duties of, the Borrower arising under any DIP Loan Document or with respect to any Loan, in each case, payable in accordance with the DIP Loan Documents, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, premiums and fees that accrue after the commencement by or against the Borrower of any

proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.

"**DIP Order**" means the Interim Order or Final Order, as applicable under the circumstances.

"**Disposition**" or "**Dispose**" means the sale, transfer, license, lease or other disposition (including any Sale and Leaseback Transaction) of any property by the Borrower outside the ordinary course of business, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"**Dollar**" and "**$**" mean lawful money of the United States.

"**Environment**" means ambient and indoor air, surface water and groundwater (including potable water, navigable water and wetlands), the land surface or subsurface strata or sediment, and natural resources such as flora or fauna.

"**Environmental Laws**" means any and all Laws relating to (a) the Environment, preservation or reclamation of natural resources, or to the generation, use, handling, transportation, storage, treatment, Release of any Hazardous Material or (b) human health and employee health as affected by exposure to Hazardous Materials.

"**Environmental Liability**" means any liability, contingent or otherwise (including any liability for personal injury or damages, costs of environmental investigation, feasibility studies, and remediation, fines, penalties or indemnities), of the Borrower directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release of any Hazardous Materials, or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Permits**" means any and all Permits required under any applicable Environmental Law.

"**Equity Interests**" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and any successor thereto.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) under common control with the Borrower within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code) or the meaning of Section 4001(a)(14) of ERISA; provided, however, that in no event shall the Lender or any of its Affiliates constitute an ERISA Affiliate for the purposes of this Agreement. Any former ERISA Affiliate of a Person shall continue to be considered an ERISA Affiliate of such Person within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of such Person and with respect to liabilities arising during such period (but, for the avoidance of doubt, not after such period) for which such Person could be liable under the Code or ERISA.

"**ERISA Event**" means (a) a Reportable Event; (b) a withdrawal by the Borrower or any of its ERISA Affiliates from any Pension Plan subject to Section 4063 of ERISA during a plan year in which such entity was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by the Borrower or any of its ERISA Affiliates from a Multiemployer Plan or notification that a Multiemployer Plan is in "critical," "endangered" or "critical and declining" status (each, within the meaning of Section 432 of the Code or ERISA Section 305); (d) a mass withdrawal from a Multiemployer Plan under ERISA Section 4219(c)(1)(D); (e) the withdrawal from a Multiemployer Plan by any employer required to be listed in Schedule R of the Multiemployer Plan's Form 5500; (f) a Multiemployer Plan's adoption, amendment or update of a rehabilitation plan under ERISA Section 305(e); (g) the adoption by a Multiemployer Plan of any plan rule creating employer liability that is in addition to collectively bargained contributions or withdrawal liability; (h) the filing of a notice of intent to terminate, the treatment of a Pension Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (i) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (j) notice received by the Borrower or any of its ERISA Affiliates from a Multiemployer Plan that such Multiemployer Plan is subject to Section 4245 of ERISA; (k) the failure of the Borrower or any of its ERISA Affiliates to make by its due date a required installment under Section 430(j) of the Code with respect to any Pension Plan or the failure by any Pension Plan to satisfy the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Pension Plan, whether or not waived in accordance with Section 412(c) of the Code or Section 302(C) of ERISA; (l) a determination that any Pension Plan is, or is expected to be, in "at risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA); (m) the filing pursuant to Section 412 of the Code or Section 302 of ERISA of an application for a waiver of the minimum funding standard with respect to any Pension Plan; (n) the failure by the Borrower or any of its ERISA Affiliates to make any required contribution to a Multiemployer Plan pursuant to Section 431 or 432 of the Code; (o) the failure by the Borrower or any of its ERISA Affiliates to pay when due (after expiration of any applicable grace period) any installment payment with respect to withdrawal liability under Section 4201 of ERISA; (p) the imposition of a Lien pursuant to Section 430(k) of the Code or Section 303(k) or 4068 of ERISA with respect to any Pension Plan; (q) the assertion of a material claim (other than routine claims for benefits) against any ERISA Plan other than a Multiemployer Plan or the assets thereof or against the Borrower or any of its ERISA Affiliates in connection with any ERISA Plan; or (r) the

imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any of its ERISA Affiliates.

"**ERISA Plan**" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) in respect of which the Borrower or any of its ERISA Affiliates is (or, if such ERISA Plan were terminated, would under Section 4062 or Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"**Event of Default**" has the meaning specified in Section 8.01.

"**Excluded Accounts**" means any accounts exclusively used for payroll, payroll taxes or employee benefits and funded in the ordinary course of business.

"**Excluded Assets**" means, collectively, the following assets, properties and rights of the Borrower, together with the proceeds thereof:

(a) The Borrower's interests in or related to Pacific Gardens Medical Center;

(b) Chapter 5 causes of action; provided that to the extent a consensual resolution with the Master Lease Landlord is not reached, all claims and causes of action of the Estate against the Landlord (including recharacterization of the Master Lease, any claim affecting title to or the characterization of the Site, and chapter 5 claims against the Landlord) shall be specifically retained under section 1123(b)(3)(B) and post-Effective Date prosecuted by Newco (at its option), as the Estate's representative, with any net cash recovery on chapter 5 claims against the Landlord contributed to the Liquidating Trust waterfall and all other relief inuring to Newco;

(c) Other litigation causes of action, including claims against directors, officers and other affiliated or related parties of the Debtor (subject to treatment of claims against the Landlord as noted in (b) above);

(d) All rights and claims under the Borrower's director & officer insurance policies;

(e) Any QAF Delta amounts received by the Borrower, *provided* that any such additional amounts will not negatively impact future QAF receipts (i.e., QAF 9, 10, 11 etc. other than the QAF identified in the Budget); and

(f) The Borrower's cash on hand as of the Interim Closing Date under ordinary course of business (e.g., no discounts to accelerate payments) ***excluding*** cash from (i) any QAF funds that are not identified in the Budget or (ii) amounts described in clause (e) above.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of the Lender, its office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes; (b) U.S. federal withholding Taxes imposed on amounts payable to or for the account of the Recipient pursuant to

a law in effect on the date on which (A) in the case of the Lender, the Lender ceases to be treated as a U.S. Person, and (B) in the case of any other Recipient, such Recipient becomes a party hereto (or in each case, if such Recipient is an intermediary, partnership or other flow-through entity for U.S. tax purposes, the date on which the relevant beneficiary, partner or member of such Recipient becomes a beneficiary, partner or member thereof, if later); and (c) any withholding Taxes imposed under FATCA.

"**FATCA**" means Section 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code, and any applicable intergovernmental agreement with respect thereto.

"**Final Order**" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court, which order shall be in form and substance satisfactory to the Lender, in its sole and absolute discretion, and which order is in effect and not stayed, together with all extensions, modifications and amendments thereto, in form and substance satisfactory to the Lender, in its sole discretion, which, among other matters but not by way of limitation, authorizes the Borrower to obtain credit, incur (or guaranty) Indebtedness and grant Liens under this Agreement and the other DIP Loan Documents, as the case may be, provides for the super priority of the Lender's claims and authorizes the use of cash collateral.

"**Fiscal Year**" means the Fiscal Year of the Borrower, which period shall be the 12-month period ending on December 31 of each year.

"**GAAP**" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and the statements and pronouncements of the Financial Accounting Standards Board, consistently applied and as in effect from time to time.

"**Governmental Authority**" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, any tribal, aboriginal or native government or corporation, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Guarantee**" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum

reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"**Hazardous Materials**" means (a) any substance, material or waste designated or defined as a "hazardous substance," "hazardous material," "hazardous waste," "extremely hazardous waste," "restricted hazardous waste," "pollutant or contaminant," "toxic waste," or "toxic substance" under any provision of Environmental Law, and (b) any petroleum, petroleum distillates, petroleum products, asbestos or asbestos-containing materials, urea-formaldehyde insulation, explosive or radioactive materials, and polychlorinated biphenyls.

"**Hospital**" means Pacifica Hospital of the Valley.

"**IMA**" means an Interim Management Agreement between the Debtor and Newco to be entered into effective as of the IMA Transition Date to transition financial and operational responsibility from the Debtor to Newco pending receipt of applicable regulatory approvals.

"**IMA Transition Date**" means the date upon which an IMA between the Debtor and Newco becomes effective and Newco assumes financial and operational responsibility of the Hospital from the Debtor.

"**Indebtedness**" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a) all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b) all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c) net obligations of such Person under any swap agreement;

(d) all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business and, in the case of any such trade account payables, not past due for more than 90 days);

(e) indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f) Capital Leases and Synthetic Lease obligations;

(g) all obligations of such Person prior to the Maturity Date to purchase, redeem, retire, defease or otherwise make any payment in cash or cash equivalents in respect of any Equity Interest in such Person or any other Person, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; and

(h) all Guarantees of such Person in respect of any of the foregoing.

Notwithstanding the foregoing, in no event shall the following constitute Indebtedness, in each case to the extent consistent with the Borrower's past practices: (i) purchase price holdbacks arising in the ordinary course of business in respect of a portion of the purchase price of an asset to satisfy warranties or other unperformed obligations of the seller of such asset; (ii) trade accounts payable, deferred revenues, liabilities associated with customer prepayments and deposits and other accrued obligations (including transfer pricing and accruals for payroll and other operating expenses accrued in the ordinary course of business), in each case incurred in the ordinary course of business, (iii) operating leases, (iv) customary obligations under employment agreements and deferred employee compensation, and (v) prepaid or deferred revenue and deferred tax liabilities.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person. The amount of any Capital Lease or Synthetic Lease obligation as of any date shall be deemed to be the amount of Attributable Indebtedness in respect thereof as of such date. To the extent that any recourse with respect to Indebtedness of the type described in clause (e) above is limited solely to property of a Person, the amount of Indebtedness of any Person for purposes of clause (e) shall be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the net book value of such property encumbered thereby.

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any DIP Loan Document, and (b) to the extent not otherwise described in clause (a), Other Taxes.

"**Indemnitee**" has the meaning specified in Section 10.04(b).

"**Interest Payment Date**" means the last Business Day of each calendar month.

"**Interest Period**" means each period commencing on the date a Loan is made or on the immediately preceding Interest Payment Date, as applicable, and ending on the next succeeding Interest Payment Date.

"**Interim Closing Date**" means the earlier of the IMA Transition Date and the effective date of the Plan.

"**Interim New Money DIP Commitment**" means the commitment of the Lender to make the Interim New Money DIP Loan in the aggregate principal amount of $7,000,000.

"**Interim New Money DIP Loan**" has the meaning specified in Section 2.01(a)(i).

"**Interim Roll Up DIP Loan**" has the meaning specified in Section 2.01(a)(ii).

"**Interim Order**" means any interim order of the Bankruptcy Court entered in the Chapter 11 Case after an interim hearing in form and substance satisfactory to the Lender which, among other matters (but not by way of limitation), authorizes and approves, on an interim basis, the use

of prepetition cash collateral and authorizes and approves (i) the Borrower's entry into the DIP Loan Documents, (ii) the making of the Loans, (iii) the granting of the DIP Superpriority Claims and DIP Liens against the Borrower and its property in accordance with the DIP Loan Documents with respect to the DIP Collateral, (iv) stipulations and orders with respect to the validity, priority, and amount of the Prepetition Indebtedness, (v) the right of the Lender to credit bid all claims arising under this Agreement and the other DIP Loan Documents, (vi) the payment of all fees and expenses (including the fees and expenses of outside counsel) required to be paid to the Lender by the Borrower, , (vii) the use of Prepetition cash collateral, and (viii) the relief from the Automatic Stay to exercise all rights and remedies available to the Lender under the Prepetition Loan Documents, and applicable Laws, including the order entered on September 30, 2026 as Docket No. 229 in the Chapter 11 Case.

"**Investment**" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person and any arrangement pursuant to which the investor Guarantees Indebtedness of such other Person, or (c) an Acquisition. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in value, or the write-ups, write-downs or write-offs with respect thereto, of such Investment net of any return representing a return of capital or repayment of principal or payment of interest, if applicable, with respect to such Investment.

"**Involuntary Disposition**" means any loss of, damage to or destruction of, or any condemnation or other taking for public use of, any property of the Borrower.

"**L.A. Care**" means L.A. Care Health Plan.

"**Laws**" means, collectively, all international, foreign, federal, state, local, tribal or aboriginal statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"**Lease Principle Agreement**" means an agreement in principle among the Borrower, the Lender and the Master Lease Landlord regarding lease terms in the event that the Lender acquires the Hospital.

"**Lender's Expenses**" are, without duplication, (a) all reasonable and documented out-of-pocket fees, costs and expenses incurred by the Lender in connection with the Chapter 11 Case, including the reasonable fees, charges and disbursements of the Lender's Professionals, in connection with the closing and funding of the DIP credit facility and the negotiation, preparation, execution, delivery and administration of the DIP Loan Documents and any related documentation, including in connection with any amendment, modification or waiver of any provision of any DIP

Loan Document, and the transactions contemplated hereby and thereby, and (b) all reasonable and documented and invoiced out-of-pocket expenses incurred by the Lender, including the reasonable fees, charges and disbursements of the Lender's Professionals, in connection with the defense, enforcement, collection or protection of the Lender's rights in connection with the DIP Loan Documents or the Loans (including expenses incurred in connection with the Chapter 11 Case, any appeals or other insolvency proceedings, but for the avoidance of doubt, excluding such costs only related to the Prepetition Loan); provided, however, that the Lender shall not be entitled to reimbursement for any fees or expenses solely incurred in connection with (i) the acquisition of the Hospital or the transfer of operations at the Hospital (including in connection with regulatory approval, Interim Management Agreement or similar agreement with the Debtor, or negotiation of a lease with the Master Lease Landlord), or (ii) the negotiation, preparation or documentation of any asset purchase agreement or (iii) any other activities undertaken in furtherance of the Lender's acquisition of the Debtor's assets.

"**Lender's Professionals**" means (i) all legal counsel of the Lender, including Raines Feldman Littrell LLP (but excluding the Lender's in-house counsel); (ii) the financial advisors and accountants of the Lender and (iii) all other third party professionals, consultants or advisors retained by the Lender.

"**Lien**" means (a) any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title, and any financing lease having substantially the same economic effect as any of the foregoing) and (b) in the case of securities or Equity Interests, any purchase option, call or similar right of a third party with respect to such securities or Equity Interests; provided, however, that in no event shall any operating lease in and of itself be deemed to constitute a Lien.

"**Loans**" means New Money DIP Loans and/or Roll Up DIP Loans, as applicable.

"**Master Lease**" means that certain Master Lease Agreement dated August 30, 2013, between the Master Lease Landlord and the Borrower, as amended, restated, amended and restated, supplemented or otherwise modified through the Petition Date.

"**Master Lease Landlord**" means, collectively, (a) with respect to the period prior to the Petition Date and claims that may be asserted against the Master Lease Landlord, Reliq Pacifica LLC, Beverly Gemini Investments, LLC, Taking the 5th, LLC and Fifth/Arizona Investors, LLC, and (b) with respect to the period from and after the Petition Date, Reliq Pacifica LLC and Beverly Gemini Investments, LLC.

"**Material Adverse Effect**" means (a) a material adverse change in, or a material adverse effect upon, the business, assets, properties, liabilities (actual or contingent) or financial condition of the Borrower taken as a whole (except for the filing, commencement and continuation of the Chapter 11 Case and the events that result from the filing, commencement and continuation of the Chapter 11 Case); (b) a material impairment of the ability of the Borrower taken as a whole to pay the DIP Obligations or perform its other material obligations under the DIP Loan Documents; or (c) a material adverse effect upon the legality, validity, binding effect or enforceability against the

Borrower of any DIP Loan Documents.

"**Material Contract**" means the contracts, agreements, leases, instruments and other binding commitments and undertakings of the Borrower the performance or breach of which could reasonably be expected to have a Material Adverse Effect on Borrower.

"**Material ERISA Event**" means liability of the Borrower or any of its ERISA Affiliates with respect to an ERISA Event in an aggregate amount in excess of $100,000.

"**Maturity Date**" means the earliest of (i) the date upon which a Milestone is not timely satisfied and not waived by the Lender, (ii) the date upon which a Chapter 11 trustee is appointed in the Chapter 11 Case, (iii) the conversion of the Chapter 11 Case into a case under Chapter 7 of the Bankruptcy Code, (iv) the consummation of the sale of all or substantially all of the assets of the Borrower pursuant to section 363 of the Bankruptcy Code, (v) the date of the acceleration of the Loans and termination of the New Money DIP Commitments hereunder, (vi) the effective date of the Plan or any plan of reorganization in the Chapter 11 Case and (vii) December 8, 2026; provided that if a confirmation order, in form and substance reasonably acceptable to the Lender, approving the Plan, the related disclosure statement and the related sale of the Borrower's assets to the Lender (or its designee) is entered on or before such date, the date in this clause (vii) shall be extended to the occurrence of the effective date of the Plan and the closing of such sale, which shall not be later than December 15, 2026 (unless the Lender agrees in writing to a further extension).

"**Milestones**" has the meaning set forth in Section 6.17.

"**Multiemployer Plan**" means any employee benefit plan of the type described in Section 3(37) or 4001(a)(3) of ERISA that is subject to Title IV of ERISA or Section 412 of the Code and to which the Borrower or any of its ERISA Affiliates makes or is obligated to make contributions or, during the preceding five plan years, has made or been obligated to make contributions.

"**Net Cash Proceeds**" means the aggregate cash or cash equivalents proceeds received by the Borrower in respect of any Disposition, Debt Issuance, or Involuntary Disposition, including by way of insurance proceeds or condemnation awards or sale or issuance of Equity Interests, net of (a) direct costs incurred in connection therewith (including, without limitation, legal, accounting and investment banking fees, costs, expenses and sales commissions), (b) Taxes paid as a result thereof or reasonably estimated to be actually payable within two (2) years of the date of the relevant Disposition, Debt Issuance, or Involuntary Disposition as a result thereof, (c) payment of ordinary course expenses set forth in the Budget, and (d) in the case of any Disposition, the amount necessary to retire any Indebtedness secured by a Permitted Lien (ranking senior to any Lien of the Lender) on the related property; it being understood that "Net Cash Proceeds" shall include, without limitation, any cash or cash equivalents received upon the sale or other disposition of any non-cash consideration received by the Borrower in any Disposition, Debt Issuance, Involuntary Disposition or sale or issuance of Equity Interests.

"**Newco**" means any Person through which the Lender or its designee purchases or acquires substantially all of the assets of the Debtor in connection with this Chapter 11 Case.

"**New Money DIP Commitments**" means, collectively, the Interim New Money DIP Commitments and Additional New Money DIP Commitments.

"**New Money DIP Loans**" has the meaning specified in Section 2.01(b)(i).

"**Note**" has the meaning specified in Section 2.06.

"**Notice Period**" has the meaning specified in Section 8.02(d).

"**Organization Documents**" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Other Connection Taxes**" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any DIP Loan Document, or sold or assigned an interest in any Loan or DIP Loan Document).

"**Other Taxes**" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any DIP Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"**Patriot Act**" has the meaning ascribed to such term in Section 9.15.

"**PBGC**" means the Pension Benefit Guaranty Corporation or any successor thereto.

"**Pension Plan**" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that (i) is subject to Title IV of ERISA or the minimum funding standards under Section 412 of the Code and (ii) is sponsored or maintained by the Borrower or any of its ERISA Affiliates or to which the Borrower or any of its ERISA Affiliates contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

"**Permit**" means any permit, license, certificate, approval, consent, clearance, notification, waiver certification, registration, franchises, accreditations, qualification or authorization issued or granted by any Governmental Authority or pursuant to any applicable Law.

