# EXHIBIT B

**(Redline)**

**THE BANKRUPTCY COURT HAS NOT APPROVED SOLICITATION OF THIS PLAN. THIS PLAN HAS NOT YET BEEN CONFIRMED BY THE BANKRUPTCY COURT. THIS PLAN IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>Pacifica of the Valley Corp.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 26-11060 (TMH) |

**COMBINED DISCLOSURE STATEMENT AND CHAPTER 11 PLAN OF LIQUIDATION OF PACIFICA OF THE VALLEY CORPORATION**

[1] The Debtor in this Chapter 11 Case, along with the last four digits of the Debtor's federal tax identification number, is: Pacifica of the Valley Corporation d/b/a Pacifica Hospital of the Valley [7312]. The Debtor's mailing address is 9449 San Fernando Road, Sun Valley, CA 91352.

Dated: ~~October 30,~~November [•], 2026

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ DRAFT*________________

Laura Davis Jones (DE Bar No. 2436)
919 North Market Street, 17th Floor
Wilmington, DE 19899
Telephone: (302) 652-4100
Email: ljones@pszjlaw.com

-and-

**DENTONS US LLP**

Tania M. Moyron (*pro hac vice*)
Samuel R. Maizel (*pro hac vice*)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone: (213) 623-9300
Facsimile: (213) 623-9924
Email: tania.moyron@dentons.com
samuel.maizel@dentons.com

John D. Beck (*pro hac vice*)
Geoffrey Miller (*pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone: (212) 768-6700
Facsimile: (212) 768-6800
Email: john.beck@dentons.com
geoffrey.miller@dentons.com

*Counsel to Debtor and Debtor in Possession*

# TABLE OF CONTENTS


DISCLAIMERS ..... 1

SECTION 1 INTRODUCTION ..... 4

SECTION 2 DEFINED TERMS ..... 6

SECTION 3 SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER PLAN AND IMPORTANT SOLICITATION AND CONFIRMATION DATES AND DEADLINES ..... ~~20~~21

3.1 Summary of Classification and Treatment of Claims and Interests. ..... ~~20~~21

3.2 Important Dates and Deadlines. ..... ~~24~~25

SECTION 4 BACKGROUND ..... ~~25~~26

4.1 General Background. ..... ~~25~~26

4.2 Events Leading to Chapter 11 Filing. ..... ~~27~~28

SECTION 5 THE CHAPTER 11 CASE ..... ~~27~~28

5.1 First Day Motions and Other Early Developments in the Chapter 11 Case. ..... ~~27~~28

5.2 DIP Financing. ..... ~~28~~29

5.3 The Axios Sale. ..... ~~28~~29

5.4 Sale of HQAF Receivables to L.A. Care. ..... ~~29~~30

5.5 Debtor's Retention of Professionals and Personnel. ..... ~~29~~31

5.6 Formation of the Committee; Retention of Professionals. ..... ~~29~~31

5.7 Debtor's Schedules and Statement of Financial Affairs. ..... ~~29~~31

5.8 Employees. ..... ~~30~~31

5.9 Claims Bar Dates. ..... ~~30~~32

5.10 Contract and Lease Rejection Motion. ..... ~~30~~32

SECTION 6 CONFIRMATION AND VOTING PROCEDURES ..... ~~30~~32

6.1 Confirmation Hearing. ..... ~~30~~32

6.2 Procedures for Objections. ..... ~~31~~32

6.3 Requirements for Confirmation. ~~31~~33

6.4 Classification of Claims and Interests. ~~31~~33

6.5 Impaired Claims or Interests. ~~33~~34

6.6 Confirmation Without Necessary Acceptances; Cramdown. ~~33~~35

6.7 Feasibility. ~~34~~36

6.8 Best Interests Test and Liquidation Analysis. ~~34~~36

6.9 Eligibility to Vote on the Combined DS and Plan. ~~35~~37

6.10 Solicitation Package / Release Opt-In Election Form. ~~35~~37

6.11 Voting Procedures, Voting Deadline, and Deadline to Submit the Release Opt-In Election Form. ~~36~~38

6.12 Acceptance of the Combined DS and Plan. ~~37~~39

SECTION 7 UNCLASSIFIED CLAIMS ~~37~~39

7.1 Unclassified Claims. ~~37~~39

7.2 Administrative Claims. ~~37~~39

7.3 Professional Fees. ~~38~~40

7.4 Priority Claims. ~~38~~40

7.5 Priority Tax Claims. ~~38~~40

SECTION 8 CLASSIFICATION OF CLAIMS AND INTERESTS ~~39~~41

8.1 Summary of Classification. ~~39~~41

8.2 Special Provision Governing Unimpaired Claims. ~~39~~41

8.3 Vacant and Abstaining Classes. ~~39~~41

SECTION 9 TREATMENT OF CLAIMS AND INTERESTS ~~40~~42

9.1 Class 1—Axios Prepetition Secured Claim. ~~40~~42

9.2 Class 2—Reliq Claim. ~~40~~42

9.3 Class 3—L.A. Care Claim. ~~40~~43

9.4 Class 4—Other Secured Claims. ~~41~~43

9.5 Class 5—General Unsecured Claims. ~~41~~43

9.6 Class 6—Insured Claims. ~~41~~44

9.7 Class 7—Subordinated Claims ~~42~~44

9.8 Class 8—Interests ~~42~~44

SECTION 10 MEANS FOR IMPLEMENTATION OF THE PLAN ~~42~~44

10.1 General Settlement of Claims and Interests. ~~42~~44

10.2 The Global Settlement Agreement Among the Debtor, Axios, and the Committee. ~~42~~45

10.3 PGMC Settlement Proposal. ~~43~~46

10.4 Taxing Authority Settlements. ~~44~~46

10.5 Post-Effective Date Operations Pursuant to IMA. ~~44~~46

10.6 Operating Accounts for the Post-Effective Date Debtor. ~~44~~47

10.7 Transfer of the Liquidating Trust Cash Contribution and Certain Other Funds Into the Liquidating Trust. ~~44~~47

10.8 Coordination Between Post-Effective Date Debtor and the Liquidating Trust. ~~45~~47

10.9 Funding for Distributions. ~~45~~47

10.10 Preservation of Insurance. ~~45~~47

10.11 Destruction and Abandonment of Books and Records. ~~45~~48

10.12 Dissolution of the Committee. ~~45~~48

10.13 No Further Court Authorization. ~~46~~48

SECTION 11 ~~46~~50

11.1 Creation and Purpose of Liquidating Trust. ~~46~~50

11.2 Liquidating Trust Agreement. ~~46~~51

11.3 Litigation. ~~47~~51

11.4 Appointment of the Liquidating Trustee. ~~47~~52
11.5 Liquidating Trust Assets. ~~48~~52
11.6 Rights and Powers of the Liquidating Trustee. ~~48~~53
11.7 Standing and Authority. ~~49~~54
11.8 Oversight Committee. ~~49~~54
11.9 Fees and Expenses of the Liquidating Trust. ~~50~~54
11.10 Liquidating Trust Interests. ~~50~~55
11.11 Transfer of Beneficial Interests in the Liquidating Trust. ~~50~~55
11.12 Effective Date Cash Transfers. ~~50~~55
11.13 Term of the Liquidating Trust. ~~50~~55
11.14 Certain Tax Matters. ~~51~~56
SECTION 12 DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS ~~51~~57
12.1 Distribution Dates. ~~51~~57
12.2 Subsequent Distributions. ~~51~~57
12.3 Distribution Record Date. ~~52~~57
12.4 Manner of Cash Payments Under the Plan or Liquidating Trust Agreement. ~~52~~57
12.5 Time Bar to Cash Payments by Check. ~~52~~57
SECTION 13 PROCEDURES FOR RESOLVING DISPUTED CLAIMS ~~52~~58
13.1 No Distributions Pending Allowance. ~~52~~58
13.2 Resolution of Disputed Claims. ~~52~~58
13.3 Objection Deadline. ~~53~~58
13.4 Estimation of Claims. ~~53~~58
13.5 Disallowance of Claims. ~~53~~58
13.6 Adjustment to Claims Register Without Objection. ~~53~~59

13.7 Reserve Provisions for Disputed Claims. ~~53~~59

13.8 Rounding. ~~54~~59

13.9 No Cash Payments of Less Than $100 on Account of Allowed Claims. ~~54~~59

13.10 Delivery of Distributions and Unclaimed Property. ~~54~~60

13.11 Required Tax Information. ~~55~~60

13.12 Books and Records. ~~55~~61

SECTION 14 TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ~~55~~61

14.1 Rejection / Assumption. ~~55~~61

14.2 Rejection Claims. ~~56~~61

14.3 Insurance Policies. ~~56~~62

SECTION 15 ~~57~~62

15.1 Continued Existence of Post-Effective Date Debtor After the Effective Date. ~~57~~62

15.2 No Further Approvals Required. ~~57~~63

15.3 Operation of the Health Care System. ~~57~~63

15.4 Dissolution. ~~57~~63

15.5 Post-Effective Date Board of Directors. ~~57~~63

SECTION 16 EFFECT OF CONFIRMATION ~~58~~64

16.1 Binding Effect of the Plan. ~~58~~64

16.2 Vesting of Property of the Debtor on the Effective Date. ~~58~~64

SECTION 17 EXCULPATIONS, INJUNCTIONS, AND RELEASES ~~58~~64

17.1 Exculpation. ~~59~~65

17.2 Releases. ~~59~~65

17.3 Injunction. ~~61~~67

17.4 Post-Confirmation Liability of Liquidating Trustee. ~~61~~67

17.5 Preservation of Rights of Action. ~~62~~68

17.6 No Discharge. ~~65~~71

SECTION 18 CERTAIN RISK FACTORS, TAX CONSEQUENCES, AND OTHER DISCLOSURES ~~65~~71

18.1 Certain Risk Factors to Be Considered. ~~65~~71

18.2 Tax Treatment. ~~69~~76

18.3 Alternatives to the Combined DS and Plan. ~~71~~78

SECTION 19 CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN ~~71~~78

19.1 Conditions to Confirmation of the Plan. ~~71~~78

19.2 Conditions to the Effective Date. ~~72~~79

19.3 Waiver of Conditions Precedent. ~~73~~80

SECTION 20 RETENTION OF JURISDICTION ~~73~~80

SECTION 21 MISCELLANEOUS PROVISIONS ~~74~~81

21.1 Revocation of the Combined DS and Plan. ~~74~~81

21.2 Severability of Plan Provisions. ~~74~~81

21.3 Exhibits. ~~75~~82

21.4 Notices. ~~75~~82

21.5 Reservation of Rights. ~~76~~84

21.6 Defects, Omissions and Amendments. ~~77~~84

21.7 Filing of Additional Documents. ~~77~~84

21.8 Successors and Assigns. ~~77~~84

21.9 Setoffs and Recoupments. ~~77~~84

21.10 Tax Exemption. ~~77~~85

21.11 Securities Exemption. ~~78~~85

21.12 Implementation. ~~78~~85

21.13 Record Date. ~~78~~85

21.14 Certain Actions. ~~78~~85

21.15 Substantial Consummation. ~~78~~86

21.16 Waiver of Fourteen-Day Stay. ~~78~~86

21.17 Governing Law. ~~78~~86

21.18 Entire Agreement. ~~79~~86

SECTION 22 RECOMMENDATION ~~79~~86

**DISCLAIMERS**

**EACH HOLDER OF A CLAIM AGAINST THE DEBTOR ENTITLED TO VOTE TO ACCEPT OR REJECT THE COMBINED DISCLOSURE STATEMENT AND PLAN OF LIQUIDATION OF PACIFICA OF THE VALLEY CORPORATION (THE "COMBINED DS AND PLAN") SHOULD READ THE COMBINED DS AND PLAN IN ITS ENTIRETY BEFORE VOTING. NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE COMBINED DS AND PLAN MAY BE MADE EXCEPT PURSUANT TO THE TERMS HEREOF AND §§ 1121 AND 1125. IF YOU ARE ENTITLED TO VOTE TO ACCEPT THE COMBINED DS AND PLAN, YOU ARE RECEIVING A BALLOT WITH YOUR NOTICE OF THE COMBINED DS AND PLAN. THE DEBTOR URGES YOU TO VOTE TO ACCEPT THE COMBINED DS AND PLAN.**

**THE COMBINED DS AND PLAN HAS BEEN PREPARED IN ACCORDANCE WITH §§ 1121 AND 1125 AND BANKRUPTCY RULES 3016 AND 3017, AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST OR INTERESTS IN THE DEBTOR SHOULD EVALUATE THE COMBINED DS AND PLAN IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED. THE COMBINED DS AND PLAN SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE COMBINED DS AND PLAN AS TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTOR. YOU SHOULD CONSULT YOUR PERSONAL COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES, OR OTHER LEGAL CONSEQUENCES OF THE COMBINED DS AND PLAN.**

**THE COMBINED DS AND PLAN CONTAINS SUMMARIES OF CERTAIN STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE COMBINED DS AND PLAN, ANTICIPATED EVENTS IN THE CHAPTER 11 CASE, AND FINANCIAL INFORMATION. ALTHOUGH THE DEBTOR BELIEVES THAT THE STATEMENTS AND DESCRIPTIONS CONTAINED IN THE COMBINED DS AND PLAN ARE TRUE AND ACCURATE, THEY ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THE DOCUMENTS RELATED TO THE COMBINED DS AND PLAN AND APPLICABLE STATUTORY PROVISIONS. THE TERMS OF THE DOCUMENTS RELATED TO THE COMBINED DS AND PLAN AND APPLICABLE STATUTES GOVERN IN THE EVENT OF ANY DISCREPANCY WITH THE COMBINED DS AND PLAN. CREDITORS AND OTHER INTERESTED PARTIES SHOULD READ THE COMBINED DS AND PLAN, THE DOCUMENTS RELATED TO THE COMBINED DS AND PLAN, AND THE APPLICABLE STATUTES THEMSELVES FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.**

**THE FACTUAL STATEMENTS AND REPRESENTATIONS CONTAINED IN THE COMBINED DS AND PLAN ARE MADE BY THE DEBTOR AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFIED, AND THE DEBTOR DISCLAIMS ANY OBLIGATION TO UPDATE ANY SUCH STATEMENTS AFTER THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE COMBINED DS AND PLAN. THE DELIVERY OF THE COMBINED DS AND PLAN SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.**

**THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT NECESSARILY BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.**

**ALL FORWARD-LOOKING STATEMENTS CONTAINED HEREIN OR OTHERWISE MADE BY THE DEBTOR INVOLVE MATERIAL RISKS AND UNCERTAINTIES AND ARE SUBJECT TO CHANGE BASED ON NUMEROUS FACTORS, INCLUDING FACTORS THAT ARE BEYOND THE DEBTOR'S CONTROL. ACCORDINGLY, THE DEBTOR'S FUTURE PERFORMANCE AND FINANCIAL RESULTS MAY DIFFER MATERIALLY FROM THOSE EXPRESSED OR IMPLIED IN ANY SUCH FORWARD-LOOKING STATEMENTS. SUCH FACTORS INCLUDE, BUT ARE NOT LIMITED TO, THOSE DESCRIBED IN THE COMBINED DS AND PLAN. THE DEBTOR DOES NOT INTEND TO UPDATE OR REVISE ITS FORWARD-LOOKING STATEMENTS EVEN IF EXPERIENCE OR FUTURE CHANGES MAKE IT CLEAR THAT ANY PROJECTED RESULTS EXPRESSED OR IMPLIED THEREIN WILL NOT BE REALIZED.**

**ANY PROJECTED RECOVERIES TO CREDITORS SET FORTH IN THIS DISCLOSURE STATEMENT ARE BASED UPON THE ANALYSES PERFORMED BY THE DEBTOR AND ITS ADVISORS. ALTHOUGH THE DEBTOR AND ITS ADVISORS HAVE MADE EVERY EFFORT TO VERIFY THE ACCURACY OF THE INFORMATION PRESENTED HEREIN, THE DEBTOR AND ITS ADVISORS CANNOT MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THIS INFORMATION.**

**IN CONNECTION WITH THE SOLICITATION OF ACCEPTANCES OF THE COMBINED DS AND PLAN PURSUANT TO § 1126, THE DEBTOR IS FURNISHING A SOLICITATION PACKAGE, CONSISTING OF THE CO COMBINED DS AND PLAN, THE EXHIBITS HERETO, NOTICE OF CONFIRMATION HEARING, AND A BALLOT OR RELEASE OPT-IN ELECTION FORM, AS APPLICABLE, TO EACH RECORD HOLDER OF CLAIMS ELIGIBLE TO VOTE OR ITS COUNSEL. THE COMBINED DS AND PLAN IS TO BE USED BY EACH SUCH ELIGIBLE HOLDER SOLELY IN CONNECTION WITH ITS EVALUATION OF THE COMBINED DS AND PLAN; USE OF THE COMBINED DS AND PLAN FOR ANY OTHER PURPOSE IS NOT AUTHORIZED. NOTHING STATED IN THE COMBINED DS AND PLAN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING**

**INVOLVING THE DEBTOR OR ANY OTHER PARTY. THE COMBINED DS AND PLAN MAY NOT BE REPRODUCED OR PROVIDED TO ANYONE OTHER THAN ADVISORS TO THE RECIPIENT WITHOUT THE PRIOR WRITTEN CONSENT OF THE DEBTOR.**

## SECTION 1
## INTRODUCTION

Pacifica of the Valley Corporation, the debtor and debtor in possession (the "Debtor") in the above-referenced Chapter 11 Case,[2] hereby proposes the following combined disclosure statement and plan of liquidation, pursuant to §§ 1121(a) and 1125(b) of the Bankruptcy Code[3] (the disclosure statement portion hereof, the "Disclosure Statement" and the chapter 11 plan portion hereof, the "Plan," as may be modified and/or amended from time to time, and collectively, the Combined DS and Plan). The Debtor is the proponent of this Plan within the meaning of § 1129.

The Debtor filed this Chapter 11 Case on an emergency basis with rapidly dwindling liquidity and no access to incremental debtor-in-possession ("DIP") financing. After operating in chapter 11 with limited liquidity, the Debtor obtained DIP financing from Axios and in connection therewith reached a comprehensive plan term sheet (the "Global Settlement Agreement") with Axios and the Committee providing for principal of up to $52.5 million in DIP financing consisting of up to $21 million in new money term loans and a 1.5x roll-up of Axios's Prepetition Secured Claim of up to $31.5 million, a sale of substantially all of the Debtor's assets (other than the Excluded Assets) to Axios, and the sharing of net proceeds of the Excluded Assets between Axios and the ~~Committee through the~~ Liquidating Trust to be implemented in the Plan.

The Debtor will sell substantially all of its assets (other than the Excluded Assets) to Axios, through its Designee, in accordance with the Global Settlement Agreement. The Axios Sale maximizes value to the Estate and will ensure continuity of care for the Debtor's patients and preserve approximately 697 jobs.

Axios had a claim in the approximate amount of $50,943,321 on the Petition Date. Pursuant to the Global Settlement Agreement and the DIP Order, approximately $31.5 million of that amount has been or will be rolled up into the Axios DIP Claim, leaving approximately $19.4 million of the Axios Secured Claim outstanding, plus accrued interest and fees. After giving effect to the Roll-up and Commitment Fee as provided in the DIP Order, the Axios DIP Claim has a principal balance of not less than $54.6 million. Accordingly, the Axios Secured Claim and Axios DIP Claim total approximately $74 million in the aggregate, excluding additional interest and fees. In connection with the Global Settlement Agreement and the Axios Sale, Axios shall credit bid no less than $40 million of its secured claims and cap any remaining claims against the

[2] Capitalized terms used in the Combined DS and Plan and not otherwise defined have the meanings ascribed to such terms in Section 2 hereof.

[3] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), and all "Bankruptcy Rule" references are to the Federal Rules of Bankruptcy Procedure. All references to the Local Rules are to the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

Debtor's Estate at $15 million, with any remaining Axios claims to be assumed by Axios's Designee as Assumed Axios Debt. Accordingly, the Axios Sale will satisfy at least $59 million in secured claims against the Estate, consisting of the $40 million credit bid and approximately $19 million in additional debt relief resulting from the assumption by Axios's Designee of all Axios claim amounts in excess of the $15 million (i.e., total debt of approximately $74 million less the Axios Credit Bid of $40 million less the $15 million remaining claim against the Liquidating Trust, equals approximately $19 million in claims to be assumed by the Designee pursuant to the Global Settlement Agreement). The Axios Sale structure also delivered substantial additional value through, among other things, (i) Axios's commitment to fund future operating losses and capital expenditures of the Operations, through the term of the IMA, and (ii) the anticipated resolution of all claims asserted by Reliq against the Debtor's Estate, estimated at approximately $13.8 million. Taken together, these substantial and quantifiable economic benefits demonstrate that the value delivered by the Axios Sale far exceeds the face amount of the Axios Credit Bid Amount, materially reduced the claims burden on the Estate, and meaningfully enhanced the prospects for recoveries to general unsecured creditors. Consistent with the Global Settlement Agreement, the Debtor will file the Sale Motion seeking approval of the Axios Sale.

Generally, the Plan proposes to pay or otherwise satisfy Allowed Administrative Claims, Allowed Secured Claims, and Allowed Priority Claims in full on the Effective Date or as soon as reasonably practicable thereafter, and to resolve Allowed Priority Tax Claims through the Taxing Authority Settlements. The Plan establishes a Liquidating Trust to prosecute and resolve certain estate causes of action. The Holders of Allowed General Unsecured Claims shall receive their *pro rata* interests in the Liquidating Trust. The Plan appoints the Liquidating Trustee to, among other things: (1) liquidate the Liquidating Trust Assets; (2) investigate, prosecute, settle, abandon or compromise any Causes of Action the Debtor holds or may hold against any Entity; and (3) make all Distributions in accordance with the Plan and the Liquidating Trust Agreement.

The Debtor will distribute the Combined DS and Plan to all Holders of Claims and Interests in accordance with § 1125(b) and Bankruptcy Rules 2002, 3016, and 3017, and the Bankruptcy Court's order conditionally approving the Combined DS and Plan (the "Conditional Approval and Procedures Order"). The Combined DS and Plan and the exhibits hereto include a discussion of: (1) the nature and history of the Debtor's business and liabilities; (2) events during the Chapter 11 Case; (3) the requirements for confirmation of the Plan and procedures for voting to accept or reject the Plan; (4) additional factors and disclosures to be considered, including risk factors and certain U.S. federal income tax consequences of the Plan; and (5) the terms of the Plan, including the treatment of Holders of Claims and Interests under the Plan. The Disclosure Statement was prepared with the intent to provide "adequate information" (as defined in the Bankruptcy Code) to enable Holders of Claims against and Interests in the Debtor to make informed judgments about the Plan.

Subject to the restrictions on modifications set forth in § 1127 and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Combined DS and Plan, the Debtor expressly reserves the right to alter, amend, or modify the Combined DS and Plan, including the Plan Supplement, one or more times, before substantial consummation thereof.

***Please read the Combined DS and Plan, the exhibits, other supporting materials, and any appropriate ballot carefully and follow the instructions set forth below and on the appropriate ballot to vote on the Plan. The Debtor believes that the Plan provides the best method of maximizing the recoveries for the Holders of Claims and Interests against the Debtor. Therefore, the Debtor recommends that all creditors who are entitled to vote should vote in favor of the Plan.***

Unless otherwise specified, all section or exhibit references in the Combined DS and Plan are to the respective section in, or exhibit to, the Combined DS and Plan, as the same may be amended, waived, or modified from time to time. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Combined DS and Plan as a whole and not to any particular section, subsection, or clause contained herein. The headings in the Combined DS and Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; and (3) unless otherwise noted above, the rules of construction set forth in § 102 shall apply.

## SECTION 2
## DEFINED TERMS

As used in the Combined DS and Plan, capitalized terms not otherwise defined have the meanings set forth below. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

"Administrative Claim" means a Claim for an expense of administration of the Chapter 11 Case arising under §§ 365(d)(3), 503(b), 507(b), 503(b)(9) or 1114(e)(2), including: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estate; (b) the value of any goods received by the Debtor within twenty (20) days before the Petition Date to the extent those goods were sold to the Debtor in the ordinary course of the Debtor's business; (c) Professional Fee Claims; (d) all fees and charges assessed against the Estate under 28 U.S.C. §§ 1911-1930; (e) all obligations designated as Allowed Administrative Claims pursuant to an order of the Bankruptcy Court; and (f) any Tax Claims incurred by the Debtor after the Petition Date or relating to a tax year or period which occurs after the Petition Date.

"Administrative Expense Bar Date" means the applicable last date, at 5:00 p.m. Eastern time, set by the Bankruptcy Court for a Claimant to file a request for payment of any Administrative Claim (excluding Professional Fee Claims) arising on or after the Petition Date, through and including the Effective Date. The Administrative Expense Bar Date shall be sixty (60) days after the Effective Date.

"Affiliate" means with respect to any specified Entity, any other Entity directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Entity. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by," and "under common control with") as used with respect to any Entity, shall mean the possession, directly or indirectly, of the right or power to direct or cause the direction of the management or policies of such Entity, whether through the ownership of voting securities, by agreement, or otherwise.

"Allowed" means, with respect to any Claim, except as otherwise provided herein: (a) a Claim that has been scheduled by the Debtor on the Schedules as other than disputed, contingent, or unliquidated and, as to which, the Debtor, the Liquidating Trustee or other party in interest has not filed an objection on or before the Claims Objection Deadline; (b) a Claim that is set forth in a timely filed Proof of Claim as to which no objection has been filed on or before the Claims Objection Deadline and which is not otherwise a Disputed Claim; (c) a Claim that has been allowed by a Final Order; (d) a Claim that is allowed: (i) in any stipulation executed by the Debtor prior to the Effective Date and approved by the Bankruptcy Court; (ii) in any stipulation executed by the Liquidating Trustee on or after the Effective Date; or (iii) in any contract, instrument, indenture or other agreement entered into or assumed by the Debtor in connection with and in accordance with the Plan; (e) a Claim relating to a rejected executory contract or unexpired lease that either (i) is not a Disputed Claim or (ii) has been allowed by a Final Order, in either case only if a Proof of Claim has been timely filed by the Claimant before the applicable Rejection Bar Date for such claim or has otherwise been deemed timely filed under applicable law; or (f) a Claim that is allowed pursuant to the terms of the Plan. For the purpose of determining distributions pursuant to the Plan, allowance under subsections (a) and (b) only is applicable once any of the following occurs: (1) before the Claims Objection Deadline, the Debtor or the Liquidating Trustee, as applicable, determine not to object to the Claim, (2) the Claims Objection Deadline passes without an objection being filed, or (3) after the Debtor or Liquidating Trustee timely objects to the Claim, the Claim is allowed as provided in subparagraphs (c), (d) or (e) above.

"Allowed Claim" or "Allowed […] Claim" means a Claim that has been Allowed.

"APA" has the meaning set forth in Section 5.3 hereof.

"Approved Budget" means the 13-week cash-flow budget and funding schedule attached as Exhibit B to the Final DIP Order.

"Assumed Axios Debt" means any portion of the Axios Secured Claim remaining after application of the Axios Credit Bid Amount in excess of $15 million, which shall be assumed by Axios's Designee.