"**Permitted Dispositions**" means (so long as no Default exists or would result therefrom) the following:

(a) the granting of Permitted Liens;

(b) (i) any involuntary loss, damage or destruction of property by casualty and (ii) to the extent such property is equipment, the disposition of the assets so damaged or destroyed for fair market value (if any);

(c) the leasing of equipment by the Borrower in the ordinary course of business or as otherwise consented to in writing by the Lender;

(d) the making of a Permitted Investment;

(e) use of supplies or sales of inventory in the ordinary course of business;

(f) rejection of leases (subject to consultation and reasonable approval of Lender), and/or sale, liquidation or otherwise disposal of obsolete, surplus or worn-out property as permitted by order of the Bankruptcy Court;

(g) sale of substantially all of the assets of the Borrower pursuant to a final, non-appealable order entered by the Bankruptcy Court in a form acceptable to Lender in its sole and absolute discretion, approving any Asset Purchase Transaction; and

(h) sale or other monetization of the Excluded Assets in accordance with the Plan Term Sheet.

"**Permitted Indebtedness**" means, at any time, Indebtedness of the Borrower permitted to exist at such time pursuant to the terms of Section 7.03.

"**Permitted Investments**" means, at any time, Investments by the Borrower permitted to exist at such time pursuant to the terms of Section 7.02.

"**Permitted Liens**" means, at any time, Liens in respect of property the Borrower permitted to exist at such time pursuant to the terms of Section 7.01.

"**Permitted Variances**" has the meaning set forth in Section 7.23.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Petition Date**" has the meaning set forth in the Recitals hereto.

"**PIK Capitalization**" has the meaning set forth in Section 2.05(c)(ii).

"**PIK Interest**" has the meaning set forth in Section 2.05(c)(ii).

"**Plan**" means a chapter 11 plan that is consistent in all material respects with the Plan

Term Sheet.

"**<u>Plan Confirmation Milestone Date</u>**" has the meaning specified in Section 6.17.

"**<u>Plan Documents</u>**" means, collectively, the Plan and all agreements and other documents necessary or appropriate to effectuate the Plan.

"**<u>Plan Term Sheet</u>**" means the term sheet attached as **Exhibit D**.

"**<u>Post-Carve-Out Trigger Notice Cap</u>**" has the meaning set forth in the definition of "Carve-Out."

"**<u>Prepetition Credit Agreement</u>**" has the meaning specified in the Recitals.

"**<u>Prepetition Credit Documents</u>**" means the Prepetition Credit Agreement, that certain Promissory Note dated as of December 10, 2020, in the original principal amount of $35,000,000, that certain Pledge and Security Agreement dated as of December 10, 2020, and the other agreements, documents, and instruments executed or delivered in connection therewith.

"**<u>Prepetition Secured Debt</u>**" means all loans, advances indebtedness and obligations of the Borrower arising under or in connection with the Prepetition Credit Agreement and the other Prepetition Credit Documents before the Petition Date.

"**<u>Prepetition Obligations</u>**" means the "Obligations" under and as defined in the Prepetition Credit Agreement and other Prepetition Credit Documents.

"**<u>Private Sale Motion</u>**" means a motion filed by the Debtor with the Bankruptcy Court seeking approval to consummate an Asset Purchase Transaction pursuant to a private sale under Section 363 of the Bankruptcy Code.

"**<u>Private Sale Motion Milestone Date</u>**" has the meaning specified in Section 6.17.

"**<u>QAF</u>**" means the funds or revenues received by the Hospital through California's Hospital Quality Assurance Fee program.

"**<u>QAF Delta</u>**" means any excess QAF revenues generated by the Borrower from successfully reducing asserted setoffs or recoupment amounts in excess of the amount of QAF budgeted in the Budget.

"**<u>Recipient</u>**" means the Lender or an assignee of the Lender, as applicable.

"**<u>Register</u>**" has the meaning specified in Section 9.06(c).

"**<u>Related Parties</u>**" means, with respect to any Person, such Person's Affiliates, partners, directors, officers, employees, agents, advisors and sub-advisors of such Person; *provided* that for purposes of this Agreement, the Lender shall not be a Related Party of the Borrower, or any of its Affiliates, partners, directors, officers, employees, agents, advisors, or sub-advisors.

"**Release**" means any depositing, spilling, leaking, seeping, pumping, pouring, emitting, emanating, discarding, abandoning, emptying, discharging, migrating, injecting, escaping, leaching, dumping, or disposing in, into or through the Environment.

"**Released Claims**" has the meaning set forth in Section 10.18.

"**Released Party**" or "**Released Parties**" has the meaning set forth in Section 10.18.

"**Reportable Event**" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the thirty-day notice period has been waived pursuant to DOL Reg. Section 4043.

"**Responsible Officer**" means (i) with respect to the Borrower, the chief restructuring officer, president, chief financial officer, treasurer or assistant treasurer of the Borrower or any other officer of the Borrower designated as a "Responsible Officer" for purposes of the DIP Loan Documents by Borrower in writing to the Lender and reasonably acceptable to the Lender and (ii) with respect to the Lender, any partner, managing director, principal, vice president, assistant vice president, assistant treasurer, assistant secretary, or any other officer of the Lender customarily performing functions similar to those performed by any of the above designated officers and having direct responsibility for the administration of this Agreement. Any document delivered hereunder that is signed by a Responsible Officer of the Borrower shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of the Borrower and such Responsible Officer shall be conclusively presumed to have acted on behalf of the Borrower.

"**Restricted Payment**" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests of the Borrower, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests or on account of any return of capital to the Borrower's stockholders, partners or members (or the equivalent Person thereof), any payment of management fees (or other fee of a similar nature) or out-of-pocket expenses to the holders of such Equity Interests or any setting apart of funds or property for any of the foregoing.

"**Roll Up DIP Loans**" has the meaning specified in Section 2.01(b)(ii).

"**Sale and Leaseback Transaction**" means, with respect to the Borrower, any arrangement, directly or indirectly, with any Person whereby the Borrower shall sell or transfer any property used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred.

"**Sanctioned Country**" means any country, region or territory to the extent that such country or territory itself is the subject of comprehensive Sanctions (as of the date of this Agreement, the so-called Donetsk People's Republic, the so-called Luhansk People's Republic, the Crimea, Zaporizhzhia and Kherson Regions of Ukraine, Cuba, Iran, North Korea and Syria).

"**Sanctioned Person**" means, at any time, (a) any Person who is the subject of any Sanctions, including any Person listed or designated as being the target of any Sanctions (whether by name or by reason of being included in a class of persons), (b) any Person operating, having a place of business, organized, located or resident in a Sanctioned Country, (c) any agency of the government of or an organization controlled by a Sanctioned Country, or (d) any Person that is 50% or more, individually or in the aggregate, directly or indirectly, owned, or that is Controlled by, one or more of the persons indicated in clauses (a), (b) and/or (c), or acting directly or indirectly on behalf of any such Person.

"**Sanctions**" means any economic, financial or trade sanctions, laws, regulations or restrictive measures, or trade embargoes, imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, (b) the United Nations or its Security Council, (c) the European Union, (d) His Majesty's Treasury of the United Kingdom, or (e) any other relevant sanctions authority, including any other governmental or regulatory authority, institution or agency which administers economic, financial or trade sanctions laws, regulations, trade embargoes or restrictive measures applicable to the Borrower or the Lender.

"**Subsidiary**" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which at least a majority of the shares of Voting Stock is at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person.

"**Superpriority Claim**" shall mean a claim against the Borrower in the Chapter 11 Case that is a superpriority administrative expense claim having priority over any or all administrative expenses and other claims of the kind specified in, or otherwise arising or ordered under, any sections of the Bankruptcy Code (including, without limitation, sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 546, 726, 1113 and/or 1114 thereof), whether or not such claim or expenses may become secured by a judgment Lien or other non-consensual Lien, levy or attachment, subject to the Carve-Out in all respects.

"**Synthetic Lease**" means any synthetic lease, tax retention operating lease, off-balance sheet loan or similar off-balance sheet financing arrangement whereby the arrangement is considered borrowed money indebtedness for tax purposes but is classified as an operating lease or does not otherwise appear on a balance sheet under GAAP.

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholdings), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**UCC**" means the Uniform Commercial Code as in effect in the State of New York or, when the laws of any other jurisdiction govern the perfection or enforcement of any Lien, the Uniform Commercial Code of such jurisdiction.

"**United States**" and "**U.S.**" means the United States of America.

"**U.S. Person**" means a United States person as defined in section 7701(a)(30) of the

Internal Revenue Code. An intermediary or pass-through entity for federal income tax purposes shall be considered a U.S. Person only if all of its beneficiaries or owners are United States persons.

"**UST**" means the Office of the United States Trustee for Region 3.

"**Variance Report**" means a weekly report to be provided by the Borrower to the Lender, in form satisfactory to the Lender in its sole and absolute discretion, showing, on a cumulative basis from the beginning of the applicable Budget period through the immediately preceding week, the amount of variance and percentage variance of actual disbursements of the type of each line item set forth in the Budget (on a line item basis) from those disbursements and other amounts reflected in the Budget for the corresponding periods, and an explanation of the reason for any such variance and compliance or non-compliance with the requirements set forth in Section 7.23.

"**Voting Stock**" means, with respect to any Person, Equity Interests issued by such Person the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person, even though the right so to vote has been suspended by the happening of such a contingency.

1.02 Other Interpretive Provisions.

With reference to this Agreement and each other DIP Loan Document, unless otherwise specified herein or in such other DIP Loan Document:

(a) The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented, restated or otherwise modified (subject to any restrictions on such amendments, supplements, restatements or modifications set forth herein or in any other DIP Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns and any reference herein to "Party," "Parties," "party" or "parties" shall be construed to mean a party or the parties to this Agreement, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any DIP Loan Document, shall be construed to refer to such DIP Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a DIP Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the DIP Loan Document in which such references appear, (v) any reference to any Laws shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law, and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all real and personal property and tangible and intangible assets and properties, including cash, securities, accounts and contract rights. Terms used herein (including "Accounts," "Chattel Paper," "Documents," "Instruments," "Inventory" and

"Proceeds") that are defined in the UCC, unless otherwise defined herein, shall have the meanings specified in the UCC.

(b) In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including."

(c) Section headings herein and in the other DIP Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other DIP Loan Document.

1.03 Accounting Terms.

Except as otherwise specifically prescribed herein, all accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the Borrower's financial statements; provided that calculations of Attributable Indebtedness under any Synthetic Lease or the implied interest component of any Synthetic Lease shall be made by the Borrower in accordance with accepted financial practice and consistent with the terms of such Synthetic Lease.

1.04 Times of Day.

Unless otherwise specified, all references herein to times of day shall be references to California time (Pacific daylight or standard, as applicable).

## ARTICLE II
## THE LOANS

2.01 The Loans.

(a) Interim New Money DIP Loans. Subject to the terms and conditions set forth herein and in the applicable DIP Order: (i) pursuant to the Interim Order, the Lender has advanced a term loan to the Borrower in the aggregate amount of the Interim New Money DIP Commitment (the "**Interim New Money DIP Loan**"), and (ii) $10,500,000 of the Prepetition Secured Debt held by Lender shall be deemed to have been made as a term loan by the Lender and borrowed by the Borrower under this Agreement (the "**Interim Roll Up DIP Loan**"); *provided* that the deemed borrowing by the Borrower of the Interim Roll Up DIP Loan shall entitle the Borrower to receive for cancellation an equivalent aggregate principal amount of Prepetition Secured Debt from the Lender and shall not entitle the Borrower to receive any cash or other consideration from the Lender on account of the Interim Roll Up DIP Loan. Notwithstanding that no such cash or other consideration is exchanged on account of the Interim Roll Up DIP Loan, the Borrower shall owe the aggregate principal amount of the Initial Roll Up DIP Loan to the Lender under this Agreement. The Interim New Money DIP Commitment shall expire upon the funding by Lender of the maximum amount of the Interim New Money DIP Commitment.

(b) Final DIP Facility. Subject to the terms and conditions set forth herein and in the DIP Order, following entry of the Final Order, except for funds advanced under Section 8.03: (i) the Lender agrees to make one or more loans to the Borrower, upon its written request in accordance with Section 2.02 below and subject to Article IV, in an aggregate amount of *up to* the Additional New Money DIP Commitment (the "**Additional New Money DIP Loans**" and, together with the Interim New Money DIP Loan, the "**New Money DIP Loans**") as follows: (A) an advance in the principal amount of **$4,000,000**, payable upon the Bankruptcy Court's entry of the Final Order, (B) a second advance in the principal amount of **$3,000,000**, payable upon the filing by the Debtor of the Plan or Private Sale Motion, as applicable, and (C) a third advance in the principal amount of **$7,000,000**, payable upon the earlier to occur of (x) the Plan Confirmation Milestone Date and (y) the Private Sale Motion Milestone Date, as applicable; and (ii) *up to* **$21,000,000** of the Prepetition Secured Debt held by the Lender, in an amount equal to 1.5 times the principal amount of each Additional New Money DIP Loan actually funded, shall be deemed to have been made as a term loan by Lender and borrowed by the Borrower under this Agreement (as and when each such Additional New Money DIP Loan is funded, the "**Additional Roll Up DIP Loan**" and, together with the Interim Roll Up DIP Loan, the "**Roll Up DIP Loans**"); *provided* that the deemed borrowing by the Borrower of the Additional Roll Up DIP Loan shall entitle the Borrower to receive for cancellation an equivalent aggregate principal amount of Prepetition Obligations from Lender and not entitle the Borrower to receive any cash or other consideration from Lender on account of the Additional Roll Up DIP Loan. Notwithstanding that no such cash or other consideration is exchanged on account of the Additional Roll Up DIP Loan, the Borrower shall owe the aggregate principal amount of the Additional Roll Up DIP Loans to the Lender under this Agreement and the Borrower and the Lender agree that such amounts shall no longer be outstanding under the Prepetition Credit Agreement. The Additional New Money DIP Commitment shall expire upon the funding by Lender of the maximum amount of the Additional New Money DIP Commitment.

(c) Once repaid, whether such repayment is voluntary or required, amounts borrowed (or deemed borrowed) under this Section 2.01 may not be reborrowed.

2.02 Borrowing of the Loans.

(a) The Lender has advanced to the Borrower the Interim New Money DIP Loan pursuant to the terms and conditions of the Interim Order. With respect to any Additional New Money DIP Loans, upon entry of the Final Order, the Borrower may request a Borrowing under an Additional New Money DIP Loan by delivering a Borrowing Request to the Lender no later than 12:00 p.m. one Business Day prior to the requested date of such Borrowing (or such later time as may be agreed to by the Lender in its sole discretion); *provided* that the Lender's obligations to advance any requested amounts are subject in all respects to the conditions precedent set forth in Article IV, below.

2.03 Prepayments.

(a) Voluntary Prepayments. The Borrower may, upon notice to the Lender, at any time or from time to time, voluntarily prepay any Loans in whole or in part without premium or penalty; *provided* that such notice must be received by the Lender not later than 2:00 p.m. three (3) Business Days prior to any date of prepayment of Loans. Each such notice shall specify the

date and amount of such prepayment. Any prepayment of a Loan shall be accompanied by all accrued interest thereon.

(b) Mandatory Prepayments of Loans.

(i) QAF Funds. Upon Debtor's receipt of QAF funds (excluding QAF Delta which is an Excluded Asset), Debtor shall apply such funds to prepay the Loans, except to the extent such QAF funds are QAF Program 8 or 9 funds identified in the Budget, in which event the Debtor may use such identified QAF Program 8 or 9 funds in accordance with the Budget.

(ii) Dispositions and Involuntary Dispositions. Upon the receipt by the Borrower of the Net Cash Proceeds of any Disposition or Involuntary Disposition consummated on or after the Petition Date, other than with respect to Excluded Assets, the Borrower shall, on or prior to the date which is three (3) Business Days after the date of the realization or receipt by the Borrower of such Net Cash Proceeds, prepay the Loans as hereafter provided in an aggregate amount equal to 100% of the Net Cash Proceeds of such Disposition or Involuntary Disposition; provided, however, that notwithstanding the foregoing, the Borrower may, at its option, elect to retain and apply all or any portion of the Net Cash Proceeds consisting of insurance proceeds received in connection with any casualty, loss or damage to property of the Borrower to repair, restore or replace the property subject to such casualty, loss or damage (including payment of costs and expenses reasonably related thereto), and any such Net Cash Proceeds so retained shall not be required to be applied to prepay the Loans; provided further, however, that any portion of such Net Cash Proceeds not so applied shall be applied to prepay the Loans in accordance with this Section 2.03.

(iii) Debt and Equity Issuances. Upon the receipt by the Borrower after the Petition Date of the Net Cash Proceeds (x) of any Debt Issuance not permitted under Section 7.03 or (y) from the sale or issuance by the Borrower of any of its Equity Interests, in each case the Borrower shall, on or prior to the date which is three (3) Business Days after the date of the realization or receipt by the Borrower of such Net Cash Proceeds, prepay the Loans as hereafter provided in an aggregate amount equal to 100% of such Net Cash Proceeds.

(iv) Notice of Prepayment. The Borrower shall notify the Lender in writing of any mandatory prepayment of Loans required to be made by the Borrower pursuant to clauses (ii) and (iii) of this Section 2.03(b) not later than 12:00 p.m. at least one Business Day prior to the date of such prepayment. Each such notice shall specify the date of such prepayment and provide a reasonably detailed calculation of the aggregate amount of such prepayment to be made by the Borrower.

(v) Application of Mandatory Prepayments or Payment Upon Maturity. All amounts to be paid pursuant to Section 2.03(a) or (b) or upon the Maturity Date shall be applied as follows:

(A) First, to payment of that portion of the DIP Obligations constituting fees, indemnities, expenses, and other amounts (including fees, charges and disbursements of counsel to the Lender and amounts payable under Article III) payable in accordance with the DIP Loan Documents to the Lender;

(B) Second, to payment of that portion of the DIP Obligations constituting accrued and unpaid interest on the Loans (other than PIK interest which has been added to the principal balance of the Loans); and

(C) Third, to payment of that portion of the DIP Obligations constituting unpaid principal payments.

Notwithstanding anything to the contrary in any DIP Loan Document, all prepayments under this Section 2.03(b) shall be accompanied by interest on the principal amount prepaid through the date of prepayment.

2.04 Repayment of Loans.

The Borrower shall repay to the Lender on the Maturity Date in cash the aggregate principal amount of all Loans outstanding on such date, together with all accrued and unpaid interest thereon, and any outstanding fees, in each case, payable in accordance with the DIP Loan Documents; and such amounts repaid shall be applied in the order set forth in section 2.03(b)(v).

2.05 Interest.

(a) Loans. Subject to the provisions of Section 2.05(b), the Loans shall bear interest on the outstanding principal amount thereof from the date such Loans are borrowed until repaid, accruing on a simple basis at a rate per annum equal to **12%** (the "**Base Interest Rate**").

(b) Default Interest.

(i) Upon the occurrence and during the continuance of an Event of Default, the Borrower shall pay interest on the outstanding DIP Obligations hereunder at an interest rate per annum at all times equal to the Default Rate, to the fullest extent permitted by applicable Laws.

(ii) After the Maturity Date, accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c) Interest Payment.

(i) Interest shall accrue and be paid to the Lender on each Interest Payment Date. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

(ii) Notwithstanding anything to the contrary, all interest accrued on the outstanding principal amount of the Loans during each Interest Period shall be payable in

kind ("**PIK Interest**") and, subject to the proviso in this clause below, not in cash. The amount of PIK Interest accruing on the Loans during each Interest Period shall be added to, and shall thereafter constitute part of, the outstanding principal amount of the Loans for all purposes under this Agreement, effective as of such Interest Payment Date (such increase, a "**PIK Capitalization**"); provided, however, that interest at the Default Rate shall likewise be payable in kind in accordance with this Section 2.05(c)(ii).

(iii) The Lender shall record each PIK Capitalization in the Register maintained pursuant to Section 10.06(c), and the outstanding principal amount of the Loans set forth in the Register shall be increased by the aggregate PIK Interest capitalized on the applicable Interest Payment Date. Any failure of the Lender to make such notation shall not affect the obligation of the Borrower to pay such amount in accordance with this Section 2.05. For the avoidance of doubt, following each PIK Capitalization, interest for subsequent Interest Periods shall accrue on the outstanding principal amount of the Loans as so increased, and PIK Interest shall accordingly compound on each Interest Payment Date.