"Avoidance Actions" means any and all avoidance, recovery, subordination, or other claims, actions, or remedies which any of the Debtor, the Estate, or other appropriate party in interest has asserted or may assert under §§ 502, 510, 542, 544, 545, or 547 through 553 or under similar or related state or federal statutes and common law.

"Axios" means Axios Capital Solutions, LLC.

"Axios Credit Bid Amount" means the aggregate amount of the credit bid by Axios, or its designated affiliate or designee, pursuant to § 363(k), in connection with the Axios Sale, which amount shall be satisfied through the crediting of all or a portion of the Axios Secured Claim against the purchase price for such assets, in an amount not less than $40,000,000 (with the Axios DIP Claim to be credited against such purchase price prior to the application of any portion of the Axios Prepetition Secured Claim).

"Axios DIP Claim" means any and all DIP obligations owing by the Debtor to Axios under the Credit Agreement including, without limitation, the Roll Up, the DIP Facility Fee, accrued interest, fees and expenses, and any Operating Advances.

"Axios Prepetition Secured Claim" means any and all obligations under the Prepetition Loan (excluding any "Roll-Up Loan" as defined and provided for in the Final DIP Order and Credit Agreement).

"Axios Secured Claim" means the Axios DIP Claim and the Axios Prepetition Secured Claim.

"Axios Sale" means the sale of substantially all of the Debtor's assets (other than the Excluded Assets) to Axios's Designee pursuant to §§ 363 and 365, the APA, and the Axios Sale Order, including the related IMA.

"Axios Sale Order" means any Final Order of the Bankruptcy Court approving the Axios Sale pursuant to §§ 363 and 365.

"Ballots" means the ballots upon which the Holders of Impaired Claims shall indicate their acceptance or rejection of the Plan in accordance with the Plan and the Voting Instructions.

"Bankruptcy Code" means sections 101 *et seq*. of title 11 of the United States Code, and applicable portions of titles 18 and 28 of the United States Code.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Case.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Chapter 11 Case, promulgated under 28 U.S.C. § 2075.

"Bar Date" means, as applicable, the General Claims Bar Date, Governmental Bar Date, Rejection Bar Date, the Administrative Expense Bar Date, or any other applicable deadline to file Claims referenced in the Plan or the Bar Date Order.

"Bar Date Order" means the *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment under Section 503(b)(9) of the Bankruptcy Code; (II) Setting a Bar Date for the Filing of Proofs of Claim by Governmental Units; (III) Establishing an Amended Schedules Bar Date and Rejection Damages Bar Date; (IV) Approving the Form and Manner for Filing Proofs of Claim; (V) Approving a Notice of Bar Dates; and (VI) Granting Related Relief* [Docket No. 212].

"Business Day" means any day, other than a Saturday, Sunday or legal holiday as defined in Bankruptcy Rule 9006(a).

"Cash" means cash and cash equivalents, including, but not limited to, bank deposits, wire transfers, checks, and readily marketable securities, instruments, and legal tender of the United States of America or instrumentalities thereof.

"Causes of Action" means all claims, actions, causes of action, Avoidance Actions, choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of setoff, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims, including, without limitation, all claims and any avoidance, preference, recovery, subordination or other actions of the Debtor and Estate (unless the context expressly states that such Causes of Action belong to another Entity) against Creditors, insiders, and/or any other Entities under the Bankruptcy Code, based in law or equity, including, without limitation, under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted as of the Effective Date.

"CBA" means each of (i) the Collective Bargaining Agreement between SEIU 121RN and Pacifica Hospital of the Valley covering the period from January 1, 2026 through December 31, 2028 and (ii) the Agreement between United Healthcare Workers – West, SEIU CTW, CLC and Pacifica Hospital of the Valley covering the period from June 1, 2022 through June 1, 2026, in which a further three (3) year roll over contract was negotiated, resulting in wage rate changes only (collectively, the "CBAs").

"Challenge" ~~shall have~~has the meaning ~~provided~~set forth in paragraph 21 of the Final DIP Order.

"Challenge Expiry Date" has the meaning set forth in paragraph 21 of the Final DIP Order.

"Challenge Rights" has the meaning set forth in paragraph 21 of the Final DIP Order.

"Chapter 11 Case" means the Chapter 11 case commenced when the Debtor filed its voluntary petition for relief under Chapter 11 on the Petition Date and administered under case number 26-11060 (TMH).

"Claim" means a claim (as defined in § 101(5)) against the Debtor, including, but not limited to: (a) any right to payment from the Debtor whether or not such right is reduced to judgment, liquidated, unliquidated, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) any right to an equitable remedy for breach of performance if such performance gives rise to a right of payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

"Claimant" means the Holder of a Claim.

"Claims Agent" means Kurtzman Carson Consultants LLC, dba Verita Global, which was appointed as the Debtor's claims, noticing, and balloting agent.

"Claims Objection Deadline" means, with respect to all Claims and Administrative Claims other than Professional Fee Claims, one hundred eighty (180) days after the Effective Date; provided, however, that the period of time for filing objections to all Claims other than Professional Fee Claims shall automatically renew for successive periods of one hundred eighty (180) days until the earlier of (i) the date upon which all Claims and Administrative Claims have been Allowed or Disallowed, or (ii) such other date as may be fixed by an order of the Bankruptcy Court upon motion of the Liquidating Trustee.

"Class" means a category of Holders of Claims or Interests, as set forth in Sections 8 and 9 hereof.

"Colorado Court" has the meaning set forth in Section 4.1(c)(i) hereof.

"Colorado Litigation" has the meaning set forth in Section 4.1(c)(i) hereof.

"Combined DS and Plan" has the meaning set forth in Section 1 hereof.

"Committee" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee in the Chapter 11 Case on July 20, 2026 [Docket No. 78].

"Conditional Approval and Procedures Order" has the meaning set forth in Section 1 hereof.

"Confirmation" means the entry of the Confirmation Order, subject to all terms and conditions therein.

"Confirmation Date" means the date upon which the Confirmation Order is entered by the Bankruptcy Court on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

"Confirmation Hearing" means the hearing at which the Bankruptcy Court will consider final approval of the disclosures contained in the Disclosure Statement and confirmation of the Plan.

"Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to § 1129.

"Consummation" or "Consummate" means the occurrence of the Effective Date.

"Contingent Claim" means any Claim for which a Proof of Claim has been filed with the Bankruptcy Court but was not filed in a sum certain and which Claim has not been estimated, fixed, or liquidated by the Bankruptcy Court at a sum certain as of the Effective Date, or a Claim that has accrued but nonetheless remains dependent on the occurrence of a future event that may never occur.

"Credit Agreement" means that certain Credit Agreement entered into on October 16, 2026 by and among the Debtor, as Borrower, and Axios, as DIP lender.

"Creditor" means any Holder of a Claim against the Debtor as specified in § 101(10).

"CRO" has the meaning set forth in Section 4.2 hereof.

"Debt" means liability on a Claim.

"Debtor" means Pacifica of the Valley Corporation, as debtor and debtor-in-possession.

"Debtor/Estate Release" has the meaning set forth in Section 17.2(a) hereof.

"Debtor/Estate Releasors" has the meaning set forth in Section 17.2(a) hereof.

"Designee" means Sun Valley Hospital Company or such other designee of Axios to acquire the Debtor's assets pursuant to the APA.

"DIP Facility" means the senior secured postpetition financing in an aggregate principal amount of up to $52,500,000, consisting of (a) new money term loans in an aggregate principal amount of up to $21,000,000, which new money term loans shall be made available to the Debtor in multiple tranches pursuant to the terms and subject to the conditions set forth in the Credit Agreement, the Interim DIP Order, and the Final DIP Order; and (b) a "roll up" of the principal amount of Prepetition Obligations, plus interest, fees, and other amounts due thereunder that will be deemed "rolled up" as loans under the DIP Facility on a 1.5x basis (i.e., 1.5 times the dollar amount of cash actually advanced postpetition, up to $31,500,000) pursuant to the terms and subject to the conditions set forth in the Credit Agreement, the Interim DIP Order and the Final DIP Order and before accrual of the Commitment Fee and interest.

"DIP Motion" has the meaning set forth in Section 5.2 hereof.

"Director & Officer Insurance Claims" means any and all claims and rights of the Debtor and/or the Estate under and/or relating to any and all director and officer insurance policies currently or previously maintained by or for the benefit of the Debtor.

"Disallowed" means, when used in reference to a Claim, a Disallowed Claim.

"Disallowed Claim" means a Claim or any portion thereof that (a) has been disallowed by a Final Order, (b) is listed in the Schedules at zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim has been timely filed, (c) is not listed in the Schedules, and as to which (i) no Proof of Claim has been timely filed, or (ii) no request for payment of an Administrative Claim has been filed by the Administrative Expense Bar Date, or (d) after the Effective Date, has been disallowed in a written agreement by and between the Liquidating Trustee and the Holder of such Claim.

"Disclosure Statement" has the meaning set forth in Section 1 hereof.

"Disputed" means, when used in reference to a Claim, a Disputed Claim.

"Disputed Claim" means any Claim or any portion thereof, (i) that is neither an Allowed Claim nor a Disallowed Claim; or (ii) as to which an objection to the allowance thereof or request for estimation has been interposed on or prior to the Claims Objection Deadline, which objection or request for estimation has not been withdrawn or determined by a Final Order.

"Disputed Claim Reserve" has the meaning set forth in Section 13.7 hereof.

"Distribution Agent" means the Liquidating Trustee, or its designees or agents.

"Distribution Dates" means collectively the Initial Distribution Date, any Subsequent Distribution Date(s), and the date of the Final Distribution.

"Distribution Record Date" means the close of business on the Confirmation Date.

"Distributions" means the distributions of Cash to be made in accordance with the Plan and the Liquidating Trust Agreement, as applicable.

"Effective Date" means the date selected by the Debtor, which is a Business Day after the Confirmation Date on which no stay of the Confirmation Order is in effect and all conditions precedent have been satisfied or waived. Within five (5) Business Days after the Effective Date, notice of the Effective Date shall be filed with the Bankruptcy Court by the Debtor.

"Entity" means an entity as defined in § 101(15).

"Estate" means the estate of the Debtor in the Chapter 11 Case created pursuant to § 541.

"Excluded Assets" means the Excluded Assets as set forth in the Credit Agreement including: (i) the Debtor's interests in or related to PGMC; (ii) all Causes of Action and Litigation, including Avoidance Actions, as of the Effective Date, except as otherwise released pursuant to the Plan (or as set forth in Section 10.2); (iii) Director & Officer Insurance Claims; (iv) HQAF Excluded Asset; and (v) the Liquidating Trust Cash Contribution.

"Exculpated Parties" means collectively (a) the Debtor, (b) members of the Restructuring Committee, (c) Peter C. Chadwick in his capacity as Chief Restructuring Officer of the Debtor, (d) members of the Committee (solely in their capacities as Committee members), and (e) Bankruptcy Court-approved Estate and Committee professionals.

"Final Decree" means the decree contemplated under Bankruptcy Rule 3022.

"Final DIP Order" means the *Final Order (I) Authorizing the Debtor to Obtain Postpetition Secured Financing; (II) Granting Liens and Providing Superpriority Administrative Expense Status; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; and (V) Authorizing the Debtor's Use of Cash Collateral* [Docket No. 250].

"Final Distribution" means the last payment to Holders of Allowed Claims in accordance with the provisions of the Plan.

"Final Order" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction: (i) that has not been reversed, stayed, modified, or amended; (ii) as to which the time to or the right to appeal or seek reconsideration, review, rehearing, or certiorari has expired or been waived (without regard to whether the time to seek relief from a judgment under Bankruptcy Rule 9024 has expired); and (iii) as to which no appeal or petition for reconsideration, review, rehearing, or certiorari is pending.

"First Day Declaration" means the *Declaration of Precious Mayes in Support of Emergency First-Day Motions* [Docket No. 16].

"General Claims Bar Date" means October 30, 2026, at 5:00 p.m., prevailing Eastern Time, which is the general deadline set pursuant to the Bar Date Order for filing Proofs of Claim for any Claims against the Debtor that arose prior to the Petition Date.

"General Unsecured Claim" means any unsecured Claim against the Debtor or the Estate, that is not a Secured Claim, an Administrative Claim, a Priority Tax Claim, a Priority Non-Tax Claim, or an Insured Claim.

"Global Settlement Agreement" has the meaning set forth in Section 1 hereof.

"Governmental Bar Date" means December 31, 2026, at 5:00 p.m., prevailing Eastern Time, which is the deadline set pursuant to the Bar Date Order for Governmental Units to file Proofs of Claim for any Claims against the Debtor that arose prior to the Petition Date.

"Governmental Unit" means the United States, or any department, agency, or instrumentality of the United States (but not a U.S. Trustee); any state, commonwealth, district, territory, municipality, or any department, agency, or instrumentality of any state, district, territory or municipality; or a foreign state or other foreign or domestic government.

"Health Care System" means the Hospital, Subacute Skilled Nursing Facility, and Behavioral Health Urgent Care Clinic, and other programs at the Hospital.

"Holder" means a Holder of a Claim against, or Interest in, the Debtor.

"Hospital" means Pacifica Hospital of the Valley.

"HQAF" has the meaning set forth in Section 4.1(a) hereof.

"HQAF Excluded Asset" means, as defined in the Global Settlement Agreement, any excess HQAF revenue generated by the Debtor from successfully reducing asserted setoffs or recoupment amounts in excess of the HQAF identified in the Approved Budget, provided that any such additional amounts will not negatively impact future HQAF receipts (i.e., HQAF 9, 10, 11 etc. other than the HQAF identified in the Approved Budget).

"IMA" means that certain Interim Management Services Agreement, by and between the Debtor, as hospital operator, and Axios's Designee, as manager.

"IMA Transition Date" means the date upon which an IMA between the Debtor and Axios (or its designee) becomes effective and Axios (or its designee) assumes financial and operational responsibility of the Health Care System.

"Impaired" means with respect to a Claim or Class of Claims, a Claim or Class of Claims that is impaired within the meaning of § 1124.

"Indemnified Parties" has the meaning set forth in Section 17.4 hereof.

"Initial Distribution Date" means the Effective Date, or as soon as practicable thereafter when the initial Distribution shall be made to the Holders of Allowed Claims, as determined by the Debtor or the Liquidating Trustee, as applicable, and taking into account any applicable required reserves.

"Insider" means an insider of the Debtor, as defined in § 101(31).

"Insurance Policies" means any and all insurance policies, insurance settlement agreements, coverage-in-place agreements, and other agreements, documents, or instruments relating to the provision of insurance entered into by or issued to or for the benefit of, at any time, the Debtor or its predecessors (including, for the avoidance of doubt, any such policies, agreements, or other documents that have been paid in full) currently or previously maintained by or for the benefit of the Debtor as of the Effective Date, including but not limited to director and officer insurance policies.

"Insured Claim" means a Claim that arises from personal injury, medical malpractice, or wrongful death (including slip-and-fall and medical malpractice claims) or employment or similar claim that is covered by the terms of one or more Insurance Policies, or for which the Debtor is entitled to indemnification, reimbursement, contribution or other payment under one or more Insurance Policies; provided, however, that all claims for any deductible or self-insured retention obligations of the Debtor shall be treated as General Unsecured Claims (to the extent Allowed).

"Interest" means any equity interest in the Debtor, including, but not limited to, all issued, unissued, authorized, or outstanding shares or stock, whether vested or non-vested, together with any warrants, options, or contract rights to purchase or acquire such interests at any time.

"Interim DIP Order" means the *Interim Order (I) Authorizing the Debtor to Obtain Postpetition Secured Financing; (II) Granting Liens and Providing Superpriority Administrative Expense Status; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; (V) Authorizing the Debtor's Use of Cash Collateral; and (VI) Scheduling a Final DIP Hearing* [Docket No. 229].

"Interim Fee Order" means the *Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and (II) Granting Related Relief* [Docket No. 124].

"IRS" means the United States Internal Revenue Service.

"L.A. Care" means Local Initiative Health Authority for Los Angeles County (operating as L.A. Care Health Plan).

"L.A. Care Contingent Secured Claim" means any contingent secured Claim held by L.A. Care in connection with the L.A. Care Purchase Agreements, and for the avoidance of doubt, does not include (i) L.A. Care's Administrative Claim under Paragraph 11 of the L.A. Care Sale Order or (ii) any unsecured Claim that may arise under the L.A. Care HSA.

"L.A. Care HSA" means the Hospital Services Agreement between the Debtor and L.A. Care effective June 1, 2011, as amended, amended and restated, supplemented or otherwise modified from time to time.

"L.A. Care Purchase Agreements" means the Prepetition L.A. Care Purchase Agreements and the Postpetition L.A. Care Purchase Agreement.

"L.A. Care Challenge Period" has the meaning set forth in Section 4.1(c) hereof.

"L.A. Care ~~Claim~~Receivables" means ~~any Claim held by L.A. Care, including in connection with the two prepetition purchase agreements pursuant to which the Debtor sold to L.A. Care the right to receive designated future HQAF receivables in exchange for immediate cash consideration~~the Prepetition L.A. Care Receivables and the Postpetition L.A. Care Receivables.

"L.A. Care Sale Order" has the meaning set forth in Section 4.1(c) hereof.

"Lease Principle Agreement" means a nonbinding agreement in principle between the Debtor, Axios, and Reliq regarding lease terms in the event Axios acquires the Health Care System.

"Lien" means any charge against or interest in property (including, but not limited to, any mortgage, lien, pledge, charge, security interest, encumbrance, or other security device of any kind) to secure payment of a debt or performance of an obligation.

"Liquidating Trust" means the trust established on the Effective Date in accordance with the Liquidating Trust Agreement for the purpose of liquidating and distributing the assets of the Estate, in accordance with 26 C.F.R. § 301.7701-4(d).

"Liquidating Trust Agreement" means the agreement, substantially in the form included in the Plan Supplement, governing the Liquidating Trust, as it may be subsequently modified from time to time.

"Liquidating Trust Assets" means the Excluded Assets and any other assets transferred to the Liquidating Trust under the Plan. It shall not include any claims against Released Parties.

"Liquidating Trust Assets Account" means an interest-bearing bank account or money-market account to be established and held in trust by the Liquidating Trustee on or after the Effective Date for the purpose of holding the Liquidating Trust Assets to be distributed pursuant to the Plan.

"Liquidating Trust Beneficiaries" means the Holders of Liquidating Trust Interests.

"Liquidating Trust Cash Contribution" means the Debtor's cash-on-hand in the minimum amount of $500,000 on the Effective Date excluding cash from Disproportionate Share Hospital funds that are not identified in the Approved Budget.

"Liquidating Trust Expenses" means any and all fees, costs, and expenses incurred by the Liquidating Trustee and the Liquidating Trust from and after the Effective Date in connection with the Plan and the Chapter 11 Case, including but not limited to all fees, costs, and expenses of professionals who may be employed by the Liquidating Trustee in administering the Liquidating Trust, subject to the terms of the Liquidating Trust Agreement.

"Liquidating Trust Interests" means the beneficial interests in the Liquidating Trust provided to Holders of Allowed General Unsecured Claims, which shall entitle Holders of Allowed General Unsecured Claims to receive payment of the Liquidating Trust Assets in accordance with the Sharing Agreement and Liquidating Trust Agreement.

"Liquidating Trustee" means the Person selected by the Committee, in consultation with the Debtor and Axios, to act as trustee of the Liquidating Trust, in accordance with the terms of the Plan, the Confirmation Order, and the Liquidating Trust Agreement, or such successor appointed as the trustee in accordance with the Liquidating Trust Agreement.

"Liquidation Analysis" has the meaning set forth in Section 6.8 hereof.

"Liquidation Proceeds" means any Cash or other consideration paid to or realized by the Liquidating Trustee upon the collection, sale, transfer, assignment, or other disposition of the Liquidating Trust Assets.

"Litigation" means the interest of the Estate, the Debtor, or the Liquidating Trust, as applicable, in any and all claims, rights, and Causes of Action that have been or may be commenced by the Debtor or the Liquidating Trustee, as applicable, except to the extent concerning any Released Parties. Litigation includes, without limitation, any action: (i) for recovery of an Avoidance Action; (ii) for the recovery of property or payment of money that belongs to or can be asserted by the Debtor or the Liquidating Trust, as applicable; (iii) for compensation for damages incurred by the Debtor; and (iv) equitable subordination actions against Creditors.

"Litigation Recovery" means any Cash or other property received by the Debtor or the Liquidating Trust, as applicable, from all or any portion of the Litigation, including, but not limited to, awards of damages, attorneys' fees and expenses, interest, and punitive damages,

whether recovered by way of settlement, execution on judgment, or otherwise. If any Litigation is pursued on a contingent-fee basis, the Litigation Recovery will be net of any contingent fee paid to legal counsel.

"Master Lease" means that certain Master Lease Agreement dated August 30, 2013, as amended, between Reliq, as landlord, and the Debtor, as ~~amended, restated, amended and restated, supplemented or otherwise modified through the Petition Date~~tenant.

"MSL" has the meaning set forth in Section 4.1(c)(i) hereof.

"New Lease Agreement" means an amended and restated master lease, consistent with the Lease Principle Agreement, that will be entered into between Reliq, as landlord, and Axios (or its Designee), as tenant, at the closing of the Axios Sale.

"Operate" (and any variations thereof, such as "Operation") means to operate, oversee, manage, administer, coordinate, control, supervise and/or direct the business and operations of any and/or all of the Health Care System in accordance with the IMA, whether in the ordinary course of business or otherwise, and including undertaking or pursuing strategies, activities, or actions with the intent of furthering the objectives of, and otherwise to effectuate the Plan as contemplated by the provisions hereof.

"Operating Advances" has the definition set forth in the IMA and includes all amounts advanced by Axios (or its Designee) to fund operating shortfalls from and after the IMA Transition Date.

"Operating Budget" means the budget (as the same may be amended or modified from time to time) setting forth the projected costs and expenses associated with the Health Care System (including without limitation, the cost of Operating the Health Care System), which shall be filed with the Plan Supplement.

"Other Secured Claims" means a Secured Claim other than the Axios Secured Claim, the Reliq Claim, and the L.A. Care Contingent Secured Claim, as applicable.

"Oversight Committee" has the meaning set forth in Section 11.8 hereof.

"Person" means any individual, corporation, limited liability company, general partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, Governmental Unit, or other Entity.

"Petition Date" shall mean July 4, 2026.

"PGMC" means Pacific Gardens Medical Center.

"PGMC Settlement Agreement" has the meaning set forth in Section 10.3 hereof.

"Plan" has the meaning set forth in Section 1 hereof.

"Plan Documents" means the Plan, the Disclosure Statement, the Plan Supplement, the Liquidating Trust Agreement, and any other documents or pleadings filed by the Debtor relating to the Plan.

"Plan Objection Deadline" means the deadline established by the Bankruptcy Court for filing and serving objections to Confirmation of the Plan.

"Plan Supplement" means the pleading or pleadings identified in the Combined DS and Plan for filing with the Bankruptcy Court not later than ten (10) calendar days prior to the Plan Objection Deadline, which shall include certain exhibits and schedules to the Plan, as well as documents, agreements, and instruments evidencing and effectuating the Plan.

"Plan Term Sheet" means that certain Plan Term Sheet, substantially in the form attached to the Credit Agreement as Exhibit D, by and among the Debtor, Axios as the DIP lender, and the Committee.

"Post-Effective Date Board of Directors" means the board of directors for the Post-Effective Date Debtor that may be formed on the Effective Date in accordance with Section 15.5 hereof.

"Post-Effective Date Debtor" means Pacifica of the Valley Corporation, which shall exist solely for the limited duration and purposes set forth in the Plan on and after the Effective Date.

"Postpetition L.A. Care Purchase Agreement" means that certain purchase agreement between the Debtor and L.A. Care dated on or around August 3, 2026 relating to the sale and purchase of certain HQAF receivables.

"Postpetition L.A. Care Receivables" means the HQAF receivables and proceeds sold to L.A. Care under the Postpetition L.A. Care Purchase Agreement.

"Prepetition L.A. Care Receivables" has the meaning set forth in Section 10.14 hereof.

"Prepetition L.A. Care Purchase Agreements" means together (i) that certain purchase agreement between the Debtor and L.A. Care dated January 14, 2026 relating to the sale and purchase of certain HQAF receivables; and (ii) that certain purchase agreement between the Debtor and L.A. Care dated May 12, 2026 relating to the sale and purchase of certain HQAF receivables.

"Prepetition Loan" has the meaning set forth in Section 4.1(c)(i) hereof.

"Prepetition Obligations" has the meaning set forth in Section 4.1(c)(i) hereof.

"Priority Claim" means any Claim entitled to priority in right of payment under § 507(a) other than (i) Priority Tax Claims and (ii) Administrative Claims.

"Priority Non-Tax Claim" means any Claim, other than an Administrative Claim or Priority Tax Claim, to the extent entitled to priority under § 507(a).

"Priority Tax Claim" means a Claim of a Governmental Unit of the kind specified in §§ 502(i) and 507(a)(8), excluding any Allowed Tax Penalty Claim.

"Pro Rata" means proportionately so that, with respect to a Claim, the ratio of: (a) (i) the amount of property distributed on account of a particular Claim to (ii) the Allowed amount of the Claim, is the same as the ratio of (b) (i) the amount of property distributed on account of all Allowed Claims in the Class or Classes entitled to share in the applicable distribution to (ii) the amount of all Allowed Claims in such Class or Classes.

"Professional" means an Entity: (a) employed pursuant to a Final Order in accordance with §§ 327 and 1103 and to be compensated for services rendered prior to the Effective Date, pursuant to §§ 327, 328, 329, 330, and 331, or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to § 503(b)(4).

"Professional Fee Claim" means those fees and expenses claimed by Professionals pursuant to §§ 330, 331, or 503, and accrued and unpaid as of the Effective Date.

"Professional Fee Escrow" means the reserve fund currently held by the Claims Agent and established by the Debtor in connection with the Interim DIP Order to pay any accrued and unpaid (a) Professional Fee Claims incurred by a Professional and which have not yet been approved by the Bankruptcy Court; and (b) Professional Fee Claims approved by the Bankruptcy Court. The amounts deposited into the Professional Fee Escrow shall be free and clear of all liens, claims and encumbrances of any Persons or Entities except to the extent that any excess amounts remain in the Professional Fee Escrow after payment of all Allowed Professional Fee Claims, such excess amounts shall be distributed in accordance with the Plan.

"Proof of Claim" means a proof of claim filed pursuant to § 501 or any order of the Bankruptcy Court, together with supporting documents.

"Province" means (i) Province, LLC, together with each of its subsidiaries; and (ii) StoneTurn Group, LLP, together with each of its subsidiaries.

"Rejection Bar Date" means the last date for any Entity whose claims arise out of the Bankruptcy Court-approved rejection of an executory contract or unexpired lease to file a Proof of Claim for damages related to such rejection. The Rejection Bar Date for such Claims will be, (i) with respect to executory contracts and unexpired leases rejected pursuant to a Bankruptcy Court order other than the Confirmation Order, 5:00 p.m. (prevailing Eastern Time) on the date that is thirty (30) days following entry of such order or any other date that the Bankruptcy Court may fix in the applicable order approving such rejection in accordance with the Bar Date Order, and, (ii) with respect to executory contracts and unexpired leases rejected pursuant to the Confirmation Order, the date that is thirty (30) days after the Effective Date.