(d) Computation of Interest and Fees. All computations of interest for the Loans shall be made on the basis of a 360-day year and actual days elapsed. Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; *provided* that any Loan that is repaid on the same day on which it is made shall bear interest for one day. Each determination by the Lender of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

2.06 Evidence of Debt.

The Loans made by Lender shall be evidenced by one or more accounts or records (including the Register maintained pursuant to Section 10.06(c)) maintained by Lender in the ordinary course of business. Such accounts or records maintained by the Lender shall be conclusive as to the amount of the Loans made by the Lender to the Borrower and the interest and payments thereon, absent manifest error. Any failure to so record or any error in the accounts or records shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount actually owing with respect to the DIP Obligations. For the avoidance of doubt, this Agreement is being executed as a "noteless" credit agreement. However, at the request of the Lender at any time, the Borrower agrees that it will prepare, execute and deliver to the Lender a promissory note, in form and substance satisfactory to the Lender and consistent with the terms of this Agreement, payable to the order of Lender and its registered assigns (a "**Note**"). Thereafter, the Loans evidenced by such Note and interest thereon shall at all times (including after assignment permitted hereunder) be represented by one or more Notes in such form payable to the order of the payee named therein and its registered assigns.

2.07 Lender's Expenses.

All Lender's Expenses, in an amount not to exceed 20% of such amounts provided in the Budget, shall be paid in cash pursuant to Section 4.02(j) or within five Business Days after presentation of a payment request. Any amounts in excess of 20% of the Budget shall be added to the principal balance of the Loans.

2.08 Payments Generally.

All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment, or setoff. Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Lender in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein. All payments received by the Lender after 2:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue. If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

2.09 Commitment Fee.

The Lender shall be entitled to receive a commitment fee (the "**Commitment Fee**") equal to ten percent (10%) of the aggregate amount of the New Money DIP Loans, payable on the Maturity Date. The Commitment Fee shall be paid by adding and capitalizing it to the outstanding principal balance amount of the Loans as of the Interim Order. The Commitment Fee was fully earned as of, and is non-refundable pursuant to, entry of the Interim Order.

2.10 Asset Purchase Transaction.

The Lender may, in its sole discretion, elect to consummate an Asset Purchase Transaction either pursuant to the Plan or a Private Sale Motion, in each case pursuant to the terms set forth in **Exhibit C** which are hereby incorporated herein.

## ARTICLE III
## TAXES, YIELD PROTECTION AND ILLEGALITY

3.01 Taxes.

(a) General. Any and all payments made by or on behalf of the Borrower under this Agreement or any other DIP Loan Document shall be made in full, free and clear of, and without deduction or withholding for, any Taxes, except as required by applicable Laws. If the Borrower or any applicable withholding agent is required by applicable Laws to deduct or withhold any Tax from or with respect of any such payment, then (i) the Borrower or such withholding agent shall make such deduction or withholding and pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Laws and (ii) if such Tax is an Indemnified Tax, the sum payable by the Borrower shall be increased as necessary so that, after all required deductions and withholdings have been made (including deductions and withholdings applicable to additional sums payable under this Section), the Lender receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b) Other Taxes. In addition, without limiting the foregoing, the Borrower shall timely pay all Other Taxes to the relevant Governmental Authority in accordance with applicable Laws, or at the option of the Lender timely reimburse the Lender for the payment of any present or future Other Taxes, other than Excluded Taxes.

(c) Tax Indemnity. The Borrower hereby agrees to indemnify the Lender, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 3.01) paid or payable by the Lender and any penalties, interest, and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to Borrower by Lender shall be conclusive absent manifest error.

(d) Payment of Taxes. Within thirty (30) days after the date required for payment of any Taxes or Other Taxes required to be deducted or withheld by the Borrower in respect of any payment or delivery to the Lender, the Borrower will furnish to the Lender a form of evidence of payment thereof acceptable to the Lender.

3.02 Increased Costs.

(a) Increased Costs Generally. If any Change in Law shall:

(i) impose, modify, or deem applicable any reserve, special deposit, compulsory loan, insurance charge, or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, the Lender;

(ii) subject the Lender to any Taxes and Other Taxes payable by the Lender (other than Excluded Taxes) with respect to this Agreement or any Loan made by it, or change the basis of taxation of payments to the Lender in respect thereof; or

(iii) impose on the Lender any other condition, cost, or expense affecting this Agreement or loan made by the Lender;

and the result of any of the foregoing shall be to increase the cost to the Lender of making or maintaining the Loan, or to reduce the amount of any sum received or receivable by the Lender hereunder (whether of principal, interest, or any other amount) then, upon request of the Lender, the Borrower will pay to the Lender such additional amount or amounts as will compensate the Lender for such additional costs incurred or reduction suffered.

(b) Certificates for Reimbursement. A certificate of a Responsible Officer of the Lender setting forth the amount or amounts necessary to compensate the Lender as specified in paragraph (a) of this Section 3.02 and delivered to the Borrower shall be conclusive absent manifest error. The Borrower shall pay the Lender the amount shown as due on any such certificate within five (5) Business Days after receipt thereof.

(c) Delay in Requests. Failure or delay on the part of the Lender to demand compensation pursuant to this Section 3.02 shall not constitute a waiver of the Lender's right to demand such compensation.

3.03 Survival.

All of the Borrower's obligations under this Article III shall survive repayment of all other

DIP Obligations hereunder, subject to the limitations contained in this Article III.

## ARTICLE IV
## CONDITIONS PRECEDENT

4.01 Conditions to Funding of the Interim New Money DIP Loan.

The parties acknowledge and agree that the Interim New Money DIP Loan was previously funded by the Lender to the Borrower pursuant to the Interim Order and that each of the following conditions precedent was either satisfied by the Borrower or waived by the Lender prior to making the Interim New Money DIP Loan:

(a) Credit Agreement. Receipt by the Lender of executed counterparts of this Agreement and the other DIP Loan Documents, in form and substance reasonably satisfactory to the Lender, properly executed by a Responsible Officer of the Borrower, and subject only to entry of the Interim Order.

(b) Financing Statement Searches. Certified copies, dated no earlier than 30 days prior to the first Borrowing Request, of financing statement searches, as the Lender shall request, accompanied by written evidence (including any UCC termination statements) that the Liens indicated in any such financing statements either constitute Permitted Liens or have been or, in connection with the funding of the Interim New Money DIP Loan, will be terminated or released;

(c) Evidence of Insurance. Receipt by the Lender of certificates of insurance and related endorsements of the Borrower evidencing liability and casualty insurance naming the Lender as additional insured (in the case of liability insurance) and loss payee (in the case of hazard insurance).

(d) No Litigation. There shall be no (i) material litigation pending, or to the Borrower's knowledge threatened in writing, against or affecting the Borrower, or (ii) injunction or other form of restraining order, which in either case restrains or restricts or seeks to restrain or restrict the closing of this Agreement or the making of the Loans.

(e) Interim Order. The Interim Order, in form and substance satisfactory to the Lender in its sole and absolute discretion, shall have been entered by the Bankruptcy Court and shall not have been (x) stayed, vacated, reversed or rescinded, and any appeal of such order shall not have been timely filed and a stay of such order pending appeal shall not be presently effective, or (y) without the prior written consent of the Lender, given in its sole and absolute discretion, revised, amended or modified.

(f) Budget. The Lender shall have approved the Budget, and the Budget shall have been delivered to the Lender and approved by the Bankruptcy Court in the DIP Order.

(g) DIP Collateral. Upon the entry of the Interim Order, the Lender shall have as collateral, for the Interim New Money DIP Loan, the Superpriority Claim and valid and perfected Liens on the DIP Collateral as set forth in this Agreement.

(h) Good Faith. The Interim Order shall provide that the Lender has at all times acted in good faith and is entitled to the protections of section 364(e) of the Bankruptcy Code.

4.02 Conditions to Funding Additional New Money DIP Loans.

The obligations of Lender to make any Additional New Money DIP Loans shall be subject to the satisfaction by the Borrower (or waiver by the Lender) of the following additional conditions precedent:

(a) Chapter 11 Case. The motions or other pleadings related to the Final Order, the DIP Loan Documents (to the extent filed after the Final Order), the Sale Motion and the Plan, to the extent filed by such date, shall have been provided at least two (2) Business Days in advance to the Lender or otherwise with as much notice as reasonably practicable and shall be in form, scope, and substance reasonably satisfactory to the Lender.

(b) Accuracy of Representations and Warranties. The representations and warranties of the Borrower contained in Article V or any other Credit Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects (without duplication of any materiality qualifier contained therein) on and as of the date of any Borrowing Request, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (without duplication of any materiality qualifier contained therein) as of such earlier date.

(c) No Default. No Default or Event of Default shall exist or would result from the making of such Loans or from the application of the proceeds thereof.

(d) Borrowing Request. The Lender shall have received an executed Borrowing Request in accordance with the requirements of Section 2.02 of this Agreement.

(e) DIP Order. Other than with respect to the Interim New Money DIP Loan, the Final Order, in a form satisfactory to Lender in its sole and absolute discretion, shall be in full force and effect, and shall not have been (x) stayed, vacated, reversed, or rescinded, and any appeal of such order shall not have been timely filed and a stay of such order pending appeal shall not be presently effective, or (y) without the prior written consent of the Lender, given in its sole and absolute discretion, revised, amended or modified.

(f) Material Adverse Effect. There shall have occurred no material adverse change in the Debtor's condition (financial, environmental or otherwise) operations, performance, or properties (other than, in each case, the continuation of the Chapter 11 Case) since the entry of the Interim Order that, in the reasonable judgment of the Lender, has had or could reasonably be expected to have a material adverse effect on the rights and remedies of the Lender or the ability of the Debtor to perform its obligations to them under the DIP Facility.

(g) Milestones. All Milestones set forth in Section 6.17 required to have been met as of the date of each applicable Borrowing shall have been met.

(h) Budget. The Borrower shall be in compliance (subject to Permitted Variances) with the then-current Budget as determined pursuant to Section 7.23.

(i) Valid Security Interest. The Lender shall have, approved in the applicable DIP Order, a valid and perfected, priming first-priority Lien on and security interest in the DIP Collateral pursuant to this Agreement and the DIP Order, subject to the Carve-Out.

(j) Payment of Lender Expenses. The Borrower shall have paid in cash all Lender's Expenses then due as set forth in Section 2.07 hereof.

(k) Compliance Certificate. The Lender shall have received a certificate duly signed by a Responsible Officer of the Borrower certifying to the conditions set forth in clauses (a)-(i) of this Section.

(l) Access to E-Books and Records. With respect to the Additional New Money DIP Loans, Borrower shall have complied with Sections 6.08(c) and (d).

(m) Master Lease. The Master Lease Landlord shall not have, in the Lender's reasonable judgment, repudiated or otherwise abandoned the Lease Principle Agreement.

(n) Licenses and Permits. With respect to the third Additional New Money DIP Loan advance, the Borrower shall hold all requisite licenses and permits (which shall be valid and active) necessary for the conduct and operations of the business of the Borrower as it is being conducted as of the date hereof.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Lender as follows:[1]

5.01 Existence, Qualification and Power.

The Borrower (a) is duly organized or formed, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, (b) upon entry of the DIP Order, has all requisite organizational power and authority and all requisite governmental licenses, authorizations, consents and approvals to own, pledge, mortgage and operate its assets, to lease or sublease its assets and to carry on its business and execute, deliver and perform its obligations under the DIP Loan Documents to which it is a party, and (c) is duly qualified and is licensed and in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license.

5.02 Authorization; No Contravention.

Subject to entry of the DIP Order and to the extent not remedied by the entry of the DIP Order, the execution, delivery and performance by the Borrower of each DIP Loan Document have

[1] NTD: The Lender will review the total comments to this Article and the R&W's once all of the comments have been received.

been duly authorized by all necessary company or other organizational action and do not (a) contravene the terms of any of the Borrower's Organization Documents; (b) result in any breach or contravention of, or the creation of any Lien under, or require any payment to be made under (i) any Material Contract to which the Borrower is a party or affecting the Borrower or the properties of the Borrower or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which the Borrower or its property is subject; (c) or violate any Law, except, in each case referred to in clause (c), to the extent that such violation could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

5.03 Governmental Authorization; Other Consents.

Except for the entry of the DIP Order, no Permit, approval, consent, exemption, authorization or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, the Borrower of this Agreement or any other DIP Loan Document other than (a) those that have already been obtained and are in full force and effect and (b) actions necessary to comply with the DIP Loan Documents on or after the Petition Date.

5.04 Binding Effect.

Upon entry of the Final Order, each DIP Loan Document will have been duly executed and delivered by the Borrower. Each DIP Loan Document constitutes a legal, valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

5.05 No Material Adverse Effect.

(a) Since the Petition Date, there has been no Disposition by the Borrower, or any Involuntary Disposition, of any material part of the business or property of the Borrower, and no purchase or other acquisition by any of them of any business or property (including any Equity Interests of any other Person) material to the Borrower, in each case, that is not set forth in the Budget or has not been disclosed in writing to the Lender on or prior to the date hereof.

(b) Since the Petition Date, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect, other than the continuation of the Chapter 11 Case and the events that customarily result from continuation of the Chapter 11 Case.

5.06 Litigation.

Except for the Chapter 11 Case and as listed on Statement of Financial Affairs No. 7 filed on the docket in the Chapter 11 Case [Docket No. 201], there are no actions, suits, proceedings, claims, disputes or investigations pending or, to the knowledge of the Borrower, threatened, at law, in equity, in arbitration or before any Governmental Authority, by or against the Borrower or against any of its properties or revenues including, without limitation, any actions, suits,

proceedings, claims, disputes or investigations pending that (a) purport to affect or pertain to this Agreement, any other DIP Loan Document, the DIP Collateral or any of the other transactions contemplated hereby or thereby, or (b) could reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

5.07 Subsidiaries.

Except for the Borrower's potential interest in or ownership of Pacific Gardens Medical Center, LLC, the Borrower has not had, and does not have, any Subsidiaries or any investments or other interests in any other Person.

5.08 Environmental Compliance.

(a) To the knowledge of the Borrower, after reasonable inquiry, the Borrower has not received any notice, report, or other information regarding any actual violation, alleged violation, non-compliance, liability or potential liability concerning or arising out of Environmental Laws or Hazardous Materials with regard to the Borrower or its Business or any of its past or present properties or facilities.

(b) To the knowledge of the Borrower, after reasonable inquiry, the Borrower has not handled, generated, treated, stored, transported, or disposed of, any Hazardous Materials, except in the ordinary course of business and in compliance in all material respects with all applicable Environmental Laws;

(c) To the knowledge of the Borrower, after reasonable inquiry, no judicial proceeding or governmental or administrative action is pending or threatened under any Environmental Law to which the Borrower is or may be named a party or with respect to the Businesses, nor, to the knowledge of the Borrower, are there any consent decrees or other decrees, judgements, consent orders, administrative or other orders or similar administrative or judicial requirements outstanding under any Environmental Law with respect to the Businesses.

(d) To the knowledge of the Borrower, after reasonable inquiry, the Borrower is, and for a period of two years prior to the Petition Date, has been, in material compliance with all applicable Environmental Laws.

5.09 Insurance.

The properties and business of the Borrower are insured with financially sound and reputable insurance companies that are not Affiliates of the Borrower (it being agreed that the Borrower's insurance companies as of the date of this Agreement are acceptable to the Lender for purposes of this Section 5.09), in such amounts, with such deductibles and covering such risks as are customarily carried by prudent companies of similar size and engaged in similar businesses and owning similar properties in localities where the Borrower operates. All such insurance coverage is in full force and effect and all premiums due in respect of all insurance maintained by the Borrower have been paid, to the extent due. As of the date hereof, to the knowledge of the Borrower, after reasonable inquiry, Borrower has not received notice of violation or cancellation of any such insurance coverage and there is no existing default or event which, with the giving of

notice or lapse of time or both, would constitute a default by any insured thereunder.

5.10 Taxes.

Except as set forth in Schedule 5.10, to the knowledge of the Borrower, after reasonable inquiry, the Borrower has timely filed, or caused to be timely filed, with the appropriate Governmental Authorities and in the appropriate jurisdictions, all federal, state, local and other Tax returns and reports required to be filed, and has timely paid, prior to the date on which any liability may be added thereto for non-payment thereof, all federal, state, local and other Taxes levied or imposed upon it or its properties, income or assets otherwise due and payable, except to the extent not required due to the filing of the Chapter 11 Case or those which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP. To the knowledge of the Borrower, after reasonable inquiry, no such Tax return or report is under audit or examination by any Governmental Authority.

5.11 Disclosure.

The Borrower has disclosed to the Lender all matters known to them (including with respect to all agreements, instruments and corporate or other restrictions to which it is subject) that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. To the knowledge of the Borrower, after reasonable inquiry, no representation or warranty made by them in this Agreement or any other DIP Loan Document contains any untrue statement of a material fact or omits to state any material fact necessary to make the statements herein or therein, taken as a whole, in light of the circumstances when made, not misleading.

5.12 Compliance with Laws and Agreements.

To the knowledge of the Borrower, after reasonable inquiry, and subject to entry of the DIP Order, the Borrower is in compliance with the requirements of all Laws and all orders, writs, injunctions and decrees binding upon it and its properties, except in such instances in which (i) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted and (ii) the failure to comply therewith could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

5.13 Creation and Perfection of Security Interests in the DIP Collateral.

To the Borrower's knowledge, upon the entry thereof and subject to its terms, the provisions of the DIP Order are effective to create in favor of the Lender a legal, valid and enforceable first-priority, priming Lien in all right, title and interest of the Borrower in each item of DIP Collateral, except, as set forth in the DIP Order, in the case of any Permitted Liens to the extent that any such Permitted Liens would have priority over the security interest in favor of the Lender pursuant to any applicable Law.

5.14 Labor Matters.

Except as set forth in Schedule 5.14, to the knowledge of the Borrower, there are no collective bargaining agreements or Multiemployer Plans covering the employees of the Borrower.

To the knowledge of the Borrower, after reasonable inquiry, as of the date hereof, the Borrower us in material compliance with all Laws relating to labor and employment.

5.15 Permits.

The Borrower has all Permits necessary to enable it to conduct its Business in the manner in which it is presently conducted, and each such Permit is in full force and effect. The Borrower is in compliance in all material respects with all of its Permits.

5.16 Reorganization Matters.

(a) The Chapter 11 Case was commenced on the Petition Date in accordance with applicable Laws and the Borrower shall provide proper notice of (x) the motion seeking approval of the DIP Loan Documents and the DIP Order, (y) the hearing for the approval of the Interim Order and (z) the hearing for the approval of the Final Order. The Borrower shall give on a timely basis as specified in the Interim Order or the Final Order, as applicable, all notices required to be given to all parties specified in the Interim Order or the Final Order, as applicable.

(b) Upon the entry of the DIP Order and subject to its terms, the DIP Obligations will constitute allowed Superpriority Claims in the Chapter 11 Case having priority over all administrative expense claims and unsecured claims against the Borrower now existing or hereafter arising, of any kind whatsoever, including all administrative expense claims of the kind specified in sections 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, or any other provision of the Bankruptcy Code or otherwise, as provided under section 364(c)(1) of the Bankruptcy Code, subject to the Carve-Out.

(c) Upon the entry of the DIP Order and subject to its terms, the DIP Obligations will be secured by a valid and perfected, first-priority priming Lien on all of the DIP Collateral, subject to the Carve-Out.

(d) The DIP Order is in full force and effect and has not been reversed, stayed, modified or amended without the Lender's consent in its sole and absolute discretion.

(e) The Budget delivered to the Lender was prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed in good faith by the Borrower to be reasonable in light of the conditions existing at the time of delivery of the Budget (it being understood that any projections or estimates made in the Budget are not to be viewed as facts, that no assurance can be given that any such projections or estimates will be realized, that actual results may differ from projected results and such differences may be material).