"Related Persons" means, subject to any exclusions expressly set forth in the Plan, with respect to a specific Person, said Person's successors and assigns, and as applicable, said Person's current and former shareholders, affiliates, subsidiaries, employees, agents, officers, directors, managers, trustees, partners, members, professionals, representatives, advisors,

attorneys, financial advisors, accountants, and consultants, solely in their respective capacities as such.

"Release Opt-In Election Form" means a form for Holders of Claims to opt in to being a Releasing Party in connection with the Third Party Release.

"Released Parties" means collectively (a) the Debtor, (b) members of the Restructuring Committee, (c) Peter C. Chadwick in his capacity as Chief Restructuring Officer of the Debtor, (d) members of the Committee (solely in their capacities as Committee members), (e) Axios (in its capacity as DIP lender and lender under the Prepetition Loan), ~~and~~ (f) Bankruptcy Court-approved Estate and Committee professionals; (g) L.A. Care (in its capacity as purchaser under the L.A. Care Purchase Agreements); and (h) the Related Persons of each of the Released Parties in the foregoing clauses (b) – (g).

"Releasing Parties" means, individually and collectively: (i) each Holder of a Claim or Interest that opts in to the Third Party Release; (ii) the Committee and each of its members in such capacity; and (iii) with respect to each of the foregoing Entities in clauses (i) and (ii), such Entities' or Persons' successors, assigns, and transferees.

"Reliq" means collectively, Reliq Pacifica LLC and Beverly Gemini Investments, LLC.

"Reliq Claim" means the Claims held by Reliq, including under the Master Lease.

"Restructuring Committee" means the two (2) member restructuring committee for the Debtor.

"Sale Motion" has the meaning set forth in Section 5.3 hereof.

"Schedules" means the schedules of assets and liabilities as the Bankruptcy Court required the Debtor to file pursuant to § 521, the Official Bankruptcy Forms, and the Bankruptcy Rules, as they may be amended and supplemented from time to time, and the Debtor's statements of financial affairs filed with the Bankruptcy Court, as the Bankruptcy Court required the Debtor to file pursuant to § 521, the Official Bankruptcy Forms, and the Bankruptcy Rules, as they may be amended and supplemented from time to time [Docket Nos. 200, 201].

"Secured Claim" means any Claim that is secured in whole or part, as of the Petition Date, by a Lien which is valid, perfected, and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, or subject to setoff under § 553, to the extent of the value of such Lien or right of setoff as determined under §§ 506(a) or 1129(b), as applicable.

"Securities Act" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder, as amended from time to time.

"Sharing Agreement" means the sharing formula of net recoveries from the Liquidating Trust Assets between the Holders of General Unsecured Claims and Axios as set forth in Section 10.2 of this Combined DS and Plan.

"Solicitation Package" has the meaning set forth in Section 6.10 hereof.

"Subordinated Claims" means any Claim that is subject to subordination in accordance with § 510(b)-(c) or otherwise.

"Subsequent Distribution Date" means any date after the Initial Distribution Date upon which the Debtor or Liquidating Trust, as applicable, makes a distribution to any Holders of Allowed Administrative Claims, Secured Claims, Priority Claims, Priority Tax Claims, or General Unsecured Claims.

"Tax" means any tax, charge, fee, levy, impost, or other assessment by any federal, state, local, or foreign taxing authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, *ad valorem*, estimated, severance, stamp, occupation, and withholding tax.

"Tax Claim" means all or that portion of an Allowed Claim held by a Governmental Unit for a Tax assessed or assessable against the Debtor.

"Tax Penalty Claim" means any portion of a Claim asserted by a Taxing Authority seeking penalty amounts in addition to the base tax liability or unpaid withholding amounts and accrued statutory interest thereon, which shall be treated as a Class 5 General Unsecured Claim hereunder.

"Taxing Authority" has the meaning set forth in Section 10.4 hereof.

"Taxing Authority Settlements" has the meaning set forth in Section 10.4 hereof.

"Third Party Release" has the meaning set forth in Section 17.2(b) hereof.

"Tuft Limited Objection" means *Paul R. Tuft's Limited Objection to Conditional Approval of the Disclosure Statement Contained In Docket 276 and Request For Clarification and Preservation of Rights* [Docket No. 286].

"Unimpaired Claim" means an unimpaired Claim within the meaning of § 1124.

"U.S. Trustee" means the Office of the United States Trustee for the District of Delaware.

"Voting Classes" means Classes 1, 2, 3, 5, and 6.

"Voting Deadline" means December 10, 2026, at 4:00 p.m. (prevailing Eastern Time).

"Voting Instructions" means the instructions for voting on the Plan contained on the Ballots.

"Voting Record Date" means the date as of which the identity of Holders of Claims is set by the Bankruptcy Court for purposes of determining the Entities entitled to receive and vote on the Plan.

"Wage Motion" has the meaning set forth in Section 5.1 hereof.

## SECTION 3
## SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER PLAN AND IMPORTANT SOLICITATION AND CONFIRMATION DATES AND DEADLINES

3.1 Summary of Classification and Treatment of Claims and Interests.

All Claims against or Interests in the Debtor are classified for purposes of voting and distributions under the Plan. A summary of the classification of these Claims and Interests, the treatment of each Class of Claims or Interests, and the voting status of each Class of Claims or Interests follows.

| Class | Treatment | Status |
|---|---|---|
| Unclassified: Administrative Claims, estimated to total approx. $8,560,926<br><br>**Estimated Recovery: 100%** | Except to the extent that a Holder of an Allowed Administrative Claim agrees to less favorable treatment, each Holder of an Allowed Administrative Claim, other than a Professional Fee Claim, shall receive, without interest, from the Debtor, Cash equal to the Allowed amount of such Claim: (a) on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or approving such Claim; (b) in accordance with the terms and conditions of agreements between the Holder of such Claim and the Debtor; (c) with respect to any Administrative Claims representing obligations incurred in the ordinary course of the Debtor's business, upon such regular and customary payment or performance terms as may exist in the ordinary course of the Debtor's business or as otherwise provided in the Plan; or (d) with respect to statutory fees due pursuant to 28 U.S.C. § 1930(a)(6), as and when due under applicable law. | Unclassified – not entitled to vote |
| Unclassified: Priority Claims, estimated to total approx. $17,150<br><br>**Estimated Recovery: 100%** | Except to the extent a Holder of an Allowed Priority Claim agrees to less favorable treatment, on the later of (i) the Effective Date or (ii) the date such Priority Claim becomes Allowed, or as soon as reasonably practicable thereafter, each Holder of an Allowed Priority Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claim, payment from the Debtor in full in Cash in an amount equal to | Unclassified – not entitled to vote |

| Class | Treatment | Status |
| --- | --- | --- |
| | the Allowed amount of such Claim. | |
| Unclassified: Priority Tax Claims, estimated as set forth in Schedule 1 hereto<br><br>**Estimated Recovery: Under Proposed Settlement** | Each Holder of a Priority Tax Claim shall have such Claim Allowed in the amount set forth in Schedule 1 hereto with the total amount of all such agreed amounts for Priority Tax Claims not to exceed $36,677,876 and approved pursuant to Bankruptcy Rule 9019 upon entry of the Confirmation Order (or such other time as the agreed amount is approved by an order of the Bankruptcy Court upon notice and an opportunity to be heard).<br><br>Holders of Allowed Priority Tax Claims shall receive their pro rata share of 1/3 of the net proceeds ~~of~~(i.e., after payment of all costs and expenses of the Liquidating Trust) of the Liquidating Trust's allocated portion under the Sharing Agreement over time as provided in the Liquidating Trust Agreement in full and final satisfaction, settlement, release, and discharge of their Priority Tax Claims and any liability of any current officer or director of the Debtor arising from or relating to such Priority Tax Claims, while Allowed General Unsecured Claims in Class 5 shall receive the remaining 2/3 of such net proceeds (i.e., after payment of all costs and expenses of the Liquidating Trust) of the Liquidating Trust's allocated portion under the Sharing Agreement. | Unclassified – not entitled to vote |
| Class 1: Axios Prepetition Secured Claim, *see* Section 5.3 hereof<br><br>**Estimated Recovery:** ***See*** **Section 5.3 hereof** | The Axios Prepetition Secured Claim shall be Allowed in full, but upon the closing of the Axios Sale pursuant to the APA and the Axios Sale Order, shall be reduced by the delta between the Axios Credit Bid Amount and the Axios DIP Claim to the extent the Axios Credit Bid Amount exceeds the amount of the Axios DIP Claim.<br><br>On account of any Axios Secured Claim (whether Axios DIP Claim or Axios Prepetition Secured Claim, or both) in excess of the Axios Credit Bid Amount, Axios shall be entitled solely to its share of the net proceeds of the Liquidating Trust Assets under the Sharing Agreement in an aggregate amount (together with the Axios DIP Claim) not to exceed $15 million, and any remaining Axios DIP Claim or Axios Prepetition Secured Claim in excess of $15 million in | Impaired – entitled to vote |

| **Class** | **Treatment** | **Status** |
|---|---|---|
| | the aggregate shall constitute Assumed Axios Debt, which shall be assumed by Axios's Designee and shall not be recoverable from the Debtor, the Estate, or the Liquidating Trust. | |
| Class 2:<br>Reliq Claim, estimated to total approx. $13,827,569 as of the Petition Date, plus post-petition amounts in an undetermined amount<br><br>**Estimated Recovery: N/A** | ~~The Reliq Claim shall be either: (i) in the event~~If Axios (or its designee) and Reliq enter into a mutually acceptable New Lease Agreement in connection with Axios's acquisition of substantially all of the Debtor's assets, the Reliq Claim will be deemed fully and finally satisfied, settled, released~~,~~ and discharged, ~~and~~ Reliq shall not be entitled to any distributions under the Plan or otherwise on account of ~~such~~the Reliq Claim other than the payment of its Administrative Claims under the Master Lease~~; or (ii) in the event~~ , and the Debtor and Reliq shall release each other and their respective principals from all other known and unknown claims.<br><br>If Axios (or its designee) and Reliq do not enter into such a New Lease Agreement, the Reliq Claim, or a portion or portions thereof, ~~shall~~may be classified and treated under the Plan as one or more of an Administrative Claim (with respect to postpetition obligations under the Master Lease), Secured Claim, General Unsecured Claim, or Subordinated Claim, as applicable, with the allowance, classification, amount, and treatment of the Reliq Claim, or any portion thereof, to be determined by further order of the Court. In this scenario, all rights are reserved and Axios and Reliq shall not release claims. | Impaired – entitled to vote |
| Class 3:<br>L.A. Care Contingent Secured Claim, estimated to total approx. $7,500,000<br><br>**Estimated Recovery: N/A** | ~~The L.A. Care Claim shall be either: (i) in the event the L.A. Care Challenge Period expires without a Challenge (or a Challenge is unsuccessful), L.A. Care shall have no Claim against the Debtor's Estate and shall not be entitled to any distributions under the Plan or otherwise; or (ii) in the event there is a successful Challenge of the L.A. Care Claim in a manner that results in L.A. Care having an Allowed Claim, such Allowed Claim is junior and subordinate to the Axios Secured Claim, which is not being satisfied in full hereunder, and thus the L.A. Care Claim shall be (a) rendered wholly unsecured pursuant to § 506(a)(1), and (b) treated as a General~~ | Impaired – entitled to vote |

| Class | Treatment | Status |
|---|---|---|
| | ~~Unsecured Claim in Class 5.~~Upon the earlier of Confirmation of the Plan and consummation of the Axios Sale, the Challenge Rights under the L.A. Care Sale Order shall terminate, thereby eliminating the contingency that could otherwise give rise to the L.A. Care Contingent Secured Claim and L.A. Care shall have no Claim pursuant to the L.A. Care Purchase Agreements. Notwithstanding the foregoing, because L.A. Care holds a contingent secured Claim as of the Voting Record Date, such Claim is separately classified under the Plan, entitled to vote, and treated in accordance with Sections 9.3 and 10.14 hereof. | |
| Class 4: Other Secured Claims, estimated to total approx. $0<br><br>**Estimated Recovery: N/A** | Except to the extent a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, on the later of (i) the Effective Date or (ii) the date such Other Secured Claim becomes Allowed, or as soon as reasonably practicable thereafter, each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claim, at the discretion of the Debtor (x) payment from the Debtor in full in Cash in an amount equal to the Allowed amount of such Other Secured Claim; (y) such other treatment sufficient to render such Other Secured Claim Unimpaired; or (z) return of the applicable collateral or authorization of a setoff in satisfaction of the Allowed amount of such Other Secured Claim. | Unimpaired – deemed to accept the Plan |
| Class 5: General Unsecured Claims, estimated to total approx. $83,450,459<br><br>**Estimated Recovery: *See* Section 10.2 hereof** | Each Holder of an Allowed General Unsecured Claim shall receive a Liquidating Trust Interest and become a Liquidating Trust Beneficiary in full and final satisfaction of its Allowed Class 5 Claim in accordance with the terms of the Sharing Agreement. | Impaired – entitled to vote |
| Class 6: Insured Claims, estimated to total | Each Holder of an Allowed Insured Claim shall recover only from the proceeds of available insurance and shall not be entitled to any distributions from the | Impaired – entitled to vote |

| Class | Treatment | Status |
|---|---|---|
| approx. $0<br><br>**Estimated Recovery: N/A** | Debtor or the Liquidating Trust. | |
| Class 7: Subordinated Claims, estimated to total approx. $0<br><br>**Estimated Recovery: 0%** | There shall be no Distribution on account of Subordinated Claims. On the Effective Date, each Subordinated Claim shall be cancelled, released, and extinguished, and each Holder of a Subordinated Claim shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such Subordinated Claim. | Impaired – deemed to reject the Plan |
| Class 8: Interests<br><br>**Estimated Recovery: 0%** | There shall be no Distribution on account of Interests. Upon the Effective Date, all Interests will be deemed cancelled and will cease to exist. | Impaired – deemed to reject the Plan |

3.2 Important Dates and Deadlines.

| Event | Proposed Date |
|---|---|
| Disclosure Statement Conditional Approval Objection Deadline | November 6, 2026, at 4:00 p.m. |
| Disclosure Statement Reply Deadline | November 9, 2026, at 12:00 p.m. |
| Voting Record Date | November 10, 2026 |
| Proposed Hearing Date for Conditional Approval of Disclosure Statement | November 10, 2026, at 3:00 p.m. |
| Expected Entry of Conditional Approval and Procedures Order/Delivery to Claims Agent | November 11, 2026 |
| Deadline to Serve Notice and Solicitation Package | Four (4) business days following entry of Conditional Approval and Procedures Order |
| Publication Deadline | Four (4) business days following entry of Conditional Approval and Procedures Order |
| Deadline to file Plan Supplement | December 3, 2026, at 4:00 p.m. |
| Deadline for Debtor or Creditors to File Rule 3018 Motions | December 3, 2026, at 4:00 p.m. |
| Voting Deadline | December 10, 2026, at 4:00 p.m. |
| Combined DS and Plan Objection Deadline | December 10, 2026, at 4:00 p.m. |
| Deadline to File Confirmation Brief and Other Evidence Supporting the Combined DS and Plan | December 14, 2026, at 4:00 p.m. |
| Deadline to File Voting Tabulation Affidavit | December 14, 2026, at 4:00 p.m. |

| Event | Proposed Date |
|---|---|
| Confirmation Hearing | December 17, 2026, at 1:00 p.m. |

# SECTION 4
# BACKGROUND

4.1 General Background.

(a) Debtor's Prepetition Business and Operations.

The Debtor's Hospital is a safety net, 231-bed acute care hospital located in Sun Valley, California that offers a full range of inpatient and outpatient services, including 24-hour emergency care, and treats more than 50,000 patients each year. The ~~Debtor also operates~~Hospital includes a 98-bed, separately licensed subacute Skilled Nursing Unit, a Behavioral Health Urgent Care Clinic, and a Medical Surgical Program. Approximately 84% of the Debtor's patients live at or below the poverty line, and the Debtor is heavily dependent on Medi-Cal, which provides approximately 85% of the Debtor's total revenue. As of July 4, 2026, the Debtor had approximately 697 employees, including registered nurses, technicians, housekeepers, and food-service workers, all of whom are vital to patient care.

As set forth in the First Day Declaration, the Debtor faced significant financial challenges as a result of the COVID-19 pandemic, and also faced rising labor costs, state-mandated seismic retrofit requirements and delayed Hospital Quality Assurance Fees ("HQAF") and Disproportionate Share Hospital government reimbursement payments. These factors, among others, contributed to the Debtor's liquidity crisis and the commencement of this Chapter 11 Case. The factual background regarding the Debtor, including its current and historical business operations and the events precipitating its chapter 11 filing, is set forth in detail in the First Day Declaration.

(b) Corporate Organizational Structure.

The Debtor's prepetition organizational structure is attached hereto as **Exhibit A**.

(c) Debtor's Prepetition Debt Structure.

i. Main Street Priority Loan & Axios Prepetition Loan

On December 10, 2020, the Debtor entered into that certain Main Street Priority Loan Agreement (the "MSL" or "Prepetition Loan") with First Western Trust Bank ("First Western") and the Federal Reserve Bank of Boston (the "Federal Reserve"), pursuant to which First Western extended a senior secured loan to the Debtor in the principal amount of $35,000,000. In connection with the MSL, the Debtor executed a Pledge and Security Agreement granting First Western a security interest in all of its personal property.

In November 2025, Axios purchased the MSL from First Western. As of the Petition Date, the outstanding balance under the Prepetition Loan is approximately $50,943,321.41, inclusive of all accrued and unpaid interest, fees, costs, and expenses (collectively, the

"Prepetition Obligations"). The Prepetition Obligations are secured by liens on substantially all personal property assets of the Debtor.

In May 2025, First Western filed a breach of contract lawsuit (the "Colorado Litigation") styled *First Western Trust Bank v. Pacifica of the Valley Corporation and Paul R. Tuft,* Case No. 2025CV31732 (Division 209), in the District Court of Denver County, Colorado (the "Colorado Court"), over the Debtor's alleged failure to timely repay the MSL. *See* First Day Declaration ¶ 45. In November 2025, after purchasing the MSL, Axios substituted into the Colorado Litigation. *See id.* The Colorado Court appointed a special monitor to investigate Pacifica's operations on May 15, 2026, *see id.* at ¶ 45, and later denied Axios's motion for summary judgment on June 26, 2026, ruling that a jury must first resolve questions regarding whether there was common ownership that made the MSL transfer invalid. *See id.* at ¶ 45 & Ex. B attached to the First Day Declaration. The Debtor removed the Colorado Litigation to the United States District Court for the District of Colorado, but pursuant to the terms of the Credit Agreement, the Debtor has agreed to a remand of the Colorado Litigation back to the Colorado Court to proceed solely against Defendant Paul Tuft and will seek recovery from Paul Tuft in an amount no greater than the Allowed Prepetition Secured Debt Amount, together with interest, fees, costs, and expenses accruing after the Petition Date under the applicable guaranty.

In response to the Tuft Limited Objection, the Debtor confirms that this Combined DS and Plan does not purport to limit Mr. Tuft's rights to defend himself in any suits which may be commenced against him, and nothing in the Combined DS and Plan adjudicates Mr. Tuft's defenses in the Colorado Litigation. Mr. Tuft also requested in the Tuft Limited Objection for the Debtor to identify the relevant agreement and court orders concerning the remand of the Colorado Litigation, which the Debtor has provided him and the Debtor disputes any continued assertion to the contrary.

ii. Lease with Reliq

The Debtor has operated its Hospital pursuant to a long-term real property Master Lease with Reliq. As of the Petition Date, Reliq asserts it is owed approximately $13.8 million on account of accrued and unpaid rent and other obligations under the Master Lease. Reliq filed a UCC-1 financing statement in November 2022 seeking to perfect a lien in all personal property of the Debtor. That lien was subordinated to First Western's interest (now Axios's interest) pursuant to a Subordination Agreement. Reliq asserts a security interest in all personal property of the Debtor.

iii. Security Interest in Favor of L.A. Care

Prior to the Petition Date, the Debtor and L.A. Care entered into ~~two purchase agreements~~the Prepetition L.A. Care Purchase Agreements pursuant to which the Debtor sold to L.A. Care the right to receive designated future HQAF receivables in exchange for immediate cash consideration. These transactions were structured as true sales, transfers, assignments, and conveyances of the Debtor's right, title, and interest in the designated receivables ($7,500,000 in HQAF payments expected to be received later this year) to L.A. Care. As a protective measure, the Debtor also granted L.A. Care a back-up security interest in the assigned receivables.

On August 3, 2026, the Bankruptcy Court entered an order [Docket No. 115] (the "L.A. Care Sale Order") which, among other things, provided that the Debtor stipulated that such prepetition transactions were true sales subject only to a ~~currently pending~~ challenge period provided to the Committee and Axios ~~(~~. The Final DIP Order provided that such challenge period would be tolled through the first to occur of the (i) closing of the Axios Sale and (ii) the Effective Date (such period, the "L.A. Care Challenge Period").

iv. General Unsecured Claims

As of the Petition Date, the Debtor estimates that unsecured claims against the Debtor total approximately $83,450,459, including amounts owed to Taxing Authorities, the Debtor's trade vendors, and other unsecured debt incurred in the ordinary course of the Debtor's business.

4.2 Events Leading to Chapter 11 Filing.

The Debtor filed this Chapter 11 Case to protect patient care and employees; to maintain the Debtor's business operations; and to preserve the going-concern value of the Debtor's business for its stakeholders and parties in interest. The Debtor's liquidity crisis, legacy liability, and ongoing operational challenges, compounded by the Colorado Litigation, precipitated the filing of this Chapter 11 Case on an emergency basis. Shortly prior to the Petition Date, the Debtor appointed a Chief Restructuring Officer (the "CRO"), Peter Chadwick of Berkeley Research Group, to support its efforts in evaluating strategic options, developing and implementing a turnaround plan, and instituting treasury management procedures and control.

## SECTION 5
## THE CHAPTER 11 CASE

The following is a brief description of certain material events that have occurred during the Chapter 11 Case.

5.1 First Day Motions and Other Early Developments in the Chapter 11 Case.

The Debtor filed a number of motions after the Petition Date to, among other things, help stabilize operations and establish procedures for the Chapter 11 Case:

i. motion to provide procedures to deal with utility providers [Docket No. 10], interim order thereon [Docket No. 49], and final order thereon [Docket No. 131];

ii. motion for authorization to use certain cash management procedures, bank accounts, and certain payment methods, and to modify requirements imposed by § 345(b) [Docket No. 11], interim order thereon [Docket No. 47], and final order thereon [Docket No. 151];

iii. motion to pay certain prepetition employee obligations and to continue certain employee benefits programs (the "Wage Motion") [Docket No. 12], interim order thereon [Docket No. 46], and final order thereon [Docket No. 138];

iv. motion to use cash collateral [Docket No. 13], interim order thereon [Docket No. 57], and second interim order thereon [Docket No. 148]; and

v. application to appoint Kurtzman Carson Consultants, LLC dba Verita Global as the Debtor's claims and noticing agent [Docket No. 15] and order thereon [Docket No. 125].

5.2 DIP Financing.

On September 28, 2026, the Debtor filed the *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Obtain Postpetition Secured Financing and (B) Utilize Cash Collateral; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [Docket No. 217] (the "DIP Motion"). The Debtor filed the DIP Motion in order to obtain critical liquidity necessary to continue operations and fund a plan confirmation process. By the DIP Motion, the Debtor sought, among other things, authorization and approval of the DIP Facility from its prepetition secured lender, Axios, with up to $21 million in new money borrowing capacity and a roll-up of up to $31.5 million of the Prepetition Obligations, for an aggregate principal amount of up to $52.5 million. The DIP Facility requires the Debtor to consummate a sale of substantially all of its assets to Axios, at Axios's election, either pursuant to a chapter 11 plan or a private sale under §§ 363 and 365 and to file, solicit, and seek confirmation of a chapter 11 plan consistent with the Plan Term Sheet attached to the Credit Agreement, which contemplates, among other things, (a) the sale of the Health Care System to Axios, (b) the establishment of the Liquidating Trust funded with the Liquidating Trust Assets, including avoidance actions and other estate causes of action, for the benefit of general unsecured creditors and (c) the funding of the administrative expenses of the Chapter 11 Case.

On September 30, 2026, the Bankruptcy Court entered the Interim DIP Order and on October 15, 2026, the Bankruptcy Court entered the Final DIP Order.

5.3 The Axios Sale.

Shortly after filing this Combined DS and Plan, the Debtor will file a motion (the "Sale Motion"), pursuant to §§ 105(a), 363, and 365, Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014, and Del. Bankr. L.R. 6004-1, requesting entry of an order (i) authorizing the proposed private sale of substantially all of the Debtor's assets, including the Health Care System, to Axios free and clear of all liens, claims and encumbrances, (ii) approving the form of Asset Purchase Agreement between the Debtor and Axios (the "APA"), ~~and~~ (iii) approving certain

procedures governing the assumption and rejection of executory contracts, and (iv) if Axios and Reliq have agreed upon the New Lease Agreement, assuming and assigning the Master Lease to Axios (or its Designee) and its replacement by the New Lease Agreement.

As of the Petition Date, the Axios Secured Claim was not less than $50,943,321. Pursuant to the Global Settlement Agreement and the DIP Order, approximately $31.5 million of that amount has been or will be rolled up into the Axios DIP Claim, leaving approximately $19.4 million of the Axios Secured Claim outstanding, plus accrued interest and fees. After giving effect to the Roll-up and Commitment Fee as provided in the DIP Order, the Axios DIP Claim has a principal balance of not less than $54.6 million. Accordingly, the Axios Secured Claim and Axios DIP Claim total approximately $74 million in the aggregate, excluding additional interest and fees. In connection with the Global Settlement Agreement and the Axios Sale, Axios shall credit bid no less than $40 million of its secured claims and cap any remaining claims against the Debtor's Estate at $15 million, with any remaining Axios claims to be assumed by Axios's Designee as Assumed Axios Debt. Accordingly, the Axios Sale will satisfy at least $59 million in secured claims against the Estate, consisting of the $40 million credit bid and approximately $19 million in additional debt relief resulting from the assumption by Axios's Designee of all Axios claim amounts in excess of the $15 million (i.e., total debt of $74 million less the Axios Credit Bid of $40 million less the $15 million remaining claim against the Liquidating Trust, equals $19 million in claims to be assumed by Axios's Designee pursuant to the Global Settlement Agreement). The Axios Sale structure also delivered substantial additional value through, among other things, (i) Axios's commitment to fund future operating losses and capital expenditures of the Operations, through the term of the IMA, and (ii) the anticipated resolution of all claims asserted by Reliq Pacifica LLC and Beverly Gemini Investments, LLC (collectively, "Reliq") against the Debtor's Estate, estimated at approximately $13.8 million. In addition, in connection with the Axios Sale and pursuant to the APA, Axios will assume the Debtor's CBAs with the Union. Taken together, these substantial and quantifiable economic benefits demonstrate that the value delivered by the Axios Sale far exceeds the face amount of the Axios Credit Bid Amount, materially reduced the claims burden on the Estate, and meaningfully enhanced the prospects for recoveries to general unsecured creditors. Consistent with the Global Settlement Agreement, the Debtor will file the Sale Motion seeking approval of the Axios Sale, pursuant to §§ 363 and 365.