(f) Subject to and effective upon the entry of the DIP Order and subject to the terms of the DIP Order, except to the extent of the Carve-Out, no costs or expenses of administration of the Chapter 11 Case or any future proceeding under the Bankruptcy Code that may result therefrom, including a case under Chapter 7 of the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral pursuant to Section 105 or 506(c) of the Bankruptcy Code, the enhancement of collateral provisions of Section 552 of the Bankruptcy Code, or any other legal or equitable doctrine (including, without limitation, unjust enrichment) or any similar

principle of law, without the prior written consent of the Lender. Upon the entry of the DIP Order and subject to its terms, in no event shall the Lender be subject to (i) surcharge under Section 506(b), (ii) the "equities of the case" exception contained in Section 552(b) of the Bankruptcy Code, or (iii) the equitable doctrine of "marshaling" or any other similar doctrine with respect to Lender's collateral, including the DIP Collateral.

ARTICLE VI
AFFIRMATIVE COVENANTS

So long as the Lender shall have any New Money DIP Commitment hereunder, or any Loan or other DIP Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification obligations for which no underlying claim has been asserted), the Borrower shall:

6.01 Certificates; Other Information.

Deliver to the Lender, in form and detail satisfactory to the Lender in its sole and absolute discretion:

(a) promptly after any request from the Lender, information regarding the business, financial or corporate affairs of the Borrower or compliance with the terms of the DIP Loan Documents;

(b) promptly after any request by the Lender, copies of any detailed audit reports, management letters or recommendations submitted to the Board of Directors (or the audit committee of the Board of Directors) of the Borrower by independent accountants in connection with the accounts or books of the Borrower, or any audit of any of them;

(c) on or before 5:00 p.m. on the second (2nd) Monday of the week following entry of the Interim Order and on or before 5:00 p.m. on the Monday following the end of each week thereafter, a Variance Report; and

(d) copies of all monthly reports, projections, or other information respecting the Borrower's business or financial condition or prospects as well as all pleadings, motions, applications and judicial information filed by or on behalf of the Borrower with the Bankruptcy Court or provided to the UST or any trustee (including any monitor, examiner, or interim receiver) or the Committee, which documents must be provided to the Lender *at least two Business Days prior* to the time that such document is filed with the Bankruptcy Court or provided to the UST, trustee, or Committee (or if impracticable, then as soon as possible and in no event later than as promptly practicable before being filed).

Documents required to be delivered pursuant to this Section 6.01 may be delivered electronically; *provided* that the Borrower shall deliver paper copies of such documents to the Lender if the Lender so requests.

6.02 Notices.

Upon any Responsible Officer of the Borrower becoming aware thereof:

(a) Immediately notify the Lender of the occurrence of any Default or Event of Default.

(b) Immediately notify the Lender of the occurrence of any Material Adverse Effect.

(c) Immediately notify the Lender of (i) any material breach or non-performance of, or any material default under, a Contractual Obligation of the Borrower; (ii) any dispute, litigation, investigation, proceeding or suspension between the Borrower and any Governmental Authority; (iii) any action, suit, proceeding or claim alleging any Environmental Liability against the Borrower; (iv) the commencement of, or any material development in, any litigation or proceeding affecting the Borrower, including pursuant to any applicable Environmental Laws; (v) any judgment against the Borrower in excess of $100,000 individually or in the aggregate during the term of this Agreement; or (vi) any dispute, litigation, investigation, proceeding or suspension between the Borrower and any Governmental Authority against or affecting the Borrower or any Affiliate thereof with respect to any Sanctions.

(d) Immediately notify the Lender of any material change in accounting policies or financial reporting practices by the Borrower.

(e) Immediately provide the Lender with (i) copies of any adverse reports or notices received from any Governmental Authority related to any Taxes of the Borrower, and (ii) copies of any other adverse reports or notices received by the Borrower from any Governmental Authority.

(f) Immediately provide the Lender with copies of (i) any Organization Documents that have been amended or modified after the Petition Date in accordance with the terms hereof and (ii) a copy of any notice of default given or received by the Borrower under any Organization Document.

(g) Promptly, from time to time, provide such other information regarding the operations, business affairs and financial condition of the Borrower, or compliance with the terms of any DIP Loan Document, as the Lender may request.

Each notice pursuant to this Section 6.02(a) through (g) shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and propose to take with respect thereto. Each notice pursuant to Section 6.02(a) shall describe with particularity any and all provisions of this Agreement and any other DIP Loan Document that have been breached.

6.03 Payment of Taxes and Other Obligations.

(a) Payment of Obligations. Except to the extent expressly prohibited by any DIP Loan Document or excused, or not permitted, by the Bankruptcy Code or the filing, commencement and continuation of the Chapter 11 Case and effect thereof due to the filing of the Chapter 11 Case, pay and discharge, in the ordinary course of business, all of its obligations and liabilities, including (a) all Taxes upon it or its properties or assets, or with respect to which the

Borrower has a withholding obligation, unless the same are being contested in good faith by appropriate proceedings diligently conducted, adequate reserves in accordance with GAAP are being maintained by the Borrower, and the failure to make the payment could not reasonably be expected to result in a Material Adverse Effect; (b) all lawful claims arising after the Petition Date which, if unpaid, would by Law become a Lien upon its property not permitted by this Agreement and that is not void due to the filing of the Chapter 11 Case unless being contested in good faith; and (c) all Indebtedness arising after the Petition Date, as and when due and payable, in accordance with the Budget and subject to Permitted Variances, unless being contested in good faith.

(b) Filing of Returns. Timely and correctly file all federal, state, local and other Tax returns required to be filed by or with respect to it or its properties or assets.

6.04 Preservation of Existence.

(a) Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization.

(b) Preserve, renew and maintain in full force and effect its good standing under the Laws of the jurisdiction of its organization.

(c) Maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business.

6.05 Maintenance of Properties and Leases.

Except to the extent subject to the automatic stay of section 362 of the Bankruptcy Code, excused by the Bankruptcy Code, or caused by the filing, commencement and continuation of the Chapter 11 Case and effect thereof, or not permitted by the Budget:

(a) Use the standard of care typical in the industry to maintain, preserve and protect all of its properties and equipment necessary or useful in the operation of its business in good working order and condition, ordinary wear and tear excepted, except in a transaction that constitutes a Permitted Disposition.

(b) Make all necessary repairs thereto and renewals and replacements thereof except to the extent that such repairs would cause the Borrower to exceed the Permitted Variances in the Budget.

(c) Use the standard of care typical in the industry in the operation and maintenance of its facilities.

6.06 Maintenance of Insurance.

(a) Maintain in full force and effect all policies of insurance of any kind with respect to the property and businesses of the Borrower with financially sound and reputable insurance companies that are not Affiliates of the Borrower, in each instance, providing such coverages, in such amounts and with such deductibles as has been historically carried by the Borrower or are customarily carried by prudent companies of similar size engaged in similar

businesses and owning similar properties in localities where the Borrower operates. If and to extent possible and permitted under the Bankruptcy Code, (a) the Lender shall be named as loss payee or mortgagee, as its interest may appear, and/or additional insured with respect to any such insurance, (b) such insurance shall provide that no cancellation, amendment or termination of coverage shall be effective until after 30 days' notice thereof to the Lender, (c) such insurance shall provide that (i) after the occurrence and during the continuance of an Event of Default, all proceeds thereunder shall be payable to Lender and (ii) no such insurance shall be affected by any act or neglect of the insured or owner of the property described in such policy and (d) the Borrower hereby agrees that it shall provide the Lender with at least ten (10) days' prior written notice before any such policy or policies shall be renewed.

(b) Subject to the provisions of the Bankruptcy Code and any applicable order of the Bankruptcy Court, the Borrower shall have the right to adjust, settle and compromise all claims under the insurance coverage referred to in this Section 6.06 and to receive and retain the proceeds of such insurance; provided that, upon the occurrence and during the continuance of an Event of Default, the Lender may, subject to the Bankruptcy Code and any applicable order of the Bankruptcy Court, exercise such rights with respect to the adjustment, settlement and compromise of such claims as may be expressly permitted under the DIP Loan Documents and applicable law. Notwithstanding anything to the contrary contained herein or in any other DIP Loan Document, the Borrower may, at its election, retain and apply all or any portion of any insurance proceeds received in respect of any casualty, loss or damage to its property to repair, restore or replace such property (including the payment of the actual costs to repair, restore or replace), in lieu of applying such proceeds to the prepayment of the DIP Obligations, and such proceeds shall not be subject to any mandatory prepayment requirement under Article II to the extent so retained and applied. Any insurance proceeds received by the Lender that are required to be applied to the DIP Obligations pursuant to Article II shall be applied in the order set forth in Section 8.04 hereof, and any surplus shall be promptly remitted to or retained by, as applicable, the Borrower. If the Borrower fails to maintain insurance as required hereunder, the Lender may, upon prior written notice to the Borrower and the Borrower's failure to cure such deficiency within five (5) Business Days after receipt of such notice, obtain such insurance at the Borrower's expense, and the reasonable and documented out-of-pocket costs thereof shall constitute DIP Obligations

6.07 Compliance with Laws.

Except to the extent subject to the automatic stay of section 362 of the Bankruptcy Code, excused by the Bankruptcy Code, or caused by the filing, commencement and continuation of the Chapter 11 Case and effect thereof:

(a) Comply with the requirements of all applicable Laws (including all Environmental Laws, Anti-Corruption Laws, all applicable Bank Secrecy Act, Anti-Terrorism Laws and Anti- Money Laundering Laws and regulations and the Patriot Act) and all Permits, orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (i) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted and (ii) the failure to comply therewith could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b) Maintain in effect policies and procedures designed to promote and ensure compliance by the Borrower and its directors, officers, employees and agents, with this Section 6.07, and with Anti-Corruption Laws, Anti-Money Laundering Laws and regulations, the Patriot Act, and Sanctions.

6.08 Books and Records.

(a) Maintain books of record and account, in which full, true and materially correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of the Borrower.

(b) Maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Borrower.

(c) Provide the Lender with a current list of all platforms used by the Borrower for accounting, managing cash and bank balances, and data management (such as food management, inventory tracking, labor management, and sales tracking) and provide the Lender with at least five (5) Business Days written notice before making any additions, deletions, or material alterations to such platforms.

(d) Provide the Lender at all times with a unique username and password providing continuous, real time, read-only access to its deposit accounts and its cash and bank account information.

6.09 Inspection Rights.

Permit representatives and independent contractors on behalf of the Lender to visit and inspect any of its properties, to examine its corporate, financial and operating records, and to make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers and independent public accountants, all at the expense of the Borrower and, unless an Event of Default has occurred and is continuing, at reasonable intervals and at reasonable times during the Borrower's normal business hours, upon reasonable advance written notice to the Borrower.

6.10 Use of Proceeds.

(a) The Borrower shall use the proceeds of the Loans solely for the following purposes, subject to and in accordance with the Budget and the DIP Order:

(i) Working capital and other operating expenses incurred in the conduct of the Borrower's business through the effective date of the Plan;

(ii) Costs and expenses of administering the Chapter 11 Case;

(iii) funding of an escrow pursuant to the Budget for payment of documented, reasonable and court-allowed estate professional fees and expenses;

(iv) payment of amounts expressly authorized under the DIP Loan Documents or by the Bankruptcy Court;

(v) the payment of documented and reasonable fees and expenses of Lender's Professionals, including negotiation and preparation of the DIP Loan Documents (for the avoidance of doubt, all other obligations under the DIP Facility shall be paid-in-kind); and

(vi) other purposes identified in the Budget.

(b) Notwithstanding the foregoing, without the Lender's prior written consent, no portion of proceeds of the Loans, the Carve-Out or the DIP Collateral may be used to investigate, challenge, object to, contest or raise any defense to, the validity, security, perfection, priority, extent or enforceability of any amount due under or the Liens or claims granted under or in connection with the Prepetition Obligations, the Master Lease or the prepetition sales of receivables to L.A. Care; provided, however, that up to $50,000 in the aggregate of the Loans, DIP Collateral, and Carve-Out may be used by the Committee to investigate Challenges (as defined in the DIP Order) against the Lender in its capacity as prepetition lender under the Prepetition Credit Agreement or the Master Lease Landlord, and the legality, validity, priority, perfection, enforceability and extent of the any prepetition liens securing the Prepetition Loan or any obligations owed to the Master Lease Landlord (to the extent set forth in the DIP Order).

6.11 <u>ERISA Compliance</u>.

Except to the extent subject to the automatic stay of section 362 of the Bankruptcy Code, excused by the Bankruptcy Code, or caused by the filing, commencement and continuation of the Chapter 11 Case and effect thereof, do, and cause each of its ERISA Affiliates to do, each of the following: (a) maintain each ERISA Plan in compliance with the applicable provisions of ERISA, the Code and other federal or state law; (b) cause each ERISA Plan that is qualified under Section 401(a) of the Code to maintain such qualification; (c) make all required contributions to any ERISA Plan subject to Section 412 of the Code, except as could not reasonably be expected to result in a Material ERISA Event; and (d) take no actions that could reasonably be expected to result in an ERISA Event, except, with respect to clauses (a) through (d) individually or in the aggregate, as could not reasonably be expected to result in a Material ERISA Event.

6.12 <u>Environmental Compliance</u>.

(i) Comply, and use commercially reasonable efforts to cause all lessees and other Persons occupying any real properties owned by the Borrower to comply, with all Environmental Laws and Environmental Permits applicable to properties owned, leased or occupied by the Borrower; (ii) not Release or threaten to Release any Hazardous Material on, under, about or from any properties owned, leased, or occupied by the Borrower to the extent caused by the Borrower's operations except in compliance with all applicable Environmental Laws; (iii) timely obtain and renew all Environmental Permits applicable to its operations and properties; (iv) undertake and perform any cleanup, removal, remedial or other action necessary to address a Release of Hazardous Materials at, on or from any of its current or former properties in accordance with applicable Environmental Laws.

6.13 Replacement/Substitution of Existing Workers' Compensation Insurance Policies.

Promptly following the expiration of all applicable tail periods, the Borrower will use commercially reasonable efforts to replace existing workers' compensation and self-insured retention insurance policies using insurance collateral deposit accounts or cash deposit collateral with non-collateral required policies. For the avoidance of doubt, all such accounts and all proceeds thereof are and shall constitute DIP Collateral to be applied in accordance with this Agreement.

6.14 Pledged Assets.

(a) Equity Interests. If the Borrower acquires any Equity Interests in any Person, cause 100% of the issued and outstanding Equity Interests of each such Person directly owned by the Borrower to be subject at all times to a first-priority, perfected Lien in favor of the Lender pursuant to the terms and conditions of this Agreement and the DIP Order, any filings and deliveries necessary or desirable in connection therewith to perfect the security interests therein, all in form and substance satisfactory to the Lender.

(b) Other Property. Deliver such other documentation as may be necessary or as the Lender may request in connection with the DIP Collateral, including appropriate UCC-1 financing statements, resolutions and other organizational and authorizing documents of such Person, all in form, content and scope satisfactory to the Lender.

6.15 Casualty and Condemnation.

Furnish to the Lender prompt written notice of any casualty or other insured damage to any of the DIP Collateral or the commencement of any action or proceeding for the taking of any of the DIP Collateral or any part thereof or interest therein under power of eminent domain or by condemnation or similar proceeding and ensure that the Net Cash Proceeds of any such event (whether in the form of insurance proceeds, condemnation awards or otherwise) are collected and applied as and to the extent required in accordance with the applicable provisions of this Agreement.

6.16 Further Assurances.

At the request of the Lender at any time and from time to time, the Borrower shall, at its expense, duly execute and deliver, or cause to be duly executed and delivered, such further agreements, documents and instruments as are necessary to effectuate the provisions or purposes of this Agreement or any of the other DIP Loan Documents.

6.17 Milestones.

The Borrower shall satisfy or cause to be satisfied the following milestones (the "**Milestones**"), unless extended or waived by the Lender in accordance with the DIP Order.

(a) Lease Extension Milestone. On or before October 5, 2026, the Debtor shall have filed a motion pursuant to section 365(d)(4)(B)(i) of the Bankruptcy Code to extend the time within which the Debtor may assume or reject the Master Lease, and no later than October 30,

2026, the Bankruptcy Court shall have entered an order extending such time through a date not earlier than January 29, 2027.

(b) Private Sale Closing Milestone. If the Lender elects to consummate an Asset Purchase Transaction pursuant to a Private Sale Motion, the Asset Purchase Transaction shall be consummated on or before the thirtieth (30th) day following the date of such election (as such date may be extended by the mutual written agreement of the Borrower and the Lender, the "**Private Sale Motion Milestone Date**") and, if the IMA Transition Date has not already occurred, the Debtor and the Lender shall enter into an IMA after which the Lender shall pursue applicable regulatory approvals, and the Debtor and the Lender (or its designee) shall close thereafter.

(c) Plan Confirmation Milestone. If the Lender elects to consummate an Asset Purchase Transaction pursuant to the Plan, the Debtor shall have confirmed the Plan that is in all respects consistent with the Plan Term Sheet and otherwise in a form and substance reasonably acceptable to the Lender on or before December 8, 2026 (as such date may be extended by the mutual written agreement of the Borrower and the Lender, the "**Plan Confirmation Milestone Date**").

(d) Master Lease Milestone. If the Master Lease Landlord has repudiated or otherwise abandoned the agreement in principle reflected in the Lease Principle Agreement (or an agreement is not reached by October 28, 2026 or such later date as may be agreed to by the Lender and the Landlord), then the Committee and the Lender each shall be immediately deemed to have been granted standing to commence litigation against the Master Lease Landlord to assert any and all claims and causes of action of the Debtor's estate against the Master Lease Landlord, including seeking recharacterization of the Master Lease with the Master Lease Landlord and the restriction on use of DIP Facility proceeds to prosecute such litigation shall be deemed terminated. To the extent necessary, reference to the Master Lease Landlord shall include Taking the 5th LLC and Fifth/Arizona Investors, LLC for all purposes herein, including this grant of standing. The Committee will discuss with the Lender and the Debtor pursuing such litigation against Master Lease Landlord and the Lender may commence any such litigation, and the Committee shall have thirty (30) days after the commencement of such action to join or otherwise intervene, unless otherwise agreed by the Lender and the Committee. Upon the effective date of the Plan, if such dispute is not resolved, the litigation shall be handled by Newco or its designated counsel for the benefit of Newco. So long as the IMA is still in effect and the Lender has not consummated the purchase of the Hospital, any settlement, compromise, or release of any such claims or causes of action against the Master Lease Landlord (whether commenced by the Committee, the Debtor or the Lender) shall require the prior written consent of the Lender. For the avoidance of doubt, neither the absence of an agreement with the Master Lease Landlord nor the pendency of any such litigation shall be a condition to, or shall excuse or delay the consummation of, an Asset Purchase Transaction; in such event the Master Lease shall be assumed and assigned to Newco pursuant to Section 365 of the Bankruptcy Code solely to the extent it constitutes a true lease and expressly without prejudice to, or waiver, release, or ratification of, any claim or cause of action of the estate against the Master Lease Landlord (including recharacterization), all of which shall be preserved pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code (or sold to the Lender or its designee under Section 363) and vested in Newco.

The Borrower and Lender acknowledge that certain of the milestones set forth above are

subject to the Court's availability. The Borrower and the Lender shall cooperate in good faith to effectuate each such milestone. To the extent that any such milestone is not satisfied due to the Bankruptcy Court not being available on the timing contemplated herein, such milestone shall be deemed extended (with corresponding extensions of subsequent milestones) as appropriate to resolve such conflict but in no event for more than three (3) Business Days.

6.18 Budget.

The use by the Borrower of Loans and other credit extensions under this Agreement and the DIP Loan Documents shall be in compliance with the Budget, the DIP Loan Documents and the DIP Order. The Lender (i) may assume that the Borrower will comply with the Budget, (ii) shall have no duty to monitor such compliance, and (iii) shall not be obligated to pay (directly or indirectly from the DIP Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to the Budget or unpaid expenses that the Borrower may have failed to include in the Budget. The line items in the Budget for payment of interest, expenses and other amounts to the Lender are estimates only, and the Borrower remain obligated to pay any and all DIP Obligations in accordance with the terms of the DIP Loan Documents and the DIP Order regardless of whether such amounts exceed such estimates. Nothing in the Budget shall constitute an amendment or other modification of any DIP Loan Document or any of the borrowing restrictions or other lending limits set forth therein.