5.4 Sale of HQAF Receivables to L.A. Care.

On July 29, 2026, the Debtor filed the *Emergency Motion to (I) Sell HQAF Receivables to L.A. Care Pursuant to Section 363, (II) Stipulate to the Validity and Non Avoidability of Prepetition Sales of HQAF Receivables to L.A. Care (III) Grant L.A. Care a Release of Any Estate Claims, (IV) Grant Administrative Claims in Favor of L.A. Care, (V) to the Extent Necessary Modify the Automatic Stay and (VI) Grant Related Relief* [Docket No. 97], which sought entry of an order granting the Debtor authority to (i) sell HQAF receivables to L.A. Care, (ii) stipulate to the validity and non-avoidability of prepetition sales of HQAF receivables to L.A. Care, (iii) grant L.A. Care a release of estate claims and causes of action, (iv) grant administrative claims in favor of L.A. Care, and (v) to the extent necessary, modify the automatic stay. On August 3, 2026, the Bankruptcy Court entered an order granting the requested sale of the Debtor's HQAF receivables to L.A. Care. [Docket No. 115].

5.5 <u>Debtor's Retention of Professionals and Personnel.</u>

The Bankruptcy Court granted the Debtor's applications or motions, as applicable, to employ certain professionals, including (i) Dentons US LLP and Pachulski Stang Ziehl & Jones LLP as bankruptcy co-counsel in the Chapter 11 Case [Docket Nos. 123 and 126]; (ii) Berkeley Research Group, LLC, a restructuring advisory firm, to provide Peter Chadwick as the Debtor's Chief Restructuring Officer and additional personnel as of the Petition Date [Docket No. 122]; and (iii) Houlihan Lokey Capital, Inc. as investment banker to the Debtor [Docket No. 274].

5.6 <u>Formation of the Committee; Retention of Professionals.</u>

On July 20, 2026, the U.S. Trustee formed the Committee, comprised of (i) McKesson Medical-Surgical, Inc., (ii) Sun Valley Emergency Physicians, P.C., (iii) Sierra Health Group, (iv) SERRA Community Medical Clinic d/b/a SERRA Medical Group, and (v) SEIU United Healthcare Workers-West [Docket No. 78]. The Committee retained Sills Cummis & Gross P.C. and Ice Miller LLP as bankruptcy co-counsel, and Province as its financial advisor [Docket Nos. 177, 178, and 179, respectively].

5.7 <u>Debtor's Schedules and Statement of Financial Affairs.</u>

Upon the Debtor's motion, pursuant to an order entered on August 5, 2026 [Docket No. 128], the Bankruptcy Court extended the Debtor's time to file the Debtor's Schedules until August 31, 2026. The Bankruptcy Court entered an order on September 17, 2026 [Docket No. 203], further extending the Debtor's time to file the Debtor's Schedules until September 16, 2026.

On September 17, 2026, the Debtor filed its Schedules [Docket Nos. 200, 201]. The *General Global Notes And Statement Of Limitations, Methodology And Disclaimers Regarding The Debtor's Schedules Of Assets And Liabilities And Statements Of Financial Affairs* provided, among other things, a comprehensive explanation regarding the limitations on the Debtor's financial reporting and processes and explained that the Schedules contained unaudited financial information that may be inaccurate and/or incomplete.

5.8 <u>Employees.</u>

As further described in the Wage Motion, the Debtor's workforce consists of approximately 697 employees. These employees include registered nurses, technicians, cleaning staff, and food-service workers. In addition to full-time and part-time employees, the Debtor employs per-diem employees on an as-needed basis. Per diem employees are called in whenever the Debtor would not otherwise meet its core staffing requirements – for example, when core employees are sick or on vacation, or there is a spike in patient census.

Approximately 538 of the Debtor's employees are represented by unions (the "<u>Represented Employees</u>"). The Represented Employees are represented by SEIU 121 RN and SEIU-UHW (collectively, the "<u>Unions</u>"). The Debtor's contractual arrangements with the Unions regarding the employment of the Represented Employees are reflected in ~~collective~~

~~bargaining agreements (each a "CBA," and collectively,~~ the ~~"~~CBAs~~")~~. In connection with the Axios Sale and pursuant to the APA, Axios will assume the Debtor's CBAs with the Union.

5.9 Claims Bar Dates.

On September 23, 2026, the Bankruptcy Court entered the Bar Date Order setting, among other bar dates, October 30, 2026 as the General Claims Bar Date for filing Proofs of Claim and December 31, 2026 as the Governmental Bar Date for Governmental Units to file Proofs of Claim.

5.10 Contract and Lease Rejection Motion.

On October 5, 2026, the Debtor filed the *Motion for Entry of an Order (I) Extending the Time to Assume or Reject Debtor's Leases of Nonresidential Real Property Pursuant to Section 365(d)(4) and (II) Granting Related Relief* [Docket No. 234] for entry of an order (i) extending the deadline for the Debtor to assume or reject its unexpired leases of nonresidential real property through and including January 30, 2027; and (ii) granting related relief. On October 21, 2026, the Bankruptcy Court entered an order granting the requested extension under § 365(d)(4) through and including January 30, 2027 [Docket No. 259].

## SECTION 6
## CONFIRMATION AND VOTING PROCEDURES

6.1 Confirmation Hearing.

The Confirmation Hearing has been scheduled for **December 17, 2026, at 1:00 p.m. (prevailing Eastern Time)** to consider (a) final approval of the Combined DS and Plan as providing adequate information pursuant to § 1125 and (b) confirmation of the Combined DS and Plan pursuant to § 1129. The Confirmation Hearing may be adjourned from time to time by the Debtor without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or by filing a notice with the Bankruptcy Court.

6.2 Procedures for Objections.

Any objection to final approval of the Combined DS and Plan as providing adequate information pursuant to § 1125 and/or confirmation of the Combined DS and Plan must be made in writing and filed with the Bankruptcy Court by no later than **December 10, 2026, at 4:00 p.m. (prevailing Eastern Time)** and be served in accordance with the local rules of the Bankruptcy Court on the following parties: (i) the Debtor c/o Berkeley Research Group, LLC, 1800 M Street NW, Second Floor, Washington, DC 20036, Attn: Peter Chadwick (pchadwick@thinkbrg.com); (ii) counsel for the Debtor, (1) Dentons US LLP, 601 S. Figueroa St., Suite 2500, Los Angeles, CA 90017, Attn: Tania M. Moyron (tania.moyron@dentons.com) and Samuel Maizel (samuel.maizel@dentons.com) and (2) Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, Delaware 19899, Attn: Laura Davis Jones (ljones@pszjlaw.com) and Timothy Cairns (tcairns@pszjlaw.com); and (iii) the Office of the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Hannah J. McCollum (hannah.mccollum@usdoj.gov). **Unless an objection is timely filed and served, it may not be considered by the Bankruptcy Court.**

6.3 Requirements for Confirmation.

The Bankruptcy Court will confirm the Combined DS and Plan only if it meets all the applicable requirements of § 1129. Among the requirements for confirmation in the Chapter 11 Case is that the Combined DS and Plan be: (i) accepted by all impaired classes of Claims and Interests or, if rejected by an impaired class, that the Combined DS and Plan "does not discriminate unfairly" against, and is "fair and equitable" with respect to, such Class; and (ii) feasible. The Bankruptcy Court must also find that:

a. the Combined DS and Plan has classified Claims and Interests in a permissible manner;

b. the Combined DS and Plan complies with the requirements of Chapter 11 of the Bankruptcy Code; and

c. the Combined DS and Plan has been proposed in good faith.

The Debtor believes that the Combined DS and Plan complies, or will comply, with all such requirements.

6.4 Classification of Claims and Interests.

Section 1123 provides that a plan must classify the claims and interests of a debtor's creditors and equity interest Holders. In accordance with § 1123, the Combined DS and Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those claims which pursuant to § 1123(a)(1) need not be and have not been classified).

Section 1122 requires the Combined DS and Plan to place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests in such class. The Combined DS and Plan creates separate Classes to deal respectively with the Axios Secured Claim, Reliq Claim, L.A. Care Contingent Secured Claim, Other Secured Claims, General Unsecured Claims, Insured Claims, Subordinated Claims, and Interests. The Debtor believes that the Combined DS and Plan's classifications place substantially similar Claims or Interests in the same Class and, thus, meet the requirements of § 1122.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim Holder or interest Holder agrees to a less favorable treatment of its claim or interest. The Debtor believes that the Combined DS and Plan complies with such standard. If the Bankruptcy Court finds otherwise, however, it could deny confirmation of the Combined DS and Plan if the Holders of Claims or Interests affected do not consent to the treatment afforded them under the Combined DS and Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim also is placed in a particular Class for the purpose of receiving distributions pursuant to

the Combined DS and Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

The Debtor believes that the Combined DS and Plan has classified all Claims and Interests in compliance with the provisions of § 1122 and applicable case law. It is possible that a Holder of a Claim or Interest may challenge the classification of Claims or Interests herein and that the Bankruptcy Court may find that a different classification is required for the Combined DS and Plan to be confirmed. If such a situation develops, the Debtor intends, in accordance with the terms of the Combined DS and Plan, to make such permissible modifications to the Combined DS and Plan as may be necessary to permit its confirmation. Any such reclassification could adversely affect Holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Combined DS and Plan.

**EXCEPT AS SET FORTH IN THE COMBINED DS AND PLAN, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RE-SOLICITATION, ACCEPTANCE OF THE COMBINED DS AND PLAN BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE COMBINED DS AND PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.**

The amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Bankruptcy Court with respect to each impaired class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any impaired class. Thus, the actual recovery ultimately received by a particular Holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class. Additionally, any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein or the actual Distribution received by creditors. The projected recoveries are based on information available to the Debtor as of the date hereof and reflect the Debtor's views as of the date hereof only.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized herein. The Debtor believes that the consideration, if any, provided under the Combined DS and Plan to Holders of Allowed Claims reflects an appropriate resolution of their Allowed Claims taking into account the differing nature and priority of such Claims and Interests. The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Combined DS and Plan. Many of these tests are designed to protect the interests of Holders of Claims or Interests who are not entitled to vote on the Combined DS and Plan, or do not vote to accept the Combined DS and Plan, but who will be bound by the provisions of the Combined DS and Plan if it is confirmed by the Bankruptcy Court.

6.5 Impaired Claims or Interests.

Pursuant to § 1126, only the Holders of Claims in Classes Impaired by the Combined DS and Plan and receiving a payment or Distribution under the Combined DS and Plan may vote to accept or reject the Combined DS and Plan. Pursuant to § 1124, a Class of Claims may be Impaired if the Combined DS and Plan alters the legal, equitable, or contractual rights of the Holders of such Claims or Interests treated in such Class. The Holders of Claims not Impaired by the Combined DS and Plan are deemed to accept the Combined DS and Plan and do not have the right to vote on the Combined DS and Plan. The Holders of Claims or Interests in any Class which will not receive any payment or Distribution or retain any property pursuant to the Combined DS and Plan are deemed to reject the Combined DS and Plan and do not have the right to vote. Finally, the Holders of Claims or Interests whose Claims or Interests are not classified under the Combined DS and Plan are not entitled to vote on the Combined DS and Plan.

Under the Combined DS and Plan, Holders of Claims in the Voting Classes – Classes 1, 2, 3, 5, and 6 – are Impaired and are entitled to vote to accept or reject the Combined DS and Plan. Holders of Claims in Class 4 are Unimpaired and, therefore, not entitled to vote on the Combined DS and Plan and are deemed to accept the Combined DS and Plan. Holders of Claims and Interests in Classes 7 and 8 are Impaired and will not receive any payment or Distribution or retain any property pursuant to the Combined DS and Plan and, therefore, are deemed to reject the Combined DS and Plan and do not have the right to vote.

**ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE COMBINED DS AND PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN THE VOTING CLASSES.**

6.6 Confirmation Without Necessary Acceptances; Cramdown.

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan. A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims, determined without including any acceptance of the plan by any insider holding a claim in that class, and the plan meets the "cramdown" requirements set forth in § 1129(b). Section 1129(b) requires that a court find that a plan (a) "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests. Here, because Holders of Claims and Interests in Classes 7 and 8 are deemed to reject the Combined DS and Plan, the Debtor will seek confirmation of the Combined DS and Plan from the Bankruptcy Court by satisfying the "cramdown" requirements set forth in § 1129(b). The Debtor believes that such requirements are satisfied, as no Holder of a Claim or Interest junior to those in the impaired class is entitled to receive any property under the Combined DS and Plan.

The concept of "unfair discrimination" is not defined in the Bankruptcy Code, but case law suggests it exists when a difference in a plan's treatment of two classes of equal priority results in a materially lower percentage recovery for the non-accepting class. The Debtor does not believe that the Plan unfairly discriminates against any Class of Claims.

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable." To determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cramdown" tests for secured creditors, unsecured creditors, and equity Holders, as follows:

a. Secured Creditors. Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

b. Unsecured Creditors. Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the Holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

c. Interests. Either (i) each Holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such Holder is entitled, the fixed redemption price to which such Holder is entitled or the value of the interest or (ii) the Holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

As discussed above, the Debtor believes that the distributions provided under the Combined DS and Plan satisfy the absolute priority rule, where required.

6.7 Feasibility.

Section 1129(a)(11) requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor (unless such liquidation or reorganization is proposed in the Combined DS and Plan). Based on the Debtor's analysis, the Liquidating Trustee will have sufficient assets to carry out his or her duties and obligations under the Combined DS and Plan. Therefore, the Debtor believes that the liquidation pursuant to the Combined DS and Plan will meet the feasibility requirements of the Bankruptcy Code.

6.8 Best Interests Test and Liquidation Analysis.

Even if a plan is accepted by the Holders of each class of claims and interests, the Bankruptcy Code requires the Bankruptcy Court to determine that such plan is in the best interests of all Holders of claims or interests that are impaired by that plan and that have not accepted the plan. The "best interests" test, as set forth in § 1129(a)(7), requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a

value, as of the effective date of the plan, that is not less than the amount that such Holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to Holders of each impaired class of claims and interests if the debtor was liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 case was converted to a case under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses, and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan. If the hypothetical liquidation distribution to Holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the Holders of claims or interests in such impaired class.

The Debtor, with the assistance of its advisors, has prepared a liquidation analysis that summarizes the Debtor's best estimate of recoveries by Holders of Claims if the Chapter 11 Case were converted to a case under chapter 7 (the "Liquidation Analysis"), which will be filed with the Plan Supplement or earlier.

Based upon the Debtor's current projections, Holders of Allowed Administrative Claims, Allowed Priority Claims, and Other Secured Claims will be paid in full under the Plan, while Holders of Allowed Priority Tax Claims, Allowed General Unsecured Claims, the Reliq Claim, the L.A. Care Contingent Secured Claim, and the Axios Secured Claim will receive a projected distribution to be determined based on various assumptions and in accordance with the terms herein.

Based upon the Liquidation Analysis, the Debtor submits that creditors will receive at least as much or more under the Plan than they would receive if the Chapter 11 Case was converted to a chapter 7 case.

6.9 Eligibility to Vote on the Combined DS and Plan.

Unless otherwise ordered by the Bankruptcy Court, only Holders of Allowed Claims in the Voting Classes may vote on the Combined DS and Plan. Further, subject to the tabulation procedures that were approved by the Conditional Approval and Procedures Order, in order to vote on the Combined DS and Plan, you must hold a Claim in the Voting Classes that is not the subject of a pending objection, or be the Holder of a Claim that has been temporarily Allowed for voting purposes only pursuant to the approved tabulation procedures or under Bankruptcy Rule 3018(a).

6.10 Solicitation Package / Release Opt-In Election Form.

All Holders of Allowed Claims in the Voting Classes will receive a solicitation package (the "Solicitation Package"). The Solicitation Packages will contain: (i) the Combined DS and Plan; (ii) the Conditional Approval and Procedures Order; (iii) notice of the Confirmation Hearing; (iv) a form of Ballot, including voting instructions and a pre-addressed return envelope;

(v) a Release Opt-In Election Form; and (vi) such other materials as the Bankruptcy Court may direct or approve or that the Debtor deems appropriate.

All other Creditors and parties in interest not entitled to vote on the Combined DS and Plan will receive only a copy of the notice of Confirmation Hearing and a Release Opt-In Election Form.

Copies of the Combined DS and Plan shall be available on the Claims Agent's website at https://www.veritaglobal.net/pacificaofthevalley. Any creditor or party-in-interest can request a paper copy of the Combined DS and Plan be sent to them by regular mail by calling the Claims Agent at (888) 249-2792 (U.S./Canada) or +1 (310) 751-2607 (International).

6.11 Voting Procedures, Voting Deadline, and Deadline to Submit the Release Opt-In Election Form.

The Voting Record Date for determining which Holders of Claims in the Voting Classes may vote on the Combined DS and Plan is **November 10, 2026**.

In order for your Ballot to count, you must (1) complete, date, and properly execute the Ballot and (2) properly deliver the Ballot to the Claims Agent by either (a) mailing the Ballot to the Claims Agent at the following address: Pacifica Claims Processing Center c/o KCC dba Verita, 100 N Pacific Coast, Suite 100, El Segundo, CA 90245; and/or (b) uploading the Ballot on the Claims Agent's online balloting platform at https://www.veritaglobal.net/pacificaofthevalley. Instructions for casting a Ballot will be available on the Claims Agent's website.

Ballots must be submitted electronically, or the Claims Agent must actually receive physical, original Ballots by mail or overnight delivery, on or before the Voting Deadline, which is **December 10, 2026 at 4:00 p.m. (prevailing Eastern Time)**. Subject to the tabulation procedures approved by the Conditional Approval and Procedures Order, you may not change your vote once a Ballot is submitted electronically or the Claims Agent receives your original paper Ballot. Subject to the tabulation procedures approved by the Conditional Approval and Procedures Order, any Ballot that is timely and properly submitted electronically or received physically will be counted and will be deemed to be cast as an acceptance, rejection or abstention, as the case may be, of the Combined DS and Plan.

In order to be effective, a Release Opt-In Election Form for Holders of Claims or Interests entitled to opt in to being a Releasing Party in connection with the Third Party Release contained herein must be received by the Claims Agent by the Voting Deadline. Each Release Opt-In Election Form must be properly delivered to the Claims Agent by either (a) mailing the Release Opt-In Election Form to the Claims Agent at the following address: Pacifica Claims Processing Center c/o KCC dba Verita, 100 N Pacific Coast, Suite 100, El Segundo, CA 90245; or (b) uploading the Release Opt-In Election Form on the Claims Agent's online opt-in portal at https://www.veritaglobal.net/pacificaofthevalley.

**IF YOU ARE ENTITLED TO VOTE ON THE COMBINED DS AND PLAN, YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY MAIL OR UPLOAD THE BALLOT YOU RECEIVE. PLEASE BE SURE TO COMPLETE ALL BALLOT**

**ITEMS PROPERLY AND LEGIBLY. IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE COMBINED DS AND PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT, OR YOU LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE COMBINED DS AND PLAN OR PROCEDURES FOR VOTING ON THE COMBINED DS AND PLAN, PLEASE CONTACT THE CLAIMS AND BALLOTING AGENT BY (I) TELEPHONE AT (888) 249-2792 (U.S./Canada) or +1 (310) 751-2607 (International) OR (II) EMAIL AT PacificaInfo@veritaglobal.com. THE CLAIMS AND BALLOTING AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.**

6.12 Acceptance of the Combined DS and Plan.

If you are a Holder of a Claim in the Voting Classes, your acceptance of the Combined DS and Plan is important. In order for the Combined DS and Plan to be accepted by an impaired class of Claims, a majority in number (*i.e.*, more than half) and two-thirds in dollar amount of the Claims voting (of each impaired class of Claims) must vote to accept the Combined DS and Plan. At least one impaired class of Creditors, excluding the votes of insiders, must actually vote to accept the Combined DS and Plan. The Debtor urges that you vote to accept the Combined DS and Plan.

## SECTION 7
## UNCLASSIFIED CLAIMS

7.1 Unclassified Claims.

In accordance with § 1123(a)(1), the following claims have not been classified for purposes of voting or receiving Distributions. Rather, all such Claims are treated separately as unclassified Claims as set forth in this Section, and the Holders thereof are not entitled to vote on the Combined DS and Plan.

7.2 Administrative Claims.

(a) Except to the extent that a Holder of an Allowed Administrative Claim agrees to a less favorable treatment, each Holder of an Allowed Administrative Claim, other than a Professional Fee Claim, shall receive from the Debtor, without interest, Cash equal to the Allowed amount of such Claim: (a) on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or approving such Claim; (b) in accordance with the terms and conditions of agreements between the Holder of such Claim and the Debtor; (c) with respect to any Administrative Claims representing obligations incurred in the ordinary course of the Debtor's business, upon such regular and customary payment or performance terms as may exist in the ordinary course of the Debtor's business or as otherwise provided in the Plan; or (d) with respect to statutory fees due pursuant to 28 U.S.C. § 1930(a)(6), as and when due under applicable law.

(b) To the extent that any portion of the Axios DIP Claim in excess of the Credit Bid Amount would otherwise constitute an Allowed Administrative Claim, pursuant to the Global Settlement, Axios has agreed to less favorable treatment of such excess amount,

which shall instead be treated together with the Axios Secured Claim in accordance with the treatment provided for Class 1 hereof.

(c) Holders of Administrative Claims that do not file such requests within sixty (60) days of the Effective Date shall be prohibited from asserting such claims against the Debtor, the Estate, the Liquidating Trust, their successors or assigns, or their property. Any objection to Professional Fee Claims shall be filed on or before the objection deadline specified in the application for final compensation or order of the Bankruptcy Court.

(d) All fees due and payable under 28 U.S.C. § 1930 that have not been paid shall be paid on or before the Effective Date.

7.3 Professional Fees.

(a) Professionals requesting compensation or reimbursement of expenses pursuant to §§ 327, 328, 330, 331, 503(b), or 1103 or required to file fee applications by order of the Bankruptcy Court for services rendered prior to the Effective Date must file and serve pursuant to the notice provisions of the Interim Fee Order, an application for final allowance of compensation and reimbursement of expenses no later than forty-five (45) days after the Effective Date. All such applications for final allowance of compensation and reimbursement of expenses will be subject to the authorization and approval of the Bankruptcy Court. For avoidance of doubt, the Liquidating Trustee is not authorized under the Plan to object to applications for final allowance of compensation and reimbursement of expenses.

(b) Upon approval of the fee applications by the Bankruptcy Court, the applicable fee applications shall first be paid from the Professional Fee Escrow and the Claims Agent shall be authorized to release from the Professional Fee Escrow to the applicable Professional, an amount equal to the Allowed Professional Fee Claims of such Professional. To the extent the Professional Fee Escrow is insufficient to satisfy the Allowed Professional Fee Claim in full, the Debtor shall pay the remainder of their respective Allowed Professional Fee Claims from any remaining cash on hand.

(c) If there are amounts in excess of all Allowed Professional Fee Claims remaining in the Professional Fee Escrow, such amounts shall be transferred to the Liquidating Trust and shall, only upon transfer thereto, constitute Liquidating Trust Assets.

7.4 Priority Claims.

Except to the extent a Holder of an Allowed Priority Claim agrees to less favorable treatment, on the later of (i) the Effective Date or (ii) the date such Priority Claim becomes Allowed, or as soon as reasonably practicable thereafter, each Holder of an Allowed Priority Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claim, payment from the Debtor in full in Cash in an amount equal to the Allowed amount of such Claim.

7.5 Priority Tax Claims.

Pursuant to the Taxing Authority Settlements, each Holder of a Priority Tax Claim shall have such Claim Allowed in the amount set forth in Schedule 1 hereto with the total amount of all such agreed amounts for Priority Tax Claims not to exceed $36,677,876 and approved pursuant to Bankruptcy Rule 9019 upon entry of the Confirmation Order (or such other time as the agreed amount is approved by an order of the Bankruptcy Court upon notice and an opportunity to be heard).

Holders of Allowed Priority Tax Claims shall receive their pro rata share of 1/3 of the net proceeds of(i.e., after payment of all costs and expenses of the Liquidating Trust) of the Liquidating Trust's allocated portion under the Sharing Agreement over time as provided in the Liquidating Trust Agreement in full and final satisfaction, settlement, release, and discharge of their Priority Tax Claims and any liability of any current officer or director of the Debtor arising from or relating to such Priority Tax Claims, while Allowed General Unsecured Claims in Class 5 shall receive the remaining 2/3 of such net proceeds (i.e., after payment of all costs and expenses of the Liquidating Trust) of the Liquidating Trust's allocated portion under the Sharing Agreement.

## SECTION 8
## CLASSIFICATION OF CLAIMS AND INTERESTS

8.1 Summary of Classification.

The provisions of this Section 8 govern Claims against and Interests in the Debtor. Any Class that is vacant will be treated in accordance with Section 8.3.

The following table designates the Classes of Claims against, and Interests in, the Debtor and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept or reject the Combined DS and Plan in accordance with § 1126, and (iii) deemed to accept or reject the Combined DS and Plan. A Claim or portion thereof is classified in a particular Class only to the extent that such Claim or portion thereof qualifies within the description of such Class and is classified in a different Class to the extent that the portion of such Claim qualifies within the description of such different Class.

| Class | Designation | Treatment | Entitled to Vote |
|---|---|---|---|
| 1 | Axios Prepetition Secured Claim | Impaired | Yes |
| 2 | Reliq Claim | Impaired | Yes |
| 3 | L.A. Care Contingent Secured Claim | Impaired | Yes |
| 4 | Other Secured Claims | Unimpaired | No |
| 5 | General Unsecured Claims | Impaired | Yes |
| 6 | Insured Claims | Impaired | Yes |

| Class | Designation | Treatment | Entitled to Vote |
|---|---|---|---|
| 7 | Subordinated Claims | Impaired | No (presumed to reject) |
| 8 | Interests | Impaired | No (presumed to reject) |

8.2 Special Provision Governing Unimpaired Claims.

Except as otherwise provided in the Combined DS and Plan, nothing under the Combined DS and Plan shall affect the rights of the Debtor or the Liquidating Trustee, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

8.3 Vacant and Abstaining Classes.

Any Class of Claims or Interests that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or Interest or a Claim or Interest temporarily Allowed under Bankruptcy Rule 3018 shall be deemed eliminated from the Combined DS and Plan for purposes of voting to accept or reject the Combined DS and Plan and for purposes of determining acceptance or rejection of the Combined DS and Plan by such Class pursuant to § 1129(a)(8).

## SECTION 9
## TREATMENT OF CLAIMS AND INTERESTS

9.1 Class 1—Axios Prepetition Secured Claim.

(a) Classification. Class 1 consists of the Axios Prepetition Secured Claim.

(b) Treatment. The Axios Prepetition Secured Claim shall be Allowed in full, but upon the closing of the Axios Sale pursuant to the APA and the Axios Sale Order, shall be reduced by the delta between the Axios Credit Bid Amount and the Axios DIP Claim to the extent the Axios Credit Bid Amount exceeds the amount of the Axios DIP Claim.