## ARTICLE VII
## NEGATIVE COVENANTS

So long as the Lender shall have any New Money DIP Commitment hereunder, or any Loan or other DIP Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification obligations for which no underlying claim has been asserted), the Borrower shall not, directly or indirectly:

7.01 Liens.

Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following (collectively "Permitted Liens"):

(a) Liens pursuant to any DIP Loan Document;

(b) Liens arising under the DIP Order;

(c) Liens existing on the Petition Date and listed on Schedule 7.01 or that become validly perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code;

(d) normal and customary rights of setoff upon deposits of cash in favor of banks or other depository institutions;

(e) encumbrances consisting of minor easements, zoning restriction or other restrictions on the use of real property that do not (individually or in the aggregate) affect the value

of the assets encumbered thereby in any material respect or impair the ability of the Borrower to use such assets in its business, and none of which is violated by existing or proposed structures or land use;

(f) Liens for Taxes not yet due or that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP; and

(g) statutory or common law Liens arising in connection with landlords, carriers, warehousemen, mechanics, suppliers, materialmen or repairmen and other similarly situated Persons imposed by applicable Laws that, in each case, arise in the ordinary course of business which secure amounts not overdue for a period of more than thirty (30) days or are being contested in good faith by appropriate proceedings, including in connection with the Chapter 11 Case, so long as reserves, if any, to the extent required by GAAP shall have been made for any such contested amounts.

7.02 Investments.

Make any Investments, except:

(a) Investments held by the Borrower in the form of cash or cash equivalents;

(b) Investments existing on the Petition Date and listed on Schedule 7.02;

(c) Guarantees permitted by Section 7.03; and

(d) Investments received in settlement of amounts due to the Borrower effected in the ordinary course of business or owing to the Borrower as a result of insolvency proceedings involving an account debtor or upon the foreclosure or enforcement of any Lien in favor of the Borrower.

7.03 Indebtedness.

Create, incur, assume or suffer to exist any Indebtedness, except:

(a) Indebtedness under the DIP Loan Documents;

(b) Indebtedness incurred pursuant to the DIP Order;

(c) Indebtedness listed on Schedule 7.03;

(d) unsecured Indebtedness incurred in respect of netting services or overdraft protection services, in each case, incurred in the ordinary course of business;

(e) Indebtedness constituting Permitted Investments;

(f) Indebtedness in respect of performance bonds, bid bonds, appeal bonds, surety bonds and completion guarantees and similar obligations, in each case provided in the

ordinary course of business, including those incurred to secure health, safety and environmental obligations in the ordinary course of business; and

(g) unsecured Indebtedness incurred by the Borrower in the ordinary course of business and consistent with the Budget (including Permitted Variances).

Notwithstanding anything herein to the contrary, Borrower may not incur any additional Indebtedness that is pari passu or senior to the DIP Obligations or the obligations under this Agreement in right of payment or security.

7.04 Fundamental Changes.

Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except as permitted by final, non-appealable order entered by the Bankruptcy Court in a form acceptable to Lender in its sole and absolute discretion.

7.05 Dispositions.

Make any Disposition, other than Permitted Dispositions or except as permitted by final, non-appealable order entered by the Bankruptcy Court in a form acceptable to Lender in its sole and absolute discretion.

7.06 Restricted Payments.

Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so.

7.07 Transactions with Affiliates and Insiders.

Enter into or permit to exist any transaction or series of transactions with any officer, director or Affiliate of the Borrower other than normal and reasonable compensation and reimbursement of expenses of officers, employees and directors in the ordinary course of business consistent with the Budget.

7.08 Burdensome Agreements.

(a) Enter into, or permit to exist, any Contractual Obligation that encumbers or restricts the ability of the Borrower to (i) pay dividends or make any other distributions to the Borrower on its Equity Interests or with respect to any other interest or participation in, or measured by, its profits, (ii) pay any Indebtedness or other obligation owed to the Borrower, (iii) make loans or advances to the Borrower, (iv) sell, lease or transfer any of its property to the Borrower, (v) pledge its property pursuant to the DIP Loan Documents or any renewals, refinancings, exchanges, refundings or extensions thereof or (vi) act as Borrower pursuant to the DIP Loan Documents or any renewals, refinancings, exchanges, refundings or extensions thereof, except (in respect of any of the matters referred to in clauses (i) through (v) above) for (1) this Agreement and the other DIP Loan Documents and (2) any Permitted Lien or any document or

instrument governing any Permitted Lien; provided that any such restriction contained therein relates only to the asset or assets subject to such Permitted Lien.

(b) Enter into, or permit to exist, any Contractual Obligation that prohibits or otherwise restricts the existence of any Lien upon any of its property in favor of the Lender for the purpose of securing the DIP Obligations, whether now owned or hereafter acquired, or requiring the grant of any security for any obligation if such property is given as security for the DIP Obligations, except in connection with any Permitted Lien or any document or instrument governing any Permitted Lien; provided that any such restriction contained therein relates only to the asset or assets subject to such Permitted Lien.

7.09 Amendments to Indebtedness; Material Contracts.

(a) Amend any document, agreement or instrument evidencing any Indebtedness that is subordinated to the DIP Obligations, other than amendments or modifications that are not adverse to the Lender and that do not affect the subordination or payment provisions thereof (if any) in a manner adverse to the Lender;

(b) Amend, modify or change any Material Contract in a manner that is not adverse to the interests of the Borrower or the Lender; provided, however, that the Borrower may seek to reject any contract or lease pursuant to section 365 of the Bankruptcy Code with prior written notice to, and upon consultation with, the Lender; and

(c) Without limiting the generality of the foregoing, the Borrower shall not assume, reject, or seek to extend, amend, or modify the Master Lease, and shall not stipulate to or agree upon any cure amount or adequate assurance of future performance with respect to the Master Lease, in each case without the prior written consent of the Lender.

7.10 Amendments to Material Documents; Fiscal Year; Legal Name.

(a) Amend, modify or change its Organization Documents without the Lender's prior written consent.

(b) Change its Fiscal Year without the Lender's prior written consent.

(c) Change its name, jurisdiction of formation or type of entity without the Lender's prior written consent.

7.11 Ownership of Subsidiaries.

Notwithstanding any other provisions of this Agreement to the contrary, (a) permit any Person (other than the Borrower) to own any Equity Interests of any Subsidiary of the Borrower, (b) create, incur, assume or suffer to exist any Lien on any Equity Interests of any Subsidiary of the Borrower, except for Permitted Liens, or (c) enter into any joint venture, partnership or similar arrangement.

7.12 Sale and Leaseback Transactions.

Enter into any Sale and Leaseback Transaction.

7.13 Speculative Transactions.

Engage in any transaction involving commodity options or swap contracts or any similar speculative transactions, which are, in any case, inconsistent with prior practice and not otherwise made in the ordinary course of business.

7.14 Formation of Subsidiaries.

Acquire, organize, or form any new Subsidiary.

7.15 Prepayment of Indebtedness.

At any time, directly or indirectly, make any payment or prepayment or redemption of any Indebtedness or repurchase, redeem, retire or otherwise acquire any Indebtedness of the Borrower except (a) the DIP Obligations and (b) regularly scheduled or required repayments or redemptions of Permitted Indebtedness as provided for in the Budget.

7.16 Sanctions.

(a) Permit any Loan or the proceeds of any Loan, directly or indirectly, to be used, lent, contributed or otherwise made available (i) to any Sanctioned Person or in any Sanctioned Country, (ii) to fund any activity or business of any Sanctioned Person or in any Sanctioned Country; or (iii) in any other manner that will result in any violation by any Person (including the Lender) of any Sanctions.

(b) Fund all or part of any payment under this Agreement out of proceeds or property of a Sanctioned Person or that is directly or indirectly derived from transactions which would cause a violation by any Person (including the Lender) of any Sanctions.

7.17 Anti-Corruption Laws.

Permit any Loan or the proceeds of any Loan, directly or indirectly, to be used, lent, contributed or otherwise made available in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Law, including the United States Foreign Corrupt Practices Act of 1977, as amended.

7.18 Capital Expenditures.

Make any Capital Expenditure other than in accordance with the Budget and the DIP Order other than those necessary to address immediate life safety issues or to meet regulatory requirements, in each such case the Borrower shall provide immediate notice of such Capital Expenditures to the Lender.

7.19 Compensation.

Pay any compensation or other payments (x) to any Affiliate of the Borrower without the consent of the Lender or (y) to any officer, director or employee of the Borrower or any other Affiliate of the Borrower other than as provided for in the Budget.

7.20 Chapter 11 Claims.

(a) Except for the Carve-Out and the adequate protection Liens and claims of the Lender against the Borrower in its role as prepetition lender, incur, create, assume, suffer to exist or permit any other super priority claim or Lien on any DIP Collateral which is pari passu with or senior to the DIP Obligations (or the Liens securing the DIP Obligations) or adequate protection Liens or claims of the Lender against the Borrower in its role as a prepetition lender.

(b) File an application for approval of any Superpriority Claim or Lien in the Chapter 11 Case that is pari passu with or senior to (i) the DIP Obligations (or the Liens securing the DIP Obligations), (ii) the Liens securing the Prepetition Obligations, or (iii) any Liens granted by the Bankruptcy Court to the Lender in its role as a prepetition lender as adequate protection, in each case without the consent of the Lender in its sole and absolute discretion.

(c) Commence any adversary proceeding, contested matter or other action asserting any claims or defenses or otherwise against Lender arising from or relating to the Prepetition Credit Documents, the other documents or agreements executed or delivered in connection therewith or the transactions contemplated thereby.

(d) The Borrower shall not make (i) any prepetition "critical vendor" payments or other payments on account of any creditor's prepetition unsecured claim, (ii) payments on account of claims or expenses arising under section 503(b)(9) of the Bankruptcy Code or (iii) payments under any management incentive plan or on account of claims or expenses arising under section 503(c) of the Bankruptcy Code, except in each case in amounts and on terms and conditions that (x) are approved pursuant to order of the Bankruptcy Court after notice and a hearing and (y) to the extent that such payments will be made from Borrowings, are approved by the Lender and within the limits of the Budget and the DIP Order.

7.21 Amendments to the DIP Order.

Amend, supplement or otherwise modify the DIP Order without the written consent of the Lender, in its sole and absolute discretion.

7.22 Bankruptcy Notices.

Fail to provide the Lender with copies of all motions or other documents at least two Business Days prior to being filed with the Bankruptcy Court or delivered to the Committee or UST (and if impracticable, then as soon as possible and in no event later than as promptly practicable before being filed).

7.23 Budget Covenant.

The Borrower shall comply with the Budget and shall cause each Budget to be subject to a permitted negative variance of (a) fifteen percent (15%) in the aggregate and (b) twenty percent (20%) for each line item in the Budget ("**Permitted Variances**"). Each variance shall be measured solely on a cumulative basis by comparing actual operating disbursements from the beginning of the applicable Budget period through the relevant testing date against budgeted operating disbursements for the same cumulative period, and not on a standalone weekly basis.

## ARTICLE VIII
## EVENTS OF DEFAULT AND REMEDIES

8.01 Events of Default.

Any of the following shall constitute an "**Event of Default**":

(a) Non-Payment. The Borrower fails to pay, when and as required to be paid herein, (i) any principal of any Loans, any interest on any Loans or any Lender's Expenses and such failure shall continue unremedied for a period of two (2) Business Days after the date so due or (ii) any other amount payable under this Agreement or the other DIP Loan Documents and such failure shall continue unremedied for a period of six (6) Business Days after the date that is the earlier of the date on which the Borrower either (A) obtains actual knowledge thereof and (B) receives notice thereof from the Lender; or

(b) Specific Covenants; Other Defaults. The Borrower fails to perform or observe (i) any term, covenant or agreement contained in any of Article VI (Affirmative Covenants) (other than Section 6.17 (Milestones) which is covered under clause (g) below)) or Article VII (Negative Covenants) or (ii) any other term, covenant or agreement contained in any DIP Loan Document on its part to be performed or observed which failure under this clause (ii) has not been remedied or waived within five (5) Business Days after receipt by the Borrower of written notice thereof from the Lender; or

(c) Representations and Warranties. Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrower herein, in any other DIP Loan Document or in any document delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made (other than those representations, warranties and certifications that are expressly qualified by Material Adverse Effect or other materiality, in which case such representations, warranties and certifications shall be incorrect or misleading in any respect when made or deemed made); or

(d) Cross-Default. The Borrower, except to the extent the payment obligation is stayed or otherwise not required by virtue of the Chapter 11 Case, and except to the extent constituting a good faith dispute, (i) fails to make any payment when due beyond the grace period, if any, provided therefor (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) in respect of any Indebtedness or Guarantee (other than Indebtedness hereunder) having an aggregate principal amount (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit

arrangement) of more than $50,000, or (ii) fails to observe or perform any other agreement or condition relating to any such Indebtedness or such Guarantee or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness or the beneficiary or beneficiaries of such Guarantee (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; or

(e) Insolvency Proceedings. Other than the Chapter 11 Case, the Borrower institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer is appointed without the application or consent of the Borrower and the appointment continues undischarged or unstayed for sixty (60) calendar days; or any proceeding under any Debtor Relief Law relating to the Borrower or to all or any material part of its property is instituted without the consent of the Borrower and continues undismissed or unstayed for sixty (60) calendar days, or an order for relief is entered in any such proceeding; or

(f) Judgments. There is entered against the Borrower (i) one or more final judgments or orders for the payment of money in an aggregate amount exceeding $50,000 (to the extent not covered (subject to normal deductibles) by independent third-party insurance as to which the insurer does not dispute coverage), or (ii) any one or more non-monetary final judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case ((i) or (ii)), and either (A) enforcement proceedings are commenced by any creditor upon such judgment or order and such proceedings remain unstayed or undismissed for a period of forty-five (45) consecutive days, or (B) there is a period of forty-five (45)consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal, the Chapter 11 Case, or otherwise, is not in effect; or

(g) Milestones. Any Milestone under Section 6.17 is not met as of the date required to be met, unless extended or waived by the Lender; or

(h) Invalidity of DIP Loan Documents. Any DIP Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or on account of satisfaction in full of all the DIP Obligations, ceases to be in full force and effect; or the Borrower contests in any manner the validity or enforceability of any DIP Loan Document; or purports to revoke, terminate or rescind any DIP Loan Document; or

(i) DIP Collateral. The DIP Order after delivery thereof shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected Lien, with the priority required by the DIP Order on and security interest in any DIP Collateral purported to be covered thereby, subject to Liens permitted under Section 7.01; or

(j) Chapter 11 Case. There shall have occurred any of the following in the Chapter 11 Case:

(i) An order shall be entered by the Bankruptcy Court appointing, or the Borrower shall file an application for an order seeking the appointment of, (a) a trustee under Section 1104 of the Bankruptcy Code, or (b) an examiner or other responsible person or officer with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code;

(ii) An order shall be entered by the Bankruptcy Court converting the Chapter 11 Case to a chapter 7 case;

(iii) An order shall be entered by the Bankruptcy Court confirming a plan of reorganization or liquidation which does not (A) contain a provision for termination of the commitments and indefeasible payment in full in cash of all DIP Obligations of the Borrower hereunder and under the other DIP Loan Documents on or before the effective date of such plan (or, in the case of the Plan, does not provide for treatment of the DIP Obligations consistent with the Plan Term Sheet and Exhibit C), (B) provide for the continuation of the Liens and security interests granted to the Lender hereunder until such plan effective date and (C) provide for the consummation of the Asset Purchase Transaction with Newco unless a prior order of the Bankruptcy Court was entered approving the Private Sale Motion and the IMA Transition Date has already occurred;

(iv) An order shall be entered by the Bankruptcy Court dismissing the Chapter 11 Case which does not contain a provision for termination of the commitments hereunder and payment in full in cash of all DIP Obligations of the Borrower hereunder and under the other DIP Loan Documents upon entry thereof;

(v) An order shall be entered by the Bankruptcy Court without the express prior written consent of the Lender (a) to revoke, reverse, stay, modify, supplement or amend any of the DIP Orders, (b) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Debtor equal or superior to the priority of the Lender in respect of the DIP Obligations, except for certain allowed administrative expenses, or (c) to grant or permit the grant of a Lien on the DIP Collateral, other than a Permitted Lien;

(vi) An order shall be entered by the Bankruptcy Court that is not stayed pending appeal granting relief from the automatic stay to any creditor of the Borrower with respect to any claim in an amount equal to or exceeding $100,000; or

(vii) An application for (a) an order impairing the DIP Collateral, the appointment of a trustee, conversion to Chapter 7 or dismissal of the Chapter 11 Case shall be made (i) by a Person other than the Borrower and such application is not contested by Debtor in good faith or (ii) by the Borrower, (b) an order for the use of cash collateral without the prior written consent of the Lender is made, or (c) an order for the use of DIP Collateral (or the obtaining of financing or loans, secured by liens that are senior, pari

passu, or junior to the Lender's Liens on DIP Collateral) without the prior written consent of the Lender is made.

8.02 Remedies Upon Event of Default.

If any Event of Default occurs and is continuing, the Lender may (subject to the terms hereof) take any or all of the following actions:

(a) declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, premiums, fees and all other amounts owing or payable hereunder or under any other DIP Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower; and

(b) declare the New Money DIP Commitments terminated, whereupon the New Money DIP Commitments shall immediately be terminated, except as provided in Section 8.03;

(c) terminate this Agreement and the other DIP Loan Documents as to any future liability or obligation of the Lender, subject to the obligations in Section 8.03, but without affecting any of the Lender's Liens in the DIP Collateral and without affecting the DIP Obligations; and

(d) after providing five Business Days' notice to counsel to the Borrower, the UST, and counsel the Committee (if any), which notice may be by email, of the occurrence of the Event of Default, during which period (the "**Notice Period**") the Borrower may attempt to cure or remedy the event giving rise to such Event of Default if feasible, exercise all rights and remedies with respect to the DIP Collateral and all rights and remedies available to it under the DIP Loan Documents, or under applicable Law or equity.

Subject to entry of the Final Order, none of the DIP Collateral or the application of the proceeds of the DIP Collateral (in connection with any voluntary or mandatory prepayment, exercise of remedy or otherwise) shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine. Upon termination of the Notice Period, if any then-existing Event of Default shall not have not been cured or remedied, and unless an order is entered by the Bankruptcy Court to the contrary prior to the expiration of the Notice Period, the automatic stay pursuant to Section 362 of the Bankruptcy Code shall be automatically terminated without further notice or order of the Bankruptcy Court, unless the Lender elects otherwise in a written notice to the Debtor, and the Lender shall be permitted to exercise all rights and remedies, including with respect to the DIP Collateral, set forth in the DIP Order and the DIP Loan Documents, and as otherwise available at law without further order or application or motion to the Bankruptcy Court, and without restriction or restraint by any stay under Bankruptcy Code Sections 362 or 105 or otherwise.

8.03 Carve Out Reserve Funding.

Upon the occurrence of an Event of Default, the Borrower may use the proceeds of the New Money DIP Loans or cash collateral to fund, subject to the Budget, the Carve-Out and the Professional Fee Escrow (as defined in the DIP Order).

8.04 Application of Funds.

After the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable), any amounts received on account of the DIP Obligations shall be applied by the Lender in the following order:

First, to that portion of the DIP Obligations constituting Lender Expenses, fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the Lender and amounts payable under Article III) payable to the Lender;

Second, to that portion of the DIP Obligations constituting accrued and unpaid interest on the Loans (other than PIK Interest which has been added to the principal amount of the Loans);

Third, to that portion of the DIP Obligations constituting unpaid principal of the Loans; and

Last, the balance, if any, after all of the DIP Obligations have been indefeasibly paid in full, to the Borrower, or as otherwise required by Law.