On account of any Axios Secured Claim (whether Axios DIP Claim or Axios Prepetition Secured Claim, or both) in excess of the Axios Credit Bid Amount, Axios shall be entitled solely to its share of the net proceeds of the Liquidating Trust Assets under the Sharing Agreement in an aggregate amount (together with the Axios DIP Claim) not to exceed $15 million, and any remaining Axios DIP Claim or Axios Prepetition Secured Claim in excess of $15 million in the aggregate shall constitute Assumed Axios Debt, which shall be assumed by Axios's Designee and shall not be recoverable from the Debtor, the Estate, or the Liquidating Trust.

(c) Impairment and Voting. Class 1 is Impaired, and the Holder of the Class 1 Claim is entitled to vote on the Plan.

9.2 Class 2—Reliq Claim.

(a) Classification. Class 2 consists of the Reliq Claim.

(b) Treatment. ~~The Reliq Claim shall be either: (i) in the event~~If Axios and Reliq enter into a mutually acceptable New Lease Agreement in connection with Axios's acquisition of substantially all of the Debtor's assets, the Reliq Claim will be deemed fully and finally satisfied, settled, released~~,~~ and discharged, ~~and~~ Reliq shall not be entitled to any distributions under the Plan or otherwise on account of ~~such~~the Reliq Claim other than the payment of its Administrative Claims under the Master Lease~~; or (ii) in the event~~ , and the Debtor and Reliq shall release each other and their respective principals from all other known and unknown claims.

If Axios (or its designee) and Reliq do not enter into such a New Lease Agreement, the Reliq Claim, or a portion or portions thereof, ~~shall~~may be classified and treated under the Plan as one or more of an Administrative Claim (with respect to postpetition obligations under the Master Lease), Secured Claim, General Unsecured Claim, or Subordinated Claim, as applicable, with the allowance, classification, amount, and treatment of the Reliq Claim, or any portion thereof, to be determined by further order of the Court. In this scenario, all rights are reserved and Axios and Reliq shall not release claims.

(c) Impairment and Voting. Class 2 is Impaired, and the Holder of the Class 2 Claim is entitled to vote on the Plan.

9.3 Class 3—L.A. Care Contingent Secured Claim.

(a) Classification. Class 3 consists of the L.A. Care Contingent Secured Claim.

(b) Treatment~~. The L.A. Care Claim shall be either: (i) in the event the L.A. Care Challenge Period expires without a Challenge (or a Challenge is unsuccessful), L.A. Care shall have no Claim against the Debtor's Estate and shall not be entitled to any distributions under the Plan or otherwise; or (ii) in the event there is a successful Challenge of the L.A. Care Claim in a manner that results in L.A. Care having an Allowed Claim, such Allowed Claim is junior and subordinate to the Axios Secured Claim, which is not being satisfied in full hereunder, and thus the L.A. Care Claim shall be (a) rendered wholly unsecured pursuant to § 506(a)(1), and (b) treated as a General Unsecured Claim in Class 5.~~ Upon the earlier of Confirmation of the Plan and consummation of the Axios Sale, the Challenge Rights under the L.A. Care Sale Order shall terminate, thereby eliminating the contingency that could otherwise give rise to the L.A. Care Contingent Secured Claim and L.A. Care shall have no Claim pursuant to the L.A. Care Purchase Agreements. Notwithstanding the foregoing, because L.A. Care holds a contingent secured Claim as of the Voting Record Date, such Claim is separately classified under the Plan, entitled to vote, and treated in accordance with Section 10.14 hereof.

For the avoidance of doubt, the L.A. Care Contingent Secured Claim does not include (i) L.A. Care's Administrative Claim under Paragraph 11 of the L.A. Care Sale Order or (ii) any unsecured Claim or other rights or defenses that may arise under the L.A. Care HSA, which shall be treated separately hereunder.

(c) Impairment and Voting. Class 3 is Impaired, and the Holder of the Class 3 Claim is entitled to vote on the Plan.

9.4 Class 4—Other Secured Claims.

(a) Classification. Class 4 consists of Other Secured Claims.

(b) Treatment. Except to the extent a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, on the later of (i) the Effective Date or (ii) the date such Other Secured Claim becomes Allowed, or as soon as reasonably practicable thereafter, each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claim, at the discretion of the Debtor (x) payment from the Debtor in full in Cash in an amount equal to the Allowed amount of such Claim; (y) such other treatment sufficient to render such Other Secured Claim Unimpaired; or (z) return of the applicable collateral or authorization of a setoff in satisfaction of the Allowed amount of such Other Secured Claim.

(c) Impairment and Voting. Class 4 is Unimpaired under the Plan. Each Holder of an Allowed Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to § 1126(f). Therefore, Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders shall not be solicited with respect to Other Secured Claims.

9.5 Class 5—General Unsecured Claims.

(a) Classification. Class 5 is comprised of all General Unsecured Claims.

(b) Treatment. Each Holder of an Allowed General Unsecured Claim shall receive a Liquidating Trust Interest and become a Liquidating Trust Beneficiary in full and final satisfaction of its Allowed Class 5 Claim in accordance with the terms of the Sharing Agreement.

(c) Impairment and Voting. Class 5 is Impaired, and the Holders of Class 5 Claims are entitled to vote on the Plan.

9.6 Class 6—Insured Claims.

(a) Classification. Class 6 consists of all Insured Claims.

(b) Treatment. Each Holder of an Allowed Insured Claim shall recover only from the proceeds of available insurance and shall not be entitled to any distributions from the Debtor or the Liquidating Trust.

(c) Impairment and Voting. Class 6 is Impaired, and the Holders of Class 6 Claims are entitled to vote on the Plan.

9.7 Class 7—Subordinated Claims.

(a) Classification. Class 7 consists of all Subordinated Claims.

(b) Treatment. On the Effective Date, each Subordinated Claim shall be cancelled, released, and extinguished, and each Holder of a Subordinated Claim shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such Subordinated Claim.

(c) Impairment and Voting. Holders of Allowed Subordinated Claims are deemed to have rejected the Plan, and are not entitled to vote.

9.8 Class 8—Interests.

(a) Classification. Class 8 consists of all Interests.

(b) Treatment. There shall be no Distribution on account of Class 8 Interests. Upon the Effective Date, all Interests will be deemed cancelled and will cease to exist.

(c) Impairment and Voting. Holders of Interests are deemed to have rejected the Plan, and are not entitled to vote.

## SECTION 10
## MEANS FOR IMPLEMENTATION OF THE PLAN

10.1 General Settlement of Claims and Interests.

Pursuant to § 1123 and Bankruptcy Rule 9019, and in consideration for the classification, Distributions, releases, and other benefits provided under the Plan, upon the Effective Date, all settlements contained in the Plan (including, without limitation, the Taxing Authority Settlements) shall constitute a good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the relevant Plan provisions. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromises and settlements under § 1123 and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlements and compromises are fair, equitable, reasonable, and in the best interests of the Debtor and the Estate. All Plan Distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final. For the avoidance of doubt, the Plan itself shall not be deemed to be a settlement.

10.2 The Global Settlement Agreement Among the Debtor, Axios, and the Committee.

The Combined DS and Plan implements the Global Settlement Agreement reflected in the Plan Term Sheet amongst the Debtor, Axios, and the Committee. As part of the Global Settlement Agreement, Axios provided the DIP Facility, consisting of up to $21 million in new money loans plus a 1.5x roll-up of the Axios Prepetition Secured Claim, for an aggregate principal amount of up to $52.5 million. The DIP Facility provided the Debtor necessary

liquidity to continue operating the Hospital during the Chapter 11 Case and to fund the plan process.

The Global Settlement Agreement provided for Axios to fund future operating losses and capital expenditures of the Operations pursuant to the term of the IMA and the sale of substantially all of the Debtor's assets (other than certain Excluded Assets) to Axios, free and clear of all liens, claims, and encumbrances pursuant to § 363. Axios elected to effectuate the sale through a private sale under §§ 363 and 365, and the Debtor will file the Sale Motion seeking approval of the Axios Sale pursuant to the APA. Simultaneously, the Plan Term Sheet required that either (i) Axios and Reliq enter into a New Lease Agreement consistent with the "Lease Principal Agreement" as defined in the Credit Agreement, or (ii) notwithstanding anything herein to the contrary, all claims and causes of action of the estate against Reliq, including recharacterization of the Master Lease, equitable subordination and avoidance claims against Reliq, and claims under the Subordination Agreement, and the attorney client privilege and work product of the Debtor relating to Reliq and the Master Lease shall pass to Axios's Designee on Closing. Pursuant to the Plan Term Sheet, Axios agreed that any net cash recovery on chapter 5 claims against Reliq shall be transferred to the Liquidation Trust for Distribution. Nothing herein shall prohibit the Liquidating Trust from objecting to any Claim asserted by Reliq.

The Global Settlement Agreement also provided for the establishment of the Liquidating Trust pursuant to the Plan and for the transfer of the Excluded Assets to the Liquidating Trust free and clear of all liens, claims and encumbrances.

In connection with the Liquidating Trust, the Global Settlement Agreement provided for a sharing of net proceeds (the "Sharing Agreement") pursuant to a waterfall as follows:

i. The first $1 million shall be retained by the Liquidating Trust for distribution to Holders of Allowed General Unsecured Claims and/or payment of expenses;

ii. Equal sharing (50% to each) between Axios and the Liquidating Trust, until Axios has received $4 million from net proceeds; and

iii. 75% of subsequent net proceeds shall be retained by the Liquidating Trust and 25% shall be distributed to Axios, until Axios's allowed claim of $15 million is paid in full, at which time all subsequent net proceeds shall be retained by the Liquidating Trust.

The Global Settlement Agreement further provided that Axios shall not assert against the Estate, or for purposes of sharing in the proceeds of the Excluded Assets, more than $15 million in the aggregate, shall not recover or receive by any means from the Liquidating Trust more than $15 million in the aggregate from the Excluded Assets, and following consummation of the Axios Sale, Axios shall not recover or claw back any amounts paid during the Chapter 11 Case.

10.3 PGMC Settlement Proposal.

The Debtor maintains that it holds a legal and/or equitable ownership interest in PGMC, while acknowledging that other parties have asserted competing claims to ownership of PGMC.

Given exigent circumstances, the Debtor is negotiating with the landlord for PGMC and other parties that have asserted an ownership interest in PGMC and anticipates that, prior to the Effective Date, the Debtor and those parties will reach an agreement in principle (the "PGMC Settlement Agreement") resolving issues related to PGMC and the lease for PGMC's facility either (a) through mediation or binding arbitration, or (b) by a settlement agreement to be approved under Bankruptcy Rule 9019 in connection with confirmation of the Plan.

Any PGMC Settlement Agreement ~~is~~shall be subject to (i) the prior consent of the Committee in its sole and absolute discretion~~.~~, and (ii) notice and a hearing, with all parties in interest, including Paul Tuft, afforded an opportunity to object or otherwise be heard. For the avoidance of doubt, the Tuft Limited Objection expressly states that Paul Tuft does not acknowledge or concede that the Debtor owns any interest in PGMC. All parties expressly reserve their respective rights with respect to any asserted ownership interest in PGMC.

10.4 Taxing Authority Settlements.

Pursuant to Bankruptcy Rule 9019 and § 1123(b)(3)(A), the Plan constitutes a compromise and settlement of all Priority Tax Claims and Tax Penalty Claims held or asserted by the IRS and any state, local, or other Governmental Unit (each, a "Taxing Authority") against the Debtor or the Estate, on the terms set forth herein (collectively, the "Tax Authority Settlements"). The treatment of Priority Tax Claims in Section 7.5 and the treatment of Tax Penalty Claims as Class 5 General Unsecured Claims, which combined treatment shall be in full and final satisfaction, release and discharge of such Priority Tax Claims and Tax Penalty Claims and any liability of any current officer or director of the Debtor arising from or relating to such Priority Tax Claims or Tax Penalty Claim. Each Holder of a Priority Tax Claim shall have such Claim Allowed in the reduced amount applicable to such Holder as set forth in Schedule 1 hereto in full and final satisfaction, settlement, release, and discharge of such Claim.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Taxing Authority Settlements pursuant to Bankruptcy Rule 9019 and § 1123(b)(3)(A), without the need for any separate motion, settlement agreement, or further order of the Bankruptcy Court.

10.5 Post-Effective Date Operations Pursuant to IMA.

The Post-Effective Date Debtor, acting through a responsible officer (to be identified in the Plan Supplement), shall oversee the management and Operations of the Health Care System pursuant to the IMA, including, without limitation, the administration of all obligations and claims, until Axios obtains any required licenses, including hospital and pharmacy licenses, and approval of a change in ownership ("CHOW") with regard to any provider agreements. The Post-Effective Date Debtor's expenses will be paid by Axios or its designee ~~under the~~to the extent set forth in and pursuant to the terms of the IMA. After the Post-Effective Date Debtor obtains regulatory approval, the Post-Effective Date Debtor shall be dissolved pursuant to Section 15.1 of the Combined DS and Plan.

10.6 Operating Accounts for the Post-Effective Date Debtor.

The Post-Effective Date Debtor shall continue to use its existing operating accounts in accordance with the Operating Budget.

10.7 Transfer of the Liquidating Trust Cash Contribution and Certain Other Funds Into the Liquidating Trust.

On the Effective Date, the Debtor shall transfer the Liquidating Trust Cash Contribution to the Liquidating Trust to an account to be established by the Liquidating Trustee. Thereafter, Post-Effective Date, subject to the prior payment of, or reserve for, all amounts required to be paid by the Debtor in cash on and after the Effective Date pursuant to this Plan, including all Allowed Administrative Claims and all Allowed Priority Claims, the Debtor shall transfer all additional funds (if any) that the Debtor may have received or receives (to the extent property of the Estate) to the Liquidating Trust except for funds that are (i) assets of Axios pursuant to the IMA or Axios Sale, or (ii) funded by Axios and to be retained by the Post-Effective Date Debtor under the IMA and the Operating Budget. The post-Effective Date transfers by the Debtor to the Liquidating Trust shall be made as soon as practicable after the Effective Date.

10.8 Coordination Between Post-Effective Date Debtor and the Liquidating Trust.

Notwithstanding anything herein to the contrary, in furtherance of the purposes of the Liquidating Trust and any IMA, at the request of the Liquidating Trustee, the Post-Effective Date Debtor (including, without limitation, the Post-Effective Date Debtor's employees, directors, agents and/or professionals) shall be authorized to provide assistance and services to, or otherwise act on behalf of, the Liquidating Trustee in the performance of the Liquidating Trustee's duties under the Plan and the Liquidating Trust Agreement, with the Post-Effective Date Debtor's expenses related thereto paid by the Liquidating Trust. Without limiting any of the foregoing, the Post-Effective Date Debtor shall be authorized to assist in the reconciliation and administration of claims, and assist in the liquidation and/or collection of Liquidating Trust Assets (including, without limitation, Causes of Action not otherwise released pursuant to the Plan).

10.9 Funding for Distributions.

The distributions to Holders of Allowed General Unsecured Claims contemplated under the Plan shall be funded as set forth herein and in the Liquidating Trust Agreement.

10.10 Preservation of Insurance.

Nothing in this Plan shall diminish, impair or otherwise affect payments from the proceeds or the enforceability of any insurance policies that may cover (a) Claims by the Debtor, or (b) Claims against the Debtor or covered Persons thereunder.

10.11 Destruction and Abandonment of Books and Records.

Subject to the terms of any records retention order with respect to the records covered thereby, on or after the Effective Date, pursuant to § 554(a), the Liquidating Trustee is authorized, from time to time, without further application to the Bankruptcy Court or notice to any party, to abandon or otherwise destroy documents and records (other than medical records) of the Liquidating Trust, the Debtor and the Post-Effective Date Debtor (whether in electronic or paper format) that they determine, in their reasonable business judgment, are no longer necessary

to the administration of either the Chapter 11 Case or the Plan, notwithstanding any federal, state, or local law or requirement requiring the retention of the applicable documents or records; provided, that, sixty (60) days prior to any abandonment or destruction, the Liquidating Trustee will give notice to any insurer of the Debtor requesting notice prior to the Confirmation Date and a general description of the documents to be abandoned or destroyed, and the insurer shall have thirty (30) days thereafter to request, at its expense, copies of the documents relevant to the defense or indemnity claims covered by that insurer. The insurer and the Liquidating Trustee shall cooperate in limiting the request to documents relevant to defense or indemnity of claims covered by that insurer.

In response to the Tuft Limited Objection, the Debtor will preserve and transfer to the Liquidating Trust any documents relevant to existing or reasonably anticipated litigation against Paul Tuft, and the Liquidating Trustee shall not destroy such documents without 30 days' notice to Paul Tuft.

10.12 Dissolution of the Committee.

On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto). The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fee Claims pending on the Effective Date or filed and served after the Effective Date. Nothing in the Plan shall prohibit or limit the ability of the Committee's or Debtor's Professionals to represent the Liquidating Trustee or to be compensated or reimbursed per the Plan and/or the Liquidating Trust Agreement in connection with such representation.

10.13 No Further Court Authorization.

Except as provided herein or the Confirmation Order, the Liquidating Trustee will continue the orderly administration of the Liquidating Trust Assets and otherwise implement the provisions of this Plan without necessity of any further order of the Bankruptcy Court or approval or consent of any Governmental Unit. Further, except as provided herein or the Confirmation Order, the Liquidating Trustee will continue their oversight and related responsibilities pursuant to the Plan and Liquidating Trust Agreement without necessity of any further order of the Bankruptcy Court or other Governmental Unit.

10.14 Provisions Relating to L.A. Care.

(a) L.A. Care Sale Order Controls.

Except as to the Challenge Rights that that will be released under the Plan, the L.A. Care Sale Order, including the findings, stipulations, release, and administrative claim granted therein, and the L.A. Care Purchase Agreements shall remain in full force and effect, survive the Effective Date, bind the Debtor, the Post-Effective Date Debtor, the Liquidating Trust, the

Liquidating Trustee, Axios or Axios's Designee, and any estate representative, and control over any inconsistent provision of the Plan Documents.

(b) Challenge Rights Released.

On the first to occur of (i) the closing of the Axios Sale and (ii) the Effective Date, all Challenge Rights and any other right of the Committee, the Liquidating Trust, the Liquidating Trustee, Axios or Axios's Designee, or any estate representative to challenge, recharacterize, avoid, subordinate, or otherwise recover in respect of the Prepetition L.A. Care Purchase Agreements or the HQAF receivables and proceeds sold to L.A. Care thereunder (the "Prepetition L.A. Care Receivables"), or in respect of any recoupment, offset, or withholding exercised under the Prepetition L.A. Care Purchase Agreements, shall be deemed waived and released, and the stipulations in the L.A. Care Sale Order shall be final and binding on all parties.

(c) Not Estate Property.

The L.A. Care Receivables are not property of the Estate and are not Purchased Assets, Excluded Assets, Liquidating Trust Assets, QAF Delta, or HQAF Excluded Assets. L.A. Care may receive and retain the L.A. Care Receivables, whenever or however received (including after the Effective Date), as provided in paragraph 12 of the L.A. Care Sale Order.

(d) Post-Effective Date HQAF.

Until L.A. Care has received payment on all L.A. Care Receivables, the Debtor, the Post-Effective Date Debtor, and Axios or Axios's Designee shall cooperate in all DHCS and CMS filings and communications needed to secure payment of such receivables, and shall provide L.A. Care with the information described in paragraph 9(c) of the L.A. Care Purchase Agreements. Upon receipt of all L.A. Care Receivables, L.A. Care shall disburse any HQAF Funds it has received in excess of the Assigned HQAF Funds (as defined in the L.A. Care Purchase Agreements) as and to the extent provided in the L.A. Care Purchase Agreements, and shall be fully discharged upon doing so.

(e) Administrative Claim.

L.A. Care's Administrative Claim under paragraph 11 of the L.A. Care Sale Order is Allowed without the need to file a proof of claim or any formal motion, is not subject to the Administrative Expense Bar Date, and, to the extent not previously paid in accordance with the L.A. Care Sale Order, shall be paid in full in Cash on the Effective Date (and before then as invoiced).

(f) Carve-Outs.

No Cause of Action against L.A. Care is retained or vested in the Liquidating Trust, Axios or Axios's Designee, or any other person, including under Sections 11.3, 11.7, and 17.5 of the Combined DS and Plan (including clauses (viii) and (ix) of Section 17.5(b)).

(g) Consent.

No amendment, modification, or supplement to the Plan, the Confirmation Order, or any Plan Supplement document (including the APA, the IMA, and the assumption schedule) that materially adversely affects the rights of L.A. Care under this Combined DS and Plan shall be effective without L.A. Care's prior written consent.

(h) Debtor Releases.

L.A. Care and each of its Related Persons are "Released Parties" for purposes of the Debtor/Estate Release set forth in section 17.2(a) of the Combined DS and Plan.

(i) Preservation of Setoff and Recoupment Rights.

Notwithstanding anything in the Confirmation Order or the Combined DS and Plan to the contrary, L.A. Care reserves any and all defenses, including setoff and recoupment, including under the L.A. Care HSA or the L.A. Care Purchase Agreements, that it may have against the Debtor, the Post-Effective Date Debtor, the Estate, the Liquidating Trust, the Liquidating Trustee, and any other successors or assigns of the Debtor or the Estate; provided, however, that the rights and defenses of the Debtor, the Post-Effective Date Debtor, the Estate, the Liquidating Trust, the Liquidating Trustee, and any other successors or assigns of the Debtor or the Estate and any other successors or assigns of the Debtor or the Estate as applicable, with respect thereto are fully preserved; *provided further* that nothing contained herein shall supersede any provisions in the Axios Sale Order that provide (to the extent it provides) for the sale of assets free and clear of liens, claims and encumbrances and enjoins any such relief against assets purchased by Axios (or its Designee) pursuant to such Axios Sale Order. Nothing in this paragraph shall be construed to create, expand, limit, impair or acknowledge any right of setoff or recoupment by the Debtor and its successors and assigns beyond those that exist independent of this paragraph.

## SECTION 11
## THE LIQUIDATING TRUST

11.1 Creation and Purpose of Liquidating Trust.

On the Effective Date, the Liquidating Trust shall be established in accordance with the Liquidating Trust Agreement for the purpose of liquidating and distributing certain assets of the Estate, in accordance with 26 C.F.R. § 301.7701-4(d), this Plan, the Liquidating Trust Agreement, the Confirmation Order, and the Bankruptcy Code's priority scheme, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust.

The primary functions of the Liquidating Trust are as follows: (i) to liquidate, sell, or dispose of the Liquidating Trust Assets; (ii) to cause all net proceeds of the Liquidating Trust Assets, including proceeds of Causes of Action on behalf of the Liquidating Trust, to be distributed in accordance with the Sharing Agreement, including depositing the Liquidating Trust's share thereunder into the Liquidating Trust; (iii) to initiate actions to resolve any remaining issues regarding the allowance and payment of Claims including, as necessary, initiation and/or participation in proceedings before the Bankruptcy Court; (iv) to take such actions as are necessary or useful to maximize the recoveries to the Liquidating Trust Beneficiaries; and (v) in its capacity as Distribution Agent, to make the payments and

distributions to Holders of Allowed General Unsecured Claims. All Causes of Action constituting Excluded Assets, including Avoidance Actions, will vest in the Liquidating Trust whether or not identified on a retained action schedule (to be provided in the Plan Supplement).

11.2 Liquidating Trust Agreement.

On or prior to the Effective Date, the Debtor and Liquidating Trustee shall enter into the Liquidating Trust Agreement, in form and substance acceptable to the Committee, to establish the Liquidating Trust. The Liquidating Trust Agreement executed by the parties thereto shall be filed with the Plan Supplement. The Liquidating Trust Agreement, including the designation of the Liquidating Trustee thereunder, shall be approved by the Bankruptcy Court, and the designated Liquidating Trustee shall accept its duties thereunder on the Effective Date. The Liquidating Trust Agreement shall, among other things, create the Liquidating Trust, identify the Liquidating Trustee, identify the compensation of the Liquidating Trustee, and specify the authorities and powers of the Liquidating Trustee consistent with this Plan. The Liquidating Trust Agreement may only be amended, modified and/or supplemented by providing five (5) business days' written notice to the Post-Effective Date Debtor and Axios, and if any such party objects to such amendment, modification and/or supplement in writing, thereafter only pursuant to Bankruptcy Court approval, after notice and a hearing.

11.3 Litigation.

Except as otherwise provided herein (including with respect to the Exculpation and Release provisions hereof), all Litigation is retained, vested in the Liquidating Trust, and preserved pursuant to § 1123(b) for prosecution or settlement, including by the Liquidating Trustee as the representative of the Estate. From and after the Effective Date, all Litigation will be prosecuted or settled by the Liquidating Trustee. To the extent any Litigation is already pending on the Effective Date, the Liquidating Trustee will continue the prosecution of such Litigation and shall be substituted as plaintiff, defendant, or in any other capacity for the Debtor or the Estate pursuant to the Plan and the Confirmation Order on the Effective Date, without need for any further motion practice or notice in any case, action, or matter.

Although the Debtor is unable to predict with certainty the value or outcome of any particular Litigation, the Liquidating Trustee will evaluate and pursue only those Causes of Action that, in the exercise of its reasonable judgment, are expected to yield a net positive recovery to the Liquidating Trust, taking into account the anticipated costs of prosecution, including Liquidating Trustee fees and expenses.

By way of example only, the following Causes of Action, in addition to those set forth in Section 17.5(b) hereof, are currently known to the Debtor as of the date hereof and may be pursued by the Liquidating Trustee:

- Litigation related to PGMC;
- Director & Officer Insurance Claims;
- Claims related to fraudulent conveyances;
- Claims related to preferential transfers; and

- Any other legal actions indicated on the Debtor's Schedules.

A further comprehensive list of Causes of Action will be filed with the Plan Supplement.

The Tuft Limited Objection asserts that Paul Tuft should be afforded an opportunity to review and respond to any supplemental list of Causes of Action and any material modifications to the Plan's settlement, release, or litigation provisions and further asserts that he does not consent to any third-party release. The Debtor disagrees with Mr. Tuft's position to the extent he is requesting rights beyond the notice requirements provided by the Bankruptcy Code and Bankruptcy Rules. Moreover, the foregoing objections concern confirmation of the Plan, rather than conditional approval of the Disclosure Statement, and the Plan Supplement will be filed by December 3, 2026, at 4:00 p.m., and Mr. Tuft will have until December 10, 2026, at 4:00 p.m., to review the Plan Supplement and object to any provisions of the Combined Disclosure Statement and Plan that he contends are objectionable.

11.4 Appointment of the Liquidating Trustee.

The Committee, in consultation with the Debtor and Axios, shall select the initial Liquidating Trustee. The Liquidating Trustee will be identified in the Plan Supplement and its appointment shall be approved in the Confirmation Order and effective as of the Effective Date. As provided in the Liquidating Trust Agreement, (i) the Liquidating Trustee shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Court; (ii) the Liquidating Trustee shall only be removed upon a Final Order of the Court determining that the Liquidating Trustee engaged in gross negligence or willful misconduct, and (iii) in the event the Liquidating Trustee resigns or is removed, terminated, or otherwise unable to serve as Liquidating Trustee, then a successor shall be appointed as set forth in the Liquidating Trust Agreement. Any successor Liquidating Trustee appointed shall be bound by and comply with the terms of the Plan, the Confirmation Order, and the Liquidating Trust Agreement. From and after the Effective Date, professionals may be retained by the Liquidating Trustee as set forth in the Liquidating Trust Agreement, without further need for documentation or Bankruptcy Court approval. All fees and expenses incurred by the professionals retained by the Liquidating Trustee following the Effective Date shall be paid by the Liquidating Trust from the Liquidating Trust Assets in accordance with the Liquidating Trust Agreement.