## ARTICLE IX
## COLLATERAL

9.01 Grant of Security Interest.

As collateral security for all DIP Obligations, the Borrower hereby collaterally assigns and grants to the Lender a continuing first priority (subject to the Carve-Out) security interest and Lien in and to all property, assets and rights of the Borrower, whether now owned or existing or hereafter acquired or arising, regardless of where located, whether now owned or hereafter acquired or arising, and all proceeds and products and supporting obligations (as defined in the Code) in respect thereof, including the following (each term used in this Section 9.01 shall have the meaning for all purposes of this Agreement given to such term in the UCC, unless otherwise defined in this Agreement), collectively being the "**DIP Collateral**"):

(i) all accounts;

(ii) all chattel paper;

(iii) all documents;

(iv) all instruments;

(v) all supporting obligations and letter-of-credit rights;

(vi) all general intangibles (including payment intangibles, intercompany accounts, intellectual property and software);

(vii) all deposit accounts, bank deposits, prepayments (including prepayments made to third party vendors), deferred assets, refunds, credits or overpayments, and similar cash items of the Borrower, including all tax credits and rights arising from any refunds due from federal, state, or local Government entities with respect to taxes paid by the Debtor for periods ending on or before the Petition Date, including any employee retention tax credits to which the Borrower may be entitled;

(viii) all inventory and other goods;

(ix) all motor vehicles, equipment and fixtures;

(x) all investment property, financial assets and all securities accounts;

(xi) all money, cash, cash equivalents, securities, and other property of any kind;

(xii) all promissory notes, and all documents of title;

(xiii) all books, records and other property related to or referring to any of the foregoing, including books, records, account ledgers, data processing records, computer software and other property, and general intangibles at any time evidencing or relating to any of the foregoing;

(xiv) unless and until entry of a Final Order, all commercial tort claims;

(xv) all of the Debtor's interests in and rights to the assets;

(xvi) all of the Debtor's interest in deposit accounts, money, cash, cash equivalents, securities, or other property interests serving as collateral or funding sources for any other obligation, including the Cash Collateral and Bank Accounts (as such terms are defined in the Debtor's motion for authorization to continue use of its existing cash management system) and all other accounts serving as collateral or payment source for any other obligation;

(xvii) all real property and rights therein;

(xviii) all other personal property of the Debtor, including proceeds from any Avoidance Actions (as defined in the DIP Order) and recoveries therefrom (but not the actions themselves) unless and until entry of a Final Order; and

(xix) all accessions to, substitutions for, and replacements, products and proceeds of any of the foregoing, including dividends or distributions on investment property, rents, profits, income and benefits, proceeds of any insurance policies, claims against third parties, and condemnation or requisition payments with respect to all or any of the foregoing;

provided, however, that notwithstanding the foregoing, upon entry of the Final Order, and in consideration of the sharing of proceeds from the Excluded Assets as set forth in the Asset Purchase Transaction Terms attached hereto as Exhibit C, Lender shall release its DIP Liens on

the Excluded Assets solely for the purpose of the Debtor holding such assets in trust for the purposes of monetizing the Excluded Assets and distributing the resulting proceeds to the general unsecured creditors and the Lender in accordance with the Asset Purchase Transaction Terms attached hereto as Exhibit C.

9.02 Perfection of Security Interest.

(a) Notwithstanding the perfection of any security interest or Lien granted hereunder pursuant to the order of the Bankruptcy Court under the applicable DIP Order, to the fullest extent permitted by applicable Laws, the Lender may, but is not required to, file or authorize the filing of one or more financing statements disclosing the Liens under this Agreement on the DIP Collateral.

(b) A certified copy of the DIP Order may, in the discretion of the Lender, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of the DIP Order for filing and recording. Notwithstanding the date of any such filing, the date of such perfection shall be the date of the DIP Order.

9.03 Right to Cure.

Upon the occurrence and during the continuance of an Event of Default, the Lender shall have the right to (but not the obligation to) pay any amount or do any act required of the Borrower hereunder or under any other DIP Loan Document (other than in respect of principal, interest or fees on the Loans) in order to preserve, protect, maintain, or enforce the DIP Obligations, the DIP Collateral, or the Liens securing the DIP Obligations, and which the Borrower fails to pay or do, including payment of any judgment against the Borrower, any insurance premium, any warehouse charge, any finishing or processing charge, any landlord's or bailee's claim, and any other obligation secured by a Lien upon or with respect to the DIP Collateral. All payments that the Lender makes under this Section 9.03 and all documented out-of-pocket costs and expenses that the Lender pays or incurs in connection with the foregoing shall be considered part of the DIP Obligations. Any payment made or other action taken by the Lender under this Section 9.03 shall be without prejudice to any right to assert an Event of Default hereunder and to proceed thereafter as herein provided.

9.04 The Lender's Rights, Duties, and Liabilities.

To the extent permitted by applicable Laws, the Borrower assumes all responsibility and liability arising from or relating to the use, sale, or other disposition of the DIP Collateral. The DIP Obligations shall not be affected by any failure of the Lender to take any steps to perfect the Liens hereunder or to collect or realize upon the DIP Collateral, nor shall loss of or damage to the DIP Collateral, to the extent permitted by applicable Laws, release the Borrower from any of the DIP Obligations. Nothing in this Agreement shall be interpreted as giving the Lender responsibility for or any duty concerning the validity, perfection, priority or enforceability of the Liens granted hereunder or giving the Lender any obligation to take any action to procure or maintain such validity, perfection, priority or enforceability, including any duty to file any financing statements, amendments, continuation statements or other documents to perfect or maintain the perfection of

the security interest granted hereunder.

9.05 Remedies.

(a) The Borrower recognizes that the Lender may be unable to effect a public sale of any or all of the DIP Collateral that constitutes securities to be sold by reason of certain prohibitions contained in the laws of any jurisdiction outside the United States or in applicable federal, provincial, territorial or state securities laws but may be compelled to resort to one or more private sales thereof to a restricted group of purchasers who will be obliged to agree, among other things, to acquire such DIP Collateral to be sold for its own account for investment and not with a view to the distribution or resale thereof. The Borrower acknowledges and agrees that any such private sale may result in prices and other terms less favorable to the seller than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall, to the extent permitted by applicable Laws, be deemed to have been made in a commercially reasonable manner. Unless required by applicable Laws, the Lender shall not be under any obligation to delay a sale of any of such DIP Collateral to be sold for the period of time necessary to permit the issuer of such securities to register such securities under the laws of any jurisdiction outside the United States or under any applicable federal, provincial, territorial or state securities laws, even if such issuer would agree to do so. The Borrower further agrees to do or cause to be done, to the extent that the Borrower may do so under applicable Laws, all such other acts and things as may be necessary to make such sales or resales of any portion or all of such DIP Collateral to be sold valid and binding and in compliance with any and all applicable Laws at the Borrower's expense. The Borrower further agrees that a breach of any of the covenants contained in this Section 9.05(a) will cause irreparable injury to the Lender for which there is no adequate remedy at law and, as a consequence, agrees that each covenant contained in this Section 9.05(a) shall be specifically enforceable against the Borrower, and the Borrower hereby waives and agrees, to the fullest extent permitted by law, not to assert as a defense against an action for specific performance of such covenants that (i) the Borrower's failure to perform such covenants will not cause irreparable injury to the Lender or (ii) the Lender has an adequate remedy at law in respect of such breach.

(b) Subject to the terms of the DIP Order and the terms hereof, including Section 8.02 above: If an Event of Default has occurred and is continuing, the Lender shall have, in addition to all other rights of the Lender, the rights and remedies of a secured party under the UCC, and without limiting the generality of the foregoing, the Lender shall be empowered and entitled to: (i) take possession of, foreclose on and/or request a receiver of the DIP Collateral and keep it on the Borrower's premises at any time, at no cost to the Lender, or remove any part of it to such other place or places as the Lender may desire, or the Borrower shall, upon the Lender's demand, at the Borrower's cost, assemble the DIP Collateral and make it available to the Lender at a place reasonably convenient to the Lender; (ii) exercise set-off rights on cash collateral or deposits (other than, for the avoidance of doubt, with respect to Excluded Accounts); (iii) sell and deliver any DIP Collateral at public or private sales, for cash, upon credit or otherwise, at such prices and upon such terms as the Lender deems advisable and may postpone or adjourn any sale of the DIP Collateral by an announcement at the time and place of sale or of such postponed or adjourned sale; (iv) hold, lease, develop, manage, operate, control and otherwise use the DIP Collateral upon such terms and conditions as may be reasonable under the circumstances (making

such repairs, alterations, additions and improvements and taking other actions, from time to time, as may be reasonably necessary or desirable), exercise all such rights and powers of the Borrower with respect to the DIP Collateral, whether in the name of the Borrower or otherwise, including the right to make, cancel, enforce or modify leases, obtain and evict tenants, and demand, sue for, collect and receive all rents, in each case, in accordance with the standards applicable to the Lender under the DIP Loan Documents; and (v) take any other actions, as may be reasonably necessary or desirable, in connection with the DIP Collateral (including preparing for the disposition thereof), and all reasonable and documented out-of-pocket fees and expenses incurred in connection therewith shall be borne by the Borrower. Promptly following written demand from the Lender, the Borrower shall direct the grantor or licensor of, or the contracting party to, any property agreement with respect to any property to recognize and accept the Lender as the party to such agreement for any and all purposes as fully as it would recognize and accept the Borrower and the performance of the Borrower thereunder and, in such event, without further notice or demand and at the Borrower's sole cost and expense, the Lender may exercise all rights of the Borrower arising under such agreements. Without in any way requiring notice to be given in the following manner, the Borrower agrees that any notice by the Lender of sale, disposition or other intended action hereunder or in connection herewith, whether required by the UCC or otherwise, shall constitute reasonable notice to the Borrower if such notice is delivered by registered or certified mail, return receipt requested, postage prepaid, or is delivered personally against receipt, at least five (5) Business Days prior to such action to the Borrower's addresses specified in Section 10.02. If any DIP Collateral is sold on terms other than payment in full at the time of sale, no credit shall be given against the DIP Obligations until the Lender receives payment, and if the buyer defaults in payment, the Lender may resell the DIP Collateral. In the event the Lender seeks to take possession of all or any portion of the DIP Collateral by judicial process, the Borrower irrevocably waives (to the extent permitted by applicable Laws): (A) the posting of any bond, surety or security with respect thereto which might otherwise be required; (B) any demand for possession prior to the commencement of any suit or action to recover the DIP Collateral; and (C) any requirement that the Lender retain possession and not dispose of any DIP Collateral until after trial or final judgment. The Borrower agrees that the Lender has no obligation to preserve rights to the DIP Collateral or marshal any DIP Collateral for the benefit of any Person. The Lender is hereby granted a license or other right to use, without charge, the Borrower's labels, patents, copyrights, name, trade secrets, trade names, trademarks and advertising matter, or any similar property, in completing production of, advertising or selling any DIP Collateral, and each the Borrower's rights under all licenses and all franchise agreements shall inure to the Lender's benefit for such purpose. The Lender will return any excess proceeds of the DIP Collateral to the Borrower and the Borrower shall remain liable for any deficiency. The proceeds of sale shall be applied as required pursuant to Section 2.03(b)(v) hereof.

(c) Notwithstanding anything herein to the contrary, the Lender shall not take any action under this Section 9.05 except after compliance with any applicable requirements under the DIP Order applicable thereto.

9.06 Concerning the DIP Collateral.

(a) Except for the custody of the DIP Collateral in its possession and the accounting for monies actually received by it hereunder, the Lender shall have no other duty as to

the DIP Collateral, whether or not the Lender has or is deemed to have knowledge of any matters, or as to the taking of any necessary steps to preserve rights against any parties or any other rights pertaining to the DIP Collateral. The Lender shall not be liable for any interest on any money received by it. The Lender shall be deemed to have exercised reasonable care in the custody and preservation of the DIP Collateral in its possession if such DIP Collateral is accorded treatment substantially equal to that which the Lender would accord similar assets held for the benefit of third parties.

(b) Notwithstanding anything to the contrary contained herein or in any other DIP Loan Document, in no event shall the Lender be obligated to execute or deliver any document evidencing any release or re-conveyance of DIP Collateral without receipt of a certificate executed by a duly authorized officer of the Borrower certifying that such release is permitted by this Agreement and the other DIP Loan Documents, and that all conditions precedent to such release or re-conveyance (if any) have been complied with.

(c) The Lender shall not be responsible for insuring the DIP Collateral or for the payment of Taxes (and shall not be responsible for any tax reporting in connection with this Agreement), charges, assessments or liens upon the DIP Collateral. The Lender shall be under no obligation independently to request or examine insurance coverage with respect to any DIP Collateral. The Lender shall not be responsible for the maintenance of the DIP Collateral, except as expressly provided in this Agreement.

(d) In connection with the exercise of any rights or remedies in respect of, or foreclosure or realization upon, any Equity Interest Collateral pursuant to this Agreement or any other DIP Loan Document, the Lender shall not be obligated to take title to or possession of such Equity Interests, as the case may be, in its own name, or otherwise in a form or manner that may, in its reasonable judgment, expose it to liability. In the event that the Lender deems that it may be considered an "owner or operator" under any Environmental Laws or otherwise cause the Lender to incur, or be exposed to, any Environmental Liability or any liability under any other federal, state or local law, the Lender reserves the right, instead of taking such action, to arrange for the transfer of the title or control of the asset to a court appointed receiver. The Lender will not be liable to any Person for any Environmental Liability or any environmental claims or contribution actions under any federal, state or local law, rule or regulation by reason of the Lender's actions and conduct as authorized, empowered and directed hereunder or relating to any kind of discharge or release or threatened discharge or release of any Hazardous Materials into the environment.

(e) The Lender shall not be liable for the acts or omissions of any bank, depositary bank, custodian or independent counsel of the Lender or the Borrower or any other party selected by the Lender with reasonable care or selected by any other party hereto that may hold or possess DIP Collateral or documents related to DIP Collateral, and such Agent shall not be required to monitor the performance of any such Persons holding DIP Collateral.

## ARTICLE X
## MISCELLANEOUS

10.01 Amendments.

Unless otherwise provided in this Agreement (including, for the avoidance of doubt, provisions that permit or require the consent, approval, waiver, extension, satisfaction, determination, judgment, acceptance or similar action of the Lender), no amendment or waiver of any provision of this Agreement or any other DIP Loan Document, and no consent to any departure by the Borrower therefrom, shall be effective unless in writing signed by the Lender and the Borrower, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

10.02 Notices and Other Communications; Facsimile Copies.

(a) Notices Generally. All notices and other communications provided for herein shall be in writing and shall be delivered both (i) by hand or overnight courier service or mailed by certified or registered mail and (ii) by electronic mail, each to the address specified in this Section 10.02. Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received (if by hand) or one day after being deposited with a courier for overnight delivery. Notices delivered through electronic communications to the extent provided in subsection (b) below shall be effective as provided in such subsection (b).

TO THE LENDER................. Axios Capital Solutions, LLC
_________________________
_________________________
_________________________
[___]

*With Copies to:*

Raines Feldman Littrell LLP
Hamid R. Rafatjoo
Carollynn Callari
1900 Avenue of the Stars, 19th Floor
Los Angeles, CA 90067
hrafatjoo@raineslaw.com
ccallari@raineslaw.com

TO THE BORROWER........... Pacifica of the Valley Corporation
9449 San Fernando Road
Sun Valley, CA 91352
Attention: Precious Mayes
Peter Chadwick
Email: PMayes@Corp.PacificaHospital.com
pchadwick@thinkbrg.com

*With Copies to:*

Dentons US LLP
Tania M. Moyron
Samuel R. Maizel
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Email: tania.moyron@dentons.com
samuel.maizel@dentons.com

-and-

John D. Beck
1221 Avenue of the Americas
New York, NY 10020-1089
Email: john.beck@dentons.com

(b) Electronic Communications. The Borrower or the Lender may, in its discretion, agree to accept notices and other communications to them hereunder by electronic communications pursuant to procedures approved by them; *provided* that approval of such procedures may be limited to particular notices or communications. Notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient.

(c) Change of Address, Etc. The Borrower and the Lender may change its address or electronic mail address for notices and other communications hereunder by notice to the other parties.

(d) Reliance by Lender. The Lender shall be entitled to rely and act upon any notices (including telephonic notices) purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Borrower shall indemnify the Lender and its Related Parties from all reasonable and documented out-of-pocket losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower, except for such losses caused by the Lender's or any of its Related Parties' gross negligence or willful misconduct. All telephonic notices to and other telephonic communications with the Lender may be recorded by the Lender, and each of the parties hereby consents to such recording.

10.03 No Waiver; Cumulative Remedies.

No failure by the Lender to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

10.04 Expenses; Indemnity; Damage Waiver.

(a) Costs and Expenses. Except as provided in the DIP Order, the Borrower shall pay in cash, whether accrued or incurred prior to, on or after the Petition Date: (i) all Lender's Expenses (and the documented out-of-pocket expenses incurred by the Lender of all persons not regularly in its employ incurred by the Lender) in connection with this Agreement, the transactions contemplated hereby, and the Chapter 11 Case, and (ii) all reasonable and documented out-of-pocket expenses (including, without limitation, fees, disbursements and other charges of counsel) of the Lender for enforcement costs and documentary taxes associated with this Agreement, the transactions contemplated hereby, and the Chapter 11 Case.

(b) Indemnification by the Borrower. The Borrower shall indemnify and defend the Lender and its Related Parties (each such Person being called an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the reasonable and documented out-of-pocket fees, charges and disbursements of outside counsel for any Indemnitee, incurred by any Indemnitee or asserted against any Indemnitee arising out of, in connection with, or as a result of, (i) the execution or delivery of this Agreement or any other DIP Loan Document, the performance by the parties of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or the administration of this Agreement and the other DIP Loan Documents; (ii) any Loan or the use or proposed use of the proceeds therefrom; (iii) any actual or alleged Release of Hazardous Materials at, on, under or from any property owned, leased or operated by Borrower,

or any Environmental Liability related in any way to Borrower or its facilities and/or properties; or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the actual fraud, gross negligence, bad faith or willful misconduct of such Indemnitee.

(c) Waiver of Consequential Damages, Etc. To the fullest extent permitted by applicable Laws, none of the Borrower or any of its Related Parties shall assert, and the Borrower hereby waives, any claim against the Lender or its Related Parties on any theory of liability for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other DIP Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof. The Lender and its Related Parties shall not be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other DIP Loan Documents or the transactions contemplated hereby or thereby.

(d) Payments. Except as provided in Section 2.07 hereof, all amounts due under this Section 10.04 shall be payable not later than five (5) Business Days after demand therefor.

(e) Survival. The agreements in this Section 10.04 shall survive the resignation or replacement of the Lender and the repayment, satisfaction or discharge of all the DIP Obligations.

10.05 Payments Set Aside.

To the extent that any payment by or on behalf of the Borrower is made to the Lender, or the Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred.

10.06 Successors and Assigns.

(a) Successors and Assigns Generally. The provisions of this Agreement and the other DIP Loan Documents shall be binding upon and inure to the benefit of the parties and thereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of their rights or obligations hereunder or thereunder without the prior written consent of the Lender, and the Lender may not assign or otherwise transfer any

of its rights or obligations hereunder except (i) in accordance with the provisions of Section 10.06(b) or (ii) by way of pledge or assignment of a security interest subject to the restrictions of Section 10.06(d) (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, the Related Parties of the Lender) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b) Assignments by Lender. The Lender may at any time assign all of its rights and obligations under this Agreement and the other DIP Loan Documents (but not a portion thereof) to another Person that is treated as a U.S. Person. Subject to recording thereof by the Lender pursuant to clause (c) of this Section 10.06, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of the Lender under this Agreement to the extent of the interest assigned, and the Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, the Lender shall cease to be a party hereto and the assignee shall become the "Lender" hereunder) but shall continue to be entitled to the benefits of Article III and Section 10.04 with respect to facts and circumstances occurring prior to the effective date of such assignment. Upon request, the Borrower (at its expense) shall execute and deliver a Note to the assignee. Any assignment or transfer by the Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by the Lender of a participation in such rights and obligations.