11.5 Liquidating Trust Assets.

On the Effective Date, the Debtor shall be deemed to have transferred and assigned all of its rights, title, and interests in the Liquidating Trust Assets to the Liquidating Trust, and the Liquidating Trust Assets shall vest automatically in the Liquidating Trust free and clear of all Liens, Claims, charges, or other encumbrances. The Plan shall be considered a motion pursuant to §§ 105, 363 and 365 for such relief. The transfer of the Liquidating Trust Assets shall be made for the benefit and on behalf of the Liquidating Trust Beneficiaries. The assets comprising the Liquidating Trust Assets will be treated for tax purposes as being transferred by the Debtor to the Liquidating Trust Beneficiaries pursuant to the Plan in exchange for their Allowed Claims and then by the Liquidating Trust Beneficiaries to the Liquidating Trust in exchange for the beneficial interests in the Liquidating Trust. The Liquidating Trust Beneficiaries shall be treated as the grantors and owners of the Liquidating Trust. Upon the transfer of the Liquidating Trust

Assets, the Liquidating Trust shall succeed to all of the Debtor's rights, title and interest in the Liquidating Trust Assets, and the Debtor will have no further interest in or with respect to the Liquidating Trust Assets.

11.6 Rights and Powers of the Liquidating Trustee.

The Liquidating Trustee shall be deemed the Estate's representative in accordance with § 1123(b) and shall have all the rights and powers set forth in the Liquidating Trust Agreement, including, without limitation, the powers of a trustee under §§ 704 and 1106 and Bankruptcy Rule 2004 to act on behalf of the Liquidating Trust, in addition to any powers granted by law or conferred to it by any other provision of the Plan. Without limiting the foregoing, the Liquidating Trustee will have the right and power to, among other things, (1) effect all actions and execute all agreements, instruments and other documents necessary to implement the provisions of the Plan and the Liquidating Trust Agreement; (2) receive, manage, protect, and liquidate the Liquidating Trust Assets; (3) investigate, prosecute, settle, abandon or compromise any Litigation or Causes of Action the Debtor or the Estate held or may have held against any Entity, including as the representative of the Estate, without further notice to or action, order, or approval by the Bankruptcy Court; (4) make all Distributions in accordance with the Plan and the Liquidating Trust Agreement; (5) administer the Liquidating Trust and pursue viable Causes of Action in accordance with the Plan and the Liquidating Trust Agreement; (6) establish and administer any necessary reserves for Disputed Claims that may be required; (7) object to Claims and prosecute, settle, compromise, withdraw or resolve such objections and any Claim objections pending as of the Effective Date in any manner without further notice to or action, order, or approval by the Bankruptcy Court; (8) pay taxes or other obligations incurred by the Liquidating Trust and issue to employees or other Persons, and/or file with the appropriate Governmental Units, applicable tax and wage returns and forms; and (9) employ and compensate professionals and other agents, including, without limitation, existing Professionals employed by the Debtor or the Committee without further notice to or action, order, or approval by the Bankruptcy Court, *provided, however,* that any such compensation shall be made only out of the Liquidating Trust Assets. The enumeration of the foregoing rights and powers shall not be considered in any way to limit or control the power and authority of the Liquidating Trustee to act as specifically authorized by any other provision of the Plan, the Liquidating Trust Agreement, and/or any applicable law, and to act in such manner as the Liquidating Trustee may deem necessary or appropriate, including, without limitation, to discharge all obligations assumed by the Liquidating Trustee or provided herein, to conserve and protect the Liquidating Trust and the Liquidating Trust Assets, or to confer on the Liquidating Trust Beneficiaries the benefits intended to be conferred upon them by the Plan.

On the Effective Date, in connection with the transfer and assignment of the Liquidating Trust Assets to the Liquidating Trust, any prepetition attorney-client privilege, work-product doctrine, or other privilege or immunity attaching to any documents or communications (whether written, electronic, or oral) shall be transferred to, or otherwise acquired by, the Liquidating Trust pursuant to the terms of the Plan or otherwise shall vest in the Liquidating Trustee and the representatives of the Liquidating Trust, and the Liquidating Trustee shall be authorized to take any actions to the extent necessary to effectuate the transfer of such privileges and rights attendant thereto. Upon the later of the Effective Date and the IMA Transition Date, any postpetition attorney-client privilege, work-product doctrine, or other privilege or immunity

attaching to any documents or communications (whether written, electronic, or oral) shall vest in, be transferred to, or otherwise acquired by, the Liquidating Trustee and the representatives of the Liquidating Trust, and the Liquidating Trustee shall be authorized to take any actions to the extent necessary to effectuate the transfer of such privileges and rights attendant thereto. The Liquidating Trustee's receipt of all such privileges shall not operate as a waiver of any other privileges possessed or retained by the Debtor. The Liquidating Trustee's disclosure of any privileged documents or information to the members of the Oversight Committee in connection with their duties under the Plan or the Liquidating Trust Agreement shall not result in any waiver of such privileged documents, communications or information.

11.7 Standing and Authority.

For the avoidance of doubt, upon the occurrence of the Effective Date, the Liquidating Trustee shall automatically be granted, have, and be vested with exclusive standing and authority to: (i) bring and prosecute any Litigation and Causes of Action in a court of competent jurisdiction in the name of the Liquidating Trust or in the name of the Debtor as the Estate's representative in accordance with § 1123(b) (whichever the Liquidating Trustee may determine is most favorable to maximizing recoveries for the benefit of Liquidating Trust Beneficiaries), notwithstanding any anti-assignment provisions under otherwise applicable law; and (ii) negotiate, settle, waive, or otherwise resolve any Litigation or Causes of Action. The Liquidating Trustee shall have the right to freely amend the named plaintiff in any lawsuits asserting Litigation if the Liquidating Trustee determines that such amendment is necessary to maximize recoveries for the benefit of Liquidating Trust Beneficiaries. For the further avoidance of doubt, upon the Effective Date, the Liquidating Trustee shall automatically: (a) constitute a representative of the Debtor and the Estate with respect to all Litigation and Causes of Action and any related Insurance Policies; and (b) be granted and have the right to control any and all privileges and protections on behalf of the Debtor and the Estate with respect to all Litigation and Causes of Action.

11.8 Oversight Committee.

The Liquidating Trust shall have a separate oversight committee comprised of three (3) members, with two (2) members selected by the Committee and one (1) member selected by Axios (the "Oversight Committee"). The Oversight Committee shall have approval rights over certain key decisions by the Liquidating Trustee, all as set forth in the Liquidating Trust Agreement.

11.9 Fees and Expenses of the Liquidating Trust.

Liquidating Trust Expenses shall be paid by the Liquidating Trustee, from the Liquidating Trust Assets, in accordance with the Liquidating Trust Agreement without further order of the Bankruptcy Court.

11.10 Liquidating Trust Interests.

On the Effective Date, each Holder of an Allowed General Unsecured Claim shall, by operation of the Plan, receive its *pro rata* share of the Liquidating Trust Interests. Liquidating Trust Interests shall be reserved for Holders of Disputed General Unsecured Claims and issued

by the Liquidating Trust to, and held by the Liquidating Trustee in, the Disputed Claims Reserve pending allowance or disallowance of such Claims. No other entity shall have any interest, legal, beneficial or otherwise, in the Liquidating Trust Assets upon the assignment and transfer of such assets to the Liquidating Trust. The Liquidating Trust Interests shall be uncertificated and shall be nontransferable except upon death of the Holder or by operation of law. Holders of Liquidating Trust Interests, in such capacity, shall have no voting rights with respect to such interests. Distributions from the Liquidating Trust on account of Liquidating Trust Interests shall be made from the Liquidating Trust Assets after paying, reserving for or satisfying the Liquidating Trust Expenses.

11.11 Transfer of Beneficial Interests in the Liquidating Trust.

The Liquidating Trust Interests shall not be transferable except upon death of the interest Holder or by operation of law. The Liquidating Trust shall not have any obligation to recognize any transfer of Claims or Interests occurring after the Distribution Record Date.

11.12 Effective Date Cash Transfers.

On the Effective Date, the Debtor shall transfer the Liquidating Trust Cash Contribution to the Liquidating Trust. On or as soon after the Effective Date as is reasonably practical, the Debtor shall use any available Cash to fund payments to be made pursuant to or otherwise consistent with the Plan and the Confirmation Order, including distributions to Holders of Allowed Administrative Claims and Priority Claims. Subject to the restrictions set forth herein, the Liquidating Trust Assets will be used by the Liquidating Trustee to pay for the expenses of the Liquidating Trust in accordance with the Liquidating Trust Agreement. On or as soon as practicable following the Effective Date, the Liquidating Trust Assets Account shall be opened by the Liquidating Trustee and funded with the Liquidating Trust Cash Contribution, which shall constitute Liquidating Trust Assets.

11.13 Term of the Liquidating Trust.

The Liquidating Trust will terminate on the earlier of the: (a) final liquidation, administration, and Distribution of the Liquidating Trust Assets in accordance with the terms of the Plan and the Liquidating Trust Agreement, and the Liquidating Trustee's full performance of all duties and functions as set forth in the Plan or the Liquidating Trust Agreement; and (b) the fifth anniversary of the Effective Date. Notwithstanding the foregoing, multiple fixed term extensions of the term of the Liquidating Trust may be obtained so long as Bankruptcy Court approval is obtained within six months before or after the expiration of the term of the Liquidating Trust and each extended term, in the discretion of the Liquidating Trustee. Notwithstanding any such termination, the Liquidating Trustee shall have the power to: (i) take all actions necessary to its full performance of all duties and functions as set forth in the Plan or the Liquidating Trust Agreement, including without limitation, the authority, power, and responsibility to investigate, prosecute to Final Order, litigate, settle, abandon or compromise any Litigation; and (ii) seek to obtain a nunc pro tunc extension of the term of the Liquidating Trust. For the avoidance of doubt, the Litigation shall survive any termination of the Liquidating Trust and shall remain unaffected by any termination of the Liquidating Trust and may be pursued and prosecuted through Final Order during any period of winding up the Liquidating

Trust. After (x) the final Distributions pursuant to the Plan, and (y) the filing by or on behalf of the Liquidating Trust of a certification of dissolution with the Bankruptcy Court, the Liquidating Trust shall be dissolved for all purposes without the necessity for any other or further actions.

11.14 Certain Tax Matters.

i. The Liquidating Trustee shall file tax returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulations Section 1.671-4(a) and in accordance with the Plan. The Liquidating Trust's items of taxable income, gain, loss, deduction, and/or credit (other than such items in respect of any assets allocable to, or retained on account of, Disputed Claims) will be allocated to each Holder in accordance with their relative ownership of Liquidating Trust Interests.

ii. The Liquidating Trustee may request an expedited determination of taxes under § 505(b) for all tax returns filed by or on behalf of the Liquidating Trust for all taxable periods through the dissolution thereof. Nothing in this Section shall be deemed to determine, expand, or contract the jurisdiction of the Bankruptcy Court under § 505.

iii. The Liquidating Trustee (1) may timely elect to treat any Liquidating Trust Assets allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulations Section 1.468B-9, and (2) to the extent permitted by applicable law, shall report consistently for state and local income tax purposes. If a "disputed ownership fund" election is made, all parties (including the Liquidating Trustee and the Holders of Liquidating Trust Interests) shall report for U.S. federal, state, and local income tax purposes consistently with the foregoing. The Liquidating Trustee shall file all income tax returns with respect to any income attributable to a "disputed ownership fund" and shall pay the U.S. federal, state, and local income taxes attributable to such disputed ownership fund based on the items of income, deduction, credit, or loss allocable thereto.

iv. Except to the extent definitive guidance from the IRS or a court of competent jurisdiction (including the issuance of applicable Treasury Regulations or the receipt by the Liquidating Trustee of a private letter ruling if the Liquidating Trustee so requests one) indicates that such valuation is not necessary to maintain the treatment of the Liquidating Trust as a liquidating trust for purposes of the Internal Revenue Code and applicable Treasury Regulations, as soon as possible after the Effective Date, the Liquidating Trustee shall make a good-faith valuation of the Liquidating Trust Assets and such valuation shall be used consistently by all parties (including, without limitation, the Debtor, the Liquidating Trust, and the Liquidating Trust Beneficiaries) for all federal income tax purposes.

## SECTION 12
## DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS

12.1 Distribution Dates.

The Liquidating Trustee shall make Distributions to Holders of Claims, and with respect to General Unsecured Claims, may, in its discretion, make a full or partial Pro Rata Distribution to the Holders of General Unsecured Claims on the Initial Distribution Date or a Subsequent Distribution Date.

12.2 Subsequent Distributions.

Any Distribution not made on the Initial Distribution Date or a Subsequent Distribution Date because the Claim relating to such Distribution had not been Allowed on that Distribution Date shall be made by the Distribution Agent on any Subsequent Distribution Date after such Claim is Allowed. No interest shall accrue or be paid on the unpaid amount of any Distribution.

12.3 Distribution Record Date.

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Distribution Record Date will be treated as the Holders of those Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer may not have expired by the Distribution Record Date. The Distribution Agent shall have no obligation to recognize any transfer of any Claim occurring after the Distribution Record Date. In making any Distribution with respect to any Claim, the Distribution Agent shall be entitled instead to recognize and deal with, for all purposes hereunder, only the Entity that is listed on the Proof of Claim filed with respect thereto or on the Schedules as the Holder thereof as of the close of business on the Distribution Record Date and upon such other evidence or record of transfer or assignment that is known to the Distribution Agent as of the Distribution Record Date.

12.4 Manner of Cash Payments Under the Plan or Liquidating Trust Agreement.

Cash payments made pursuant to the Plan shall be in United States dollars by checks drawn on a domestic bank selected by the Distribution Agent, or by wire transfer from a domestic bank, at the option of the Distribution Agent.

12.5 Time Bar to Cash Payments by Check.

Checks issued by the Distribution Agent on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof. Requests for the reissuance of any check that becomes null and void pursuant to this Section shall be made directly to the Distribution Agent by the Holder of the Allowed Claim to which the check was originally issued. Any Claim in respect of such voided check shall be made in writing on or before the later of six months from the Effective Date or ninety (90) days after the date of issuance thereof. After that date, all Claims in respect of voided checks shall be discharged and forever barred and the proceeds of those checks shall revest in and become the property of the Liquidating Trust, as unclaimed property in accordance with § 347(b).

## SECTION 13
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

13.1 No Distributions Pending Allowance.

Notwithstanding any other provision of the Plan, the Debtor and the Liquidating Trustee, as applicable, shall not distribute any Cash or other property on account of any Disputed Claim unless and until such Claim becomes Allowed. Nothing contained herein, however, shall be

construed to prohibit or require payment or Distribution on account of any undisputed portion of a Claim.

13.2 Resolution of Disputed Claims.

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, subject to the Liquidating Trust Agreement, the Liquidating Trustee shall have the right to make, file, prosecute, settle, withdraw, or resolve objections to Claims.

The costs of pursuing the objections to Claims shall be borne by the Liquidating Trust. From and after the Confirmation Date, all objections with respect to Disputed Claims shall be litigated to a Final Order except to the extent the Liquidating Trustee elects to withdraw any such objection or the Liquidating Trustee and the Claimant elect to compromise, settle, or otherwise resolve any such objection, in which event they may settle, compromise, or otherwise resolve any Disputed Claim or Disputed Interest without approval of the Bankruptcy Court.

13.3 Objection Deadline.

All objections to Claims shall be filed and served upon the Claimant not later than the Claims Objection Deadline.

13.4 Estimation of Claims.

At any time, (a) prior to the Effective Date, the Debtor, and (b) after the Effective Date, the Liquidating Trustee, may request that the Bankruptcy Court estimate any contingent or unliquidated Claim to the extent permitted by § 502(c) regardless of whether the Debtor or the Liquidating Trustee has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall have jurisdiction to estimate any Claim at any time during Litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection. If the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on the Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the Claim, the Debtor or the Liquidating Trustee, as applicable, may elect to pursue supplemental proceedings to object to the ultimate allowance of the Claim. All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism of the Bankruptcy Court.

13.5 Disallowance of Claims.

Except as otherwise agreed or ordered by the Bankruptcy Court, any and all Proofs of Claim filed after the Bar Date shall not be treated as an Allowed Claim for purposes of Distribution without any further notice or action, and Holders of such Claims shall not receive any Distributions on account of such Claims, unless on or before the Confirmation Date the Bankruptcy Court has entered an order deeming such Claim to be timely filed.

Any Claims held by Entities from which property is recoverable under §§ 542, 543, 550, or 553 or Entities that are transferees of transfers avoidable under §§ 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a), provided that such Cause of Action is retained by the Liquidating Trust, shall be deemed disallowed pursuant to § 502(d), and Holders of such Claims may not receive any Distributions on account of such Claims until such time as such Causes of Action the Debtor holds or may hold against any Entity have been resolved or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Estate by that Entity have been turned over or paid to the Debtor or the Liquidating Trust.

13.6 Adjustment to Claims Register Without Objection.

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the claims register at the direction of the Debtor or the Liquidating Trustee, as applicable, without an objection filed and without further notice to or action, order, or approval of the Bankruptcy Court.

13.7 Reserve Provisions for Disputed Claims.

On or by each Distribution Date, the Debtor or the Liquidating Trustee, as applicable, shall reserve Cash required for distribution on Disputed Claims as if such Claims were Allowed as filed with any Disputed Claims that are unliquidated or contingent being reserved in an amount reasonably determined by the Debtor or the Liquidating Trustee (the "Disputed Claim Reserve").

The property in the Disputed Claim Reserve shall be held in trust for the benefit of the Holders of Disputed Claims that are ultimately determined to be Allowed. Each Disputed Claim Reserve shall be closed and extinguished when all Distributions and other dispositions of Cash or other property required to be made hereunder will have been made in accordance with the terms of the Plan.

13.8 Rounding.

Whenever any payment of a fraction of a cent would otherwise be called for, the actual distribution shall reflect a rounding of such fraction down to the nearest cent.

13.9 No Cash Payments of Less Than $100 on Account of Allowed Claims.

Notwithstanding anything herein to the contrary, except with respect to Administrative Claims, Priority Claims, Priority Tax Claims, and Other Secured Claims, if a Distribution to be made to a Holder of an Allowed Claim on the Initial Distribution Date or any Subsequent Distribution Date would be $100 or less in the aggregate, no such Distribution will be made to that Holder unless a request therefor is made in writing to the Distribution Agent. If such request is made, such Cash shall be held for such Holder until the earlier of (i) the next time an interim distribution is made to the Holders of Allowed Claims (unless the distribution would still be less than $100, in which case this Section shall again apply), or (ii) the date on which Final Distributions are made to the Holders of Allowed Claims.

13.10 Delivery of Distributions and Unclaimed Property.

Subject to Bankruptcy Rule 9010 and except as otherwise provided herein, Distributions to the Holders of Allowed Claims shall be made at (a) the address of each Claimant as set forth in the Schedules, unless superseded by the address set forth on Proof(s) of Claim filed by such Claimant, or (b) the last known address of such Claimant if no Proof of Claim is filed or the Debtor or the Liquidating Trustee has been notified in writing of a change of address. If any Distribution is returned as undeliverable, the Distribution Agent may, in its discretion, but shall not be required to, make reasonable efforts to determine the current address of the Holder of the Claim with respect to which the Distribution was made, but no Distribution to any such Holder shall be made unless and until the Distribution Agent has determined the then-current address of such Holder, at which time the Distribution to such Holder shall be made without interest. Amounts in respect of any undeliverable Distributions shall be returned to, and held in trust by, the Distribution Agent, until the Distributions are claimed or are deemed to be unclaimed property under § 347(b). The Distribution Agent shall have the discretion to determine how to make Distributions in the most efficient and cost-effective manner possible; *provided, however*, that its discretion may not be exercised in a manner inconsistent with any express requirements of the Plan or, if applicable, the Liquidating Trust Agreement. On or about the time that the Final Distribution is made, the Distribution Agent may make a charitable donation with undistributed funds if, in its reasonable judgment, the cost of calculating and making the Final Distribution of the remaining funds is excessive in relation to the benefits to the Holders of Claims that would otherwise be entitled to such Distributions, and such charitable donation is provided to an entity not otherwise related to the Debtor or the Liquidating Trustee.

**Except with respect to property not distributed because it is being held in a Disputed Claim Reserve, Distributions that are not claimed by the later of the expiration of six (6) months from the Effective Date or ninety (90) days after the date of a Distribution shall be deemed to be unclaimed property under § 347(b) and shall vest or revest in the Liquidating Trust, and the Claims with respect to which those Distributions are made shall be automatically cancelled and disallowed and shall receive no further Distributions. After the expiration of that period, the claim of any Entity to those Distributions shall be cancelled and disallowed**. Nothing contained in the Plan shall require the Debtor or the Liquidating Trust to attempt to locate any Holder of an Allowed Claim. All funds or other property that vest or revest in the Liquidating Trust pursuant to this Section shall be distributed to the other Holders of Allowed Claims in accordance with the provisions of the Plan or the Liquidating Trust Agreement, as applicable.

13.11 Required Tax Information.

**The Distribution Agent may require any Claimant to provide a duly executed IRS Form W-9 or such other documentation or information as the Distribution Agent reasonably deems necessary to effectuate a Distribution with respect to any Claim. If a Claimant fails to provide the requested information within ninety (90) days after written request, the Distribution Agent may, in its discretion, deem the Distribution to such Claimant undeliverable, administer such Distribution as unclaimed property in accordance**

**with the terms of the Plan, and treat the Claim as Disallowed and ineligible to receive any further Distributions pursuant to the Plan.**

13.12 Books and Records.

The Debtor shall transfer dominion and control over all of its books and records (other than those relating to the Liquidating Trust Assets), in whatever form, manner or media, to Axios on or as soon as reasonably practicable after the Effective Date. The Debtor shall transfer dominion and control over all of its books and records relating to the Liquidating Trust Assets, in whatever form, manner or media, or provide copies of such books and records in electronic format, to the Liquidating Trustee on or as soon as reasonably practicable after the Effective Date.

**SECTION 14**
**TREATMENT OF EXECUTORY CONTRACTS**
**AND UNEXPIRED LEASES**

14.1 Rejection / Assumption.

Except with respect to (i) executory contracts or unexpired leases that were previously assumed or rejected by order of the Bankruptcy Court, (ii) executory contracts or unexpired leases that are the subject of a pending motion to assume or reject, pursuant to § 365, (iii) executory contracts or unexpired leases that are scheduled by the Debtor to be assumed as of the Effective Date, as set forth in the Plan Supplement, or in the APA, (iv) executory contracts that are Insurance Policies, (v) the Master Lease, and (vi) the CBAs, on the Effective Date, each executory contract and unexpired lease entered into by the Debtor prior to the Petition Date that has not previously expired or terminated pursuant to its own terms shall be deemed rejected pursuant to § 365. Nothing in this Section shall cause the rejection, breach, or termination of any Insurance Policies and/or other contracts of insurance benefiting the Debtor and the Estate, the Debtor's officers and directors and/or the Liquidating Trust. The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections pursuant to § 365, as of the Effective Date. Nothing in this Section shall be construed as an acknowledgement that a particular contract or agreement is executory or is properly characterized as a lease.

The non-Debtor parties to any rejected personal property leases shall be responsible for taking all steps necessary to retrieve the personal property that is the subject of such executory contracts and leases, and neither the Debtor nor the Liquidating Trust shall bear any liability for costs associated with such matters.

14.2 Rejection Claims.

All Proofs of Claim with respect to Claims arising from the rejection of executory contracts or unexpired leases pursuant to Confirmation of the Plan, if any, must be filed with the Claims Agent within thirty (30) days after the Effective Date. Any Claim arising from the rejection of an executory contract or unexpired lease pursuant to Confirmation of the Plan that is not filed by such deadline shall not be treated as an Allowed Claim for purposes of Distribution without any further notice or action, and the Holders of such Claim shall not receive any Distributions on account of such Claim, unless the Bankruptcy Court has entered an order

deeming such Claim to be timely filed. All such Claims for which Proofs of Claim are timely and properly filed and ultimately Allowed will be treated as General Unsecured Claims.

14.3 Insurance Policies.

Notwithstanding anything to the contrary contained herein, Confirmation of the Plan shall not discharge, impair or otherwise modify any obligation under any of the Insurance Policies. To the extent one or more of the Insurance Policies provide potential coverage related to one or more Causes of Action the Debtor holds or may hold against any Entity, the Debtor shall, to the extent permissible under each Insurance Policy, be deemed to have assigned all of its rights thereunder with respect to such Causes of Action to the Liquidating Trust. All net proceeds (including, for the avoidance of doubt, net of any deductibles or retentions) of Insurance Policies received by the Liquidating Trust shall be treated as proceeds of such Causes of Action for all purposes under the Plan. The Debtor shall not take any action to or otherwise impair the Insurance Policies. The Debtor shall pay any premiums necessary to maintain such Insurance Policies and may not terminate any such Insurance Policies without the consent of the Liquidating Trustee. Nothing herein shall diminish or impair the enforceability of the Insurance Policies and related agreements that may cover Claims and Causes of Action against the Debtor or any other Entity.

The Confirmation Order shall constitute a determination that no default by the Debtor exists with respect to any of the Insurance Policies and that nothing in any prior order, any prior agreements, or this Combined DS and Plan shall be construed or applied to modify, impair, or otherwise affect the enforceability of the Insurance Policies or any coverage thereunder with regard to any Causes of Action, Litigation, or claims, interests, or rights of the Debtor, the Estate, the Liquidating Trustee, or the Liquidating Trust. The Combined DS and Plan shall be liberally construed to protect the interests of all Creditors in all Causes of Action and Litigation. Nothing in this Combined DS and Plan shall diminish, impair, or otherwise affect (i) rights of the Debtor's current or former directors, officers, trustees, managers, or any other Person covered under the Insurance Policies, or (ii) payments from the proceeds or the enforceability of any Insurance Policies that may cover (a) claims by the Debtor, or (b) claims against the Debtor or covered Persons thereunder.

## SECTION 15
## POST EFFECTIVE DATE GOVERNANCE

15.1 Continued Existence of Post-Effective Date Debtor After the Effective Date.

On and after the Effective Date, the Post-Effective Date Debtor shall continue in existence for the following purposes:

i. to maintain its corporate existence and full rights to receive any payments, including, but not limited to, payments related to Medi-Cal, Medicare, and HQAF;

ii. in furtherance of implementation of the provisions of the IMA and/or the Plan, to take any action necessary under applicable law that is consistent with the provisions of the IMA and/or the Plan; and

iii. to take such other actions as may be necessary or appropriate with respect to the affairs, businesses and/or Operations of the Health Care System which are not permitted to be undertaken by Axios under applicable law.

15.2 No Further Approvals Required.

In performance of its duties hereunder, the Post-Effective Date Debtor shall have the rights and powers of a debtor in possession under § 1107, and such other rights, powers, and duties necessary, appropriate, advisable or convenient to effectuate the provisions of the Plan. On and after the Effective Date, the Post-Effective Date Debtor shall not be required to obtain any approvals from the Bankruptcy Court, any court or Governmental Unit and/or provide any notices to implement the terms of the Plan.