(c) Register. The Lender, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain at its office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of any assignees and the New Money DIP Commitments of, and principal amounts of (and stated interest on) the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive absent manifest error. The Register shall be available for inspection by the Borrower at any reasonable time and from time to time upon reasonable prior notice.

(d) Certain Pledges. The Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such as a party hereto.

(e) Electronic Execution of Assignments. The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act and any state laws based on the Uniform Electronic Transactions Act.

10.07 Set-off.

If an Event of Default shall have occurred and be continuing, the Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by Lender or any such Affiliate to or for the credit or the account of the Borrower against any and all of the obligations of the Borrower now or hereafter existing under this Agreement or any other DIP Loan Document to the Lender, irrespective of whether or not the Lender shall have made any demand under this Agreement or any other DIP Loan Document and although such obligations of the Borrower may be contingent or unmatured. The rights of the Lender and its Affiliates under this Section 10.07 are in addition to other rights and remedies (including other rights of setoff) that the Lender or its Affiliates may have. The Lender agrees to notify the Borrower promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

10.08 Interest Rate Limitation.

Notwithstanding anything to the contrary contained in any DIP Loan Document, the interest paid or agreed to be paid under the DIP Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate"). If the Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower. In determining whether the interest contracted for, charged, or received by the Lender exceeds the Maximum Rate, the Lender may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the DIP Obligations hereunder.

10.09 Credit Bid Limitation

The Lender agrees that any credit bid by the Lender in connection with any Asset Purchase Transaction, whether consummated pursuant to the Plan or a Private Sale Motion, shall be at least the amount of $40,000,000 of the DIP Obligations (including the Commitment Fee, the Roll Up DIP Loans and the Operating Advances), and no credit bid shall include the Excluded Assets. The Borrower expressly waives its right to object to the exercise and the amount of any credit bid by the Lender. The Borrower expressly waives right to object to the exercise and the amount of any credit bid by the Lender, and other parties in interest shall have no later than seven (7) days prior to the date set for the hearing regarding the proposed Sale Order or Plan, or as otherwise ordered by the Bankruptcy Court, to object to any credit bid by the Lender, failing which the Lender's credit bid shall be deemed valid and enforceable. As provided in the Plan Term Sheet, any amount of the DIP Facility not credit bid and any portion of the Prepetition Secured Debt not rolled up into the DIP Facility and not credit bid, shall not be waived, released, satisfied, or discharged by the credit bid, the sale, or the Plan; provided that (i) the Lender shall not assert against the Debtor's estate or for purposes of sharing in the proceeds of the Excluded Assets, more than $15,000,000 (with any remaining obligations under the DIP Facility to be satisfied first) and (ii) any aggregate

allowed claim amounts above $15,000,000 shall be assumed by Newco as senior secured indebtedness (the "**Assumed Axios Debt**"), in each case on the terms set forth in the Plan Term Sheet. For the avoidance of doubt, following the consummation of a sale either through a Plan or a Private Sale Motion, the Lender shall not recover or claw back any amounts paid during the Chapter 11 Case, or recover from the Debtor's estate or Liquidating Trust more than $15,000,000 in the aggregate.

10.10 Counterparts; Integration; Effectiveness.

This Agreement may be executed in counterparts (and by different parties in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other DIP Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof; *provided*, *however*, that nothing herein shall be deemed to alter, amend or supersede the terms of the Plan Term Sheet or the DIP Financing Term Sheet attached as Exhibit A to the Interim Order. Except as provided in Article IV, this Agreement shall become effective when it shall have been executed by the Lender and when the Lender shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties. Delivery of an executed counterpart of a signature page of this Agreement by email shall be effective as delivery of a manually executed counterpart of this Agreement.

10.11 Survival of Representations and Warranties.

All representations and warranties made hereunder and in any other DIP Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the Lender, regardless of any investigation made by the Lender or on its behalf and notwithstanding that the Lender may have had notice or knowledge of any Default at the time of the making of any Loan, and shall continue in full force and effect as long as any Loan or any other DIP Obligation hereunder shall remain unpaid or unsatisfied.

10.12 Severability.

If any provision of this Agreement or the other DIP Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other DIP Loan Documents shall not be affected or impaired thereby, and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions, the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

10.13 GOVERNING LAW; JURISDICTION.

(a) GOVERNING LAW. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CHOICE-OF-LAW PROVISIONS THAT WOULD REQUIRE THE APPLICATION OF LAW OF ANOTHER JURISDICTION AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

(b) SUBMISSION TO JURISDICTION. EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO (I) THE NONEXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND, IN THE EVENT THAT THE BANKRUPTCY COURT DOES NOT HAVE, OR ABSTAINS FROM EXERCISING SUCH JURISDICTION, TO (II) THE NONEXCLUSIVE JURISDICTION OF THE FEDERAL AND STATE COURTS SITTING IN NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY BORROWER OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c) WAIVER OF VENUE. EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (b) OF THIS SECTION. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d) SERVICE OF PROCESS. EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 9.02. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

10.14 WAIVER OF RIGHT TO TRIAL BY JURY.

EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER DIP LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.15 USA Patriot Act Notice.

The Lender hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Patriot Act"), it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow the Lender to identify the Borrower in accordance with the Patriot Act.

10.16 No Advisory or Fiduciary Relationship.

In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other DIP Loan Document), the Borrower acknowledges and agrees that: (a)(i) the arranging and other services regarding this Agreement provided by the Lender are arm's-length commercial transactions between the Borrower, on the one hand, and the Lender, on the other hand, (ii) the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (iii) the Borrower is capable of evaluating, and understand and accept, the terms, risks and conditions of the transactions contemplated hereby and by the other DIP Loan Documents; (b)(i) the Lender is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not and will not be acting as an advisor, agent or fiduciary, for the Borrower and (ii) the Lender has no obligation to the Borrower with respect to the transactions contemplated hereby, except those obligations expressly set forth herein and in the other DIP Loan Documents to which it is a party; and (c) the Lender and its Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower, and the Lender has no obligation to disclose any of such interests to the Borrower. To the fullest extent permitted by law, the Borrower hereby waives and releases any claims that it may have against the Lender with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

10.17 Conflict.

In the event of a conflict between this Agreement and the DIP Order, the DIP Order shall govern.

10.18 Release.

Subject only to the Challenge Rights provided in the DIP Order, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Borrower hereby, for itself and its successors and assigns, fully and without reserve, releases acquits, and forever discharges Lender, its successors and assigns, officers, directors, employees, representatives, trustees, attorneys, agents and affiliates (collectively, the "**Released Parties**" and each individually a "**Released Party**") from any and all actions, claims, demands, causes of action, judgments, executions, suits, debs, liabilities, costs, damages, expenses or other obligations of any kind and nature whatsoever, direct and/or indirect, at law or in equity, whether now existing or hereafter asserted, whether absolute or contingent, whether due or to become due, whether disputed or undisputed, whether known or unknown, for or because of any matters or things occurring, existing or actions done, omitted to be done, or suffered to be done by any of the Released Parties, in each case, on or prior to the date hereof and are in any way directly or indirectly arising out of this Agreement, any other DIP Loan Document, the Prepetition Credit Agreement, the Prepetition Obligations, any other DIP Loan Document (as defined in the Prepetition Credit Agreement), the Chapter 11 Case, the DIP Order or any of the other orders, documents, or other matters related thereto, or any of the transactions contemplated hereby or thereby (collectively, the "**Released Claims**"). The Borrower agrees that it will not sue any Released Party on the basis of any Released Claim. The provisions of this Section 10.18 shall survive the termination of the DIP Loan Documents and the payment in full of the DIP Obligations.

*[SIGNATURE PAGE FOLLOWS]*

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed as of the date first above written.

**BORROWER**

**PACIFICA OF THE VALLEY CORPORATION**

By:____________________________
Name:__________________________
Title:___________________________

**LENDER**

**AXIOS CAPITAL SOLUTIONS, LLC**

By:____________________________
Name:__________________________
Title:___________________________

**SCHEDULE 5.10**
**TAX PAYMENTS**

[TO COME]

**SCHEDULE 5.14**
**LABOR MATTERS**

[TO COME]

**SCHEDULE 7.01**
**EXISTING LIENS**

[TO COME]

**SCHEDULE 7.02**
**EXISTING INVESTMENTS**

[TO COME]

**SCHEDULE 7.03**
**EXISTING INDEBTEDNESS**

[TO COME]

**EXHIBIT A**
**FORM OF BORROWING REQUEST**

**PACIFICA OF THE VALLEY CORPORATION**
**BORROWING REQUEST**

Date: _____________, 2026

Lender: Axios Capital Solutions, LLC

Ladies and Gentlemen:

This Borrowing Request is furnished pursuant to Section 2.02 of that certain Senior Secured Superpriority Debtor-in-Possession Credit and Security Agreement dated as of [______], 2026 (as amended, modified, renewed or extended from time to time, the "Credit Agreement") between PACIFICA OF THE VALLEY CORPORATION, as Borrower, and AXIOS CAPITAL SOLUTIONS, LLC, as the Lender. Unless otherwise defined herein, capitalized terms used in this Borrowing Request have the meanings ascribed to them in the Credit Agreement.

The Borrower represents that as of the date of this Borrowing Request:

A. The Borrower has not exceeded the Budget inclusive of the Permitted Variance, on a cumulative basis, for the week ending prior to the date of this Borrowing Request;

B. All Milestones in Section 6.17 of the Credit Agreement that shall have been met prior to the date of this Borrowing Request have been met; and

C. There is no Default or Event of Default under the Credit Agreement.

The Borrower hereby notifies Lender of its request for the following Borrowing:

(1) Borrowing Date of the Borrowing (must be a Business Day): ____________________

(2) Amount of the Requested Borrowing: $_____________________________________

(3) Account to be Credited (last 4 digits): _______________________________________

PACIFICA OF THE VALLEY CORPORATION

By:_______________________
Name:
Title:

**EXHIBIT B**
**BUDGET**

Pacifica of the Valley Corporation
13-Week Cash Flow Forecast

| Week # | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 13 Week |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | 10/3/26 | 10/10/26 | 10/17/26 | 10/24/26 | 10/31/26 | 11/7/26 | 11/14/26 | 11/21/26 | 11/28/26 | 12/5/26 | 12/12/26 | 12/19/26 | 12/26/26 | Total |
| Actual / Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| **I. Receipts** | | | | | | | | | | | | | | |
| 1.) Government | $ 451,828 | $ 451,828 | $ 451,828 | $ 451,828 | $ 451,828 | $ 451,828 | $ 451,828 | $ 951,828 | $ 951,828 | $ 951,828 | $ 451,828 | $ 451,828 | $ 451,828 | $ 7,373,765 |
| 2.) Non-Government | 130,544 | 130,544 | 130,544 | 130,544 | 130,544 | 130,544 | 130,544 | 130,544 | 130,544 | 130,544 | 130,544 | 130,544 | 130,544 | 1,697,073 |
| 3.) QAF | - | - | - | - | 2,121,620 | - | 547,147 | 1,998,647 | - | 547,147 | - | - | - | 5,214,561 |
| 4.) Sale to LA Care of QAF | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 5.) DSH | - | - | - | 850,000 | - | - | - | - | - | - | - | 850,000 | - | 1,700,000 |
| 6.) LACare | 221,215 | 221,215 | 221,215 | 221,215 | 221,215 | 221,215 | 221,215 | 221,215 | 221,215 | 221,215 | 221,215 | 221,215 | 221,215 | 2,875,795 |
| 7.) Other | 613,402 | 435,781 | 689,781 | 89,781 | 439,781 | 189,781 | 89,781 | 89,781 | 89,781 | 539,781 | 89,781 | 89,781 | 89,781 | 3,536,779 |
| 8.) **Total Receipts** | **$ 1,416,989** | **$ 1,239,369** | **$ 1,493,369** | **$ 1,743,369** | **$ 3,364,989** | **$ 993,369** | **$ 1,440,516** | **$ 3,392,016** | **$ 1,393,369** | **$ 2,390,516** | **$ 893,369** | **$ 1,743,369** | **$ 893,369** | **$ 22,397,973** |
| **II. Operating Disbursements** | | | | | | | | | | | | | | |
| 9.) Payroll | $ 833,850 | $ 740,831 | $ 851,474 | $ 700,681 | $ 851,474 | $ 700,681 | $ 851,474 | $ 700,681 | $ 851,474 | $ 700,681 | $ 851,474 | $ 700,681 | $ 851,474 | $ 10,186,932 |
| 10.) Payroll Taxes | 411,890 | 240,311 | 411,890 | 240,311 | 411,890 | 240,311 | 411,890 | 240,311 | 411,890 | 240,311 | 411,890 | 240,311 | 411,890 | 4,325,099 |
| 11.) Benefits | 417,279 | 576,269 | 415,842 | 340,430 | 501,261 | 310,857 | 308,580 | 339,273 | 290,111 | 1,254,720 | 190,826 | 209,253 | 190,826 | 5,345,527 |
| 12.) Rent | - | 646,240 | - | 646,240 | - | - | - | - | 646,240 | - | - | - | 1,195,704 | 3,134,424 |
| 13.) Supplies | 211,559 | 117,150 | 110,500 | 114,770 | 106,200 | 103,300 | 101,000 | 107,770 | 94,200 | 117,800 | 101,000 | 89,750 | 113,320 | 1,488,319 |
| 14.) Pharmaceuticals | 18,000 | 10,000 | 10,000 | 11,500 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 11,500 | 141,000 |
| 15.) Purchased Services | 312,411 | 191,940 | 97,954 | 105,263 | 173,902 | 129,411 | 64,732 | 80,600 | 81,910 | 252,808 | 63,800 | 66,532 | 86,910 | 1,708,173 |
| 16.) Repairs and Maintenance | 4,090 | 15,228 | 15,228 | 15,228 | 15,228 | 15,228 | 15,228 | 15,228 | 15,228 | 15,228 | 15,228 | 15,228 | 15,228 | 186,826 |
| 17.) Utilities | 8,000 | 86,400 | 1,175 | 13,000 | - | 93,950 | 5,000 | 1,175 | 8,000 | 85,950 | 13,000 | 1,175 | 8,000 | 324,826 |
| 18.) Insurance | 252,752 | 308,441 | - | - | 326,840 | 4,286 | - | 2,576 | 41,156 | 331,126 | - | - | 23,322 | 1,290,500 |
| 19.) QAF Fees | - | 140,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 250,000 |
| 20.) Medical Professional Fees | 120,000 | 263,685 | - | - | - | 368,685 | - | - | - | 368,685 | - | - | - | 1,121,055 |
| 21.) Other | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 650,000 |
| 22.) CapEx - Seismic and Opening Beds | - | 243,112 | 21,600 | - | - | 48,677 | 172,384 | - | 350,000 | 640,554 | - | - | - | 1,476,327 |
| 23.) **Total Operating Disbursements** | **$ 2,639,832** | **$ 3,629,606** | **$ 1,995,663** | **$ 2,247,424** | **$ 2,456,796** | **$ 2,085,387** | **$ 2,000,288** | **$ 1,557,616** | **$ 2,860,209** | **$ 4,077,864** | **$ 1,717,218** | **$ 1,392,931** | **$ 2,968,174** | **$ 31,629,008** |
| 24.) **Net Operating Cash Flow** | **$ (1,222,843)** | **$ (2,390,238)** | **$ (502,295)** | **$ (504,055)** | **$ 908,193** | **$ (1,092,018)** | **$ (559,773)** | **$ 1,834,400** | **$ (1,466,840)** | **$ (1,687,348)** | **$ (823,850)** | **$ 350,438** | **$ (2,074,806)** | **$ (9,231,035)** |
| **III. Bankruptcy Related Disbursements** | | | | | | | | | | | | | | |
| 25.) Professional Fees | $ - | $ 2,595,000 | $ 1,453,965 | $ 1,925,407 | $ 1,950,407 | $ 1,282,907 | $ 89,000 | $ - | $ - | $ 3,075,907 | $ 644,407 | $ 581,000 | $ 581,000 | $ 14,179,000 |
| 26.) DIP Lender Professional Fees | $ - | $ - | $ 497,035 | $ 25,593 | $ 25,593 | $ 25,593 | $ - | $ - | $ - | $ 25,593 | $ 25,593 | $ - | $ - | $ 625,000 |
| 27.) UST Fees | - | - | - | 250,000 | - | - | - | - | - | - | - | - | - | 250,000 |
| 28.) Other Non-Recurring | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 29.) **Total Non-Operating Disbursements** | **$ -** | **$ 2,595,000** | **$ 1,951,000** | **$ 2,201,000** | **$ 1,976,000** | **$ 1,308,500** | **$ 89,000** | **$ -** | **$ -** | **$ 3,101,500** | **$ 670,000** | **$ 581,000** | **$ 581,000** | **$ 15,054,000** |
| 30.) **Net Cash Flow** | **$ (1,222,843)** | **$ (4,985,238)** | **$ (2,453,295)** | **$ (2,705,055)** | **$ (1,067,807)** | **$ (2,400,518)** | **$ (648,773)** | **$ 1,834,400** | **$ (1,466,840)** | **$ (4,788,848)** | **$ (1,493,850)** | **$ (230,562)** | **$ (2,655,806)** | **$ (24,285,035)** |
| **VI. Liquidity Summary** | | | | | | | | | | | | | | |
| 31.) Beginning Cash Balance | $ 1,551,056 | $ 7,328,212 | $ 2,342,975 | $ 3,889,680 | $ 4,184,625 | $ 3,116,818 | $ 716,299 | $ 67,527 | $ 1,901,927 | $ 435,086 | $ 2,646,238 | $ 1,152,388 | $ 921,826 | $ 1,551,056 |
| 32.) Net Cash Flow | (1,222,843) | (4,985,238) | (2,453,295) | (2,705,055) | (1,067,807) | (2,400,518) | (648,773) | 1,834,400 | (1,466,840) | (4,788,848) | (1,493,850) | (230,562) | (2,655,806) | (24,285,035) |
| 33.) DIP Draws | 7,000,000 | - | 4,000,000 | 3,000,000 | - | - | - | - | - | 7,000,000 | - | - | - | 21,000,000 |
| 34.) **Ending Cash Balance** | **$ 7,328,212** | **$ 2,342,975** | **$ 3,889,680** | **$ 4,184,625** | **$ 3,116,818** | **$ 716,299** | **$ 67,527** | **$ 1,901,927** | **$ 435,086** | **$ 2,646,238** | **$ 1,152,388** | **$ 921,826** | **$ (1,733,980)** | **$ (1,733,980)** |

**Footnotes:**

*- Forecast assumes ordinary course operations throughout the 13 weeks and does not contemplate the Asset Purchase Transaction or IMA.*

*- The Fourth Advance ($7mm) during the week ending 12/5/2026 is intended to support administrative expenses associated with Plan Confirmation.*

*- The three weeks ending 11/28/2026 show professional fee escrow payments being deferred.*

# EXHIBIT C
# ASSET PURCHASE TRANSACTION TERMS

The Lender may elect, in its sole discretion, to consummate an Asset Purchase Transaction either pursuant to the Plan or a Private Sale Motion, all in accordance with the following terms and such other terms in the Lender's sole discretion.

(a) If Lender elects to consummate an Asset Purchase Transaction pursuant to the Plan, the Plan shall be confirmed on or before the Plan Confirmation Milestone Date.

(b) If Lender elects to consummate an Asset Purchase Transaction pursuant to a Private Sale Motion, the Borrower and the Lender shall enter into the IMA no later than the thirtieth (30th) day after the Lender makes such election. Upon the IMA Transition Date, the Lender shall be responsible for all operating costs of, and obtain all revenue from, the Hospital from and after the date of the IMA Transition Date except to the extent such revenues constitute Excluded Assets, pending receipt of applicable regulatory approvals, and upon the receipt of such approvals, the parties shall consummate the Asset Purchase Transaction.