15.3 Operation of the Health Care System.

The Post-Effective Date Debtor, through its agent, shall be authorized (i) to continue to manage the Operations of the Health Care System pursuant to the IMA without necessity of any further notice or approval by the Bankruptcy Court, (ii) to execute any agreement or other instrument necessary to implement the terms of the APA and the IMA, and (iii) to enforce the terms of the IMA.

15.4 Dissolution.

The Liquidating Trustee, in consultation with the Post-Effective Date Board of Directors, may cause the Post-Effective Date Debtor to be dissolved for all purposes under applicable non-bankruptcy law, upon consummation of the sale of the Health Care System to Axios, transfer of applicable licenses to Axios, and execution of related documents such as the IMA.

15.5 Post-Effective Date Board of Directors.

(a) Post-Effective Date Board of Directors. As of the Effective Date, the members of the Restructuring Committee will remain the governing board or a new Post-Effective Date Board of Directors will be formed.

(b) Duties. The Post-Effective Date Board of Directors shall fulfill its duties and obligations under the bylaws and state and federal law consistent with the terms of this Plan.

(c) Resignation. Any member of the Post-Effective Date Board of Directors may resign at any time upon not less than thirty (30) days' written notice to the Liquidating Trustee; provided, that, the Liquidating Trustee may waive such notice period.

(d) Replacement. Notwithstanding anything in the bylaws to the contrary, in the event that a director serving on the Post-Effective Date Board of Directors resigns or is duly removed for cause, or in the event of the death of any such director or other occurrence rendering

such director incapacitated or unavailable for a period of thirty (30) consecutive days, a replacement director shall be designated by the remaining members of the Post-Effective Date Board of Directors in consultation with the Liquidating Trustee and Axios.

(e) Termination. The terms of the Post-Effective Date Board of Directors shall expire upon the date they are no longer required under state law but no later than the later of (i) the dissolution of the Post-Effective-Date Debtor and (ii) the entry of a final decree of the Court closing the Chapter 11 Case.

(f) Limitation of Liability of the Post-Effective Date Board of Directors. The liability of the Post-Effective Date Board of Directors shall be limited to the maximum extent permitted by law, including any exculpations under the articles of incorporation or bylaws of the Post-Effective Date Debtor.

## SECTION 16
## EFFECT OF CONFIRMATION

16.1 Binding Effect of the Plan.

The provisions of the confirmed Plan shall bind the Debtor, Axios, the Committee, the Liquidating Trust, the Liquidating Trustee, any Entity acquiring property under the Plan, any Liquidating Trust Beneficiary, and any Creditor or Interest Holder, whether or not such Creditor or Interest Holder has filed a Proof of Claim or Interest in the Chapter 11 Case, whether or not the Claim of such Creditor or the Interest of such Interest Holder is impaired under the Plan, and whether or not such Creditor or Interest Holder has accepted or rejected the Plan. All Claims and Debts shall be fixed and adjusted pursuant to the Plan. The Plan shall also bind any taxing authority, recorder of deeds, or similar official for any county, state, or Governmental Unit or parish in which any instrument related to the Plan or related to any transaction contemplated under the Plan is to be recorded with respect to any taxes of the kind specified in § 1146(a).

16.2 Vesting of Property of the Debtor on the Effective Date.

Except as otherwise provided in the Plan, the Confirmation Order, the APA, or any agreement, instrument, or other document incorporated herein or therein, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, the assets of the Debtor that are not transferred to Axios pursuant to the APA, including the Excluded Assets, shall vest in the Liquidating Trust free and clear of all Liens, Claims, charges, or other encumbrances.

Following the Effective Date, the Liquidating Trustee may transfer and dispose of any such property free of any restrictions imposed by the Bankruptcy Code or the Bankruptcy Rules and without further approval of the Bankruptcy Court or notice to Creditors, except as may otherwise be required under the Plan or the Confirmation Order.

## SECTION 17
## EXCULPATIONS, INJUNCTIONS, AND RELEASES

This Combined DS and Plan contains certain releases, exculpations, and injunction language. Parties are urged to read these provisions carefully to understand how Confirmation and consummation of the Plan will affect any Claim, interest, right, or action with regard to the Debtor and certain third parties.

**THE COMBINED DS AND PLAN SHALL BIND ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED UNDER THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE AND ALL OTHER APPLICABLE LAW**

17.1 Exculpation.

The Exculpated Parties will neither have nor incur any liability to any entity for any action in good faith taken or omitted to be taken between the Petition Date and Effective Date in connection with or related to the Chapter 11 Case, the sale or other disposition of the Debtor's assets or the formulation, preparation, dissemination, implementation, Confirmation, or Consummation of the Plan, the Disclosure Statement, or any agreement created or entered into in connection with the Plan; *provided, however*, that this limitation will not affect or modify the obligations created under the Plan, or the rights of any Holder of an Allowed Claim to enforce its rights under the Plan, and shall not release any action (or inaction) constituting willful misconduct, fraud, bad faith, or gross negligence (in each case subject to determination by Final Order of the Bankruptcy Court); *provided that* any Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Plan, and such reasonable reliance shall form a defense to any such claim, Cause of Action, or liability. Without limiting the generality of the foregoing, each Exculpated Party shall be entitled to and granted the protections of § 1125(e).

17.2 Releases.

(a) **Debtor Releases**.

**Notwithstanding anything in the Combined DS and Plan to the contrary, pursuant to § 1123(b), for good and valuable consideration, on and after and subject to the occurrence of the Effective Date, the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any cause of action, by, through, for, or because of the foregoing entities (collectively, the "Debtor/Estate Releasors"), shall release (the "Debtor/Estate Release") each Released Party, and each Released Party is deemed released by the Debtor/Estate Releasors from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtor/Estate Releasors, as applicable, whether known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, or due or to become due, existing or hereinafter arising, in law, equity, or otherwise, that the Debtor/Estate Releasors would have been legally entitled to assert in its own right, or on behalf of the Holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtor (including the management, ownership, or operation thereof), the Debtor's liquidation, the Chapter 11 Case, the purchase, sale, transfer of any security, asset, right, or interest of the Debtor and the ownership thereof, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Case, the negotiation, formulation, or preparation of, or solicitation of votes on, the Combined DS and Plan or related agreements, instruments, or other documents, or any other act or omission, transaction, agreement, event, or other occurrence taking place on and before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct, actual fraud, bad faith, or gross negligence (in each case subject to determination of such by final order of a court of competent jurisdiction) but in all respects such Released Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan; provided, that the foregoing Debtor/Estate Release shall not operate to waive or release any obligations of any party under the Plan or any other document, instrument, or agreement executed to implement the Plan; and further provided that nothing herein shall act as a discharge of the Debtor.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtor/Estate Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor/Estate Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) in the best interests of the Debtor and all Holders of Claims and Interests; (c) fair, equitable, and reasonable; (d) given and made after due notice and opportunity for hearing; and (e) a bar to any of the Debtor/Estate**

**Releasors asserting any Claim or Cause of Action released pursuant to the Debtor/Estate Release.**

(b) **Third Party Release**.

**Notwithstanding anything in the Plan to the contrary, on and after and subject to the occurrence of the Effective Date, each of the Releasing Parties shall release (the "Third Party Release") each Released Party, and each of the Debtor, the Estate, and the Released Parties shall be deemed released from, any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of any of the Debtor or the Estate, as applicable, whether known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, or due or to become due, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtor (including the management, ownership, or operation thereof), the Debtor's liquidation, the Chapter 11 Case, the purchase, sale, transfer of any security, asset, right, or interest of the Debtor and the ownership thereof, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Combined DS and Plan, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Case, the negotiation, formulation, or preparation of, or solicitation of votes on, the Combined DS and Plan or related agreements, instruments, or other documents, any other act or omission, transaction, agreement, event, or other occurrence taking place on and before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct, actual fraud, bad faith, or gross negligence (in each case subject to determination of such by final order of a court of competent jurisdiction) but in all respects such Released Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Combined DS and Plan. Notwithstanding anything to the contrary in the foregoing, the Third Party Release shall not release any obligations of any party under the Combined DS and Plan or any other document, instrument, or agreement executed to implement the Combined DS and Plan. For the avoidance of doubt, the Third Party Release shall not be effective upon any party that does not execute and return a Release Opt-In Election Form in accordance with the terms of this Combined DS and Plan.**

17.3 Injunction.

**In implementation of the Plan, except as otherwise expressly provided in the Confirmation Order or the Plan, and except in connection with the enforcement of the terms of the Plan or any documents provided for or contemplated in the Plan, all entities who have held, hold or may hold Claims against or Interests in the Debtor, the Liquidating Trust, Axios in its capacity as purchaser, or the Estate that arose prior to the Effective Date are permanently enjoined from: (a) commencing or continuing in any manner, directly or indirectly, any action or other proceeding of any kind against the Debtor, the Estate, Axios in its capacity as purchaser, the Liquidating Trust, or any of the Liquidating**

**Trust Assets with respect to any such Claim or Interest; (b) the enforcement, attachment, collection, or recovery by any manner or means, directly or indirectly, of any judgment, award, decree, or order against the Debtor, the Estate, the Liquidating Trust, or any of the Liquidating Trust Assets with respect to any such Claim or Interest; (c) creating, perfecting, or enforcing, directly or indirectly, any Lien or encumbrance of any kind against the Debtor, the Estate, the Liquidating Trust, or any of the Liquidating Trust Assets with respect to any such Claim or Interest; and (d) any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan with respect to such Claim or Interest. Nothing contained in this Section shall prohibit the Holder of a timely filed Proof of Claim from litigating its right to seek to have such Claim declared an Allowed Claim and paid in accordance with the distribution provisions of the Plan, or enjoin or prohibit the interpretation or enforcement by the Claimant of any of the obligations of the Debtor or the Liquidating Trust under the Plan. Notwithstanding any other provision of this Plan, the Debtor shall not receive a discharge pursuant to Bankruptcy Code section 1141(d)(3).**

17.4 Post-Confirmation Liability of Liquidating Trustee.

The Liquidating Trustee, together with its consultants, agents, advisors, attorneys, accountants, financial advisors, other representatives and the professionals engaged by the foregoing and the Post-Effective Date Board of Directors (collectively, the "Indemnified Parties") shall not be liable for any and all liabilities, losses, damages, claims, Causes of Action, costs and expenses, including but not limited to attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, to the Holders of Claims or Interests for any action or inaction in connection with the performance or discharge of their duties under the Plan, except the Indemnified Parties will be liable for actions or inactions that constitute willful misconduct, fraud, bad faith, or gross negligence (in each case subject to determination of such by final order of a court of competent jurisdiction). However, any act or omission taken with the approval of the Bankruptcy Court, and not inconsistent therewith, will be conclusively deemed not to constitute willful misconduct, fraud, bad faith, or gross negligence. In addition, the Liquidating Trust and the Estate shall, to the fullest extent permitted by the laws of the State of Delaware, indemnify and hold harmless the Indemnified Parties from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including but not limited to attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Liquidating Trust and the Estate or the implementation or administration of the Plan if the Indemnified Party acted in good faith and in a manner reasonably believed to be in or not opposed to the best interest of the Liquidating Trust and the Estate. To the extent the Liquidating Trust indemnifies and holds harmless the Indemnified Parties as provided above, the legal fees and related costs incurred by counsel to the Liquidating Trustee in monitoring and participating in the defense of such claims giving rise to the right of indemnification shall be paid as Liquidating Trust Expenses. All rights of the Persons indemnified pursuant hereto shall survive confirmation of the Plan. For the avoidance of doubt, the Liquidating Trustee and Post-Effective Date Board of Directors shall not be deemed Exculpated Parties under this Plan, nor shall this provision be read to grant the Liquidating Trustee or the Post-Effective Date Board of Directors an exculpation under this Plan.

17.5 Preservation of Rights of Action.

(a) Vesting of Causes of Action.

Except as otherwise provided in the Plan or Confirmation Order, including any Cause of Action that is expressly waived, relinquished, exculpated, released, settled, or compromised under the Plan or Confirmation Order (including, without limitation, pursuant to the Debtor/Estate Release), (i) in accordance with § 1123(b)(3), any Causes of Action that the Debtor or the Estate held, holds or may hold against any Entity shall vest upon the Effective Date in the Liquidating Trust; (ii) after the Effective Date, the Liquidating Trustee, including as the representative of the Estate, shall have the exclusive right to institute, prosecute, abandon, settle, or compromise any Causes of Action the Debtor or the Estate held, holds or may hold against any Entity constituting Liquidating Trust Assets in accordance with the terms of the Plan and the Liquidating Trust Agreement, and without further order of the Bankruptcy Court, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in the Chapter 11 Case; and (iii) Causes of Action and recoveries therefrom shall remain the sole property of the Liquidating Trust, and Holders of Claims shall have no direct right or interest in any such Causes of Action or recoveries. For the avoidance of doubt, the Claims described in Section 10.2 shall be preserved and vested as set forth in such section and in accordance with § 1123(b)(3).

(b) Preservation of All Causes of Action Not Expressly Settled or Released.

Unless a Cause of Action against a Holder of a Claim or other Entity is expressly waived, relinquished, released, compromised, or settled in the Plan (including, without limitation, pursuant to the Debtor/Estate Release) and/or any Final Order (including the Confirmation Order), the Liquidating Trustee expressly reserves such retained Cause of Action for later adjudication by the Liquidating Trustee (including, without limitation, Causes of Action not specifically identified or described in the Plan Supplement or elsewhere, or of which the Debtor may be presently unaware, or which may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time, or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise) or laches shall apply to such Causes of Action upon or after the entry of the Confirmation Order or Effective Date based on the Disclosure Statement, Plan, or Confirmation Order, except where such Causes of Action have been released or otherwise resolved by a Final Order (including the Confirmation Order). In addition, the Liquidating Trustee expressly reserves the right to pursue or adopt claims alleged in any lawsuit in which the Debtor is a defendant or interested party against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

Subject to the immediately preceding paragraph, any Entity to which the Debtor has incurred an obligation (whether on account of services, the purchase or sale of goods, or otherwise), or that has received services from the Debtor or a transfer of money or property of the Debtor, or that has transacted business with the Debtor, or that has leased property from the Debtor, should assume and is hereby advised that any such obligation, transfer, or transaction may be reviewed by the Liquidating Trustee subsequent to the Effective Date and may be the

subject of an action after the Effective Date, regardless of whether (i) such Entity has filed a Proof of Claim against the Debtor in the Chapter 11 Case; (ii) the Debtor or Liquidating Trustee have objected to any such Entity's Proof of Claim; (iii) any such Entity's Claim was included in the Schedules; (iv) the Debtor or Liquidating Trustee have objected to any such Entity's scheduled Claim; (v) any such Entity's scheduled Claim has been identified by the Debtor or Liquidating Trustee as disputed, contingent, or unliquidated; or (vi) the Debtor has identified any potential claim or Cause of Action against such Entity herein.

No Person or Entity may rely on the absence of a specific reference in this Combined DS and Plan to any claim against them as any indication that the Liquidating Trust shall not pursue any and all available claims against them. Unless any claims are expressly waived, relinquished, exculpated, released, compromised, or settled in in this Combined DS and Plan or a Bankruptcy Court order, the Liquidating Trust expressly reserves all such claims for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppels (judicial, equitable, or otherwise), or laches, shall apply to such claims as a consequence of Confirmation or Consummation.

In the Tuft Limited Objection, Paul Tuft asserts that (i) the preservation of claims against him distinguishes potential claims from established liabilities, (ii) naming him does not constitute a finding that he alone controlled the Debtor's management, transfers, taxes, or other functions, and (iii) unnamed persons have not been exonerated. The Debtor does not purport to have limited Mr. Tuft's rights to defend himself in any suits which may be commenced against him, and approval of the Disclosure Statement does not itself establish any allegation against Mr. Tuft or eliminate his applicable defenses.

Except as specifically provided herein, nothing contained herein shall constitute a waiver or relinquishment of any claims, Litigation, or Causes of Action of the Debtor or the Estate that are not settled or specifically waived or relinquished hereunder (collectively, along with the proceeds thereof, the "Retained Causes of Action"). The Retained Causes of Action preserved hereunder include, without limitation, the following claims, rights, Litigation or other Causes of Action:

i. claims and Causes of Action, including, without limitation, breach of fiduciary duty claims and Avoidance Actions, against Paul R. Tuft and any other party not expressly released or enjoined under this Plan;

ii. claims and Causes of Action against or related to PGMC;

iii. Avoidance Actions, including, without limitation, against recipients of transfers disclosed in the Schedules during the 90-day period and/or one-year period preceding the Petition Date, as applicable;

iv. claims and Causes of Action relating to pending litigation, including, without limitation, the suits, administrative proceedings, executions, garnishments, and attachments listed in the Schedules;

v. claims and Causes of Action against any former owner or Person in control of the Debtor, including, without limitation, claims and Causes of Action based on

preferential or fraudulent transfers, equitable subordination, recharacterization, improper dividends, pre-Petition Date operations or mismanagement, or any other misconduct;

vi. claims and Causes of Action against any of the Debtor's former professionals, consultants or any other advisors who are not expressly released pursuant to the Plan;

vii. claims arising from prepetition operations, mismanagement or breach of any applicable fiduciary duty or law, including, without limitation failure to remit payroll, withholding, trust fund, or other taxes;

viii. against vendors, suppliers of goods or services (including attorneys, accountants, consultants, or other professional service providers), utilities, contract counterparties, and other parties for, including but not limited to: (A) services rendered; (B) over- and under-payments, back charges, duplicate payments, improper holdbacks, deposits, warranties, guarantees, indemnities, setoff, or recoupment; (C) failure to fully perform or to condition performance on additional requirements under contracts with the Debtor; (D) wrongful or improper termination, suspension of services, or supply of goods, or failure to meet other contractual or regulatory obligation; (E) indemnification and/or warranty claims; or (F) turnover Causes of Action arising under §§ 542 or 543;

ix. against health plans, payors, and other related providers;

x. related to third-party non-Debtor's violations of antitrust, unfair competition, or similar laws;

xi. against landlords or lessors, including, without limitation, for erroneous charges, overpayments, returns of security deposits, indemnification, or for environmental claims;

xii. arising from damage to the Debtor's property;

xiii. relating to claims, rights, or other Causes of Action the Debtor may have to interplead third parties in actions commenced against the Debtor;

xiv. for collection of a debt or other amount owed to the Debtor; and

xv. against insurance carriers, reinsurance carriers, underwriters, surety bond issuers or other related or similar parties relating to coverage, indemnity, contribution, reimbursement, or other matters.

**Except as otherwise expressly provided in the Combined DS and Plan, any and all claims and Causes of Action of the Debtor and the Estate are preserved under the Plan for commencement and prosecution by the Liquidating Trustee, including as the representative of the Estate. The Plan shall be interpreted so as to afford, for the benefit of all Holders of Allowed Claims, the greatest opportunity for maximum recovery by the Liquidating Trustee on the Liquidating Trust Assets and proceeds thereof, Litigation and proceeds thereof, and rights in and proceeds of any applicable Insurance Policies. The**

**proceeds of Litigation, including, but not limited to, claims under state law, are material to the implementation of this Plan and the recoveries to Creditors.**

17.6 No Discharge.

Nothing contained in the Combined DS and Plan shall be deemed to constitute a discharge of the Debtor under § 1141(d)(3).

## SECTION 18
## CERTAIN RISK FACTORS, TAX CONSEQUENCES, AND OTHER DISCLOSURES

18.1 Certain Risk Factors to Be Considered.

THE COMBINED DS AND PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE COMBINED DS AND PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE COMBINED DS AND PLAN AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE COMBINED DS AND PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE COMBINED DS AND PLAN AND ITS IMPLEMENTATION.

(a) The Axios Sale May Not be Consummated.

The Plan conditions the Effective Date on the closing of the Axios Sale, which is dependent on a number of factors, including a resolution between ~~Axios's~~Axios (or its Designee) and Reliq regarding entering into a New Lease Agreement or assuming the Master Lease. If ~~Axios's~~Axios (or its Designee) and Reliq are unable to reach a New Lease Agreement, it is likely to result in litigation among the Debtor, Axios, and Reliq, including, without limitation, litigation concerning ~~the~~ potential recharacterization of the Master Lease as a secured financing instead of a true lease, equitable claims, and disputes regarding applicable cure amounts and/or adequate assurance of future performance. Any such litigation could be protracted ~~and~~, costly, and ~~is likely to~~could materially delay (and potentially prevent) the closing of the Axios Sale, thereby jeopardizing confirmation and consummation of the Plan.

Among other things, Reliq asserts that: (i) the Debtor released any claims to recharacterization of the Master Lease multiple times prior to the Petition Date and that neither the Debtor nor Axios can now resuscitate such claims; (ii) even if such claims were not released, it has strong defenses to any claims of recharacterization; (iii) if Axios (or its Designee) do not reach a New Lease Agreement, the Master Lease must be either assumed or rejected, and, if assumed, it would be entitled to prompt payment of an amount it asserts is more than $14 million to cure monetary defaults under the Master Lease, and, if rejected, Reliq could seek to evict the Debtor and charge rent to the Debtor as a holdover tenant prior to eviction in an amount it asserts equal to 150% of current rent; and (iv) without a lease, the Hospital could also lose its Hospital and pharmacy licenses, the Hospital and pharmacy licenses would not be transferable to Axios

(or its Designee), and the Hospital would be forced to close. The Debtor and Axios dispute certain aspects of Reliq's assertions and reserve all rights.

If the Axios Sale does not close, the Plan will need to be materially modified. Moreover, there can be no assurance that the Debtor could obtain extended access to cash collateral to provide additional liquidity, or that an alternative source of financing would be available to fund the Hospital's operations until an alternative transaction could be negotiated and closed. Any such financing may also be on different, more expensive, and more onerous terms. If the Hospital were closed rather than sold as a going concern, the proceeds from a liquidation of the Debtor's assets would likely be materially less than under the Axios Sale, the collection of receivables and fees may be reduced and delayed, and the Estate would face substantial additional claims, including, without limitation, additional rejection damage claims, employee severance claims, and other claims that would no longer be assumed or paid by Axios (or its Designee) as the buyer.

(b) No Settlement with Taxing Authorities.

The Plan provides for the Taxing Authority Settlements pursuant to Bankruptcy Rule 9019. The Debtor estimates that there are Priority Tax Claims in the approximate amount of $36,677,876 and $18,661,429 in unsecured claims owed to Taxing Authorities. The Debtor continues to reconcile these approximate amounts owed to Taxing Authorities. Specifically, the IRS may be owed a total of approximately $44,229,453. Of that amount, $26,642,189 is priority tax and $3,453,501 is priority interest for a total of approximately $30,095,690 in priority claims. Further, approximately $855,453 is non-priority tax, $940,583 is non-priority interest, and $12,337,725 is total penalties, for a total of approximately $14,133,762 in potential non-priority claims to the IRS. The California Employment Development Department may be owed a total of approximately $7,261,325. This amount is broken down into $5,023,270 in tax due and $692,173 in interest, for a total of approximately $5,715,443 in priority tax. Non-priority claims total approximately $1,545,882 which includes $1,364,836 in penalty and $181,045 in interest. Lastly, approximately $2,332,760 may be owed to the California Franchise Tax Board, comprised of $962,272 in tax, $736,798 in interest, and $633,689 in penalties, none of which are priority taxes. The amount that may be owed to the California Franchise Tax Board is from a Notice of Balance Due dated August 27, 2025. On its filed proof of claim, the Los Angeles County Treasurer and Tax Collector indicates it is owed $356,791 on account of secured claims (which the Debtor disputes), $81,567 of priority claims, and $9,000 of non-priority claims. The City of Los Angeles, Office of Finance may be owed approximately $785,175 in priority claims and $283,232 in non-priority claims. The Debtor reserves all defenses and rights with respect to Priority Tax Claims, any unsecured claims owed to the Taxing Authorities, and any other amounts asserted in any Proofs of Claim.

There can be no assurance that any or all of the Taxing Authorities will agree to the Taxing Authority Settlements on terms acceptable to the Debtor, or at all. If one or more Taxing Authorities do not agree to settle, the Debtor may need to object to the applicable Priority Tax Claims or seek a determination of the amount of the Debtor's tax liability pursuant to § 505, which would require additional time and expense and could delay or prevent confirmation of the Plan, the Effective Date, and distributions to Holders of Allowed Claims. Moreover, any Priority Tax Claim that is not resolved by settlement and is ultimately Allowed would need to be treated

in accordance with § 1129(a)(9)(C), which may require payment in full, with interest, in amounts materially greater than those contemplated by the Taxing Authority Settlements. Because Priority Tax Claims must be paid ahead of General Unsecured Claims, any such increase would reduce the funds available for distribution to Holders of General Unsecured Claims and could, if significant enough, render the Plan infeasible and require that it be modified.

(c) No New Lease Agreement with Reliq

If Axios and Reliq enter into a mutually acceptable New Lease Agreement in connection with Axios's acquisition of substantially all of the Debtor's assets, the Reliq Claim will be deemed fully and finally satisfied, settled, released and discharged, and Reliq shall not be entitled to any distributions under the Plan or otherwise on account of the Reliq Claim other than the payment of its Administrative Claims under the Master Lease, and the Debtor and Reliq shall release each other and their respective principals from all other known and unknown claims.

If Axios and Reliq do not enter into a such a New Lease Agreement, Reliq asserts that: (a) if the Master Lease is assumed and assigned to Axios (or its designee), all pre-petition and post-petition monetary defaults in an amount it asserts totals more than $14 million must be promptly cured; (b) if the Master Lease is rejected, the Reliq Claim could be classified and treated as (i) Administrative Claims with respect to post-petition obligations under the Master Lease, and (ii) a Secured Claim or General Unsecured Claim as determined by the Bankruptcy Court, in an amount it estimates to exceed $20 million, or (c) if the Master Lease is recharacterized as a secured financing instead of a lease then the amount of the Reliq Claim could be significantly increased. In any scenario, the allowance, classification, amount, and treatment of various portions of the Reliq Claim as Administrative Claims (with respect to postpetition obligations under the Master Lease), a Secured Claim, General Unsecured Claim, or Subordinated Claim, shall be determined by further order of the Bankruptcy Court. The Debtor and Axios dispute certain aspects of Reliq's assertions and reserve all rights.

(~~c~~d) The Combined DS and Plan May Not Be Accepted.

The Debtor can make no assurances that the requisite acceptances of the Combined DS and Plan will be received, and the Debtor may need to obtain acceptances of an alternative plan for the Debtor, or otherwise, that may not have the support of the creditors and/or may be required to liquidate the Estate under chapter 7 of the Bankruptcy Code. There can be no assurance that the terms of any alternative arrangement or plan would be similar to or as favorable to creditors as those proposed in the Combined DS and Plan.

(~~d~~e) The Combined DS and Plan May Not Be Confirmed.

Even if the Debtor receives the requisite acceptances, there is no assurance that the Bankruptcy Court, which may exercise substantial discretion as a court of equity, will confirm the Combined DS and Plan. Even if the Bankruptcy Court determined that the Combined DS and Plan and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Combined DS and Plan if it finds that any of the statutory requirements for confirmation had not been met. As is described in greater detail herein, § 1129 sets forth the requirements for confirmation of a chapter 11 plan. While, as more fully set forth

herein, the Debtor believes that the Combined DS and Plan complies with or will comply with all such requirements, there can be no guarantee that the Bankruptcy Court will agree.

Section 1129(a) requires that, except to the extent that the Holder of an Administrative Claim agrees to a different treatment of such claim, Holders of Administrative Claims receive on account of such claim cash equal to the allowed amount of such claim (i.e., "with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of this title, on the effective date of the plan, the Holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim."). In this Chapter 11 Case, the requests for Administrative Claims filed by the Administrative Expense Bar Date exceed the Debtor's estimate of Allowed Administrative Claims and are the subject of ongoing review and reconciliation by the Debtor. The Debtor will seek to reach an agreement on those Administrative Claims and/or object to those requests if appropriate; however, there is no guarantee that Holders of Administrative Claims will agree to a different treatment and/or the Bankruptcy Court will sustain each or all of the objection(s) filed by the Debtor, if any.

Moreover, there can be no assurance that modifications to the Combined DS and Plan will not be required for Confirmation or that such modifications would not necessitate the re-solicitation of votes. If the Combined DS and Plan is not confirmed, it is unclear what distributions Holders of Claims ultimately would receive with respect to their Claims in a subsequent plan of liquidation. If an alternative could not be agreed to, it is possible that the Debtor would have to liquidate its remaining assets in chapter 7, in which case it is likely that the Holders of Allowed Claims would receive substantially less favorable treatment than they would receive under the Combined DS and Plan.

(ef) Distributions to Holders of Allowed Claims Under the Combined DS and Plan May be Inconsistent with Projections.

Projected Distributions are based upon good faith estimates of the total amount of Claims ultimately Allowed and the funds available for Distribution. There can be no assurance that the estimated Claim amounts set forth in the Combined DS and Plan are correct. These estimated amounts are based on certain assumptions with respect to a variety of factors. Both the actual amount of Allowed Claims in a particular Class and the funds available for distribution to such Class may differ from the Debtor's estimates. If the total amount of Allowed Claims in a Class is higher than the Debtor's estimates, or the funds available for distribution to such Class are lower than the Debtor's estimates, the percentage recovery to Holders of Allowed Claims in such Class will be less than projected.

(fg) Estimated Recoveries for General Unsecured Claims are Difficult to Predict and May be Inconsistent with Projections.

The estimated recoveries for General Unsecured Claims are derived from the Debtor's books and records and related financial data. While the Debtor has undertaken reasonable diligence to ensure the accuracy of these estimates, such figures are inherently based on numerous assumptions and remain subject to material revision. In addition, a material portion of such recoveries is expected to be derived from potential litigation claims, the value and outcome of which are inherently uncertain and difficult to predict. Subsequent developments, including

adjustments to the Debtor's books and records or changes in circumstances, may significantly alter projected recoveries. These estimates are provided for illustrative purposes only and do not constitute, and should not be construed as, a prediction, representation, or guarantee of actual recoveries to any Class.

(gh) Objections to Classification of Claims.

Section 1122 provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. As is described in greater detail herein, the Debtor believes that the classification of Claims and Interests under the Combined DS and Plan complies with the requirements set forth in the Bankruptcy Code. Nevertheless, there can be no assurance the Bankruptcy Court will reach the same conclusion.

To the extent that the Bankruptcy Court finds that a different classification is required for the Combined DS and Plan to be confirmed, the Debtor would seek to (i) modify the Combined DS and Plan to provide for whatever classification might be required for Confirmation and (ii) use the acceptances received from any Holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member. Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such Holder was initially a member, or any other Class under the Combined DS and Plan, by changing the composition of such Class and the vote required for approval of the Combined DS and Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Combined DS and Plan based upon such reclassification. Except to the extent that modification of classification in the Combined DS and Plan requires re-solicitation, the Debtor will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Combined DS and Plan by any Holder of Claims pursuant to this solicitation will constitute a consent to the Combined DS and Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member. The Debtor believes that under the Bankruptcy Rules, it would be required to resolicit votes for or against the Combined DS and Plan only when a modification adversely affects the treatment of the Claim or Interest of any Holder.

The Bankruptcy Code also requires that the Combined DS and Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Debtor believes that the Combined DS and Plan complies with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Combined DS and Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Combined DS and Plan. Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Combined DS and Plan and could increase the risk that the Combined DS and Plan will not be consummated.

(~~h~~i) Failure to Consummate the Combined DS and Plan.

Although the Debtor believes that the Effective Date will occur and may occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

(~~i~~j) The Releases May Not Be Approved.

There can be no assurance that the releases provided herein will be granted. Failure of the Bankruptcy Court to grant such relief may result in a plan that differs from the Combined DS and Plan or the Plan not being confirmed.

(~~j~~k) Reductions to Estimated Creditor Recoveries.

The Allowed amount of Claims in any Class could be greater than projected, which, in turn, could cause the amount of distributions to creditors in such Class to be reduced substantially. The amount of cash realized from the monetization of the Debtor's remaining assets could be less than anticipated, which could cause the amount of distributions to creditors to be reduced substantially.

18.2 Tax Treatment.

(a) Tax Treatment of Liquidating Trust.

It is intended that the Liquidating Trust shall qualify as a "liquidating trust" for U.S. federal income tax purposes. Accordingly, (i) the terms of the Liquidating Trust shall be set forth in the Liquidating Trust Agreement; (ii) the Liquidating Trust shall be structured to qualify as a "liquidating trust" within the meaning of Treas. Reg. § 301.7701-4(d) and in compliance with Rev. Proc. 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Internal Revenue Code to the Holders of Claims receiving beneficial interests in the Liquidating Trust (whether Allowed on or after the Effective Date), consistent with the terms of the Plan; (iii) the Holders of Allowed General Unsecured Claims shall be treated as the grantors and deemed owners of the Liquidating Trust; (iv) the primary purpose of the Liquidating Trust shall be the liquidation and distribution of the Liquidating Trust Assets in accordance with Treas. Reg. § 301.7701-4(d), including the resolution of Allowed Claims in accordance with this Plan, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the Liquidating Trust's liquidating purpose; (v) all parties shall report consistently with such treatment as a liquidating trust, including treating the transfer of the Liquidating Trust Assets to the Liquidating Trust as (A) the deemed transfer of the Liquidating Trust Assets (subject to applicable liabilities and obligations) by the Debtor to the Liquidating Trust Beneficiaries, followed by (B) the deemed transfer of such assets by the Liquidating Trust Beneficiaries to the Liquidating Trust in exchange for beneficial interests therein; (vi) all parties shall report consistently with the valuation of the Liquidating Trust Assets transferred to the Liquidating Trust as determined by the Liquidating Trustee; (vii) the Liquidating Trustee shall be responsible for filing returns for the Liquidating Trust as a grantor trust pursuant to Treas. Reg. § 1.671-4(a); (viii) the Liquidating Trustee shall annually provide to each Liquidating Trust Beneficiary a separate statement regarding the receipts and expenditures of the Liquidating Trust as relevant for U.S.

federal income tax purposes; and (ix) all items of income, deductions, credit, and loss of the Liquidating Trust shall be allocated for federal income tax purposes to the Liquidating Trust Beneficiaries in accordance with their relative ownership of Liquidating Trust Interests.

In general, a beneficiary of the Liquidating Trust will recognize gain or loss with respect to its Allowed General Unsecured Claim in an amount equal to the difference between (i) the fair market value of its undivided interest in the Liquidating Trust Assets consistent with its economic rights in the Liquidating Trust received in respect of its Claim and (ii) the adjusted tax basis of the Allowed General Unsecured Claim exchanged therefor. Any gain or loss recognized with respect to an Allowed General Unsecured Claim may be classified as ordinary income unless the Claim disposed of is a capital asset in the hands of the Holder and has been held for more than one year, in which case such gain or loss may be treated as long-term capital gain or loss.

A Holder's aggregate tax basis in its undivided interest in the Liquidating Trust Assets (other than those allocable to Disputed Claims) will generally equal the fair market value of such interest, and a Holder's holding period in such assets generally will begin the day following establishment of the Liquidating Trust.

The U.S. federal income tax obligations of a Holder with respect to its Liquidating Trust Interests are not dependent on the Liquidating Trust distributing any cash or other proceeds. Thus, a Holder may incur a U.S. federal income tax liability with respect to its allocable share of the Liquidating Trust's income even if the Liquidating Trust does not make a concurrent distribution to the Holder. In general, other than in respect of cash retained on account of Disputed Claims and distributions resulting from undeliverable distributions, a distribution of cash by the Liquidating Trust will not be separately taxable to a Holder of Liquidating Trust Interests as the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the cash was earned or received by the Liquidating Trust).

The Liquidating Trustee will comply with all applicable governmental withholding requirements. Thus in the case of any non-U.S. Holders, the Liquidating Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate or is otherwise excluded from withholding). Non-U.S. Holders are urged to consult their tax advisors with respect to the U.S. federal income tax consequences of the Plan, including holding Liquidating Trust Interests.

Holders of Liquidating Trust Interests are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of any subsequent distributions of cash originally retained by the Liquidating Trust on account of Disputed Claims.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE COMBINED DS AND PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES. EACH HOLDER OF A CLAIM OR INTEREST IS**

**URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES OF THE COMBINED DS AND PLAN.**

18.3 Alternatives to the Combined DS and Plan.

If the requisite acceptances are not received or the Combined DS and Plan is not confirmed and consummated, the theoretical alternatives to the Combined DS and Plan would be (a) formulation of an alternative chapter 11 plan, (b) conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or (c) dismissal of the Chapter 11 Case. As discussed below, the Debtor does not believe that any of these alternatives, even if viable, would afford Holders of Claims or Interests a greater recovery than what is provided by the Combined DS and Plan.

If the Combined DS and Plan is not confirmed, then the Debtor or any other party in interest could attempt to formulate a different plan. The additional costs, including, among other amounts, additional professional fees, all of which would constitute Administrative Claims (subject to allowance thereof), however, may be so significant that one or more parties in interest could request that the Chapter 11 Case be converted to chapter 7.

If the Combined DS and Plan is not confirmed, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate and distribute the Debtor's remaining assets in accordance with the priorities established by the Bankruptcy Code. As discussed above and indicated in the Liquidation Analysis, the Debtor believes that the Combined DS and Plan provides a better outcome for Holders of Claims than a chapter 7 liquidation would provide.

If the Combined DS and Plan is not confirmed, the Chapter 11 Case also could be dismissed. Among other effects, dismissal would result in the termination of the automatic stay, thus permitting creditors to assert state-law rights and remedies against the Debtor and its assets, likely to the detriment of other creditors. While it is impossible to predict precisely what would happen in the event the Chapter 11 Case is dismissed, it is unlikely that dismissal would result in a ratable distribution of the Debtor's assets among creditors as provided in the Combined DS and Plan. Thus, the vast majority of creditors could expect to receive less in the dismissal scenario than they would receive under the Combined DS and Plan.

## SECTION 19
## CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

19.1 Conditions to Confirmation of the Plan.

Confirmation of the Combined DS and Plan is conditioned upon the satisfaction of each of the following conditions precedent, any one or more of which may be waived by the Debtor:

i. The Bankruptcy Court shall have approved a disclosure statement to the Plan, which may be this Combined DS and Plan, in form and substance acceptable to the Debtor and Axios;

ii. The Plan, including any amendments, modifications or supplements thereto, and all documentation contemplated by the Plan, shall be in form and substance reasonably satisfactory to Axios and the Committee;

iii. There shall not have occurred a force majeure event (to be defined as a significant global disruption in the financial markets caused by outbreak of war, terrorism, or other incidents, but not adverse changes in the financial, banking or capital markets generally);

iv. The Debtor shall have determined that there will be sufficient Cash on the Effective Date to pay (or with respect to Disputed Claims to reserve for as required pursuant to the Plan) Allowed Administrative Claims, Priority Claims and Priority Tax Claims in full or over time (except as provided by the Taxing Authority Settlements or in such lesser amount or alternative treatment as may be agreed to by the Claimant);

v. The final version of the schedules, documents, and exhibits contained in the Plan Supplement, and all other schedules, documents, supplements and exhibits to the Combined DS and Plan, shall be in form and substance acceptable to the Debtor; and

vi. The Bankruptcy Court shall have entered the Confirmation Order approving the Disclosure Statement and confirming the Plan, which order shall be in form and substance reasonably satisfactory to the Debtor, Axios and the Committee.

19.2 Conditions to the Effective Date.

The occurrence of the Effective Date is conditioned upon the satisfaction of each of the following conditions precedent, any one or more of which may be waived by the Debtor, except for condition iv., which may only be waived by the Debtor with the written consent of the Committee:

i. The Axios Sale shall have closed, and no plan with terms contrary to the Plan Term Sheet shall have been proposed;

ii. The Confirmation Order, including, without limitation, the approval of the Taxing Authority Settlements pursuant to Bankruptcy Rule 9019 and § 1123(b)(3)(A), shall have been entered by this Court, which Confirmation Order shall not have been terminated, suspended, vacated or stayed;

iii. The Liquidating Trust shall have been created pursuant to the terms of the Plan, the Liquidating Trustee shall have been appointed by order of the Bankruptcy Court (which may be the Confirmation Order), and the Liquidating Trust Agreement shall have been executed by the Liquidating Trustee;

iv. The Liquidating Trust Cash Contribution shall have been fully funded and released to the Liquidating Trustee upon the Effective Date;

v. No modification or stay of the Confirmation Order or entry of other court order prohibiting Plan transactions from being consummated; and

vi. All actions, documents, and agreements necessary to implement and consummate the Plan shall have been effected or executed and binding on all parties thereto.

19.3 Waiver of Conditions Precedent.

To the fullest extent permitted by law, the conditions to the Effective Date set forth herein may be waived or modified in whole or in part at any time in writing by the Debtor without leave from or an order of the Bankruptcy Court, ~~,~~ except for the condition in Section 19.2.iv., which may only be waived by the Debtor with the written consent of the Committee.

## SECTION 20
## RETENTION OF JURISDICTION

To the extent necessary to preserve the Bankruptcy Court's post-confirmation jurisdiction to adjudicate any Litigation (including Retained Causes of Action and any Causes of Action identified in the Plan Supplement) commenced or prosecuted by the Liquidating Trustee, the Estate shall remain open from and after the Confirmation Date, and the Liquidating Trustee shall be authorized, but not required, pursuant to section 1123(b) of the Bankruptcy Code, to commence and prosecute any such Litigation in the Bankruptcy Court, including as the representative of the Estate.

Without limiting the foregoing, from and after the Confirmation Date, the Bankruptcy Court shall retain such jurisdiction as is legally permissible, including, but not limited to, for the following purposes:

(a) To hear and determine any and all objections to the allowance of a Claim, proceedings to estimate a Claim for any purpose, actions to equitably subordinate a Claim, proceedings seeking approval of any necessary claims reconciliation protocols, or any controversy as to the classification of a Claim in a particular Class under the Plan;

(b) To administer the Plan, the Liquidating Trust, the Liquidating Trust Assets, and the proceeds thereof;

(c) To estimate or liquidate any Disputed Claims;

(d) To hear and determine any and all adversary proceedings, contested matters or applications pending on the Effective Date or otherwise relating to, arising from, or in connection with the Litigation; provided, however, that the Liquidating Trustee shall reserve the right to commence actions in all appropriate jurisdictions;

(e) To hear and determine any and all motions and/or objections to fix, estimate, allow and/or disallow any Claims arising therefrom;

(f) To hear and determine any and all applications by Professionals for an award of Professional Fee Claims;

(g) To enable the Liquidating Trustee to commence and prosecute any Litigation which may be brought after the Effective Date;

(h) To interpret and/or enforce the provisions of the Plan and the injunction provided for in the Plan and to determine any and all disputes arising under or regarding interpretation of the Plan or any agreement, document, or instrument contemplated by the Plan;

(i) To enter and implement such orders as may be appropriate in the event Confirmation is for any reason stayed, reversed, revoked, modified, or vacated;

(j) To modify any provision of the Plan to the extent permitted by the Bankruptcy Code and to correct any defect, cure any omission, or reconcile any inconsistency in the Plan or in the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan;

(k) To enter such orders as may be necessary or appropriate in furtherance of Confirmation and the successful implementation of the Plan and to determine such other matters as may be provided for in the Confirmation Order or as may be authorized under the provisions of the Bankruptcy Code;

(l) To enter any orders as required by Rule 23 of the Federal Rules of Civil Procedure, to the extent made applicable to any adversary proceeding or contested matter pursuant to Bankruptcy Rules 7023 and 9014(c), as applicable;

(m) To enforce all orders previously entered by the Bankruptcy Court in the Chapter 11 Case;

(n) To enforce, and hear and determine all disputes involving, the injunction, release, and exculpation provisions provided in Section 17; and

(o) To close the Chapter 11 Case when administration of the Liquidating Trust and the Chapter 11 Case has been completed.

## SECTION 21
## MISCELLANEOUS PROVISIONS

21.1 Revocation of the Combined DS and Plan.

The Debtor reserves the right to revoke and withdraw the Combined DS and Plan at any time on or before the Confirmation Date. If the Debtor revokes or withdraws the Combined DS and Plan, or if Confirmation or the Effective Date does not occur, then the Plan shall be deemed null and void and, in such event, nothing contained herein shall be deemed to constitute a waiver

or release of any Claims by or against the Debtor or any other entity or to prejudice in any manner the rights of the Debtor or any Entity in any further proceedings involving the Debtor.

21.2 Severability of Plan Provisions.

In the event that, prior to the Confirmation Date, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall, with the consent of the Debtor, have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision hereof, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

21.3 Exhibits.

All exhibits to the Combined DS and Plan and Plan Supplement are, by this reference, hereby incorporated herein. The Debtor reserves the right to make non-substantive changes and corrections to such exhibits in advance of the Confirmation Hearing. If any exhibits are changed or corrected, the replacement exhibits will be filed with the Bankruptcy Court prior to the commencement of the Confirmation Hearing.

21.4 Notices.

All notices required or permitted to be made in accordance with the Plan shall be in writing and shall be delivered personally or by nationally recognized overnight or next-day courier service, first-class mail, electronic mail, or via facsimile with electronic confirmation of receipt as follows:

Counsel for Debtor:

Dentons US LLP
601 S. Figueroa Street, #2500
Los Angeles, CA 90017
Telephone: (213) 623-9300
Attn: Tania M. Moyron, Esq.
Samuel Maizel, Esq.
tania.moyron@dentons.com
samuel.maizel@dentons.com

-and-

Dentons US LLP
1221 Avenue of the Americas
New York, NY 10020-1089

United States
Attn: John D. Beck
Geoffrey Miller
john.beck@dentons.com
geoffrey.miller@dentons.com

-and-

Pachulski Stang Ziehl & Jones LLP
919 North Market Street
17th Floor,
Wilmington, DE 19899
Attn: Laura Davis Jones
ljones@pszjlaw.com

Counsel for the Committee

Sills Cummis & Gross, P.C.
One Riverfront Plaza
Newark, NJ 07102
Attn: Andrew H. Sherman
Boris I. Mankovetskiy
asherman@sillscummis.com and
bmankovetskiy@sillscummis.com

Counsel for Axios:

Raines Feldman Littrell LLP
824 North Market Street, Suite 805
Wilmington, DE 19801
Attn: Thomas J. Francella, Jr.
Matthew P. Milana
tfrancella@raineslaw.com
mmilana@raineslaw.com

-and -

Raines Feldman Littrell LLP
4675 MacArthur Ct., Suite 1550
Newport Beach, CA 92660
Attn: Hamid R. Rafatjoo, Esquire
HRafatjoo@raineslaw.com

-and-

Raines Feldman Littrell LLP
1350 Avenue of the Americas, 22nd Floor

New York, NY 10019
Attn: Carollynn H.G. Callari, Esquire
ccallari@raineslaw.com

Liquidating Trustee:

To be provided in the Plan Supplement.

21.5 Reservation of Rights.

Neither the filing of the Combined DS and Plan nor any statement or provision contained in the Combined DS and Plan, nor the taking by any party in interest of any action with respect to the Plan, shall: (a) be or be deemed to be an admission against interest and (b) until the Effective Date, be or be deemed to be a waiver of any rights any party in interest may have (i) against any other party in interest, or (ii) in or to any of the assets of any other party in interest, and, until the Effective Date, all such rights are specifically reserved. In the event that the Plan is not confirmed or fails to become effective, neither the Combined DS and Plan nor any statement contained in the Combined DS and Plan may be used or relied upon in any manner in any suit, action, proceeding, or controversy within or without the Chapter 11 Case involving the Debtor, except with respect to Confirmation of the Plan.

21.6 Defects, Omissions and Amendments.

The Debtor may, with the approval of the Bankruptcy Court and without notice to all Holders of Claims or Interests, insofar as it does not materially and adversely affect Holders of Claims, correct any defect, omission, or inconsistency in the Plan in such manner and to such extent as may be necessary or desirable to expedite the execution of the Plan. The Plan may be altered or amended before or after Confirmation as provided in § 1127 if, in the opinion of the Bankruptcy Court, the modification does not materially and adversely affect the interests of Holders of Claims, so long as the Plan, as modified, complies with §§ 1122 and 1123 and the Debtor has complied with § 1125. The Plan may be altered or amended before or after the Confirmation Date but, prior to substantial Consummation, in a manner which, in the opinion of the Bankruptcy Court, materially and adversely affects Holders of Claims, so long as the Plan, as modified, complies with §§ 1122 and 1123, the Debtor has complied with § 1125 and, after notice and a hearing, the Bankruptcy Court confirms such Plan, as modified, under § 1129.

21.7 Filing of Additional Documents.

The Debtor shall file with the Bankruptcy Court such agreements, instruments, pleadings, orders, papers, or other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

21.8 Successors and Assigns.

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors, and/or assigns of such Entity.

21.9 Setoffs and Recoupments.

The Debtor and the Liquidating Trust may, but shall not be required to, set off against or recoup from the payments to be made pursuant to the Plan in respect of a Claim, any claim of any nature whatsoever that the Debtor, the Liquidating Trust, or the Estate, as applicable, may have against the Holder of such Claim, but neither the failure to do so or the allowance of any Claim hereunder shall constitute a waiver or release of any such claim by the Debtor, the Liquidating Trust, or the Estate, against such Holder.

21.10 Tax Exemption.

Pursuant to § 1146, the issuance, transfer, or exchange of any security under the Plan, or the execution, delivery, or recording of an instrument of transfer pursuant to, in implementation of, or as contemplated by the Plan, including, without limitation, any transfers to or by the Debtor, if on the Effective Date, and the Liquidating Trustee, if after the Effective Date, of the Debtor's property in implementation of or as contemplated by the Plan (including, without limitation, any subsequent transfer of property by the Liquidating Trust) shall not be taxed under any state or local law imposing a stamp tax, transfer tax, or similar tax or fee. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

21.11 Securities Exemption.

To the extent the Liquidating Trust Interests are deemed or asserted to constitute securities, such interests and the issuance and distribution thereof shall be exempt from Section 5 of the Securities Act, if applicable, and from any state or federal securities laws requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security, and shall otherwise enjoy all exemptions available for distributions of securities under a plan in accordance with all applicable law, including without limitation, § 1145.

21.12 Implementation.

Upon Confirmation, the Debtor shall be authorized to take all steps and execute all documents necessary to effectuate the provisions contained in the Plan.

21.13 Record Date.

To the extent a "Record Date" is required for implementation of the Plan, the record date shall be the voting record date established by the Bankruptcy Court in the Conditional Approval and Procedures Order.

21.14 Certain Actions.

By reason of entry of the Confirmation Order, prior to, on, or after the Effective Date (as appropriate), all matters provided for under the Plan that would otherwise require approval of the shareholders, directors, officers, or other interest Holders of the Debtor under the Plan, including, without limitation, (i) the distributions of Cash pursuant to the Plan, (ii) the adoption, execution, delivery, and implementation of all contracts, leases, instruments, releases, and other agreements or documents related to the Plan, and (iii) the adoption, execution, and implementation of other matters provided for under the Plan involving the corporate structure of the Debtor, shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as appropriate), pursuant to applicable corporate laws, without any requirement of further action by the shareholders, directors, officers, or other interest Holders of the Debtor, irrespective of whether the Confirmation Order specifically authorizes any such action.

All Interests shall be deemed canceled, annulled, and extinguished on the Effective Date without any further notice or action by the Liquidating Trustee; provided, however, that the Liquidating Trustee shall have the power to take all actions on behalf of the Debtor that could have been taken by the shareholders, directors, officers, or other interest Holders of the Debtor prior to the Effective Date.

21.15 Substantial Consummation.

On the Effective Date, the Plan shall be deemed substantially consummated under §§ 1101 and 1127(b).

21.16 Waiver of Fourteen-Day Stay.

The Debtor requests as part of the Confirmation Order a waiver from the Bankruptcy Court of the 14-day stay of Bankruptcy Rule 3020(e) and, to the extent applicable, a waiver of the 14-day stay of Bankruptcy Rule 6004(h).

21.17 Governing Law.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof.

21.18 Entire Agreement.

On the Effective Date, the Plan and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, ~~all of which~~and any orders of the Bankruptcy Court inconsistent with the Plan, all of which will have become merged and integrated into the Plan and the Confirmation Order.

## SECTION 22
## RECOMMENDATION

The Debtor strongly recommends that all creditors receiving a Ballot vote in favor of the Plan. The Debtor believes that the Plan is in the best interests of creditors. The Plan as structured, among other things, allows creditors with Allowed Claims to participate in distributions believed to be in excess of those that would otherwise be available were the Chapter 11 Case dismissed or converted under chapter 7 of the Bankruptcy Code and minimizes delays in recoveries to creditors.

FOR ALL THE REASONS SET FORTH IN THIS COMBINED DS AND PLAN, THE DEBTOR BELIEVES THAT THE CONFIRMATION AND CONSUMMATION OF THE PLAN IS PREFERABLE TO ALL OTHER ALTERNATIVES. THE DEBTOR URGES ALL CREDITORS ENTITLED TO VOTE TO ACCEPT THE PLAN AND TO EVIDENCE SUCH ACCEPTANCE BY RETURNING THEIR BALLOTS SO THAT THEY WILL BE RECEIVED BY **4:00 P.M. EASTERN TIME ON DECEMBER 10, 2026**.

Dated: ~~October 30~~November [•], 2026

Respectfully submitted,

PACIFICA OF THE VALLEY CORPORATION
DEBTOR AND DEBTOR-IN-POSSESSION

*/s/ ~~Peter C. Chadwick~~DRAFT* ______
Peter C. Chadwick
Chief Restructuring Officer

| **Summary report:**<br>**Litera Compare for Word 11.4.0.111 Document comparison done on 11/9/2026 11:31:05 AM** | |
|---|---|
| **Style name:** Underline Strikethrough | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://dentonsus.cloudimanage.com/US_ACTIVE/138798195/20 | |
| **Modified DMS:** iw://dentonsus.cloudimanage.com/US_ACTIVE/138798195/24 | |
| **Changes:** | |
| Add | 300 |
| ~~Delete~~ | 203 |
| ~~Move From~~ | 4 |
| Move To | 4 |
| Table Insert | 0 |
| ~~Table Delete~~ | 0 |
| Table moves to | 0 |
| ~~Table moves from~~ | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 511 |