(c) Regardless of whether the Lender has elected to consummate an Asset Purchase Transaction pursuant to the Plan or a Private Sale Motion, the Borrower and the Lender shall enter into a mutually acceptable IMA, in form and substance acceptable to the Lender in its sole discretion, on or before November 10, 2026 (or such later date as the Borrower and the Lender may agree in writing), pursuant to which, for the period commencing upon the entry into such agreement and ending upon the consummation of the Asset Purchase Transaction, the Lender shall retain all net operating profits derived from operations of the Hospital and shall fund operating shortfalls of the Hospital (a) during the period covered by the Budget, solely to the extent set forth therein, by means of advances under the DIP Facility, and (b) thereafter through such consummation, by additional advances that shall constitute DIP Obligations for all purposes hereunder (the "**Operating Advances**"); provided, however, that the Lender shall not assume, and nothing herein shall be construed to impose on the Lender, any liability of the Borrower arising or accruing prior to the IMA Transition Date for any professional liability, regulatory, seismic, tax, or similar liability of the Borrower or the Hospital, other than ordinary course payables accrued and unpaid as of the IMA Transition Date consistent with the Budget.

(d) In connection with any Asset Purchase Transaction, whether consummated pursuant to the Plan or a Private Sale Motion, the Lender shall credit bid not less than $40,000,000 of the obligations outstanding under the DIP Facility, including the Commitment Fee, Roll-Up and Operating Advances. Any amount of the DIP Facility not credit bid and any portion of the Prepetition Secured Debt not rolled up into the DIP Facility and not credit bid, shall not be waived, released, satisfied, or discharged by the credit bid, the sale, or the Plan; provided, however, that (i) the Lender shall not assert against the Debtor's estate or for purposes of sharing in the proceeds of the Excluded Assets, more than $15,000,000 (with any remaining obligations under the DIP Facility to be satisfied first) and (ii) any aggregate allowed claim amounts above $15,000,000 shall be assumed by Newco as senior secured indebtedness (the "**Assumed Axios Debt**"), in each case on the terms set forth in the Plan Term Sheet. For the avoidance of doubt, following the consummation of an Asset Purchase Transaction, the Lender shall not recover or claw back any

amounts paid during the Chapter 11 Case, or recover from the Debtor's estate or Liquidating Trust more than $15,000,000 in the aggregate from the Excluded Assets.

(e) For the avoidance of doubt, and notwithstanding anything to the contrary, in any scenario, whether or not a Plan or a Private Sale is consummated, the Lender shall not recover or receive by any means from the Debtor's estate or Liquidating Trust (as applicable) more than $15,000,000 in the aggregate from the Excluded Assets as provided in the Plan Term sheet waterfall set forth below:

(i) The first $1,000,000 of net proceeds shall be retained by the Liquidating Trust / estate for distribution to holders of allowed general unsecured claims and/or payments of expense;

(ii) Subsequent net recoveries will be split 50/50 between the Liquidating Trust / estate and the Lender, until a total of $8,000,000 of net proceeds is realized (i.e., until the Liquidating Trust / estate and the Lender each realize a total recovery of $4,000,000 from net proceeds);

(iii) After $8,000,000 in net proceeds is realized, 75% of subsequent net proceeds shall be retained by the Liquidating Trust / estate and 25% shall be transferred to the Lender, until the Lender's allowed claim (not to exceed $15,000,000) is paid in full.

(f) For the avoidance of doubt, the election by the Lender to pursue an Asset Purchase Transaction pursuant to a Private Sale Motion shall not preclude, restrict, or otherwise prevent the Debtor from concurrently pursuing, filing, or prosecuting a plan of liquidation consistent with the Plan Term Sheet.

(g) The Debtor shall prepare, file, solicit, prosecute, and seek confirmation of a combined disclosure statement and the Plan, together with all other Plan Documents.

(h) The Debtor shall use its commercially reasonable efforts to obtain entry of an order confirming the Plan as soon as reasonably practicable and, in any event, on or before December 8, 2026.

(i) The Plan and the other Plan Documents shall be in form and substance reasonably satisfactory to the Lender and the Committee (if the Committee has executed the Plan Term Sheet). The Debtor shall not file, support, consent to, or seek confirmation of any plan, or agree to any amendment, modification, or supplement to any Plan Document, that is inconsistent in any material respect with the Plan Term Sheet without the prior written consent of the Lender and the Committee (if it is a signatory to the Plan Term Sheet).

# EXHIBIT D
# PLAN TERM SHEET

# PLAN TERM SHEET

On July 4, 2026 ("Petition Date"), Pacifica of the Valley Corporation ("Pacifica" or "Debtor") commenced a voluntary chapter 11[1] proceeding in the U.S. Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The case is pending before Judge Thomas M. Horan, bearing Case No. 26-11060 (the "Case").

This term sheet ("Term Sheet") between Pacifica and Axios Capital Solutions, LLC ("Axios") describes the principal terms of a proposed plan of reorganization for the Debtor ("Plan") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Plan is subject to, inter alia, definitive documentation satisfactory to the Debtor and Axios, and to compliance with statutory confirmation requirements and the occurrence of the effective date of the Plan (the "Effective Date") in accordance with the provisions of chapter 11 of the Bankruptcy Code.

This Term Sheet is not a solicitation of acceptances or rejections with respect to any chapter 11 plan. Any such solicitation will comply with the provisions of the Bankruptcy Code. However, the terms set forth herein are binding in connection with the parties obligations under the DIP Facility (defined below).

The distributions under, and other benefits provided in, the Plan constitute a resolution, compromise and settlement of claims and causes of action between the Parties, including addressing the Debtor's funding needs for the Case.

| | |
|---|---|
| **Plan Sponsor** | Axios, or one or more of its designated affiliates, successors, or assigns ("Sponsor"). |
| **Restructuring Summary** | The Plan will provide for the sale of all the Debtor's assets to Sponsor free and clear of all liens, claims and encumbrances, except for certain assets expressly excluded that will be transferred to a liquidating trust. To provide critical funding for the Case, and in conjunction with the restructuring, the Sponsor has agreed to provide a debtor-in-possession financing facility up to $21 million plus a 1.5X roll up of the Axios Prepetition Claim (defined below) for an aggregate principal amount of $52.5 million (such facility as more fully described in the DIP Credit Agreement, the "DIP Facility"), which shall be credit bid under the Plan in an amount not less than $40 million.<br><br>Any and all estate claims against Axios shall be released and there shall be no challenge to the Axios Prepetition Claim and related liens except that solely the Committee will retain a right to a 14-day period to challenge the Axios Prepetition Claim and related liens as and to the extent set forth in the DIP Credit |

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, §§ 101 - 1532.

Agreement, which is incorporated herein.

**Key Plan Terms**

The Plan shall contain the following key terms:

i. Axios's prepetition secured claim is allowed in full as a secured claim with full credit bid rights as set forth in the DIP Credit Agreement ("Axios Prepetition Claim");

ii. Sponsor or its designee ("Newco") shall acquire all the assets of the Debtor, including, assuming the lease, as amended (or entering into an amended or new lease, in each case without novation of the 2013 Master Lease and without prejudice to the estate's claims against the Landlord as set forth in the DIP Credit Agreement) pursuant to that Lease Principle Agreement (as defined in the DIP Credit Agreement) between the Debtor, Axios, and the Landlord (as defined in the DIP Credit Agreement), which set forth the parties' agreement in principle regarding lease terms in the event Axios acquires Pacifica Hospital of the Valley (the "Hospital")) except for the Excluded Assets (defined below) which shall not be assets acquired by Sponsor under the applicable sale documents;

iii. A liquidating trust ("Liquidating Trust") shall be established, and the Excluded Assets will be transferred to the Liquidating Trust free and clear of all liens, claims and encumbrances and subject to the distribution waterfall set forth herein;

iv. Funding for the Plan shall be proceeds from the DIP Facility, excess cash from the Approved Budget as of the earliest of the IMA transition date and the Plan Effective Date (except any cash resulting from an extraordinary receipt not reflected in the Approved Budget) and the Excluded Assets in the Liquidating Trust; and

v. The claims treatment provided below.

**Claims Treatment**

The Plan shall provide for the following claim treatment:

i. Each holder of an allowed administrative claim, including claims of the type described in section 503(b)(9) (to the extent not already paid during the chapter 11 case), shall receive payment in full (in cash) of the unpaid portion of its allowed administrative claim on the Effective Date or as soon thereafter as

practicable (or, if payment is not then due, shall be paid in accordance with its terms) or pursuant to such other terms as may be agreed to by the holder of such claim and the Debtor;

ii. Holders of priority tax claims shall be treated in accordance with section 1129(a)(9)(C) or pursuant to such other terms as may be agreed to by the holder of such claim and the Debtor;

iii. Holders of a secured claim (other than Axios or the Landlord) shall receive the following treatment, at the option of the Debtor: (a) payment in full (in cash) on the Effective Date or as soon thereafter as practicable to the extent secured; (b) delivery of collateral securing any such claim and payment of any interest required under section 506(b); or (c) other treatment rendering such claim unimpaired. The Subordination Agreement between Axios and the Landlord shall be enforced.

iv. Axios shall have a secured claim in the aggregate amount of any remaining DIP Obligations and Axios Prepetition Claim after its credit bid; provided that it shall not assert against the Debtor's estate or for purposes of sharing in the proceeds of the Excluded Assets, more than $15 million (with any remaining obligations under the DIP Facility to be satisfied first) and shall receive an interest in the proceeds of the Liquidating Trust subject to the sharing percentages as set forth below. Newco will assume any remaining debt in excess of $15 million, including under the DIP Facility or the Axios Prepetition Claim (which is secured). Unless otherwise agreed, any indebtedness so assumed by Newco shall continue to constitute Senior Debt under the Subordination Agreement and shall not be deemed waived, released, satisfied or discharged by the credit bid, the sale or the Plan.

v. For the avoidance of doubt, and notwithstanding anything to the contrary, in any scenario, whether or not a Plan or a Private Sale is consummated, Axios shall not recover or receive by any means from the Liquidating Trust more than $15 million in the aggregate from Excluded Assets as provided in the waterfall set forth below:

(1) Holders of General Unsecured Claims shall

receive their *pro rata* share of the interest in the Liquidating Trust with the right to proceeds thereof subject to the sharing with Axios as set forth below.

(2) Equity holder(s) shall receive no recoveries under the Plan. The Plan shall not provide any release, exculpation, injunction or indemnity in favor of Paul R. Tuft or any of his affiliates, and the Colorado Litigation shall be treated as set forth in the DIP Credit Agreement.

**Sale Toggle**

In the event confirmation of the Plan does not or cannot occur, the Debtor shall promptly execute a private sale to Sponsor maintaining the same economic terms for Axios and the Excluded Assets waterfall as if the sale occurred under the Plan.

Under either sale process, Axios shall receive the assets free and clear of all liens, claims and encumbrances and assets shall be purchased in accordance with the DIP Credit Agreement. The DIP Credit Agreement contains terms relating to the Plan and Sale Toggle process and deadlines that are incorporated herein.

**Excluded Assets**

The following assets (collectively, with the proceeds thereof, the "Excluded Assets") shall not be acquired by Newco and shall vest in the Liquidating Trust:

i. The Debtor's interests in or related to Pacific Gardens Medical Center;

ii. Chapter 5 causes of action; provided that to the extent a consensual resolution with the Landlord is not reached, all claims and causes of action of the Estate against the Landlord (including recharacterization of the Master Lease, any claim affecting title to or the characterization of the Site, and chapter 5 claims against the Landlord) shall be specifically retained under section 1123(b)(3)(B) and post-Effective Date prosecuted by Newco (at its option) as the Estate's representative, with any net cash recovery on chapter 5 claims against the Landlord contributed to the Liquidating Trust waterfall and all other relief inuring to Newco;

iii. Other litigation causes of action, including claims against directors, officers and other affiliated or

related parties of the Debtor (subject to treatment of claims against the Landlord as noted in (ii) above);

iv. Director & Officer Insurance rights and claims;

v. Any excess QAF revenue generated by the Debtor from successfully reducing asserted setoffs or recoupment amounts in excess of the amount of QAF budgeted in the Approved Budget (the "QAF Delta"), provided that any such additional amounts will not negatively impact future QAF receipts (*i.e.*, QAF 9, 10, 11 etc. other than the QAF identified in the Approved Budget); and

vi. The Debtor's cash on hand as of the earlier of the IMA transition date and the Effective Date under ordinary course of business (*e.g.*, no discounts to accelerate payments) and excluding cash from any QAF funds that are not identified in the Approved Budget or from (v) hereof (collectively, (i)-(vi), the "Excluded Assets").

**Liquidating Trust**

The Liquidating Trust shall have a three-member oversight committee, with 2 members selected by the Committee and 1 member selected by Axios. The Liquidating Trustee will be selected by the Committee, in consultation with the Debtor and Axios.

Net recoveries (*i.e.*, after all costs and expenses of the Liquidating Trust) from the assets in the Liquidating Trust shall be distributed as follows:

i. The first $1 million shall be retained by the Liquidating Trust for distribution to holders of allowed General Unsecured Claims and/or payment of expenses for payment;

ii. Then, a 50%/50% sharing between Axios and the Liquidating Trust, until Axios has received $4 million from net proceeds; and

iii. Then, 75% of subsequent net proceeds shall be retained by the Liquidating Trust and 25% shall be distributed to Axios, until Axios' allowed claim of $15 million is paid in full, at which time all subsequent net proceeds shall be retained by the Liquidating Trust.

| | |
|---|---|
| **Other Litigation** | *L.A. Care*. Except as set forth in the DIP Credit Agreement, neither Axios, the Committee, nor the Liquidating Trust will pursue a challenge against L.A. Care in respect of the $7.5 million in QAF receivables that are the subject of the 2026 prepetition agreements with L.A. Care. L.A. Care shall be a released party under the Plan and a Private Sale, and the release in favor of L.A. Care shall become effective on the first to occur of the effective date of a chapter 11 plan and the closing of a Private Sale.<br><br>*Landlord*. The lease relating to Landlord (as defined in the DIP Credit Agreement) will be handled as set forth in the DIP Credit Agreement. Without limiting the foregoing, the Plan shall, except as otherwise agreed with the Landlord, specifically retain and vest in Newco, pursuant to section 1123(b)(3)(B), all claims and causes of action of the estate against the Landlord, including recharacterization of the Master Lease, avoidance claims against the Landlord, and claims under the Subordination Agreement, and the attorney-client privilege and work product of the Debtor relating to the Landlord and the Master Lease shall pass to Newco on the Effective Date. Any net cash recovery on chapter 5 claims against the Landlord shall be contributed to the Liquidating Trust waterfall. |
| **Conditions Precedent to Plan Confirmation** | (i) The agreement in principle reflected in this Term Sheet shall not have been repudiated or otherwise abandoned, and no Plan with terms contrary to this Term Sheet shall have been proposed; (ii) the Disclosure Statement shall have been approved; (iii) an asset purchase agreement shall have been agreed upon in form and substance reasonably satisfactory to the Debtor and Sponsor; (iv) the Plan, including any amendments, modifications or supplements thereto, and all documentation contemplated by this Term Sheet or the Plan, shall be in form and substance reasonably satisfactory to the Debtor, the Committee (if a signatory hereto) and Sponsor; (v) there shall not have occurred a force majeure event (to be defined as a significant global disruption in the financial markets caused by outbreak of war, terrorism, or other incidents, but not adverse changes in the financial, banking or capital markets generally); and (vi) the Bankruptcy Court shall have entered an order approving the Disclosure Statement and confirming the Plan ("<u>Confirmation Order</u>"), which order shall be in form and substance reasonably satisfactory to the Debtor, the Committee (if a signatory hereto) and Sponsor. |
| **Conditions Precedent to** | (i) Contemporaneous effectiveness of the Sale (and related |

| | |
|---|---|
| **Plan Consummation** | documents such as an interim management agreement or management operations transfer agreement ("MOTA")); (ii) issuance to Newco of the general acute care hospital license for the Hospital by the California Department of Public Health, or the effectiveness of an interim arrangement, reasonably satisfactory to Sponsor, that permits Newco to operate the Hospital pending such issuance, which condition may be waived by Sponsor in its sole discretion; and (iii) No modification or stay of the Confirmation Order or entry of other court order prohibiting Plan transactions from being consummated. |
| **Documentation** | The agreed upon funding by Sponsor shall be pursuant to this Term Sheet, the Plan, the Confirmation Order, the "Asset Purchase Agreement," the MOTA, and any other document(s) and/or instrument(s) required to be executed by the Sponsor or Newco shall constitute the definitive Plan documents (the "Documentation"). The Asset Purchase Agreement shall provide, among other things, that all payments received by the Debtor on account of services rendered after entering into the MOTA, including Medicare, Medi-Cal and payor receipts paid to the Debtor's provider numbers or accounts pending completion of change-of-ownership processing, shall be remitted to Newco promptly upon receipt. The Documentation shall contain customary provisions, such as, among other things, representations and warranties, events of default, Documentation not in form reasonably satisfactory to Sponsor or Newco, etc. The Documentation shall conform to this Term Sheet and otherwise shall be in form and substance reasonably acceptable to the Sponsor. In the event of any inconsistency between the Documentation and the Confirmation Order, the Confirmation Order shall control (subject only to the requirement that it be in a form reasonably acceptable to the Debtor, the Committee (only if a signatory hereto) and Sponsor). |
| **Regulatory Cooperation** | The Debtor shall reasonably cooperate and reasonably promptly respond to Lender and its regulatory counsel in the transition process, including (i) after October 5, 2026, within five (5) business days after Lender's written request, execute and deliver all notices, applications, consents and other documents required of the current licensee, provider, enrollee, registrant or contracting party in connection with the transfer to Lender or its designee of the Hospital's licenses, permits, registrations, certificates, designations, accreditations, provider agreements, program participations and other governmental and accreditation authorizations, including |

| | |
|---|---|
| | without limitation the notice required by 22 C.C.R. § 70125, the licensee's portions of the CDPH change-of-ownership application, Form CMS-855A, DHCS Medi-Cal and Hospital Quality Assurance Fee program filings, HCAI notices and pending seismic compliance filings, LA County DMH (LPS designation) and EMS Agency designations, DEA, CLIA, pharmacy and radiologic health registrations, accreditation-body notifications, and the assignment of managed care, payor and graduate medical education participating-site agreements; (ii) promptly furnish all information and documents reasonably required for such filings; (iii) cooperate with Lender and its regulatory counsel in all communications with the foregoing agencies and bodies; (iv) maintain all such authorizations in good standing and not take or omit any action that would impair them; (v) timely file all Medicare and Medi-Cal cost reports, including any terminating cost report, in a form reasonably acceptable to Lender; and (vi) execute and file, subject to any required approvals, the notices and applications associated with any interim arrangement contemplated hereby. |
| **Preservation of Rights** | This Term Sheet is part of a proposed settlement among the Parties with respect to their Claims. Nothing herein shall be deemed to be an admission of any kind. To the extent provided by Federal Rule of Evidence 408 and any applicable state rules of evidence, this Term Sheet and all negotiations relating thereto shall not be admissible into evidence in any proceeding. Except as expressly provided in this Term Sheet, nothing herein is intended to, and shall not be deemed to in any manner waive, limit, impair, or restrict the ability of any Party to protect and preserve its rights, remedies, and interests, including Axios' Claims against the Debtor or any other person, any liens or security interests it may have in any assets of the Debtor, or its full participation in the Chapter 11 Case, including with respect to any matters covered by this Term Sheet. Without limiting the previous sentence in any way, if the transactions contemplated by this Term Sheet or otherwise set forth in the Term Sheet are not consummated as provided herein, or if this Term Sheet is repudiated or abandoned for any reason, the Parties each fully reserve any and all of their respective rights, remedies, and interests. |
| **Governing Law** | The definitive Plan Documents would be governed by the laws of the State of New York, except to the extent governed by the Bankruptcy Code or other applicable federal law. |

**If the foregoing is acceptable to you, please so indicate by signing a copy of this proposal in the space provided below and return an executed copy at your earliest convenience.**

**PACIFICA OF THE VALLEY CORPORATION**

By: ________________________________
Name:
Title:

**AXIOS CAPITAL SOLUTIONS, LLC**

By: ________________________________
Name:
Title:

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

By: ________________________________
Name:
Title: